# In the Matter Of:

*TAMICA J. SMITHSON*

*-v-*

*LLOYD AUSTIN III*

_____

## Tamica Smithson, Volume I

*July 25, 2022*

_____



**DEPOSITION SERVICES**

800.869.0873 | www.StewartRichardson.com

*Reporting Driven by Excellence — Since 1975*

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

```
 1                  UNITED STATES DISTRICT COURT
 2                  SOUTHERN DISTRICT OF INDIANA
                         INDIANAPOLIS DIVISION
 3

 4
     TAMICA J. SMITHSON,              )
 5                                    )
               Plaintiff,             )
 6                                    )
               -v-                    )    Case No.
 7                                    )    1:21-CV-02193-JRS-MJD
     LLOYD AUSTIN III,                )
 8                                    )
               Defendant.            )
 9

10         The videoconference deposition upon oral

11   examination of TAMICA SMITHSON, a witness produced and

12   sworn remotely before me, Cascidy Bandyk, Notary

13   Public in and for the County of Porter, State of

14   Indiana, taken on behalf of the Defendant on Monday,

15   July 25, 2022, at 9:59 a.m., pursuant to the Federal

16   Rules of Civil Procedure.

17

18

19

20

21

22

23              STEWART RICHARDSON & ASSOCIATES
                Registered Professional Reporters
24                       (800) 869-0873

25
```

```
 1                        APPEARANCES

 2   FOR THE PLAINTIFF:
     (Via Zoom conference)
 3
            Pro Se
 4

 5   FOR THE DEFENDANT:
     (Via Zoom conference)
 6
            MS. RACHANA N. FISCHER, ESQ.
 7          U.S. ATTORNEY'S OFFICE
            10 West Market Street
 8          Suite 2100
            Indianapolis, Indiana  46204
 9          rachana.fischer@usdoj.gov

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF EXAMINATION

 2    EXAMINATION                                    PAGE

 3    BY MS. FISCHER:                                  4

 4
                   INDEX OF DEFENDANT'S EXHIBITS
 5
       NUM.                  DESCRIPTION            PAGE
 6
      Exhibit 1       EEO Declaration                22
 7    Exhibit 2       EEO Decision Letter            24
      Exhibit 3       Email                          48
 8    Exhibit 4       Photos                         55
      Exhibit 5       Email                          57
 9    Exhibit 6       Email                          75
      Exhibit 7       Email                          85
10    Exhibit 8       Coworker's EEO Declaration    125
      Exhibit 10      Second Amended Complaint      137
11

12               (Exhibit 9 was skipped.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          THE REPORTER:  My name is Cascidy Bandyk, an
 2      associate of Stewart Richardson & Associates,
 3      150 West Lincolnway, Valparaiso, Indiana.  Today's
 4      date is July 25, 2022.  The time is 9:59 a.m.
 5          This deposition is being held via
 6      videoconference.  The deponent is Tamica Smithson.
 7          Will counsel please identify themselves and
 8      any persons present with you for the record.
 9          MS. FISCHER:  Rachana Fischer for Defendant,
10      Lloyd Austin, and there's no one present with me.
11                  TAMICA SMITHSON,
12      called as a witness by the Defendant, having been
13      first duly sworn to tell the truth, the whole truth
14      and nothing but the truth, was examined and
15      testified as follows:
16  EXAMINATION
17  BY MS. FISCHER:
18  Q.  Ms. Smithson, could you state and spell your name
19      for the record.
20  A.  Tamica Jenice Smithson, T-a-m-i-c-a, J-e-n-i-c-e,
21      S-m-i-t-h-s-o-n.
22  Q.  And I know we met by Zoom before, but my name is
23      Rachana Fischer and I represent the defendant in
24      this action.  This is an opportunity for me to
25      learn all about your claims.  And I'm going be
```

```
 1            taking your deposition today.
 2                Before we get started, I want to go over some
 3            of the ground rules.  The oath that the court
 4            reporter administered is the same as if you were
 5            testifying in court and you have the same
 6            obligation to the tell the truth.  Do you
 7            understand that?
 8   A.   Yes, I do.
 9   Q.   The court reporter will be taking down everything
10            we say.  It's hard for her to understand if we're
11            talking over one another.  So I'd ask that you let
12            me finish my question before responding and I will
13            try to do the same for you.  Do you understand
14            that?
15   A.   Yes, I do.
16   Q.   She also can't take down any gestures or uh-huhs or
17            nods, so I'd ask that you make a verbal response to
18            my questions.  Do you understand that?
19   A.   Yes, I do.
20   Q.   I don't always ask perfect questions so if you
21            don't understand my question, please let me know
22            and I'll clarify.  If you answer my question, I'm
23            going to assume that you understood my question.
24            Do you understand that?
25   A.   Yes.
```

1    Q.   I want your best answers, so if you remember
2         something partway through the deposition and
3         remember that you didn't get something quite right,
4         feel free to interrupt me and let me know.  Do you
5         understand that?
6    A.   Yes.
7    Q.   And then, if at any point you need to take a break,
8         please let me know.  The only thing I'd ask is if
9         there's a question pending that you answer it
10        before taking a break.  Do you understand that?
11   A.   Yes.
12   Q.   Are you currently taking any medications or other
13        drugs?
14   A.   Yes, I am.
15   Q.   Could you tell me which medications you're taking?
16   A.   Candesartan, 16 milligrams for --
17   Q.   Oh.  Go ahead.
18   A.   -- for high blood pressure.  And Glaupax,
19        500 milligrams, for intracranial hypertension.
20   Q.   Anything else?
21   A.   Motrin, 800 -- 600 milligrams -- excuse me -- for
22        pain.
23   Q.   And is there anything else that you're taking?
24   A.   No.  No, I can't think of anything else that I'm
25        taking.

| | | |
|---|---|---|
| 1 | Q. | Would any of these medications affect your ability |
| 2 | | to testify today? |
| 3 | A. | No. |
| 4 | Q. | Is there anything else that would affect your |
| 5 | | ability to testify truthfully and accurately today? |
| 6 | A. | I don't know if this -- I don't think that this |
| 7 | | will affect my ability to testify, I'm just a |
| 8 | | little uncomfortable because I'm going through |
| 9 | | physical therapy. |
| 10 | | I had a fall so I probably will ask for, like, |
| 11 | | a five-minute break every hour, maybe. |
| 12 | Q. | Okay.  Yes.  Just let me know if you need breaks. |
| 13 | | And if there ever gets to be a point where you feel |
| 14 | | like you're no longer able to testify truthfully |
| 15 | | and accurately, please let me know. |
| 16 | A. | Thank you. |
| 17 | Q. | Is there any other reason you can think of that |
| 18 | | would make this a bad day for a deposition? |
| 19 | A. | Just -- you know, it's a lot -- there's a lot going |
| 20 | | on right now.  Again, I had a fall, so unexpected |
| 21 | | physical therapy and appointments. |
| 22 | | And then I had other appointments because I |
| 23 | | have a lot going on this summer. |
| 24 | Q. | Would any of that affect your ability to testify |
| 25 | | truthfully and accurately? |

```
 1    A.    No.

 2    Q.    Have you ever been deposed before?

 3    A.    Yes.

 4    Q.    And when was that?

 5    A.    Whenever you and I had our last depositions, in

 6          January or something.

 7    Q.    I believe that was in December of 2021 or around

 8          then.

 9    A.    Okay.

10    Q.    But besides the deposition I previously took of

11          you, have you ever been deposed before?

12    A.    Yes.  That would have been 2020, around May or

13          June.

14    Q.    What was the nature of that case?

15    A.    It was a federal lawsuit.  It was the same one, the

16          same case that you took deposition on in December,

17          I think you said, right?  I think it was December.

18    Q.    So was that the deposition you did in the

19          administrative process for filing in federal court?

20    A.    Yes.

21    Q.    Have you ever been deposed besides those two

22          depositions?

23    A.    I don't think so.  I'm not recalling any right now.

24    Q.    Have you ever testified in court or any other

25          proceeding?
```

```
1   A.   Yes.

2   Q.   When was that?

3   A.   Around 2002, 2003, 2004.  And that was in family

4        court.

5             And I'd like to go back to the question that

6        you asked before.

7   Q.   Sure.

8   A.   So -- no, maybe not.  I'll just continue this way.

9        I'll be fine.

10  Q.   So you testified in family court.  Was that related

11       to any kind of employment issue?

12  A.   No.  No, ma'am.

13  Q.   Have you ever been involved in a lawsuit other than

14       the two against the Department of Defense?

15  A.   Not that I can recall, no.

16  Q.   Have you ever been charged with or convicted of a

17       crime?

18  A.   No.

19  Q.   Did you review any documents concerning the case to

20       prepare for the deposition?

21  A.   No, I -- well, only the documents that you sent for

22       me to answer interrogatories or questions.  Those

23       were sent on the day that I traveled to the United

24       States so I've been trying to slowly go through

25       those.  That's it.
```

1   Q.   Can you tell me your full name?

2   A.   Tamica Jenice Smithson.

3   Q.   Have you ever been known by a different name?

4   A.   Tammy, a couple of people have called me Jenice.

5   Q.   Have you ever had a different last name?

6   A.   Welch.

7   Q.   And that's W-e-l-c-h?

8   A.   Yes.

9   Q.   What's your date of birth?

10   A.   August 15, 1972.

11   Q.   What's your current address?

12   A.   So CMR 411, Box 3668, APO, AE 09112.

13   Q.   Do you have any other address?

14   A.   Yes.

15   Q.   What's your other address?

16   A.   15465 Gallow Lane, Noblesville, Indiana 46060.

17   Q.   And are you married?

18   A.   Yes.  I'm sorry, and I have another address but

19        it's my physical address in Germany.

20   Q.   What's your other address?

21   A.   Sandstrabe or Sand Street, Vilseck, Germany 92249.

22   Q.   So I believe you testified that you're married; is

23        that correct?

24   A.   Yes.

25   Q.   And how many times have you been married?

| | | |
|---|---|---|
| 1 | A. | One. |
| 2 | Q. | So how long have you been married? |
| 3 | A. | 30 years. |
| 4 | Q. | And do you have children? |
| 5 | A. | Yes. |
| 6 | Q. | How many children do you have? |
| 7 | A. | Two. |
| 8 | Q. | What are their ages? |
| 9 | A. | 16 and 28. |
| 10 | Q. | Are they living at home? |
| 11 | A. | My 16-year-old is living at home. |
| 12 | Q. | Is she in school? |
| 13 | A. | Yes. |
| 14 | Q. | Where does she attend school? |
| 15 | A. | She's a homeschool student who takes classes at |
| 16 | | Vilseck High School. |
| 17 | Q. | Has she always been a homeschool student? |
| 18 | A. | No. |
| 19 | Q. | When did she start doing homeschool? |
| 20 | A. | Right before the pandemic, so February 2020. |
| 21 | Q. | Before that did she attend Vilseck High? |
| 22 | A. | No. |
| 23 | Q. | Where did she attend school before February 2020 |
| 24 | | when she became homeschooled? |
| 25 | A. | A local German school. |

```
 1   Q.   Has she ever attended Vilseck High?

 2   A.   She's always been attached to Vilseck High as a

 3        homeschool student.  So she's never been, like,

 4        only Vilseck High.  I've always had her registered

 5        as a homeschool student.

 6   Q.   Let's discuss your education.  After high school,

 7        where did you attend school?

 8   A.   After the military, I attended school at Niagara

 9        Community College; then, University of Buffalo;

10        then, Niagara University.  Took some courses at

11        Purdue University and Indiana University.

12             And then received a second master's from Grand

13        Canyon University.

14   Q.   So where did you obtain your bachelor's degree?

15   A.   University of Buffalo.

16   Q.   And then what degree did you obtain at Niagara

17        University?

18   A.   Secondary science education.

19   Q.   Is that a master's?

20   A.   Yes, it is.  You said Niagara --  I'm sorry.

21   Q.   Yes, I said Niagara.  What degree did you obtain

22        from Niagara?

23   A.   Okay.  I think that I'm forgetting University of

24        San Diego.  I've also taken courses there.  And it

25        seems like I'm forgetting some, but that's
```

| | | |
|---|---|---|
| 1 | | basically the most important, I think. |
| 2 | Q. | And then you mentioned you got a second master's at |
| 3 | | Grand Canyon.  What was that master's in? |
| 4 | A. | Principalship administration. |
| 5 | Q. | And when did you obtain that master's? |
| 6 | A. | 2008. |
| 7 | Q. | So for degrees, I have a bachelor's from University |
| 8 | | of Buffalo, a secondary science education master's |
| 9 | | from Niagara and principalship from Grand Canyon. |
| 10 | | Is that all of your degrees or is there |
| 11 | | anything I'm missing? |
| 12 | A. | An associate's degree from Niagara Community. |
| 13 | Q. | Is there anything else? |
| 14 | A. | Not that I can think of. |
| 15 | Q. | So you mentioned you were in the military.  Did you |
| 16 | | do your military service before pursuing higher |
| 17 | | education? |
| 18 | A. | Yes. |
| 19 | Q. | When did you serve in the military? |
| 20 | A. | From 1990 until 1995. |
| 21 | Q. | Where were you located when you were serving in the |
| 22 | | military? |
| 23 | A. | That was my active duty time.  I have to make that |
| 24 | | correction.  I served all the way until 1998 |
| 25 | | because I had reserved time.  So what was the |

```
 1           question?  I'm sorry.
 2    Q.     Where were you stationed when you served in the
 3           military?
 4    A.     Korea was my first duty station.  Virginia Beach --
 5           no.  No.  I was stationed in Virginia Beach, but my
 6           station was Fort Eustis, Virginia, was my second
 7           duty.  And my final was Fort Bragg, North Carolina.
 8                So Camp Long, Korea; Fort Eustis, Virginia;
 9           and Fort Bragg, North Carolina.
10    Q.     What was your role in the military?
11    A.     I was a dental assistant.
12    Q.     Did you have dental assistant training or did the
13           military train you to do that role?
14    A.     The military trained me.
15    Q.     What was the reason that you left the military?
16    A.     To go to school.
17    Q.     So I'm going use the term DoDEA throughout this
18           deposition.  That stands for Department of Defense
19           Education Activity.  If I say DoDEA, do you
20           understand what I mean?
21    A.     Yes.
22    Q.     When did you join DoDEA?
23    A.     2004.
24    Q.     How long after you completed your education did you
25           join DoDEA?
```

```
 1   A.   I completed my education -- I continued after I
 2        joined DoDEA.
 3   Q.   How long did you work before joining DoDEA in the
 4        private sector -- or private sector is wrong for
 5        teaching.  But how long did you work outside of the
 6        federal government before joining DoDEA?
 7   A.   Only with teaching or with other things as well?
 8   Q.   With other things as well.
 9   A.   Off and on from 1996 or 1997 until 2003 -- no --
10        yeah, until 2003.  And then once I received my
11        master's, consistently from 2000 -- no.  Hold on.
12        I'm sorry.  Off and on from 19- -- so 1995 -- hold
13        on.  I'm sorry.
14            Off and on from 19- -- because I didn't work
15        when I started school.  From 1997 until 2002.  And
16        then when I received my master's, consistently from
17        2002 until I was hired with DoDEA.
18   Q.   And what types of employment were you doing between
19        1995 and 2004?
20   A.   I was a security guard.  I was a program director
21        for United Cerebral Palsy of New York.  I was a
22        substitute teacher.
23   Q.   What teaching jobs did you have before joining
24        DoDEA?
25   A.   I was a substitute teacher in Niagara Falls, in
```

| | | |
|---|---|---|
| 1 | | Buffalo and Sanborn, New York.  And I was a -- no, |
| 2 | | I wasn't a substitute teacher.  I worked for |
| 3 | | McGraw -- no, that wasn't teaching though.  Sorry. |
| 4 | | Then the Indianapolis Public School system.  I was |
| 5 | | never a substitute teacher; I always taught there. |
| 6 | | So from 2002 until 2004. |
| 7 | Q. | So is it fair to say that after leaving the |
| 8 | | military you pursued your education and you taught |
| 9 | | full-time for two years in the Indianapolis Public |
| 10 | | School system before joining DoDEA? |
| 11 | A. | Yes. |
| 12 | Q. | What was your title when you joined DoDEA? |
| 13 | A. | Teacher, secondary teacher, science teacher. |
| 14 | Q. | Secondary, you mean? |
| 15 | A. | That would be middle school as well. |
| 16 | Q. | Where were you located when you were first hired |
| 17 | | with DoDEA? |
| 18 | A. | Where did they place me or where did they hire me |
| 19 | | from? |
| 20 | Q. | Where did they place you?  Where was your first |
| 21 | | teaching assignment? |
| 22 | A. | Ankara, Turkey. |
| 23 | Q. | How long were you in Turkey? |
| 24 | A. | Two years. |
| 25 | Q. | So that would have been from 2004 to 2006? |

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | And then what was your next posting? |
| 3 | A. | Vilseck, Germany. |
| 4 | Q. | And that would have been from 2006 to present; is |
| 5 | | that correct? |
| 6 | A. | Yes. |
| 7 | Q. | What is your current title? |
| 8 | A. | Secondary teacher, science teacher. |
| 9 | Q. | Has your title ever changed since you have worked |
| 10 | | with DoDEA? |
| 11 | A. | No.  Outside of sponsoring organizations, my title |
| 12 | | has remained the same. |
| 13 | Q. | What do you mean by sponsoring organizations? |
| 14 | A. | Like, if I were, like, a -- if I were a sponsor of |
| 15 | | a student organization at school or the |
| 16 | | representative for human civil rights within the |
| 17 | | district, different things like that. |
| 18 | | But my title for work has never changed.  I |
| 19 | | have always been a secondary science teacher. |
| 20 | Q. | So if I'm understanding it correctly, your primary |
| 21 | | title has always stayed the same, but you, from |
| 22 | | time to time, take on additional titles or roles |
| 23 | | within your organization; is that correct? |
| 24 | A. | Yes. |
| 25 | Q. | What is your current salary? |

1   A.   About 90,000.

2   Q.   Has your salary changed during your time at DoDEA?

3   A.   Yes.

4   Q.   How has it changed?

5   A.   It has increased.  By natural step, it increases.

6   Q.   What was your initial salary when you started at

7        DoDEA?

8   A.   I don't recall right now.  I believe that I was a

9        Step 3.

10  Q.   What are your current responsibilities?

11  A.   Prepare lessons for my students.  Right now, the

12       preparation is a bit different because I work in

13       the virtual school.

14            Can you hold on one minute, please?

15  Q.   Sure.

16  A.   Okay.  Thank you.  Did you ask me a question?  I'm

17       sorry.

18  Q.   You were talking about what your current

19       responsibilities are and you were telling us about

20       the virtual school.

21  A.   And so to prepare -- so since I'm in the virtual

22       school, it's to also make sure that students

23       understand the virtual lessons that are given to

24       them, to provide supplements for those lessons if

25       they don't understand them, meet with students and

| | | |
|---|---|---|
| 1 | | parents and administrators for meetings. |
| 2 | | Keep open communication with parents, update |
| 3 | | myself and know the technology that we're supposed |
| 4 | | to use in the virtual school. |
| 5 | Q. | Have your responsibilities ever changed during the |
| 6 | | time you've been at DoDEA? |
| 7 | A. | Yes.  They changed when I went from the brick and |
| 8 | | mortar to the virtual school.  There were |
| 9 | | responsibilities -- more responsibility as far as |
| 10 | | technology went. |
| 11 | | There's an additional component to my |
| 12 | | assessments -- my words are not coming right now -- |
| 13 | | to my progress, the evaluations. |
| 14 | | So before I had five crucial components.  Now |
| 15 | | I have six crucial components.  Over the years, |
| 16 | | while I was in brick and mortar, the crucial |
| 17 | | components changed just a little bit. |
| 18 | | But for the most part, my responsibilities |
| 19 | | have been fairly consistent. |
| 20 | Q. | So let's talk about the virtual school.  When did |
| 21 | | your detail to the virtual school begin? |
| 22 | A. | In fall -- in 2020.  The beginning of the school |
| 23 | | year, 2020. |
| 24 | Q. | So would that be around August? |
| 25 | A. | August. |

| | | |
|---|---|---|
| 1 | Q. | How did you get the detail to the virtual school? |
| 2 | A. | I had a reasonable accommodation that was no longer |
| 3 | | being honored at my brick and mortar so I applied |
| 4 | | when the opportunity came about to the virtual |
| 5 | | school. |
| 6 | Q. | Is the virtual school something you wanted to do? |
| 7 | A. | I never thought about the virtual school before. |
| 8 | | It didn't cross my mind. |
| 9 | Q. | I think the question is more, you applied for this, |
| 10 | | it wasn't something that was assigned to you; is |
| 11 | | that correct? |
| 12 | A. | Exactly.  I applied for it when it was offered |
| 13 | | because of COVID. |
| 14 | Q. | And is it correct that you're still teaching in the |
| 15 | | virtual school? |
| 16 | A. | Yes.  There was a short disruption in that teaching |
| 17 | | for one week in January of 2021 when I was |
| 18 | | reassigned to the brick and mortar.  And then I |
| 19 | | questioned that reassignment and I was placed back |
| 20 | | into the virtual school. |
| 21 | Q. | Who did you question the reassignment to? |
| 22 | A. | I'd have to find the emails. |
| 23 | Q. | Who reassigned you -- oh.  Go ahead. |
| 24 | A. | It would have been to, like, the DE -- oh, goodness |
| 25 | | -- diversity management. |

1    Q.    Who reassigned you to the brick and mortar?

2    A.    I'm not sure.

3    Q.    So during -- while you've been detailed to the

4          virtual school, do you have face-to-face

5          interactions with the employees at Vilseck High

6          School?

7    A.    Sometimes.

8    Q.    How often do you go into the high school?

9    A.    As least as possible.  It's not a place that I like

10         to visit.  This past year, maybe three times,

11         possibly four.

12   Q.    So in the past year, you've been back to Vilseck

13         approximately three to four times a year; is that

14         correct?

15   A.    This past year.  From 2020 -- school year 2021 to

16         2022.  2020 to 2021, I visited more often but it

17         was usually after all of my colleagues had left the

18         building so that I could make copies of materials

19         or, you know, do things within the classroom that I

20         was still assigned.  But I did not want contact

21         with many of my colleagues in the building.

22   Q.    Who do you report to during the detail?

23   A.    The assistant principal of the virtual school -- of

24         my district in the virtual school.

25   Q.    So is that different from the principal of Vilseck

| | | |
|---|---|---|
| 1 | | High School? |
| 2 | A. | Yes.  However, I, usually depending on the |
| 3 | | correspondence, will cc the principal at Vilseck |
| 4 | | High School depending on what -- like, if I take |
| 5 | | leave or something like that or if I'm going to |
| 6 | | work outside of my home, something like that. |
| 7 | | I'll let both the principal of Vilseck High |
| 8 | | School and the assistant principal in the |
| 9 | | virtual school know. |
| 10 | Q. | Who is the assistant principal at the virtual |
| 11 | | school? |
| 12 | A. | My assistant principal this past year was -- why am |
| 13 | | I not remembering names here?  Hold on one second. |
| 14 | | Let me think for a second.  Dr. Lohmeier, Dr. Keri |
| 15 | | Lohmeier. |
| 16 | Q. | Keri Lohmeier.  Where is she located? |
| 17 | A. | In Sembach, Germany, I believe. |
| 18 | Q. | Let's look at Exhibit 1.  And we're going to have |
| 19 | | Exhibit 1 open for most of the deposition.  You |
| 20 | | might want to just leave that -- |
| 21 | | (Defendant's Exhibit 1 marked.) |
| 22 | A. | Wait.  I'm sorry.  Exhibit 1 from -- |
| 23 | Q. | I emailed you exhibits this morning.  Do you have |
| 24 | | them? |
| 25 | A. | I didn't see.  Hold on one second.  So I need to |

| | | |
|---|---|---|
| 1 | | pull them up on my email.  I do see several.  Okay. |
| 2 | | Exhibit 1. |
| 3 | Q. | Yes. |
| 4 | A. | Okay. |
| 5 | Q. | Do you recognize this document? |
| 6 | A. | Yes.  But you know, now that I'm reading something, |
| 7 | | let me put my other glasses on.  This is a new |
| 8 | | prescription so it's a little blurry.  I'm just |
| 9 | | trying to get used to it.  Yes. |
| 10 | Q. | What is this document? |
| 11 | A. | It's one of my interrogatories, I believe. |
| 12 | Q. | So I'll represent that this is the Declaration made |
| 13 | | in the EEO case that's the basis for this action. |
| 14 | | Did you make the statements in this document |
| 15 | | under the penalty of perjury? |
| 16 | A. | Yes, I did. |
| 17 | Q. | Are these the claims that you're raising in this |
| 18 | | action? |
| 19 | A. | Let me read which one it is first.  I'm sorry. |
| 20 | | Looking for a date.  Sorry.  So this was signed |
| 21 | | 04/2020.  And the other one was prior to that so, |
| 22 | | yes. |
| 23 | Q. | I'm going start with the first claim.  And so the |
| 24 | | claims here refer back to the claims accepted in |
| 25 | | your EEO.  So let's start with the first claim, 1A. |

```
 1            It's on page 5 of this document.
 2                And to get this specific claim, we're going to
 3            have to look at Exhibit 2.  So if you could pull up
 4            Exhibit 2.
 5                (Defendant's Exhibit 2 marked.)
 6     Q.    Do you recognize Exhibit 2?
 7     A.    I recognize the information in it, I'm not sure
 8            what is the document.
 9     Q.    I'm going to represent to you that is the final
10            agency decision on your EEO case that forms the
11            basis of this lawsuit.
12     A.    Okay.
13     Q.    And so if you look at Claim 1 on Exhibit 2 -- or
14            Claim A, it says "From early to late
15            September 2019, coworkers allegedly walked in front
16            of Complainant's seventh period class rudely while
17            Complainant was performing a microscope use
18            demonstration for the class."
19                Who were the coworkers who you refer to in
20            Claim A?
21     A.    In Claim A, when I was performing microscope, it
22            was Ms. Natanaun -- I think is how you pronounce
23            her name.  I don't want to pronounce it
24            incorrectly.  And I believe she was a substitute
25            teacher.
```

```
 1            Ms. Ester Franklin who was a counselor at the
 2       school.  It was a specialty counselor.  I can't
 3       remember exactly.  I think it's drug and alcohol.
 4            I want to say, but I'm not quite sure -- I
 5       would have to look back at the documents if
 6       Mr. Johnson was one of the individuals as well.  He
 7       did interrupt me.
 8            I'm not sure right now if it was during the
 9       microscope.  I'm not sure if that was what I was
10       doing at that time.
11  Q.   So you mentioned Ms. Natanaun, Ms. Franklin and
12       Mr. Johnson.  Why did they walk in front of your
13       class?
14  A.   I know why they said they walked in front -- well,
15       I don't -- I would have to look back at the
16       paperwork.  But I'm not quite sure exactly why.
17            I believe Mr. Johnson said that it was to
18       check some technology and compare it to
19       Mr. Krebsbach's technology on this one occasion.
20       He's done it other times as well.
21            Ms. Franklin wanted to see a student.  And
22       Ms. -- the substitute, Ms. Natanaun, she was
23       actually -- she wasn't a substitute.  She was in my
24       class -- well, I think she was substituting for a
25       special ed individual.
```

 1            And so she was in my classroom working with me

 2       with other students at the time I was giving

 3       students instruction on how to operate the

 4       microscope.

 5            And out of nowhere -- it was just during my

 6       instruction, she walked from the back of the class,

 7       came to the middle of the class and just walked in

 8       front of me as I speaking with a student.  And that

 9       was very inappropriate.

10  Q.   So she was in your class for some other reason?

11  A.   She was in my class monitoring a special ed

12       student.

13  Q.   Did you say anything to them about it?

14  A.   I told her that I was instructing at the time and

15       I'll see her after I'm finished.

16  Q.   So if you look at Exhibit 1 -- and I'm on page 5 of

17       Exhibit 1 under Claim 1A.  You were asked, "How

18       many times approximately did coworkers walk in

19       front of Complainant's seventh period class while

20       she was performing a microscope use demonstration

21       for the class?"

22            You responded, "Twice; during microscope

23       instruction, Ms. Franklin and Ms. Natanaun,

24       substitute for SPED.  Mr. Johnson interrupted my

25       class twice during the same class; and once after I

```
 1            told him that I was instructing students.
 2                 When Mr. Johnson entered the second time, Ms.
 3            Villanueva entered as well.  I've already informed
 4            Ms. Villanueva that class should not be interrupted
 5            during the first and last ten minutes."
 6                 Does that accurately describe what happened?
 7    A.      That was one particular day that -- right now I
 8            can't remember if that all took place on the same
 9            day.  Mr. Johnson and Ms. Villanueva were
10            definitely the same day.
11                 Ms. Natanaun and Ms. Franklin were different
12            days.  And because this happened throughout -- I
13            was having interruptions consistently throughout,
14            like, from the beginning of the year.
15                 Yeah, I was just having consistent
16            interruptions.  So the issues that I just spoke
17            with you about, Mr. Johnson and Ms. Villanueva,
18            those were definitely the same day.
19                 But the other incidents were different days
20            I'm pretty sure, and I just can't remember how they
21            were spaced out now.
22    Q.      We didn't talk about Ms. Villanueva, why did she
23            say she was in your class?
24    A.      She -- I can't remember.  I don't know.  Most
25            likely to see a student though.
```

1    Q.   What was her role at the school?

2    A.   She was a guidance counselor.

3    Q.   So you say on page 6 of your Declaration "I believe

4         that they were walking into my classroom to cause a

5         distraction in my teaching, to cause anxiety while

6         I am giving instruction, to be disrespectful and

7         inconsiderate, especially after I've asked not to

8         be interrupted during instruction.  I am almost

9         positive that my colleagues are making attempts to

10        cause me to have a negative response in the

11        presence of my students."

12            What was the basis for this belief?

13   A.   They had become aware of my medical situation for

14        some reasons that were beyond my control.

15   Q.   Why do you believe they were aware of your medical

16        situation?

17   A.   My records, a couple of years ago there -- I'm not

18        sure when, actually, but it had been a while --

19        were improperly stored and office personnel had

20        access to the records.  And our office personnel

21        had a high rotation rate.

22            So there were at least two or three different

23        persons in position that could see my records

24        during that time.  None of them should have been

25        able to.  One I know for sure saw the records

1    because she told me that she was rearranging my
2    personnel file.
3         So my records were improperly stored in
4    violation of my PIIH -- PIIH.  My speech is kind
5    of -- I'm not doing well right now, but I'll
6    continue.
7         My PIIH was violated.  And what other reason?
8    And because after my reasonable accommodations were
9    taken away, my symptoms were exacerbated and it
10   became very apparent to everyone that I had medical
11   issues because I wasn't being properly accommodated
12   anymore.
13   Q.  Let's take a step back.  What is your race,
14       Ms. Smithson?
15   A.  I am an American of African decent, a descendant of
16       slaves.
17   Q.  And what is your disability?
18   A.  Vertigo, ADHD, intracranial hypertension,
19       hypertension, high blood pressure, tinnitus -- I
20       forgot to write that on something, tinnitus.
21       There's several neurological conditions and high
22       blood pressure.
23   Q.  So to go back to the question, you said in your
24       statement "I am almost positive that my colleagues
25       are making attempts to cause me to have a negative

| | | |
|---|---|---|
| 1 | | response in the presence of my students." |
| 2 | | So if I'm understanding your answer, it's |
| 3 | | because you believe they had access to your medical |
| 4 | | records and that it was obvious that you were |
| 5 | | suffering from a disability; is that correct? |
| 6 | A. | Yes. |
| 7 | Q. | And is there any other reason why you believe that |
| 8 | | your colleagues were intentionally trying to cause |
| 9 | | you to have a negative response in the presence of |
| 10 | | your students? |
| 11 | A. | So there had been complaints about me entering |
| 12 | | late.  But that -- there had been complaints about |
| 13 | | my entering -- not late but on a flexible schedule |
| 14 | | because that's what I had for my accommodations so |
| 15 | | colleagues had complained about that. |
| 16 | Q. | So Ms. Natanaun, Ms. Franklin, Mr. Johnson or |
| 17 | | Ms. Villanueva, were they the ones who made the |
| 18 | | complaints? |
| 19 | A. | I'm not sure exactly who made the complaints, but |
| 20 | | there were complaints.  Well, I do know of a |
| 21 | | couple, but I'm not sure exactly, like, how -- all |
| 22 | | of them who made the complaints -- |
| 23 | Q. | Who made the complaints? |
| 24 | A. | -- or submitted the complaints.  I'm sorry. |
| 25 | Q. | Who made the complaints? |

```
 1   A.   I know that -- I would just say -- I won't say,
 2        like, as far as if someone told me.  I will say
 3        what I saw in writing.  I saw that Ms. Holt had
 4        made a complaint.
 5   Q.   And what was the complaint?
 6   A.   I can't remember exactly.  It had to do with my
 7        classes being covered.
 8   Q.   Who did she make a complaint to?
 9   A.   What I saw in writing was that she made the
10        complaint during the investigation.
11   Q.   So during the EEO investigation?
12   A.   Yes.
13   Q.   So she was being asked about your lawsuit and then
14        she said something about your classes being
15        covered, but she didn't complain to the high school
16        administration; is that correct?
17   A.   There were complaints before the investigation, but
18        again, that's -- I can't remember exactly who said
19        what.
20   Q.   But you don't know if Ms. Natanaun, Ms. Franklin,
21        Mr. Johnson or Ms. Villanueva ever complained about
22        you?
23   A.   I don't know that Ms. Natanaun ever complained
24        about me.
25   Q.   What about the rest?
```

```
 1   A.   It's possible.

 2   Q.   Do you know one way or the other?

 3   A.   I would have to -- I don't know.  I can't -- I'd

 4        have to look through the ROIs to refresh my memory.

 5   Q.   Do you believe that your coworkers walking in front

 6        of your classroom was based on race?

 7   A.   Yes.

 8   Q.   What is the basis for this belief?

 9   A.   I believe that race is the root of everything.  So

10        it's the root of the mistreatment for disability

11        and reasonable accommodation and knowing that my

12        attention needs to be focused on my class but

13        continuing to interrupt the class anyway.

14             I believe that race is the root.  They

15        wouldn't do it -- none of this would have come

16        about if it weren't for race.  Right now, I can't

17        articulate too much why I believe so, but I do.

18        And so I'll have to think about that more.

19   Q.   Do you believe your coworkers walking in front of

20        your class is based on disability?

21   A.   Yes.

22   Q.   What is the basis for this belief?

23   A.   It was because even after they knew about my

24        disability, then the incidents increased in

25        frequency.
```

1   Q.   Do you have any other basis for your belief that

2          they were walking in front of your class because of

3          disability?

4   A.   There may have been some comments but I would have

5          to, again, look through the ROI to remember.

6   Q.   Do you believe your coworkers walking in front of

7          your class was based on retaliation for prior

8          protected activity?

9   A.   Yes.

10   Q.   What's the basis for that belief?

11   A.   I just believe it.  I can't articulate it at this

12          time.

13   Q.   Let's turn to your second claim.  So if you look at

14          Exhibit 2, it's Claim B.  "On September 30, 2019,

15          Complainant's coworker allegedly walked behind her

16          desk uninvited and placed her hand on Complainant's

17          shoulder while Complainant was in the midst of

18          instructing her biology class."

19   A.   I'm sorry.  Where are you reading from?

20   Q.   I'm reading from Exhibit 2 and it's Claim B.

21   A.   Exhibit 2.  What page?  I'm sorry.

22   Q.   It's the first page.

23   A.   Okay.

24   Q.   So Claim B is "On September 30, 2019, Complainant's

25          coworker allegedly walked behind her desk uninvited

```
 1         while Complainant was in the midst of instructing
 2         her biology class."
 3             Who walked behind your desk?
 4    A.   That was Ms. Michele Wolff.
 5    Q.   What was her role at the school?
 6    A.   I believe it's administrative assistant.  And she
 7         still is in that role.
 8    Q.   What does the administrative assistant do?
 9    A.   I don't know.  I know that we put in orders for if
10         we need things done in our classrooms to her.
11         There are several things that we will ask her for,
12         if teachers need, she makes arrangements.
13             I think she communicates, you know -- yeah, I
14         don't want to tell you what her role is.  I'm not
15         sure.  I just know what teachers request from her.
16             So if we need things done in our classroom,
17         then she's the person who gets the work order.
18         That's all I can think of right now.
19    Q.   Why was she in your class on September 30, 2019?
20    A.   I had been communicating with Ms. Wolff through
21         email about the placement of a hydroponic system so
22         that I could instruct one of my -- well, a couple
23         of my classes.
24             And she was reluctant in placing the
25         hydroponic -- just allowing me to use it at all.
```

1      But I wanted it placed into a classroom that was

2      not being used and she was reluctant.  She didn't

3      want to do that.

4           And also did not want me to use it in the

5      classroom that it was in, but that's where it was

6      used before by the other teacher.

7   Q.  Why did she walk behind your desk?

8   A.  When she walked behind my desk, she said that she

9      came about the hydroponic system.  She just came

10     behind about the hydroponic system -- oh -- to tell

11     me that she could not place it.

12          I'd have to look back at what I wrote because

13     that was disturbing as well because she not only

14     walked behind my desk while I was actually talking

15     to my students -- I was sitting down, but she

16     walked behind my desk and put her hip against my

17     shoulder.

18          And so that was uncomfortable for several

19     reasons.  But there was also a sign on my desk for

20     her not to walk behind it.  So she shouldn't have

21     done that anyways.

22          So there was just a lot of touching going on

23     when she walked behind my desk and it was

24     inappropriate in front of my students.

25          I can't remember right now.  Let me think for

|    |    |                                                        |
|----|----|--------------------------------------------------------|
| 1  |    | a second.  Your question was why did she walk          |
| 2  |    | behind my desk?                                        |
| 3  | Q. | Yes.                                                   |
| 4  | A. | She walked behind my desk to tell me that she could    |
| 5  |    | not arrange for the hydroponic system to be placed     |
| 6  |    | into my classroom.  And she stated -- she asked me     |
| 7  |    | if I expected her to move the system.  But yeah,       |
| 8  |    | something like that.                                   |
| 9  | Q. | What did you say to her?                               |
| 10 | A. | I told her that I was instructing my class and I       |
| 11 |    | would speak with her later.  Because we were           |
| 12 |    | communicating on email so there was no reason for      |
| 13 |    | her to come into my class.  We didn't make             |
| 14 |    | arrangements for her to come into my classroom         |
| 15 |    | while I was instructing.                               |
| 16 | Q. | So let's look at Exhibit 1.  And on page 6 of          |
| 17 |    | Exhibit 1 under claim 1B, you write "We had been       |
| 18 |    | communicating through email concerning the            |
| 19 |    | hydroponic system.  She disrupted the learning when    |
| 20 |    | she entered my class and walked directly behind my     |
| 21 |    | desk while I was speaking with my students.            |
| 22 |    | "She stood directly over my shoulder, leaned           |
| 23 |    | against me with her hips.  She placed her hand on      |
| 24 |    | my shoulder and exited after I told her I would        |
| 25 |    | speak to her later about the hypotonic system" -- I    |

```
 1          think you mean hydroponic system?

 2    A.    Hydroponic, yeah.

 3    Q.    She stated, "Yes, we can speak later."  Does that

 4          accurately characterize what happened?

 5    A.    It sounds like the gist of it.

 6    Q.    Do you believe that Ms. Wolff going behind your

 7          desk and putting her hand on your shoulder was

 8          based on race?

 9    A.    I'm not sure about that.  I think everything is

10          based -- is the root of race.  But I'm not sure

11          if -- I'm not sure if it was directly because of my

12          race.

13    Q.    Do you believe Ms. Wolff putting her hand on your

14          shoulder and walking behind your desk was based on

15          disability?

16    A.    Yes.

17    Q.    What's the basis for that belief?

18    A.    Again, by this time, because of my complaints and

19          because of my colleagues' knowledge of my

20          condition.

21    Q.    Do you believe Ms. Wolff walking behind your desk

22          and putting her hand on your shoulder was based on

23          retaliation for prior protected activity?

24    A.    Yes.

25    Q.    What's the basis for that belief?
```

1    A.   Oh.  I'm so sorry.  For prior protected --
2         possibly.
3    Q.   What's the basis for that belief?
4    A.   I'm sorry.  Can you repeat the question again?
5    Q.   Sure.
6    A.   I was still thinking about the hands being -- hips
7         on me.  If you can rephrase?
8    Q.   Do you believe Ms. Wolff walking behind your desk
9         and putting her hand on your shoulder was based on
10        retaliation for prior protected activity?
11   A.   Yes, I do.
12   Q.   What's the basis for that belief?
13   A.   I can't articulate that right now, but I do believe
14        so.
15   Q.   Did you report Ms. Wolff for putting her hand on
16        your shoulder?
17   A.   Yes.
18   Q.   Who did you report it to?
19   A.   Mr. Villarreal.
20   Q.   What was his response?
21   A.   I can't remember at the time.  It was not something
22        that I liked.  I think it was -- I can't remember
23        exactly.  I can't remember exactly.
24   Q.   Let's go back.  Let's talk about the interruptions
25        of Ms. Franklin, Ms. Natanaun, Mr. Johnson and

| 1 | | Ms. Villanueva.  Did you report those to anyone? |
|---|---|---|
| 2 | A. | Yes, Ms. Franklin.  I also spoke with Mr. -- I |
| 3 | | reported everything I'm pretty sure.  Ms. Franklin. |
| 4 | | I also spoke with Mr. Villarreal.  However, she had |
| 5 | | already spoken with Mr. Villarreal. |
| 6 | Q. | What was Mr. Villarreal's response? |
| 7 | A. | Again, it was something that I didn't like.  I |
| 8 | | think that he should have just spoken with her |
| 9 | | about not interrupting the class.  I can't remember |
| 10 | | exactly because I spoke with him when she walked |
| 11 | | into my class crying after I asked her not to |
| 12 | | interrupt my class. |
| 13 | | So now I ask individuals not to interrupt my |
| 14 | | class and they've increased the -- I call it -- |
| 15 | | it's aggression to me to have a woman, small woman, |
| 16 | | cry because I ask her not to interrupt my class. |
| 17 | Q. | We'll discuss that a little later.  But I just want |
| 18 | | to go back.  So you don't remember what |
| 19 | | Mr. Villarreal's response was to your report? |
| 20 | A. | No.  I just know that I didn't like it.  I thought |
| 21 | | that he could have done more, especially knowing |
| 22 | | the complaints that I've had in the past. |
| 23 | | And this was right -- fell right in line with |
| 24 | | the complaints that I had in the past.  And, again, |
| 25 | | he was doing nothing.  It was basically gaslighting |

| | |
|---|---|
| 1 | all of my concerns, and therefore, my colleagues |
| 2 | continued. |
| 3 | Q.  Let's turn to claim three on Exhibit 2 -- or Claim |
| 4 | C.  You write -- |
| 5 | A.  What exhibit?  I'm sorry. |
| 6 | Q.  Exhibit 2.  Sorry. |
| 7 | A.  I'm sorry. |
| 8 | Q.  Let's go back to Exhibit 2 and look at Claim C. |
| 9 | A.  Claim C, okay. |
| 10 | Q.  You write "On September 30, 2019, Complainant's |
| 11 | coworker allegedly refused to move the hydroponic |
| 12 | system for her." |
| 13 | Who was the coworker? |
| 14 | A.  So "On September 30th, Complainant's coworker |
| 15 | allegedly refused to move" -- that's Ms. Wolff. |
| 16 | That's Ms. Wolff. |
| 17 | Q.  Can you describe the hydroponic system for me? |
| 18 | A.  So it's a system where water moves through tubes. |
| 19 | So the way this one is organized -- I've worked |
| 20 | with another one before; it was a little bit |
| 21 | different. |
| 22 | But this one was on a slant.  I think it was a |
| 23 | really good model.  And so the tubing had water. |
| 24 | The water could come up.  I had never worked with |
| 25 | this one before but I saw it, the setup. |

```
1              And the water should be able to come up and

2         irrigate the several plants at a time.  And so it

3         would have allowed, like, several of my classes to

4         perform an experiment, if I could get it working.

5              And so I would just have had to engineer it a

6         little bit to hopefully get it working, but I was

7         never allowed to really even look at it and -- to

8         work with it rather.  I saw it but I wasn't allowed

9         to actually work with it.

10   Q.   Why did you want it in your classroom?

11   A.   Oh.  I did not want it in my classroom.  That was

12        part of the issue because I don't think that it

13        would have been safe in my classroom.

14             I did look to consider it being in my

15        classroom, but looking at my classroom, because

16        my -- I could have 20-something students in my

17        class.

18             And then all of the classes would not be

19        utilizing that system and it might -- the system

20        could be in the way of other laboratories that I

21        had to conduct, like for my chemistry class, for

22        example, who would not be using the hydroponic

23        system.

24             So there was a classroom that was empty.  It

25        belonged to Ms. Wolff when she was at the school --
```

```
 1          I mean, Ms. Holt.  Excuse me.  The classroom
 2     belonged to Ms. Holt when she was at the school.
 3          So I wanted to have the system moved into her
 4     classroom from the classroom that it was in.  And
 5     that classroom had now belonged to the counselor,
 6     Ms. Franklin.
 7          So I wanted the system moved from
 8     Ms. Franklin's room because I didn't want to bother
 9     her and, you know, she had students that would come
10     to see her in her room.  It was right around the
11     corner from my room.
12          So I wanted it moved from her room to
13     Ms. Holt's old room because we were using it for
14     storage and there was enough room in there for it.
15  Q.  How large is the hydroponic system?
16  A.  I never measured the dimensions.  As I walked
17     across, I had to take quite a few steps so
18     probably -- maybe four or five steps to walk across
19     the -- that would be the length of it, the base
20     that was on the floor.  So about four or five steps
21     to walk across.
22          I'm trying to think when I went to look at it.
23     And then from the front to the back, because it was
24     on a slant, it was probably two steps back.  And it
25     was taller than I am, so maybe 6 feet tall.
```

```
 1              It's been a while so I can't remember.  I'm
 2         just trying to give you an idea of how large it
 3         was.  It was too large for my room.  It would have
 4         definitely been a safety hazard.
 5    Q.   Were there any challenges with moving a system that
 6         large?
 7    A.   Well, for things like that, that's why we contact
 8         Ms. Wolff so that she can arrange for anything that
 9         has to be maybe bolted into a wall, which I'm not
10         sure if that had to be.  But it was a large system
11         that needed someone else to move it.
12              So I would never have students do it.  I would
13         never do it.  And I don't expect Ms. Wolff to do it
14         either, not herself.  But to arrange for it, yes.
15    Q.   I'm going to ask a question that's a little bit of
16         a tangent.  So you said you were detailed to the
17         virtual school in August of 2020; is that correct?
18    A.   (Witness nods head.)
19    Q.   What happened to Vilseck High?  So the pandemic
20         started in March 2020 and then you were on summer
21         break.  I'm not sure if you guys start in May or
22         June.
23              But what happened between March 2020 and May
24         or June 2020 when the school year ended?  Were you
25         guys in person or did it close?
```

|    |    |                                                          |
|----|----|----------------------------------------------------------|
| 1  |    | Obviously, I know it happened to schools in              |
| 2  |    | the States, but I don't know what happened to            |
| 3  |    | schools in Germany.                                      |
| 4  | A. | From when the pandemic started -- I think it was         |
| 5  |    | March 13th or 15th.  I think it was Friday the           |
| 6  |    | 13th.  We were told that we would be going to            |
| 7  |    | remote learning.                                         |
| 8  |    | And we were in remote learning from                      |
| 9  |    | March 13th, 15th, something like that until the end      |
| 10 |    | of the school year.                                      |
| 11 | Q. | So was the hydroponic system ever moved before you       |
| 12 |    | left for remote learning in March 2020?                  |
| 13 | A. | No.                                                      |
| 14 | Q. | So what was the reason Ms. Wolff told you that the       |
| 15 |    | hydroponic system could not be moved?                    |
| 16 | A. | Ms. Wolff -- I'm not sure if she ever gave me a          |
| 17 |    | reason.  She just said -- I think she just asked me      |
| 18 |    | if I expected her to move it.  She said that -- I        |
| 19 |    | can't remember.  I just know that she refused to do      |
| 20 |    | it.                                                      |
| 21 | Q. | Do you believe that Ms. Wolff refusing to move the       |
| 22 |    | hydroponic system was based on race?                     |
| 23 | A. | Yes.                                                     |
| 24 | Q. | What's the basis for that belief?                        |
| 25 | A. | So Ms. Holt was the teacher who ordered and used         |

1   the hydroponic system the previous year.  Ms. Holt

2   is a Caucasian teacher who had already been -- let

3   me think about how -- who was -- I want to say more

4   favorable, like, they considered more favorable

5   than me.

6       They preferred Ms. Holt over me.  And I think

7   that -- I believe that it was due to race.  So

8   Ms. Holt could get what she wanted, but I

9   definitely could not get what I wanted.

10      So they accommodated Ms. Holt when she would

11  ask for things, which is how the hydroponic system

12  came to be and it was placed in the room.  And then

13  other issues as well.  But then when I wanted to

14  use the same system, it was denied.

15      I think I'm about -- after this question, I

16  need to take a little break.

17      MS. FISCHER:  Yes.  Why don't we take a break

18  just right now.

19      THE WITNESS:  Just five minutes, you know.

20      MS. FISCHER:  Sure.  I'll just make a note of

21  where we were.

22      Five minutes.  So it's 11:15, why don't we

23  come back on at 11:20.

24      THE WITNESS:  But I want to make sure that I

25  answer your question completely.

```
 1              MS. FISCHER:  I can follow up after the break.
 2         (A recess was taken, 11:15 a.m. - 11:22 a.m.)
 3    Q.   So you mentioned that you thought that Ms. Wolff
 4         refusing to move the hydroponic system was based on
 5         race because Ms. Holt was able to have the system
 6         installed.  Do you know who installed the system
 7         for Ms. Holt?
 8    A.   No.
 9    Q.   Do you believe Ms. Wolff refusing to move the
10         hydroponic system was based on your disability?
11    A.   Yes.  Yes, that too.
12    Q.   What is the basis for that belief?
13    A.   She kept saying like -- asking if I expected her --
14         she asked me that.  And she asked me how it was
15         supposed to be moved, asked me if I was going to
16         move it or however -- no.  I don't think she asked
17         me how.  I'll take that last one back.
18              I don't think she asked me if I was going to
19         move it.  She asked me how I expected it to be
20         moved and if I expected her to move it, for sure.
21              She may have asked me if I was going move it
22         but I can't remember that for sure.  But in order
23         to put a system of that size into our classroom, we
24         have to go through her and the administrator.
25              So it was not something that I can just move
```

```
 1            or bring into my class, even if it was coming from
 2            somewhere else.  So Ms. Holt, for example, she
 3            would have had to have gotten permission to put a
 4            system of that size into any room in the school,
 5            even her classroom.  And it wasn't in her
 6            classroom.
 7                 It was in -- they had given her a whole other
 8            room that wasn't being used at that time for her to
 9            operate the system with her students.  So she was
10            totally accommodated.
11    Q.      Is there any other reason you believe that
12            Ms. Holt -- or Ms. Wolff refusing to move the
13            hydroponic system was based on your disability?
14    A.      Because she knew that it would be difficult for me
15            to move it.  She knew that I could not move that
16            myself.
17    Q.      Do you believe Ms. Wolff refusing to move the
18            hydroponic system was based on retaliation for
19            prior protected activity?
20    A.      I think so.
21    Q.      What's the basis for that belief?
22    A.      I can't really articulate that at the time, but I
23            think so.
24    Q.      Did you report Ms. Wolff for refusing to move the
25            hydroponic system?
```

1   A.   I emailed Mr. Villarreal and verbally spoke with

2        him about it as well.  I'm pretty sure.

3   Q.   What was his response?

4   A.   I can't remember right now.  But it wasn't -- I

5        thought, again, that he could have done more to

6        facilitate the whole situation, but he didn't.  He

7        kind of left it for us to hash out when he already

8        knew that I was having problems with individuals,

9        including Ms. Wolff.

10        So, again, I believe he dropped the ball on

11       being an administrator and keeping this building

12       safe, I mean, for everyone to work.

13  Q.   Let's look at Exhibit 3.

14        (Defendant's Exhibit 3 marked.)

15  A.   I have it.

16  Q.   Do you recognize this document?

17  A.   Yeah.  Okay.  So this is the correspondence.

18  Q.   What is this document?

19  A.   This is between Ms. Wolff and myself about the

20       hydroponic system and Mr. Villarreal is cc'd on it.

21  Q.   So when she writes hydro system, is she referring

22       to the hydroponic system?

23  A.   Yes.

24  Q.   So Ms. Wolff writes "Mrs. Smithson, I just would

25       like to ask if you want the system moved into your

1      room?  If so, let me know when a good time to stop

2      by would be so you can show me where.  Thanks,

3      Michele."

4          Is there anything wrong with this email?

5  A.  No.  This is when, I think, I was considering and

6      she was asking.  But when I looked at the room, it

7      wasn't safe.

8          "There may be one area -- there may be one

9      area were the system could fit, but I'm not sure.

10     It needs to be drilled into a wall, correct?"

11         I'm asking her because she had more dealings

12     with the system than I did when Ms. Holt had it.

13         "Ms. Smithson, I just would like to ask if you

14     want the system moved into your" -- yeah, she was

15     just trying to move it in, but I just -- I did not

16     feel -- but I was willing to check.  But I didn't

17     feel that it would be safe in my room.

18  Q.  So would you agree from this email -- "Mrs.

19     Smithson, I just would like to ask if you want the

20     system moved into your room?  If so, let me know

21     when a good time to stop by would be so you can

22     show me where."

23         But from this email, Ms. Wolff was trying to

24     coordinate moving the hydroponic system into your

25     class?

```
 1   A.   She sent that at 2:58.  I'm trying to look at all
 2        of the correspondence.  So that was on the 16th.
 3        Yeah, but I want to say this was after I had
 4        already -- I want to say that this was after I had
 5        already said that the -- it probably wouldn't fit.
 6             And that's probably why I sent this email.
 7        But what was this, Monday, Wednesday?  I think
 8        there was some discussion between this because this
 9        is two days right here.
10             So I believe there was some discussion between
11        this and that's why I said I didn't think that it
12        would fit.  So yeah, she asked me if I would like
13        for it to be moved in my room, but I think we
14        already knew -- or it was -- we were already pretty
15        sure that it wouldn't fit.
16             So I'm not going to give permission for
17        something to be moved into my room because I'm
18        responsible for my room and the safety directly in
19        my room.  So I wouldn't just say, "Yeah.  Go ahead
20        and move it into my room," and she knows that.
21             So it appears that she's trying to work with
22        me in this email but I'm not quite sure if that was
23        the case.
24   Q.   So then you respond, "Ms. Wolff, there may be one
25        area where the system would fit, but I'm not sure.
```

```
 1          It needs to be drilled into the wall, correct?
 2          Thank you."
 3               So at the time these emails were exchanged, do
 4          you agree that you weren't sure if the hydroponic
 5          system would fit into your class?
 6     A.   Yeah.  I was -- that's what I was communicating
 7          with her.  I was pretty sure that it wouldn't, but
 8          in my saying, I said, "I'm not sure that it would
 9          fit, but I'll check."
10               That's what I was -- looking for a space, but
11          there was no space where it could safely go into my
12          room.
13     Q.   So Ms. Wolff responds, "Yes.  It will be drilled
14          into your wall.  I am in my office until 1100 today
15          and would like to look before Friday so we can do
16          this over break with SKE."
17               Is there anything wrong with Ms. Wolff's email
18          to you?
19     A.   No.  That's -- "Yes, it will be drilled into your
20          wall."  That's the only thing.  I'm still talking
21          to her about if it needs to go into my room and
22          she's emailing, trying to get me to -- it seems to
23          agree to put it in my room, but I didn't think that
24          it would be safe in my room.
25     Q.   Do you agree that Ms. Wolff stated that she wanted
```

1    to move the system over break?

2  A.  Yeah.  SKE is the company that would have had to

3      move the system.  And moving it over break probably

4      would have been best but not into my room.

5          And so I wasn't going to give "Oh.  Yeah, go

6      ahead and do it" and then the system is in my room

7      when I come back and a student trips over it and

8      I'm liable.

9  Q.  So then you respond, "It doesn't look like I have a

10     free wall for the system to be drilled into.  The

11     power strips are in the way and may cause a safety

12     issue.  That's what I'm thinking but not sure."

13         So do you agree, you thought it would be a

14     safety issue to install the hydroponic system in

15     your classroom?

16 A.  Yeah.  So that's exactly what I was remembering, so

17     yeah.

18 Q.  And then she responds, "Let me know if I should

19     stop by and consult with you."

20         So do you agree that Ms. Wolff offered to

21     consult with you about the project?

22 A.  That was on December 18th.  That was a Wednesday.

23     And then I said yes, at 1500 hours -- that looks

24     like me; right?  So then I said, Yes, 1500 hours or

25     fifth period because fifth period was my free

|    |    |                                                        |
|----|----|--------------------------------------------------------|
| 1  |    | class, my free period.  That would be good for me.     |
| 2  |    | So yeah, I agree.                                      |
| 3  | Q. | So would you agree that Ms. Wolff tried to             |
| 4  |    | facilitate moving the hydroponic system for you?       |
| 5  | A. | She appeared to attempt to facilitate and then she     |
| 6  |    | walked into my class when I had students, in           |
| 7  |    | addition to trying to get a system put into my room    |
| 8  |    | that she knew would not be safe.                       |
| 9  | Q. | But earlier you testified that she completely          |
| 10 |    | refused and asked how it would been done.  But         |
| 11 |    | looking at this email, she had arranged for a          |
| 12 |    | vendor, SKE, to do the move; correct?                  |
| 13 | A. | No, I don't think so.                                  |
| 14 | Q. | Well, she referenced then "I would like to look        |
| 15 |    | before Friday so we can do this over break with        |
| 16 |    | SKE."                                                   |
| 17 |    | You said SKE would be the organization that            |
| 18 |    | would move the hydroponic system for you; right?       |
| 19 | A. | Right.  So once we made an agreement as to where       |
| 20 |    | the system would be safely moved, then SKE would       |
| 21 |    | come in and do it.  And they're not responsible for    |
| 22 |    | making sure that it's safely in the room.              |
| 23 |    | Ms. Wolff is responsible for making sure that          |
| 24 |    | it's safely in the room but not above the classroom    |
| 25 |    | teacher.  So it -- now -- and just looking at this     |

1        right now, even more so it looks -- it appears as

2        though she was trying to force it into my room over

3        the break.  And then something happens when I come

4        back -- if something happens when I come back, that

5        is my liability and I could be fired for that.

6            If a student tripped over it because there

7        wasn't enough room or if the wires -- you know, if

8        the water -- once the water is connected and

9        someone gets electrocuted, obviously I would be

10       more concerned about the safety.

11           But it would still be my fault and I could

12       probably go to jail for that.  So she appears to --

13   Q.  I'm just trying to understand your earlier

14       testimony.  You said that she refused to move the

15       hydroponic system and asked you "Am I supposed to

16       move it?"

17           But this email shows that she had SKE, a

18       vendor who was able to move it over the break.  So

19       I'm trying to understand who was going move the

20       system, her or SKE?

21   A.  So she said that she would like to arrange for SKE.

22       It doesn't say that she did arrange for SKE, and I

23       don't believe that she did.

24           And then after these emails, that's when the

25       issue -- when she walked into my class.  So, again,

```
 1        by email it appears as though she's trying to work
 2        with me.  But then she outright refused when she
 3        came into my room, and she asked if I expected her
 4        to move it.
 5             What else did she say?  She also -- she said,
 6        Do I expect her to move it?  Who do I expect to
 7        move it?  So she's sitting there trying to talk to
 8        me while I'm instructing my class when I clearly
 9        told her the times that I was available -- I gave
10        her two times that I was available.  And she
11        deliberately came in when I had instruction.
12   Q.   So let's look at Exhibit 4.
13             (Defendant's Exhibit 4 marked.)
14   A.   I did respond to her, right?  Oh, no.  Never mind.
15        Exhibit 4.  I'm just looking at this stuff because
16        it's been a while.  Yeah, that's it.
17   Q.   Okay.  So let's look at the first page of
18        Exhibit 4.  Is that the hydroponic system?
19   A.   Yes, it is.
20   Q.   And then let's look at the next pages, the
21        remaining -- it's a five-page document, pages 2
22        through 5.  Are these pictures of your classroom?
23   A.   Yes, that's one section of my class.  That's
24        definitely not where it would have gone.  I was
25        never even considering that area.
```

1   Q.   Let's look at page 5.  At the bottom, it says "This

2        is the only free wall."

3             Is that where the hydroponic system would have

4        gone?

5   A.   I was considering it, but it would not have worked.

6        It just was still taking away too much room.  It

7        was -- I would have had to move all of these desks

8        because these desks still had to facilitate

9        students.  So it just wouldn't have worked.

10  Q.   So do you agree that the hydroponic system would

11       not have fit in your classroom in 2019?

12  A.   I don't think that it would have, not safely.  It

13       would have fit, but it wouldn't have been safe.

14  Q.   Could there have been a good reason why Ms. Wolff

15       did not want to move the hydroponic system to your

16       classroom?

17  A.   If there was a good reason -- there could have

18       been, but she didn't communicate that with me.

19  Q.   Let's move to Exhibit 5.

20  A.   Back to your question, the previous question.  You

21       said could there have been a good reason that she

22       couldn't move it into my room, right?

23  Q.   Right.

24  A.   Or the other room?  I'm sorry.  The other room,

25       right, or were you talking about my room?  I'm

 1        sorry.

 2   Q.   Both.  Let's answer both.

 3   A.   Okay.

 4   Q.   Could there have been a good reason why she

 5        couldn't move it into your room?

 6   A.   So for my room, there was definitely a good reason

 7        because I told her it was a safety issue.  And I

 8        didn't really want it in my room.

 9             So the other room, no.  There was plenty of

10        room in there.  We started storing boxes in there

11        when Ms. Holt left.  And there was room for the

12        hydroponic system in there as well.

13   Q.   And why couldn't you use it in the room that it was

14        in?

15   A.   Because that was Ms. Franklin's room for

16        counseling.  It was in the same area as our rooms,

17        but obviously she's counseling students in that

18        room.

19   Q.   So let's look at Exhibit 5.

20             (Defendant's Exhibit 5 marked.)

21   A.   Okay.  I'm in there.

22   Q.   Do you recognize this document?

23   A.   So it's Mr. Villarreal, it looks like, responding

24        to me about -- wait.  It's me.  Hold on.  Let me go

25        to the bottom.  I recognize it, yes.

1   Q.   Who is Mr. Villarreal?  We've talked about him a
2        few times.  Who is he?
3   A.   He was the principal of Vilseck High School.
4   Q.   Is he still the principal?
5   A.   No.
6   Q.   When did he stop being principal?
7   A.   At the end of the 2020/2021 school year, so
8        June 2021.
9   Q.   So you write "I would like to speak with you,
10       PLEASE," in all caps.  And then Mr. Villarreal
11       responds, "I am working through my email right now.
12       I had been away from my computer.  I was glad that
13       you were still in your office when I came up.  If
14       this situation doesn't get immediately better with
15       Ms. Wolff, please let me know ASAP.  I will speak
16       with her first thing in the morning tomorrow.
17            "We are working on the interruptions as a
18       whole faculty problem and will continue to address
19       that ongoing issue for all teachers.  I am glad we
20       had the opportunity to speak.  Please keep me
21       informed if the situation does not improve."
22            From this email it sounds like you had had a
23       verbal discussion before he wrote this email; is
24       that correct?
25  A.   Yes.  I was constantly telling him about

```
 1            interruptions and disrespect from colleagues and

 2            even people outside of the building.

 3    Q.    What did you tell him during that verbal

 4            communication?

 5    A.    I can't recall right now.  I'd have to look through

 6            some ROI stuff because I had so many conversations

 7            with him.

 8    Q.    Do you remember what he said in response during

 9            that verbal communication on September 30, 2019?

10    A.    It looks like I ended up emailing him back.  Again,

11            I have to look at what exactly -- because we did

12            have a verbal as well after this.

13                And I wasn't happy with his response, again,

14            because it was the same thing.  It was partial

15            gaslighting.  Did you speak with her?  Did you --

16            but he already knew that I had been speaking with

17            everyone who interrupted my class.  And then this

18            was about the hydroponic system as well.

19                But it was also partial -- just saying what

20            needed to be said but not doing -- not actually

21            taking action.  So yeah, the emails might say one

22            thing, but there's no proof of any action that was

23            taken because my colleagues continued to just

24            behave in the same way and worse.

25    Q.    So he writes "If this situation doesn't get
```

```
 1          immediately better with Ms. Wolff, please let me
 2          know ASAP."
 3               Do you agree that he told you to contact him
 4          if the situation didn't get better?
 5     A.   In the email, yes.  And probably verbally, yes.
 6     Q.   And then he also said, "I will speak to her first
 7          thing in the morning."
 8               Do you agree that Mr. Villarreal said that he
 9          said he was going to speak with Ms. Wolff?
10     A.   If it says it in here, then he said it.
11     Q.   Do you know whether he spoke to Ms. Wolff?
12     A.   No, I don't.
13     Q.   And he wrote "We are working on the interruptions
14          as a whole faculty problem and will continue to
15          address the ongoing issue for all teachers."
16               Do you agree that interruptions were an issue
17          for all teachers?
18     A.   No.
19     Q.   Why not?
20     A.   Because all teachers did not always complain about
21          interruptions.  But then when it became more
22          convenient after I had complained about it so that
23          it wouldn't look like I was -- that it was the only
24          black person or the person with the disability that
25          was being disrupted, then all of a sudden, people
```

```
 1            had some issues.
 2                 But before that, I mean, they've never
 3            produced anything showing -- I mean, I have a whole
 4            lot of emails showing that I was disrupted.  I
 5            wonder if he has emails from others.
 6    Q.     Is it possible your colleagues just have a higher
 7            tolerance for interruptions?
 8    A.     No.
 9    Q.     So you think they're as distracted by the
10            interruptions from counselors as you are?
11    A.     No.  Not -- during this time, I don't think that
12            they were being disrupted as much as I was being
13            disrupted.  I mean, I'm not sure.  Is that what you
14            are asking?  If you could repeat.
15    Q.     Yes.  What I'm asking is, is it possible that your
16            colleagues were being interrupted as much as you
17            were, but they just have a higher tolerance for
18            interruptions than you do?
19    A.     I don't think so.  I don't believe so.
20    Q.     Why not?
21    A.     I don't believe that they were being interrupted as
22            much as I was.  And I did ask my students if their
23            other classes had been disrupted and they said, "No
24            way."  And a couple have even said that they spoke
25            with their parents about it.
```

1   Q.   Do you have the names of the students?

2   A.   No, but I probably could go in some old records to

3        see what my classes were at the time, like, what

4        students I had in those classes at the time.

5   Q.   So do you think having your classroom interrupted

6        by a guidance counselor warrants a federal lawsuit?

7   A.   Having my classes -- yes, depending on the reason

8        that the guidance counselor is interrupting my

9        class and the frequency and the others as well

10       interrupting my class, the others as a collective.

11  Q.   You respond, "Basically, Ms. Wolff came to my room

12       to inform me that she could not place the

13       hydroponic into A218.  Hopefully we can find a way

14       to do that since there's no class instruction

15       taking place in the room this year.  The system

16       would be useful for the biology classes."

17            Did Ms. Wolff ever explain why she couldn't

18       move the hydroponic system into that room?

19  A.   I believe -- I can't remember.  No, I can't

20       remember if she did.  I don't want to say.

21  Q.   So you don't know one way or the other if she

22       explained why she couldn't move the hydroponic

23       system into Room A --

24  A.   I believe that she did give a reason why.  I

25       believe she said that there wasn't enough room

```
 1            which is why I'm thinking -- why I keep saying
 2            there was because it was the science department.
 3                We had science stuff that we were storing in
 4            there and we would go -- once Ms. Holt left, we
 5            would go into her old room and grab what we needed.
 6                But we had room in there and I had already
 7            spoken with my colleagues in the science department
 8            and there was no problem with them.
 9                But Ms. Wolff -- well, they appeared to have
10            no problem with it.  I don't know if they really
11            did.  But Ms. Wolff was the one who continued to
12            say that it couldn't happen for whatever reason.
13    Q.   So --
14    A.   I don't remember exactly.  I think it was room -- I
15            think it was the space in there and she -- because
16            we were using it for storage, which we were, but
17            there was enough room.
18    Q.   So you also write "I have had to speak with Ms.
19            Villanueva, Mr. Johnson and one or two others about
20            interrupting my classes while I'm engaged with
21            instruction."
22                Are these the interruptions in Claim A that we
23            discussed earlier?
24    A.   Those are some of them, yes.
25    Q.   And then you write "Please note that this is not an
```

```
1           invite for my colleagues to inundate my prep
2           periods either."
3                So is it true that you also didn't want your
4           colleagues to interrupt you during your prep
5           period?
6   A.   I said inundate.  So yeah, they could visit me
7           during my prep period but not to a point where I
8           couldn't prep.
9   Q.   So when should your colleagues have spoken with
10          you?
11  A.   During my prep period.  That's what I was arranging
12          with Ms. Wolff.  So my fifth period was my prep
13          period so I asked her if she could stop by -- I
14          told her that would fine, if she stopped by at that
15          time.  And after school at 3 o'clock, I told her
16          that would fine.
17               So it's not like I don't want them visiting at
18          all during my prep period.  But no, they can't
19          inundate me when I'm supposed to be preparing for
20          class.  It's, you know, a give-and-take.  Of course
21          I'm flexible with my prep period.  I'm not flexible
22          with my instructional period.
23  Q.   So Mr. Villarreal responds, "After we spoke
24          yesterday, I wrote Ms. Wolff.  I met with her this
25          morning.  She has been instructed not to interrupt
```

| | | |
|---|---|---|
| 1 | | during instructional time." |
| 2 | | Do you agree that Mr. Villarreal instructed |
| 3 | | Ms. Wolff not to interrupt your class? |
| 4 | A. | He told me that he did.  So rather he did or not, I |
| 5 | | don't know. |
| 6 | Q. | He also writes "She has said that she originally |
| 7 | | went to your classroom because she could not open |
| 8 | | your email.  Occasionally work orders can be |
| 9 | | emergencies." |
| 10 | | Are you aware that Ms. Wolff went to your room |
| 11 | | because she could not open your email? |
| 12 | A. | Again, that's what she put in the -- what are you |
| 13 | | looking at right now? |
| 14 | Q. | So I'm looking at -- the email, it's time-stamped |
| 15 | | October 1, 2019, 3:13 p.m.  It says -- |
| 16 | A. | Exhibit 5 still? |
| 17 | Q. | Yes, Exhibit 5.  Mr. Villarreal writes "I hope |
| 18 | | you're feeling better today.  After we spoke |
| 19 | | yesterday, I wrote Ms. Wolff and met with her this |
| 20 | | morning.  She has been instructed not to interrupt |
| 21 | | your instructional time.  She has said that she |
| 22 | | originally went to your classroom because she could |
| 23 | | not open your email.  Occasionally work orders can |
| 24 | | be emergencies.  Moving forward I believe we should |
| 25 | | assume it is not an emergency worthy of a classroom |

```
 1            interruption unless there is a phone call.  Would
 2            that work for you?"
 3                 So were you aware that Ms. Wolff went to your
 4            room because she could not open your email?
 5    A.     That makes absolutely no sense because she and I
 6            had already been communicating by email when she
 7            just walked into my classroom, so no.
 8    Q.     So he also talks about Mr. Johnson.  He writes
 9            "We've had so much turnover in the IT Department.
10            I do not believe I have spoken to Mr. Johnson about
11            the classroom interruptions yet.  Would you like
12            for me to reinforce the issue with him?"
13                 Do you agree that Mr. Johnson was new?
14    A.     I don't remember Mr. Johnson being new at that
15            time.  I don't know, but I could check.  I mean,
16            that could be checked into, but I don't think that
17            he was new.
18    Q.     But do you know one way or the other?
19    A.     I can't remember.  It's easy to check because I
20            just have to go through our rosters.
21    Q.     And Mr. Villarreal writes "Some teachers are so
22            anxious to have technology back online that they
23            are okay with an interruption from IT.  Others
24            prefer any repairs wait until non-instructional
25            times.  That makes it challenging to have a
```

```
 1        school-wide policy."
 2              Do you agree that some teachers might want the
 3        IT Department to interrupt their class?
 4   A.   It's not my concern what everyone else wants
 5        because I have, as per my reasonable
 6        accommodations, spoken with Mr. Villarreal and told
 7        him the issues with my instructional time being
 8        interrupted constantly.
 9              So it -- I don't -- it doesn't matter to me
10        what the other teachers want.  They don't have
11        reasonable accommodations from my understanding.
12   Q.   So he writes "Not all technical issues are
13        equivalent either.  Sometimes a technology issue
14        can completely shut down instruction.  I can
15        support your preference either way.  Please let me
16        know how you would like to move forward with IT
17        issues."
18              Do you agree that Mr. Villarreal asked for
19        your input on how to address the IT issue?
20   A.   Again, on email, it looks great and it looks like
21        it's accommodating, possibly.  But when you put all
22        of the situations, all of the verbal discussions,
23        all of the documented times that I've spoke with
24        him about interruptions.
25              And so now, it's okay -- now you used your
```

1  time up to interrupt her, let someone else use time

2  up to interrupt her and let someone else use -- so

3  it's a game of -- it's a relay race.

4      And they keep passing the baton to the next

5  person.  And as we know, relay races can go on

6  forever if you have enough people.  So at some

7  point, Mr. Villarreal was responsible for having

8  a -- during one of our faculty meetings would have

9  been the perfect time -- just a blanket statement

10  saying, "Do not interrupt one another when you're

11  having instruction."

12      It is as simple as that, I think, for an

13  administrator to do.  And he didn't do it.  And he

14  continued to gaslight me as if -- and making it

15  seem as though I'm complaining -- he didn't make it

16  seem as though I'm complaining.  It made it seem as

17  though I'm just complaining and complaining,

18  complaining.

19      When in actuality, there are several people

20  performing a relay race because they know or they

21  think that they'll be able to -- well, they know

22  that they could cause some kind of reaction.  So

23  maybe not the reaction they want, but it has caused

24  a reaction.

25      And it's caused me to be anxious when I'm

|    |    |                                                              |
|----|----|--------------------------------------------------------------|
| 1  |    | trying to instruct my students, have more                    |
| 2  |    | migraines.  My intracranial pressure was high.  My           |
| 3  |    | vision was getting bad because my intracranial               |
| 4  |    | pressure was high.                                           |
| 5  | Q. | So let's unpack this relay race analogy.  It's your          |
| 6  |    | testimony that someone would interrupt you and then          |
| 7  |    | Mr. Villarreal would talk to them and they'd stop,           |
| 8  |    | but then someone else would pick up the baton and            |
| 9  |    | start interrupting you?                                       |
| 10 | A. | Yes.  That's what was going on.                              |
| 11 | Q. | So after, you know, he talked to Ms. Wolff and               |
| 12 |    | Mr. Johnson, they'd stop interrupting you, but then          |
| 13 |    | someone else would start interrupting you; is that           |
| 14 |    | right?                                                        |
| 15 | A. | Yes.  And it's the gaslighting that's the worst.             |
| 16 | Q. | So do you believe that all of these people we've             |
| 17 |    | mentioned -- Mr. Johnson, Ms. Franklin,                      |
| 18 |    | Ms. Villanueva, Ms. Natanaun -- that they were all           |
| 19 |    | coordinating this?                                           |
| 20 | A. | Yes.                                                         |
| 21 | Q. | And what's the basis for your belief that they were          |
| 22 |    | all coordinating this?                                        |
| 23 | A. | In all of my years of teaching -- and at that time,          |
| 24 |    | I think there was like 20 -- there were 20 years,            |
| 25 |    | you know, to include substituting and things like            |

```
 1            that -- never, ever visited -- from 2017 and then
 2            even a little bit before that but increase,
 3            increase, increase.  2018, 2019, everything just
 4            got so bad to where in 2019, it just -- in 2018
 5            even, it just started to boil over.
 6                 But definitely 2019, there was, like, a --
 7            just a lot.  And he just sat back trying to appear
 8            to be the nice guy when actually he was, in my
 9            opinion, trying to ride the fence until he could
10            get out of Vilseck High School because they were
11            probably not treating him much better than they
12            were treating me.
13   Q.       Why do you say they weren't treating him much
14            better than they were treating you?
15   A.       Because here's the thing -- let me just back up a
16            bit.  And I've had this discussion with
17            Mr. Villarreal as well because he is a Latino
18            teacher -- I mean, Latino administrator and he told
19            me that he had received horrible treatment at the
20            school as well.
21   Q.       Where is he now?
22   A.       Italy or Spain.  I don't -- either Italy or Spain,
23            I think.  One of those.
24   Q.       And is he still a principal?
25   A.       Yes, he is.
```

```
 1   Q.   So you mentioned the relay race, and I wanted to
 2        stick with that.
 3   A.   Okay.  Sorry.
 4   Q.   Do you think the entire faculty was involved in the
 5        relay race or was it a certain group?
 6   A.   There were -- there was definitely a certain group.
 7        I mean, no, not everyone in the faculty.
 8            No, not everyone in the faculty, but there
 9        were a significant number.  I mean, if it's just me
10        and ten people are taking turns, I mean, that could
11        make for a horrible year.
12   Q.   How many people would you say were involved in the
13        group coordinating the interruptions of your class?
14   A.   About -- between 7 to 12 somewhere.  You know,
15        that's why I said 10 is an average, maybe.
16   Q.   Why do you believe they were coordinating it?
17   A.   You know, some of the interruptions seemed to be
18        timed.  And definitely the ones that I mentioned
19        here, especially since I said -- requested not to
20        be interrupted and later demanded not to be
21        interrupted during my instructional time.
22            I have a right to say don't interrupt my
23        instruction.  And I was flexible.  I gave -- you
24        know, I said don't interrupt me ten minutes before,
25        ten minutes after for sure.
```

```
 1              If there must be an interruption during class
 2         time, make sure it's not the first ten minutes of
 3         class or the last ten minutes of class because, of
 4         course, I'm giving the initial instruction to my
 5         students.  And then at the end, we're wrapping
 6         things up.
 7              And so I knew that I should not have said that
 8         because as soon as I did, that's exactly when most
 9         of them started interrupting and even two at a
10         time.
11              So Mr. Johnson and Ms. Villanueva both walked
12         in at the same time.  And I think it was
13         Mr. Johnson the second time within like five
14         minutes, and it was the last ten minutes of class.
15    Q.   So if you look at the job titles of the people
16         interrupting your class, some are guidance
17         counselors, some are administrative assistants,
18         some are IT.  They all have very different roles in
19         the school.  What makes you think that they're all
20         colluding with each other to interrupt your class?
21    A.   We only have about 40 to 50 people at the school.
22         It's a very small school.  And we are all friends
23         in one way or another.
24    Q.   So earlier you testified you think it's between 7
25         to 12 of the members of the school that were kind
```

| | | |
|---|---|---|
| 1 | | of coordinating to interrupt your class. |
| 2 | | So you think about 25 percent of the school |
| 3 | | was working to interrupt your class; is that about |
| 4 | | right? |
| 5 | A. | It's a small school so it's easier to get to the |
| 6 | | 25 percent, yes. |
| 7 | Q. | So let's look at the top of the email.  It says |
| 8 | | "Note to self, Mr. Johnson was instructed in early |
| 9 | | October to minimize his interruptions as much as |
| 10 | | possible.  He has been asked to cover two schools |
| 11 | | and sometimes this will not be possible." |
| 12 | | Were you aware that Mr. Villarreal spoke with |
| 13 | | Mr. Johnson about minimizing interruptions? |
| 14 | A. | Just what he sent me in this email, I guess, that's |
| 15 | | dated October 19th.  But, again, that's what he |
| 16 | | told me.  I don't know if he actually did it.  I |
| 17 | | don't know what their conversations are.  I know |
| 18 | | that as a principal it would have been very easy |
| 19 | | for him, in any faculty meeting, to just tell |
| 20 | | everyone. |
| 21 | Q. | Is there anything wrong with -- |
| 22 | A. | If there was a problem with all teachers, all |
| 23 | | teachers would have been satisfied with that. |
| 24 | Q. | Is there anything wrong, just looking at Exhibit 5, |
| 25 | | with your communications with Mr. Villarreal? |

1   A.   Anything wrong with my --

2   Q.   Communications with Mr. Villarreal, anything about

3        this email that you think was wrong?

4   A.   You know, with this and the other emails, even from

5        Ms. Wolff, the only thing that I can think of is,

6        okay, it looks good in writing for the most part,

7        if you have no background information.

8             And so if you're looking at this email, you're

9        like, "Oh.  Of course they work with her."

10            But then, if you're in the actual environment,

11       you -- it will become very apparent, especially if

12       you're one of my students, that this is not

13       happening.

14            People are not being spoken to because my

15       classes were constantly interrupted.  And I'm glad

16       that I was able to hold my composure for the most

17       part because it's difficult when you have, you

18       know, instruction.  And this is instruction that

19       I've prepared.

20            But I also have an attention issue that I have

21       a disability for and reasonable accommodations for

22       and, you know, they abused it and they abused me.

23  Q.   Let's move on to Exhibit 6.  This is the same email

24       thread, but it's just a different version of the

25       thread.

```
 1              (Defendant's Exhibit 6 marked.)
 2    Q.   Do you recognize this document?
 3    A.   It does look familiar, yes.  This is the same one,
 4         right?
 5    Q.   It is.  It just has a different email at the top.
 6         So it's just a different string in the thread.  So
 7         except for the top email, the bottom thread is the
 8         same.
 9    A.   Okay.
10    Q.   So let's look at this top email.  You write "What I
11         have experienced here at Vilseck High School is an
12         extension of the problems that are taking place
13         across the United States at this time."
14              And this was October 2, 2019.  What were the
15         problems taking place in the United States at the
16         time that you felt like your experiences at Vilseck
17         were similar to?
18    A.   Just aggressions against -- I will use the term
19         African for purposes here, not to get too technical
20         or specific.  So just the problems that were going
21         on in America with the abuse of African Americans.
22              But, I mean, it was going on way before that
23         with me at Vilseck High School.  And I had
24         complained about it way before everyone started
25         seeing the assaults on African Americans on
```

```
 1            television and, you know, problems that African
 2            Americans were having at work and, you know, and
 3            sometimes even being killed.  But my colleagues
 4            were ganging up on me.  That was apparent.
 5   Q.   So was there a specific incident going on in the
 6            United States in October 2019 that you felt your
 7            situation was similar to?
 8   A.   I can't remember.  There probably -- there must
 9            have been because I said it.  You know, so maybe
10            there was some other things going on that caused me
11            to -- everything to resonate with me even more.
12                But there were always things going on.  I
13            mean, everyone has, you know -- we have the news
14            over in Germany as well for the United States.  So
15            there were -- this was October 2019.  Yeah, I mean,
16            things seemed to have been -- I know, but I can't
17            remember anything specific right now, not at this
18            time.
19   Q.   So do you equate the issues that we discussed -- so
20            having your classroom interrupted by your
21            colleagues, not getting the hydroponic system
22            moved, do you equate those with racial violence
23            happening across --
24   A.   Yes.
25   Q.   And what's the basis for that equivalence?
```

| | | |
|---|---|---|
| 1 | A. | I'm sorry.  I answered you when you were speaking. |
| 2 | | Can you please repeat that?  I'm sorry. |
| 3 | Q. | Sure.  Do you equate the issues that we've |
| 4 | | discussed today, like having your classroom |
| 5 | | interrupted by a guidance counselor and having |
| 6 | | someone not move the hydroponic system to the room |
| 7 | | you wanted, do you equate that to racial violence |
| 8 | | occurring in the United States? |
| 9 | A. | So the movement of things and, you know, me making |
| 10 | | a request and maybe not getting it, or even |
| 11 | | interrupting my classroom, I don't equate that to |
| 12 | | the violence.  I equate that to -- I mean, it could |
| 13 | | lead to violence which has started to happen in my |
| 14 | | workplace. |
| 15 | | So it could lead to it, but those actual |
| 16 | | things that you just mentioned, no, because those |
| 17 | | are not violent things.  Those are agitations. |
| 18 | | And, you know -- but it could lead to violence, |
| 19 | | which it did in my work environment.  I had been |
| 20 | | assaulted in my work environment. |
| 21 | Q. | So I just want to go back to the quote.  Again, you |
| 22 | | said, "What I have experienced here at Vilseck High |
| 23 | | School is an extension of the problems that are |
| 24 | | taking place across the United States at this |
| 25 | | time." |

```
1              What did you mean by that?

2   A.   There must have been something.  I don't know.  I

3        can't remember a specific incident at the time.

4        I'm looking at the date, October 2019.  Nothing is

5        coming to mind.

6              But that doesn't mean that I didn't see

7        something or read something because I read a lot.

8        So maybe I read something or saw something on

9        social media or the news or -- but looking at this

10       right now, I couldn't tell you exactly what it is.

11             But the statement itself, as a general

12       statement, yes, I would say that I would still

13       agree with that.

14  Q.   And what do you mean by that statement in general?

15  A.   Like, when you said that it's an extension of what

16       I was going through at the school -- or what I

17       said, what I was going through in my building is an

18       extension of what is happening in the United States

19       with African Americans, not being given a personal

20       space, problems at work, problems finding work,

21       problems being treated equitably at work.

22             Anything that I've complained about, these are

23       problems that happen across the United States that

24       our Caucasian counterparts don't have to experience

25       at the same levels.
```

1   Q.   Let's move on to your fourth claim, Claim D, that's
2        in Exhibit 2.
3   A.   Exhibit 2.
4            And before you ask, can we do another
5        five-minute?
6   Q.   Sure.
7   A.   Thank you.
8            MS. FISCHER:  So it's 12:14, why don't we get
9        back on 12:20 just to round up.
10           THE WITNESS:  Okay.  Thank you.
11       (A recess was taken, 12:14 p.m. - 12:23 p.m.)
12  Q.   So on Exhibit 2, we're looking at Claim D.
13  A.   Okay.
14  Q.   It says "On October 9, 2019, Complainant's coworker
15       allegedly walked in during her class and attempted
16       to come behind Complainant's desk while she was
17       instructing and then returned to her room 'crying'
18       the next day after Complainant sent an email
19       concerning her interrupting Complainant's class."
20           So who was the coworker?
21  A.   That was Ms. Franklin.
22  Q.   Who is Ms. Franklin?
23  A.   She is the alcohol and drug counselor, I believe.
24  Q.   Why did she come to your classroom?
25  A.   It had to have, you know, been for a student maybe.

1     I don't think it was for me.  It had to have

2     been -- it was for a student, but I can't -- I

3     can't really remember.  I would have to look back

4     at the ROI.

5  Q.  What did she say when she came into your classroom?

6  A.  I didn't give her much chance because I had already

7     spoken with her.  And she attempted to -- no, that

8     was the first time.  She attempted to walk

9     directly -- just directly behind my desk.

10        I was working with a student on the microscope

11    at that time.  I was testing them, giving them a

12    crucial.  So that's when I call students up one by

13    one and they show me how to operate the microscope.

14        So this is after I had already given

15    instructions and shown students what to do.  And

16    then they use the microscope for some time.  And

17    then they have to take a crucial, which is

18    presenting to me one-on-one where they just use

19    my -- I give them the devices and they perform them

20    on the microscope.

21        So she came to walk directly behind my desk

22    and -- which made no sense again because there's a

23    large envelope right there saying, you know, "Do

24    not walk behind the desk."

25        And I have a small space behind the desk so

```
 1        you're definitely in my personal space when you
 2        come back there.
 3   Q.   Did she explain why she walked behind your desk?
 4   A.   I think she was coming to see a student, I believe.
 5        But once I stopped her and she was walking behind
 6        my desk, she left the room, I believe.
 7            I'm pretty sure.  I'm not sure -- I'm pretty
 8        sure that's all what happened because I just
 9        totally blocked her out and continued to work with
10        my student when she interrupted as the student was
11        testing.
12   Q.   So looking at Claim D, it appears that you made
13        your coworker cry.  Why do you feel that this was
14        harassment of you?
15   A.   What do you mean?  Why do I feel she harassed me?
16   Q.   Yes.  You made her cry.  Why do you feel that
17        harassed you?
18   A.   That was -- I'm not sure why she cried.  She was
19        told that I was busy and that she should come back
20        another time.  And her crying is her issue, not my
21        issue.  Because I've told her the same thing that I
22        told my other coworkers and they continue to pass
23        the baton.  And so they passed the baton to her,
24        and she was told promptly just like the other ones,
25        but she cried.
```

1   Q.   So let's look at --

2   A.   I'm sorry.  I'm so sorry.  Can I finish?  I'm so

3        sorry.  You didn't mean to interrupt me.  I just

4        paused for a while.  I don't think you meant to

5        interrupt me.

6   Q.   I did not.

7   A.   What did I say?  I said -- because your question

8        was why do I think that was harassment to me.  So I

9        think that that was harassment to me because that's

10       one thing that's been going on, and I think I made

11       the statement before this incident happened, but I

12       have to look back at that email.

13            But it's an example of what's been going on in

14       the United States.  A black person makes a request

15       or is doing something that they're supposed to do,

16       and then you have a Caucasian person that comes in

17       and wants to override whatever the African American

18       person wants.

19            And when they don't get their way, usually a

20       Caucasian female, then there's crying.  And that's

21       what she did to me, and which made me feel

22       like "Okay.  Here we go."

23            And she didn't cry at that time, but she came

24       back to my classroom crying.  So that's the part

25       that makes me feel like that was harassment because

```
 1          now I'm supposed to completely shut down because

 2          she showed tears.  And I'm not going to operate

 3          that way.

 4     Q.   So let's look at Exhibit 1.  And I'm on the bottom

 5          of page 6 where it's discussing Claim 1D.  And you

 6          were asked "Please explain what happened during

 7          this incident."

 8               You said, "Ms. Franklin walked into my

 9          classroom during active instruction.  She attempted

10          to walk behind my desk while I was administering a

11          microscope quiz to a student who was positioned on

12          the opposite side of my desk.  I signaled for Ms.

13          Franklin to see me at the front of my desk, for

14          there was an empty space for her to speak with me.

15               "She sent me an email the next day, and I took

16          the opportunity to inform her that she had caused a

17          disruption to the learning in my classroom.

18               "About 25 minutes later, Ms. Franklin entered

19          my classroom.  She was crying.  She stated that I

20          was 'angry.'  I spoke with her about my concerns

21          for about five minutes because my students were

22          starting to enter her class."

23               Does that accurately describe what happened?

24     A.   Hold on.  Let me find your -- so I can look at you

25          in the eye when I say this.  So I'm glad that you
```

```
 1        read this.  So even in my statement -- I guess I
 2        have to go back and take back part of my
 3        statement -- previous statement when I said that I
 4        told her to leave because I guess I didn't tell her
 5        to leave.  I actually told her to come around to
 6        another area.
 7            So I was even flexible with that.  And yes, I
 8        was still -- I was testing with a student.
 9            But then she -- and so I guess I was remaining
10        cordial.  That's probably why I just said to see me
11        at the front of the desk, and we spoke, I guess.
12            And then later she came back to my class
13        crying.  So it was two incidents.  And then when
14        she came back to my class crying, it was three
15        minutes before my chemistry class entered.
16            So now she's crying -- again, crying in my
17        class right before I have another class so I'm
18        having to push her out the door.  So this is the
19        time where I had to push her out, not physically
20        push her but rush her out.
21            But students are walking in and they're
22        witnessing her crying so it makes me look like a
23        bully.  And so that's harassment.  So that's
24        harassment.
25   Q.   Do you think she was intentionally crying to harass
```

```
 1        you?

 2   A.   I think so.

 3   Q.   Let's look at Exhibit 7.

 4             (Defendant's Exhibit 7 marked.)

 5   A.   So I don't -- oh.  Yes, I do.  It's up at the top.

 6        Sorry.

 7   Q.   Do you recognize this document?

 8   A.   It looks like it's an email between Ms. Franklin

 9        and I.

10   Q.   So were these emails written on the day that she

11        interrupted your classroom and walked behind your

12        desk?

13   A.   I think it was the next day.

14   Q.   It looks like --

15   A.   No.  No.  Yes, the day that she did.  So the day

16        before -- excuse me -- the day before is when she

17        walked in and interrupted while I was with a

18        student.  And then this day, which is the day

19        after, is when she walked in right before my

20        chemistry class, crying.

21             And when I spoke with Mr. Villarreal, she had

22        been to his office because there's some time

23        between this email when I expressed my concern to

24        her and when she actually walked into my office.

25             So between that time, she went to see
```

```
 1            Mr. Villarreal and he sent her to my classroom from
 2            my understanding.  And, again, totally out of line
 3            for Mr. Villarreal knowing my situation.  You don't
 4            send a teacher that's visibly upset to my class
 5            right before my chemistry class.
 6   Q.   So let's unpack this.  So is October 9, 2019, the
 7            day that she first came in to talk to the student?
 8   A.   In this occasion, yes.
 9   Q.   And then October 10th is the day that she came in
10            crying?
11   A.   Yes, that's what it looks like.
12   Q.   So let's start with the bottom email that was
13            written on October 9, 2019.  So she writes "Hi
14            Tamica.  I appreciate your patience with me today
15            when I came in.  Will do my best not to be too
16            interruptive in your space."
17               So do you agree that Ms. Franklin apologized
18            for interrupting your class?
19   A.   That was the 9th, that was the same day.  I'm not
20            sure if I saw it then.  I think I saw it the next
21            day, but didn't I -- yeah, I responded to her.
22   Q.   So my question is, once she writes "Hi, Tamica.  I
23            appreciate your patience with me today when I came
24            in.  Will do my best not to be too interruptive in
25            your space," would you agree that she apologized
```

```
 1              for interrupting your class on October 9th?
 2    A.   Yes.  That email looks like she did say that.
 3    Q.   And if you look at her email signature, it says
 4         that she's the adolescent support and counseling
 5         service -- or she works at the adolescent support
 6         and counseling service at the Vilseck High School.
 7         What is that, adolescent support and counseling
 8         service?
 9    A.   I think it's alcohol, substance -- I think that's
10         what ASACS is.
11    Q.   What do they do?  What does ASACS do?
12    A.   I'm going to have to look that up because I don't
13         want to get my acronym -- we have a lot of
14         acronyms.  I don't want to get them mixed up.
15              But I'm pretty sure this is alcohol and
16         substance abuse counseling.
17    Q.   Is there a reason she'd want her conversation with
18         you in the classroom to be confidential?
19    A.   I'm not sure if I understand you.
20    Q.   So if she's coming into your room to talk about
21         alcohol and substance abuse, is there a reason she
22         might want to keep that conversation with you
23         confidential?
24    A.   It wouldn't be confidential if she's in the class
25         and I'm working one-on-one with a student.  If I'm
```

```
 1        instructing class, it's not confidential.
 2   Q.   But is there a reason she might want to come behind
 3        your desk to have a confidential conversation with
 4        you about a student?
 5   A.   Again, it would never have been confidential
 6        because my desk is close proximity.  So we can't
 7        sit there and have a conversation without this --
 8        definitely the student that's standing there --
 9        sitting there with me because that student was on
10        the other side of the desk as well, on another
11        side.
12             But that would never have been confidential,
13        so no.  Yeah, that's not -- I think it would have
14        been more confidential to send an email.  Or if
15        there's a student that she needed to see, those
16        arrangements can be made in other ways instead of
17        interrupting the teacher's class.
18   Q.   So you respond, "Yes, I was giving microscope tests
19        to individual students when you entered.  It would
20        be great if students could be given a pass to see
21        you; then classes would not be interrupted as much.
22             "I'm having a huge problem with interruptions
23        again this year, not just from your end.  The only
24        ones who are disadvantaged due to these
25        interruptions are the students.  They are easily
```

1          distracted and it can take quite a bit to get them

2          back on track, even with the best classroom

3          management.

4              "Also, I prefer for individuals not to walk

5          around my desk into my personal space unless I

6          prompt them to do so.  That's why I redirected you

7          when you were walking around.  I also have a sign

8          on the corner of my desk.

9              "Again, a call might be less distracting for

10         my classes and even more confidential for the

11         student that you have an appointment to counsel.

12         Thank you for understanding."

13             Is this the email that made Ms. Franklin cry?

14    A.   Yes.

15    Q.   You told her "The only ones who are disadvantaged

16         due to these interruptions are the students."

17             What does that mean?

18    A.   Exactly what I said.  It's an interruption of their

19         classroom time.

20    Q.   So is that why you didn't like the interruptions,

21         because it disrupted your students?

22    A.   So the interruptions are one thing and then the

23         violation of my personal space is another thing.

24         But she didn't have an opportunity to interrupt my

25         personal space like my colleagues had already been

```
 1        doing at a very high frequency lately because I
 2        abruptly asked her to meet me at the front of my
 3        desk, which was easier for her to enter the room
 4        and come to that area anyways.
 5             It takes some effort for someone to walk in my
 6        room, walk around the student desk and then make
 7        their way around to where I'm sitting.  It's much
 8        easier to walk through the door.  And it's a
 9        straight beeline from the door to the front of my
10        desk where they can speak with me.
11   Q.   So she responds, "Tamica, thank you for your
12        authenticity.  I appreciate that we can talk.  And
13        I appreciate being neighbors with you.  Do you
14        recommend that I say something to Mark since he was
15        cc'd in the email or no?"
16             So she says, "I appreciate that we could
17        talk."
18             Did you guys have an in-person conversation
19        before this email?
20   A.   No.  This is the email.  She walked into my room on
21        the first day.  And then she sent the email, the
22        short one below, saying she appreciated my
23        patience.  And I try to be patient, I do, even if I
24        feel on the inside something else, which a lot of
25        times I do because I'm trying to manage my class,
```

```
 1        the outward -- what I'm displaying outwardly,

 2        outward to my students so that they can see me

 3        behaving well and, you know, to my colleagues as

 4        well.

 5            It's totally different than what I'm feeling

 6        on the inside.  So she even said that I was patient

 7        with her, even though on the inside that's not what

 8        I was feeling.

 9   Q.   I think we're getting far field from the question.

10        So what I asked was --

11   A.   I'm sorry.

12   Q.   So she says, "Thank you for your authenticity.  And

13        I appreciate being neighbors with you."

14            Had you talked on October 10th before 11:17

15        when she sent this email?

16   A.   Okay.  So right -- no.  So we hadn't talked.  We

17        hadn't spoken yet.

18   Q.   At what time did she come into your room crying?

19   A.   So this is 8:32 a.m., this first one, "Good

20        morning, Ester."  And then this one right here was

21        11:17.  Okay.  So she asked me if she -- do you

22        recommend I speak with Mark, which is who was

23        Mr. Villarreal.

24            And then I emailed her at 12:08 saying, "Mr.

25        Villarreal already knows my" --
```

1  Q.  So my question is just --

2  A.  I know.  I'm trying to figure out -- I'm looking at

3       the emails -- I'm sorry -- to try to figure out

4       because this is years ago.  So I'm trying to figure

5       out.  "Thanks for being very transparent with me."

6           And so I made that statement.  And it was

7       after -- hold on.  So I sent her that email and

8       then she came in after the email right here, the

9       one at 12:08 when I sent that to her.

10        But this one right here that she sent to me,

11      "Hi.  Okay.  I think it's not necessary for me to

12      write him back, but I will let him know we are

13      figuring things out just fine."

14        Maybe -- I can't remember if it was before or

15      after this 1:11 p.m. email.  But I can -- it's easy

16      to find out because I can look and see what time my

17      class was at that time that she came in directly

18      before.  I just can't remember right now.

19        But she's saying, "Hi.  Okay.  I think it's

20      not necessary for me to write him back."

21  Q.  Yes.  You don't need to read -- okay.  So let me

22      help you out here.  If you look at Exhibit 1, you

23      say about 25 minutes -- "She sent me an email the

24      next day and I took the opportunity to inform her

25      that she had caused a disruption to the learning in

```
 1          my classroom.  About 25 minutes later, Ms. Franklin
 2          entered my classroom."
 3               So does that help you remember when she
 4          entered your classroom?
 5     A.   Yes, but what I'm trying to say is I'm not sure if
 6          that 25 minutes was after the 12:08 email that I
 7          sent her or if it was after the 1:11 email that she
 8          sent me.  Because right now, I can't remember what
 9          time those classes were.
10     Q.   In the 12:08 email, you say, "I appreciate you
11          stopping by to speak face-to-face.  Unfortunately,
12          the students were arriving for second period and we
13          had to cut our discussion short."
14               So does that remind you that she stopped by
15          before the 12:08 email?
16     A.   Okay.  So then yes.  I didn't read that part.  So
17          "I appreciate you stopping to speak with me
18          face-to-face.  Unfortunately" -- okay.  So yeah.
19          So obviously she came after one of the emails
20          before that and that's when she was crying.
21     Q.   So do you think that when she said I appreciate
22          that we can talk and I appreciate being neighbors
23          with you at 11:17, she had already stopped by to
24          talk to you?
25     A.   Yeah, but that doesn't make sense.  Hold on.  Let
```

```
 1          me think for a second because now you're making
 2          some things resonate with me.
 3               So she said here "I appreciate that we could
 4          talk.  And I appreciate being neighbors with you.
 5          Do you recommend that I say something to Mark since
 6          he was cc'd in the email or no?"
 7               And so she's asking me at this point, after
 8          she --
 9   Q.     Okay.  Look.  You keep repeating these documents
10          and reading them out loud.  I just want you to
11          answer my questions.  And my question is, do you
12          think she stopped by before this 11:17 email?
13   A.     So the 11:17 email, it appears --
14   Q.     You don't need to read the document out loud.
15   A.     -- that she stopped by before the 11:17 email.
16          That's what it looks like.
17   Q.     Okay.  So from the email, it sounds like your
18          conversation with her went well; is that correct?
19          She's thanking you for your authenticity.  Is it
20          correct that the conversation with her face-to-face
21          went well?
22   A.     When she walked in -- nothing about a teacher
23          walking in crying is going well -- or a colleague
24          walking in crying is going well.
25               And so from the email, it might appear that
```

```
 1          way, but when I look -- when you look at the total
 2          situation, it obviously didn't go well because she
 3          has already spoken with Mr. Villarreal before this
 4          email because it appears that he said -- and I have
 5          to look back -- that she had already gone to his
 6          office with teary eyes.
 7               And then he told her to speak with me.  But
 8          I'll have to check on that.  I'll have to look back
 9          at the ROI to make sure.
10    Q.    So you respond to her "I appreciate you stopping by
11          to speak face-to-face.  Unfortunately, the students
12          were arriving for second period and we had to cut
13          our discussion short."
14               So is it true that you appreciated Ms.
15          Franklin stopping by to speak to you face-to-face?
16    A.    Yeah, to stop by, it was not a problem during my
17          prep.  However, it was so close to the bell
18          ringing, there was nothing of significance that we
19          could really discuss without the students walking
20          in and seeing her cry, which left it up for, you
21          know, their perception to wonder what happened.
22    Q.    So you told Ms. Franklin you appreciated her
23          stopping by on October 10th; is that right?
24    A.    I told Ms. Franklin that I appreciated her stopping
25          by -- let me see.  I said whatever -- I appreciate
```

```
 1          that -- "I appreciate you stopping by to speak

 2          face-to-face."

 3   Q.     So do you agree that you told Ms. Franklin that you

 4          appreciated her stopping by to speak face-to-face

 5          on October 10th?

 6   A.     And then I stated, "Unfortunately, the students

 7          were arriving," but yes.

 8   Q.     And now you're claiming that her stopping by on

 9          October 10th was harassment of you?

10   A.     When things are going on in the moment, which all

11          of this seems to be in the moment here, okay.  And

12          I'm, like she said, patient and everything.  But

13          when I finally spoke with Mr. Villarreal about the

14          situation, that's when, you know, he had told me

15          that he had spoken with her.

16              And then, when I read the ROI later, I

17          realized that, oh, not only did he speak with her,

18          but she came into the room crying.  So after

19          putting all of that together, aside from the hour

20          or so within this email, yes, that was harassment.

21          And it was an attempt to make me feel -- or not

22          feel because I didn't feel like a bully.  It was an

23          attempt to make me look like the aggressor and the

24          bully, and I stand by that.

25   Q.     So she responds, "What makes me feel good about
```

```
 1          this situation is that you and I work well together
 2          and feel like we're on the same team and are good
 3          neighbors.  Anyway, thank you for being you and for
 4          our good encounter."
 5               Is there anything --
 6     A.   Oh.  I'm sorry.
 7     Q.   Is there anything wrong with Ms. Franklin's email
 8          to you on October 10, 2019, at 1:11 p.m.?
 9     A.   Yes.
10     Q.   What's wrong?
11     A.   It doesn't match with everything else after that
12          because after that, it was made to appear that I
13          bullied her.
14     Q.   Who made it to appear that you bullied her?
15     A.   Agency attorneys, the way they wrote it up.
16          Evidently, Ms. Franklin because I was unaware that
17          she was crying in Mr. Villarreal's office.
18     Q.   So do you agree that you and Ms. Franklin work well
19          together?
20     A.   I agree that I was attempting to work well
21          together.
22     Q.   Do you agree that you had a good encounter?
23     A.   No.  It wasn't a good encounter.
24     Q.   So setting aside what was happening outside, is
25          there anything in this email thread that suggests
```

1      that Ms. Franklin was harassing you?

2    A.  Again, this is what people -- what she put out

3        through email.  So when you look at the email, it

4        looks like there may not be anything going on.

5    Q.  Do you believe that Ms. Franklin stopping by your

6        classroom to talk to a student was based on your

7        race?

8    A.  I need to go back.  I'm sorry.  When you look at

9        the email, you -- I'm sorry.

10         When you look at the email, you actually can

11       tell that something is going on but that people are

12       trying to be cordial.  That's what it kind of looks

13       like when I'm looking at it right now.

14   Q.  Is there anything wrong with people trying to be

15       cordial?

16   A.  Yes.  It looks like there's an attempt here to be

17       cordial.  I know that's what I feel like because

18       I'm reading it, but I also know the actual -- the

19       situation of everything that happened before and

20       after this.

21         Your next question?  I'm sorry.

22   Q.  Do you believe that Ms. Franklin stopping by your

23       classroom is based on race?

24   A.  Yes.

25   Q.  What's the basis for that belief?

1  A.   Again, I can't articulate that right now.  I just

2       feel that that is the -- well, in some ways I can

3       articulate it in this situation because the crying

4       part is indicative of the crying that's before, I

5       guess, and after this taking place in the United

6       States, where African Americans are at fault for,

7       you know, making Caucasian women feel bad or, you

8       know, because they don't want to be inconvenienced.

9           But it's my classroom that she's

10      inconveniencing.  So her go-to in my feeling is

11      that -- her go-to was to cry because this is a

12      large size black female, dark skinned.  So there is

13      colorism involved as well.

14          Large size, black female.  It doesn't matter

15      that I work well with my students or that I have an

16      impeccable work record.  She's a large size female

17      that's dark skin and she made me, a small, petite

18      Caucasian woman, cry.

19          And that's the story that played out obviously

20      because that's what agency attorneys put in as an

21      argument.  And that's what you're saying as well,

22      why is it harassment for me when she's the was one

23      that was crying?

24          But I say it is harassment for me because she

25      produced tears to make it look just like that, to

1        make it look like I was a bully.  And I'm not a

2        bully.  But I don't allow people to bully me

3        either.

4   Q.   Do you believe Ms. Franklin stopping by your

5        classroom was based on your disability?

6   A.   Yes.

7   Q.   What is the basis for that belief?

8   A.   The same as I've been saying before.  And everyone

9        knows my situation because it was forced to remain

10       public when my reasonable accommodations were

11       taken.

12            So, you know, all of my symptoms and, you

13       know -- and I had to start saying, hey, my

14       concentration -- please don't interrupt me.  I have

15       to say it -- I did haven't to say it, but I would

16       say it just to help have people understand.

17            And again, just like far too often with female

18       African Americans, their medical needs are

19       disregarded; and my medical needs were definitely

20       disregarded, not just disregarded, they were preyed

21       upon.

22   Q.   Do you believe Ms. Franklin stopping by your

23       classroom is based on retaliation for prior

24       protected activity?

25   A.   Not directly.  I don't -- I mean, she probably

| | | |
|---|---|---|
| 1 | | won't have any knowledge of that. |
| 2 | Q. | So let's talk about the interruptions generally and |
| 3 | | you talked about the relay race.  After |
| 4 | | Mr. Villarreal talked to Mr. Johnson, Ms. Franklin, |
| 5 | | Ms. Wolff, did the same employees continue to |
| 6 | | harass you or did it move on to other employees? |
| 7 | A. | Can you repeat that?  I'm sorry. |
| 8 | Q. | So we talked about classroom interruptions.  After |
| 9 | | Mr. Villarreal spoke to the employees, did they |
| 10 | | continue to harass you or did new employees start |
| 11 | | to interrupt you? |
| 12 | A. | There was a mixture.  There was a mixture. |
| 13 | Q. | So after Mr. Villarreal spoke to Ms. Wolff, did she |
| 14 | | continue to interrupt your class? |
| 15 | A. | I'm not sure when he spoke with Ms. Wolff.  I mean, |
| 16 | | I know when he wrote me the email -- I can't |
| 17 | | remember the date now.  So I can't say that yes, |
| 18 | | after he says he spoke with her, she didn't |
| 19 | | interrupt me anytime after that.  I just can't |
| 20 | | remember that right now. |
| 21 | Q. | After he -- |
| 22 | A. | Maybe the ROI, if I look at it, then maybe there's |
| 23 | | something in there.  But right now, offhand, I |
| 24 | | can't remember that. |
| 25 | Q. | So after he spoke with Ms. Franklin, did she |

```
 1        continue to interrupt your class?
 2   A.   I believe that she kept her distance.
 3   Q.   After he spoke to Mr. Johnson, did he continue to
 4        interrupt your class?
 5   A.   He had to come to my class, but I think -- I don't
 6        remember having to tell him about disruptions
 7        anymore, not in my classroom, no.
 8   Q.   Let's move on to your fifth claim on Exhibit 2.
 9        It's Claim E.  "Beginning on August 26, 2019,
10        Complainant was allegedly denied materials and
11        instruction while others were provided said
12        materials and instruction for the implementation of
13        the new curriculum."
14            What course materials were you denied?
15   A.   Which page?  Hold on.  Let me look at it again.
16   Q.   I'm on Exhibit 2.
17   A.   Exhibit 2, you said, or 1?
18   Q.   Exhibit 2 and it's Claim E.
19   A.   "On August 26, 2019, Complainant was allegedly
20        denied materials and instructions while others were
21        provided" -- so that was the beginning of the year
22        in August.  And that would have been -- so what was
23        your question?
24   Q.   What course materials were you denied?
25   A.   There were textbooks for the most part.  Well,
```

```
 1            like, hard copy textbooks, hard-covered textbooks,
 2            as well as digital information that we were to get.
 3                  And those materials were not provided to me,
 4            but they were provided to other, I want to say,
 5            colleagues.  She's a colleague, even though she was
 6            temporary -- other colleagues.
 7     Q.     Who denied you the course materials?
 8     A.     Well, it appeared that Ms. Schiele was denying the
 9            course materials.
10     Q.     Why did you say it was appearing that Ms. Schiele
11            was denying the course materials?
12     A.     Because Ms. Snowden who was a substitute for a
13            vacancy that we had, she had been assigned to work
14            with me, and so we were just talking about the
15            course materials -- or the course and how we would
16            begin without those materials until the materials
17            came in.
18                  And I think we were trying to get a teacher's
19            edition or something.  But the textbooks had not
20            come in, the hard-covered ones.  And for some
21            reason, the student log-ins weren't working.  But
22            within about a week or so, Ms. Snowden stopped
23            meeting with me.
24                  And when I asked her about it, she said that
25            she was meeting with Ms. Holt who I believe was
```

1    working with Ms. Schiele on the new curriculum.

2        And Ms. Holt had provided electronic textbooks

3    and different things to Ms. Snowden that I had not

4    received.  So I was unable to access my student

5    textbooks and things like that.  So I had to, like,

6    find roundabout ways to give them instruction.

7        But, you know, for Ms. Snowden to discontinue

8    her meetings with me and start meeting with

9    Ms. Holt, who was not at the school anymore -- and

10   Ms. Holt was also connected to Ms. Schiele who had

11   assaulted me, as well, in the past.

12       And during this conversation that I had with

13   Ms. Snowden, Ms. Connors, who had also assaulted me

14   in the past, walked into my class and asked

15   Ms. Snowden when they would be meeting because they

16   had been meeting together.

17       So the new teacher, who I had been assigned to

18   work with, was working with two individuals who I

19   had -- who had assaulted me.  And two individuals

20   who had assaulted me, that would be Ms. Schiele and

21   Ms. Connors.

22       And working with the teacher who was

23   reassigned to another school, you know.  And that

24   was the teacher whose hydroponic system they

25   refused to let me use.  So it just seemed to be

```
 1            really deliberate.
 2                 Even my not receiving the materials appeared
 3            to be deliberate.  A substitute teacher getting the
 4            materials and the regular teacher not getting --
 5            I'm sorry -- the regular teacher who had more
 6            seniority than every other science teacher in the
 7            department not getting materials.  And that's
 8            important.
 9   Q.  So why didn't you have biology textbooks?
10   A.  I'm not sure.  I think it was -- I think they said
11            that the order was backdated -- not backdated but
12            backlogged or something.
13   Q.  Back-ordered?
14   A.  Back-ordered, yeah.
15   Q.  So the biology textbooks were back-ordered for the
16            to 2019/2020 school year; is that correct?
17   A.  I believe so.  I'm pretty sure that that was the
18            reason.
19   Q.  So none of the students had biology textbooks; is
20            that correct?
21   A.  No, they did not have biology textbooks.
22   Q.  Besides Ms. Snowden, did any of the other biology
23            teachers have textbooks?
24   A.  So Ms. Snowden and I were the only biology teachers
25            which is why she was assigned to work with me
```

```
 1        because I had already been instructing that class
 2        in the past.  So there were no other biology
 3        teachers.  There were no other teachers teaching
 4        biology.
 5   Q.   So let's look at Exhibit 1.  Exhibit 1 under Claim
 6        1E on page 7, you were asked "Who did you ask for
 7        materials and instruction on August 26, 2019?"
 8            And you respond, "I made request to Ms. Joy
 9        Schiele during the first few weeks of class.  I
10        asked the supply clerk, Mr. Clyde Harris, if
11        biology textbooks had arrived.  I had limited to no
12        access to online teacher accounts.  I was told that
13        there was a problem with my biology textbook
14        order."
15            So does this accurately describe the issue
16        that you were facing?
17   A.   Yeah, that -- yes, it does.
18   Q.   And then why didn't you have access to online
19        teacher accounts?
20   A.   I'm not sure.  I know that I attempted to get into
21        the accounts, to get the students with their
22        individual textbooks assigned to their accounts.  I
23        spoke with Ms. Schiele about that.  And for
24        whatever reason, she said, "Well, we'd have to
25        use" -- I can't remember -- they would have to use,
```

1    like, one textbook for all of the students, which

2    meant that no student could, like, pigment their

3    notes in the textbook and things like that.

4        And so that's how I had to instruct them.

5    Which, again, my students then needed to write

6    their notes on a regular paper as opposed to in

7    their textbooks.

8        However, when I spoke with Ms. Snowden, her

9    students had their textbooks.

10   Q.   So is it your testimony --

11   A.   Digital textbooks.

12   Q.   Okay.

13   A.   At least that's what she told me.  And that's when

14   she told me she was working with Ms. Holt.

15   Q.   So you were asked "What reason did this person give

16   for not providing you with materials and

17   instructions to implement the new curriculum?"

18       And it says "I was told that the technology

19   had glitches and that the biology textbooks were

20   not ordered properly for the building."  Is that

21   correct?

22   A.   That sounds like it could have been correct there.

23   Q.   Is it your allegation that someone intentionally

24   disabled all the log-ins for your students and then

25   allowed Ms. Snowden's students to log in to their

```
 1        textbooks?
 2   A.   Well, that could happen because they can go into my
 3        account from Ms. Schiele's and -- because she was
 4        the, I think, program director or something.
 5             So it could happen.  I don't think that I said
 6        that, but I probably thought that that was
 7        happening, especially after Ms. Snowden shared with
 8        me that her students had their textbooks,
 9        individuals, and that she had gotten them because
10        Ms. Holt gave them to her.
11             So that -- so for me, they found a roundabout
12        way.  Because other biology students other than
13        mine were taking the class at the school so a
14        roundabout way was found for a substitute teacher
15        to get the materials that she needed but for me not
16        to get the materials that I needed to instruct my
17        classes.
18             So therefore, it disrupted my classroom
19        instruction.
20   Q.   So who do you think it was that was denying you the
21        textbooks?
22   A.   It appeared as though it was Ms. Schiele.
23   Q.   Do you know for sure who was denying you the
24        materials?
25   A.   I just know that I asked Ms. Schiele because she's
```

```
 1          the person that I'm suppose to speak with for it.
 2          And I informed Mr. Villarreal that I didn't have
 3          the materials that I needed.
 4             He did the same thing that he normally does,
 5          made excuses and gave reasons why I didn't have it.
 6          And so I waited until I was able to get access.
 7          That's all I could do.  I mean, what else could I
 8          do?
 9   Q.     On page 7 of Exhibit 1, you say, "Ms. Mary Corrigan
10          received the materials."  And who is Ms. Mary
11          Corrigan?
12   A.     She was teaching one of the same classes that I
13          was.  I think she may have had -- I can't remember.
14          She's a teacher as well.  She's a science teacher.
15             I can't remember.  I think her materials came
16          in.  I don't think that she was teaching any of the
17          classes that I was teaching.  But her materials
18          came in, yeah.
19   Q.     Biology?
20   A.     No.  No.  No.  Just Ms. Snowden and I were doing
21          biology.  I'm pretty sure that we were the only
22          ones doing biology that year.
23   Q.     So you also says that Mr. Michael Krebsbach
24          received his materials.  Does he teach biology?
25   A.     No, he teaches chemistry.  And I want to say that
```

```
 1          the chemistry for me came -- ours came in together,
 2          Mr. Krebsbach and mine.  I can't remember about --
 3          but I believe that ours came in together.  It was a
 4          problem with the biology.
 5   Q.     So when they asked you, "Did other employees
 6          receive the materials and instructions to implement
 7          the new curriculum," and you responded, "Ms. Mary
 8          Corrigan and Mr. Michael Krebsbach," they didn't
 9          receive the new biology curriculum; is that right?
10   A.     No.  They received -- it was new curriculum, all of
11          the -- the whole science was new curriculum.  So
12          they received it for whatever courses they were
13          teaching.  And Mr. Krebsbach and I were both
14          teaching chemistry.
15   Q.     But they didn't receive the biology materials that
16          you were missing; is that correct?
17   A.     No.  No, because they weren't teaching biology, but
18          Ms. Snowden did.
19   Q.     So do you believe that you not receiving the
20          biology materials was based on your race?
21   A.     Yes.
22   Q.     What's the basis for this belief?
23   A.     The same as -- I think that it's just -- it's a --
24          it was -- I don't know what the -- let me go back.
25              When you say what the basis is, I can't
```

```
 1         articulate why someone -- let me ask a question.

 2         When you say what the basis is, exactly what do you

 3         mean when you say that?  And that may help a little

 4         bit.  Because I keep saying I can't articulate it,

 5         but --

 6    Q.   So when I'm asking what the basis for the belief

 7         is, just why you believe that not receiving the

 8         biology materials was based on race.

 9    A.   Okay.  That's what I thought.  Okay.  Again, I

10         think that all of the treatment that I've been

11         receiving here is -- the root cause of it is my

12         race.

13              There are other causes that are more apparent

14         than my race.  But I think that the root cause is

15         my race.  In other words, none of the other

16         reasons, the disability, prior EEO, none of that

17         would be happening if it weren't for my race and

18         individuals thinking that they could do whatever

19         they want because of my race and that I would have

20         no recourse.

21    Q.   Do you believe not receiving the materials was

22         based on your disability?

23    A.   Yes.

24    Q.   What is the basis for this belief?

25    A.   So you have a teacher with adult ADHD -- and if you
```

1       look at the symptoms of adult ADHD alone, and

2       that's not even considering my hypertension, my

3       intracranial hypertension, that's not considering

4       anything else, that's considering ADHD, which all

5       teachers are aware of the symptoms and the effects

6       of ADHD.

7           And so when you attempt to take away materials

8       that a teacher is supposed to have, it would be

9       like those teachers, including me, taking away

10      resources that a student with ADHD is suppose to

11      have.

12          So all teachers and everyone in that building,

13      just about, is very aware of the symptoms, side

14      effects and everything of ADHD.  And they are aware

15      of my condition because my records were improperly

16      stored.

17  Q.  Do you believe that not receiving materials was

18      based on retaliation for prior protected activity?

19  A.  Maybe indirectly.

20  Q.  What's the basis for that belief?

21  A.  It's just that my activities were all known.

22  Q.  Let's turn to your sixth claim on Exhibit 2, so

23      it's Claim F.  "On July 9, 2019, Complainant's

24      coworker allegedly asked Complainant's minor

25      daughter interrogating questions."

1          Who was the coworker?

2   A.   Ms. Michele Wolff.

3   Q.   Can you describe what happened?

4   A.   My daughter and her classmates -- she, at that

5        time, was going to a German school.  They had --

6        they were in their pause, which is a break, lunch

7        break, and had gone to a local store and they were

8        purchasing a lunch from a Doner stand, a sandwich

9        stand.  And so it was outside of a store and them

10       in their group.

11          And when my daughter and her friends walked

12       into our house, her friend started talking about

13       the lady, the strange lady that had stood next to

14       my daughter.

15          And then that's when they told me that, you

16       know -- my daughter said, "Yeah, the lady with the

17       truck with the stripes" because she had, like,

18       tiger stripes or something on the front of her

19       truck.  And she said she stood next to me and said,

20       "So how are you doing?  You're Ms. Smithson's

21       daughter; right?  So what is she doing this

22       summer?"

23          And that was inappropriate as far as I was

24       concerned, especially considering our relationship,

25       because I would never approach her daughter, Penny.

| | | |
|---|---|---|
| 1 | | Her daughter's name is Penny.  So if I saw Penny, I |
| 2 | | would say hello and I would keep going. |
| 3 | | And I would not stand next to Penny and |
| 4 | | question what Ms. Wolff was doing -- what her |
| 5 | | mother was doing over the summer. |
| 6 | Q. | How old was your daughter at the time that this |
| 7 | | happened? |
| 8 | A. | 14. |
| 9 | Q. | So let's look back at Exhibit 1, under Claim 1F. |
| 10 | | And I'm on page 7 of Exhibit 1.  And it said "What |
| 11 | | specifically did your coworker ask your daughter?" |
| 12 | | You wrote "Ms. Michele Wolff approached my |
| 13 | | daughter and asked if she was Ms. Smithson's |
| 14 | | daughter and how Ms. Smithson was spending her |
| 15 | | summer.  She asked my daughter what kind of work I |
| 16 | | was doing in the summer.  This was interrogation of |
| 17 | | a minor." |
| 18 | | Does this accurately describe what happened? |
| 19 | A. | I think so. |
| 20 | Q. | Then below that you said that this took place when |
| 21 | | your daughter and her classmates were getting lunch |
| 22 | | at a local Doner Kebab stand.  Is that accurate? |
| 23 | A. | Yes. |
| 24 | Q. | So your daughter was in a group with others? |
| 25 | A. | Yes. |

1  Q.   What was wrong with Ms. Wolff asking what you were

2       doing over the summer?

3  A.   Ms. Wolff is very well aware of my grievances and

4       complaints.  And she could have been trying to

5       figure out if I was working on, you know, case --

6       my case or anything.

7            It was just not for her to ask my daughter

8       what I was doing over the summer, especially

9       considering our relationship.

10 Q.   Could she have just been making small talk, like,

11      "Hey.  What are you up to this summer?  What's your

12      mom up to this summer?"  Could it have just been

13      small talk?

14 A.   Well, if that was the case, I don't think that my

15      daughter's friends would have had the reactions

16      that they had because they called her the weird

17      lady, the strange lady that walked up to her.

18            And in Ms. Wolff's statement, she stated that

19      she spoke with all of them, but that's not true.

20      Well, I'll make that correction; that's not what

21      the kids said.

22 Q.   So do you believe that Ms. Wolff asking what you

23      were doing over the summer was based on your race?

24 A.   Yes.

25 Q.   What's the basis for that belief?

```
 1   A.   Again, it's another situation of a Caucasian female

 2        just approaching a young black female, thinking

 3        nothing can happen.  And she's my colleague.  And I

 4        am black.  I'm an African American that works at

 5        the school which sets me aside.  It's different

 6        than if she approached anyone else's who doesn't

 7        work at the school that has complaints in already.

 8             So I think as an adult, she should have known

 9        better.  She could have just -- and there's a side

10        also.  She did not purchase anything from the Doner

11        Kebab stand.  That's the other thing.  So all of

12        the kids said she didn't even buy anything.  She

13        just stood next to my daughter, had this

14        conversation and then walked off after they all

15        looked like, "Who was that?"

16             So yes, I think when you're African American

17        and you're dealing with a Caucasian American,

18        sometimes -- not all the time of course --

19        sometimes the ideal is that you can do what you

20        want and have no repercussions.

21             And it's been proven actually in our society.

22        So it's just an extension of what's going on here

23        in the United States.

24   Q.   So do you think that someone saying "What's your

25        mom doing for the summer" is harassment?
```

1   A.   In context -- in the context that I'm speaking,

2        yes.

3   Q.   Do you believe Ms. Wolff asked what you're doing

4        over the summer based your disability?

5   A.   Yeah.  In the context that I'm speaking, yes,

6        because Ms. Wolff, again, is very well aware that

7        that will cause some anxiety in me -- so yes, if my

8        daughter were to tell me.  And then, Ms. Wolff --

9        yes.  Yes.  I think so.

10  Q.   Do you believe that Ms. Wolff asked what you're

11       doing over the summer based on retaliation for your

12       prior protected activity?

13  A.   Since she would know about the prior protected

14       activity, I would say yes.

15  Q.   Is that the only basis you have for that belief?

16  A.   At this point, anything that -- most, not all of my

17       colleagues are doing, but anything that certain

18       colleagues are doing is going to be based on my

19       race, my prior protected activity, my disability,

20       anything they can do to cause a reaction possibly

21       that would get me fired.

22  Q.   Did you report this incident to anybody?

23  A.   Yes.  Yes, I did.

24  Q.   When did you report it?

25  A.   When I returned to school, sometime after we

```
 1        returned to school.

 2   Q.   Who did you report it to?

 3   A.   I think I put it in the complaint that I filed

 4        because I didn't -- yeah, I think -- I may have

 5        spoken with Mr. Villarreal about it but maybe not

 6        because it took place in, I think, June or July.

 7        I'm trying to think.  So no, because school lets

 8        out in June.

 9             So my daughter's school, which is a German

10        school, let out at the very end of July, last week

11        of July.  So this happened early to mid July.  So

12        when -- by the time I got back to school, I just

13        prepared for my classes.

14             It's not that I forgot about it.  I just kind

15        of left it and then other things just started --

16        continued to happen.  So when I finally filed a

17        complaint on everything, I put that in there as

18        well because I felt like that was a part of their

19        relay, you know.

20             And I'm sure I missed some things, but I just

21        put in there what I can remember and what I felt

22        like was significant.  I left out maybe little

23        things that were annoyances.  But things that I

24        thought would lead to something more significant --

25        things that I thought could lead to things more
```

```
 1              significant, assault, harassments of my family,
 2              then I included in that -- in the complaint that I
 3              filed.
 4      Q.      Okay.  Let's turn to Exhibit 2 again and look at
 5              Claim G.  You write "In late March 2019,
 6              Complainant's coworker approached her in her
 7              classroom and allegedly asked if she would consider
 8              leaving the school so that she, the coworker, could
 9              stay."
10                   Who was the coworker?
11      A.      Ms. Susan Holt.
12      Q.      And could you describe what happened?
13      A.      Ms. Susan Holt, who is also the teacher who had the
14              hydroponic system, she came to my class and asked
15              if I would consider relocating because -- and I
16              can't remember her exact situation, her scenario.
17              It had something to do with if she stayed there --
18              I can't remember her exact situation.
19                   She gave me a scenario that I can't remember
20              offhand right now.  But she was asking if I would
21              consider leaving, applying to VSIP or something
22              like that, one of the acronyms that I didn't pay
23              much attention to because I never considered -- I
24              wasn't considering leaving.  But I think it was
25              VSIP or something like -- she asked me if I would
```

1        consider -- or maybe she was doing that and she

2        would rather stay.

3             Again, I'd have to look at the notes from the

4        ROI to see exactly what she said.  But in a

5        nutshell, she asked if I would consider leaving

6        because then she would be able to stay because she

7        and I have the exact same credentials, which she

8        was right about that.  We had the exact same

9        courses that we were certified to teach.

10  Q.   So do you remember the conversation clearly or you

11       just kind of remember what she said?  You said you

12       weren't paying attention very closely.

13  A.   No.  No.  No.  Did I say wasn't paying attention?

14       I was paying attention to her when she came in, but

15       no, I wasn't paying attention to the process of --

16       I know what you mean.

17            I wasn't paying attention to the process of --

18       it's a process that we have when you want to be

19       relocated.  That was what I was not paying

20       attention to, that process.

21            So she threw out a couple of acronyms, one of

22       them I'm pretty sure was VSIP, V -- I don't even

23       know what it stands for, but I just remember that's

24       one of the acronyms that she threw out.

25            And it has to do with when you're applying to

```
 1          leave one station to go to another or something
 2          like that.  But she just asked me if I would
 3          consider leaving and I told her that I had no plans
 4          on leaving.
 5               And then she went into saying that -- like,
 6          something about her house, which I think she had
 7          already sold her house.  So I don't know why she
 8          was talking -- at least that's what she told me, so
 9          I don't know.  She had told me that beforehand.
10               And as a matter of fact, I didn't realize that
11          she was going to Ramstein at the time.  I thought
12          that she was leaving to go to Florida.
13               So it was -- I think I had a lack of
14          information at that time.  Maybe she had decided by
15          then that she was not going to leave the system but
16          stay in the system and just be relocated because
17          from my knowledge, before that, she was -- she did
18          not want to be relocated.
19               And then she and her partner had found a home
20          in Florida.  And that's the knowledge that I had.
21          So I was even surprised that she came in to ask me
22          that.
23     Q.   So at the time she came to ask you about
24          relocation, she had already sold her home in
25          Vilseck; is that correct?
```

1   A.   I think so.  At least that's what I thought.

2   Q.   And she was already planning to be reassigned to

3        Ramstein; is that right?

4   A.   I don't know.  So at the time -- I'm speaking of,

5        like, what I knew at that time.  So I'm trying to

6        go back and remember what I had knowledge of at

7        that time.

8             And at that time that she walked into my

9        class, I had knowledge that -- from her, from what

10       she and her partner had told me, because I talked

11       to her partner just about more than I spoke with

12       her when I would see her.  And from my

13       understanding, they had a home in Florida that they

14       purchased in a really nice gated community.

15            And again, when she walked into my class, I

16       was just surprised that she had even made the

17       request.  And I don't believe that I had knowledge

18       about Ramstein at that time.

19  Q.   So of course she denies making this request, but if

20       she had requested that you leave so that she could

21       stay, would there have been anything wrong about

22       her doing that?

23  A.   Yes.  I think so.  We have a process.  And the

24       process is -- first, I have a home, too, in the

25       area.  So why would I want to sell my home if you

```
 1          didn't want to sell your home?  So when she stated
 2          that, that kind of -- I didn't get into that
 3          though, but it was in my mind.
 4               And then, as far as work goes, I have --
 5          you're just now coming off of probation.  This was
 6          2019.  I have 20 years in the system come February,
 7          which is more time than you and any other
 8          individual in the science department, but you feel
 9          like you can come to me and request that I -- maybe
10          you want to move.  Why would I want to move?
11     Q.   And again, she denies that she asked you.  But if
12          she had, is there any harm in her just asking if
13          you wanted to move?
14     A.   I felt so, yes, because of the treatment that I had
15          already been receiving there.  I felt that, you
16          know, "Okay.  Is this another way to try to push me
17          out?"  And then you want me to start all over
18          somewhere else.  And, you know, that's just how I
19          felt.
20     Q.   And she was junior to you, right?  She's not your
21          supervisor?
22     A.   Yeah, she's a junior to me.
23     Q.   So is there any harm with a junior employee coming
24          and saying, "Hey.  Would you ever consider a
25          different opportunity?"  Is there harm in just
```

```
 1          asking the question?

 2   A.     Well, that's not how she presented it.  It was more

 3          of a, you know -- almost like a pity kind of thing,

 4          like oh, if I moved then I'd have to go through

 5          this or that kind of thing.  It wasn't --

 6   Q.     Is there anything wrong with her --

 7   A.     I'm sorry.  It wasn't a discussion that we were

 8          having.  And again, it was -- and again, it was a

 9          time where I was just prepping in my class.  It was

10          during my lunch, though, I believe, but I prep

11          during my lunch.  I have a working lunch.

12               So I'm pretty sure it was my lunchtime.  I

13          would have to look back and see.  But she came in

14          and just laid all of that out on me and of course

15          it seemed weird.  It seemed odd for her to do --

16   Q.     Is there anything wrong for her to go and say,

17          "Hey.  Take pity on me.  I will have to leave.  Is

18          there any chance you wanted to leave?"  Is there

19          anything wrong with that?

20   A.     I think considering our history, she and I, Ms.

21          Holt and my history, and the history that I have

22          with her and other colleagues at the school, yes.

23          You don't ask, again, the only black person, only

24          African American in the science department "Hey.

25          If you leave" -- as far as I'm concerned, diversity
```

```
 1              needs to remain in that school.
 2                   So no, don't ask me if I will leave so that
 3              you can stay.  Yes, I think that something was
 4              wrong with that.  And I still think that
 5              something's wrong with that.
 6    Q.   How did she know that you didn't -- maybe weren't
 7              wanting to leave potentially?
 8    A.   Well, I mean, we had been like, you know, working
 9              together for a couple of years, at least -- I think
10              three to five, five years maybe.  I'm sure we've
11              had some type of discussion.  I don't know.
12                   I had never said that I planned on leaving.  I
13              had never even said that I was thinking about --
14              not that I can recall -- applying for VSIP.  If I
15              said it, I don't know why I would.
16    Q.   Isn't that why?  If you've never talked about it
17              before, isn't that why she asked you the question?
18    A.   I mean, she could have.  I mean, I don't know what
19              was in her mind.  I just know how she made me feel.
20    Q.   Let's turn to Exhibit 8.
21                   (Defendant's Exhibit 8 marked.)
22    Q.   Do you recognize this document?
23    A.   Yes.
24    Q.   What is this document?
25    A.   The document that Susan Holt completed.
```

1   Q.   So she was asked "Ms. Smithson states that in late

2        March 2019 you entered her classroom and asked her

3        if she would consider leaving the school so that

4        you could stay.  Is this a true statement?  If so,

5        why did ask her the question?  If not, please

6        explain what happened."

7            She wrote "This is not true.  Whether she

8        stayed or not made no impact on if I could stay or

9        not.  Excessed positions are determined by

10       seniority and I had higher seniority over one, if

11       not two other teachers in the science department.

12       I could have stayed if I wanted to."

13           Were you aware that Ms. Holt could have stayed

14       if she wanted to?

15   A.   So they excessed teachers based on -- not

16       individual.  They excessed people based on

17       department and then based on -- once they decide on

18       which department they're going to excess from, they

19       base it on the certification within the department.

20           So Ms. Holt had the same exact credentials

21       that I had.  So once they decided what they were

22       going to excess -- in this case, whatever they

23       decided, either biology or chemistry, obviously,

24       because the other individuals had physics and

25       chemistry and physics and math.  So they didn't

```
 1          want to excess, obviously, those individuals, those
 2          courses, the course -- you know, anyone certified
 3          in those courses.
 4              So no, that is an incorrect statement.  She
 5          could not have remained there over anyone else.
 6   Q.     So Mr. Villarreal testified that she volunteered to
 7          be excessed.  Are you saying you know more about
 8          the process than Mr. Villarreal and Ms. Holt do?
 9   A.     She may have -- no.  No.  That's not what I'm
10          saying.  So she may have -- and because I've had to
11          go through this process as well -- so she may have
12          volunteered, but once you're told that you're going
13          to be excessed -- and they do as a courtesy kind of
14          tell you "Hey.  We have to excess out of this
15          department.  And from this department, we have to
16          excess this subject."
17              Once you're told that -- like, I was told when
18          I was in Turkey -- then you -- if they force excess
19          you, it puts you -- gives you some type of benefits
20          and I can't remember exactly what it is.  But if
21          you volunteer, then that opens up some other
22          opportunities for you.
23              So just because you volunteer doesn't mean
24          that they weren't going excess you anyways.  If I
25          had not volunteered or whatever the situation was
```

```
 1            in Turkey -- if I don't volunteer, I would be
 2            excessed anyways, but then my choices are a little
 3            different.
 4     Q.     So is this public?  Like, you were told about
 5            Ms. Holt's private employment situation and you had
 6            that knowledge.  Like, someone came to you and
 7            said, "Ms. Susan Holt has been excessed."  Like,
 8            you would be privy to her personal --
 9     A.     I can't remember.  No.  No.  No one would come to
10            me other than her or Judy, her partner.  But not
11            that I can remember.  So it's just having knowledge
12            of what, you know, what the process is, that's all.
13                And she's making statements here saying that
14            first -- the first statement, she said that it
15            wasn't true -- that she approached me, which that
16            is absolutely 100 percent not true.  She did
17            approach me.
18     Q.     So Mr. Villarreal also testified that she
19            volunteered to be excessed.
20     A.     Okay.
21     Q.     So a few people are saying that she was not forced
22            to leave the school.  You testified that no one
23            came to you to tell what personnel decisions were
24            being made about her.  Is it just kind of your
25            guess knowing how the process works that she was
```

```
 1        told that she was going to be excessed?
 2   A.   No. It wasn't a guess.  We're told when -- what
 3        department -- well, we're told when they have to
 4        excess individuals.  And then the department is let
 5        know that someone in that department is going be
 6        excessed.
 7             But then after that, they don't tell us what
 8        individual is going to be excessed out of the
 9        department.  They tell that individual that they're
10        going be excessed.  So it was apparent that Ms.
11        Holt was that individual after some time.
12             So from that point on, knowing what that
13        process is, you know -- okay, so if she
14        volunteers -- I know in my head, I know, well, they
15        were going to excess anyways from our department.
16        But they will give you other options to make it a
17        smoother transition.
18   Q.   So Ms. Holt wrote "My wife and I brought property
19        in The Villages, Florida, in December and were in
20        the middle of designing a house at that time.  I
21        had already made it clear to my supervisors that I
22        had no intention of staying at Vilseck High School
23        because I was a local hire, meaning I did not have
24        benefits of LQA, living quarters allowance, or
25        transportation after my wife resigned from her
```

```
 1          position at Hohenfels High School.
 2              "We felt it would be best to move back to the
 3          States with her transportation agreement and I had
 4          paid over $300 for processing and receiving my
 5          Florida teachers certification in preparation to
 6          move to Florida."
 7          And then she said, "We already sold our house
 8          in Vilseck by February 2019, and made arrangements
 9          with the new owners to take possession of the house
10          in April.  We would ship our household goods to
11          Florida and move into temporary quarters."
12          So were you aware that Ms. Holt had bought a
13          house in Florida in December?
14   A.     Well, I didn't know when she had purchased the
15          house.  I just know that I had spoken with,
16          probably, Ms. Holt and Judy as well but definitely
17          Judy, Ms. Holt's partner.
18          And so that's why I was probably confused when
19          she asked me because she definitely 100 percent
20          asked me.  I will never go back on that.
21          She asked me if I would consider -- I don't
22          know if she -- I saw a VSIP in here, but I'm not --
23          VERA I also see.  I can't remember what those are
24          for, but I know that she mentioned them during our
25          conversation.  But she asked if I would consider
```

```
 1          leaving, being reassigned so that she could stay.
 2               But that's where my confusion during that
 3          whole conversation came in.  And I don't think that
 4          I questioned why, didn't you just buy a house?  I
 5          don't think that I questioned it.
 6               I just said that I'm not considering leaving.
 7          I was working so I didn't try to have a long
 8          conversation about it.
 9    Q.    Were you aware that Ms. Holt had lost her living
10          quarters allowance after her wife resigned her
11          position?
12    A.    I probably became aware after reading this, but
13          that wasn't something that I remembered until you
14          just read it again and because it's not something
15          that we discussed, I don't think.  And so --
16    Q.    Are you aware that Ms. Holt had no intention of
17          remaining at Vilseck High School?
18    A.    No.  From my understanding, they would have loved
19          to stay.  They just purchased a home.
20    Q.    Were you aware that she had already sold her house
21          in Vilseck High School in February 2019 before you
22          alleged that she had this conversation with you?
23    A.    I did know that she sold the house.  I didn't know
24          when, but I know that that was a part of the
25          process so...
```

1   Q.   So if you look down on the page -- let me get the

2        number.  It's page 3 of 5 of this document.

3             She was asked "Did you have any problem

4        receiving new materials and instruction to

5        implement the new curriculum in August 2019?  If

6        so, explain why."

7             And she said, "Yes.  The new materials were

8        not released until the first week of returning to

9        work from summer break.  And even then we only had

10       digital resources for a period of time.  There were

11       not enough books for all students at the beginning

12       of the year."

13            So do you agree that all of the biology

14       teachers didn't get hard textbooks or had trouble

15       getting hard textbooks?

16  A.   So I didn't get any hard textbooks.  I got none,

17       zero.  And my digital resources -- I had digital

18       resources for me.  And then my students had to

19       share their textbooks so they couldn't write their

20       notes in it.

21            But Ms. Snowden had communicated with me that

22       all of her students had been assigned digital

23       textbooks.

24  Q.   I'm just going to ask -- a lot of your claims that

25       we're going to look at later, too, involve people

| | |
|---|---|
| 1 | having access to websites and resources that you |
| 2 | can't seem to access.  Are you good with computers? |
| 3 | A.  I'm better now. |
| 4 | Q.  Have you ever had issues accessing computers or |
| 5 | log-ins? |
| 6 | A.  Yes, of course. |
| 7 | Q.  Would you consider yourself, like, tech savvy? |
| 8 | A.  I wouldn't say tech savvy, but if there -- like, |
| 9 | once I was given access to my student -- for |
| 10 | example, to my textbooks and the students could |
| 11 | actually get their own, I had no problem getting |
| 12 | them signed up. |
| 13 | I just loaded all their information and then |
| 14 | they were able to get their own individual |
| 15 | textbooks.  But before that, that was not available |
| 16 | to me. |
| 17 | Q.  Because I want to say -- and we'll go through |
| 18 | them -- but three or four of your claims are about |
| 19 | you having trouble logging in to websites or |
| 20 | resources.  So I just wanted to get a sense of what |
| 21 | your computer familiarity is.  Do you tend to have |
| 22 | problems with technology? |
| 23 | A.  Not a lot, but there are times when -- just like |
| 24 | anyone else, that I have an issue, maybe. |
| 25 | Q.  Okay.  Do you think someone, you know, in IT is |

```
 1        intentionally messing with your log-ins or do you
 2        think it's a technical issue?
 3   A.   Oh.  Sometimes it's just a technical issue.  But
 4        then other times I think that it's intentional.
 5   Q.   Who do you think it is doing it?
 6   A.   It depends on at that time.  I don't know if --
 7        well, it depends.  You would have to ask me, like,
 8        the names and then I would be able to tell you.
 9        Like, if so-and-so --
10   Q.   So do you think Ms. Holt asking you these questions
11        was based on your race?
12   A.   Yes.
13   Q.   What's the basis for that belief?
14   A.   She's an African American.  I want to stay.  I
15        should be higher on the totem pole or seniority
16        regardless of if she has more years.  I'm going to
17        ask her if she'll leave.  That's what I think.
18            I think that, you know, she figured why not?
19        Let me ask her.  She'll go.  And then she probably
20        also felt like people would rather her stay, which
21        she was probably right about it.
22            People would rather her be there than me, at
23        least her friend group or the group, cohort group
24        that I was discussing before that like -- a little
25        gang that continues to run that relay race that we
```

```
 1          were talking about.
 2     Q.   So if she had stayed, she would have no living
 3          quarters allowance though; right?
 4     A.   I can't remember if she went through all of that.
 5          I remember reading it.  And then just now when you
 6          read it, but that wasn't -- I don't think -- a part
 7          of our conversation when she asked me if I would
 8          consider leaving.
 9               I just don't remember that being a part of
10          our -- I do remember her saying -- there were a
11          couple of things about that conversation that would
12          confuse me because, again, like I said, I already
13          told you that I thought she sold the house, which
14          she did.
15               What other -- I don't know.  But I don't
16          remember, like, the things that she wrote in here,
17          in her statement, her declaration.  Most of that we
18          didn't discuss.
19     Q.   So she said I want to stay at Vilseck and she
20          didn't bring up that fact she'd already sold her
21          house, bought a house in Florida and then would
22          lose her living quarters allowance if she had
23          stayed at Vilseck?
24     A.   No.  I had already -- I knew already that she had
25          sold her house, or at least -- I didn't know
```

1    because, I mean, how could I know.  I was told that

2    she already sold her house.

3         But the living quarters, I probably had

4    knowledge of it, maybe, but I don't remember

5    talking about it on this day.

6  Q.  Do you believe Ms. Holt asking you these questions

7    was based on your disability?

8  A.  I mean, no.  The reason for coming in to ask me is

9    just that she figured -- no, not my disability, I

10   don't think.

11 Q.  Do you believe that Ms. Holt asking you these

12   questions was based on retaliation for prior

13   protected activity?

14 A.  Just like with disability, maybe indirectly but not

15   direct reason.  I think the race issue would be

16   more direct here because she just, yeah, felt like

17   she should leave instead of me, you know.

18 Q.  Did you report this incident to anyone?

19 A.  Mr. Villarreal, I think.  It may have been more of

20   a discussion, a conversation but not a grievance at

21   the time until I started -- I couldn't get the

22   hydroponic system.

23        And so then it started to be more apparent

24   that, oh, okay, so now they don't want me to use

25   any of the things that actually belong to the

```
 1          science department because she was the one that
 2          ordered it and was using it, you know.  So all of
 3          this stuff started to come together.
 4     Q.   What was Mr. Villarreal's response?
 5     A.   I don't remember.  But I saw his response in the
 6          ROI when I actually put it on the complaint.
 7     Q.   What was his response in the ROI?
 8     A.   I can't remember -- I can't remember what he wrote
 9          in the ROI either.  I would need to actually read
10          it.
11     Q.   So let's turn to Exhibit 9.
12     A.   Uh-huh.
13     Q.   Do you recognize this document?
14     A.   It looks like Ms. Snowden.
15     Q.   So this is the declaration Ms. Snowden did in your
16          EEO case that is a basis for this action.
17               Actually, let's go out of order and switch to
18          Exhibit 10.  My apologies.
19     A.   That's okay.
20     Q.   We'll come back to Exhibit 9.  So let's pull up
21          Exhibit 10.
22               (Defendant's Exhibit 10 marked.)
23     Q.   Do you recognize this document?
24     A.   Yes.
25     Q.   So I'll represent that this is the Second Amended
```

```
1        Complaint in your federal lawsuit.

2   A.   Yes, ma'am.

3   Q.   Let's go to paragraph 24.  So in paragraph 24, you

4        write "In September 2019, Plaintiff was subjected

5        to adverse action when Ms. Holt replaced Plaintiff

6        as mentor for a new teacher.  Ms. Holt was a

7        Caucasian teacher and had recently completed her

8        probationary period.  Ms. Holt was also relocated

9        and working in a different school and district over

10       200 miles away from Plaintiff and new teacher, Ms.

11       Snowden.

12            "The new teacher discontinued face-to-face

13       collaborations with the Plaintiff without notice,

14       stated that she had been working with Ms. Holt

15       (teleconference).

16            "Until this point, the plaintiff had not been

17       notified of the change and was providing the new

18       teacher with information that Plaintiff thought the

19       new teacher needed.

20            "During this discussion, Plaintiff found that

21       the new teacher had received textbooks and

22       materials that the Plaintiff was told could not be

23       supplied at that time.  The new teacher shared that

24       she had received the new materials from Ms. Susan

25       Holt."
```

| | | |
|---|---|---|
| 1 | | So who was Ms. Snowden? |
| 2 | A. | She was a substitute that they hired to teach some |
| 3 | | more biology classes and math classes. |
| 4 | Q. | Was this claim about being replaced as |
| 5 | | Ms. Snowden's mentor included in your EEO |
| 6 | | Complaint? |
| 7 | A. | I have to look back at the complaint.  I don't have |
| 8 | | it open -- wait -- the EEO Complaint.  No.  This |
| 9 | | was the -- wait a minute.  I think so.  I'd have to |
| 10 | | look back.  I'm not sure. |
| 11 | Q. | So in Exhibit 2 we just looked at all your claims |
| 12 | | in your EEO Complaint.  Would you agree that |
| 13 | | mentoring Ms. Snowden was not one of the claims |
| 14 | | listed on Exhibit 2? |
| 15 | A. | I think that it was, but I'd have to look back. |
| 16 | | I'm pretty sure it was in the original report. |
| 17 | | But, again, I'd have to look back and see. |
| 18 | Q. | So how does the mentorship work?  Is it a formal |
| 19 | | assignment?  Did someone formally assign you to |
| 20 | | mentor her? |
| 21 | A. | No.  Mr. Villarreal just asked me if I would.  And, |
| 22 | | of course, yes.  I said yes and just started making |
| 23 | | sure that she had everything -- Ms. Snowden had |
| 24 | | everything that she needed.  And unfortunately, |
| 25 | | didn't have access for -- the computers for the |

```
 1        students.

 2             So in fact, that's when I -- later, I said we

 3        would talk because we didn't have the hardcover

 4        books and I would send her some information.  And

 5        then one day, I hadn't heard from her in a couple

 6        of days.  So she stated that they had her working

 7        with Ms. Holt.

 8             And I said, "Oh.  Okay.  Ms. Holt that used to

 9        work here?"  Because Ms. Snowden wasn't there the

10        year before so I don't even think that Ms. Snowden

11        really knew Ms. Holt, but I could be wrong, and

12        maybe she was a substitute the year before too.

13             But either way, Ms. Holt was no longer at the

14        school.

15   Q.   Who do you think made the decision to have

16        Ms. Snowden work with Ms. Holt?

17   A.   So I'm not sure who made the decision to have

18        Ms. Snowden work with Ms. Holt.  I just know that

19        Mr. Villarreal asked me to work with Ms. Holt.

20             I don't know if it was Mr. Villarreal who

21        asked Ms. Holt to work with Ms. Snowden or if it

22        was Ms. Schiele -- Ms. Joy Schiele who asked

23        Ms. Holt to work with Ms. Snowden.

24             But I'm pretty sure that one of them -- one of

25        the individuals did.  And so if it was
```

 1             Mr. Villarreal, that would seem weird because --

 2             and undermining because he had already asked me.

 3             And I was working with her.

 4                  If it was Ms. Schiele, it would also seem

 5             undermining because she knew that I couldn't get

 6             access to my -- I didn't have access to anything,

 7             but she would put her with Ms. Holt who had access

 8             obviously.

 9                  And a substitute in the school had access to

10             teacher materials when the actual teacher didn't.

11    Q.    So sitting here today, you don't know why

12          Ms. Snowden started working with Ms. Holt?

13    A.    I'm not sure if I knew at that point and put it in

14          the ROI -- in my complaint.  Again, I would have to

15          look back to see if I wrote "Ms. Snowden said that

16          so-and-so assigned her" because I can't remember.

17    Q.    And so you don't --

18    A.    Yeah.

19    Q.    And sitting here today, you don't know who decided

20          that Ms. Snowden should start working with Ms. Holt

21          as her mentor?

22    A.    I want to say I can't remember.  I don't know if --

23          I may have known at that time.  But with there

24          being so many things that have taken place, I just

25          may not be able to remember that detail.

```
 1              So I will say that I don't remember at this
 2         time today.
 3    Q.   So do you think Ms. Snowden working with Ms. Holt
 4         as her mentor was discrimination based on your
 5         race?
 6    A.   Yes.
 7    Q.   What's the basis for that belief?
 8    A.   So they assigned her with Ms. Holt, who just
 9         happened to have her materials or digital
10         materials.
11              I mean, Ms. Holt was also attempting to stay
12         at Vilseck High School because she did ask me if I
13         would consider leaving.
14    Q.   After she sold her house; right?
15    A.   I have no -- if that's what the situation is, then
16         that's what the situation is.  I just know that
17         100 percent she asked me if I would consider
18         leaving so that she could stay.
19              And Ms. Holt, you know, was also a teacher who
20         they tried to give my courses to and I had to
21         complain to a principal about that.  Unfortunately,
22         he was -- you know, he knew enough to say that
23         wasn't right.  And he said that I would retain my
24         chemistry courses because they attempted to take my
25         chemistry courses and give them to Ms. Holt in
```

 1        2016.  I think that it was.

 2             So these are not the first issues that I've

 3        had involving Ms. Holt.  So she's considered -- as

 4        far as what they make me feel, she's considered

 5        more favorable.  They would rather have her there,

 6        at least most of the -- some of the colleagues.  I

 7        don't know.

 8             I don't think all of them.  Some of them don't

 9        even care.  But there are enough that would prefer

10        her to be there to where they made problems for me.

11        So that was just a whole other set of problems that

12        I had on top of the other problems that were being

13        presented to me because remember, they are

14        presenting me with these problems.

15             And 98 percent of these issues, I am working

16        in my classroom and people are entering my space

17        and disrupting my work.

18   Q.   But you don't even know who made this decision;

19        right?

20   A.   I don't know.

21   Q.   But you know that it was based on race?

22   A.   I believe that it was based on race.

23   Q.   Okay.  Do you believe that the decision to have

24        Ms. Snowden work with Ms. Holt is based on

25        disability?

1   A.   I believe that it was based on race.  I believe

2        that it could have been based on disability.

3        Mr. Villarreal asked me to work with her.  I worked

4        with her until -- I still work with her after even,

5        you know, because I think I have emails after this

6        all happened.  So I wasn't going to stop working

7        with Ms. Snowden.

8            I just thought it was underhanded.  So I

9        continued.  So yes, I think it still was based on

10       disability.  Maybe -- possibly, you know, maybe

11       they didn't think I could handle it for whatever

12       reason, but I was just doing just fine with her,

13       just like I had done helping other teachers in the

14       past.

15  Q.   Did Ms. Snowden think it was going fine?

16  A.   She never said that she didn't.  We met and I think

17       I want to say that I sent her -- I'm not sure if I

18       sent her that, but I sent her materials.

19           But she never complained about anything.  It

20       was fine.  We were fine.  I mean, it didn't last

21       long but we were fine for the time that we were

22       working together.

23  Q.   Do you believe that Ms. Holt being asked to work

24       with Ms. Snowden was done in retaliation for prior

25       protected activity?

1    A.    Yes.

2    Q.    What's the basis for that belief?

3    A.    Because she was also attached to Ms. Connors so

4          there might be some interweaving some things that

5          are going on that are -- I want to say I'm not

6          aware of, but when she's been placed with Ms. Holt,

7          Ms. Connors and then Ms. Schiele, I mean, again

8          these are three individuals who I've had complaints

9          concerning in the past.  All three.  All three.

10   Q.    So I'm guessing I have about an hour left.  Do you

11         want to take a five-minute break here and finish?

12   A.    Actually, we can continue.  I can do this for about

13         15 more minutes because I said no more than four

14         hours at a time and I'm having to rock back and

15         forth right now.

16         And then I'm starting to develop a migraine.

17         Again, I had a fall and I'm undergoing physical

18         therapy so this has been -- sitting has been very

19         difficult.  Like for -- after the first two hours,

20         I felt that.

21         MS. FISCHER:  Okay.  Why don't we stop it here

22         then.

23         THE WITNESS:  Would you like to look at other

24         dates?

25         MS. FISCHER:  Yes.  What dates do you have

1   available?

2       THE WITNESS:  I'd have to look at my email to

3   see which ones I told you about.

4       MS. FISCHER:  And I'm just going to tell you

5   right now that weekends are not available.

6       THE WITNESS:  Okay.  That's fine.  I was just

7   trying to be flexible when I said I would need

8   Saturdays or Sundays.  I was just trying to give,

9   you know, more opportunity.

10      So first, I have to find the email, so hold

11  on.  Let me do this.  Let me put in your name so I

12  can find your email.  I need to find the one that

13  we discussed the dates.  I can't remember the dates

14  offhand and I'll just tell you the very next date

15  and then we can talk about if that will work for

16  you.

17      We've had quite a few emails going back and

18  forth.  Let me expand this page for my emails.  I

19  just won't be able to see you; that's the problem.

20  I just need to see all of my emails.

21      MS. FISCHER:  Like I said, I estimate the

22  remainder of the deposition will just be about an

23  hour.

24      THE WITNESS:  Okay.  No problem.  Here it is.

25  All right.  So I gave you the 23rd, 24th, 25th.

 1   Today is the 25th.

 2        MS. FISCHER:  And the 23rd and 24th were

 3   weekends.

 4        THE WITNESS:  Right.  The 4th is what day?

 5        MS. FISCHER:  The 4th is a Thursday, but I

 6   will be out of town.

 7        THE WITNESS:  Let me see if anything has

 8   opened up on my calendar.  And the 6th is what day?

 9        MS. FISCHER:  Saturday.  So that's

10   unavailable.

11        THE WITNESS:  And then I said the 3rd and the

12   5th.  What about the 3rd?

13        MS. FISCHER:  The 3rd, I will also be out of

14   town.

15        THE WITNESS:  The 5th?

16        MS. FISCHER:  I'm out of town that week.

17        THE WITNESS:  Okay.  The whole week.  Tomorrow

18   I have early appointments and late appointments.

19   27th, I have appointments all day.  I have early

20   appointments and then I believe I might be able to

21   get back between those two on the 28th.  Let me

22   check the 29th first.  Oh.  No, definitely can't do

23   the 29th.  That's the day before my son's wedding.

24        And you said all next week you're not

25   available; right?

1        MS. FISCHER:  Right.  The August 1st through

2   5th, I'm out of town.

3        THE WITNESS:  So the only time that I see that

4   I could possibly make myself available, I have

5   morning appointments on the 28th which is Thursday.

6        There's a very good chance I have a migraine

7   after these appointments, but I want to try to, you

8   know, just to get this done.  This 2:00 p.m. to

9   start, like we would --

10       MS. FISCHER:  I have to be in court at

11  2:00 p.m. so I can't do that.

12       THE WITNESS:  You have to be there at

13  2:00 p.m.?

14       MS. FISCHER:  Right.  And it's a hearing so I

15  don't know how long it will take.

16       THE WITNESS:  So 1:00 p.m. wouldn't work for

17  you?  You're not that close; right?

18       MS. FISCHER:  I've got to be in court early to

19  be ready for it.

20       THE WITNESS:  I understand.  Noon is not going

21  to work because I won't be back from my appointment

22  by noon.

23       MS. FISCHER:  And it's just impossible to

24  complete this hour right now?

25       THE WITNESS:  Yes, because I have to be

1   somewhere, another appointment.  The original --

2   oh.  I'm just not sure.  We only need one hour;

3   right?

4       MS. FISCHER:  Right.

5       THE WITNESS:  That original week that you had

6   asked for, the 8th through the 12th, I will be in

7   New York, but I'm not sure how things are going to

8   go.  What is the latest that you give depositions?

9       MS. FISCHER:  August 12th, but we can always

10  ask the Court for more time.

11      THE WITNESS:  I'm sorry.  I mean the latest

12  end of day.

13      MS. FISCHER:  I'd like to conclude by 5:00.

14      THE WITNESS:  Yeah, it's not -- I don't see

15  another -- other than the dates that I sent you, I

16  don't see where I will be able to.

17      MS. FISCHER:  Well, Ms. Smithson, frankly,

18  since you're the plaintiff in this case, the Court

19  is going to order you to complete your deposition.

20      So how do you want to handle this?

21      THE WITNESS:  Well, I mean, I've given you

22  dates that I'm available.  I'm giving you dates

23  that I'm available.

24      MS. FISCHER:  So the dates that you're

25  available are the 3rd, 4th, and 5th.

```
 1        THE WITNESS:  3rd, 4th -- oh.  Yes, because
 2   the 6th is the weekend.  So the 3rd, 4th and 5th,
 3   if it's just an hour.
 4        I mean, I can do four hours on those days, but
 5   you're saying that you're not able to do that.
 6   Maybe you can do an hour.
 7        MS. FISCHER:  Yes.  So this is your lawsuit.
 8   You know, asking me to rearrange my travel plans
 9   because you don't want to rearrange any of your
10   plans is just not going to happen.
11        So besides those three days, you don't have a
12   single hour to complete your deposition?
13        THE WITNESS:  I tried to do one for tomorrow,
14   but you said you couldn't do that either.
15        MS. FISCHER:  Tomorrow.  What time are you
16   available tomorrow?
17        THE WITNESS:  Or was that the 27th?  I'm
18   sorry.  Oh, no.  That was tomorrow, right.  No.
19   No.  Today is the 25th and we agreed upon today.
20        We hadn't agreed upon any other day yet, but I
21   did give dates.  So I said tomorrow -- no, I didn't
22   say tomorrow because I have early appointments and
23   later appointments tomorrow.
24        And between those two times -- which those
25   appointments have to happen, I don't have time.  I
```

```
 1   won't have time -- I won't have time between.  I
 2   have to go from one directly to the other and both
 3   of them are a couple of hours each.
 4       And you want to be done by 5:00.  So for one
 5   appointment, actually -- the 26th, for tomorrow,
 6   let me see what time this appointment starts --
 7   from 4:00 to 5:00 tomorrow?
 8       MS. FISCHER:  Okay.  Let's plan on that.
 9       THE WITNESS:  And then, I actually have
10   another appointment at 5:00.  So I think 3:30 to
11   4:30, maybe that will be better because I think I
12   can get back here by 3:30.  Or actually -- I'm
13   sorry.  3:45 to 4:45, how does that work?
14       MS. FISCHER:  3:45 to 4:45.  Can you do any
15   earlier than 3:45 to start, as a start time?
16       THE WITNESS:  Because by the time I get from
17   my physical therapy, it may be 3:30.  So I don't
18   want to say 3:30 and I'm just walking into the
19   house at 3:30.
20       MS. FISCHER:  And you said you might be able
21   to do 15 more minutes today; is that still true?
22   Can we do --
23       THE WITNESS:  Well, we just did 15 minutes
24   trying to -- 10 minutes trying to figure this out.
25   So I have another appointment coming up.
```

1      MS. FISCHER:  Okay.  So let's plan on

2  reconvening at 3:45 to 4:45 tomorrow.

3      Just for the record, I'd like to say I'm

4  leaving this deposition open to be continued on

5  another day.

6      And I will see you back at 3:45 to 4:45

7  tomorrow.  And hopefully we can conclude it then.

8      Is there anything else from the court reporter

9  that you need from us?

10      THE WITNESS:  Nope.  It's just -- if you need

11  any other times after tomorrow, then, again, I'm

12  available the dates that I gave you.

13      THE REPORTER:  You're not going to be ordering

14  this today; correct?  Should we wait for tomorrow?

15      MS. FISCHER:  That's correct.  I'll order it

16  after we finish our hour tomorrow.

17      THE REPORTER:  Okay.  No problem.

18      MS. FISCHER:  Thank you.

19      (Whereupon the deposition was adjourned at

20  2:20 p.m.)

21

22

23

24

25

Page 153

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
 2                     INDIANAPOLIS DIVISION

 3


 4
     TAMICA J. SMITHSON,              )
 5                                    )
          Plaintiff,                  )
 6                                    )
        -v-                           )    Case No.
 7                                    )    1:21-CV-02193-JRS-MJD
     LLOYD AUSTIN III,                )
 8                                    )
          Defendant.                  )
 9

10

11                      Job No. 174264

12

13        I, TAMICA SMITHSON, state that I have read the
     foregoing transcript of the testimony given by me
     at my deposition on July 25, 2022, and that said
14   transcript constitutes a true and correct record of
     the testimony given by me at said deposition except
15   as I have so indicated on the errata sheets
     provided herein.

16

17

18   _____
     TAMICA SMITHSON
     VOLUME I
19

20

21

22

23             STEWART RICHARDSON & ASSOCIATES
              Registered Professional Reporters
24             One Indiana Square, Suite 2425
                 Indianapolis, IN  46204
25                    (800)869-0873
```

```
 1   STATE OF INDIANA  )
                       )
 2   COUNTY OF MARION  )

 3

 4            I, Cascidy Bandyk, a Notary Public in and for

 5   said county and state, do hereby certify that the

 6   deponent herein, TAMICA SMITHSON, was by me first duly

 7   sworn to tell the truth, the whole truth, and nothing

 8   but the truth in the aforementioned matter;

 9            That the foregoing deposition was taken on

10   behalf of the Defendant; that said deposition was taken

11   at the time and place heretofore mentioned between 9:59

12   a.m. and 2:20 p.m.;

13            That said deposition was taken down in

14   stenograph notes and afterwards reduced to typewriting

15   under my direction; and that the typewritten transcript

16   is a true record of the testimony given by said

17   deponent;

18            And thereafter presented to said witness for

19   signature; that this certificate does not purport to

20   acknowledge or verify the signature hereto of the

21   deponent.

22            I do further certify that I am a disinterested

23   person in this cause of action; that I am not a

24   relative of the attorneys for any of the parties.

25                IN WITNESS WHEREOF, I have hereunto set my
```

1  hand and affixed my notarial seal this 9th day of

2  August, 2022.

3

4

5

6

7

8

9

10

Notary Public - State of Indiana
11 My Commission Expires:  July 5, 2029

12

Job No. 174264
13

14

15

16

17

18

19

20

21

22

23

24

25

Index: $300..28th

**Exhibits**

**Tamica Smithson Ex 01** 3:6 22:18,19,21,22 23:2 26:16,17 36:16,17 83:4 92:22 106:5 109:9 114:9,10

**Tamica Smithson Ex 02** 3:7 24:3,4,5,6,13 33:14,20,21 40:3,6, 8 79:2,3,12 102:8,16,17,18 112:22 119:4 139:11,14

**Tamica Smithson Ex 03** 3:7 48:13,14

**Tamica Smithson Ex 04** 3:8 55:12,13,15,18

**Tamica Smithson Ex 05** 3:8 56:19 57:19,20 65:16,17 73:24

**Tamica Smithson Ex 06** 3:9 74:23 75:1

**Tamica Smithson Ex 07** 3:9 85:3,4

**Tamica Smithson Ex 08** 3:10 125:20,21

**Tamica Smithson Ex 10** 3:10 137:18,21,22

**$**

**$300** 130:4

**0**

**04/2020** 23:21

**09112** 10:12

**1**

**1** 22:18,19,21,22 23:2 24:13 26:16,17 36:16,17 65:15 83:4 92:22 102:17 106:5 109:9 114:9, 10

**10** 71:15 97:8 137:18,21,22 151:24

**100** 128:16 130:19 142:17

**10th** 86:9 91:14 95:23 96:5,9

**1100** 51:14

**11:15** 45:22 46:2

**11:17** 91:14,21 93:23 94:12,13,15

**11:20** 45:23

**11:22** 46:2

**12** 71:14 72:25

**12:08** 91:24 92:9 93:6,10,15

**12:14** 79:8,11

**12:20** 79:9

**12:23** 79:11

**12th** 149:6,9

**13th** 44:5,6,9

**14** 114:8

**15** 10:10 145:13 151:21,23

**150** 4:3

**1500** 52:23,24

**15465** 10:16

**15th** 44:5,9

**16** 6:16 11:9

**16-year-old** 11:11

**16th** 50:2

**18th** 52:22

**19-** 15:12,14

**1972** 10:10

**1990** 13:20

**1995** 13:20 15:12,19

**1996** 15:9

**1997** 15:9,15

**1998** 13:24

**19th** 73:15

**1:00** 148:16

**1:11** 92:15 93:7 97:8

**1A** 23:25 26:17

**1B** 36:17

**1D** 83:5

**1E** 106:6

**1F** 114:9

**1st** 148:1

**2**

**2** 24:3,4,5,6,13 33:14,20,21 40:3, 6,8 55:21 75:14 79:2,3,12 102:8, 16,17,18 112:22 119:4 139:11,14

**20** 69:24 123:6

**20-something** 41:16

**200** 138:10

**2000** 15:11

**2002** 9:3 15:15,17 16:6

**2003** 9:3 15:9,10

**2004** 9:3 14:23 15:19 16:6,25

**2006** 16:25 17:4

**2008** 13:6

**2016** 143:1

**2017** 70:1

**2018** 70:3,4

**2019** 24:15 33:14,24 34:19 40:10 56:11 59:9 65:15 70:3,4,6 75:14 76:6,15 78:4 79:14 86:6,13 97:8 102:9,19 106:7 112:23 119:5 123:6 126:2 130:8 131:21 132:5 138:4

**2019/2020** 105:16

**2020** 8:12 11:20,23 19:22,23 21:15,16 43:17,20,23,24 44:12

**2020/2021** 58:7

**2021** 8:7 20:17 21:15,16 58:8

**2022** 4:4 21:16

**23rd** 146:25 147:2

**24** 138:3

**24th** 146:25 147:2

**25** 4:4 73:2,6 83:18 92:23 93:1,6

**25th** 146:25 147:1 150:19

**26** 102:9,19 106:7

**26th** 151:5

**27th** 147:19 150:17

**28** 11:9

**28th** 147:21 148:5

**29th** 147:22,23

**2:00** 148:8,11,13

**2:20** 152:20

**2:58** 50:1

---

**3**

**3** 18:9 48:13,14 64:15 132:2

**30** 11:3 33:14,24 34:19 40:10 59:9

**30th** 40:14

**3668** 10:12

**3:13** 65:15

**3:30** 151:10,12,17,18,19

**3:45** 151:13,14,15 152:2,6

**3rd** 147:11,12,13 149:25 150:1,2

---

**4**

**4** 55:12,13,15,18

**40** 72:21

**411** 10:12

**46060** 10:16

**4:00** 151:7

**4:30** 151:11

**4:45** 151:13,14 152:2,6

**4th** 147:4,5 149:25 150:1,2

---

**5**

**5** 24:1 26:16 55:22 56:1,19 57:19, 20 65:16,17 73:24 132:2

**50** 72:21

**500** 6:19

**5:00** 149:13 151:4,7,10

**5th** 147:12,15 148:2 149:25 150:2

---

**6**

**6** 28:3 36:16 42:25 74:23 75:1 83:5

**600** 6:21

**6th** 147:8 150:2

---

**7**

**7** 71:14 72:24 85:3,4 106:6 109:9 114:10

---

**8**

**8** 125:20,21

**800** 6:21

**8:32** 91:19

**8th** 149:6

---

**9**

**9** 79:14 86:6,13 112:23 137:11,20

**90,000** 18:1

**92249** 10:21

**98** 143:15

**9:59** 4:4

**9th** 86:19 87:1

---

**A**

**a.m.** 4:4 46:2 91:19

**A218** 62:13

**ability** 7:1,5,7,24

**abruptly** 90:2

**absolutely** 66:5 128:16

**abuse** 75:21 87:16,21

**abused** 74:22

**accepted** 23:24

**access** 28:20 30:3 104:4 106:12, 18 109:6 133:1,2,9 139:25 141:6, 7,9

**accessing** 133:4

**accommodated** 29:11 45:10 47:10

**accommodating** 67:21

**accommodation** 20:2 32:11

**accommodations** 29:8 30:14 67:6,11 74:21 100:10

**account** 108:3

**accounts** 106:12,19,21,22

**accurate** 114:22

**accurately** 7:5,15,25 27:6 37:4 83:23 106:15 114:18

**acronym** 87:13

**acronyms** 87:14 119:22 120:21, 24

**action** 4:24 23:13,18 59:21,22 137:16 138:5

**active** 13:23 83:9

**activities** 112:21

**activity** 14:19 33:8 37:23 38:10 47:19 100:24 112:18 117:12,14, 19 136:13 144:25

**actual** 74:10 77:15 98:18 141:10

**actuality** 68:19

**addition** 53:7

**additional** 17:22 19:11

**address** 10:11,13,15,18,19,20 58:18 60:15 67:19

**ADHD** 29:18 111:25 112:1,4,6, 10,14

**adjourned** 152:19

**administered** 5:4

**administering** 83:10

**administration** 13:4 31:16

**administrative** 8:19 34:6,8 72:17

**administrator** 46:24 48:11 68:13 70:18

**administrators** 19:1

**adolescent** 87:4,5,7

**adult** 111:25 112:1 116:8

**adverse** 138:5

**AE** 10:12

**affect** 7:1,4,7,24

**African** 29:15 75:19,21,25 76:1 78:19 82:17 99:6 100:18 116:4,16

Index: agency..back

124:24 134:14

**agency**  24:10 97:15 99:20

**ages**  11:8

**aggression**  39:15

**aggressions**  75:18

**aggressor**  96:23

**agitations**  77:17

**agree**  49:18 51:4,23,25 52:13,20 53:2,3 56:10 60:3,8,16 65:2 66:13 67:2,18 78:13 86:17,25 96:3 97:18,20,22 132:13 139:12

**agreed**  150:19,20

**agreement**  53:19 130:3

**ahead**  6:17 20:23 50:19 52:6

**alcohol**  25:3 79:23 87:9,15,21

**allegation**  107:23

**alleged**  131:22

**allegedly**  24:15 33:15,25 40:11, 15 79:15 102:10,19 112:24 119:7

**allowance**  129:24 131:10 135:3, 22

**allowed**  41:3,7,8 107:25

**allowing**  34:25

**Amended**  137:25

**America**  75:21

**American**  29:15 82:17 116:4,16, 17 124:24 134:14

**Americans**  75:21,25 76:2 78:19 99:6 100:18

**analogy**  69:5

**angry**  83:20

**Ankara**  16:22

**annoyances**  118:23

**answers**  6:1

**anxiety**  28:5 117:7

**anxious**  66:22 68:25

**anymore**  29:12 102:7 104:9

**anytime**  101:19

**APO**  10:12

**apologies**  137:18

**apologized**  86:17,25

**apparent**  29:10 74:11 76:4 111:13 129:10 136:23

**appeared**  53:5 63:9 103:8 105:2 108:22

**appearing**  103:10

**appears**  50:21 54:1,12 55:1 81:12 94:13 95:4

**applied**  20:3,9,12

**applying**  119:21 120:25 125:14

**appointment**  89:11 148:21 149:1 151:5,6,10,25

**appointments**  7:21,22 147:18, 19,20 148:5,7 150:22,23,25

**appreciated**  90:22 95:14,22,24 96:4

**approach**  113:25 128:17

**approached**  114:12 116:6 119:6 128:15

**approaching**  116:2

**approximately**  21:13 26:18

**April**  130:10

**area**  49:8,9 50:25 55:25 57:16 84:6 90:4 122:25

**argument**  99:21

**arrange**  36:5 43:8,14 54:21,22

**arranged**  53:11

**arrangements**  34:12 36:14 88:16 130:8

**arranging**  64:11

**arrived**  106:11

**arriving**  93:12 95:12 96:7

**articulate**  32:17 33:11 38:13 47:22 99:1,3 111:1,4

**ASACS**  87:10,11

**ASAP**  58:15 60:2

**assault**  119:1

**assaulted**  77:20 104:11,13,19,20

**assaults**  75:25

**assessments**  19:12

**assign**  139:19

**assigned**  20:10 21:20 103:13 104:17 105:25 106:22 132:22 141:16 142:8

**assignment**  16:21 139:19

**assistant**  14:11,12 21:23 22:8, 10,12 34:6,8

**assistants**  72:17

**associate**  4:2

**associate's**  13:12

**Associates**  4:2

**assume**  5:23 65:25

**attached**  12:2 145:3

**attempt**  53:5 96:21,23 98:16 112:7

**attempted**  79:15 80:7,8 83:9 106:20 142:24

**attempting**  97:20 142:11

**attempts**  28:9 29:25

**attend**  11:14,21,23 12:7

**attended**  12:1,8

**attention**  32:12 74:20 119:23 120:12,13,14,15,17,20

**attorneys**  97:15 99:20

**August**  10:10 19:24,25 43:17 102:9,19,22 106:7 132:5 148:1 149:9

**Austin**  4:10

**authenticity**  90:12 91:12 94:19

**average**  71:15

**aware**  28:13,15 65:10 66:3 73:12 112:5,13,14 115:3 117:6 126:13 130:12 131:9,12,16,20 145:6

---

**B**

**bachelor's**  12:14 13:7

**back**  9:5 20:19 21:12 23:24 25:5, 15 26:6 29:13,23 35:12 38:24 39:18 40:8 42:23,24 45:23 46:17 52:7 54:4 56:20 59:10 66:22 70:7, 15 77:21 79:9 80:3 81:2,19 82:12,

Index: back-ordered..choices

24 84:2,12,14 89:2 92:12,20 95:5, 8 98:8 110:24 114:9 118:12 122:6 124:13 130:2,20 137:20 139:7,10, 15,17 141:15 145:14 146:17 147:21 148:21 151:12 152:6

**back-ordered** 105:13,14,15

**backdated** 105:11

**background** 74:7

**backlogged** 105:12

**bad** 7:18 69:3 70:4 99:7

**ball** 48:10

**Bandyk** 4:1

**base** 42:19 126:19

**based** 32:6,20 33:7 37:8,10,14, 22 38:9 44:22 46:4,10 47:13,18 98:6,23 100:5,23 110:20 111:8,22 112:18 115:23 117:4,11,18 126:15,16,17 134:11 136:7,12 142:4 143:21,22,24 144:1,2,9

**basically** 13:1 39:25 62:11

**basis** 23:13 24:11 28:12 32:8,22 33:1,10 37:17,25 38:3,12 44:24 46:12 47:21 69:21 76:25 98:25 100:7 110:22,25 111:2,6,24 112:20 115:25 117:15 134:13 137:16 142:7 145:2

**baton** 68:4 69:8 81:23

**Beach** 14:4,5

**beeline** 90:9

**begin** 19:21 103:16

**beginning** 19:22 27:14 102:9,21 132:11

**behave** 59:24

**behaving** 91:3

**belief** 28:12 32:8,22 33:1,10 37:17,25 38:3,12 44:24 46:12 47:21 69:21 98:25 100:7 110:22 111:6,24 112:20 115:25 117:15 134:13 142:7 145:2

**bell** 95:17

**belong** 136:25

**belonged** 41:25 42:2,5

**benefits** 127:19 129:24

**biology** 33:18 34:2 62:16 105:9, 15,19,21,22,24 106:2,4,11,13 107:19 108:12 109:19,21,22,24 110:4,9,15,17,20 111:8 126:23 132:13 139:3

**birth** 10:9

**bit** 18:12 19:17 40:20 41:6 43:15 70:2,16 89:1 111:4

**black** 60:24 82:14 99:12,14 116:2,4 124:23

**blanket** 68:9

**blocked** 81:9

**blood** 6:18 29:19,22

**blurry** 23:8

**boil** 70:5

**bolted** 43:9

**books** 132:11 140:4

**bother** 42:8

**bottom** 56:1 57:25 75:7 83:4 86:12

**bought** 130:12 135:21

**Box** 10:12

**boxes** 57:10

**Bragg** 14:7,9

**break** 6:7,10 7:11 43:21 45:16,17 46:1 51:16 52:1,3 53:15 54:3,18 113:6,7 132:9 145:11

**breaks** 7:12

**brick** 19:7,16 20:3,18 21:1

**bring** 47:1 135:20

**brought** 129:18

**Buffalo** 12:9,15 13:8 16:1

**building** 21:18,21 48:11 59:2 78:17 107:20 112:12

**bullied** 97:13,14

**bully** 84:23 96:22,24 100:1,2

**busy** 81:19

**buy** 116:12 131:4

**C**

**calendar** 147:8

**call** 39:14 66:1 80:12 89:9

**called** 4:12 10:4 115:16

**Camp** 14:8

**Candesartan** 6:16

**Canyon** 12:13 13:3,9

**caps** 58:10

**care** 143:9

**Carolina** 14:7,9

**Cascidy** 4:1

**case** 8:14,16 9:19 23:13 24:10 50:23 115:5,6,14 126:22 137:16 149:18

**Caucasian** 45:2 78:24 82:16,20 99:7,18 116:1,17 138:7

**caused** 68:23,25 76:10 83:16 92:25

**cc'd** 48:20 90:15 94:6

**Cerebral** 15:21

**certification** 126:19 130:5

**certified** 120:9 127:2

**challenges** 43:5

**challenging** 66:25

**chance** 80:6 124:18 148:6

**change** 138:17

**changed** 17:9,18 18:2,4 19:5,7, 17

**characterize** 37:4

**charged** 9:16

**check** 25:18 49:16 51:9 66:15,19 95:8 147:22

**checked** 66:16

**chemistry** 41:21 84:15 85:20 86:5 109:25 110:1,14 126:23,25 142:24,25

**children** 11:4,6

**choices** 128:2

**civil** 17:16

**claim** 23:23,25 24:2,13,14,20,21 26:17 33:13,14,20,24 36:17 40:3, 8,9 63:22 79:1,12 81:12 83:5 102:8,9,18 106:5 112:22,23 114:9 119:5 139:4

**claiming** 96:8

**claims** 4:25 23:17,24 132:24 133:18 139:11,13

**clarify** 5:22

**class** 24:16,18 25:13,24 26:6,7, 10,11,19,21,25 27:4,23 32:12,13, 20 33:2,7,18 34:2,19 36:10,13,20 39:9,11,12,14,16 41:17,21 47:1 49:25 51:5 53:1,6 54:25 55:8,23 59:17 62:9,10,14 64:20 65:3 67:3 71:13 72:1,3,14,16,20 73:1,3 79:15,19 83:22 84:12,14,15,17 85:20 86:4,5,18 87:1,24 88:1,17 90:25 92:17 101:14 102:1,4,5 104:14 106:1,9 108:13 119:14 122:9,15 124:9

**classes** 11:15 31:7,14 34:23 41:3,18 61:23 62:3,4,7,16 63:20 74:15 88:21 89:10 93:9 108:17 109:12,17 118:13 139:3

**classmates** 113:4 114:21

**classroom** 21:19 26:1 28:4 32:6 34:16 35:1,5 36:6,14 41:10,11,13, 15,24 42:1,4,5 46:23 47:5,6 52:15 53:24 55:22 56:11,16 62:5 65:7, 22,25 66:7,11 76:20 77:4,11 79:24 80:5 82:24 83:9,17,19 85:11 86:1 87:18 89:2,19 93:1,2,4 98:6,23 99:9 100:5,23 101:8 102:7 108:18 119:7 126:2 143:16

**classrooms** 34:10

**clear** 129:21

**clerk** 106:10

**close** 43:25 88:6 95:17 148:17

**closely** 120:12

**Clyde** 106:10

**CMR** 10:12

**cohort** 134:23

**collaborations** 138:13

**colleague** 94:23 103:5 116:3

**colleagues** 21:17,21 28:9 29:24 30:8,15 40:1 59:1,23 61:6,16 63:7 64:1,4,9 76:3,21 89:25 91:3 103:5,6 117:17,18 124:22 143:6

**colleagues'** 37:19

**collective** 62:10

**College** 12:9

**colluding** 72:20

**colorism** 99:13

**comments** 33:4

**communicate** 56:18

**communicated** 132:21

**communicates** 34:13

**communicating** 34:20 36:12,18 51:6 66:6

**communication** 19:2 59:4,9

**communications** 73:25 74:2

**community** 12:9 13:12 122:14

**company** 52:2

**compare** 25:18

**complain** 31:15 60:20 142:21

**Complainant** 24:17 33:17 34:1 79:18 102:10,19

**Complainant's** 24:16 26:19 33:15,16,24 40:10,14 79:14,16,19 112:23,24 119:6

**complained** 30:15 31:21,23 60:22 75:24 78:22 144:19

**complaining** 68:15,16,17,18

**complaint** 31:4,5,8,10 118:3,17 119:2 137:6 138:1 139:6,7,8,12 141:14

**complaints** 30:11,12,18,19,20, 22,23,24,25 31:17 37:18 39:22,24 115:4 116:7 145:8

**complete** 148:24 149:19 150:12

**completed** 14:24 15:1 125:25 138:7

**completely** 45:25 53:9 67:14 83:1

**component** 19:11

**components** 19:14,15,17

**composure** 74:16

**computer** 58:12 133:21

**computers** 133:2,4 139:25

**concentration** 100:14

**concern** 67:4 85:23

**concerned** 54:10 113:24 124:25

**concerns** 40:1 83:20

**conclude** 149:13 152:7

**condition** 37:20 112:15

**conditions** 29:21

**conduct** 41:21

**confidential** 87:18,23,24 88:1,3, 5,12,14 89:10

**confuse** 135:12

**confused** 130:18

**confusion** 131:2

**connected** 54:8 104:10

**Connors** 104:13,21 145:3,7

**considered** 45:4 119:23 143:3,4

**consistent** 19:19 27:15

**consistently** 15:11,16 27:13

**constantly** 58:25 67:8 74:15

**consult** 52:19,21

**contact** 21:20 43:7 60:3

**context** 117:1,5

**continue** 9:8 29:6 58:18 60:14 81:22 101:5,10,14 102:1,3 145:12

**continued** 15:1 40:2 59:23 63:11 68:14 81:9 118:16 144:9 152:4

**continues** 134:25

**continuing** 32:13

**control** 28:14

**convenient** 60:22

**conversation** 87:17,22 88:3,7 90:18 94:18,20 104:12 116:14 120:10 130:25 131:3,8,22 135:7, 11 136:20

**conversations** 59:6 73:17

**convicted** 9:16

**coordinate** 49:24

**coordinating** 69:19,22 71:13,16 73:1

**copies** 21:18

**copy** 103:1

**cordial** 84:10 98:12,15,17

**corner** 42:11 89:8

**correct** 10:23 17:5,23 20:11,14 21:14 30:5 31:16 43:17 49:10 51:1 53:12 58:24 94:18,20 105:16,20 107:21,22 110:16 121:25 152:14,15

**correction** 13:24 115:20

**correctly** 17:20

**correspondence** 22:3 48:17 50:2

**Corrigan** 109:9,11 110:8

**counsel** 4:7 89:11

**counseling** 57:16,17 87:4,6,7,16

**counselor** 25:1,2 28:2 42:5 62:6, 8 77:5 79:23

**counselors** 61:10 72:17

**counterparts** 78:24

**couple** 10:4 28:17 30:21 34:22 61:24 120:21 125:9 135:11 140:5 151:3

**courses** 12:10,24 110:12 120:9 127:2,3 142:20,24,25

**court** 5:3,5,9 8:19,24 9:4,10 148:10,18 149:10,18 152:8

**courtesy** 127:13

**cover** 73:10

**covered** 31:7,15

**COVID** 20:13

**coworker** 33:15,25 40:11,13,14 79:14,20 81:13 112:24 113:1 114:11 119:6,8,10

**coworkers** 24:15,19 26:18 32:5, 19 33:6 81:22

**credentials** 120:7 126:20

**cried** 81:18,25

**crime** 9:17

**cross** 20:8

**crucial** 19:14,15,16 80:12,17

**cry** 39:16 81:13,16 82:23 89:13 95:20 99:11,18

**crying** 39:11 79:17 81:20 82:20, 24 83:19 84:13,14,16,22,25 85:20 86:10 91:18 93:20 94:23,24 96:18 97:17 99:3,4,23

**current** 10:11 17:7,25 18:10,18

**curriculum** 102:13 104:1 107:17 110:7,9,10,11 132:5

**cut** 93:13 95:12

---

### D

**dark** 99:12,17

**date** 4:4 10:9 23:20 78:4 101:17 146:14

**dated** 73:15

**dates** 145:24,25 146:13 149:15, 22,24 150:21 152:12

**daughter** 112:25 113:4,11,14,16, 21,25 114:6,11,13,14,15,21,24 115:7 116:13 117:8

**daughter's** 114:1 115:15 118:9

**day** 7:18 9:23 27:7,9,10,18 79:18 83:15 85:10,13,15,16,18 86:7,9, 19,21 90:21 92:24 136:5 140:5 147:4,8,19,23 149:12 150:20 152:5

**days** 27:12,19 50:9 140:6 150:4, 11

**DE** 20:24

**dealing** 116:17

**dealings** 49:11

**December** 8:7,16,17 52:22 129:19 130:13

**decent** 29:15

**decide** 126:17

**decided** 121:14 126:21,23 141:19

**decision** 24:10 140:15,17 143:18,23

**decisions** 128:23

**declaration** 23:12 28:3 135:17 137:15

**defendant** 4:9,12,23

**defendant's** 22:21 24:5 48:14 55:13 57:20 75:1 85:4 125:21 137:22

**Defense** 9:14 14:18

**degree** 12:14,16,21 13:12

**degrees** 13:7,10

**deliberate** 105:1,3

**deliberately** 55:11

**demanded** 71:20

**demonstration** 24:18 26:20

**denied** 45:14 102:10,14,20,24 103:7

**denies** 122:19 123:11

**dental** 14:11,12

**denying** 103:8,11 108:20,23

**department** 9:14 14:18 63:2,7 66:9 67:3 105:7 123:8 124:24 126:11,17,18,19 127:15 129:3,4, 5,9,15 137:1

**depending** 22:2,4 62:7

**depends** 134:6,7

**deponent** 4:6

**deposed** 8:2,11,21

**deposition** 4:5 5:1 6:2 7:18 8:10, 16,18 9:20 14:18 22:19 146:22 149:19 150:12 152:4,19

**depositions** 8:5,22 149:8

**descendant** 29:15

**describe** 27:6 40:17 83:23 106:15 113:3 114:18 119:12

**designing** 129:20

**desk** 33:16,25 34:3 35:7,8,14,16, 19,23 36:2,4,21 37:7,14,21 38:8 79:16 80:9,21,24,25 81:3,6 83:10, 12,13 84:11 85:12 88:3,6,10 89:5, 8 90:3,6,10

**desks** 56:7,8

**detail** 19:21 20:1 21:22 141:25

**detailed** 21:3 43:16

**determined** 126:9

**develop** 145:16

**devices** 80:19

**Diego** 12:24

**difficult** 47:14 74:17 145:19

**digital** 103:2 107:11 132:10,17, 22 142:9

**dimensions** 42:16

**direct** 136:15,16

**directly** 36:20,22 37:11 50:18 80:9,21 92:17 100:25 151:2

**director** 15:20 108:4

**disability** 29:17 30:5 32:10,20,24 33:3 37:15 46:10 47:13 60:24 74:21 100:5 111:16,22 117:4,19 136:7,9,14 143:25 144:2,10

**disabled** 107:24

**disadvantaged** 88:24 89:15

**discontinue** 104:7

**discontinued** 138:12

**discrimination** 142:4

**discuss** 12:6 39:17 95:19 135:18

**discussed** 63:23 76:19 77:4 131:15 146:13

**discussing** 83:5 134:24

**discussion** 50:8,10 58:23 70:16 93:13 95:13 124:7 125:11 136:20 138:20

**discussions** 67:22

**displaying** 91:1

**disregarded** 100:19,20

**disrespect** 59:1

**disrespectful** 28:6

**disrupted** 36:19 60:25 61:4,12, 13,23 89:21 108:18

**disrupting** 143:17

**disruption** 20:16 83:17 92:25

**disruptions** 102:6

**distance** 102:2

**distracted** 61:9 89:1

**distracting** 89:9

**distraction** 28:5

**district** 17:17 21:24 138:9

**disturbing** 35:13

**diversity** 20:25 124:25

**document** 23:5,10,14 24:1,8 48:16,18 55:21 57:22 75:2 85:7 94:14 125:22,24,25 132:2 137:13, 23

**documented** 67:23

**documents** 9:19,21 25:5 94:9

**Dodea** 14:17,19,22,25 15:2,3,6, 17,24 16:10,12,17 17:10 18:2,7 19:6

**Doner** 113:8 114:22 116:10

**door** 84:18 90:8,9

**drilled** 49:10 51:1,13,19 52:10

**dropped** 48:10

**drug** 25:3 79:23

**drugs** 6:13

**due** 45:7 88:24 89:16

**duly** 4:13

**duty** 13:23 14:4,7

─────────────────

**E**

**earlier** 53:9 54:13 63:23 72:24 151:15

**early** 24:14 73:8 118:11 147:18, 19 148:18 150:22

**easier** 73:5 90:3,8

**easily** 88:25

**easy** 66:19 73:18 92:15

**ed** 25:25 26:11

**edition** 103:19

**education** 12:6,18 13:8,17 14:19,24 15:1 16:8

**EEO** 23:13,25 24:10 31:11 111:16 137:16 139:5,8,12

**effects** 112:5,14

**effort** 90:5

**electrocuted** 54:9

**electronic** 104:2

**else's** 116:6

**email** 23:1 34:21 36:12,18 49:4, 18,23 50:6,22 51:17 53:11 54:17 55:1 58:11,22,23 60:5 65:8,11,14, 23 66:4,6 67:20 73:7,14 74:3,8,23 75:5,7,10 79:18 82:12 83:15 85:8, 23 86:12 87:2,3 88:14 89:13 90:15,19,20,21 91:15 92:7,8,15, 23 93:6,7,10,15 94:6,12,13,15,17, 25 95:4 96:20 97:7,25 98:3,9,10 101:16 146:2,10,12

**emailed** 22:23 48:1 91:24

**emailing** 51:22 59:10

**emails** 20:22 51:3 54:24 59:21 61:4,5 74:4 85:10 92:3 93:19 144:5 146:17,18,20

**emergencies** 65:9,24

**emergency** 65:25

**employee** 123:23

**employees** 21:5 101:5,6,9,10 110:5

**employment** 9:11 15:18 128:5

**empty** 41:24 83:14

**encounter** 97:4,22,23

**end** 44:9 58:7 72:5 88:23 118:10 149:12

**ended** 43:24 59:10

**engaged** 63:20

**engineer** 41:5

**enter** 83:22 90:3

**entered** 27:2,3 36:20 83:18 84:15 88:19 93:2,4 126:2

**entering** 30:11,13 143:16

**entire** 71:4

**envelope** 80:23

**environment** 74:10 77:19,20

**equate** 76:19,22 77:3,7,11,12

**equitably** 78:21

**equivalence** 76:25

**equivalent** 67:13

**Ester** 25:1 91:20

**estimate** 146:21

**Eustis** 14:6,8

**evaluations** 19:13

**Evidently** 97:16

**exacerbated** 29:9

**exact** 119:16,18 120:7,8 126:20

**EXAMINATION** 4:16

**examined** 4:14

**excess** 126:18,22 127:1,14,16, 18,24 129:4,15

**excessed** 126:9,15,16 127:7,13 128:2,7,19 129:1,6,8,10

**exchanged** 51:3

**excuse** 6:21 42:1 85:16

**excuses** 109:5

**exhibit** 22:18,19,21,22 23:2 24:3, 4,5,6,13 26:16,17 33:14,20,21 36:16,17 40:3,5,6,8 48:13,14 55:12,13,15,18 56:19 57:19,20 65:16,17 73:24 74:23 75:1 79:2,3, 12 83:4 85:3,4 92:22 102:8,16,17, 18 106:5 109:9 112:22 114:9,10 119:4 125:20,21 137:11,18,20,21, 22 139:11,14

**exhibits** 22:23

**exited** 36:24

**expand** 146:18

**expect** 43:13 55:6

**expected** 36:7 44:18 46:13,19,20 55:3

**experience** 78:24

**experienced** 75:11 77:22

**experiences** 75:16

**experiment** 41:4

**explain** 62:17 81:3 83:6 126:6 132:6

**explained** 62:22

**expressed** 85:23

**extension** 75:12 77:23 78:15,18 116:22

**eye** 83:25

**eyes** 95:6

---

**F**

**face-to-face** 21:4 93:11,18 94:20 95:11,15 96:2,4 138:12

**facilitate** 48:6 53:4,5 56:8

**facing** 106:16

**fact** 121:10 135:20 140:2

**faculty** 58:18 60:14 68:8 71:4,7,8 73:19

**fair** 16:7

**fairly** 19:19

**fall** 7:10,20 19:22 145:17

**Falls** 15:25

**familiar** 75:3

**familiarity** 133:21

**family** 9:3,10 119:1

**fault** 54:11 99:6

**favorable** 45:4 143:5

**February** 11:20,23 123:6 130:8 131:21

**federal** 8:15,19 15:6 62:6 138:1

**feel** 6:4 7:13 49:16,17 81:13,15, 16 82:21,25 90:24 96:21,22,25 97:2 98:17 99:2,7 123:8 125:19 143:4

**feeling** 65:18 91:5,8 99:10

**feet** 42:25

**fell** 39:23

**felt** 75:16 76:6 118:18,21 123:14, 15,19 130:2 134:20 136:16 145:20

**female** 82:20 99:12,14,16 100:17 116:1,2

**fence** 70:9

**field** 91:9

**figure** 92:2,3,4 115:5 151:24

**figured** 134:18 136:9

**figuring** 92:13

**file** 29:2

**filed** 118:3,16 119:3

**filing** 8:19

**final** 14:7 24:9

**finally** 96:13 118:16

**find** 20:22 62:13 83:24 92:16 104:6 146:10,12

**finding** 78:20

**fine** 9:9 64:14,16 92:13 144:12, 15,20,21 146:6

**finish** 5:12 82:2 145:11 152:16

**finished** 26:15

**fired** 54:5 117:21

**Fischer** 4:9,17,23 45:17,20 46:1 79:8 145:21,25 146:4,21 147:2,5, 9,13,16 148:1,10,14,18,23 149:4, 9,13,17,24 150:7,15 151:8,14,20 152:1,15,18

**fit** 49:9 50:5,12,15,25 51:5,9 56:11,13

**five-minute** 7:11 79:5 145:11

**five-page** 55:21

**flexible** 30:13 64:21 71:23 84:7 146:7

**floor** 42:20

**Florida** 121:12,20 122:13 129:19 130:5,6,11,13 135:21

**focused** 32:12

**follow** 46:1

**force** 54:2 127:18

**forced** 100:9 128:21

**forever** 68:6

**forgetting** 12:23,25

**forgot** 29:20 118:14

**formal** 139:18

**formally** 139:19

**forms** 24:10

**Fort** 14:6,7,8,9

**forward** 65:24 67:16

**found** 108:11,14 121:19 138:20

**fourth** 79:1

**Franklin** 25:1,11,21 26:23 27:11 30:16 31:20 38:25 39:2,3 42:6 69:17 79:21,22 83:8,13,18 85:8 86:17 89:13 93:1 95:15,22,24 96:3 97:16,18 98:1,5,22 100:4,22 101:4,25

**Franklin's** 42:8 57:15 97:7

**frankly** 149:17

**free** 6:4 52:10,25 53:1 56:2

**frequency** 32:25 62:9 90:1

**Friday** 44:5 51:15 53:15

**friend** 113:12 134:23

**friends** 72:22 113:11 115:15

**front** 24:15 25:12,14 26:8,19 32:5,19 33:2,6 35:24 42:23 83:13 84:11 90:2,9 113:18

**full** 10:1

**full-time** 16:9

---

**G**

---

**Gallow** 10:16

**game** 68:3

**gang** 134:25

**ganging** 76:4

**gaslight** 68:14

**gaslighting** 39:25 59:15 69:15

**gated** 122:14

**gave** 44:16 55:9 71:23 108:10 109:5 119:19 146:25 152:12

**general** 78:11,14

**generally** 101:2

**German** 11:25 113:5 118:9

**Germany** 10:19,21 17:3 22:17 44:3 76:14

**gestures** 5:16

**gist** 37:5

**give** 43:2 50:16 52:5 62:24 80:6, 19 104:6 107:15 129:16 142:20, 25 146:8 149:8 150:21

**give-and-take** 64:20

**giving** 26:2 28:6 72:4 80:11 88:18 149:22

**glad** 58:12,19 74:15 83:25

**glasses** 23:7

**Glaupax** 6:18

**glitches** 107:19

**go-to** 99:10,11

**good** 40:23 49:1,21 53:1 56:14, 17,21 57:4,6 74:6 91:19 96:25 97:2,4,22,23 133:2 148:6

**goodness** 20:24

**goods** 130:10

**government** 15:6

**grab** 63:5

**Grand** 12:12 13:3,9

**great** 67:20 88:20

**grievance** 136:20

**grievances** 115:3

**ground** 5:3

**group** 71:5,6,13 113:10 114:24 134:23

**guard** 15:20

**guess** 73:14 84:1,4,9,11 99:5 128:25 129:2

**guessing** 145:10

**guidance** 28:2 62:6,8 72:16 77:5

**guy** 70:8

**guys** 43:21,25 90:18

---

**H**

---

**hand** 33:16 36:23 37:7,13,22 38:9,15

**handle** 144:11 149:20

**hands** 38:6

**happen** 63:12 77:13 78:23 108:2, 5 116:3 118:16 150:10,25

**happened** 27:6,12 37:4 43:19,23 44:1,2 81:8 82:11 83:6,23 95:21 98:19 113:3 114:7,18 118:11 119:12 126:6 142:9 144:6

**happening** 74:13 76:23 78:18 97:24 108:7 111:17

**happy** 59:13

**harass** 84:25 101:6,10

**harassed** 81:15,17

**harassing** 98:1

**harassment** 81:14 82:8,9,25 84:23,24 96:9,20 99:22,24 116:25

**harassments** 119:1

**hard** 5:10 103:1 132:14,15,16

**hard-covered** 103:1,20

**hardcover** 140:3

**harm** 123:12,23,25

**Harris** 106:10

**hash** 48:7

**hazard** 43:4

**head** 43:18 129:14

**heard** 140:5

**hearing** 148:14

**held** 4:5

**helping** 144:13

**hey** 100:13 115:11 123:24 124:17,24 127:14

**high** 6:18 11:16,21 12:1,2,4,6 21:5,8 22:1,4,7 28:21 29:19,21 31:15 43:19 58:3 69:2,4 70:10 75:11,23 77:22 87:6 90:1 129:22 130:1 131:17,21 142:12

**higher** 13:16 61:6,17 126:10 134:15

**hip** 35:16

**hips** 36:23 38:6

**hire** 16:18 129:23

**hired** 15:17 16:16 139:2

**history** 124:20,21

**Hohenfels** 130:1

**hold** 15:11,12 18:14 22:13,25 57:24 74:16 83:24 92:7 93:25 102:15 146:10

**Holt** 31:3 42:1,2 44:25 45:1,6,8, 10 46:5,7 47:2,12 49:12 57:11 63:4 103:25 104:2,9,10 107:14 108:10 119:11,13 124:21 125:25 126:13,20 127:8 128:7 129:11,18 130:12,16 131:9,16 134:10 136:6, 11 138:5,6,8,14,25 140:7,8,11,13, 16,18,19,21,23 141:7,12,20 142:3,8,11,19,25 143:3,24 144:23 145:6

**Holt's** 42:13 128:5 130:17

**home** 11:10,11 22:6 121:19,24 122:13,24,25 123:1 131:19

**homeschool** 11:15,17,19 12:3,5

**homeschooled** 11:24

**honored** 20:3

**hope** 65:17

**horrible** 70:19 71:11

**hour** 7:11 96:19 145:10 146:23 148:24 149:2 150:3,6,12 152:16

**hours** 52:23,24 145:14,19 150:4 151:3

**house** 113:12 121:6,7 129:20 130:7,9,13,15 131:4,20,23 135:13,21,25 136:2 142:14 151:19

**household** 130:10

**huge** 88:22

**human** 17:16

**hydro** 48:21

**hydroponic** 34:21,25 35:9,10 36:5,19 37:1,2 40:11,17 41:22 42:15 44:11,15,22 45:1,11 46:4, 10 47:13,18,25 48:20,22 49:24 51:4 52:14 53:4,18 54:15 55:18 56:3,10,15 57:12 59:18 62:13,18, 22 76:21 77:6 104:24 119:14 136:22

**hypertension** 6:19 29:18,19 112:2,3

**hypotonic** 36:25

**I**

**idea** 43:2

**ideal** 116:19

**identify** 4:7

**immediately** 58:14 60:1

**impact** 126:8

**impeccable** 99:16

**implement** 107:17 110:6 132:5

**implementation** 102:12

**important** 13:1 105:8

**impossible** 148:23

**improperly** 28:19 29:3 112:15

**improve** 58:21

**in-person** 90:18

**inappropriate** 26:9 35:24 113:23

**incident** 76:5 78:3 82:11 83:7 117:22 136:18

**incidents** 27:19 32:24 84:13

**include** 69:25

**included** 119:2 139:5

**including** 48:9 112:9

**inconsiderate** 28:7

**inconvenienced** 99:8

**inconveniencing** 99:10

**incorrect** 127:4

**incorrectly** 24:24

**increase** 70:2,3

**increased** 18:5 32:24 39:14

**increases** 18:5

**Indiana** 4:3 10:16 12:11

**Indianapolis** 16:4,9

**indicative** 99:4

**indirectly** 112:19 136:14

**individual** 25:25 88:19 106:22 123:8 126:16 129:8,9,11 133:14

**individuals** 25:6 39:13 48:8 89:4

104:18,19 108:9 111:18 126:24 127:1 129:4 140:25 145:8

**inform** 62:12 83:16 92:24

**information** 24:7 74:7 103:2 121:14 133:13 138:18 140:4

**informed** 27:3 58:21 109:2

**initial** 18:6 72:4

**input** 67:19

**inside** 90:24 91:6,7

**install** 52:14

**installed** 46:6

**instruct** 34:22 69:1 107:4 108:16

**instructed** 64:25 65:2,20 73:8

**instructing** 26:14 27:1 33:18 34:1 36:10,15 55:8 79:17 88:1 106:1

**instruction** 26:3,6,23 28:6,8 55:11 62:14 63:21 67:14 68:11 71:23 72:4 74:18 83:9 102:11,12 104:6 106:7 108:19 132:4

**instructional** 64:22 65:1,21 67:7 71:21

**instructions** 80:15 102:20 107:17 110:6

**intention** 129:22 131:16

**intentional** 134:4

**intentionally** 30:8 84:25 107:23 134:1

**interactions** 21:5

**interrogating** 112:25

**interrogation** 114:16

**interrogatories** 9:22 23:11

**interrupt** 6:4 25:7 32:13 39:12, 13,16 64:4,25 65:3,20 67:3 68:1, 2,10 69:6 71:22,24 72:20 73:1,3 82:3,5 89:24 100:14 101:11,14,19 102:1,4

**interrupted** 26:24 27:4 28:8 59:17 61:16,21 62:5 67:8 71:20, 21 74:15 76:20 77:5 81:10 85:11, 17 88:21

**interrupting** 39:9 62:8,10 63:20 69:9,12,13 72:9,16 77:11 79:19

86:18 87:1 88:17

**interruption** 66:1,23 72:1 89:18

**interruptions** 27:13,16 38:24 58:17 59:1 60:13,16,21 61:7,10, 18 63:22 66:11 67:24 71:13,17 73:9,13 88:22,25 89:16,20,22 101:2,8

**interruptive** 86:16,24

**interweaving** 145:4

**intracranial** 6:19 29:18 69:2,3 112:3

**inundate** 64:1,6,19

**investigation** 31:10,11,17

**invite** 64:1

**involve** 132:25

**involved** 9:13 71:4,12 99:13

**involving** 143:3

**irrigate** 41:2

**issue** 9:11 41:12 52:12,14 54:25 57:7 58:19 60:15,16 66:12 67:13, 19 74:20 81:20,21 106:15 133:24 134:2,3 136:15

**issues** 27:16 29:11 45:13 61:1 67:7,12,17 76:19 77:3 133:4 143:2,15

**Italy** 70:22

**I've** 28:7

**J**

**J-E-N-I-C-E** 4:20

**jail** 54:12

**January** 8:6 20:17

**Jenice** 4:20 10:2,4

**job** 72:15

**jobs** 15:23

**Johnson** 25:6,12,17 26:24 27:2, 9,17 30:16 31:21 38:25 63:19 66:8,10,13,14 69:12,17 72:11,13 73:8,13 101:4 102:3

**join** 14:22,25

**joined** 15:2 16:12

**joining** 15:3,6,23 16:10

**Joy** 106:8 140:22

**Judy** 128:10 130:16,17

**July** 4:4 112:23 118:6,10,11

**June** 8:13 43:22,24 58:8 118:6,8

**junior** 123:20,22,23

**K**

**Kebab** 114:22 116:11

**keeping** 48:11

**Keri** 22:14,16

**kids** 115:21 116:12

**killed** 76:3

**kind** 9:11 29:4 48:7 68:22 72:25 98:12 114:15 118:14 120:11 123:2 124:3,5 127:13 128:24

**knew** 32:23 47:14,15 48:8 50:14 53:8 59:16 72:7 122:5 135:24 140:11 141:5,13 142:22

**know** 4:22 5:21 6:4,8 7:6,12,15, 19 19:3 21:19 22:9 23:6 25:14 27:24 28:25 30:20 31:1,20,23 32:2,3 34:9,13,15 39:20 42:9 44:1,2,19 45:19 46:6 49:1,20 52:18 54:7 58:15 60:2,11 62:21 63:10 64:20 65:5 66:15,18 67:16 68:5,20,21 69:11,25 71:14,17,24 73:16,17 74:4,18,22 76:1,2,9,13, 16 77:9,18 78:2 79:25 80:23 91:3 92:2,12 95:21 96:14 98:17,18 99:7,8 100:12,13 101:16 104:7,23 106:20 108:23,25 110:24 113:16 115:5 117:13 118:19 120:16,23 121:7,9 122:4 123:16,18 124:3 125:6,8,11,15,18,19 127:2,7 128:12 129:5,13,14 130:14,15,22, 24 131:23,24 133:25 134:6,18 135:15,25 136:1,17 137:2 140:18, 20 141:11,19,22 142:16,19,22 143:7,18,20,21 144:5,10 146:9 148:8,15 150:8

**knowing** 32:11 39:21 86:3 128:25 129:12

**knowledge** 37:19 101:1 121:17, 20 122:6,9,17 128:6,11 136:4

**Korea** 14:4,8

**Krebsbach** 109:23 110:2,8,13

**Krebsbach's** 25:19

**L**

**laboratories** 41:20

**lack** 121:13

**lady** 113:13,16 115:17

**laid** 124:14

**Lane** 10:16

**large** 42:15 43:2,3,6,10 80:23 99:12,14,16

**late** 24:14 30:12,13 119:5 126:1 147:18

**latest** 149:8,11

**Latino** 70:17,18

**lawsuit** 8:15 9:13 24:11 31:13 62:6 138:1 150:7

**lead** 77:13,15,18 118:24,25

**leaned** 36:22

**learn** 4:25

**learning** 36:19 44:7,8,12 83:17 92:25

**leave** 22:5,20 84:4,5 121:1,15 122:20 124:17,18,25 125:2,7 128:22 134:17 136:17

**leaving** 16:7 119:8,21,24 120:5 121:3,4,12 125:12 126:3 131:1,6 135:8 142:13,18 152:4

**left** 14:15 21:17 44:12 48:7 57:11 63:4 81:6 95:20 118:15,22 145:10

**length** 42:19

**lessons** 18:11,23,24

**lets** 118:7

**levels** 78:25

**liability** 54:5

**liable** 52:8

**limited** 106:11

**Lincolnway** 4:3

**listed** 139:14

**living** 11:10,11 129:24 131:9

135:2,22 136:3

**Lloyd** 4:10

**loaded** 133:13

**local** 11:25 113:7 114:22 129:23

**located** 13:21 16:16 22:16

**log** 107:25

**log-ins** 103:21 107:24 133:5 134:1

**logging** 133:19

**Lohmeier** 22:14,15,16

**long** 11:2 14:8,24 15:3,5 16:23 131:7 144:21 148:15

**longer** 7:14 20:2 140:13

**looked** 49:6 116:15 139:11

**lose** 135:22

**lost** 131:9

**lot** 7:19,23 35:22 61:4 70:7 78:7 87:13 90:24 132:24 133:23

**loud** 94:10,14

**loved** 131:18

**LQA** 129:24

**lunch** 113:6,8 114:21 124:10,11

**lunchtime** 124:12

---

**M**

**made** 23:12 30:17,19,22,23,25 31:4,9 53:19 68:16 80:22 81:12, 16 82:10,21 88:16 89:13 92:6 97:12,14 99:17 106:8 109:5 122:16 125:19 126:8 128:24 129:21 130:8 140:15,17 143:10, 18

**make** 5:17 7:18 13:23 18:22 21:18 23:14 31:8 36:13 45:20,24 68:15 71:11 72:2 90:6 93:25 95:9 96:21,23 99:25 100:1 115:20 129:16 143:4 148:4

**makes** 34:12 66:5,25 72:19 82:14,25 84:22 96:25

**making** 28:9 29:25 53:22,23 68:14 77:9 94:1 99:7 115:10 122:19 128:13 139:22

**manage** 90:25

**management** 20:25 89:3

**March** 43:20,23 44:5,9,12 119:5 126:2

**Mark** 90:14 91:22 94:5

**marked** 22:21 24:5 48:14 55:13 57:20 75:1 85:4 125:21 137:22

**married** 10:17,22,25 11:2

**Mary** 109:9,10 110:7

**master's** 12:12,19 13:2,3,5,8 15:11,16

**match** 97:11

**materials** 21:18 102:10,12,14, 20,24 103:3,7,9,11,15,16 105:2,4, 7 106:7 107:16 108:15,16,24 109:3,10,15,17,24 110:6,15,20 111:8,21 112:7,17 132:4,7 138:22,24 141:10 142:9,10 144:18

**math** 126:25 139:3

**matter** 67:9 99:14 121:10

**Mcgraw** 16:3

**meaning** 129:23

**meant** 82:4 107:2

**measured** 42:16

**media** 78:9

**medical** 28:13,15 29:10 30:3 100:18,19

**medications** 6:12,15 7:1

**meet** 18:25 90:2

**meeting** 73:19 103:23,25 104:8, 15,16

**meetings** 19:1 68:8 104:8

**members** 72:25

**memory** 32:4

**mentioned** 13:2,15 25:11 46:3 69:17 71:1,18 77:16 130:24

**mentor** 138:6 139:5,20 141:21 142:4

**mentoring** 139:13

**mentorship** 139:18

**messing** 134:1

**met** 4:22 64:24 65:19 144:16

**Michael** 109:23 110:8

**Michele** 34:4 49:3 113:2 114:12

**microscope** 24:17,21 25:9 26:4, 20,22 80:10,13,16,20 83:11 88:18

**mid** 118:11

**middle** 16:15 26:7 129:20

**midst** 33:17 34:1

**migraine** 145:16 148:6

**migraines** 69:2

**miles** 138:10

**military** 12:8 13:15,16,19,22 14:3,10,13,14,15 16:8

**milligrams** 6:16,19,21

**mind** 20:8 55:14 78:5 123:3 125:19

**mine** 108:13 110:2

**minimize** 73:9

**minimizing** 73:13

**minor** 112:24 114:17

**minute** 18:14 139:9

**minutes** 27:5 45:19,22 71:24,25 72:2,3,14 83:18,21 84:15 92:23 93:1,6 145:13 151:21,23,24

**missed** 118:20

**missing** 13:11 110:16

**mistreatment** 32:10

**mixed** 87:14

**mixture** 101:12

**model** 40:23

**mom** 115:12 116:25

**moment** 96:10,11

**Monday** 50:7

**monitoring** 26:11

**morning** 22:23 58:16 60:7 64:25 65:20 91:20 148:5

**mortar** 19:8,16 20:3,18 21:1

**mother** 114:5

Index: Motrin..patient

**Motrin** 6:21

**move** 36:7 40:11,15 43:11 44:18, 21 46:4,9,16,19,20,21,25 47:12, 15,17,24 49:15 50:20 52:1,3 53:12,18 54:14,16,18,19 55:4,6,7 56:7,15,19,22 57:5 62:18,22 67:16 74:23 77:6 79:1 101:6 102:8 123:10,13 130:2,6,11

**moved** 42:3,7,12 44:11,15 46:15, 20 48:25 49:14,20 50:13,17 53:20 76:22 124:4

**movement** 77:9

**moves** 40:18

**moving** 43:5 49:24 52:3 53:4 65:24

**N**

**names** 22:13 62:1 134:8

**Natanaun** 24:22 25:11,22 26:23 27:11 30:16 31:20,23 38:25 69:18

**natural** 18:5

**nature** 8:14

**needed** 43:11 59:20 63:5 88:15 107:5 108:15,16 109:3 138:19 139:24

**negative** 28:10 29:25 30:9

**neighbors** 90:13 91:13 93:22 94:4 97:3

**neurological** 29:21

**news** 76:13 78:9

**Niagara** 12:8,10,16,20,21,22 13:9,12 15:25

**nice** 70:8 122:14

**Noblesville** 10:16

**nods** 5:17 43:18

**non-instructional** 66:24

**noon** 148:20,22

**North** 14:7,9

**note** 45:20 63:25 73:8

**notes** 107:3,6 120:3 132:20

**notice** 138:13

**notified** 138:17

**number** 71:9 132:2

**nutshell** 120:5

**O**

**oath** 5:3

**obligation** 5:6

**obtain** 12:14,16,21 13:5

**obvious** 30:4

**occasion** 25:19 86:8

**Occasionally** 65:8,23

**occurring** 77:8

**October** 65:15 73:9,15 75:14 76:6,15 78:4 79:14 86:6,9,13 87:1 91:14 95:23 96:5,9 97:8

**odd** 124:15

**offered** 20:12 52:20

**offhand** 101:23 119:20 146:14

**office** 28:19,20 51:14 58:13 85:22,24 95:6 97:17

**one-on-one** 80:18 87:25

**ongoing** 58:19 60:15

**online** 66:22 106:12,18

**open** 19:2 22:19 65:7,11,23 66:4 139:8 152:4

**opened** 147:8

**opens** 127:21

**operate** 26:3 47:9 80:13 83:2

**opinion** 70:9

**opportunities** 127:22

**opportunity** 4:24 20:4 58:20 83:16 89:24 92:24 123:25 146:9

**opposed** 107:6

**opposite** 83:12

**options** 129:16

**order** 34:17 46:22 105:11 106:14 137:17 149:19 152:15

**ordered** 44:25 107:20 137:2

**ordering** 152:13

**orders** 34:9 65:8,23

**organization** 17:15,23 53:17

**organizations** 17:11,13

**organized** 40:19

**original** 139:16 149:1,5

**originally** 65:6,22

**outright** 55:2

**outward** 91:1,2

**outwardly** 91:1

**override** 82:17

**owners** 130:9

**P**

**p.m.** 65:15 79:11 92:15 97:8 148:8,11,13,16 152:20

**pages** 55:20,21

**paid** 130:4

**pain** 6:22

**Palsy** 15:21

**pandemic** 11:20 43:19 44:4

**paper** 107:6

**paperwork** 25:16

**paragraph** 138:3

**parents** 19:1,2 61:25

**part** 19:18 41:12 74:6,17 82:24 84:2 93:16 99:4 102:25 118:18 131:24 135:6,9

**partial** 59:14,19

**partner** 121:19 122:10,11 128:10 130:17

**partway** 6:2

**pass** 81:22 88:20

**passed** 81:23

**passing** 68:4

**past** 21:10,12,15 22:12 39:22,24 104:11,14 106:2 144:14 145:9

**patience** 86:14,23 90:23

**patient** 90:23 91:6 96:12

**pause** 113:6

**paused** 82:4

**pay** 119:22

**paying** 120:12,13,14,15,17,19

**penalty** 23:15

**pending** 6:9

**Penny** 113:25 114:1,3

**people** 10:4 59:2 60:25 68:6,19 69:16 71:10,12 72:15,21 74:14 98:2,11,14 100:2,16 126:16 128:21 132:25 134:20,22 143:16

**percent** 73:2,6 128:16 130:19 142:17 143:15

**perception** 95:21

**perfect** 5:20 68:9

**perform** 41:4 80:19

**performing** 24:17,21 26:20 68:20

**period** 24:16 26:19 52:25 53:1 64:5,7,11,12,13,18,21,22 93:12 95:12 132:10 138:8

**periods** 64:2

**perjury** 23:15

**permission** 47:3 50:16

**person** 34:17 43:25 60:24 68:5 82:14,16,18 107:15 109:1 124:23

**personal** 78:19 81:1 89:5,23,25 128:8

**personnel** 28:19,20 29:2 128:23

**persons** 4:8 28:23

**petite** 99:17

**phone** 66:1

**physical** 7:9,21 10:19 145:17 151:17

**physically** 84:19

**physics** 126:24,25

**pick** 69:8

**pictures** 55:22

**pigment** 107:2

**PIIH** 29:4,7

**pity** 124:3,17

**place** 16:18,20 21:9 27:8 35:11 62:12,15 75:12,15 77:24 99:5 114:20 118:6 141:24

**placement** 34:21

**placing** 34:24

**plaintiff** 138:4,5,10,13,16,18,20, 22 149:18

**plan** 151:8 152:1

**planned** 125:12

**planning** 122:2

**plans** 121:3 150:8,10

**plants** 41:2

**played** 99:19

**plenty** 57:9

**point** 6:7 7:13 64:7 68:7 94:7 117:16 129:12 138:16 141:13

**pole** 134:15

**policy** 67:1

**position** 28:23 130:1 131:11

**positioned** 83:11

**positions** 126:9

**positive** 28:9 29:24

**possession** 130:9

**possibly** 21:11 38:2 67:21 117:20 144:10 148:4

**posting** 17:2

**potentially** 125:7

**power** 52:11

**prefer** 66:24 89:4 143:9

**preference** 67:15

**preferred** 45:6

**prep** 64:1,4,7,8,11,12,18,21 95:17 124:10

**preparation** 18:12 130:5

**prepare** 9:20 18:11,21

**prepared** 74:19 118:13

**preparing** 64:19

**prepping** 124:9

**prescription** 23:8

**presence** 28:11 30:1,9

**present** 4:8,10 17:4

**presented** 124:2 143:13

**presenting** 80:18 143:14

**pressure** 6:18 29:19,22 69:2,4

**pretty** 27:20 39:3 48:2 50:14 51:7 81:7 87:15 105:17 109:21 120:22 124:12 139:16 140:24

**previous** 45:1 56:20 84:3

**previously** 8:10

**preyed** 100:20

**primary** 17:20

**principal** 21:23,25 22:3,7,8,10, 12 58:3,4,6 70:24 73:18 142:21

**principalship** 13:4,9

**prior** 23:21 33:7 37:23 38:1,10 47:19 100:23 111:16 112:18 117:12,13,19 136:12 144:24

**private** 15:4 128:5

**privy** 128:8

**probation** 123:5

**probationary** 138:8

**problem** 58:18 60:14 63:8,10 73:22 88:22 95:16 106:13 110:4 132:3 133:11 146:19,24 152:17

**problems** 48:8 75:12,15,20 76:1 77:23 78:20,21,23 133:22 143:10, 11,12,14

**proceeding** 8:25

**process** 8:19 120:15,17,18,20 122:23,24 127:8,11 128:12,25 129:13 131:25

**processing** 130:4

**produced** 61:3 99:25

**program** 15:20 108:4

**progress** 19:13

**project** 52:21

**prompt** 89:6

**promptly** 81:24

**pronounce** 24:22,23

**proof** 59:22

**properly** 29:11 107:20

**property** 129:18

**protected** 33:8 37:23 38:1,10 47:19 100:24 112:18 117:12,13, 19 136:13 144:25

**proven** 116:21

**provide** 18:24

**provided** 102:11,21 103:3,4 104:2

**providing** 107:16 138:17

**proximity** 88:6

**public** 16:4,9 100:10 128:4

**pull** 23:1 24:3 137:20

**purchase** 116:10

**purchased** 122:14 130:14 131:19

**purchasing** 113:8

**Purdue** 12:11

**purposes** 75:19

**pursued** 16:8

**pursuing** 13:16

**push** 84:18,19,20 123:16

**put** 23:7 34:9 35:16 46:23 47:3 51:23 53:7 65:12 67:21 98:2 99:20 118:3,17,21 137:6 141:7,13 146:11

**puts** 127:19

**putting** 37:7,13,22 38:9,15 96:19

**Q**

**quarters** 129:24 130:11 131:10 135:3,22 136:3

**question** 5:12,21,22,23 6:9 9:5 14:1 18:16 20:9,21 29:23 36:1 38:4 43:15 45:15,25 56:20 82:7 86:22 91:9 92:1 94:11 98:21 102:23 111:1 114:4 124:1 125:17 126:5

**questioned** 20:19 131:4,5

**questions** 5:18,20 9:22 94:11 112:25 134:10 136:6,12

**quiz** 83:11

**quote** 77:21

**R**

**race** 29:13 32:6,9,14,16 37:8,10, 12 44:22 45:7 46:5 68:3,20 69:5 71:1,5 98:7,23 101:3 110:20 111:8,12,14,15,17,19 115:23 117:19 134:11,25 136:15 142:5 143:21,22 144:1

**races** 68:5

**Rachana** 4:9,23

**racial** 76:22 77:7

**raising** 23:17

**Ramstein** 121:11 122:3,18

**rate** 28:21

**reaction** 68:22,23,24 117:20

**reactions** 115:15

**read** 23:19 78:7,8 84:1 92:21 93:16 94:14 96:16 131:14 135:6 137:9

**reading** 23:6 33:19,20 94:10 98:18 131:12 135:5

**ready** 148:19

**realize** 121:10

**realized** 96:17

**rearrange** 150:8,9

**rearranging** 29:1

**reason** 7:17 14:15 26:10 29:7 30:7 36:12 44:14,17 47:11 56:14, 17,21 57:4,6 62:7,24 63:12 87:17, 21 88:2 103:21 105:18 106:24 107:15 136:8,15 144:12

**reasonable** 20:2 29:8 32:11 67:5,11 74:21 100:10

**reasons** 28:14 35:19 109:5 111:16

**reassigned** 20:18,23 21:1 104:23 122:2 131:1

**reassignment** 20:19,21

**recall** 9:15 18:8 59:5 125:14

**recalling** 8:23

**receive** 110:6,9,15

**received** 12:12 15:10,16 70:19 104:4 109:10,24 110:10,12 138:21,24

**receiving** 105:2 110:19 111:7, 11,21 112:17 123:15 130:4 132:4

**recently** 138:7

**recess** 46:2 79:11

**recognize** 23:5 24:6,7 48:16 57:22,25 75:2 85:7 125:22 137:13,23

**recommend** 90:14 91:22 94:5

**reconvening** 152:2

**record** 4:8,19 99:16 152:3

**records** 28:17,20,23,25 29:3 30:4 62:2 112:15

**recourse** 111:20

**redirected** 89:6

**refer** 23:24 24:19

**referenced** 53:14

**referring** 48:21

**refresh** 32:4

**refused** 40:11,15 44:19 53:10 54:14 55:2 104:25

**refusing** 44:21 46:4,9 47:12,17, 24

**registered** 12:4

**regular** 105:4,5 107:6

**reinforce** 66:12

**related** 9:10

**relationship** 113:24 115:9

**relay** 68:3,5,20 69:5 71:1,5 101:3 118:19 134:25

**released** 132:8

**relocated** 120:19 121:16,18 138:8

**relocating** 119:15

**relocation** 121:24

Index: reluctant..school

**reluctant** 34:24 35:2

**remain** 100:9 125:1

**remainder** 146:22

**remained** 17:12 127:5

**remaining** 55:21 84:9 131:17

**remember** 6:1,3 25:3 27:8,20,24 31:6,18 33:5 35:25 38:21,22,23 39:9,18 43:1 44:19 46:22 48:4 59:8 62:19,20 63:14 66:14,19 76:8,17 78:3 80:3 92:14,18 93:3,8 101:17,20,24 102:6 106:25 109:13,15 110:2 118:21 119:16, 18,19 120:10,11,23 122:6 127:20 128:9,11 130:23 135:4,5,9,10,16 136:4 137:5,8 141:16,22,25 142:1 143:13 146:13

**remembered** 131:13

**remembering** 22:13 52:16

**remind** 93:14

**remote** 44:7,8,12

**repairs** 66:24

**repeat** 38:4 61:14 77:2 101:7

**repeating** 94:9

**repercussions** 116:20

**rephrase** 38:7

**replaced** 138:5 139:4

**report** 21:22 38:15,18 39:1,19 47:24 117:22,24 118:2 136:18 139:16

**reported** 39:3

**reporter** 4:1 5:4,9 152:8,13,17

**represent** 4:23 23:12 24:9 137:25

**representative** 17:16

**request** 34:15 77:10 82:14 106:8 122:17,19 123:9

**requested** 71:19 122:20

**reserved** 13:25

**resigned** 129:25 131:10

**resonate** 76:11 94:2

**resources** 112:10 132:10,17,18 133:1,20

**respond** 50:24 52:9 55:14 62:11 88:18 95:10 106:8

**responded** 26:22 86:21 110:7

**responding** 5:12 57:23

**responds** 51:13 52:18 58:11 64:23 90:11 96:25

**response** 5:17 28:10 30:1,9 38:20 39:6,19 48:3 59:8,13 137:4, 5,7

**responsibilities** 18:10,19 19:5, 9,18

**responsibility** 19:9

**responsible** 50:18 53:21,23 68:7

**rest** 31:25

**retain** 142:23

**retaliation** 33:7 37:23 38:10 47:18 100:23 112:18 117:11 136:12 144:24

**returned** 79:17 117:25 118:1

**returning** 132:8

**review** 9:19

**Richardson** 4:2

**ride** 70:9

**rights** 17:16

**ringing** 95:18

**rock** 145:14

**ROI** 33:5 59:6 80:4 95:9 96:16 101:22 120:4 137:6,7,9 141:14

**ROIS** 32:4

**role** 14:10,13 28:1 34:5,7,14

**roles** 17:22 72:18

**room** 42:8,10,11,12,13,14 43:3 45:12 47:4,8 49:1,6,17,20 50:13, 17,18,19,20 51:12,21,23,24 52:4, 6 53:7,22,24 54:2,7 55:3 56:6,22, 24,25 57:5,6,8,9,10,11,13,15,18 62:11,15,18,23,25 63:5,6,14,17 65:10 66:4 77:6 79:17 81:6 87:20 90:3,6,20 91:18 96:18

**rooms** 57:16

**root** 32:9,10,14 37:10 111:11,14

**rosters** 66:20

**rotation** 28:21

**round** 79:9

**roundabout** 104:6 108:11,14

**rudely** 24:16

**rules** 5:3

**run** 134:25

**rush** 84:20

**S**

**S-M-I-T-H-S-O-N** 4:21

**safe** 41:13 48:12 49:7,17 51:24 53:8 56:13

**safely** 51:11 53:20,22,24 56:12

**safety** 43:4 50:18 52:11,14 54:10 57:7

**salary** 17:25 18:2,6

**San** 12:24

**Sanborn** 16:1

**Sand** 10:21

**Sandstrabe** 10:21

**sandwich** 113:8

**sat** 70:7

**satisfied** 73:23

**Saturday** 147:9

**Saturdays** 146:8

**savvy** 133:7,8

**scenario** 119:16,19

**schedule** 30:13

**Schiele** 103:8,10 104:1,10,20 106:9,23 108:22,25 140:22 141:4 145:7

**Schiele's** 108:3

**school** 11:12,14,16,23,25 12:6,7, 8 14:16 15:15 16:4,10,15 17:15 18:13,20,22 19:4,8,20,21,22 20:1, 5,6,7,15,20 21:4,6,8,15,23,24 22:1,4,8,9,11 25:2 28:1 31:15 34:5 41:25 42:2 43:17,24 44:10 47:4 58:3,7 64:15 70:10,20 72:19, 21,22,25 73:2,5 75:11,23 77:23 78:16 87:6 104:9,23 105:16

108:13 113:5 116:5,7 117:25 118:1,7,9,10,12 119:8 124:22 125:1 126:3 128:22 129:22 130:1 131:17,21 138:9 140:14 141:9 142:12

**school-wide** 67:1

**schools** 44:1,3 73:10

**science** 12:18 13:8 16:13 17:8, 19 63:2,3,7 105:6 109:14 110:11 123:8 124:24 126:11 137:1

**secondary** 12:18 13:8 16:13,14 17:8,19

**section** 55:23

**sector** 15:4

**security** 15:20

**sell** 122:25 123:1

**Sembach** 22:17

**send** 86:4 88:14 140:4

**seniority** 105:6 126:10 134:15

**sense** 66:5 80:22 93:25 133:20

**September** 24:15 33:14,24 34:19 40:10,14 59:9 138:4

**serve** 13:19

**served** 13:24 14:2

**service** 13:16 87:5,6,8

**serving** 13:21

**set** 143:11

**sets** 116:5

**setting** 97:24

**setup** 40:25

**seventh** 24:16 26:19

**share** 132:19

**shared** 108:7 138:23

**she'd** 87:17 135:20

**she'll** 134:17,19

**ship** 130:10

**short** 20:16 90:22 93:13 95:13

**shoulder** 33:17 35:17 36:22,24 37:7,14,22 38:9,16

**show** 49:2,22 80:13

**showed** 83:2

**showing** 61:3,4

**shown** 80:15

**shows** 54:17

**shut** 67:14 83:1

**side** 83:12 88:10,11 112:13 116:9

**sign** 35:19 89:7

**signaled** 83:12

**signature** 87:3

**signed** 23:20 133:12

**significance** 95:18

**significant** 71:9 118:22,24 119:1

**similar** 75:17 76:7

**simple** 68:12

**single** 150:12

**sit** 88:7

**sitting** 35:15 55:7 88:9 90:7 141:11,19 145:18

**situation** 28:13,16 48:6 58:14,21 59:25 60:4 76:7 86:3 95:2 96:14 97:1 98:19 99:3 100:9 116:1 119:16,18 127:25 128:5 142:15, 16

**situations** 67:22

**sixth** 112:22

**size** 46:23 47:4 99:12,14,16

**SKE** 51:16 52:2 53:12,16,17,20 54:17,20,21,22

**skin** 99:17

**skinned** 99:12

**slant** 40:22 42:24

**slaves** 29:16

**slowly** 9:24

**small** 39:15 72:22 73:5 80:25 99:17 115:10,13

**Smithson** 4:6,11,18,20 10:2 29:14 48:24 49:13,19 114:14 126:1 149:17

**Smithson's** 113:20 114:13

**smoother** 129:17

**Snowden** 103:12,22 104:3,7,13, 15 105:22,24 107:8 108:7 109:20 110:18 132:21 137:14,15 138:11 139:1,13,23 140:9,10,16,18,21,23 141:12,15,20 142:3 143:24 144:7, 15,24

**Snowden's** 107:25 139:5

**so-and-so** 134:9 141:16

**social** 78:9

**society** 116:21

**sold** 121:7,24 130:7 131:20,23 135:13,20,25 136:2 142:14

**something's** 125:5

**son's** 147:23

**sounds** 37:5 58:22 94:17 107:22

**space** 51:10,11 63:15 78:20 80:25 81:1 83:14 86:16,25 89:5, 23,25 143:16

**spaced** 27:21

**Spain** 70:22

**speak** 36:11,25 37:3 58:9,15,20 59:15 60:6,9 63:18 83:14 90:10 91:22 93:11,17 95:7,11,15 96:1,4, 17 109:1

**speaking** 26:8 36:21 59:16 77:1 117:1,5 122:4

**special** 25:25 26:11

**specialty** 25:2

**specific** 24:2 75:20 76:5,17 78:3

**specifically** 114:11

**SPED** 26:24

**speech** 29:4

**spell** 4:18

**spending** 114:14

**spoke** 27:16 39:2,4,10 48:1 60:11 61:24 64:23 65:18 67:23 73:12 83:20 84:11 85:21 96:13 101:9,13,15,18,25 102:3 106:23 107:8 115:19 122:11

**spoken** 39:5,8 63:7 64:9 66:10 67:6 74:14 80:7 91:17 95:3 96:15 118:5 130:15

**sponsor** 17:14

**sponsoring**  17:11,13

**stand**  96:24 113:8,9 114:3,22 116:11

**standing**  88:8

**stands**  14:18 120:23

**start**  11:19 23:23,25 43:21 69:9, 13 86:12 100:13 101:10 104:8 123:17 141:20 148:9 151:15

**started**  5:2 15:15 18:6 43:20 44:4 57:10 70:5 72:9 75:24 77:13 113:12 118:15 136:21,23 137:3 139:22 141:12

**starting**  83:22 145:16

**starts**  151:6

**state**  4:18

**stated**  36:6 37:3 51:25 83:19 96:6 115:18 123:1 138:14 140:6

**statement**  29:24 68:9 78:11,12, 14 82:11 84:1,3 92:6 115:18 126:4 127:4 128:14 135:17

**statements**  23:14 128:13

**states**  9:24 44:2 75:13,15 76:6, 14 77:8,24 78:18,23 82:14 99:6 116:23 126:1 130:3

**station**  14:4,6 121:1

**stationed**  14:2,5

**stay**  119:9 120:2,6 121:16 122:21 125:3 126:4,8 131:1,19 134:14,20 135:19 142:11,18

**stayed**  17:21 119:17 126:8,12,13 135:2,23

**staying**  129:22

**step**  18:5,9 29:13

**steps**  42:17,18,20,24

**Stewart**  4:2

**stick**  71:2

**stood**  36:22 113:13,19 116:13

**stop**  49:1,21 52:19 58:6 64:13 69:7,12 95:16 144:6 145:21

**stopped**  64:14 81:5 93:14,23 94:12,15 103:22

**stopping**  93:11,17 95:10,15,23, 24 96:1,4,8 98:5,22 100:4,22

**storage**  42:14 63:16

**store**  113:7,9

**stored**  28:19 29:3 112:16

**storing**  57:10 63:3

**story**  99:19

**straight**  90:9

**strange**  113:13 115:17

**Street**  10:21

**string**  75:6

**stripes**  113:17,18

**strips**  52:11

**student**  11:15,17 12:3,5 17:15 25:21 26:8,12 27:25 52:7 54:6 79:25 80:2,10 81:4,10 83:11 84:8 85:18 86:7 87:25 88:4,8,9,15 89:11 90:6 98:6 103:21 104:4 107:2 112:10 133:9

**students**  18:11,22,25 26:2,3 27:1 28:11 30:1,10 35:15,24 36:21 41:16 42:9 43:12 47:9 53:6 56:9 57:17 61:22 62:1,4 69:1 72:5 74:12 80:12,15 83:21 84:21 88:19,20,25 89:16,21 91:2 93:12 95:11,19 96:6 99:15 105:19 106:21 107:1,5,9,24,25 108:8,12 132:11,18,22 133:10 140:1

**stuff**  55:15 59:6 63:3 137:3

**subject**  127:16

**subjected**  138:4

**submitted**  30:24

**substance**  87:9,16,21

**substitute**  15:22,25 16:2,5 24:24 25:22,23 26:24 103:12 105:3 108:14 139:2 140:12 141:9

**substituting**  25:24 69:25

**sudden**  60:25

**suffering**  30:5

**suggests**  97:25

**summer**  7:23 43:20 113:22 114:5,15,16 115:2,8,11,12,23 116:25 117:4,11 132:9

**Sundays**  146:8

**supervisor**  123:21

**supervisors**  129:21

**supplements**  18:24

**supplied**  138:23

**supply**  106:10

**support**  67:15 87:4,5,7

**suppose**  109:1 112:10

**supposed**  19:3 46:15 54:15 64:19 82:15 83:1 112:8

**surprised**  121:21 122:16

**Susan**  119:11,13 125:25 128:7 138:24

**switch**  137:17

**sworn**  4:13

**symptoms**  29:9 100:12 112:1,5, 13

**system**  16:4,10 34:21 35:9,10 36:5,7,19,25 37:1 40:12,17,18 41:19,23 42:3,7,15 43:5,10 44:11, 15,22 45:1,11,14 46:4,5,6,10,23 47:4,9,13,18,25 48:20,21,22,25 49:9,12,14,20,24 50:25 51:5 52:1, 3,6,10,14 53:4,7,18,20 54:15,20 55:18 56:3,10,15 57:12 59:18 62:15,18,23 76:21 77:6 104:24 119:14 121:15,16 123:6 136:22

**T**

**T-A-M-I-C-A**  4:20

**takes**  11:15 90:5

**taking**  5:1,9 6:10,12,15,23,25 56:6 59:21 62:15 71:10 75:12,15 77:24 99:5 108:13 112:9

**talk**  19:20 27:22 38:24 55:7 69:7 86:7 87:20 90:12,17 93:22,24 94:4 98:6 101:2 115:10,13 140:3 146:15

**talked**  58:1 69:11 91:14,16 101:3,4,8 122:10 125:16

**talking**  5:11 18:18 35:14 51:20 56:25 103:14 113:12 121:8 135:1 136:5

**talks**  66:8

**tall** 42:25

**taller** 42:25

**Tamica** 4:6,11,20 10:2 86:14,22 90:11

**Tammy** 10:4

**tangent** 43:16

**taught** 16:5,8

**teach** 109:24 120:9 139:2

**teacher** 15:22,25 16:2,5,13 17:8, 19 24:25 35:6 44:25 45:2 53:25 70:18 86:4 94:22 104:17,22,24 105:3,4,5,6 106:12,19 108:14 109:14 111:25 112:8 119:13 138:6,7,10,12,18,19,21,23 141:10 142:19

**teacher's** 88:17 103:18

**teachers** 34:12,15 58:19 60:15, 17,20 66:21 67:2,10 73:22,23 105:23,24 106:3 112:5,9,12 126:11,15 130:5 132:14 144:13

**teaches** 109:25

**teaching** 15:5,7,23 16:3,21 20:14,16 28:5 69:23 106:3 109:12,16,17 110:13,14,17

**team** 97:2

**tears** 83:2 99:25

**teary** 95:6

**tech** 133:7,8

**technical** 67:12 75:19 134:2,3

**technology** 19:3,10 25:18,19 66:22 67:13 107:18 133:22

**teleconference** 138:15

**television** 76:1

**telling** 18:19 58:25

**temporary** 103:6 130:11

**ten** 27:5 71:10,24,25 72:2,3,14

**tend** 133:21

**term** 14:17 75:18

**testified** 4:15 8:24 9:10 10:22 53:9 72:24 127:6 128:18,22

**testify** 7:2,5,7,14,24

**testifying** 5:5

**testimony** 54:14 69:6 107:10

**testing** 80:11 81:11 84:8

**tests** 88:18

**textbook** 106:13 107:1,3

**textbooks** 102:25 103:1,19 104:2,5 105:9,15,19,21,23 106:11,22 107:7,9,11,19 108:1,8, 21 132:14,15,16,19,23 133:10,15 138:21

**thanking** 94:19

**therapy** 7:9,21 145:18 151:17

**thing** 6:8 51:20 58:16 59:14,22 60:7 70:15 74:5 81:21 82:10 89:22,23 109:4 116:11 124:3,5

**things** 15:7,8 17:17 21:19 34:10, 11,16 43:7 45:11 69:25 72:6 76:10,12,16 77:9,16,17 92:13 94:2 96:10 104:3,5 107:3 118:15, 20,23,25 135:11,16 136:25 141:24 145:4 149:7

**thinking** 38:6 52:12 63:1 111:18 116:2 125:13

**thought** 20:7 39:20 46:3 48:5 52:13 108:6 111:9 118:24,25 121:11 122:1 135:13 138:18 144:8

**thread** 74:24,25 75:6,7 97:25

**threw** 120:21,24

**Thursday** 147:5 148:5

**tiger** 113:18

**time** 4:4 13:23,25 17:22 18:2 19:6 25:10 26:2,14 27:2 28:24 33:12 37:18 38:21 41:2 47:8,22 49:1,21 51:3 61:11 62:3,4 64:15 65:1,21 66:15 67:7 68:1,9 69:23 71:21 72:2,10,12,13 75:13,16 76:18 77:25 78:3 80:8,11,16 81:20 82:23 84:19 85:22,25 89:19 91:18 92:16,17 93:9 113:5 114:6 116:18 118:12 121:11,14,23 122:4,5,7,8, 18 123:7 124:9 129:11,20 132:10 134:6 136:21 138:23 141:23 142:2 144:21 145:14 148:3 149:10 150:15,25 151:1,6,15,16

**time-stamped** 65:14

**timed** 71:18

**times** 10:25 21:10,13 25:20 26:18 55:9,10 58:2 66:25 67:23 90:25 133:23 134:4 150:24 152:11

**tinnitus** 29:19,20

**title** 16:12 17:7,9,11,18,21

**titles** 17:22 72:15

**today** 5:1 7:2,5 51:14 65:18 77:4 86:14,23 141:11,19 142:2 147:1 150:19 151:21 152:14

**Today's** 4:3

**told** 26:14 27:1 29:1 31:2 36:10, 24 44:6,14 55:9 57:7 60:3 64:14, 15 65:4 67:6 70:18 73:16 81:19, 21,22,24 84:4,5 89:15 95:7,22,24 96:3,14 106:12 107:13,14,18 113:15 121:3,8,9 122:10 127:12, 17 128:4 129:1,2,3 135:13 136:1 138:22 146:3

**tolerance** 61:7,17

**tomorrow** 58:16 147:17 150:13, 15,16,18,21,22,23 151:5,7 152:2, 7,11,14,16

**top** 73:7 75:5,7,10 85:5 143:12

**total** 95:1

**totally** 47:10 81:9 86:2 91:5

**totem** 134:15

**touching** 35:22

**town** 147:6,14,16 148:2

**track** 89:2

**train** 14:13

**trained** 14:14

**training** 14:12

**transition** 129:17

**transparent** 92:5

**transportation** 129:25 130:3

**travel** 150:8

**traveled** 9:23

**treated** 78:21

**treating** 70:11,12,13,14

**treatment** 70:19 111:10 123:14

Index: tripped..week

**tripped** 54:6

**trips** 52:7

**trouble** 132:14 133:19

**truck** 113:17,19

**true** 64:3 95:14 115:19 126:4,7 128:15,16 151:21

**truth** 4:13,14 5:6

**truthfully** 7:5,14,25

**tubes** 40:18

**tubing** 40:23

**Turkey** 16:22,23 127:18 128:1

**turn** 33:13 40:3 112:22 119:4 125:20 137:11

**turnover** 66:9

**turns** 71:10

**type** 125:11 127:19

**types** 15:18

U

**Uh-huh** 137:12

**uh-huhs** 5:16

**unable** 104:4

**unavailable** 147:10

**unaware** 97:16

**uncomfortable** 7:8 35:18

**undergoing** 145:17

**underhanded** 144:8

**undermining** 141:2,5

**understand** 5:7,10,13,18,21,24 6:5,10 14:20 18:23,25 54:13,19 87:19 100:16 148:20

**understanding** 17:20 30:2 67:11 86:2 89:12 122:13 131:18

**understood** 5:23

**unexpected** 7:20

**uninvited** 33:16,25

**United** 9:23 15:21 75:13,15 76:6, 14 77:8,24 78:18,23 82:14 99:5 116:23

**University** 12:9,10,11,13,15,17, 23 13:7

**unpack** 69:5 86:6

**update** 19:2

**upset** 86:4

**utilizing** 41:19

V

**vacancy** 103:13

**Valparaiso** 4:3

**vendor** 53:12 54:18

**VERA** 130:23

**verbal** 5:17 58:23 59:3,9,12 67:22

**verbally** 48:1 60:5

**version** 74:24

**Vertigo** 29:18

**videoconference** 4:6

**Villages** 129:19

**Villanueva** 27:3,4,9,17,22 30:17 31:21 39:1 63:19 69:18 72:11

**Villarreal** 38:19 39:4,5 48:1,20 57:23 58:1,10 60:8 64:23 65:2,17 66:21 67:6,18 68:7 69:7 70:17 73:12,25 74:2 85:21 86:1,3 91:23, 25 95:3 96:13 101:4,9,13 109:2 118:5 127:6,8 128:18 136:19 139:21 140:19,20 141:1 144:3

**Villarreal's** 39:6,19 97:17 137:4

**Vilseck** 10:21 11:16,21 12:1,2,4 17:3 21:5,12,25 22:3,7 43:19 58:3 70:10 75:11,16,23 77:22 87:6 121:25 129:22 130:8 131:17,21 135:19,23 142:12

**violated** 29:7

**violation** 29:4 89:23

**violence** 76:22 77:7,12,13,18

**violent** 77:17

**Virginia** 14:4,5,6,8

**virtual** 18:13,20,21,23 19:4,8,20, 21 20:1,4,6,7,15,20 21:4,23,24 22:9,10 43:17

**visibly** 86:4

**vision** 69:3

**visit** 21:10 64:6

**visited** 21:16 70:1

**visiting** 64:17

**volunteer** 127:21,23 128:1

**volunteered** 127:6,12,25 128:19

**volunteers** 129:14

**VSIP** 119:21,25 120:22 125:14 130:22

W

**W-E-L-C-H** 10:7

**wait** 22:22 57:24 66:24 139:8,9 152:14

**waited** 109:6

**walk** 25:12 26:18 35:7,20 36:1 42:18,21 80:8,21,24 83:10 89:4 90:5,6,8

**walked** 24:15 25:14 26:6,7 33:15, 25 34:3 35:8,14,16,23 36:4,20 39:10 42:16 53:6 54:25 66:7 72:11 79:15 81:3 83:8 85:11,17, 19,24 90:20 94:22 104:14 113:11 115:17 116:14 122:8,15

**walking** 28:4 32:5,19 33:2,6 37:14,21 38:8 81:5 84:21 89:7 94:23,24 95:19 151:18

**wall** 43:9 49:10 51:1,14,20 52:10 56:2

**wanted** 20:6 25:21 35:1 42:3,7, 12 45:8,9,13 51:25 71:1 77:7 123:13 124:18 126:12,14 133:20

**wanting** 125:7

**warrants** 62:6

**water** 40:18,23,24 41:1 54:8

**ways** 88:16 99:2 104:6

**websites** 133:1,19

**wedding** 147:23

**Wednesday** 50:7 52:22

**week** 20:17 103:22 118:10 132:8 147:16,17,24 149:5

**weekend** 150:2

**weekends** 146:5 147:3

**weeks** 106:9

**weird** 115:16 124:15 141:1

**Welch** 10:6

**West** 4:3

**wife** 129:18,25 131:10

**wires** 54:7

**witnessing** 84:22

**Wolff** 34:4,20 37:6,13,21 38:8,15 40:15,16 41:25 43:8,13 44:14,16, 21 46:3,9 47:12,17,24 48:9,19,24 49:23 50:24 51:13,25 52:20 53:3, 23 56:14 58:15 60:1,9,11 62:11, 17 63:9,11 64:12,24 65:3,10,19 66:3 69:11 74:5 101:5,13,15 113:2 114:4,12 115:1,3,22 117:3, 6,8,10

**Wolff's** 51:17 115:18

**woman** 39:15 99:18

**women** 99:7

**words** 19:12 111:15

**work** 15:3,5,14 17:18 18:12 22:6 34:17 41:8,9 48:12 50:21 55:1 65:8,23 66:2 74:9 76:2 77:19,20 78:20,21 81:9 97:1,18,20 99:15, 16 103:13 104:18 105:25 114:15 116:7 123:4 132:9 139:18 140:9, 16,18,19,21,23 143:17,24 144:3, 4,23 146:15 148:16,21 151:13

**worked** 16:2 17:9 40:19,24 56:5, 9 144:3

**working** 26:1 41:4,6 58:11,17 60:13 73:3 80:10 87:25 103:21 104:1,18,22 107:14 115:5 124:11 125:8 131:7 138:9,14 140:6 141:3,12,20 142:3 143:15 144:6, 22

**workplace** 77:14

**works** 87:5 116:4 128:25

**worse** 59:24

**worst** 69:15

**worthy** 65:25

**wrapping** 72:5

**write** 29:20 36:17 40:4,10 58:9 63:18,25 75:10 92:12,20 107:5 119:5 132:19 138:4

**writes** 48:21,24 59:25 65:6,17 66:8,21 67:12 86:13,22

**writing** 31:3,9 74:6

**written** 85:10 86:13

**wrong** 15:4 49:4 51:17 73:21,24 74:1,3 97:7,10 98:14 115:1 122:21 124:6,16,19 125:4,5 140:11

**wrote** 35:12 58:23 60:13 64:24 65:19 97:15 101:16 114:12 126:7 129:18 135:16 137:8 141:15

## Y

**year** 19:23 21:10,12,13,15 22:12 27:14 43:24 44:10 45:1 58:7 62:15 71:11 88:23 102:21 105:16 109:22 132:12 140:10,12

**years** 11:3 16:9,24 19:15 28:17 69:23,24 92:4 123:6 125:9,10 134:16

**yesterday** 64:24 65:19

**York** 15:21 16:1 149:7

**young** 116:2

## Z

**Zoom** 4:22

# In the Matter Of:

*TAMICA J. SMITHSON*

*-v-*

*LLOYD AUSTIN III*

---

## Tamica Smithson, Volume II

*July 26, 2022*

---



DEPOSITION SERVICES

800.869.0873 | www.StewartRichardson.com

Reporting Driven by Excellence — Since 1975

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

1
2                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
3                         INDIANAPOLIS DIVISION

4
     TAMICA J. SMITHSON,              )
5                                     )
              Plaintiff,              )
6                                     )
              -v-                     )   Case No.
7                                     )   1:21-CV-02193-JRS-MJD
     LLOYD AUSTIN III,                )
8                                     )
              Defendant.              )
9

10                          VOLUME II

11          The videoconference deposition upon oral

12   examination of TAMICA SMITHSON, a witness produced and

13   sworn remotely before me, Cascidy Bandyk, Notary

14   Public in and for the County of Marion, State of

15   Indiana, taken on behalf of the Defendant on Tuesday,

16   July 26, 2022, at 3:43 p.m., pursuant to the Federal

17   Rules of Civil Procedure.

18

19

20

21

22

23               STEWART RICHARDSON & ASSOCIATES
24               Registered Professional Reporters
                        (800) 869-0873
25

```
 1                       APPEARANCES

 2    FOR THE PLAINTIFF:
      (Via Zoom conference)
 3
            Pro Se
 4

 5    FOR THE DEFENDANT:
      (Via Zoom conference)
 6
            MS. RACHANA N. FISCHER, ESQ.
 7          U.S. ATTORNEY'S OFFICE
            10 West Market Street
 8          Suite 2100
            Indianapolis, Indiana  46204
 9          rachana.fischer@usdoj.gov

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF EXAMINATION

 2   EXAMINATION                                   PAGE

 3   BY MS. FISCHER:                               159

 4
                   INDEX OF DEFENDANT'S EXHIBITS
 5
      NUM.                DESCRIPTION              PAGE
 6
     Exhibit 9       Coworker's EEO Declaration    160
 7   Exhibit 10      Second Amended Complaint      164
     Exhibit 11      Email                         167
 8   Exhibit 12      Email                         173
     Exhibit 13      Email                         177
 9   Exhibit 14      Email                         184
     Exhibit 15      Email                         187
10   Exhibit 16      Email                         190

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE REPORTER:  My name is Cascidy Bandyk, an

 2         associate of Stewart Richardson & Associates,

 3         150 West Lincolnway, Valparaiso, Indiana.  Today's

 4         date is July 26, 2022.  The time is 3:43 p.m.

 5              This deposition is being held via

 6         videoconference.  The deponent is Tamica Smithson.

 7              Will counsel please identify themselves and

 8         any persons present with you for the record.

 9              MS. FISCHER:  Rachana Fischer for Defendant,

10         Lloyd Austin, and I do not have anyone present with

11         me.

12              THE REPORTER:  Do the parties stipulate and

13         agree that the deponent may be sworn outside the

14         presence of the court reporter?

15              MS. FISCHER:  Yes.

16                    TAMICA SMITHSON,

17         called as a witness by the Defendant, having been

18         first duly sworn to tell the truth, the whole truth

19         and nothing but the truth, was examined and

20         testified as follows:

21    EXAMINATION

22    BY MS. FISCHER:

23    Q.   Ms. Smithson, is there any reason that you cannot

24         testify truthfully and accurately today?

25    A.   I do have a migraine, but I can testify truthfully
```

```
 1          and accurately.

 2   Q.    If that ever changes throughout the deposition,

 3          please let me know.  So we were talking about

 4          Ms. Snowden when we left off yesterday.

 5               So why don't we turn to Exhibit 9, which is

 6          Ms. Snowden's declaration.  Could you pull up

 7          Exhibit 9?

 8               (Defendant's Exhibit 9 marked.)

 9   A.    I have it.  Thank you.

10   Q.    Do you recognize this document?

11   A.    Yes.

12   Q.    What is this document?

13   A.    It's Ms. Snowden's declaration.

14   Q.    Okay.

15   A.    Interrogatories.

16   Q.    Let's look at her response on page 2 of 4.  She was

17          asked "Ms. Smithson states that you were provided

18          guidance for the new biology curriculum while the

19          same information was being withheld from her during

20          the first weeks of instruction in August/September

21          of 2019.

22          Who provided you with the new materials and

23          instruction to implement the new curriculum in

24          August 2019?"

25               And her response was "I was provided
```

1        instructional guidance from Ms. Susan Holt, a

2        science teacher at the Ramstein High School (also a

3        previous science teacher and coworker at Vilseck

4        High School) in curriculum planning and

5        implementation because at the time,

6        August/September 2019, I was a long-term substitute

7        and not a licensed science teacher.

8            "I asked administration for additional support

9        because I needed help in lesson planning and

10       day-to-day curriculum implementation.

11       Administration put me in contact with Ms. Holt who

12       offered to assist me.  I was provided the same

13       material, information and curriculum as

14       Ms. Smithson.

15           "Ms. Holt let me borrow a hard copy of the new

16       textbook until ours arrived because the new

17       curriculum (textbook, lab equipment) was stuck in

18       customs outside of the school's control.

19       Ms. Smithson and I had the same access to the same

20       curriculum's online textbook."

21           So my first question is, Ms. Snowden said she

22       was a long-term substitute and not a licensed

23       science teacher; is that correct?

24   A.  From my understanding.

25   Q.  So what is a long-term substitute?

1   A.   A substitute because a position needed to be filled

2        but they couldn't necessarily hire someone

3        full-time for it at the time for whatever reason.

4        And so Ms. Snowden was placed in that position.

5   Q.   Why was Ms. Snowden substituting?  Who was absent

6        from the school?

7   A.   I don't know.  I have no idea.

8   Q.   Is it true that she hadn't taught science before?

9   A.   If she said that, then that probably was true.

10   Q.   So is it possible that Ms. Holt loaned Ms. Snowden

11        a hard copy of the textbook because she was a

12        substitute who'd never taught science before?

13   A.   It's possible that she did.

14   Q.   So she said that the new curriculum was stuck in

15        customs.  Is that the reason that the textbooks

16        were delayed?

17   A.   That sounds familiar.

18   Q.   So the conclusion on page 4, Ms. Snowden was asked

19        "Do you have anything to add that is relevant to

20        the accepted claims for investigation?"

21            She responded, "As a substitute teacher at

22        Vilseck High School, I was asked three days before

23        the school year started to teach biology and

24        algebra 1 until the permanent teacher was hired,

25        and I agreed to do so.  I'm not a licensed teacher

1   so when administration asked me, they said that I

2   would have the science department's support in

3   lesson planning and in curriculum support.

4         "Since Ms. Smithson also teaches biology, she

5   was my main point of contact for questions I had.

6   She helped me in the first few days to get set up

7   with the first week of biology material, but that

8   was about all since she was so busy with her own

9   courses and the new curriculum.

10         "As I had no previous experience teaching

11   biology and not a lot of time to get prepared and

12   feeling overwhelmed, I asked for additional support

13   from administration because I personally did not

14   feel well supported long term by Ms. Smithson and

15   the Science ISS.

16         "Administration put me in contact with

17   Ms. Holt to offer long-term support and share

18   lesson ideas so that I could better support my

19   students and their learning until a permanent

20   science teacher was hired.

21         "The new science teacher started in January

22   2020.  Ms. Holt's support was instrumental to me,

23   but in no way did she provide me any new curriculum

24   material that was not available to Ms. Smithson."

25         So let's unpack that.  So she said she

```
 1          requested -- Ms. Snowden requested a new mentor; is
 2          that correct?
 3    A.    I did not have knowledge of that.
 4    Q.    And Ms. Snowden asked for a new mentor because she
 5          didn't feel supported by both you and the science
 6          ISS.  Who is the science ISS?
 7    A.    Ms. Joy Schiele.
 8    Q.    So you weren't aware that it was Ms. Snowden
 9          herself who asked for a new mentor?
10    A.    No.  I think I probably missed that in her -- in
11          here.
12    Q.    So let's look at paragraph 29 of your complaint
13          which is Exhibit 10 --
14              (Defendant's Exhibit 10 premarked.)
15    A.    Uh-huh.
16    Q.    -- that we previously marked.  Okay.
17              So in Paragraph 29, you wrote "Ms. Joy Schiele
18          assaulted the Plaintiff in January 2020 when she
19          forced a hug on the Plaintiff and then asked
20          Plaintiff 'It was okay to hug you, right?'
21              "The plaintiff was filled with fury because
22          Ms. Schiele knew that this would not be acceptable
23          to the plaintiff.  The plaintiff felt highly
24          anxious because of this unwanted and uninvited
25          touching.  Plaintiff addressed the assault together
```

```
 1          in person with Principal Mr. Villarreal and

 2          Ms. Schiele.

 3               "After a couple of days, Plaintiff still felt

 4          that she had been deliberately violated because of

 5          her race, ethnicity and disabilities.  Plaintiff

 6          again addressed the issue through email to

 7          Mr. Villarreal and Ms. Schiele.  Plaintiff received

 8          no response from either person."

 9               So do you agree that this is not one of the

10          claims that was included in your EEO Complaint?

11    A.    What page was that again?  I'm sorry.

12    Q.    This is paragraph 29 on Exhibit 10.  It's on

13          page 10 of 19.

14    A.    So can I please clarify -- I mean, can you please

15          restate your question?  Thank you.

16    Q.    Sure.  Would you agree this claim was not included

17          in your EEO Complaint?

18    A.    Which EEO Complaint are you speaking of?

19    Q.    The one that we have the final agency decision for

20          in Exhibit 2.

21    A.    Okay.  The current EEO Complaint.

22    Q.    Yes.

23    A.    So this was the original one -- what was the date

24          filed on the original?  I'm sorry.

25    Q.    I think it's -- you know, I can look it up.  The
```

1       original EEO Complaint was filed on December 3,
2       2019.
3    A.   Okay.  So you're reading from Number 29?
4    Q.   Yes.
5    A.   So 29 was added after because the harassment and
6       the assaults continued.
7    Q.   What do you mean when you say, "It was added
8       after"?
9    A.   It was -- I can't remember when I added it, but I
10      obviously -- if I filed in December 2019, this
11      didn't take place until January 2020.  So it was a
12      continuation of -- and an elevation of the
13      harassment that had been taking place.
14   Q.   Would you agree that it's not one of the accepted
15      claims that's listed in Exhibit 2, the final agency
16      decision?
17   A.   I don't know.  I would have to go back in.
18   Q.   So why don't you pull up Exhibit 2.  And looking at
19      the accepted claims in Exhibit 2, would you agree
20      that Ms. Schiele hugging you in January 2020, is
21      not one of the accepted claims in the final agency
22      decision?
23   A.   It's not one of the original claims.
24   Q.   Could you describe what happened in January 2020
25      when Ms. Schiele hugged you?

1   A.   I've already -- exactly what I wrote there, what

2        you just read.

3   Q.   Okay.  Let's look at Exhibit 11.

4   A.   I don't think that it's labeled.  What is it?

5        Exhibit 11?

6   Q.   Yes, Exhibit 11.

7   A.   It may have showed up in the email without being a

8        link, like an attachment.  It's an attachment but

9        there are a couple of emails that just show as

10       emails.  So what is it?

11  Q.   It should be a PDF.  It's Exhibit 11.  It should

12       just say Exhibit11.pdf.  It's an email dated

13       February 12, 2020.

14  A.   Okay.  I do see -- it is at 7:44 p.m.?

15  Q.   Yes.

16  A.   Okay.  It didn't show up as an attachment.  The

17       whole email is open so I see it, yes.

18          (Defendant's Exhibit 11 marked.)

19  Q.   Okay.  Do you recognize this email?

20  A.   Yes.

21  Q.   What is this email?

22  A.   It is an email from me -- let me make sure -- to

23       Ms. Schiele concerning the assault that took

24       place -- or wait a minute.  Hold on.  So this was

25       February 2020.  So the assault that took place in

```
 1          February 2020.
 2   Q.     Is this the email that you referred to in paragraph
 3          29 of the complaint when you were describing the
 4          incident where she hugged you?
 5   A.     It appears to be.
 6   Q.     So if you look at the first paragraph, you say,
 7          "Ms. Schiele, I know that I accepted your apology
 8          for violating my personal space last Wednesday
 9          during the teacher's training day.  Unfortunately,
10          I can't seem to move past the fact that you
11          continue to violate my personal space knowing we
12          don't have that type of working or personal
13          relationship."
14               So starting with that first part of the email,
15          you say, "I know that I accepted your apology for
16          violating my personal space last Wednesday."
17               Do you agree that Ms. Schiele apologized for
18          hugging you?
19   A.     Yes.
20   Q.     In the second paragraph you say, "During our
21          Catapult training on April 18, 2018, you picked up
22          my personal belongings and moved them when I
23          refused to do so at your request.  You
24          inadvertently hit my leg with the table/chair as
25          you did so."
```

```
 1              So would you agree that she hit your leg
 2        inadvertently?
 3   A.   I put that in there, but I'm not so sure.
 4   Q.   But you agree that that's what you wrote to her?
 5   A.   I did.
 6   Q.   Then later on, so the last paragraph or partway
 7        through the last paragraph, you write "Again, I
 8        know that I accepted your apology for hugging me
 9        and only asking for permission after you had
10        already done so, but I'm still feeling very uneasy
11        about this situation."
12              So do you agree that you accepted her apology
13        when she apologized after hugging you?
14   A.   I did.
15   Q.   Does a hug from a female coworker constitute
16        harassment to you?
17   A.   A hug from anyone that is unwanted does.
18   Q.   Do you consider a hug from a coworker to be
19        assault?
20   A.   I do --
21   Q.   Do you believe --
22   A.   -- if it's unwanted.  I'm sorry.
23   Q.   Do you believe Ms. Schiele hugged you based on your
24        race?
25   A.   Yes.
```

```
 1    Q.    What is the basis for this belief?

 2    A.    She felt that she had a right to violate my space,

 3          regardless of how I felt.

 4    Q.    Do you believe that Ms. Schiele hugged you based on

 5          your disability?

 6    A.    Yes.

 7    Q.    What is the basis for that belief?

 8    A.    She tried to cause anxiety and discomfort and angst

 9          knowing that she and I already had a problem

10          before.

11    Q.    So why do you think she hugged you to try to cause

12          anxiety?

13    A.    I don't know.  I don't know why she -- I mean, you

14          would have to ask her that.  I don't know what

15          makes people do the things they do sometimes, but I

16          just know they do.

17    Q.    Do you believe Ms. Schiele hugged you in

18          retaliation for prior protected activity?

19    A.    Yes.

20    Q.    What's the basis for that belief?

21    A.    I can't -- I have to think about it, but I can't

22          really articulate that one right now.  But she's an

23          administrator with the school and the district so

24          she probably has some knowledge to some things.

25          And then -- yeah.  It's not something that I can
```

1        articulate right now though.

2   Q.   Let's look at paragraph 33 of Exhibit 10.  Let's go

3        back to Exhibit 10.  I'm going to have to find it.

4        Here we go.

5             So in paragraph 33 you say "In January 2021,

6        Plaintiff was greeted with harassment immediately

7        upon callback to brick and mortar (remote learning)

8        from the virtual school (reasonable accommodation)

9        when she was denied proper technology and guidance

10        as she prepared for her students.

11             "Plaintiff's supervisor failed to assure

12        Plaintiff received an equitable working

13        environment.  This was a disruption to Plaintiff's

14        work production and instruction."

15             So first, would you agree that this was not a

16        claim in your EEO Complaint?

17   A.   Not the original, no, it wasn't.

18   Q.   Who denied you proper technology and guidance?

19   A.   I believe that it was a combination.  I know

20        that -- I could tell you who I emailed and who I

21        didn't get proper responses from for things that

22        are their responsibilities.

23   Q.   So what was the technology and guidance that you

24        were being denied?

25   A.   I can't recall right now.  I'd have to look at

```
 1            emails and things, but I've turned those in for the
 2            investigation in the case so I can't remember right
 3            now.
 4     Q.    When you say you turned it in for the
 5            investigation, does that mean you turned it over in
 6            discovery or to the EEO?
 7     A.    Either one or both.
 8     Q.    So sitting here today, you don't remember who it
 9            was who denied you the proper technology and
10            guidance?
11     A.    Yes.  I can tell you who I -- and I may miss a
12            person or two, but I can tell you the main people
13            that I emailed to get myself set up for entry back
14            into the brick and mortar and I didn't receive
15            proper responses.
16     Q.    Who were the people?
17     A.    Ms. Joy Schiele was one.  And I thought that I knew
18            one other, but I'm not quite sure.  So I need to
19            look back at the emails and see.  But those emails
20            have been turned in -- have been submitted.
21     Q.    And sitting here today, you don't remember what the
22            proper technology and guidance was that you were
23            denied?
24     A.    No, I would like to tell you exactly which ones and
25            I can't recall exactly which ones.  Some had to do
```

| | | |
|---|---|---|
| 1 | | with curriculum.  So when I was speaking -- when I |
| 2 | | emailed Ms. Schiele, I believe that it pertained to |
| 3 | | curriculum.  And that's all I can remember right |
| 4 | | now. |
| 5 | Q. | Let's look at Exhibit 12. |
| 6 | | (Defendant's Exhibit 12 marked.) |
| 7 | A. | I think that's already opened as well.  What is |
| 8 | | that exhibit? |
| 9 | Q. | It should be an email.  Let me pull it up.  Yes, so |
| 10 | | it should be Exhibit 12. |
| 11 | A. | Right.  So I'll tell you which email has popped up |
| 12 | | right before Exhibit 13 and then you can let me |
| 13 | | know if that's it.  It says "Reset your Ed |
| 14 | | password" as an email. |
| 15 | Q. | That's correct. |
| 16 | A. | Is that it?  Okay. |
| 17 | Q. | Yes.  So do you recognize this document? |
| 18 | A. | Yes. |
| 19 | Q. | What is this document? |
| 20 | A. | It was about a password that my -- a password that |
| 21 | | I could not -- let me see.  My password would not |
| 22 | | work.  That's what it was.  Well, no.  It wasn't |
| 23 | | that my password wouldn't work.  What was this? |
| 24 | | The system did not work for me. |
| 25 | | "Hopefully, the problem is resolved upon |

```
 1        return."
 2             It was something with a password.  I can't
 3        remember exactly.  It is difficult to read right
 4        now.
 5   Q.   Is this the technology and guidance you were denied
 6        in January 2021?
 7   A.   That's part of it, but that's -- it's not -- so the
 8        HH -- HMH, that's the -- actually, it's the same
 9        system that I think was giving me a problem before
10        and we are supposed to contact Ms. Joy Schiele
11        about it.  That's all I can remember.  And so --
12   Q.   So your email says "I know that I have been
13        returned to the virtual school for this semester."
14             So it is correct that you were going to be
15        returning to the virtual school for the semester?
16   A.   Hold on.  Let me look at this.  So this is
17        January 2021.  "I know that I've been returned to
18        the virtual school, but I figured that I would
19        still attempt to create a password when the message
20        below came through a few minutes ago.  The system
21        still does not work for me.  Hopefully the problem
22        is resolved upon my return."
23             Okay.  So I probably said this just in case I
24        returned, which I did not.  Just kind of thinking
25        ahead because I think this is the system that gave
```

```
 1        me a problem before.
 2             "And I appreciate Ms. Corrigan's efforts to
 3        help my students get logged in" because
 4        Ms. Corrigan also tried with my password and reset
 5        under my name and it still didn't work.
 6             "I appreciate Ms. Corrigan's help to get my
 7        students logged in to their accounts due to my not
 8        being able to access the teacher account."
 9             And let me see.  The next one, I don't know
10        what that is.
11             "Hi, Tamica.  Thank you for" -- I think that's
12        from the -- yeah, that's from the HMH.  So I was
13        just continuing to try and get logged in to the
14        system that teachers are supposed to use for
15        instructing their students.  So that's -- that was
16        this situation here.
17   Q.   So going back to Exhibit 10, in paragraph 33, you
18        say "Plaintiff was greeted with harassment
19        immediately upon callback to brick and mortar
20        (remote learning) from the virtual school
21        (reasonable accommodation)."
22             But is it correct that in January 2021 you
23        were not returning from the virtual school?
24   A.   Can you repeat?  In 2021, I was not returning from
25        the virtual school?
```

1  Q.  Right, the brick and mortar.

2  A.  So I was given an assignment back to the virtual

3      school in November, so that's not a correct

4      statement.  Yes, I was returning from the virtual

5      school to the brick and mortar.  And I worked in

6      the brick and mortar for, I want to say, two weeks,

7      one week where I actually instructed my students.

8          But the instruction was what I came up with to

9      introduce them to the curriculum -- or introduce

10     them to the content because I had not still been

11     provided the proper curriculum.

12         Just like when Ms. Snowden said that she

13     didn't have the proper support, I guess, from me

14     and Ms. Schiele.  I asked Ms. Schiele for

15     everything that I was supposed to have and it was

16     not provided to me so I guess I couldn't provide

17     enough to Ms. Snowden.

18         And the same thing was happening here except

19     for I didn't have another person relying on me for

20     that work.

21 Q.  So looking at Exhibit 12 -- so you think that

22     someone was intentionally denying you the ability

23     to log in to the system?

24 A.  No.  I don't know what the problem was with the

25     system because sometimes there are problems with

```
 1         the system.  But I just know that the person who
 2         was supposed to assist me was not trying to assist
 3         me, and that was Ms. Schiele.
 4              From my understanding, she's the person that
 5         we're supposed to talk to about the system.
 6   Q.    Let's look at Exhibit 13.  Do you agree that
 7         Ms. Corrigan was trying to help you access the
 8         system?
 9   A.    Yes, she tried.
10   Q.    Who is Ms. Corrigan?
11   A.    Ms. Corrigan is another science teacher.
12   Q.    Let's look at Exhibit 13.
13              (Defendant's Exhibit 13 marked.)
14   Q.    Do you recognize this document?
15   A.    It looks like correspondence between me and -- let
16         me go to the bottom.  Yes.  This is just saying
17         that I was attempting to gain access to my online
18         textbooks, which I'm supposed to do.
19              "Any assistance that you can give would be
20         appreciated."
21              And I sent it to Ms. Joy Schiele because she's
22         the contact for that.  And I made sure that I cc'd
23         Mr. Villarreal and Mr. Rodman because I had this
24         problem before with Ms. Schiele.
25   Q.    If you look at the bottom email, you write "Ms.
```

 1          Schiele, I've been attempting to gain access to my

 2          online textbooks.  Any assistance that you can give

 3          will be appreciated."  And that's on January 19,

 4          2021, at 1:06 p.m.

 5              And Ms. Schiele responds on January 19, 2021,

 6          at 3:00 p.m. "Welcome back, Tamica.  Sorry to hear

 7          you are having difficulty accessing the HMH Ed

 8          Platform.  The educator account established for you

 9          last year is still active.  Your username is your

10          DoDEA student Gmail account.  Educators establish

11          their own passwords by using the password reset

12          link.  Please see attached.  The password reset

13          link will be sent to your Outlook account.  If you

14          do not see it, please check your 'Junk Email'

15          folder.  Hope this helps.  Joy Schiele."

16              Would you agree that Ms. Schiele attempted to

17          help you log in?

18    A.    This is what she told me to do.  However, we did

19          not -- what did she say?  That the passwords were

20          the same or something.  There was something about

21          this email -- either way, what she told me to do

22          did not work.  And I tried it and Ms. Corrigan

23          tried it.

24    Q.    Would you agree that she responded within a few

25          hours trying to help you log in?

1   A.   She did respond here in a few hours.

2   Q.   And if you go up, the next email is dated

3        January 20, 2021, at 7:30 a.m. from Mr. Rodman.

4        Who is Mr. Rodman?

5   A.   He was the assistant principal.

6   Q.   Mr. Rodman writes "Ms. Smithson, I noticed in the

7        email below that the generic password used,

8        "Schoolisfun4me!" has two exclamation points.  It

9        is my understanding that the password only has one

10       exclamation point.  At least that is what was

11       provided to me for a student reset.  Not sure if it

12       will help, but might be worth a try."

13            Would you agree Mr. Rodman tried to assist you

14       to log in?

15  A.   He did send the email.  Yes, he did.

16  Q.   Do you believe you had login issues because of your

17       race?

18  A.   No, I think I had login issues because of

19       technology.

20  Q.   Do you think you had login issues because of your

21       disability?

22  A.   No, I think it -- let me go back to the question

23       you just asked.  Do I think I have login issues

24       because of my race?  No.  Do I think that I had

25       login issues because of my disability?  I just know

 1          that I couldn't log in and everyone else could.

 2              That's what I need to say because that was

 3          accurate.  I seemed to be the only one that could

 4          not log in.  Now, others said that they had had

 5          problems before, but they were logged in at the

 6          time and I just need get to my classes.  That's

 7          all.

 8   Q.    Do you believe you had login issues because of

 9          retaliation for prior protected activity?

10   A.    I mean, anything is possible.  I don't know.  It's

11          technology so it could have just been technology,

12          but it could have also been other things as well

13          since I was the only one having a problem.

14   Q.    Sitting here today, do you know why you had login

15          issues?

16   A.    No.  So when I -- there was a message I think from

17          the -- I think HMH.  And I think even HMH was

18          supposed to -- they were supposed to -- I don't

19          know.  I don't know if I even heard back from HMH.

20              So I don't know.  It's technology.  That's why

21          I called the experts because I'm not an expert.

22          That's why we have ITs and ETs to help us.

23   Q.    Were you eventually able to log in to HMH?

24   A.    So no, I wasn't.

25   Q.    So even today you haven't been able to log in to

1        HMH?

2    A.  There was no need to once I left.  I did try to,

3        like -- I think I sent an email.  It was on here

4        actually -- to Ms. Schiele saying that I continued

5        to try but I could not log in.

6            But then after that, I don't think that I

7        tried, but I can't remember.  But I doubt it

8        because at that point, I would be involved with my

9        virtual school students because I have been moved

10       back to the virtual school.

11           But I wanted to try to get logged in to the

12       HMH system just in case so that I wouldn't have the

13       same problem coming up the next school year if I

14       were to be sent back because this wasn't the first

15       time.  This is part of the problem that I had when

16       I was working with Ms. Snowden and -- yeah.

17   Q.  So let's turn to paragraph 34 of the complaint.

18   A.  Uh-huh.

19   Q.  And it reads "In August 2021, Plaintiff was removed

20       from the faculty email distribution list and given

21       restrictions to enter the school.  Her emails were

22       ignored by administrative support staff previously

23       mentioned in this complaint.  Plaintiff's

24       technology (laptop) was cut from its security cord

25       and assigned to a substitute teacher before the

```
 1          plaintiff could retrieve her government-issued
 2          property.  This was a disruption to Plaintiff's
 3          work production and instruction."
 4              So would you agree that this complaint was not
 5          included in your EEO Complaint?
 6   A.    No, that was something that was more recent that
 7          took place.
 8   Q.    And would you agree that this happened after you
 9          filed your lawsuit in this action?
10   A.    Yes, because it was right after I think.  Uh-huh.
11   Q.    Who removed you from the faculty distribution list?
12   A.    So Ms. Cora Moellendick told me that she removed
13          me.
14   Q.    Did she tell you why she removed you?
15   A.    She said that someone told her to remove me.
16   Q.    Who is -- and I didn't catch the name, Ms. --
17   A.    Cora Moellendick.
18   Q.    Cora Moellendick.  Who is Ms. Cora Moellendick?
19   A.    She's the -- we have an IT and an ET.  I think that
20          she's the ET.
21   Q.    And what faculty distribution list was this?  Was
22          this for Vilseck High School?
23          (Witness lost connection.)
24          (Witness exited proceeding.)
25          (A recess was taken, 4:20 p.m. - 4:30 p.m.)
```

```
1   Q.   So you said that you were removed from the faculty
2        distribution list.  Was it the faculty distribution
3        list for Vilseck High School?
4   A.   Yes, it was.
5   Q.   Were you removed because you were detailed to the
6        virtual school?
7   A.   No.  I don't know why I was removed, but I
8        shouldn't have been removed.  I wasn't removed the
9        year before.
10  Q.   But you don't know who instructed you to be
11       removed?
12  A.   Ms. Moellendick just said that she -- I think she
13       did say who it was but I can't remember who she
14       said.
15  Q.   And who reassigned your computer?
16  A.   Ms. Moellendick.
17  Q.   Did she say why she reassigned your computer?
18  A.   Oh.  I'm so sorry.  She gave me another computer.
19       I'm not sure who she reassigned -- she gave me my
20       original computer.  I'm not sure who had reassigned
21       it in the first place.
22           I guess they went and got it from the person
23       that they reassigned it to, the substitute, and
24       gave it to me, and they had cut the lock off.
25  Q.   So do you know why the computer had been
```

```
 1          reassigned?
 2     A.   Not --
 3               (Witness has unstable connection.)
 4     Q.   So in the end, were you able to get your computer
 5          back?
 6     A.   I got a whole other computer and a whole other
 7          device.  I'm sorry about that.
 8     Q.   I mean, the computer that was reassigned in 2021 in
 9          your complaint, were you able to get that back?
10     A.   Yes.  So I got the -- I got my original computer
11          that I had -- already had for three years back.
12     Q.   And do you know why it was reassigned to another
13          teacher?
14     A.   No, I don't.
15     Q.   Let's look at Exhibit 14.
16               (Defendant's Exhibit 14 marked.)
17     A.   Okay.  I have to use two devices now.  Hold on a
18          second.  I have the email up on here.  Okay.  Which
19          one?  I'm sorry.
20     Q.   Exhibit 14.  Do you recognize this document?
21     A.   Yes.
22     Q.   What is this document?
23     A.   It's an email that I sent to Dr. Jones letting her
24          know the issues that I had because she was -- she
25          had just entered the school.  She had not been
```

```
 1          there until like three days before I went in.
 2  Q.   Who is Dr. Jones?
 3  A.   She was the new principal at the high school.
 4  Q.   So it says you're being denied access to the
 5       building.  Who denied you access to the building?
 6  A.   Ms. Michele Wolff.
 7  Q.   And how did she deny you access to the building?
 8  A.   One of the things that teachers -- one of her
 9       responsibilities was to give us the keys that we're
10       assigned.  So she said that she could not return my
11       key fob which gave me access to the building and to
12       my classroom.  Sorry.
13  Q.   Did she explain why she wasn't giving you your key
14       fob?
15  A.   She had a reason or excuse.  I can't remember what
16       it was.
17  Q.   Could it be because you were detailed to the
18       virtual school at the time?
19  A.   They didn't take my key fob the year before, nor
20       did they take the key fobs of my two colleagues who
21       were also detailed.
22  Q.   But sitting here today, you don't know why you
23       weren't given a key fob?
24  A.   Again, she did give me a reason but I just can't
25       remember what it was.
```

1   Q.   Do you believe you had access issues and issues

2        with your computer because of race?

3   A.   Yes.

4   Q.   What's the basis for that belief?

5   A.   It's just what I believe based on how I've been

6        treated in the past, not that I can articulate but

7        it's --

8   Q.   Do you believe you had access issues because of

9        your disability?

10   A.   Yes.

11   Q.   What is the basis for that belief?

12   A.   Again, some of the things that I said before.  A

13        lot -- there's too much to articulate right now,

14        but definitely to cause stress, anxiety and affect

15        my conditions.

16   Q.   So you believe you had access issues because of

17        retaliation for prior protected activity?

18   A.   That as well, yes.

19   Q.   What is the basis for that belief?

20   A.   I can't articulate it right now.  I just do believe

21        that.

22   Q.   So going back to Exhibit 10.  Let's look at

23        paragraph 35.  You write "Mr. Rodman, assistant

24        principal, violated Plaintiff's personal space on

25        January 11, 2022, while she visited Vilseck High

1         School for a mandatory COVID test."

2              First, would you agree that -- what did you

3         say?

4    A.   I'm sorry.  Which exhibit are we looking at?

5    Q.   We're on Exhibit 10, paragraph 35.

6    A.   Okay.

7    Q.   So would you agree that this occurred after you

8         filed your complaint in federal court?

9    A.   Yes, it was a continuation of the harassment.

10   Q.   And would you agree this claim was not included in

11        your EEO Complaint?

12   A.   Yes.

13   Q.   What happened on January 11, 2022?

14   A.   Exactly what I described in the email.  And did I

15        describe it in here as well?  Which -- no, I didn't

16        describe all the way in here.

17             But there's an email that describes exactly

18        what happened and I sent that email to Dr. Jones

19        and to Mr. Rodman, and I submitted it to you as

20        well.

21   Q.   Let's take a look at that email.  Let's open

22        Exhibit 15.

23             (Defendant's Exhibit 15 marked.)

24   A.   Exhibit 15.  Okay.

25   Q.   Do you recognize this document?

```
 1   A.   Yes, ma'am.

 2   Q.   What is this document?

 3   A.   That's the email that I sent to Mr. Rodman and I

 4        cc'd Dr. Jones and myself.

 5   Q.   So if you look at the second paragraph, you write

 6        "As our discussion ended, you asked me how I was

 7        doing.  I replied that I was okay.  At this point,

 8        you decided to compliment my attire (blouse).  As

 9        you were doing this, you felt that it was

10        appropriate to reach and feel the blouse at the

11        side of my wrist and lower arm.

12            "Under the circumstances, I feel that it was

13        inappropriate for you to touch me in any manner

14        that was uninvited.  I did not invite you to touch

15        me or my attire as we spoke."

16            So do you agree that the violation of personal

17        space was Mr. Rodman complimenting your blouse and

18        feeling the blouse at the site of your lower wrist

19        and arm?

20   A.   Yes.

21   Q.   Do you believe that someone touching your blouse at

22        your wrist constitutes harassment?

23   A.   If it's an unwanted touch, yes.

24   Q.   Do you believe Mr. Rodman touched your blouse

25        because of race?
```

1    A.   I don't know why he touched, but with what I

2         believe, yes, I do.

3    Q.   And what's the basis for that belief?

4    A.   Again, a violation of my personal body, my personal

5         space.  And it's just belief that maybe, you know,

6         black people or African Americans have no right to

7         personal space.

8    Q.   Do you believe Mr. Rodman touched your blouse

9         because of your disability?

10   A.   Yes.

11   Q.   What is the basis for that belief?

12   A.   Because he has knowledge of it.  He knows exactly

13        how I feel about it and he did it anyways.  And he

14        and I, we don't have a relationship to where he

15        should feel comfortable enough doing that.

16   Q.   Do you believe Mr. Rodman touched your blouse

17        because of retaliation for prior protected

18        activity?

19   A.   Yes.

20   Q.   What is the basis for that belief?

21   A.   Because he's an administrator at the school.  And I

22        filed several complaints while he's been at that

23        school and it has not made things easy for him

24        probably.

25   Q.   Let's look at Exhibit 16.

```
 1              (Defendant's Exhibit 16 marked.)

 2    Q.   Do you recognize this document?

 3    A.   Is that the one -- so again, that's another

 4         document that hasn't shown up.  So is that the one

 5         where it says "Mr. Rod -- thank you."

 6    Q.   Yes.

 7    A.   It's Mr. Rodman's response?  Yes, I do.

 8    Q.   Right.  What is this document?

 9    A.   It's his response to the touching -- to the

10         unwanted touching.

11    Q.   So on January 18, 2022, Mr. Rodman writes

12         "Ms. Smithson, I apologize for offending you and

13         for any discomfort I caused when you came in last

14         week.  It was not my intent and it won't happen

15         again."

16              Do you agree that Mr. Rodman apologized?

17    A.   He did.

18    Q.   Do you agree that he stated that he did not intend

19         to cause you discomfort?

20    A.   He stated that, yes.

21    Q.   Do you agree that you thanked him for his email?

22    A.   I thanked him for the email, yes, I did.

23    Q.   What do you believe your damages are in this

24         action?

25    A.   He caused anxiety and it was harassment.  And just
```

1      like the other times when people have put their

2      hands on me and they should not have.  And it

3      continues to happen.  He was aware of it.  He's an

4      administrator and he was wrong.

5   Q.  In several of the documents --

6   A.  I'm sorry.  He -- I don't want to say that he was

7      wrong.  He should not have done it.  He should have

8      known better.

9   Q.  In several of the documents, you referenced talking

10     to your therapist.  Have you been diagnosed with a

11     mental health condition?

12  A.  Anxiety.  Yes, I have been.

13  Q.  Is anxiety the only mental health condition that

14     you've been diagnosed with?

15  A.  If you see in my -- my reasonable accommodations

16     are the things that I will share.  Everything else

17     is patient -- doctor-patient confidentiality.

18  Q.  You know, I'll tell you because you sued for

19     harassment and emotional distress, your mental

20     health is one of the factors in this case.

21         And so I'd ask again if you've been diagnosed

22     with any other mental health conditions besides

23     anxiety?

24  A.  Again, it's patient-doctor confidentiality.  But if

25     you subpoena my doctor, then she'll answer the

```
 1          questions that she feels is appropriate.
 2   Q.    So are you saying that other than anxiety, you're
 3          refusing to respond to whether you have another
 4          mental health condition?
 5   A.    I've answered -- in my reasonable accommodations,
 6          which you do have, it states quite a few things:
 7          ADHD, anxiety -- I just don't want to say something
 8          that she may not have diagnosed me with.
 9   Q.    Are you taking any mental health medication?
10   A.    No -- candesartan and Glaupax for my intracranial
11          hypertension.
12   Q.    And both of those medications are not mental health
13          medication; correct?
14   A.    No, ma'am.
15   Q.    So no, they are not mental health medication?
16   A.    No, they're not.
17   Q.    Could your mental health --
18   A.    Not that I know of.  I'll go back.  Not that I know
19          of.  Sorry.  I need to -- because I'm not a doctor.
20          So something could be used, I guess.  I don't think
21          that Glaupax is used for a mental health.  And I
22          don't think that candesartan is used for mental
23          health.
24              That's why I'm saying no, but I'm not
25          qualified to really make a -- because I haven't
```

```
 1          done the research.  And even if I did, I could be
 2          wrong.  Sorry.
 3     Q.   Could your mental health affect your perceptions of
 4          your interactions with your colleagues?
 5     A.   I don't know.
 6     Q.   So could having anxiety affect how you perceive
 7          your interactions with your colleagues?
 8     A.   Having anxiety can -- just being a different person
 9          can affect your perception so I don't know.  You
10          would have to ask a medical professional that.
11     Q.   When did you first receive any kind of mental
12          health treatment?
13     A.   When I realized that I was working in a hostile
14          environment.  That was probably 2000 -- not even
15          when I realized.  It was after that.  It was
16          obviously after.
17               You know, I saw one doctor for just the
18          migraines.  And then that changed into the -- you
19          know, we kind of started talking about things with
20          work.  So I'm not sure if he even diagnosed me with
21          mental health or anything like that.  So I don't --
22          you'd have to speak with the doctor about that.  I
23          don't know.
24     Q.   Have you ever taken any --
25     A.   I spoke with my doctors.  I started seeing a
```

```
 1        psychiatrist and psychologist -- both are

 2        psychiatrists actually.  I started seeing those to

 3        help me cope with the hostile work conditions that

 4        I was under.

 5   Q.   When was that?

 6   A.   To better cope with -- again, when I started seeing

 7        Dr. Gebel.  I don't know.  I can't remember.  It

 8        could have been 2009, 2010.

 9   Q.   When did you start seeing a psychologist?

10   A.   I don't know.  I think I started seeing -- I'm so

11        sorry.  I think I started seeing him in 2009, 2010,

12        but that was for my -- I didn't know it was

13        intracranial hypertension at the time.  But that

14        was for the intracranial hypertension which we

15        found out later was intracranial hypertension.  I

16        don't know.  That's a question you would have to

17        ask a medical professional.

18   Q.   When did you start seeing a psychiatrist or

19        psychologist?  You mentioned you started seeing a

20        psychologist and a psychiatrist.  When did you

21        start seeing them?

22   A.   So Dr. Gebel is a psychiatrist and a neurologist.

23        And so I started seeing him in 2009, but mainly

24        that was for my migraines.

25   Q.   Have you seen any other psychologist or
```

```
 1        psychiatrist?
 2   A.   Dr. Cedilnik.
 3   Q.   And when did you start seeing her?
 4   A.   I don't know why I always forget this.  I think it
 5        was 2018 or 2019.  It was either November of 2018
 6        or November of 2019.
 7   Q.   Have you ever taken any mental health medication?
 8   A.   I was taking -- that was for anxiety,
 9        nortriptyline.
10   Q.   How long did you take those?
11   A.   Until March of 2020 when I exited the brick and
12        mortar.
13   Q.   When did you start taking them?
14   A.   That's a question for Dr. Gebel.  I can't remember.
15   Q.   Are you currently receiving any mental --
16   A.   Three years before that, maybe two years before
17        that.  I'm sorry.  Maybe two years before that.
18   Q.   Are you currently receiving any mental health
19        treatment?
20   A.   Yes.
21   Q.   Who is your provider?
22   A.   Dr. Parul Cedilnik.
23   Q.   How often are you being treated?
24   A.   I reduced my treatments to, sometimes, every other
25        week.  But when I was in the brick and mortar, it
```

1        was every week.

2   Q.   What condition are you being treated for?

3   A.   That's a question for Dr. Cedilnik.  I could share

4        that anxiety is one -- anything that's -- ADHD,

5        adult ADHD.

6            Anything that's in my reasonable

7        accommodations are what I wanted to share and I

8        probably shouldn't say anything else because I'm

9        not sure what her diagnoses are.

10  Q.   Have you ever been diagnosed with paranoia?

11  A.   No, I don't think so.

12  Q.   Have you ever been diagnosed with personality

13       disorder?

14  A.   Not that I know of.

15  Q.   Have you ever been diagnosed with depression?

16  A.   I'm going to go back.  So have I ever been

17       diagnosed with -- what was the first one?

18  Q.   The first one was paranoia.  The second was

19       personality disorder.  And the third one was

20       depression.

21  A.   Okay.  So paranoia, personality disorder and

22       depression.  So I'd like to go back to my answers

23       and just say that it's doctor-patient

24       confidentiality.  You should just speak with my

25       neurologist.

1   Q.   And again, for the record, I'd like to say that you

2        waived your doctor-patient confidentiality by suing

3        based on emotional distress and trying to seek

4        damages for that.

5             So you have waived the privilege because you

6        are alleging that you experienced emotional

7        distress and so your mental health is an issue in

8        this case.

9   A.   Right.

10  Q.   And so I'm asking you to answer.

11  A.   I'm just trying to be consistent with maintaining

12       my doctor-patient confidentiality.

13  Q.   And again, I'm telling you, you do not have

14       doctor-patient confidentiality because you waived

15       it by filing this lawsuit and I'm asking you to

16       answer.

17  A.   So what I'm answering is that I've been

18       diagnosed -- because it's been shared in my

19       reasonable accommodations -- with anxiety, which is

20       a mental condition.

21            And there are some other things that they put

22       in my reasonable accommodations as well but I can't

23       remember them right now.

24  Q.   I'm not asking --

25  A.   But that's been submitted.  It's been submitted.

```
 1         So rather I --

 2   Q.    I'm not asking what was in your reasonable

 3         accommodation.  I'm asking what you've been

 4         diagnosed with, whether it was in your reasonable

 5         accommodation or not.  I'm asking you to answer all

 6         of your mental health diagnoses.

 7   A.    Exactly.  So just like I can't remember like all of

 8         my -- everything that's on my reasonable

 9         accommodations.  I remember anxiety and adult ADHD.

10         I can't remember -- I think that they put something

11         else on there as well, but I can't recall.

12   Q.    So sitting here today, you don't remember your

13         mental health diagnoses?

14   A.    No.

15             MS. FISCHER:  So that concludes the

16         deposition.  And yes, I think that's all for today.

17             Cascidy, do you have anything for the record?

18             THE REPORTER:  Would counsel like to order?

19             MS. FISCHER:  Yes.

20             THE REPORTER:  Did you need this before normal

21         delivery?

22             MS. FISCHER:  No.

23             THE WITNESS:  Can I have a copy of the

24         deposition as well so that I can review?

25             THE REPORTER:  For signature or did you want
```

1  an actual copy to have?

2      THE WITNESS:  Will you need an errata?

3      THE REPORTER:  Yes.  So I will send it to you

4  via email to review and send back.

5      THE WITNESS:  Thank you.

6      (The deposition concluded at 5:02 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 200

```
 1                   UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF INDIANA
 2                       INDIANAPOLIS DIVISION

 3


 4
     TAMICA J. SMITHSON,            )
 5                                  )
          Plaintiff,                )
 6                                  )
         -v-                        )   Case No.
 7                                  )   1:21-CV-02193-JRS-MJD
     LLOYD AUSTIN III,              )
 8                                  )
          Defendant.                )
 9

10

11                       Job No. 174371

12

13        I, TAMICA SMITHSON, state that I have read the
     foregoing transcript of the testimony given by me
     at my deposition on July 26, 2022, and that said
14   transcript constitutes a true and correct record of
     the testimony given by me at said deposition except
15   as I have so indicated on the errata sheets
     provided herein.

16

17

                     _____
18                   TAMICA SMITHSON
                     VOLUME II
19

20

21

22

23             STEWART RICHARDSON & ASSOCIATES
                 Registered Professional Reporters
24               One Indiana Square, Suite 2425
                   Indianapolis, IN  46204
25                       (800)869-0873
```

```
 1   STATE OF INDIANA   )
                        )
 2   COUNTY OF MARION   )

 3

 4           I, Cascidy Bandyk, a Notary Public in and for

 5   said county and state, do hereby certify that the

 6   deponent herein, TAMICA SMITHSON, was by me first duly

 7   sworn to tell the truth, the whole truth, and nothing

 8   but the truth in the aforementioned matter;

 9           That the foregoing deposition was taken on

10   behalf of the Defendant; that said deposition was taken

11   at the time and place heretofore mentioned between 3:43

12   p.m. and 5:02 p.m.;

13           That said deposition was taken down in

14   stenograph notes and afterwards reduced to typewriting

15   under my direction; and that the typewritten transcript

16   is a true record of the testimony given by said

17   deponent;

18           And thereafter presented to said witness for

19   signature; that this certificate does not purport to

20   acknowledge or verify the signature hereto of the

21   deponent.

22           I do further certify that I am a disinterested

23   person in this cause of action; that I am not a

24   relative of the attorneys for any of the parties.

25              IN WITNESS WHEREOF, I have hereunto set my
```

1 | hand and affixed my notarial seal this 10th day of

2 | August, 2022.

3

4

5

6

7

8

9

10

11 | Notary Public - State of Indiana
My Commission Expires:  July 9, 2029

12

13 | Job No. 174371

14

15

16

17

18

19

20

21

22

23

24

25

Cascidy A. Bandyk
NOTARY PUBLIC SEAL
STATE OF INDIANA
Commission No. NP0734617
My Commission Expires July 5, 2029

Index: 1..agreed

**Exhibits**

**Tamica Smithson Ex 09** 158:6 160:5,7,8

**Tamica Smithson Ex 10** 158:7 164:13,14 165:12 171:2,3 175:17 186:22 187:5

**Tamica Smithson Ex 11** 158:7 167:3,5,6,11,18

**Tamica Smithson Ex 12** 158:8 173:5,6,10 176:21

**Tamica Smithson Ex 13** 158:8 173:12 177:6,12,13

**Tamica Smithson Ex 14** 158:9 184:15,16,20

**Tamica Smithson Ex 15** 158:9 187:22,23,24

**Tamica Smithson Ex 16** 158:10 189:25 190:1

**1**

**1** 162:24

**10** 164:13,14 165:12,13 171:2,3 175:17 186:22 187:5

**11** 167:3,5,6,11,18 186:25 187:13

**12** 167:13 173:5,6,10 176:21

**13** 173:12 177:6,12,13

**14** 184:15,16,20

**15** 187:22,23,24

**150** 159:3

**16** 189:25 190:1

**18** 168:21 190:11

**19** 165:13 178:3,5

**1:06** 178:4

**2**

**2** 160:16 165:20 166:15,18,19

**20** 179:3

**2000** 193:14

**2009** 194:8,11,23

**2010** 194:8,11

**2018** 168:21 195:5

**2019** 160:21,24 161:6 166:2,10 195:5,6

**2020** 163:22 164:18 166:11,20,24 167:13,25 168:1 195:11

**2021** 171:5 174:6,17 175:22,24 178:4,5 179:3 181:19 184:8

**2022** 159:4 186:25 187:13 190:11

**26** 159:4

**29** 164:12,17 165:12 166:3,5 168:3

**3**

**3** 166:1

**33** 171:2,5 175:17

**34** 181:17

**35** 186:23 187:5

**3:00** 178:6

**3:43** 159:4

**4**

**4** 160:16 162:18

**4:20** 182:25

**4:30** 182:25

**5**

**5:02** 199:6

**7**

**7:30** 179:3

**7:44** 167:14

**9**

**9** 160:5,7,8

**A**

**a.m.** 179:3

**ability** 176:22

**absent** 162:5

**acceptable** 164:22

**accepted** 162:20 166:14,19,21 168:7,15 169:8,12

**access** 161:19 175:8 177:7,17 178:1 185:4,5,7,11 186:1,8,16

**accessing** 178:7

**accommodation** 171:8 175:21 198:3,5

**accommodations** 191:15 192:5 196:7 197:19,22 198:9

**account** 175:8 178:8,10,13

**accounts** 175:7

**accurate** 180:3

**accurately** 159:24 160:1

**action** 182:9 190:24

**active** 178:9

**activity** 170:18 180:9 186:17 189:18

**actual** 199:1

**add** 162:19

**added** 166:5,7,9

**additional** 161:8 163:12

**addressed** 164:25 165:6

**ADHD** 192:7 196:4,5 198:9

**administration** 161:8,11 163:1, 13,16

**administrative** 181:22

**administrator** 170:23 189:21 191:4

**adult** 196:5 198:9

**affect** 186:14 193:3,6,9

**African** 189:6

**agency** 165:19 166:15,21

**agree** 159:13 165:9,16 166:14,19 168:17 169:1,4,12 171:15 177:6 178:16,24 179:13 182:4,8 187:2, 7,10 188:16 190:16,18,21

**agreed** 162:25

Index: ahead..content

**ahead** 174:25

**algebra** 162:24

**alleging** 197:6

**Americans** 189:6

**angst** 170:8

**answering** 197:17

**answers** 196:22

**anxiety** 170:8,12 186:14 190:25 191:12,13,23 192:2,7 193:6,8 195:8 196:4 197:19 198:9

**anxious** 164:24

**apologize** 190:12

**apologized** 168:17 169:13 190:16

**apology** 168:7,15 169:8,12

**appears** 168:5

**appreciated** 177:20 178:3

**April** 168:21

**arm** 188:11,19

**arrived** 161:16

**articulate** 170:22 171:1 186:6, 13,20

**assault** 164:25 167:23,25 169:19

**assaulted** 164:18

**assaults** 166:6

**assigned** 181:25 185:10

**assignment** 176:2

**assist** 161:12 177:2 179:13

**assistance** 177:19 178:2

**assistant** 179:5 186:23

**associate** 159:2

**Associates** 159:2

**assure** 171:11

**attached** 178:12

**attachment** 167:8,16

**attempt** 174:19

**attempted** 178:16

**attempting** 177:17 178:1

**attire** 188:8,15

**August** 160:24 181:19

**August/september** 160:20 161:6

**Austin** 159:10

**aware** 164:8 191:3

### B

**back** 166:17 171:3 172:13,19 175:17 176:2 178:6 179:22 180:19 181:10,14 184:5,9,11 186:22 192:18 196:16,22 199:4

**Bandyk** 159:1

**based** 169:23 170:4 186:5 197:3

**basis** 170:1,7,20 186:4,11,19 189:3,11,20

**belief** 170:1,7,20 186:4,11,19 189:3,5,11,20

**belongings** 168:22

**biology** 160:18 162:23 163:4,7, 11

**black** 189:6

**blouse** 188:8,10,17,18,21,24 189:8,16

**body** 189:4

**borrow** 161:15

**bottom** 177:16,25

**brick** 171:7 172:14 175:19 176:1, 5,6 195:11,25

**building** 185:5,7,11

**busy** 163:8

### C

**callback** 171:7 175:19

**called** 159:17 180:21

**candesartan** 192:10,22

**Cascidy** 159:1 198:17

**case** 172:2 174:23 181:12 191:20 197:8

**Catapult** 168:21

**catch** 182:16

**caused** 190:13,25

**cc'd** 177:22 188:4

**Cedilnik** 195:2,22 196:3

**changed** 193:18

**check** 178:14

**circumstances** 188:12

**claim** 165:16 171:16 187:10

**claims** 162:20 165:10 166:15,19, 21,23

**clarify** 165:14

**classes** 180:6

**classroom** 185:12

**colleagues** 185:20 193:4,7

**combination** 171:19

**comfortable** 189:15

**complaint** 164:12 165:10,17,18, 21 166:1 168:3 171:16 181:17,23 182:4,5 184:9 187:8,11

**complaints** 189:22

**compliment** 188:8

**complimenting** 188:17

**computer** 183:15,17,18,20,25 184:4,6,8,10 186:2

**concluded** 199:6

**concludes** 198:15

**conclusion** 162:18

**condition** 191:11,13 192:4 196:2 197:20

**conditions** 186:15 191:22 194:3

**confidentiality** 191:17,24 196:24 197:2,12,14

**connection** 182:23 184:3

**consistent** 197:11

**constitute** 169:15

**constitutes** 188:22

**contact** 161:11 163:5,16 174:10 177:22

**content** 176:10

Index: continuation..entry

**continuation** 166:12 187:9

**continue** 168:11

**continued** 166:6 181:4

**continues** 191:3

**continuing** 175:13

**control** 161:18

**cope** 194:3,6

**copy** 161:15 162:11 198:23 199:1

**Cora** 182:12,17,18

**cord** 181:24

**correct** 161:23 164:2 173:15 174:14 175:22 176:3 192:13

**correspondence** 177:15

**Corrigan** 175:4 177:7,10,11 178:22

**Corrigan's** 175:2,6

**counsel** 159:4 198:18

**couple** 165:3 167:9

**courses** 163:9

**court** 159:14 187:8

**COVID** 187:1

**coworker** 161:3 169:15,18

**create** 174:19

**current** 165:21

**curriculum** 160:18,23 161:4,10, 13,17 162:14 163:3,9,23 173:1,3 176:9,11

**curriculum's** 161:20

**customs** 161:18 162:15

**cut** 181:24 183:24

**D**

**damages** 190:23 197:4

**date** 159:4 165:23

**dated** 167:12 179:2

**day** 168:9

**day-to-day** 161:10

**days** 162:22 163:6 165:3 185:1

**December** 166:1,10

**decided** 188:8

**decision** 165:19 166:16,22

**declaration** 160:6,13

**Defendant** 159:9,17

**defendant's** 160:8 164:14 167:18 173:6 177:13 184:16 187:23 190:1

**delayed** 162:16

**deliberately** 165:4

**delivery** 198:21

**denied** 171:9,18,24 172:9,23 174:5 185:4,5

**deny** 185:7

**denying** 176:22

**department's** 163:2

**deponent** 159:6,13

**deposition** 159:5 160:2 198:16, 24 199:6

**depression** 196:15,20,22

**describe** 166:24 187:15,16

**describes** 187:17

**describing** 168:3

**detailed** 183:5 185:17,21

**device** 184:7

**devices** 184:17

**diagnosed** 191:10,14,21 192:8 193:20 196:10,12,15,17 197:18 198:4

**diagnoses** 196:9 198:6,13

**difficult** 174:3

**difficulty** 178:7

**disabilities** 165:5

**disability** 170:5 179:21,25 186:9 189:9

**discomfort** 170:8 190:13,19

**discovery** 172:6

**discussion** 188:6

**disorder** 196:13,19,21

**disruption** 171:13 182:2

**distress** 191:19 197:3,7

**distribution** 181:20 182:11,21 183:2

**district** 170:23

**doctor** 191:25 192:19 193:17,22

**doctor-patient** 191:17 196:23 197:2,12,14

**doctors** 193:25

**document** 160:10,12 173:17,19 177:14 184:20,22 187:25 188:2 190:2,4,8

**documents** 191:5,9

**Dodea** 178:10

**doubt** 181:7

**due** 175:7

**duly** 159:18

**E**

**easy** 189:23

**Ed** 173:13 178:7

**educator** 178:8

**Educators** 178:10

**EEO** 165:10,17,18,21 166:1 171:16 172:6 182:5 187:11

**efforts** 175:2

**elevation** 166:12

**email** 165:6 167:7,12,17,19,21,22 168:2,14 173:9,11,14 174:12 177:25 178:14,21 179:2,7,15 181:3,20 184:18,23 187:14,17,18, 21 188:3 190:21,22 199:4

**emailed** 171:20 172:13 173:2

**emails** 167:9,10 172:1,19 181:21

**emotional** 191:19 197:3,6

**end** 184:4

**ended** 188:6

**enter** 181:21

**entered** 184:25

**entry** 172:13

**environment**  171:13 193:14

**equipment**  161:17

**equitable**  171:12

**errata**  199:2

**establish**  178:10

**established**  178:8

**ethnicity**  165:5

**ETS**  180:22

**eventually**  180:23

**EXAMINATION**  159:21

**examined**  159:19

**exclamation**  179:8,10

**excuse**  185:15

**exhibit**  160:5,7,8 164:13,14 165:12,20 166:15,18,19 167:3,5,6,11,18 171:2,3 173:5,6,8,10,12 175:17 176:21 177:6,12,13 184:15,16,20 186:22 187:4,5,22,23,24 189:25 190:1

**Exhibit11.pdf.**  167:12

**exited**  182:24 195:11

**experience**  163:10

**experienced**  197:6

**expert**  180:21

**experts**  180:21

**explain**  185:13

---

**F**

**fact**  168:10

**factors**  191:20

**faculty**  181:20 182:11,21 183:1,2

**failed**  171:11

**familiar**  162:17

**February**  167:13,25 168:1

**federal**  187:8

**feel**  163:14 164:5 188:10,12 189:13,15

**feeling**  163:12 169:10 188:18

**feels**  192:1

**felt**  164:23 165:3 170:2,3 188:9

**female**  169:15

**figured**  174:18

**filed**  165:24 166:1,10 182:9 187:8 189:22

**filing**  197:15

**filled**  162:1 164:21

**final**  165:19 166:15,21

**find**  171:3

**Fischer**  159:9,15,22 198:15,19,22

**fob**  185:11,14,19,23

**fobs**  185:20

**folder**  178:15

**forced**  164:19

**forget**  195:4

**found**  194:15

**full-time**  162:3

**fury**  164:21

---

**G**

**gain**  177:17 178:1

**gave**  174:25 183:18,19,24 185:11

**Gebel**  194:7,22 195:14

**generic**  179:7

**give**  177:19 178:2 185:9,24

**giving**  174:9 185:13

**Glaupax**  192:10,21

**Gmail**  178:10

**government-issued**  182:1

**greeted**  171:6 175:18

**guess**  176:13,16 183:22 192:20

**guidance**  160:18 161:1 171:9,18,23 172:10,22 174:5

---

**H**

**hands**  191:2

**happen**  190:14 191:3

**happened**  166:24 182:8 187:13,18

**happening**  176:18

**harassment**  166:5,13 169:16 171:6 175:18 187:9 188:22 190:25 191:19

**hard**  161:15 162:11

**health**  191:11,13,20,22 192:4,9,12,15,17,21,23 193:3,12,21 195:7,18 197:7 198:6,13

**hear**  178:6

**heard**  180:19

**held**  159:5

**helped**  163:6

**helps**  178:15

**HH**  174:8

**high**  161:2,4 162:22 182:22 183:3 185:3 186:25

**highly**  164:23

**hire**  162:2

**hired**  162:24 163:20

**hit**  168:24 169:1

**HMH**  174:8 175:12 178:7 180:17,19,23 181:1,12

**Hold**  167:24 174:16 184:17

**Holt**  161:1,11,15 162:10 163:17

**Holt's**  163:22

**Hope**  178:15

**hostile**  193:13 194:3

**hours**  178:25 179:1

**hug**  164:19,20 169:15,17,18

**hugged**  166:25 168:4 169:23 170:4,11,17

**hugging**  166:20 168:18 169:8,13

**hypertension**  192:11 194:13,14,15

---

**I**

**idea**  162:7

Index: ideas..minute

**ideas** 163:18

**identify** 159:7

**immediately** 171:6 175:19

**implement** 160:23

**implementation** 161:5,10

**inadvertently** 168:24 169:2

**inappropriate** 188:13

**incident** 168:4

**included** 165:10,16 182:5 187:10

**Indiana** 159:3

**information** 160:19 161:13

**instructed** 176:7 183:10

**instructing** 175:15

**instruction** 160:20,23 171:14 176:8 182:3

**instructional** 161:1

**instrumental** 163:22

**intend** 190:18

**intent** 190:14

**intentionally** 176:22

**interactions** 193:4,7

**Interrogatories** 160:15

**intracranial** 192:10 194:13,14, 15

**introduce** 176:9

**investigation** 162:20 172:2,5

**invite** 188:14

**involved** 181:8

**ISS** 163:15 164:6

**issue** 165:6 197:7

**issues** 179:16,18,20,23,25 180:8, 15 184:24 186:1,8,16

**J**

**January** 163:21 164:18 166:11, 20,24 171:5 174:6,17 175:22 178:3,5 179:3 186:25 187:13 190:11

**Jones** 184:23 185:2 187:18

188:4

**Joy** 164:7,17 172:17 174:10 177:21 178:15

**July** 159:4

**Junk** 178:14

**K**

**key** 185:11,13,19,20,23

**keys** 185:9

**kind** 174:24 193:11,19

**knew** 164:22 172:17

**know** 160:3 162:7 165:25 166:17 168:7,15 169:8 170:13,14,16 171:19 173:13 174:12,17 175:9 176:24 177:1 179:25 180:10,14, 19,20 183:7,10,25 184:12,24 185:22 189:1,5 191:18 192:18 193:5,9,17,19,23 194:7,10,12,16 195:4 196:14

**knowing** 168:11 170:9

**knowledge** 164:3 170:24 189:12

**L**

**lab** 161:17

**labeled** 167:4

**laptop** 181:24

**lawsuit** 182:9 197:15

**learning** 163:19 171:7 175:20

**left** 160:4 181:2

**leg** 168:24 169:1

**lesson** 161:9 163:3,18

**letting** 184:23

**licensed** 161:7,22 162:25

**Lincolnway** 159:3

**link** 167:8 178:12,13

**list** 181:20 182:11,21 183:2,3

**listed** 166:15

**Lloyd** 159:10

**loaned** 162:10

**lock** 183:24

**log** 176:23 178:17,25 179:14 180:1,4,23,25 181:5

**logged** 175:3,7,13 180:5 181:11

**login** 179:16,18,20,23,25 180:8, 14

**long** 163:14 195:10

**long-term** 161:6,22,25 163:17

**lost** 182:23

**lot** 163:11 186:13

**lower** 188:11,18

**M**

**made** 177:22 189:23

**main** 163:5 172:12

**maintaining** 197:11

**make** 167:22 192:25

**makes** 170:15

**mandatory** 187:1

**manner** 188:13

**March** 195:11

**marked** 160:8 164:16 167:18 173:6 177:13 184:16 187:23 190:1

**material** 161:13 163:7,24

**materials** 160:22

**medical** 193:10 194:17

**medication** 192:9,13,15 195:7

**medications** 192:12

**mental** 191:11,13,19,22 192:4,9, 12,15,17,21,22 193:3,11,21 195:7,15,18 197:7,20 198:6,13

**mentioned** 181:23 194:19

**mentor** 164:1,4,9

**message** 174:19 180:16

**Michele** 185:6

**migraine** 159:25

**migraines** 193:18 194:24

**minute** 167:24

Index: minutes..qualified

**minutes** 174:20

**miss** 172:11

**missed** 164:10

**Moellendick** 182:12,17,18 183:12,16

**mortar** 171:7 172:14 175:19 176:1,5,6 195:12,25

**move** 168:10

**moved** 168:22 181:9

**N**

**necessarily** 162:2

**needed** 161:9 162:1

**neurologist** 194:22 196:25

**normal** 198:20

**nortriptyline** 195:9

**noticed** 179:6

**November** 176:3 195:5,6

**Number** 166:3

**O**

**occurred** 187:7

**offending** 190:12

**offer** 163:17

**offered** 161:12

**online** 161:20 177:17 178:2

**open** 167:17 187:21

**opened** 173:7

**order** 198:18

**original** 165:23,24 166:1,23 171:17 183:20 184:10

**Outlook** 178:13

**overwhelmed** 163:12

**P**

**p.m.** 159:4 167:14 178:4,6 182:25 199:6

**paragraph** 164:12,17 165:12

168:2,6,20 169:6,7 171:2,5 175:17 181:17 186:23 187:5 188:5

**paranoia** 196:10,18,21

**part** 168:14 174:7 181:15

**parties** 159:12

**partway** 169:6

**Parul** 195:22

**password** 173:14,20,21,23 174:2,19 175:4 178:11,12 179:7,9

**passwords** 178:11,19

**past** 168:10 186:6

**patient** 191:17

**patient-doctor** 191:24

**PDF** 167:11

**people** 170:15 172:12,16 189:6 191:1

**perceive** 193:6

**perception** 193:9

**perceptions** 193:3

**permanent** 162:24 163:19

**permission** 169:9

**person** 165:1,8 172:12 176:19 177:1,4 183:22 193:8

**personal** 168:8,11,12,16,22 186:24 188:16 189:4,7

**personality** 196:12,19,21

**personally** 163:13

**persons** 159:8

**pertained** 173:2

**picked** 168:21

**place** 166:11,13 167:24,25 182:7 183:21

**plaintiff** 164:18,19,20,21,23,25 165:3,5,7 171:6,12 175:18 181:19 182:1

**Plaintiff's** 171:11,13 181:23 182:2 186:24

**planning** 161:4,9 163:3

**Platform** 178:8

**point** 163:5 179:10 181:8 188:7

**points** 179:8

**popped** 173:11

**position** 162:1,4

**premarked** 164:14

**prepared** 163:11 171:10

**presence** 159:14

**present** 159:8,10

**previous** 161:3 163:10

**previously** 164:16 181:22

**principal** 165:1 179:5 185:3 186:24

**prior** 170:18 180:9 186:17 189:17

**privilege** 197:5

**problem** 170:9 173:25 174:9,21 175:1 176:24 177:24 180:13 181:13,15

**problems** 176:25 180:5

**proceeding** 182:24

**production** 171:14 182:3

**professional** 193:10 194:17

**proper** 171:9,18,21 172:9,15,22 176:11,13

**property** 182:2

**protected** 170:18 180:9 186:17 189:17

**provide** 163:23 176:16

**provided** 160:17,22,25 161:12 176:11,16 179:11

**provider** 195:21

**psychiatrist** 194:1,18,20,22 195:1

**psychiatrists** 194:2

**psychologist** 194:1,9,19,20,25

**pull** 160:6 166:18 173:9

**put** 161:11 163:16 169:3 191:1 197:21 198:10

**Q**

**qualified** 192:25

Index: question..space

**question** 161:21 165:15 179:22 194:16 195:14 196:3

**questions** 163:5 192:1

---

**R**

**race** 165:5 169:24 179:17,24 186:2 188:25

**Rachana** 159:9

**Ramstein** 161:2

**reach** 188:10

**read** 167:2 174:3

**reading** 166:3

**reads** 181:19

**realized** 193:13,15

**reason** 159:23 162:3,15 185:15, 24

**reasonable** 171:8 175:21 191:15 192:5 196:6 197:19,22 198:2,4,8

**reassigned** 183:15,17,19,20,23 184:1,8,12

**recall** 171:25 172:25 198:11

**receive** 172:14 193:11

**received** 165:7 171:12

**receiving** 195:15,18

**recent** 182:6

**recess** 182:25

**recognize** 160:10 167:19 173:17 177:14 184:20 187:25 190:2

**record** 159:8 197:1 198:17

**reduced** 195:24

**referenced** 191:9

**referred** 168:2

**refused** 168:23

**refusing** 192:3

**relationship** 168:13 189:14

**relevant** 162:19

**relying** 176:19

**remember** 166:9 172:2,8,21 173:3 174:3,11 181:7 183:13 185:15,25 194:7 195:14 197:23

198:7,9,10,12

**remote** 171:7 175:20

**remove** 182:15

**removed** 181:19 182:11,12,14 183:1,5,7,8,11

**repeat** 175:24

**replied** 188:7

**reporter** 159:1,12,14 198:18,20, 25 199:3

**request** 168:23

**requested** 164:1

**research** 193:1

**reset** 173:13 175:4 178:11,12 179:11

**resolved** 173:25 174:22

**respond** 179:1 192:3

**responded** 162:21 178:24

**responds** 178:5

**response** 160:16,25 165:8 190:7,9

**responses** 171:21 172:15

**responsibilities** 171:22 185:9

**restate** 165:15

**restrictions** 181:21

**retaliation** 170:18 180:9 186:17 189:17

**retrieve** 182:1

**return** 174:1,22 185:10

**returned** 174:13,17,24

**returning** 174:15 175:23,24 176:4

**review** 198:24 199:4

**Richardson** 159:2

**Rod** 190:5

**Rodman** 177:23 179:3,4,6,13 186:23 187:19 188:3,17,24 189:8, 16 190:11,16

**Rodman's** 190:7

---

**S**

**Schiele** 164:7,17,22 165:2,7 166:20,25 167:23 168:7,17 169:23 170:4,17 172:17 173:2 174:10 176:14 177:3,21,24 178:1, 5,15,16 181:4

**school** 161:2,4 162:6,22,23 170:23 171:8 174:13,15,18 175:20,23,25 176:3,5 181:9,10, 13,21 182:22 183:3,6 184:25 185:3,18 187:1 189:21,23

**school's** 161:18

**Schoolisfun4me** 179:8

**science** 161:2,3,7,23 162:8,12 163:2,15,20,21 164:5,6 177:11

**security** 181:24

**seek** 197:3

**semester** 174:13,15

**send** 179:15 199:3,4

**set** 163:6 172:13

**share** 163:17 191:16 196:3,7

**shared** 197:18

**she'll** 191:25

**show** 167:9,16

**showed** 167:7

**shown** 190:4

**side** 188:11

**signature** 198:25

**site** 188:18

**sitting** 172:8,21 180:14 185:22 198:12

**situation** 169:11 175:16

**Smithson** 159:6,16,23 160:17 161:14,19 163:4,14,24 179:6 190:12

**Snowden** 160:4 161:21 162:4,5, 10,18 164:1,4,8 176:12,17 181:16

**Snowden's** 160:6,13

**sounds** 162:17

**space** 168:8,11,16 170:2 186:24 188:17 189:5,7

Index: speak..virtual

**speak** 193:22 196:24

**speaking** 165:18 173:1

**spoke** 188:15 193:25

**staff** 181:22

**start** 194:9,18,21 195:3,13

**started** 162:23 163:21 193:19,25 194:2,6,10,11,19,23

**starting** 168:14

**stated** 190:18,20

**statement** 176:4

**states** 160:17 192:6

**Stewart** 159:2

**stipulate** 159:12

**stress** 186:14

**stuck** 161:17 162:14

**student** 178:10 179:11

**students** 163:19 171:10 175:3,7, 15 176:7 181:9

**submitted** 172:20 187:19 197:25

**subpoena** 191:25

**substitute** 161:6,22,25 162:1,12, 21 181:25 183:23

**substituting** 162:5

**sued** 191:18

**suing** 197:2

**supervisor** 171:11

**support** 161:8 163:2,3,12,17,18, 22 176:13 181:22

**supported** 163:14 164:5

**supposed** 174:10 175:14 176:15 177:2,5,18 180:18

**Susan** 161:1

**sworn** 159:13,18

**system** 173:24 174:9,20,25 175:14 176:23,25 177:1,5,8 181:12

T

**table/chair** 168:24

**taking** 166:13 192:9 195:8,13

**talk** 177:5

**talking** 160:3 191:9 193:19

**Tamica** 159:6,16 175:11 178:6

**taught** 162:8,12

**teach** 162:23

**teacher** 161:2,3,7,23 162:21,24, 25 163:20,21 175:8 177:11 181:25 184:13

**teacher's** 168:9

**teachers** 175:14 185:8

**teaches** 163:4

**teaching** 163:10

**technology** 171:9,18,23 172:9, 22 174:25 179:19 180:11,20 181:24

**telling** 197:13

**term** 163:14

**test** 187:1

**testified** 159:20

**testify** 159:24,25

**textbook** 161:16,17,20 162:11

**textbooks** 162:15 177:18 178:2

**thanked** 190:21,22

**therapist** 191:10

**thing** 176:18

**things** 170:15,24 171:21 172:1 180:12 185:8 186:12 189:23 191:16 192:6 193:19 197:21

**thinking** 174:24

**thought** 172:17

**time** 159:4 161:5 162:3 163:11 180:6 181:15 185:18 194:13

**times** 191:1

**today** 159:24 172:8,21 180:14,25 185:22 198:12,16

**Today's** 159:3

**told** 178:18,21 182:12,15

**touch** 188:13,14,23

**touched** 188:24 189:1,8,16

**touching** 164:25 188:21 190:9, 10

**training** 168:9,21

**treated** 186:6 195:23 196:2

**treatment** 193:12 195:19

**treatments** 195:24

**true** 162:8,9

**truth** 159:18,19

**truthfully** 159:24,25

**turn** 160:5 181:17

**turned** 172:1,4,5,20

**type** 168:12

U

**Uh-huh** 164:15 181:18 182:10

**understanding** 161:24 177:4 179:9

**uneasy** 169:10

**uninvited** 164:24 188:14

**unpack** 163:25

**unstable** 184:3

**unwanted** 164:24 169:17,22 188:23 190:10

**username** 178:9

V

**Valparaiso** 159:3

**videoconference** 159:6

**Villarreal** 165:1,7 177:23

**Vilseck** 161:3 162:22 182:22 183:3 186:25

**violate** 168:11 170:2

**violated** 165:4 186:24

**violating** 168:8,16

**violation** 188:16 189:4

**virtual** 171:8 174:13,15,18 175:20,23,25 176:2,4 181:9,10 183:6 185:18

Index: visited..yesterday

**visited**  186:25

---

**W**

---

**wait**  167:24

**waived**  197:2,5,14

**wanted**  181:11 196:7

**Wednesday**  168:8,16

**week**  163:7 176:7 190:14 195:25 196:1

**weeks**  160:20 176:6

**West**  159:3

**who'd**  162:12

**withheld**  160:19

**Wolff**  185:6

**work**  171:14 173:22,23,24 174:21 175:5 176:20 178:22 182:3 193:20 194:3

**worked**  176:5

**working**  168:12 171:12 181:16 193:13

**worth**  179:12

**wrist**  188:11,18,22

**write**  169:7 177:25 186:23 188:5

**writes**  179:6 190:11

**wrong**  191:4,7 193:2

**wrote**  164:17 167:1 169:4

---

**Y**

---

**year**  162:23 178:9 181:13 183:9 185:19

**years**  184:11 195:16,17

**yesterday**  160:4