**SMITHSON
EXHIBIT
CM-1
11/20/2022**

# In the Matter Of:

*TAMICA J. SMITHSON*

*-v-*

*LLOYD AUSTIN III*

_____

## Cora Moellendick

*September 02, 2022*

_____



**DEPOSITION SERVICES**

800.869.0873 | www.StewartRichardson.com

*Reporting Driven by Excellence — Since 1975*

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

```
 1                UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF INDIANA
 2                  INDIANAPOLIS DIVISION

 3
     TAMICA J. SMITHSON,              )
 4                                    )
                    Plaintiff,        )
 5                                    )
            -v-                       )       Case No.
 6                                    )   1:21-CV-02193-JRS-MPB
     LLOYD AUSTIN III,                )
 7   Secretary, Department of         )
     Defense,                         )
 8                                    )
                    Defendant.        )
 9

10

11           The videotaped deposition upon oral

12   examination of CORA MOELLENDICK, a witness produced

13   and sworn via videoconference before me, Elizabeth

14   Taylor Culiver, RPR, a Notary Public in and for the

15   County of Vanderburgh, State of Indiana, taken on

16   behalf of the Plaintiff with all participants

17   appearing via videoconference on September 2, 2022, at

18   7:48 a.m., pursuant to the Federal Rules of Civil

19   Procedure.

20

21

22

23           STEWART RICHARDSON & ASSOCIATES
              Registered Professional Reporters
24                   (800) 869-0873
25
```

```
 1                        APPEARANCES

 2
        (All Participants Appearing Via Videoconference)
 3

 4   FOR THE PLAINTIFF:

 5           Tamica J. Smithson, Esq.
             CMR 411 Box 3668
 6           AOP, AE  09112
             tamica.smithson@yahoo.com
 7

 8   FOR THE DEFENDANT:

 9           Rachana N. Fischer, Esq.
             OFFICE OF THE UNITED STATES ATTORNEY
10           10 West Market Street
             Suite 2100
11           Indianapolis, IN  46204
             rachana.fischer@usdoj.gov
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     INDEX  OF  EXAMINATION
                                                     PAGE
 2
     EXAMINATION
 3
     QUESTIONS  BY  MS.  SMITHSON                        5
 4

 5                     INDEX  OF  EXHIBITS

 6
        NUM.                DESCRIPTION            PAGE
 7
     Exhibit  M1    Emails  between  Michele  Wolff  and    17
 8                  Tamika  Smithson

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        THE REPORTER:  Do all counsel stipulate that
 2   the witness located in Vilseck, Germany, can be
 3   sworn in remotely by the court reporter?
 4        MS. SMITHSON:  Yes.
 5        MS. FISCHER:  Yes.
 6        THE REPORTER:  My name is Beth Taylor Culiver,
 7   an associate of Stewart Richardson & Associates, in
 8   Evansville, Indiana.  Today's date is September
 9   2nd, 2022.  The time is 7:48 a.m. Central Standard
10   Time.
11        This deposition is being held via Zoom.  The
12   deponent is Cora Moellendick.
13        Will counsel please identify themselves and
14   any persons present with you for the record?
15        MS. SMITHSON:  Tamica J. Smithson, pro se
16   plaintiff against Lloyd Austin, III, and no one is
17   with me.
18        MS. FISCHER:  Rachana Fischer on behalf of
19   defendant, Lloyd Austin, and no one is present with
20   me.
21
22
23
24
25
```

| | |
|---|---|
| 1 | CORA MOELLENDICK, |
| 2 | having been first duly sworn or affirmed to tell the |
| 3 | truth, the whole truth, and nothing but the truth, was |
| 4 | examined and testified as follows: |
| 5 | EXAMINATION |
| 6 | QUESTIONS BY MS. SMITHSON |
| 7 | Q  Ms. Moellendick, can you please state and spell |
| 8 | your name for the record? |
| 9 | A  Yes.  Cora Moellendick, C-o-r-a, |
| 10 | M-o-e-l-l-e-n-d-i-c-k. |
| 11 | Q  I'm a pro se plaintiff in a federal lawsuit against |
| 12 | Lloyd Austin, III, and I'll be asking you a few |
| 13 | questions to determine if there's any information |
| 14 | that you may have about my case. |
| 15 | A  Okay. |
| 16 | Q  I'll go over some of the rules of the deposition. |
| 17 | The oath that the court reporter administered to |
| 18 | you holds the same weight as if you were testifying |
| 19 | in court and you have the same obligation to give |
| 20 | truthful statements.  Do you understand? |
| 21 | A  Yes, ma'am. |
| 22 | Q  The court reporter will transcribe everything that |
| 23 | we say.  I'll try to -- I'll try not to interrupt |
| 24 | you as you are answering questions.  I ask that you |
| 25 | not interrupt me while I'm asking them.  This makes |

```
 1        it easier for the court reporter to document what
 2        we are saying.  Do you understand?
 3   A    Yes, ma'am.
 4   Q    The court reporter cannot transcribe uh-huhs or
 5        nods.  So please make verbal statements.  Do you
 6        understand?
 7   A    Yes, ma'am.
 8   Q    I don't plan to take long for your deposition, but
 9        if you need to take a break, just let me know.  I
10        only ask that you completely answer the last
11        question that I presented before we break.  Do you
12        understand?
13   A    Yes, ma'am.
14   Q    Are you currently taking any medications or drugs
15        that would affect your testimony today?  If so,
16        what medication or drugs?
17   A    I am not taking any medications or drugs that would
18        affect my testimony today.
19   Q    Is there any reason that you can think of that
20        makes this a bad day for a deposition?
21   A    No.  I think it's an okay day.
22   Q    Okay.  If there's ever a point that you are unable
23        to testify accurately and truthfully, please let me
24        know.  Do you understand?
25   A    Yes, ma'am.
```

```
 1   Q   Have you ever been deposed before?

 2   A   No, ma'am, I have not.

 3   Q   Have you ever testified in court or any other

 4       proceeding?

 5   A   No, I have not.

 6   Q   Have you ever been charged or convicted of a crime?

 7   A   No, I have not.

 8   Q   Did you review any documents concerning this case

 9       to prepare for this deposition?

10   A   I -- I read what Ms. Fischer sent to me.  The -- I

11       think it's called the complaint, and I read that

12       there was the -- the notice that I would need to be

13       part of this deposition, and I did go back and read

14       some of my email messages to make sure that the

15       question of things you might -- Ms. Smithson might

16       ask me matched up with my thinking of what had

17       happened.  So to kind of verify that this is what I

18       thought or this is what was going to be talked

19       about.

20   Q   Great.  Have you met with counsel for the other

21       side to discuss this deposition?

22   A   Ms. Fischer and I spoke in a Zoom meeting, I

23       believe, Wednesday or Tuesday evening to tell me

24       how it would go, like that we'd meet here and that

25       I needed to be truthful so -- because I had never
```

```
 1      done this.
 2   Q  I understand.  Have you signed any agreements or
 3      made any verbal agreements with anyone or the
 4      agency about this deposition?
 5   A  No, I have not.
 6   Q  Did you speak with anyone else about the deposition
 7      at all?
 8   A  I did talk to my mom just because I said I had to
 9      do this and I was a little nervous because I did
10      not feel like I should talk to my husband because
11      he is also an employee at this school and this
12      seemed like a very legal confidential matter, but
13      my mom is not an employee at the school.  And then
14      I did ask Mr. Valenzuela, the union representative
15      for my school, for the phone number -- or for the
16      contact information for the -- the union lawyer,
17      Alex --
18   Q  Newlin (phonetic)?
19   A  -- Newlin, because I just wanted to find out if I
20      needed something on my end for this, and he had
21      told me that this wasn't an -- this wasn't where I
22      had done something wrong and -- a situation.  It's
23      just --
24          MS. FISCHER:  Ms. Moellendick, I'd asked if a
25      lawyer shared information with you not -- you're
```

```
 1        not required to provide that to Ms. Smithson, so
 2        I'm going to object on the grounds of privilege.
 3   A    Oh, okay.
 4   Q    Thank you, Ms. Moellendick.
 5   A    Okay.
 6   Q    Have you -- have you ever filed an EEO complaint in
 7        the workplace?
 8   A    No, ma'am, I have not.
 9   Q    Who is your supervisor?  I mean, who is your
10        employer?  I'm sorry.
11   A    The Department of Defense, specifically DoDEA.
12   Q    So you work for the same agency that I work for?
13   A    Yes, ma'am.
14   Q    How long have you worked for the agency?
15   A    I've worked for DoDEA for -- this is starting my
16        21st year with the agency.
17   Q    How long have you and I worked together?
18   A    Let's see.  Ms. Smithson, I came on board here in
19        2016, start of that school year.  So this is our
20        seventh year together?
21   Q    How often do you have a chance to work or interact
22        with me?
23   A    The first three years, I did not have much of a
24        chance to interact with you because I was assigned
25        as an Algebra I classroom teacher in the D wing and
```

```
 1        I really didn't venture out of that area.
 2            The -- the next three years I was assigned as
 3        the educational technologist for our school and
 4        then I did have a better chance to interact with
 5        you in our building prior to COVID and our
 6        lockdowns.
 7   Q  Are our interactions pleasant?
 8   A  I believe so, and friendly and helpful.
 9   Q  Thank you.  Are you married?
10   A  I am.
11   Q  How long have you been married?
12   A  18 years.  Yes.
13   Q  Do you have children?
14   A  I do have children.
15   Q  How old are they?
16   A  I have a 12 year old and an 11 year old.
17   Q  And what is your race?
18   A  Caucasian.
19   Q  What year did you begin working for DoDEA?
20   A  I believe it was 20 -- I think it's 2002.  Yeah.  I
21        remember -- it is 2002, August -- August 12th of
22        2002, I believe, is my start date with DoDEA.
23   Q  What is your job title?
24   A  I am an educational technologist.
25   Q  And what is your pay band?
```

```
 1    A   I'm in the teacher pay band.  I am -- I looked it

 2        up.  I am a TPCM.

 3    Q   And so what is your current salary?

 4    A   The amount of money I get?

 5    Q   Just an approximate.

 6    A   I probably make $70,000 a year.  My paycheck is

 7        automatically put in a different account that my

 8        husband then manages so -- I'm sorry.

 9    Q   No.  Thank you.

10    A   Okay.

11    Q   What are your responsibilities on the job?

12    A   Okay.  So my job is to interact with teachers and

13        students and help to integrate technology into the

14        classroom in a purposeful way and also to assist

15        them with any difficulties that may arise.  I do

16        have to supply some training opportunities as well

17        to our staff.

18    Q   Are there any other opportunities --

19        responsibilities that you can think of?

20    A   I -- I -- in -- in the past, I have also been asked

21        to assist Mr. Harris, a man who worked at our

22        school, to -- he had a stroke, and he could not

23        physically get around to each of the classrooms to

24        scan the computers, and so I did do that for him.

25        So I was in charge of accountability.  Not in
```

```
 1        charge.  I assisted with scanning the computers and
 2        giving him the data.  Other duties?  I have to
 3        participate in like CSI and BLT committee meetings.
 4   Q    How long have we had the currently used laptops,
 5        the teachers?
 6   A    So I believe these laptops came in in Mr. Bickam's
 7        (phonetic) last year, and I think -- I think we're
 8        written on the top of the computer.
 9   Q    Oh, are they?
10   A    That might not -- oh, that is not a true statement.
11        The end of the warranty is written on the top of
12        the computer, '23, but I believe we got them
13        January, in that time frame between Christmas and
14        coming back in the semester, January of 2018.
15   Q    The current laptops that we have?
16   A    Uh-huh.  Because they're usually on a five-year
17        cycle, and we are supposed to get new laptops this
18        upcoming January in '23.  I've been doing paperwork
19        -- I did paperwork in the spring.  Yeah, in the
20        spring.  I was -- I got to see paperwork to see if
21        I thought that whatever everybody else had decided
22        was going to be sufficient for us.
23   Q    Okay.  Do teachers normally get the same laptop
24        back each year?
25   A    It depends on if we move classrooms or not.  So the
```

```
 1      computers are named to the classrooms.  Like, my
 2      computer is named to room 153 because that's the
 3      room they put me in.  When I moved from my class as
 4      an Algebra teacher as a classroom to the ET, I
 5      inherited the ET's computer.  I didn't get to bring
 6      mine.  It stayed on my desk, and then the teacher
 7      that took my classroom took over that one but --
 8      but I moved from another classroom just a minute --
 9      the other classroom they had me assigned to to this
10      classroom and -- and at that point, they had me
11      bring this computer, and they re-assigned it to
12      this room instead of leaving it in that room
13      because this room didn't have a computer in it
14      because the person who had been here before wasn't
15      a full-time employee of ours, and she was bringing
16      a computer from Netzaberg over to this school
17      because she was assigned with them.  So she brought
18      that computer over and brought that computer back
19      each day.
20   Q  Makes sense.
21   A  Okay.
22   Q  So why are -- why are laptops taken during the
23      summer month?
24   A  So in the summer months, the IT department is told
25      to re-image them, and it used to not happen every
```

```
 1      year, but with so many patches and updates that

 2      need to occur, it's become a more frequent

 3      occurrence that they do.  I know that they've

 4      re-imaged them the last two years, and I was told a

 5      big reason for that was because we had taken them

 6      off the networks and we had worked from home, and

 7      then they wanted them to come back on and be like

 8      emptied.  So when they re-image them, they

 9      basically reset them.

10          I know there was also an issue with our BIOS.

11      The BIOS needed an update, I believe, this past

12      summer or the summer before last.  One of the two

13      summers we needed a BIOS update because we had a

14      really bad fan problem.  The fans were really loud.

15      I think you probably remember that.  And the BIOS

16      update fixed that -- fixed that and that was

17      something that -- that they give a window of time

18      to do it because it -- it takes like 12 to 15 hours

19      for Mr. Johnson to complete one computer through

20      that process.

21   Q  Was there a time when teachers could take their

22      laptops home throughout the summer?

23   A  I think that when you -- when we used to travel to

24      trainings, like if DoDEA had a training in Boston

25      and you had gotten approved for that, then you
```

| | | |
|---|---|---|
| 1 | | could take -- you could sign your computer out for |
| 2 | | the training, but the rest of the time I think it |
| 3 | | had to be on your campus.  Like, that's the only |
| 4 | | time I can recall having gotten permission to take |
| 5 | | that home. |
| 6 | Q | Do you recall -- |
| 7 | A | Yeah. |
| 8 | Q | -- teachers being able to complete -- oh, what are |
| 9 | | they called?  The forms that they have us sign? |
| 10 | A | The -- do you mean the property pass forms? |
| 11 | Q | Property pass forms and take it over the summer. |
| 12 | A | I don't -- I don't recall.  I did not do that, so I |
| 13 | | can't speak to whether that was completely allowed. |
| 14 | | Like, I don't know. |
| 15 | Q | Okay. |
| 16 | A | Okay. |
| 17 | Q | Did I ask to keep my laptop throughout the summer |
| 18 | | of 2021? |
| 19 | A | Of 2021? |
| 20 | Q | Did I request to keep mine? |
| 21 | A | Yes, yes.  Yes, you did.  You had -- you sent an |
| 22 | | email message asking for that permission. |
| 23 | Q | Did some teachers keep their laptop throughout the |
| 24 | | summer of 2021? |
| 25 | A | I don't know.  I don't believe so at all. |

```
 1   Q  Can you go to your exhibit.  I think I only sent
 2      one to you.  Actually, you know what, based on --
 3   A  Exhibit M1?
 4   Q  Yes.  But you know what, I think based on your
 5      ques- -- your answer, I don't think I need to go to
 6      the exhibit.
 7   A  I've lost our Zoom.
 8   Q  Don't worry --
 9   A  Oh, there it is.  There it is.  Okay.
10   Q  You know what, on second thought -- let me look at
11      something, Ms. Moellendick?
12   A  Yes, ma'am.
13   Q  Because based on your answers -- yeah, based on
14      your answers, don't worry about the email.  We
15      don't -- I don't need to --
16   A  Okay.
17   Q  I mean, don't worry about the exhibit, so I can
18      move on.
19   A  Okay.
20   Q  Thank you.
21   A  Yes, ma'am.  I'll close that out.
22   Q  Actually --
23   A  I can look it up again.
24   Q  Yeah.  Actually, yeah.  There was another question,
25      so yeah, if you can --
```

1    A   Okay.

2    Q   But you may or may not need it for this anyway.

3    A   Yes, ma'am.  I'll have to go back in my mail and

4        open it.  Stewart Richard -- oh, that's the Zoom

5        meeting.  Okay.  Email messages.  Ms. Smithson, I

6        have the exhibition --

7    Q   Exhibit?

8    A   -- Exhibit 1 in front of me.

9            (Exhibit M1 marked.)

10   Q   Okay.  So do you recognize this document?

11   A   Only that I got it in my messages a little bit ago.

12   Q   Okay.

13   A   I see my name is on it, so I assume it would have

14       come to me in -- on this date, this June 11th.  I

15       don't -- I don't -- I don't recall, like, reading

16       it on June 11th, but I don't know what day we got

17       out of school that year.

18   Q   I will say that in May and June of 2021, I sent you

19       a direct email as well stating that -- with the

20       same type of information.  So do you agree that I

21       stated that I would pick my laptop up when I

22       returned from summer break at the beginning of the

23       school year?

24   A   Yes.  That email I do recall you had -- you had

25       said you were going to put it -- pick it up on the

```
 1        15th, which was a Sunday.
 2   Q    So did you realize that I would return to school to
 3        work at the start of the school year?
 4   A    Yes, in June when we talked -- when we text --
 5        emailed, yes, I knew you'd be coming and that you
 6        wanted to pick up your computer on the 15th, that
 7        Sunday.
 8   Q    What are some things that teachers must use their
 9        government laptops for, like, at home?  Meaning
10        that they cannot -- things that we cannot do with
11        our personal laptops, information that we may not
12        be able to access with our personal --
13   A    I -- I cannot give any specifics, but I believe
14        there are -- I don't know if TOPS is accessible or
15        not.  I don't know if DEERS is accessible or not,
16        but I know that those two things are traditionally
17        done on a work computer, but I haven't done them
18        from home.
19   Q    And what is TOPS and DEERS?
20   A    I believe one of them is used to create orders and
21        one of them is used to like change your
22        beneficiaries for like benefits.
23   Q    What about government emails that are encrypted?
24        Can you access those through a personal computer?
25   A    So if you have your CAC card reader, then you can
```

```
 1        read your government encrypted emails through one
 2        of those little external CAC card readers on your
 3        personal computer.
 4   Q    What is the VPN?
 5   A    So the VPN is a virtual private network, and when
 6        we went into remote learning, that was something
 7        that we needed to utilize if you needed to access
 8        Aspen.
 9   Q    And so you need your government laptop to do that;
10        is that correct?
11   A    To access Aspen?  Yes.
12   Q    And VPN.
13   A    We used our government computers that had been set
14        up with VPN to access Aspen.
15   Q    Who sets up VPN?
16   A    Yes.  Sorry.
17   Q    I'm sorry?
18   A    I meant to say yes, but I saw I was nodding, so
19        then I went back and said yes.  I'm sorry.
20   Q    No problem.  So what did you nod to -- did you mean
21        to say yes to?
22   A    So we use our government computers that have VPN on
23        them to access Aspen, yes.
24   Q    And who puts that onto our government computers to
25        allow us to do that from home?
```

1    A   The IT department, Mr. Johnson, allows us or

2        downloads the VPN from the software center onto our

3        computers.

4    Q   And you're talking about Mr. Jacob Johnson?

5    A   Yes.

6    Q   And he's the only person -- he has to place that

7        onto our government computer to give us access?

8    A   I know that there are other people in the IT realm.

9        Like, if Mr. Johnson is not here, there are other

10       people that can install that software for him.  And

11       I do know that -- that if that software is listed

12       in the software center, that I -- that anybody else

13       can download it from the software center onto their

14       computer.

15   Q   Can they download it onto their personal computer

16       or does it have to be done from the government

17       computer?

18   A   Our personal computers cannot connect to DoDEA's

19       network in order to download any of the software

20       that DoDEA has purchased for our government -- for

21       our personal computers.

22   Q   So we would need our government computer to access

23       the VPN from home?

24   A   Need our government computers to access --

25   Q   Or our laptop.

```
 1   A   To access the government's VPN.  There are many
 2       VPNs out there.
 3   Q   Right.  The one for work --
 4   A   Okay.
 5   Q   -- to access DoDEA's --
 6   A   Okay.
 7   Q   Sorry.
 8   A   Right.
 9   Q   So the one from -- I have to -- yeah.  With the
10       technology as well, I have to be more specific.  So
11       we need the government computer with the VPN at
12       home to access DoDEA's network throughout -- if we
13       -- if we're at home; correct?
14   A   So in your statement you said we need the
15       government's computer with the VPN to access the
16       network, but do you mean the Aspen or the entire
17       network?  Because from home, we cannot access all
18       of DoDEA's network.  The VPN gives us the rights to
19       get into the Aspen, and when we had H drive, we
20       could also map to our H drives, but when we made
21       the switch, then that was no longer an option.
22       When we went to cloud, we could no longer map into
23       our H drives when they moved us.
24   Q   And at -- and at that time, we also could not -- we
25       -- at that time in 2021, we also needed our
```

| | | |
|---|---|---|
| 1 | | government computers to get into Aspen from home. |
| 2 | A | In 2021 we needed our government computers to get |
| 3 | | into Aspen from home, yes, ma'am. |
| 4 | Q | Yes.  Because now we can get into Aspen without our |
| 5 | | government computers. |
| 6 | A | Yes, ma'am.  That is correct. |
| 7 | Q | Exactly.  Okay.  In September 2021, I attempted to |
| 8 | | sign my laptop out for the school year, but it had |
| 9 | | been reassigned to a substitute.  Who was the |
| 10 | | substitute? |
| 11 | A | I -- I don't know the name of the substitute.  I |
| 12 | | know that there was somebody in that classroom, |
| 13 | | 212, that that computer was now being utilized for |
| 14 | | because there were students that were in room 212 |
| 15 | | now. |
| 16 | Q | So that's why my laptop was assigned to that |
| 17 | | substitute? |
| 18 | | MS. FISCHER:  I'm going to object for |
| 19 | | characterizing it as your laptop.  It's the |
| 20 | | government's laptop.  So please use that |
| 21 | | terminology when asking your questions, but you can |
| 22 | | answer. |
| 23 | Q | So that's why the laptop that I had been using -- |
| 24 | | the government laptop that I had been using was |
| 25 | | assigned to a substitute? |

 1  A  So the laptop that had previously been assigned to
 2     room 212, which was the room that you taught in,
 3     was then put back in room 212 for -- for use in
 4     that room when -- when you were coming back to pick
 5     up your computer, you would have come back and
 6     picked up the computer in room 212, I assume, but I
 7     don't -- I think that's all I know to say on that.
 8  Q  Do you know if plans were made to reassign me
 9     another laptop -- government laptop so that I could
10     work from home in the virtual school at that point
11     when they assigned the other computer to someone
12     else?
13  A  So I believe that if -- I believe that if you had
14     come back on the 15th or the 16th of August to pick
15     up a computer, the one from 212 would have been
16     ready and available for you.  But because --
17     because on the 16th of September, you asked for a
18     computer, the computer that had been in that
19     classroom of 212 that had been previously assigned
20     to you, was now being utilized by the teacher that
21     was working in room 212.
22         And so when I got the message about you coming
23     back on September 16th saying you'd like to come
24     pick up a computer, that computer was in the room
25     212.  And I knew you would prefer to have your

1    computer that you had previously used back.  So

2    this required Mr. Johnson to look at another

3    computer, re-image it as a teacher computer, and

4    put it in that room so that the person that was

5    covering those courses would then also have a

6    resource to teach those students.  And so that was

7    able to happen by the next day on the 17th.

8        I -- I emailed you and I think that was the

9    day you came in and we worked and got your computer

10   to have the VPN and to make sure that the new email

11   was functioning and the new -- I think that's when

12   we rolled to the Microsoft 365 Teams stuff, just to

13   make sure all that was functioning.

14  Q  On my original government computer, the one that

15     was in my -- the A212 -- room A212, was the lock

16     broken to -- off of that computer?

17  A  I -- I only know of the lock being broken from

18     having read the information that was sent to me

19     through the -- through the statement, the claim,

20     the --

21        MS. FISCHER:  The complaint?

22  A  Through the complaint.  Through the big long

23     statement from you.  I believe I read in that

24     somewhere about the lock being broken or cut.

25        If -- if you're -- if that computer had been

```
 1        put on your desk and unlocked and Mr. Johnson
 2        needed to move that computer down to his work
 3        station, then -- then I'm -- then the lock would
 4        have needed to have been opened or removed.  This
 5        is something we've had to do to other laptops in
 6        other locations when they need to be moved and the
 7        keys cannot be located to unlock them from the
 8        place that the person in the room has locked them
 9        to.
10   Q    When -- when I met with you on September 17th, and
11        we went to Ms. Waugh's room classroom and you
12        handed me my laptop, you -- the lock was still on
13        there.
14   A    Okay.
15   Q    And I still have it today.  And you informed me
16        that someone had to cut the lock.  Do you remember
17        that?
18   A    No, I do not, but that sounds like a reasonable
19        thing to have been done.
20   Q    Okay.  And you -- do you remember who had to cut
21        the lock?
22   A    I -- I do not know who would have cut the lock.
23        Like, I just know that it has been done.  Like, I
24        have cut the lock off of the PE computer when I
25        needed to move it from the PE cart into the
```

```
 1        building because we could no longer locate the key
 2        that Mr. Hall had used to lock it.
 3   Q    Did Mr. Rodman direct you or anyone else not to
 4        allow me to sign out a laptop?
 5   A    No.
 6   Q    Did Mr. Rodman direct you or anyone else to assign
 7        my laptop to a substitute?
 8   A    No.
 9   Q    Who did you report to at the start of the school
10        year before -- in 2021 before Dr. Jones arrived?
11   A    Mr. Rodman.
12   Q    Did you communicate with Dr. Jones about anything,
13        including laptops -- or did you communicate with
14        Dr. Jones about the laptops while she was in
15        Okinawa?
16   A    No.
17   Q    Did you communicate with Dr. Jones about anything
18        that you needed within the school while she was in
19        Okinawa?
20   A    I envision that I communicated with her, but I
21        cannot recall anything specific, and I did not go
22        back and read any of those messages.  She was not
23        here in the building, so I possibly copied her on
24        anything I was doing, but I don't recall anything
25        specific.
```

```
 1   Q  So who did you report directly to at the beginning
 2      of the school year of 2021?
 3   A  Mr. Rodman.  He is who I would have walked in and
 4      said things to, or if I was asking permission of
 5      something, I would have asked through him.
 6   Q  Who gave the directive to remove my name from the
 7      email distribution list?
 8   A  Nobody gave a directive.  I removed your name from
 9      the distribution list.
10   Q  Do you remember when -- well, we met again on
11      September 17th --
12   A  Uh-huh.
13   Q  -- in Mrs. Waugh's room, and you informed me that
14      someone told you that I was not returning.  Do you
15      remember that?
16   A  I don't remember saying that I -- that I told you
17      you were not returning.  I removed your name from
18      the distribution list because I removed everybody's
19      name from the distribution list that PCS'd or had
20      retired.  And so in removing your name from the
21      distribution list, that was my error.  I assume I
22      made it because it had already been -- we had
23      already started school, and I hadn't seen you or
24      heard from you.  I don't think it was a conscious
25      like, oh, yes, take Ms. Smithson's name off the
```

1   distribution list.  We had lost several, like 11 to

2   14, people that had PCS'd or retired, including

3   aides and subs, and so I used probably the phone

4   roster and just started going down the list because

5   it was an action that needed to be done so that

6   other people could get access to it also.

7   Q   But you didn't see my name on a PCS list?

8   A   I did not use a list of PCS'd people.  If I used a

9   list, I would have used the phone roster list, and

10  I don't know if your name would have appeared on

11  the phone roster list that I would have used from

12  school year 2020 to '21 because you weren't

13  in-house teaching.  So I don't know if your name

14  was on that or not, but I do know that the removal

15  of your name was done by me without anyone else

16  telling me to remove anyone's name.  I just knew

17  this was an action that was done at the start of

18  each school year.

19  Q   Are you aware that I was excluded from receiving

20  email correspondence for over three weeks at the

21  start of the school year?

22  A   Yes.  And when you mentioned to me on the 17th that

23  you had not received messages, then, I believe, I

24  checked the distribution list online, and then I

25  started sending you all the messages that had been

```
 1        sent to the distribution list for the Vilseck High
 2        School.  I also wrote a message later in that
 3        afternoon letting both Dr. Jones and Mr. Rodman
 4        know that I had been the one that had removed you
 5        from the distribution list in case you had been out
 6        of the loop on something they had expected an
 7        answer for.
 8    Q   Do you have that email that you sent Dr. Jones and
 9        Mr. Rodman on that day?
10    A   Uh-huh.
11            MS. FISCHER:  If you pass that to me -- or if
12        you haven't, I will get it produced to you,
13        Ms. Smithson.
14            MS. SMITHSON:   Thank you.
15    Q   So, again, for the record --
16    A   Yes, ma'am.
17    Q   For the record, do you -- on -- hold on.  On
18        September 17th when you and I met in Ms. Waugh's
19        room, did you inform me that someone told you to
20        remove me from the distribution list for the
21        record?
22    A   No, no.  For the record, I would not have told you
23        that because I removed you from the distribution
24        list on my own accord.  No one had told me to
25        remove anyone from the distribution list.  It was a
```

```
 1        task that I had done in the past, and I did the

 2        task again, but not -- not purposefully to exclude

 3        people.

 4   Q   During the start of the 2020-2021 -- during the

 5        start of the 20-21 school year --

 6   A   Yes.

 7   Q   -- were COVID guidelines being sent to the Vilseck

 8        faculty throughout the distribution list?

 9   A   I do not know.

10   Q   What types of emails go out in the first two or

11        three weeks of the school year?

12   A   Emails about the first -- about the first -- like,

13        the first day of training that we're going to have

14        but that should have been received by you because I

15        didn't remove you until the 26th of August.

16   Q   Again, were -- was there a problem with admin and

17        some colleagues supporting me while working in the

18        virtual school?

19   A   I do not believe so.

20   Q   Do you believe -- or did you believe that I should

21        have been supported with technology and information

22        distribution while teaching in the virtual school?

23   A   Yes.  We were supposed to assist you and Mr. Gore

24        and Mr. Valenzuela with what you guys needed.  So

25        document cameras, mice, laptops, monitors.  We --
```

```
 1        we did that.
 2   Q    And who was --
 3   A    I felt like when you guys asked, we made those
 4        things happen.
 5   Q    And who was Mr. Gore and Mr. Valenzuela?
 6   A    Those are two other teachers at Vilseck High School
 7        who in the school year 20 -- who in the school year
 8        2020 to 2021 also worked in the virtual school
 9        environment like Ms. Smithson did --
10   Q    Yes.
11   A    -- from homes.
12   Q    And so in 2021, how many persons were assigned to
13        the virtual school -- so in 2020-2021, you're
14        correct, three of us were assigned, myself,
15        Mr. Valenzuela and Mr. Gore.
16   A    Yes, ma'am.
17   Q    In 2021 -- the starting school year 2021, how many
18        persons were assigned to the virtual school?
19   A    From our school, I believe it was just the one,
20        Mrs. Smithson, that was assigned to the virtual
21        school.
22   Q    In year 2020 to 2021, were there any problems with
23        the assigning -- teachers picking up their -- any
24        of the virtual school teachers picking up our
25        laptops at the beginning of the year?
```

```
 1   A   I do not know.  I have not -- I cannot recall, and
 2       I didn't go back and review any material from 2020
 3       about that.
 4   Q   In 2020-2021, was -- were either of the individuals
 5       in the virtual school removed from the distribution
 6       list -- email distribution list?
 7   A   I don't know.  I don't recall.  If they were, then
 8       no one -- then no one notified me that they were
 9       off it.  I don't remember it being an issue, so
10       then I would say I don't recall that they were.
11   Q   Do you know why I'm assigned to the virtual school?
12       If so, why do you think?
13   A   Oh.  I know that you're -- I know that applications
14       were put in for virtual school in 2020 to 2021 and
15       -- and people that didn't want to work in buildings
16       yet were allowed to apply for that, and also we
17       were -- we were instructed, I believe, that people
18       with medical issues should have like a priority, I
19       think, towards getting to work in the remote
20       atmosphere for that school year, and then I know
21       that the next year, the other two were going to
22       come back into the building, and then you had told
23       me you were going to stay with the virtual school.
24       So I -- you want me to say what I think; right?  So
25       I think that they must have still needed more
```

```
 1       people because more kids didn't want to come back,

 2       and I know that this was an environment that I

 3       think made you happy.  So it was probably something

 4       you were glad to have.  You were glad to get to

 5       work in the virtual school for that 2021-2022 year.

 6   Q   Did Dr. Jones have to speak with you and several

 7       members of the faculty in admin concerning the

 8       obligation to support teachers in the virtual

 9       school?

10   A   Did Dr. Jones have to speak to me about an

11       obligation to supporting teachers?  I -- I don't

12       believe so.  I believe that the understanding was

13       that because you were pulling technology from our

14       building, that we would be supporting you.  I -- I

15       don't recall a meeting where I was told that we

16       would be supporting you.  There might have been an

17       email that said it if it needed to be said.  I knew

18       we were supporting you.

19           MS. SMITHSON:  That concludes my deposition

20       for Ms. Moellendick.  Ms. Moellendick, thank you

21       very much.

22           THE WITNESS:  Thank you, Ms. Smithson.

23           THE REPORTER:  This concludes the deposition

24       of Cora Moellendick.

25           Will counsel please state if they would like a
```

1   copy of the transcript, any stipulations, or other

2   matters to be included in the record?

3         MS. SMITHSON:  I'd like a copy.

4         MS. FISCHER:  I would also like a copy.

5         (The deposition concluded at 8:40 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF INDIANA
 2                    INDIANAPOLIS DIVISION

 3
       TAMICA J. SMITHSON,            )
 4                                    )
                      Plaintiff,      )
 5                                    )
            -v-                       )        Case No.
 6                                    )  1:21-CV-02193-JRS-MPB
       LLOYD AUSTIN III,              )
 7     Secretary, Department of       )
       Defense,                       )
 8                                    )
                      Defendant.      )
 9

10
                        Job No. 175089
11

12
              The deposition of CORA MOELLENDICK, taken in
13     the above-captioned matter, on September 2, 2022, and
       at the time and place set out on the title page
14     hereof.
              It was requested that the deposition be
15     transcribed by the reporter and that same be reduced
       to typewritten form.
16            It was agreed that the reading and signature
       by the deponent to the deposition were waived on
17     behalf of the parties Plaintiff and Defendant by their
       respective counsel, the witness being present and
18     consenting thereto, and/or pursuant to the Fed. R.
       Civ. P. 30(e), the deposition to be read with the same
19     force and effect as if signed by said deponent.

20

21

22
                  STEWART RICHARDSON & ASSOCIATES
23                Registered Professional Reporters
                   One Indiana Square, Suite 2425
24                   Indianapolis, IN  46204
                        (800) 869-0873
25
```

```
 1   STATE OF INDIANA        )
                             )
 2   COUNTY OF VANDERBURGH   )

 3

 4          I, Elizabeth Taylor Culiver, RPR, a Notary

 5   Public in and for said county and state, do hereby

 6   certify that the deponent herein was by me first duly

 7   sworn to tell the truth, the whole truth, and nothing

 8   but the truth in the aforementioned matter;

 9          That the foregoing deposition was taken on

10   behalf of the Plaintiff; that said deposition was

11   taken at the time and place heretofore mentioned

12   between 7:48 a.m. and 8:40 a.m.;

13          That said deposition was taken down in

14   stenograph notes and afterwards reduced to typewriting

15   under my direction; and that the typewritten

16   transcript is a true record of the testimony given by

17   said deponent;

18          Absent a request by the parties or by

19   agreement, the reading and signing by the deponent to

20   the deposition were waived on behalf of all the

21   parties by their respective counsel, the witness being

22   present and consenting thereto, and/or pursuant to the

23   Fed. R. Civ. P. 30(e); and the deposition is to be

24   read with the same force and effect as if signed by

25   said deponent.
```

1          I do further certify that I am a disinterested

2     person in this cause of action; that I am not a

3     relative of the attorneys for any of the parties.

4          IN WITNESS WHEREOF, I have hereunto set my

5     hand and affixed my notarial seal this 12th day of

6     September, 2022.

7

8

9                    *Elizabeth Taylor Culiver*

10

11                         Elizabeth Taylor Culiver
                               NOTARY PUBLIC SEAL
                                STATE OF INDIANA
12                          Commission No. NP0670402
                       My Commission Expires Aug. 14, 2023

13

      My Commission Expires:
14    August 14, 2023

15

      Job No. 175089
16

17

18

19

20

21

22

23

24

25

Index: $70,000..bad

**Exhibits**

**Cora Moellendick Ex M1**  3:7
16:3 17:9

**$**

**$70,000**  11:6

**1**

**1**  17:8
**11**  10:16 28:1
**11th**  17:14,16
**12**  10:16 14:18
**12th**  10:21
**14**  28:2
**15**  14:18
**153**  13:2
**15th**  18:1,6 23:14
**16th**  23:14,17,23
**17th**  24:7 25:10 27:11 28:22
29:18
**18**  10:12

**2**

**20**  10:20 31:7
**20-21**  30:5
**2002**  10:20,21,22
**2016**  9:19
**2018**  12:14
**2020**  28:12 31:8,22 32:2,14
**2020-2021**  30:4 31:13 32:4
**2021**  15:18,19,24 17:18 21:25
22:2,7 26:10 27:2 31:8,12,17,22
32:14
**2021-2022**  33:5
**2022**  4:9
**21**  28:12

**212**  22:13,14 23:2,3,6,15,19,21,
25
**21st**  9:16
**23**  12:12,18
**26th**  30:15
**2nd**  4:9

**3**

**365**  24:12

**7**

**7:48**  4:9

**8**

**8:40**  34:5

**A**

**a.m.**  4:9 34:5
**A212**  24:15
**access**  18:12,24 19:7,11,14,23
20:7,22,24 21:1,5,12,15,17 28:6
**accessible**  18:14,15
**accord**  29:24
**account**  11:7
**accountability**  11:25
**accurately**  6:23
**action**  28:5,17
**admin**  30:16 33:7
**administered**  5:17
**affect**  6:15,18
**affirmed**  5:2
**afternoon**  29:3
**agency**  8:4 9:12,14,16
**agree**  17:20
**agreements**  8:2,3
**aides**  28:3
**Alex**  8:17

**Algebra**  9:25 13:4
**allowed**  15:13 32:16
**amount**  11:4
**answering**  5:24
**answers**  16:13,14
**anyone's**  28:16
**appeared**  28:10
**applications**  32:13
**apply**  32:16
**approved**  14:25
**approximate**  11:5
**area**  10:1
**arise**  11:15
**arrived**  26:10
**Aspen**  19:8,11,14,23 21:16,19
22:1,3,4
**assign**  26:6
**assigned**  9:24 10:2 13:9,17
22:16,25 23:1,11,19 31:12,14,18,
20 32:11
**assigning**  31:23
**assist**  11:14,21 30:23
**assisted**  12:1
**associate**  4:7
**Associates**  4:7
**assume**  17:13 23:6 27:21
**atmosphere**  32:20
**attempted**  22:7
**August**  10:21 23:14 30:15
**Austin**  4:16,19 5:12
**automatically**  11:7
**aware**  28:19

**B**

**back**  7:13 12:14,24 13:18 14:7
17:3 19:19 23:3,4,5,14,23 24:1
26:22 32:2,22 33:1
**bad**  6:20 14:14

**band**  10:25 11:1

**based**  16:2,4,13

**basically**  14:9

**begin**  10:19

**beginning**  17:22 27:1 31:25

**behalf**  4:18

**beneficiaries**  18:22

**benefits**  18:22

**Beth**  4:6

**Bickam's**  12:6

**big**  14:5 24:22

**BIOS**  14:10,11,13,15

**bit**  17:11

**BLT**  12:3

**board**  9:18

**Boston**  14:24

**break**  6:9,11 17:22

**bring**  13:5,11

**bringing**  13:15

**broken**  24:16,17,24

**brought**  13:17,18

**building**  10:5 26:1,23 32:22 33:14

**buildings**  32:15

**C**

**C-O-R-A**  5:9

**CAC**  18:25 19:2

**called**  7:11 15:9

**cameras**  30:25

**campus**  15:3

**card**  18:25 19:2

**cart**  25:25

**case**  5:14 7:8 29:5

**Caucasian**  10:18

**center**  20:2,12,13

**Central**  4:9

**chance**  9:21,24 10:4

**change**  18:21

**characterizing**  22:19

**charge**  11:25 12:1

**charged**  7:6

**checked**  28:24

**children**  10:13,14

**Christmas**  12:13

**claim**  24:19

**class**  13:3

**classroom**  9:25 11:14 13:4,7,8, 9,10 22:12 23:19 25:11

**classrooms**  11:23 12:25 13:1

**close**  16:21

**cloud**  21:22

**colleagues**  30:17

**committee**  12:3

**communicate**  26:12,13,17

**communicated**  26:20

**complaint**  7:11 9:6 24:21,22

**complete**  14:19 15:8

**completely**  6:10 15:13

**computer**  12:8,12 13:2,5,11,13, 16,18 14:19 15:1 18:6,17,24 19:3 20:7,14,15,17,22 21:11,15 22:13 23:5,6,11,15,18,24 24:1,3,9,14, 16,25 25:2,24

**computers**  11:24 12:1 13:1 19:13,22,24 20:3,18,21,24 22:1,2, 5

**concluded**  34:5

**concludes**  33:19,23

**confidential**  8:12

**connect**  20:18

**conscious**  27:24

**contact**  8:16

**convicted**  7:6

**copied**  26:23

**copy**  34:1,3,4

**Cora**  4:12 5:1,9 33:24

**correct**  19:10 21:13 22:6 31:14

**correspondence**  28:20

**counsel**  4:1,13 7:20 33:25

**courses**  24:5

**court**  4:3 5:17,19,22 6:1,4 7:3

**covering**  24:5

**COVID**  10:5 30:7

**create**  18:20

**crime**  7:6

**CSI**  12:3

**Culiver**  4:6

**current**  11:3 12:15

**cut**  24:24 25:16,20,22,24

**cycle**  12:17

**D**

**data**  12:2

**date**  4:8 10:22 17:14

**day**  6:20,21 13:19 17:16 24:7,9 29:9 30:13

**decided**  12:21

**DEERS**  18:15,19

**defendant**  4:19

**Defense**  9:11

**department**  9:11 13:24 20:1

**depends**  12:25

**deponent**  4:12

**deposed**  7:1

**deposition**  4:11 5:16 6:8,20 7:9, 13,21 8:4,6 33:19,23 34:5

**desk**  13:6 25:1

**determine**  5:13

**difficulties**  11:15

**direct**  17:19 26:3,6

**directive**  27:6,8

**directly**  27:1

Index: discuss..individuals

discuss 7:21

distribution 27:7,9,18,19,21 28:1,24 29:1,5,20,23,25 30:8,22 32:5,6

document 6:1 17:10 30:25

documents 7:8

Dodea 9:11,15 10:19,22 14:24 20:20

Dodea's 20:18 21:5,12,18

download 20:13,15,19

downloads 20:2

drive 21:19

drives 21:20,23

drugs 6:14,16,17

duly 5:2

duties 12:2

E

easier 6:1

educational 10:3,24

EEO 9:6

email 7:14 15:22 16:14 17:5,19, 24 24:10 27:7 28:20 29:8 32:6 33:17

emailed 18:5 24:8

emails 18:23 19:1 30:10,12

employee 8:11,13 13:15

employer 9:10

emptied 14:8

encrypted 18:23 19:1

end 8:20 12:11

entire 21:16

environment 31:9 33:2

envision 26:20

error 27:21

ET's 13:5

Evansville 4:8

evening 7:23

everybody's 27:18

EXAMINATION 5:5

examined 5:4

exclude 30:2

excluded 28:19

exhibit 16:1,3,6,17 17:7,8,9

exhibition 17:6

expected 29:6

external 19:2

F

faculty 30:8 33:7

fan 14:14

fans 14:14

federal 5:11

feel 8:10

felt 31:3

filed 9:6

find 8:19

Fischer 4:5,18 7:10,22 8:24 22:18 24:21 29:11 34:4

five-year 12:16

fixed 14:16

forms 15:9,10,11

frame 12:13

frequent 14:2

friendly 10:8

front 17:8

full-time 13:15

functioning 24:11,13

G

gave 27:6,8

Germany 4:2

give 5:19 14:17 18:13 20:7

giving 12:2

glad 33:4

Gore 30:23 31:5,15

government 18:9,23 19:1,9,13, 22,24 20:7,16,20,22,24 21:11 22:1,2,5,24 23:9 24:14

government's 21:1,15 22:20

Great 7:20

grounds 9:2

guidelines 30:7

guys 30:24 31:3

H

Hall 26:2

handed 25:12

happen 13:25 24:7 31:4

happened 7:17

happy 33:3

Harris 11:21

heard 27:24

held 4:11

helpful 10:8

High 29:1 31:6

hold 29:17

holds 5:18

home 14:6,22 15:5 18:9,18 19:25 20:23 21:12,13,17 22:1,3 23:10

homes 31:11

hours 14:18

husband 8:10 11:8

I

identify 4:13

Ill 4:16 5:12

in-house 28:13

included 34:2

including 26:13 28:2

Indiana 4:8

individuals 32:4

**inform** 29:19

**information** 5:13 8:16,25 17:20
18:11 24:18 30:21

**informed** 25:15 27:13

**inherited** 13:5

**install** 20:10

**instructed** 32:17

**integrate** 11:13

**interact** 9:21,24 10:4 11:12

**interactions** 10:7

**interrupt** 5:23,25

**issue** 14:10 32:9

**issues** 32:18

J

**Jacob** 20:4

**January** 12:13,14,18

**job** 10:23 11:11,12

**Johnson** 14:19 20:1,4,9 24:2
25:1

**Jones** 26:10,12,14,17 29:3,8
33:6,10

**June** 17:14,16,18 18:4

K

**key** 26:1

**keys** 25:7

**kids** 33:1

**kind** 7:17

**knew** 18:5 23:25 28:16 33:17

**know** 6:9,24 14:3,10 15:14,25
16:2,4,10 17:16 18:14,15,16 20:8,
11 22:11,12 23:7,8 24:17 25:22,
23 28:10,13,14 29:4 30:9 32:1,7,
11,13,20 33:2

L

**laptop** 12:23 15:17,23 17:21 19:9
20:25 22:8,16,19,20,23,24 23:1,9
25:12 26:4,7

**laptops** 12:4,6,15,17 13:22 14:22
18:9,11 25:5 26:13,14 30:25
31:25

**lawsuit** 5:11

**lawyer** 8:16,25

**learning** 19:6

**leaving** 13:12

**legal** 8:12

**letting** 29:3

**list** 27:7,9,18,19,21 28:1,4,7,8,9,
11,24 29:1,5,20,24,25 30:8 32:6

**listed** 20:11

**Lloyd** 4:16,19 5:12

**locate** 26:1

**located** 4:2 25:7

**locations** 25:6

**lock** 24:15,17,24 25:3,12,16,21,
22,24 26:2

**lockdowns** 10:6

**locked** 25:8

**long** 6:8 9:14,17 10:11 12:4 24:22

**longer** 21:21,22 26:1

**looked** 11:1

**loop** 29:6

**lost** 16:7 28:1

**loud** 14:14

M

**M-O-E-L-L-E-N-D-I-C-K** 5:10

**M1** 16:3 17:9

**made** 8:3 21:20 23:8 27:22 31:3
33:3

**mail** 17:3

**make** 6:5 7:14 11:6 24:10,13

**makes** 5:25 6:20 13:20

**man** 11:21

**manages** 11:8

**map** 21:20,22

**marked** 17:9

**married** 10:9,11

**matched** 7:16

**material** 32:2

**matter** 8:12

**matters** 34:2

**Meaning** 18:9

**meant** 19:18

**medical** 32:18

**medication** 6:16

**medications** 6:14,17

**meet** 7:24

**meeting** 7:22 17:5 33:15

**meetings** 12:3

**members** 33:7

**mentioned** 28:22

**message** 15:22 23:22 29:2

**messages** 7:14 17:5,11 26:22
28:23,25

**met** 7:20 25:10 27:10 29:18

**mice** 30:25

**Microsoft** 24:12

**mine** 13:6 15:20

**minute** 13:8

**Moellendick** 4:12 5:1,7,9 8:24
9:4 16:11 33:20,24

**mom** 8:8,13

**money** 11:4

**monitors** 30:25

**month** 13:23

**months** 13:24

**move** 12:25 16:18 25:2,25

**moved** 13:3,8 21:23 25:6

N

**named** 13:1,2

**needed** 7:25 8:20 14:11,13 19:7
21:25 22:2 25:2,4,25 26:18 28:5

30:24 32:25 33:17

**nervous** 8:9

**network** 19:5 20:19 21:12,16,17,
18

**networks** 14:6

**Netzaberg** 13:16

**Newlin** 8:18,19

**nod** 19:20

**nodding** 19:18

**nods** 6:5

**notice** 7:12

**notified** 32:8

**number** 8:15

---

**O**

**oath** 5:17

**object** 9:2 22:18

**obligation** 5:19 33:8,11

**occur** 14:2

**occurrence** 14:3

**Okinawa** 26:15,19

**online** 28:24

**open** 17:4

**opened** 25:4

**opportunities** 11:16,18

**option** 21:21

**order** 20:19

**orders** 18:20

**original** 24:14

---

**P**

**paperwork** 12:18,19,20

**part** 7:13

**participate** 12:3

**pass** 15:10,11 29:11

**past** 11:20 14:11 30:1

**patches** 14:1

**pay** 10:25 11:1

**paycheck** 11:6

**PCS** 28:7

**PCS'D** 27:19 28:2,8

**PE** 25:24,25

**people** 20:8,10 28:2,6,8 30:3
32:15,17 33:1

**permission** 15:4,22 27:4

**person** 13:14 20:6 24:4 25:8

**personal** 18:11,12,24 19:3
20:15,18,21

**persons** 4:14 31:12,18

**phone** 8:15 28:3,9,11

**phonetic** 8:18 12:7

**physically** 11:23

**pick** 17:21,25 18:6 23:4,14,24

**picked** 23:6

**picking** 31:23,24

**place** 20:6 25:8

**plaintiff** 4:16 5:11

**plan** 6:8

**plans** 23:8

**pleasant** 10:7

**point** 6:22 13:10 23:10

**possibly** 26:23

**prefer** 23:25

**prepare** 7:9

**present** 4:14,19

**presented** 6:11

**previously** 23:1,19 24:1

**prior** 10:5

**priority** 32:18

**private** 19:5

**privilege** 9:2

**pro** 4:15 5:11

**problem** 14:14 19:20 30:16

**problems** 31:22

**proceeding** 7:4

**process** 14:20

**produced** 29:12

**property** 15:10,11

**provide** 9:1

**pulling** 33:13

**purchased** 20:20

**purposeful** 11:14

**purposefully** 30:2

**put** 11:7 13:3 17:25 23:3 24:4
25:1 32:14

**puts** 19:24

---

**Q**

**ques-** 16:5

**question** 6:11 7:15 16:24

**questions** 5:6,13,24 22:21

---

**R**

**race** 10:17

**Rachana** 4:18

**re-assigned** 13:11

**re-image** 13:25 14:8 24:3

**re-imaged** 14:4

**read** 7:10,11,13 19:1 24:18,23
26:22

**reader** 18:25

**readers** 19:2

**reading** 17:15

**ready** 23:16

**realize** 18:2

**realm** 20:8

**reason** 6:19 14:5

**reasonable** 25:18

**reassign** 23:8

**reassigned** 22:9

**recall** 15:4,6,12 17:15,24 26:21,
24 32:1,7,10 33:15

Index: received..takes

**received** 28:23 30:14

**receiving** 28:19

**recognize** 17:10

**record** 4:14 5:8 29:15,17,21,22 34:2

**remember** 10:21 14:15 25:16,20 27:10,15,16 32:9

**remote** 19:6 32:19

**remotely** 4:3

**removal** 28:14

**remove** 27:6 28:16 29:20,25 30:15

**removed** 25:4 27:8,17,18 29:4,23 32:5

**removing** 27:20

**report** 26:9 27:1

**reporter** 4:1,3,6 5:17,22 6:1,4 33:23

**representative** 8:14

**request** 15:20

**required** 9:1 24:2

**reset** 14:9

**resource** 24:6

**responsibilities** 11:11,19

**rest** 15:2

**retired** 27:20 28:2

**return** 18:2

**returned** 17:22

**returning** 27:14,17

**review** 7:8 32:2

**Richard** 17:4

**Richardson** 4:7

**rights** 21:18

**Rodman** 26:3,6,11 27:3 29:3,9

**rolled** 24:12

**room** 13:2,3,12,13 22:14 23:2,3, 4,6,21,24 24:4,15 25:8,11 27:13 29:19

**roster** 28:4,9,11

**rules** 5:16

**S**

**salary** 11:3

**scan** 11:24

**scanning** 12:1

**school** 8:11,13,15 9:19 10:3 11:22 13:16 17:17,23 18:2,3 22:8 23:10 26:9,18 27:2,23 28:12,18, 21 29:2 30:5,11,18,22 31:6,7,8, 13,17,18,19,21,24 32:5,11,14,20, 23 33:5,9

**semester** 12:14

**sending** 28:25

**sense** 13:20

**September** 4:8 22:7 23:17,23 25:10 27:11 29:18

**set** 19:13

**sets** 19:15

**seventh** 9:20

**shared** 8:25

**side** 7:21

**sign** 15:1,9 22:8 26:4

**signed** 8:2

**situation** 8:22

**Smithson** 4:4,15 5:6 7:15 9:1,18 17:5 29:13,14 31:9,20 33:19,22 34:3

**Smithson's** 27:25

**software** 20:2,10,11,12,13,19

**sounds** 25:18

**speak** 8:6 15:13 33:6,10

**specific** 21:10 26:21,25

**specifically** 9:11

**specifics** 18:13

**spell** 5:7

**spoke** 7:22

**spring** 12:19,20

**staff** 11:17

**Standard** 4:9

**start** 9:19 10:22 18:3 26:9 28:17, 21 30:4,5

**started** 27:23 28:4,25

**starting** 9:15 31:17

**state** 5:7 33:25

**stated** 17:21

**statement** 12:10 21:14 24:19,23

**statements** 5:20 6:5

**stating** 17:19

**station** 25:3

**stay** 32:23

**stayed** 13:6

**Stewart** 4:7 17:4

**stipulate** 4:1

**stipulations** 34:1

**stroke** 11:22

**students** 11:13 22:14 24:6

**stuff** 24:12

**subs** 28:3

**substitute** 22:9,10,11,17,25 26:7

**sufficient** 12:22

**summer** 13:23,24 14:12,22 15:11,17,24 17:22

**summers** 14:13

**Sunday** 18:1,7

**supervisor** 9:9

**supply** 11:16

**support** 33:8

**supported** 30:21

**supporting** 30:17 33:11,14,16, 18

**supposed** 12:17 30:23

**switch** 21:21

**sworn** 4:3 5:2

**T**

**takes** 14:18

Index: taking..Zoom

**taking** 6:14,17

**talk** 8:8,10

**talked** 7:18 18:4

**talking** 20:4

**Tamica** 4:15

**task** 30:1,2

**taught** 23:2

**Taylor** 4:6

**teach** 24:6

**teacher** 9:25 11:1 13:4,6 23:20 24:3

**teachers** 11:12 12:5,23 14:21 15:8,23 18:8 31:6,23,24 33:8,11

**teaching** 28:13 30:22

**Teams** 24:12

**technologist** 10:3,24

**technology** 11:13 21:10 30:21 33:13

**telling** 28:16

**terminology** 22:21

**testified** 5:4 7:3

**testify** 6:23

**testifying** 5:18

**testimony** 6:15,18

**text** 18:4

**thing** 25:19

**things** 7:15 18:8,10,16 27:4 31:4

**thinking** 7:16

**thought** 7:18 12:21 16:10

**time** 4:9,10 12:13 14:17,21 15:2,4 21:24,25

**title** 10:23

**today** 6:15,18 25:15

**Today's** 4:8

**told** 8:21 13:24 14:4 27:14,16 29:19,22,24 32:22 33:15

**top** 12:8,11

**TOPS** 18:14,19

**TPCM** 11:2

**traditionally** 18:16

**training** 11:16 14:24 15:2 30:13

**trainings** 14:24

**transcribe** 5:22 6:4

**transcript** 34:1

**travel** 14:23

**true** 12:10

**truth** 5:3

**truthful** 5:20 7:25

**truthfully** 6:23

**Tuesday** 7:23

**type** 17:20

**types** 30:10

U

**Uh-huh** 12:16 27:12 29:10

**uh-huhs** 6:4

**unable** 6:22

**understand** 5:20 6:2,6,12,24 8:2

**understanding** 33:12

**union** 8:14,16

**unlock** 25:7

**unlocked** 25:1

**upcoming** 12:18

**update** 14:11,13,16

**updates** 14:1

**utilize** 19:7

**utilized** 22:13 23:20

V

**Valenzuela** 8:14 30:24 31:5,15

**venture** 10:1

**verbal** 6:5 8:3

**verify** 7:17

**Vilseck** 4:2 29:1 30:7 31:6

**virtual** 19:5 23:10 30:18,22 31:8, 13,18,20,24 32:5,11,14,23 33:5,8

**VPN** 19:4,5,12,14,15,22 20:2,23 21:1,11,15,18 24:10

**VPNS** 21:2

W

**walked** 27:3

**wanted** 8:19 14:7 18:6

**warranty** 12:11

**Waugh's** 25:11 27:13 29:18

**Wednesday** 7:23

**weeks** 28:20 30:11

**weight** 5:18

**window** 14:17

**wing** 9:25

**work** 9:12,21 18:3,17 21:3 23:10 25:2 32:15,19 33:5

**worked** 9:14,15,17 11:21 14:6 24:9 31:8

**working** 10:19 23:21 30:17

**workplace** 9:7

**worry** 16:8,14,17

**written** 12:8,11

**wrong** 8:22

**wrote** 29:2

Y

**year** 9:16,19,20 10:16,19 11:6 12:7,24 14:1 17:17,23 18:3 22:8 26:10 27:2 28:12,18,21 30:5,11 31:7,17,22,25 32:20,21 33:5

**years** 9:23 10:2,12 14:4

Z

**Zoom** 4:11 7:22 16:7 17:4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

| | |
|---|---|
| TAMICA J. SMITHSON,<br>                Pro Se Plaintiff,<br><br>vs.<br><br><br>LLOYD AUSTIN, III<br>*Secretary, Department of Defense*,<br>                Defendant | Case No.: 1:21-cv-02193-JRS-MJD<br><br><br>DESIGNATION OF EVIDENCE IN<br>SUPPORT OF PLAINTIFF'S RESPONSE |

### PLAINTIFF'S DESIGNATION OF EVIDENCE IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Tamica Smithson, by counsel, does hereby respectfully rely on the following exhibits in support of her *Response in Opposition to Defendant's Motion for Summary Judgment*.

1.  Exhibit 1: Marc Villarreal [supervisor] declaration EU-FY20-013

2.  Exhibit 2: Plaintiff email to Joy Schiele [HQ personnel] 8/23/2019

3.  Exhibit 3: Shawn Rodman declaration EU-FY20-013

4.  Exhibit 4: Plaintiff mail to Shawn Rodman [supervisor] 1/14/2022

5.  Exhibit 5: Plaintiff email to Michelle Jones [supervisor] and Shawn Rodman 9/23/2021

6.  Exhibit 6: Plaintiff email to Mary Corrigan [science department] 1/19/2021

7.  Exhibit 7: Plaintiff email to Joy Schiele 1/22/2021

8.  Exhibit 8: Plaintiff email to Joy Schiele 2/12/2020

9.  Exhibit 9: Plaintiff email to Shawn Rodman, Joy Schiele, and Cora Mollendick 1/20/2021

10. Exhibit 10: Plaintiff email2 to Joy Schiele 1/22/2021

11. Exhibit 11: Plaintiff email to Michelle Dare [science department] 1/19/2021

12. Exhibit 12: Plaintiff email to Mary Corrigan 1/19/2021

13. Exhibit 13: Plaintiff email to Michele Wolff [administrative officer] 6/11/2021

DESIGNATION OF EVIDENCE IN SUPPORT OF PLAINTIFF'S RESPONSE - 1

14.  Exhibit 14: Melissa Hayes declaration EU-FY20-013

15.  ROI EU-FY20-013 (CASE RECORD)

16.  ROI EU-FY18-054 (CASE RECORD)

INDEX OF EXAMINATION

EXAMINATION BY Pro Se Plaintiff Smithson:

INDEX OF DEFENDANT'S EXHIBITS · NUM.· ·DESCRIPTION

·Exhibit MV1· · Deposition of Marc Villarreal
·Exhibit CM1· · Deposition of Cora Moellendick
·Exhibit JS1· · Deposition of Joy Schiele
·Exhibit MH1· · Deposition of Melissa Hayes

·Exhibit MW1· · Deposition of Michele Wolff
·Exhibit MJ1 · ·Deposition of Michelle Jones
·Exhibit SR1· · Deposition of Shawn Rodman


EXAMINATION BY Brandley Marshall

·Exhibit SR2· · Deposition of Shawn Rodman

·Exhibit MV2· · Deposition of Marc Villarreal

·Exhibit MV3· · Deposition of Marc Villarreal

Respectfully submitted.

DESIGNATION OF EVIDENCE IN SUPPORT OF PLAINTIFF'S RESPONSE - 2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Tamica J. Smithson*

*CMR 411; Box 3668*

*APO, AE 09112*

*317-683-6620 stateside*

*+49 162 952 0420 Germany*

<u>**CERTIFICATE OF SERVICE**</u>

Due to problems with technology and delayed paid professional printing arranged on Friday, November 18, 2022, I hereby certify that the foregoing documents will be mailed by first class U.S. mail within one week (7-days) to the following:

Lloyd J. Austin III

United States Secretary Department of Defense

1000 Defense Pentagon Washington, DC 20301-1000

DocuSigned by:

*Tamica Smithson*

7311DB6CA3FB4CD...

Tamica J. Smithson

Pro Se Plaintiff

CMR 411: BOX 3668

APO, AE 09112

DESIGNATION OF EVIDENCE IN SUPPORT OF PLAINTIFF'S RESPONSE - 3

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

Due to problems with technology and delayed paid professional printing arranged on Friday, November 18, 2022, I hereby certify that the foregoing documents will be mailed by first class U.S. mail within one week (7-days) to the following:

4

5

Office of General Counsel

6

U.S. Department of Justice Pennsylvania Ave

7

NW Washington, DC 20530-0001

8

9

10

DocuSigned by:

*Tamica Smithson*

7311DB6CA3FB4CD...

11

12

Tamica J. Smithson

13

Pro Se Plaintiff

14

CMR 411: BOX 3668

15

APO, AE 09112

16

17

18

19

## <u>CERTIFICATE OF SERVICE</u>

20

Due to problems with technology and delayed paid professional printing arranged on Friday, November 18, 2022, I hereby certify that the foregoing documents will be mailed by first class U.S. mail within one week (7-days) to the following:

21

22

23

U.S. Attorney; Southern District of Indiana

24

Re: Complaint Against U.S. Department of Defense

25

10 W Market Street, Suite 2100 Indianapolis, IN 46204-3048

26

27

28

DESIGNATION OF EVIDENCE IN SUPPORT OF PLAINTIFF'S RESPONSE - 4

1

2

Tamica J. Smithson

Pro Se Plaintiff

CMR 411: BOX 3668

APO, AE 09112

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DESIGNATION OF EVIDENCE IN SUPPORT OF PLAINTIFF'S RESPONSE - 5

SMITHSON
EXHIBIT
JS-1
11/20/2022

# In the Matter Of:

*TAMICA J. SMITHSON*

*-v-*

*LLOYD AUSTIN III*

---

## Joy Schiele

*September 02, 2022*

---



**StewartRichardson**

DEPOSITION SERVICES

800.869.0873 | www.StewartRichardson.com

*Reporting Driven by Excellence — Since 1975*

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

```
 1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF INDIANA
 2                     INDIANAPOLIS DIVISION


 3
     TAMICA J. SMITHSON,            )
 4                                  )
                  Plaintiff,        )
 5                                  )
             -v-                    )          Case No.
 6                                  )   1:21-CV-02193-JRS-MPB
     LLOYD AUSTIN III,              )
 7   Secretary, Department of       )
     Defense,                       )
 8                                  )
                  Defendant.        )
 9


10


11          The videotaped deposition upon oral

12   examination of JOY SCHIELE, a witness produced and

13   sworn via videoconference before me, Elizabeth Taylor

14   Culiver, RPR, a Notary Public in and for the County of

15   Vanderburgh, State of Indiana, taken on behalf of the

16   Plaintiff with all participants appearing via

17   videoconference on September 2, 2022, at 7:03 a.m.,

18   pursuant to the Federal Rules of Civil Procedure.

19


20


21


22


23               STEWART RICHARDSON & ASSOCIATES
                 Registered Professional Reporters
24                      (800) 869-0873

25
```

```
 1                      APPEARANCES

 2
        (All Participants Appearing Via Videoconference)
 3

 4   FOR THE PLAINTIFF:

 5           Tamica J. Smithson, Esq.
             CMR 411 Box 3668
 6           AOP, AE  09112
             tamica.smithson@yahoo.com
 7

 8   FOR THE DEFENDANT:

 9           Rachana N. Fischer, Esq.
             OFFICE OF THE UNITED STATES ATTORNEY
10           10 West Market Street
             Suite 2100
11           Indianapolis, IN  46204
             rachana.fischer@usdoj.gov
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    INDEX OF EXAMINATION

2                                                PAGE

   EXAMINATION
3
   QUESTIONS BY MS. SMITHSON                       5
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE REPORTER:  Do all counsel stipulate that

2  the witness located in Kaiserslautern, Germany, can

3  be sworn in remotely by the court reporter?

4      MS. RACHANA:  Yes.

5      MS. SMITHSON:  Yes.

6      THE REPORTER:  All right.  My name is Beth

7  Taylor Culiver, an associate of Stewart Richardson

8  & Associates in Evansville, Indiana.  Today's date

9  is September 2nd, 2022.  The time is 7:03 a.m.

10  Central Standard Time.

11      This deposition is being held via Zoom.  The

12  deponent is Joy Schiele.

13      Will counsel please identify themselves and

14  any persons present with you for the record?

15      MS. SMITHSON:  Tamica J. Smithson, pro se

16  plaintiff against Lloyd Austin, III.  No one is

17  present with me.

18      MS. FISCHER:  Rachana Fischer on behalf of the

19  defendant, Lloyd Austin, and no one is present with

20  me.

21

22

23

24

25

```
 1                      JOY SCHIELE,
 2   having been first duly sworn or affirmed to tell the
 3   truth, the whole truth, and nothing but the truth, was
 4   examined and testified as follows:
 5   EXAMINATION
 6   QUESTIONS BY MS. SMITHSON
 7   Q  Would you please state and spell your name for the
 8      record?
 9   A  My name is Joy Schiele.  J-o-y.  Last name,
10      S-c-h-i-e-l-e.
11   Q  Have you ever been known by a different name?
12   A  My maiden name Scavo, S-c-a-v-o.
13   Q  I'm a pro se plaintiff in a federal lawsuit against
14      Lloyd Austin, III, and I'll be asking you a few
15      questions to determine if there's information that
16      you may have about my case.
17          I'll go over some rules for the deposition.
18      The oath that the court reporter administered to
19      you holds the same weight as if you were testifying
20      in court.  You have the same obligation to give
21      truthful statements.  Do you understand?
22   A  Yes.
23   Q  The court reporter will transcribe everything that
24      we say.  I'll try not to interrupt you as you're
25      answering questions.  I ask that you not interrupt
```

```
 1        me while I ask questions.  This makes it easier for
 2        the court reporter to document what we're saying.
 3        Do you understand?
 4    A   Yes.
 5    Q   The court reporter cannot transcribe uh-huhs and
 6        nods.  So please make verbal statements.  Do you
 7        understand?
 8    A   Yes.
 9    Q   I don't plan to take long for your deposition, but
10        if you need to take a break, just let me know.  I
11        only ask that you completely answer the last
12        question that I presented before we break.  Do you
13        understand?
14    A   Yes.
15    Q   Are you currently taking -- sorry.  Are you
16        currently taking any medications or drugs that
17        would affect your testimony today?  If so, what
18        medications or drugs?
19    A   No.
20    Q   Is there any reason that you can think of that
21        makes this a bad day for a deposition?
22    A   No.
23    Q   If there's ever a point that you are unable to
24        testify accurately and truthfully, please let me
25        know.  Do you understand?
```

```
 1    A   Yes.
 2    Q   Have you ever been deposed before?
 3    A   Yes.
 4    Q   When was that?
 5    A   When was that?  It was during COVID, so March or
 6        April of 2020, I think.
 7    Q   And what was the nature of that case?
 8    A   It was the first one for -- to -- that you had
 9        requested.
10    Q   So it was an EEOC case as well -- my EEOC case?
11    A   Okay.  It was an EEOC case for you.
12    Q   Have you ever testified in court or any other
13        proceeding?
14    A   No.
15    Q   I'm sorry.  Let me go back.  I'm so sorry.  Any
16        other depositions?
17    A   No.
18    Q   No?  Okay.  Have you ever testified in court or any
19        other proceeding?
20    A   No.
21    Q   Have you ever -- have you ever been charged with or
22        convicted of a crime?
23    A   No.
24    Q   Are you married?
25    A   Yes.
```

```
 1   Q   Do you have children?

 2   A   Yes.

 3   Q   How old are they?

 4   A   28 and 25.

 5   Q   What is your age?

 6   A   62.

 7   Q   What is your race?

 8   A   Caucasian.

 9   Q   Did you review any documents concerning this case

10       to prepare for any -- I mean, for this deposition?

11   A   I looked over the things Ms. Fischer sent me and my

12       deposition from last time.

13   Q   Okay.  No other documents?

14   A   I don't -- no.

15   Q   You don't know or --

16   A   No.  I don't -- I don't have any other documents.

17   Q   Have you met with counsel for the other side to

18       discuss this deposition?

19   A   Ms. Fischer is that who is the counsel for the

20       other side?

21   Q   Is that who you met with?

22   A   I'm -- I need clarification, please.  I met with

23       Ms. Fischer.  If she is counsel for the other side,

24       then, yes.

25   Q   Have you met with anyone else?
```

```
 1   A   No.
 2   Q   Have you signed any agreements or made any verbal
 3       agreements with anyone or the agency about this
 4       deposition?
 5   A   No.
 6   Q   Do you speak -- did you speak with anyone else
 7       about this deposition?  If so, who?
 8   A   My husband in the car.
 9   Q   Okay.  Have you ever filed an EEO complaint in the
10       workplace?
11   A   No.
12   Q   Who is your employer?
13   A   Department of Defense Education Activity.
14   Q   So you work for the same agency that I work for?
15   A   Yes.
16   Q   Who is your first level supervisor?
17   A   Mr. -- Dr. Rynberg.
18   Q   And how long --
19   A   I have not met him yet.
20   Q   Okay.  How long has Dr. Rynberg been your
21       supervisor?
22   A   A week.  He -- he just came to our district.  I
23       have not met him yet.
24   Q   Who was your first level supervisor from 2017
25       through 2021?  Well, who was your first level
```

```
 1        supervisor before Dr. Rynberg?

 2   A  Dr. Jason Ter Horst.

 3   Q  And how long was Dr. Ter Horst your supervisor?

 4   A  I think he was here six years.

 5   Q  And who was --

 6   A  He was my -- oh, sorry.  I am sorry.

 7   Q  No.  I interrupted you.  Sorry about that.

 8   A  He was my supervisor the entire time he was here.

 9        Prior to him, it was Carl Albrech, but I don't have

10        the years straight.

11   Q  Okay.  And who was your second level supervisor?

12   A  What's a second level supervisor?

13   Q  The person that you report to after the first

14        level, like if the first level was not available.

15   A  Mr. Sanchez is the superintendent of the district

16        and so he would be the supervisor of my supervisor.

17        If -- if they're not available, you have to wait

18        for them to be available.

19   Q  And how long has -- and who was your supervisor

20        before -- well, how long has Mr. Sanchez been your

21        supervisor, second level?

22   A  Mr. -- Mr. Sanchez came in -- I don't know.  I

23        don't know.  I don't remember.  Before Mr. Sanchez

24        was Dr. Liz Dunham.  Oh.  Right after we merged

25        and -- with your -- with Vilseck.  So when Vilseck
```

| | | |
|---|---|---|
| 1 | | came into Europe East, Mr. Sanchez came in, but I |
| 2 | | don't remember the years.  I'm sorry. |
| 3 | Q | No problem.  What year did you begin working for |
| 4 | | DoDEA? |
| 5 | A | 1985. |
| 6 | Q | What is your job title? |
| 7 | A | I am currently instruction systems specialist for |
| 8 | | secondary science for Europe East. |
| 9 | Q | What is your pay band? |
| 10 | A | TPO E18. |
| 11 | Q | And your current salary? |
| 12 | A | I don't know. |
| 13 | Q | Estimate. |
| 14 | A | Like 103 or something. |
| 15 | Q | What are your responsibilities? |
| 16 | A | To support secondary science, to support chemical |
| 17 | | hygiene, and support literacy, support math. |
| 18 | | Whatever the district decides needs to be done. |
| 19 | Q | And when you say support secondary science, what do |
| 20 | | you mean specifically support secondary science? |
| 21 | A | I -- I help them secure the materials they need for |
| 22 | | their programs, each school.  I conduct and |
| 23 | | facilitate the quarter -- or the DoDEA required |
| 24 | | trainings.  I help teachers with all their online |
| 25 | | accounts and whatever educators need. |

1  Q  How long have you and I worked together?
2  A  I think -- when did I -- 2016 or 2017.  I think it
3     was the year 2016 was the first time I came to
4     Vilseck to do a quarterly training, and I think we
5     met at that quarterly training, the Catapult
6     training.
7  Q  How often do you have a chance to work or interact
8     with me?
9  A  Face to face or virtually?
10 Q  Face to face.
11 A  Because Vilseck is five and a half hours from here,
12    I get to come to Vilseck maybe once or twice a
13    year.  So I'll get to come there once or twice a
14    year, and when I'm in Vilseck, I try to touch base
15    with all educators that are there.
16 Q  And virtually?
17 A  Virtually whenever the educator reaches out or
18    during the quarterly trainings.  So that would be
19    -- well, six times a year because you have two back
20    to school days and then the four quarter days.
21 Q  And what is your policy for science teachers if
22    they want to contact you or other educators if they
23    want to contact you for information or resources?
24 A  They can send me a message, send me a Teams
25    message.  As soon as they send me a message, I try

```
 1         to respond that day.  Some people call.

 2    Q   Are you and I friends?

 3    A   We're colleagues.

 4    Q   Are you aware that I filed a complaint with DoDEA

 5         against you in 2018?  If so, when did you find out?

 6    A   That's the last EEO complaint?  Then I found out in

 7         August of 2018 when I got that questionnaire.

 8    Q   Are you aware that I filed a complaint with the

 9         German police against you in 2018?  If so, when did

10         you find out?

11    A   Yes, I am -- I am aware that you filed the

12         complaint with the German police, and I got that in

13         early February.  It was for bodily injury, but the

14         German police dismissed it on March the 19th.

15    Q   What year did you find out?

16    A   2019, a year after it occurred.

17    Q   And who contacted you about that?

18    A   I got the message -- or the letter from the German

19         police in my mailbox.  So I just got a regular

20         posted mail in my mailbox a year after the event.

21    Q   Are you aware of the incident that caused me to

22         file those complaints?  If so, please explain.

23    A   I know that day.  That was a Catapult training day.

24         I don't know what you want me to explain.

25    Q   When you say Catapult, what year -- what month and
```

```
 1      year was that?
 2   A  That was -- it was Friday, February the 13th, 2018,
 3      and Catapult was the agency or the consultant that
 4      DoDEA hired to conduct training -- literacy
 5      training for all educators, and I was sent to your
 6      school to support the consultant.
 7   Q  So the incident took place in 2018.  You received
 8      notice from DoDEA that I filed a complaint in 2018,
 9      and you received notice from the German police that
10      I filed a complaint in 2019; is that correct?
11   A  Yes.
12   Q  During the CCRS training in 2020, did I give you
13      permission to hug me at all?
14   A  I -- I didn't hug you.  I came behind you, and I
15      put my hand on your shoulder, and no, you did not
16      give me permission.
17   Q  Why would you hug me and ask permission after doing
18      so?
19   A  I didn't hug --
20          MS. FISCHER:  Objection.  It mischaracterizes
21      her testimony.  She said she didn't hug you, but
22      you can answer.
23   A  You had arrived to the training after the
24      consultant had presented, so you had arrived after
25      11:00, and so you had missed the morning session,
```

```
 1        and I misread what -- that you were upset, that you
 2        didn't know what was happening, and I thought I was
 3        consoling you.  When that -- when that didn't
 4        happen -- I mean, you let me know that I was out of
 5        line.  I did apologize.
 6   Q    Did I complain about you violating my personal
 7        space at any time other than the time before the
 8        hugging incident?
 9   A    No.
10   Q    Why would you violate my space -- my personal space
11        at all when you knew that I had previously filed
12        complaints against you?
13            MS. FISCHER:  Objection for characterizing
14        patting someone on the shoulder as violating
15        personal space, but you can answer.
16   A    I -- I knew that you were taking the course and
17        that you needed the information to finish the
18        course.  I was -- I thought I was helping you, and
19        I apologized that I touched your shoulder.
20   Q    When you violated my personal space, were you
21        attempting to cause anxiety?
22   A    No.
23   Q    Were you attempting to cause me to become
24        aggressive so that I would be fired?
25   A    No.
```

```
 1   Q   Did Mr. Villarreal witness you apologize for making
 2       me feel uncomfortable after you hugged me?
 3   A   I didn't hug you.
 4           MS. FISCHER:  Objection for characterizing --
 5       or mischaracterizing the witness' testimony as she
 6       has testified that she did not hug you, but you can
 7       answer.
 8   A   You requested that we talk together with your
 9       principal, and yes, he was there when I apologized
10       to you again for touching your shoulder.
11   Q   Unwanting touching is considered simple assault.
12       Did you know that?
13           MS. FISCHER:  Objection.  Mischaracterizes the
14       law, and it calls for a legal conclusion, but you
15       can answer if you know.
16   A   I do not know.
17   Q   Do you think it's appropriate to give unwanted hugs
18       or touches in the workplace?
19   A   I did not know that it was unwanted, and I did
20       apologize.  I'm sorry that you're upset.
21   Q   But do you think that it's appropriate to give
22       unwanted hugs or touches in the workplace?
23   A   If -- if it is unwanted, it is not appropriate.
24   Q   Do you think that it's appropriate to give unwanted
25       hugs to someone that you have an unfavorable
```

| 1 | | relationship with? |
|---|---|---|
| 2 | A | I guess I didn't know the relationship so I -- |
| 3 | Q | You did know that I filed complaints against you |
| 4 | | fairly recently, within the last year or two before |
| 5 | | the incident? |
| 6 | A | I did -- I did know that, but I also knew I was the |
| 7 | | ISS that needed to support you, and I was trying my |
| 8 | | best to do that. |
| 9 | Q | Do you normally give hugs or touch others in the |
| 10 | | workplace? |
| 11 | A | If I haven't seen an educator in a while, yes, I |
| 12 | | normally hug them when I come to your school -- |
| 13 | | when I go to their school.  We shake hands or we |
| 14 | | hug, depending on how long I've known them. |
| 15 | Q | So it's reciprocal? |
| 16 | A | Yes. |
| 17 | Q | Has anyone -- any of your supervisors ever |
| 18 | | counseled you by inappropriately touching me? |
| 19 | A | No. |
| 20 | Q | So you were never counseled about any of the |
| 21 | | incidents that occurred or that I complained about? |
| 22 | A | I touched your shoulder one time. |
| 23 | | MS. FISCHER:  Let's clear that up.  That |
| 24 | | occurred or that you complained about?  That was |
| 25 | | compound. |

1    Q  So you were never counseled about -- were you ever

2       counseled about any incidents that occurred with

3       me?

4    A  No.

5    Q  Were you ever counseled about any incidents that I

6       had complained about against you?

7    A  No.

8    Q  How many teachers were in the online course three

9       dimensional science instructional -- instruction

10       and secondary science classrooms -- it was three

11       dimensional science instruction and secondary

12       science classrooms -- that you instructed during

13       2019-2020, the school year?  How many teachers were

14       in that course?

15    A  Nine.

16    Q  Total teachers in -- oh --

17    A  Nine.

18    Q  Nine.  Sorry.  How many educators were -- I'll just

19       continue from there.  Okay.  So how many of these

20       individuals were -- so these -- all of these

21       individuals were in the University of San Diego

22       chat group?

23    A  They were all in our Schoology group, yes.

24    Q  But you did have a small chat group for the

25       individuals that took the university?

```
 1   A   There were nine -- there were nine educators that
 2       took the course.  We ran the course through
 3       Schoology.  The credit came from San Diego if the
 4       educator signed up for credit.
 5   Q   Right.  So the individuals that signed up for
 6       credit, they had a separate chat group as well?
 7   A   No.  They were in Schoology.  All educators were in
 8       Schoology as the learning management system for the
 9       course.
10   Q   But there was also a small chat group for educators
11       who were with the University of San Diego; is that
12       correct?
13   A   No.  The course only had one learning management
14       system through Schoology.  All educators were in
15       Schoology.
16   Q   So I was a member of two chat groups that you
17       created and one was a smaller group.
18   A   Okay.  I -- I now understand what you're talking
19       about.  There are discussion bands within the
20       Schoology course.  So you would have been in the
21       discussion band for the whole group, all nine of
22       you, and then you would have been in the discussion
23       band for the high school.  There were three high
24       school teachers and six middle school.  So the
25       three high school teachers were in one discussion
```

```
 1        and the six middle school educators were in another
 2        discussion but within Schoology.
 3   Q    But there were no chat groups for just the
 4        individuals that were taking the course for credit?
 5   A    The individuals who were taking the course for
 6        credit could use Schoology to write to the
 7        instructor on their own.  They didn't need a chat
 8        group to talk to the instructor or a lot of people
 9        just used Outlook -- I mean, a lot of participants
10        just used Outlook.
11   Q    Do you hold --
12             MS. SMITHSON:  Actually, can we take a quick
13        two-minute break?  I need to look at something
14        really fast.
15             MS. FISCHER:  Okay.  So 8:30?
16             MS. SMITHSON:  8:30 -- 8:31, how about that?
17             MS. FISCHER:  Okay.  Yeah.  Sorry.  I'm on
18        Indianapolis time.  We'll reconvene then.
19        Ms. Schiele, you can turn off your sound and video
20        if you want during the break.
21             MS. SMITHSON:  Thank you.
22             (Recess taken.)
23   Q    Ms. Schiele, do you feel that I contact you
24        whenever I need help with technology or course
25        information?
```

```
 1    A   Yes.

 2    Q   Is it appropriate for me to do so?

 3    A   Yes.

 4    Q   Have you ever withheld login information from me

 5        when requested?

 6    A   No.

 7    Q   Have you ever withheld curriculum information from

 8        me because I filed an -- filled EEO complaints

 9        against you?

10    A   I have never withheld curriculum information from

11        you.

12    Q   Have you ever withheld curriculum information from

13        me because I am African American or black?

14            MS. FISCHER:  Objection.  I believe --

15    A   I have never withheld --

16            MS. FISCHER:  Objection.  She just testified

17        she's never withheld curriculum information from

18        you ever.  So this has been asked and answered.

19    Q   Okay.  Have you ever withheld opportunities to

20        collaborate with colleagues -- have you ever

21        withheld opportunities to collaborate with

22        colleagues from me because I filed EEO complaints

23        against you?

24    A   I have never --

25    Q   Or because -- I'm sorry.  Or because I'm African
```

```
 1        American or black or because I have disabilities?
 2             MS. FISCHER:  Objection.  Compound, but you
 3        can answer.
 4   A  I have never withheld collaboration opportunities
 5        from you.
 6   Q  Ms. Schiele, is your position considered a
 7        management position or --
 8   A  No.
 9   Q  -- within DoDEA?
10   A  No.
11             MS. SMITHSON:  That concludes my deposition
12        for Ms. Joy Schiele.  Thank you very much,
13        Ms. Schiele.
14             THE WITNESS:  Thank you.
15             MS. FISCHER:  Do you want to take -- it looks
16        like our next witness isn't set to come on until
17        8:45.  So do you just want to reconvene at that
18        time?
19             THE REPORTER:  I just have the read off real
20        quick.
21             MS. FISCHER:  Sure.
22             THE REPORTER:  This concludes the deposition
23        of Joy Schiele.
24             Will counsel please state if they would like a
25        copy of the transcript, any stipulations, or other
```

 1   matters to be included in the record.

 2        MS. FISCHER:  I would like a copy.

 3        MS. SMITHSON:  I would like a copy as well.

 4        (The deposition concluded at 7:35 a.m.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF INDIANA
2                      INDIANAPOLIS DIVISION

3
    TAMICA J. SMITHSON,            )
4                                  )
                   Plaintiff,      )
5                                  )
            -v-                    )          Case No.
6                                  )   1:21-CV-02193-JRS-MPB
    LLOYD AUSTIN III,              )
7   Secretary, Department of       )
    Defense,                       )
8                                  )
                   Defendant.      )
9

10
                      Job No. 175089
11

12
            The deposition of JOY SCHIELE, taken in the
13  above-captioned matter, on September 2, 2022, and at
    the time and place set out on the title page hereof.
14          It was requested that the deposition be
    transcribed by the reporter and that same be reduced
15  to typewritten form.
            It was agreed that the reading and signature
16  by the deponent to the deposition were waived on
    behalf of the parties Plaintiff and Defendant by their
17  respective counsel, the witness being present and
    consenting thereto, and/or pursuant to the Fed. R.
18  Civ. P. 30(e), the deposition to be read with the same
    force and effect as if signed by said deponent.
19

20

21

22
                  STEWART RICHARDSON & ASSOCIATES
23              Registered Professional Reporters
                  One Indiana Square, Suite 2425
24                   Indianapolis, IN  46204
                        (800) 869-0873
25
```

```
 1   STATE OF INDIANA          )
                               )
 2   COUNTY OF VANDERBURGH     )

 3

 4            I, Elizabeth Taylor Culiver, RPR, a Notary

 5   Public in and for said county and state, do hereby

 6   certify that the deponent herein was by me first duly

 7   sworn to tell the truth, the whole truth, and nothing

 8   but the truth in the aforementioned matter;

 9            That the foregoing deposition was taken on

10   behalf of the Plaintiff; that said deposition was

11   taken at the time and place heretofore mentioned

12   between 7:03 a.m. and 7:36 a.m.;

13            That said deposition was taken down in

14   stenograph notes and afterwards reduced to typewriting

15   under my direction; and that the typewritten

16   transcript is a true record of the testimony given by

17   said deponent;

18            Absent a request by the parties or by

19   agreement, the reading and signing by the deponent to

20   the deposition were waived on behalf of all the

21   parties by their respective counsel, the witness being

22   present and consenting thereto, and/or pursuant to the

23   Fed. R. Civ. P. 30(e); and the deposition is to be

24   read with the same force and effect as if signed by

25   said deponent.
```

1          I do further certify that I am a disinterested

2     person in this cause of action; that I am not a

3     relative of the attorneys for any of the parties.

4          IN WITNESS WHEREOF, I have hereunto set my

5     hand and affixed my notarial seal this 12th day of

6     September, 2022.

7

8

9

10

11

12

13

14     My Commission Expires:
      August 14, 2023

15

16     Job No. 175089

17

18

19

20

21

22

23

24

25

*Elizabeth Taylor Culiver*

Elizabeth Taylor Culiver
NOTARY PUBLIC SEAL
STATE OF INDIANA
Commission No. NP0670402
My Commission Expires Aug. 14, 2023

### 1

**103** 11:14
**11:00** 14:25
**13th** 14:2
**1985** 11:5
**19th** 13:14

### 2

**2016** 12:2,3
**2017** 9:24 12:2
**2018** 13:5,7,9 14:2,7,8
**2019** 13:16 14:10
**2019-2020** 18:13
**2020** 7:6 14:12
**2021** 9:25
**2022** 4:9
**25** 8:4
**28** 8:4
**2nd** 4:9

### 6

**62** 8:6

### 7

**7:03** 4:9
**7:35** 23:4

### 8

**8:30** 20:15,16
**8:31** 20:16
**8:45** 22:17

### A

**a.m.** 4:9 23:4
**accounts** 11:25
**accurately** 6:24
**Activity** 9:13
**administered** 5:18
**affect** 6:17
**affirmed** 5:2
**African** 21:13,25
**age** 8:5
**agency** 9:3,14 14:3
**aggressive** 15:24
**agreements** 9:2,3
**Albrech** 10:9
**American** 21:13 22:1
**answering** 5:25
**anxiety** 15:21
**apologize** 15:5 16:1,20
**apologized** 15:19 16:9
**April** 7:6
**arrived** 14:23,24
**assault** 16:11
**associate** 4:7
**Associates** 4:8
**attempting** 15:21,23
**August** 13:7
**Austin** 4:16,19 5:14
**aware** 13:4,8,11,21

### B

**back** 7:15 12:19
**bad** 6:21
**band** 11:9 19:21,23
**bands** 19:19
**base** 12:14
**begin** 11:3
**behalf** 4:18
**Beth** 4:6
**black** 21:13 22:1
**bodily** 13:13
**break** 6:10,12 20:13,20

### C

**call** 13:1
**calls** 16:14
**car** 9:8
**Carl** 10:9
**case** 5:16 7:7,10,11 8:9
**Catapult** 12:5 13:23,25 14:3
**Caucasian** 8:8
**caused** 13:21
**CCRS** 14:12
**Central** 4:10
**chance** 12:7
**characterizing** 15:13 16:4
**charged** 7:21
**chat** 18:22,24 19:6,10,16 20:3,7
**chemical** 11:16
**children** 8:1
**clarification** 8:22
**classrooms** 18:10,12
**clear** 17:23
**collaborate** 21:20,21
**collaboration** 22:4
**colleagues** 13:3 21:20,22
**complain** 15:6
**complained** 17:21,24 18:6
**complaint** 9:9 13:4,6,8,12 14:8, 10
**complaints** 13:22 15:12 17:3 21:8,22
**completely** 6:11
**compound** 17:25 22:2
**concluded** 23:4
**concludes** 22:11,22
**conclusion** 16:14

**conduct** 11:22 14:4

**considered** 16:11 22:6

**consoling** 15:3

**consultant** 14:3,6,24

**contact** 12:22,23 20:23

**contacted** 13:17

**continue** 18:19

**convicted** 7:22

**copy** 22:25 23:2,3

**correct** 14:10 19:12

**counsel** 4:1,13 8:17,19,23 22:24

**counseled** 17:18,20 18:1,2,5

**court** 4:3 5:18,20,23 6:2,5 7:12, 18

**COVID** 7:5

**created** 19:17

**credit** 19:3,4,6 20:4,6

**crime** 7:22

**Culiver** 4:7

**current** 11:11

**curriculum** 21:7,10,12,17

---

**D**

**date** 4:8

**day** 6:21 13:1,23

**days** 12:20

**decides** 11:18

**defendant** 4:19

**Defense** 9:13

**Department** 9:13

**depending** 17:14

**deponent** 4:12

**deposed** 7:2

**deposition** 4:11 5:17 6:9,21 8:10,12,18 9:4,7 22:11,22 23:4

**depositions** 7:16

**determine** 5:15

---

**Diego** 18:21 19:3,11

**dimensional** 18:9,11

**disabilities** 22:1

**discuss** 8:18

**discussion** 19:19,21,22,25 20:2

**dismissed** 13:14

**district** 9:22 10:15 11:18

**document** 6:2

**documents** 8:9,13,16

**Dodea** 11:4,23 13:4 14:4,8 22:9

**drugs** 6:16,18

**duly** 5:2

**Dunham** 10:24

---

**E**

**E18** 11:10

**early** 13:13

**easier** 6:1

**East** 11:1,8

**Education** 9:13

**educator** 12:17 17:11 19:4

**educators** 11:25 12:15,22 14:5 18:18 19:1,7,10,14 20:1

**EEO** 9:9 13:6 21:8,22

**EEOC** 7:10,11

**employer** 9:12

**entire** 10:8

**Estimate** 11:13

**Europe** 11:1,8

**Evansville** 4:8

**event** 13:20

**EXAMINATION** 5:5

**examined** 5:4

**explain** 13:22,24

---

**F**

**face** 12:9,10

---

**facilitate** 11:23

**fairly** 17:4

**fast** 20:14

**February** 13:13 14:2

**federal** 5:13

**feel** 16:2 20:23

**file** 13:22

**filed** 9:9 13:4,8,11 14:8,10 15:11 17:3 21:8,22

**filled** 21:8

**find** 13:5,10,15

**finish** 15:17

**fired** 15:24

**Fischer** 4:18 8:11,19,23 14:20 15:13 16:4,13 17:23 20:15,17 21:14,16 22:2,15,21 23:2

**found** 13:6

**Friday** 14:2

**friends** 13:2

---

**G**

**German** 13:9,12,14,18 14:9

**Germany** 4:2

**give** 5:20 14:12,16 16:17,21,24 17:9

**group** 18:22,23,24 19:6,10,17,21 20:8

**groups** 19:16 20:3

**guess** 17:2

---

**H**

**half** 12:11

**hand** 14:15

**hands** 17:13

**happen** 15:4

**happening** 15:2

**held** 4:11

**helping** 15:18

Index: high..Outlook

**high** 19:23,25

**hired** 14:4

**hold** 20:11

**holds** 5:19

**Horst** 10:2,3

**hours** 12:11

**hug** 14:13,14,17,19,21 16:3,6
17:12,14

**hugged** 16:2

**hugging** 15:8

**hugs** 16:17,22,25 17:9

**husband** 9:8

**hygiene** 11:17

**I**

**identify** 4:13

**Ill** 4:16 5:14

**inappropriately** 17:18

**incident** 13:21 14:7 15:8 17:5

**incidents** 17:21 18:2,5

**included** 23:1

**Indiana** 4:8

**Indianapolis** 20:18

**individuals** 18:20,21,25 19:5
20:4,5

**information** 5:15 12:23 15:17
20:25 21:4,7,10,12,17

**injury** 13:13

**instructed** 18:12

**instruction** 11:7 18:9,11

**instructional** 18:9

**instructor** 20:7,8

**interact** 12:7

**interrupt** 5:24,25

**interrupted** 10:7

**ISS** 17:7

**J**

**J-O-Y** 5:9

**Jason** 10:2

**job** 11:6

**Joy** 4:12 5:1,9 22:12,23

**K**

**Kaiserslautern** 4:2

**knew** 15:11,16 17:6

**know** 6:10,25 8:15 10:22,23
11:12 13:23,24 15:2,4 16:12,15,
16,19 17:2,3,6

**L**

**law** 16:14

**lawsuit** 5:13

**learning** 19:8,13

**legal** 16:14

**letter** 13:18

**level** 9:16,24,25 10:11,12,14,21

**literacy** 11:17 14:4

**Liz** 10:24

**Lloyd** 4:16,19 5:14

**located** 4:2

**login** 21:4

**long** 6:9 9:18,20 10:3,19,20 12:1
17:14

**looked** 8:11

**lot** 20:8,9

**M**

**made** 9:2

**maiden** 5:12

**mail** 13:20

**mailbox** 13:19,20

**make** 6:6

**makes** 6:1,21

**making** 16:1

**management** 19:8,13 22:7

**March** 7:5 13:14

**married** 7:24

**materials** 11:21

**math** 11:17

**matters** 23:1

**medications** 6:16,18

**member** 19:16

**merged** 10:24

**message** 12:24,25 13:18

**met** 8:17,21,22,25 9:19,23 12:5

**middle** 19:24 20:1

**mischaracterizes** 14:20 16:13

**mischaracterizing** 16:5

**misread** 15:1

**missed** 14:25

**month** 13:25

**morning** 14:25

**N**

**nature** 7:7

**needed** 15:17 17:7

**nods** 6:6

**notice** 14:8,9

**O**

**oath** 5:18

**Objection** 14:20 15:13 16:4,13
21:14,16 22:2

**obligation** 5:20

**occurred** 13:16 17:21,24 18:2

**online** 11:24 18:8

**opportunities** 21:19,21 22:4

**Outlook** 20:9,10

## P

**participants**  20:9

**patting**  15:14

**pay**  11:9

**people**  13:1 20:8

**permission**  14:13,16,17

**person**  10:13

**personal**  15:6,10,15,20

**persons**  4:14

**place**  14:7

**plaintiff**  4:16 5:13

**plan**  6:9

**point**  6:23

**police**  13:9,12,14,19 14:9

**policy**  12:21

**position**  22:6,7

**posted**  13:20

**prepare**  8:10

**present**  4:14,17,19

**presented**  6:12 14:24

**previously**  15:11

**principal**  16:9

**Prior**  10:9

**pro**  4:15 5:13

**problem**  11:3

**proceeding**  7:13,19

**programs**  11:22

**put**  14:15

## Q

**quarter**  11:23 12:20

**quarterly**  12:4,5,18

**question**  6:12

**questionnaire**  13:7

**questions**  5:6,15,25 6:1

**quick**  20:12 22:20

## R

**race**  8:7

**Rachana**  4:4,18

**ran**  19:2

**reaches**  12:17

**read**  22:19

**real**  22:19

**reason**  6:20

**received**  14:7,9

**recently**  17:4

**recess**  20:22

**reciprocal**  17:15

**reconvene**  20:18 22:17

**record**  4:14 5:8 23:1

**regular**  13:19

**relationship**  17:1,2

**remember**  10:23 11:2

**remotely**  4:3

**report**  10:13

**reporter**  4:1,3,6 5:18,23 6:2,5
22:19,22

**requested**  7:9 16:8 21:5

**required**  11:23

**resources**  12:23

**respond**  13:1

**responsibilities**  11:15

**review**  8:9

**Richardson**  4:7

**rules**  5:17

**Rynberg**  9:17,20 10:1

## S

**S-C-A-V-O**  5:12

**S-C-H-I-E-L-E**  5:10

**salary**  11:11

**San**  18:21 19:3,11

**Sanchez**  10:15,20,22,23 11:1

**Scavo**  5:12

**Schiele**  4:12 5:1,9 20:19,23 22:6,
12,13,23

**school**  11:22 12:20 14:6 17:12,
13 18:13 19:23,24,25 20:1

**Schoology**  18:23 19:3,7,8,14,15,
20 20:2,6

**science**  11:8,16,19,20 12:21
18:9,10,11,12

**secondary**  11:8,16,19,20 18:10,
11

**secure**  11:21

**send**  12:24,25

**separate**  19:6

**September**  4:9

**session**  14:25

**set**  22:16

**shake**  17:13

**shoulder**  14:15 15:14,19 16:10
17:22

**side**  8:17,20,23

**signed**  9:2 19:4,5

**simple**  16:11

**small**  18:24 19:10

**smaller**  19:17

**Smithson**  4:5,15 5:6 20:12,16,21
22:11 23:3

**sound**  20:19

**space**  15:7,10,15,20

**speak**  9:6

**specialist**  11:7

**specifically**  11:20

**spell**  5:7

**Standard**  4:10

**state**  5:7 22:24

**statements**  5:21 6:6

**Stewart**  4:7

Index: stipulate..Zoom

**stipulate** 4:1

**stipulations** 22:25

**straight** 10:10

**superintendent** 10:15

**supervisor** 9:16,21,24 10:1,3,8, 11,12,16,19,21

**supervisors** 17:17

**support** 11:16,17,19,20 14:6 17:7

**sworn** 4:3 5:2

**system** 19:8,14

**systems** 11:7

**T**

**taking** 6:15,16 15:16 20:4,5

**talk** 16:8 20:8

**talking** 19:18

**Tamica** 4:15

**Taylor** 4:7

**teachers** 11:24 12:21 18:8,13,16 19:24,25

**Teams** 12:24

**technology** 20:24

**Ter** 10:2,3

**testified** 5:4 7:12,18 16:6 21:16

**testify** 6:24

**testifying** 5:19

**testimony** 6:17 14:21 16:5

**things** 8:11

**thought** 15:2,18

**time** 4:9,10 8:12 10:8 12:3 15:7 17:22 20:18 22:18

**times** 12:19

**title** 11:6

**today** 6:17

**Today's** 4:8

**Total** 18:16

**touch** 12:14 17:9

**touched** 15:19 17:22

**touches** 16:18,22

**touching** 16:10,11 17:18

**TPO** 11:10

**training** 12:4,5,6 13:23 14:4,5, 12,23

**trainings** 11:24 12:18

**transcribe** 5:23 6:5

**transcript** 22:25

**truth** 5:3

**truthful** 5:21

**truthfully** 6:24

**turn** 20:19

**two-minute** 20:13

**U**

**uh-huhs** 6:5

**unable** 6:23

**uncomfortable** 16:2

**understand** 5:21 6:3,7,13,25 19:18

**unfavorable** 16:25

**university** 18:21,25 19:11

**unwanted** 16:17,19,22,23,24

**Unwanting** 16:11

**upset** 15:1 16:20

**V**

**verbal** 6:6 9:2

**video** 20:19

**Villarreal** 16:1

**Vilseck** 10:25 12:4,11,12,14

**violate** 15:10

**violated** 15:20

**violating** 15:6,14

**virtually** 12:9,16,17

**W**

**wait** 10:17

**week** 9:22

**weight** 5:19

**withheld** 21:4,7,10,12,15,17,19, 21 22:4

**witness'** 16:5

**work** 9:14 12:7

**worked** 12:1

**working** 11:3

**workplace** 9:10 16:18,22 17:10

**write** 20:6

**Y**

**year** 11:3 12:3,13,14,19 13:15,16, 20,25 14:1 17:4 18:13

**years** 10:4,10 11:2

**Z**

**Zoom** 4:11

SMITHSON
EXHIBIT
MV-1
11/20/2022

# In the Matter Of:

*TAMICA J. SMITHSON*

*-v-*

*LLOYD AUSTIN III*

_____

# Marc Villarreal

*August 26, 2022*

_____



800.869.0873 | www.StewartRichardson.com

Reporting Driven by Excellence — Since 1975

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF INDIANA
 2                        INDIANAPOLIS DIVISION


 3
     TAMICA J. SMITHSON,             )
 4                                   )
                     Plaintiff,      )
 5                                   )
               -v-                   )            Case No.
 6                                   )   1:21-CV-02193-JRS-MPB
     LLOYD AUSTIN III,               )
 7   Secretary, Department of        )
     Defense,                        )
 8                                   )
                     Defendant.      )
 9


10


11          The videotaped deposition upon oral

12   examination of MARC VILLARREAL, a witness produced and

13   sworn via videoconference before me, Elizabeth Taylor

14   Culiver, RPR, a Notary Public in and for the County of

15   Vanderburgh, State of Indiana, taken on behalf of the

16   Plaintiff with all participants appearing via

17   videoconference on August 26, 2022, at 9:10 a.m.,

18   pursuant to the Federal Rules of Civil Procedure.

19


20


21


22


23                  STEWART RICHARDSON & ASSOCIATES
                     Registered Professional Reporters
24                          (800) 869-0873

25
```

```
 1                         APPEARANCES

 2
        (All Participants Appearing Via Videoconference)
 3

 4   FOR THE PLAINTIFF:

 5            Tamica J. Smithson, Esq.
              CMR 411 Box 3668
 6            AOP, AE  09112
              tamica.smithson@yahoo.com
 7

 8   FOR THE DEFENDANT:

 9            Rachana N. Fischer, Esq.
              OFFICE OF THE UNITED STATES ATTORNEY
10            10 West Market Street
              Suite 2100
11            Indianapolis, IN  46204
              rachana.fischer@usdoj.gov
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          INDEX OF EXAMINATION

                                                              PAGE
2
   EXAMINATION
3
   QUESTIONS BY MS. SMITHSON                                   5
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1       THE REPORTER:  Do all counsel stipulate that

 2  the witness located in Sicily, Italy, can be sworn

 3  in remotely by the court reporter?

 4       MS. SMITHSON:  Yes.

 5       MS. FISCHER:  Yes.

 6       THE REPORTER:  My name is Beth Culiver, an

 7  associate of Stewart Richardson & Associates, 915

 8  Main Street, Suite 405, Evansville, Indiana.

 9  Today's date is August 26th, 2022.  The time is

10  9:10 a.m. Central Standard Time.

11       This deposition is being held via Zoom.  The

12  deponent is Marc Villarreal.

13       Will counsel please identify themselves and

14  any persons present with you for the record?

15       MS. SMITHSON:  Tamica Smithson, pro se

16  plaintiff against Lloyd Austin, III.  No one is

17  with me.

18       MS. FISCHER:  Rachana Fischer, counsel for

19  defendant, Lloyd Austin, and no one is present with

20  me.

21

22

23

24

25

```
 1                        MARC VILLARREAL,

 2    having been first duly sworn or affirmed to tell the

 3    truth, the whole truth, and nothing but the truth, was

 4    examined and testified as follows:

 5    EXAMINATION

 6    QUESTIONS BY MS. SMITHSON

 7    Q  Mr. Villarreal, could you please for the record

 8       state and spell your name.

 9    A  My name is Marc, M-a-r-c, the last name

10       V-i-l-l-a -- two r's -- r-r-e-a-l.

11    Q  And have you ever been known by a different name?

12    A  Negative.  That has been my name my whole life.

13    Q  I am a pro se plaintiff in the federal -- in a

14       federal lawsuit against Lloyd Austin, III, and I'll

15       be asking you a few questions to determine if

16       there's information that you may have about my

17       case.

18            I'll go over some of the rules for a

19       deposition.  The oath that the court reporter

20       administered to you holds the same weight as if you

21       were testifying in court.  You have the same

22       obligation to give a truthful statement -- or

23       truthful statements.  Do you understand?

24    A  Yes, ma'am.

25    Q  The court reporter will transcribe everything that
```

we say. I'll try not to interrupt you as you are answering questions. I ask that you not interrupt me while I ask questions. This makes it easier for the court reporter to document what we are saying. Do you understand?
A Yes, ma'am.
Q The court reporter cannot transcribe uh-huhs or nods. So please make verbal statements. Do you understand?
A Yes, ma'am.
Q I don't plan to take long for your deposition, but if you need to take a break, just let me know. I only ask that you completely answer the last question that I presented before we break. Do you understand?
A Yes, ma'am.
Q Are you currently taking any medications or drugs that could affect your testimony today? If so, what drugs or medications?
A I'm currently taking no medication.
Q And no drugs?
A And no drugs. Thank you. No. No medication, no drugs.
Q Thank you. Is there any reason that you can think of that makes this a bad day for a deposition?

```
1   A  No, ma'am.
2   Q  Is there ever a point that you were -- I mean, if
3      there's ever a point that you're unable to testify
4      accurately and truthfully, please let me know.  Do
5      you understand?
6   A  Yes, ma'am.
7   Q  Have you ever been deposed before?
8   A  Yes, ma'am.
9   Q  When was that?
10  A  Ma'am, I couldn't tell you the date, but it was a
11     part of this case.  I would guess about half a year
12     ago.  I don't remember the date.  I really don't.
13  Q  Any other times that you've been deposed?
14  A  When we went to the formal deposition like this,
15     this is the only time where it's gone to this -- to
16     the level of deposition.  There have been --
17     there's one other EEO case that I've had in my six
18     years -- actually, 11 years as an administrator,
19     but it didn't go to the deposition, if that makes
20     sense or is -- I think I'm answering that
21     correctly, like where it went to a court
22     deposition.
23  Q  Do you recall a deposition from my EEOC complaint
24     in the administrative phase?
25  A  Yes, yes, yes, yes.  Like -- yeah, your case, and
```

1      then I've only had one other EEO case that was not

2      connected with yours.  I guess that's what I was

3      trying to say.

4  Q   Okay.  Thank you.  What was the nature of the other

5      case that's not mine?

6  A   The -- the other case -- I don't -- I don't

7      understand the question.

8  Q   What was the nature of that case, the other case

9      that you were deposed?  What was it about?  You

10     don't have to tell me the parties or anything like

11     that, but what was the nature of the case?  What

12     was it about?  Was it an EEO case or was it --

13 A   It was an EEO case, yes.

14 Q   Okay.  Have you ever testified in court or any

15     other proceeding?

16 A   No other proceeding ever.

17 Q   Have you ever been charged with a crime or

18     convicted of a crime?

19 A   No, ma'am, unless -- speeding tickets, and those

20     have been many, many, many years ago.

21 Q   Okay.  Did you review any documents concerning this

22     case to prepare for deposition?  If so, what

23     documents?

24 A   Well, I did review the exhibits for today.

25 Q   Okay.  Any other documents?

```
 1    A   No.  I believe that is it.  The documents that were

 2        attached for -- for today.

 3    Q   Have you met with opposing counsel to discuss --

 4        or, you know, the other counsel, the other side, to

 5        discuss this deposition?

 6    A   I have met with Ms. Fischer, yes.

 7    Q   Anyone else?

 8    A   Negative.  No.

 9    Q   Have you signed any agreements or made any verbal

10        agreements with anyone or the agency about this

11        deposition?

12    A   No, ma'am.

13    Q   Did you speak with anyone else about this

14        deposition at all?

15    A   No, ma'am.

16    Q   Have you ever filed an EEO complaint in the

17        workplace?

18    A   No, ma'am.

19    Q   Who is your employer?

20    A   I consider my employer DoDEA.

21    Q   So you work for the same agency that I work for?

22    A   Yes, ma'am.

23    Q   How long have you worked for DoDEA?

24    A   Since August of 1998.  So about 24 years.

25    Q   How long did you and I work together?
```

```
 1   A   We worked together -- I was in Vilseck High School
 2       for five school years, so I would say five school
 3       years.  One of those, I believe, you were working
 4       for the virtual school, but we still worked
 5       together.  We had some meetings.  So I would say
 6       five years.
 7   Q   What was your position when you were at -- in
 8       Vilseck?
 9   A   I was the principal of Vilseck High School.
10   Q   And you mentioned that I was in the virtual school?
11   A   The -- I think my last year there you were assigned
12       to the virtual school.
13   Q   I'm still in the virtual school this year.
14   A   Okay.  Congratulations.  I hope that's a good
15       assignment for you.
16   Q   It's been great.  Thank you.  Could you explain
17       what your responsibility to me was while I was in
18       the virtual school?
19   A   While you were in the virtual school?
20   Q   As far as -- the difference between your
21       responsibility to me as a teacher in the school
22       building and a teacher outside of the -- you know,
23       in the virtual school.  So once I was detailed to
24       the virtual school.
25   A   I think most principal related issue was like if
```

```
 1        you had an issue with a parent, an issue with a

 2        teacher.  The virtual school has a DoDEA virtual

 3        school principal and assistant principal and

 4        counselors.  So I think most of those issues, if

 5        you're working for the DoDEA virtual school, you

 6        would go to that virtual school principal.

 7             If there was something you needed help with

 8        for -- from -- and I believe you were still living

 9        in the Vilseck area.  If you needed something from

10        there, I would hope that you would contact me, and

11        I would be happy to help if there was something

12        facility regulated.  If you needed a computer, that

13        we could get you something like that from the high

14        school.

15             So the relationship I think changed

16        dramatically when you went from Vilseck High School

17        to the virtual school.

18   Q    Did you have to provide me with a computer?

19   A    I believe so, ma'am, yes.

20   Q    Did you have to continue to have me on your email

21        distribution list?

22   A    Yes, ma'am.  Yeah, to the best of my knowledge, but

23        I think that was still on the all staff emails and

24        all that, yes.

25   Q    And what other individuals do you remember being a
```

```
 1        part of virtual school during that time?
 2    A   I have to think back.  I don't know if we had
 3        anyone else detailed to the virtual school.  I want
 4        to say there was someone else, but right now, I am
 5        -- I am drawing a blank on anybody else being
 6        assigned to the virtual school.
 7    Q   Okay.  I actually have those questions later on so
 8        I'll -- there were two other individuals.
 9    A   I felt like we were short, you know, when it came
10        to the positions at -- but I can't remember for the
11        life of me who was -- who was assigned to the
12        virtual school.  Oh, I do.  I remember a
13        Mr. Valenzuela, he did go to -- he was a math
14        teacher.
15    Q   Uh-huh.
16    A   And was there another?  I can't remember off the
17        top of my head, but I'm sure if we talk or think
18        about the names, I would -- if I had the roster, I
19        could probably tell you, but I can't remember off
20        the top of my head right now.
21    Q   Okay.  And you continued to provide Mr. Valenzuela
22        with a laptop as well; correct?
23    A   I do believe so, yes.  Yes, yes.
24    Q   And we both had access to the building still;
25        correct?
```

```
 1    A   Correct, correct.

 2    Q   And what would we need access to the building for?

 3        What types of things maybe?

 4    A   Mr. Valenzuela actually, I believe, still coached

 5        for us, which was something that was -- you know,

 6        so, you know, he -- he needed access to the

 7        building.  I don't know if -- I believe if you

 8        needed something like a textbook resource or

 9        something like -- you would be able to come to the

10        building for that.

11    Q   Maybe we'll go back to that.  I'll just continue

12        with where I was if I can find it.  How were our

13        interactions when we worked together at Vilseck?

14    A   Ms. Smithson, I -- I can say like as a

15        professional, I respect you deeply.  I have

16        profound respect for you as an educator.  Sometimes

17        you asked challenging questions, but I always

18        enjoyed conversations with you.  I felt they were

19        very professional.  You always had thoughtful

20        questions or thought provoking conversations.

21    Q   Were most of our interactions pleasant?

22    A   From -- from my perspective, I would say yes.  Yes,

23        ma'am.

24    Q   Are you married?

25    A   I am married.
```

```
 1    Q   How long have you been married?
 2    A   I got married the year before I moved to Vilseck --
 3        actually the summer before.  So it's been six years
 4        now, but I was married just before that, yes.
 5    Q   Do you have children?
 6    A   I have no children, ma'am.
 7    Q   What is your race?
 8    A   I'm a Hispanic American, which is really an
 9        ethnicity.
10    Q   Right.
11    A   Yes, yes.
12    Q   And so your race?
13    A   Caucasian.
14    Q   What year did you begin -- oh, I think you answered
15        that -- working for DoDEA.  What is your current
16        job title?
17    A   I am currently principal of Sigonella Middle High
18        School.
19    Q   And your pay band?  You don't have to tell me your
20        salary.
21    A   I believe it's -- I believe it's step ten for the
22        pay band.
23    Q   And as a principal, what are your responsibilities?
24    A   Just about -- the pos- -- anything that involves
25        the positive functioning of a school, supervision
```

1    of teachers, supervision of children, logistics and

2    supply.  There's an unending list of

3    responsibilities.  My name is on the -- like, I

4    have pecuniary responsibility for every item that's

5    in the school.  I have -- you know, it's just --

6    it's really an incredible responsibility running a

7    school.

8  Q  Do you expect teachers to speak with students about

9    respecting one another in their workplace -- in

10   their personal space?  I'm sorry.  Let me reword

11   that.

12       Do you expect teachers to speak with students

13   about respecting one another in their personal

14   space -- in their personal space?

15 A  I expect teachers -- and I believe you can find

16   this in the performance elements -- to have a

17   respectful atmosphere in their classroom.  Do I

18   require them to have -- like each teacher could

19   have their own way of going about that, but the

20   expectation is to have a respectful environment in

21   their classroom.

22 Q  Have you ever had an issue where a teacher, you

23   know, touched a student, nonsexual, just touched a

24   student and the student was uncomfortable?

25 A  I have had that situation, yes.

```
 1   Q   And the student reported it to you?

 2   A   Yes, ma'am.

 3   Q   And how did you handle that?

 4   A   The teacher received appropriate actions for it.

 5       We have a part of the agency, which is called labor

 6       management employee relations.  We discussed the

 7       case, gave counsel to the teacher, and the -- the

 8       behavior changed in the -- in the teacher.  I would

 9       say there was resolution to the situation.

10   Q   As a principal, have you had to attend IEP,

11       individual education plan, meetings for students?

12   A   Yes, ma'am.

13   Q   About how many of these meetings do you attend in a

14       given year?

15   A   Oh, wow.  The years that I was there in Vilseck

16       High School, I would say that my assistant

17       principal, who was a special education teacher for

18       18 years, he handled most of them.  I can tell you

19       the year that he was detailed to Hohenfels, I had

20       to attend all of the IEP meetings.  So it varied

21       greatly.  Some years it would be -- maybe I went to

22       ten in a year, you know, that would be a light

23       year, but some I was going to one a week.  You

24       know, like, the year that he was detailed, I was

25       probably -- you know, minimum probably going to a
```

1       meeting a week, you know.  So it could have been 50

2       that year for all I -- you know, as far as an

3       estimation.

4  Q  So I imagine that you had students with a variety

5       of services on their IEP.  What are some -- you've

6       had -- have you had students with IEPs for anxiety,

7       ADHD, autism?

8  A  Yes, ma'am.

9  Q  Okay.  And some where, you know, a student didn't

10      want physical contact under certain circumstances?

11  A  Yes.

12  Q  Yes.  So -- so what are some of the recommendations

13      for a student with anxiety, ADHD, or autism and

14      they may not want physical contact with -- under

15      certain circumstances?  What were some of the

16      recommendations on their IEPs?  Can you recall?

17  A  I understand the question.  I'm trying to -- you

18      know, I take this oath, you know, deathly

19      seriously.  I'm trying to remember like words that

20      would be on an IEP, you know, which I don't think I

21      can recite, you know, words off of an IEP, you

22      know, for what were some of the recommendations for

23      a student that had autism that didn't like touch.

24      And I -- you know, I don't -- I don't want to

25      speculate what was on there.  I just -- I can't

```
 1        tell you verbatim what would have been some of the
 2        recommendations.
 3               What I would do is go to -- we have an autism
 4        expert in the community, Mel would have been step
 5        one, but we also have an ISS, an instructions
 6        system specialist, for autism who we would get the
 7        counsel from, and they would -- they would help us
 8        with the best situ- -- or the best suggestions.
 9        But, again, I can't -- I can't recall like word for
10        word what some of them were on an IEP at this
11        moment.  I apologize.
12   Q    As long as it wasn't a burden to the system and
13        school, the IEP would be followed; correct?
14   A    Absolutely, yes.
15   Q    So would you agree that teachers and administrators
16        must have some level of understanding of how to
17        communicate with a student who -- who would have
18        these conditions like anxiety, ADHD?
19               MS. FISCHER:  I'm objecting because it
20        misstates the previous testimony.  Earlier we were
21        discussing autism.
22               MS. SMITHSON:  No.  Earlier I mentioned ADHD,
23        autism and -- I mentioned -- in this order,
24        anxiety, ADHD, and autism.
25   Q    So teachers and -- I should add that.  Teachers and
```

```
 1        administrators must have some level of
 2        understanding of how to communicate with a student
 3        who has these conditions; is that correct,
 4        Mr. Villarreal?
 5   A    That they must have some level of --
 6   Q    Must have a level --
 7   A    -- expertise?
 8   Q    No.  Understanding of how to communicate with a
 9        student who has these conditions when it's
10        annotated on their IEP.
11   A    Well, by -- by definition, I mean, the IEP is
12        individualized educational plan.  Like, I think
13        everybody would know how to follow a plan and be
14        required to follow a plan.  Like, that's a legal
15        binding document.  Like -- I don't know if they --
16        well, yes, I -- yes, they would know how to follow
17        a plan, if that's answering your question.
18   Q    Okay.  In December 2019 -- you had mentioned that
19        we had many conversation -- thought provoking
20        conversations.  In December 2019, while you were at
21        my desk during one of my classes, did you share
22        with me that your subordinates, some of the
23        teachers within Vilseck High School, would be
24        disrespectful to you?
25   A    I do not recall.  It's possible.  I do not recall,
```

```
 1        Ms. Smithson.
 2    Q  But it's possible that you shared that with me?
 3    A  It's possible.
 4    Q  Did you tell me that I would be surprised at some
 5        of the things that has been -- have been said to
 6        you by some of your subordinates?
 7    A  It's possible.  I don't recall that conversation,
 8        but it's possible.
 9    Q  But it is possible?
10    A  Yeah.
11    Q  Did you ever report treatment that you had received
12        to your supervisor or anyone?
13    A  Like, did I -- did I go to my supervisor and say,
14        you know, the teachers are being disrespectful to
15        me?
16    Q  Yes, sir.
17    A  Right now, I can't think of one instance when I did
18        that.  I'm not going to say it never happened, but
19        it's not something that I did on a routine basis.
20    Q  Okay.
21    A  Sometimes I -- I could tell you I would think
22        sometimes, you know, if a teacher is angry,
23        sometimes it helps just to let them vent, to let
24        them express their anger, and sometimes -- you
25        know, perhaps -- I'm thinking in my head, you know,
```

```
 1        I am your supervisor, but, you know, sometimes if
 2        it's helpful to me, I don't mind.  I will just
 3        listen, you know, whether they are angry, whether
 4        curse words come out, whatever, you know, and if it
 5        helps the healing, if it helps the process, I'm
 6        okay with it and consider it a part of the job.  I
 7        didn't necessarily go to my supervisor about it as
 8        a complaint.  That was my way of handling certain
 9        situations.
10    Q   Have you ever seen me angry or very upset?
11    A   Upset?  I believe I have seen you upset.  Never --
12        I would never say out of control angry but upset,
13        definitely.
14    Q   But I have never been -- or have I ever been
15        disrespectful to you?
16    A   No, ma'am.
17    Q   Even when I was upset, have I been disrespectful to
18        you?
19    A   No, ma'am.
20    Q   Do you think it would have been appropriate for me
21        to be disrespectful to you if I was upset?
22    A   Do I think it would have been appropriate?
23    Q   For me to be disrespectful to you.
24    A   My personal philosophy, I -- I think everybody
25        should try to treat each other like they'd like to
```

```
 1    be treated.  Like, I don't think appropriate -- I
 2    don't think -- again, not you or anybody else would
 3    I judge a person, like, if they've had a horrible
 4    day and they told me, you know, this, this, this
 5    was wrong, but there -- there is -- there are
 6    boundaries, you know, the conduct that is
 7    unbecoming of a government employee.
 8         I have -- I have felt like people have been
 9    disrespectful, but I have never had anybody like
10    cross a line there.  I certainly would then go to
11    labor management employee relations and have a
12    conversation.  But do I think it would be
13    appropriate for you to be disrespectful?  No, no.
14    Did I answer your question?
15 Q  Yeah.  Yes, sir.
16 A  Okay.
17 Q  I think I asked you already.  Did you ever
18    reprimand anyone?  I'll ask again because I can't
19    remember if I -- this is getting to be kind of
20    like -- the hours now.
21         Did you ever reprimand the individuals that
22    spoke with you this way?  I may have asked you that
23    question already, though.
24 A  I don't believe I have.  I've never given a letter
25    of reprimand to anybody for being disrespectful to
```

1    me, no.

2   Q  Did this behavior of your subordinates influence

3     work environment?  If so, how?

4   A  Honestly, I'll just kind of repeat, you know.  I

5     don't -- I don't think so.  Like, if I let somebody

6     vent, it was -- it's always for the purpose of

7     trying to solve problems, and maybe I'm thinking in

8     my head, boy, that's not how I would answer or deal

9     with the problem, but, you know, I'm grateful that

10    they feel like they have an open line of

11    communication and are talking directly to me about

12    it.  So I don't -- I didn't ever see it as

13    completely completely unhealthy or

14    counterproductive if someone is voicing something

15    even in anger.

16   Q  So is it possible that any faculty member who was

17    present at Vilseck High School during the time that

18    you were principal could truthfully and accurately

19    testify that they witnessed your subordinates being

20    disrespectful or even harassing you?

21   A  Can you repeat the question?  I'm sorry.

22   Q  Is it possible that any faculty or staff member who

23    was present at Vilseck High School during the time

24    that you were principal could truthfully and

25    accurately testify that they actually witnessed

```
 1        your subordinates being disrespectful or even
 2        harassing you?  Because someone testified that
 3        they've witnessed that.
 4   A    I believe so.  Like, I believe -- harassment, no.
 5        I don't believe to the level of harassment.  Have
 6        other people witnessed people being disrespectful
 7        to me?  Yes.
 8   Q    About how many times did that happen?
 9   A    Ms. Smithson, I have no idea.  Not -- not frequent.
10        But I -- but it has happened.
11   Q    How often did our entire faculty meet?
12   A    Scheduled meetings were once a month.  There would
13        be -- so that's the minimum.  I would think we
14        would have a few more meetings than the eight or
15        nine scheduled faculty meetings.  There might be
16        additional, but, you know, I would probably say
17        probably a dozen times a year.  I don't think too
18        much more than that.
19   Q    Have you ever spoken with the faculty during a
20        meeting -- the whole faculty about respecting
21        personal space, boundaries, or just having overall
22        respect for their colleagues?  If so, which meeting
23        was that?
24   A    I do believe we've spoken about respect.  We have
25        annual trainings about respect.  We had guest
```

```
 1        speakers about respect.  We had team building
 2        activities.  I have highlighted the Center For
 3        Conflict Resolution, the CEDR program, to faculty
 4        but which -- which meeting, I could not tell you
 5        like on what given date.  I just couldn't recall.
 6    Q   Do you remember specifically speaking with us, the
 7        faculty -- because I was at every faculty meeting,
 8        I believe.  Do you remember speaking with us about
 9        respecting personal space?
10    A   I do believe so, Ms. Smithson, I do believe so.
11    Q   But you're not sure?
12    A   I can't say with 100 percent certainty, but I do
13        believe so.
14    Q   How could addressing the -- that would be -- never
15        mind.  No, no.  How could addressing the whole
16        faculty during a meeting help the work environment?
17    A   With most things, you know, including classroom
18        management and teaching, like, I -- not only just
19        philosophy, like, I -- I think looking to building
20        a positive culture is like the best way towards --
21        towards working towards the complete respectful
22        environment.  If boundaries need to be set or
23        established, like, that can be mentioned.  You
24        know, that -- that certainly sometimes has to be --
25        has to happen.  I'm not sure I answered your
```

```
 1        question.   What was the question?
 2   Q    It was just how could addressing the whole -- the
 3        faculty as a whole during a meeting help the work
 4        environment.   That's fine.   You're fine.   Thank
 5        you.
 6              Considering the number of times that I
 7        complained to you about my personal space being
 8        violated and my instruction with students being
 9        interrupted and the effect that it had on my
10        concentration due to my ADHD and anxiety, wouldn't
11        it have been a good idea to have this discussion,
12        not personally about me, but in a whole group just
13        to say that you addressed the issue of
14        interruptions on some level?
15   A    The level of interruptions that -- I mean, that's a
16        different issue, and that we discussed at faculty
17        meetings at multiple times.   I answered -- also,
18        you know, that -- that conversation has been a part
19        of union conversations.   I gave specific training
20        to our -- our front office staff about that.   We --
21        we have done everything that we could to minimize
22        interruptions, but they're never -- it's never
23        possible to absolutely run a school without
24        interruptions.   It's just -- it's impossible.
25        Sometimes parents need their kid in the middle of a
```

```
 1        class.  Sometimes emergencies happen.  Those things
 2        happen.  But we did train our front office staff,
 3        if possible, please call in the last couple minutes
 4        of class or right at the beginning if it's not
 5        something that has to happen at the beginning or if
 6        they can be called at lunch, do that.  We -- those
 7        are -- those are conversations that we had with the
 8        -- with the whole faculty in faculty meetings, and
 9        I do recall getting feedback from many teachers on
10        that.
11   Q    Do you recall having that conver- -- well, you
12        already said that you -- do you recall which
13        meetings?
14   A    No.  Like, on -- on what -- which given date and
15        which year, absolutely not.  But that would --
16        that's on more than one occasion.  From more than
17        one source we got -- it has happened here at this
18        school.  It's a very common complaint from
19        teachers, and I'm very sympathetic.  I was a
20        teacher for 14 years before going into
21        administration.  It's very frustrating when you're
22        in the middle of a conversation -- like you, I was
23        a science teacher.  If you're in the -- in the
24        middle of something, it can be frustrating if
25        you've got a demonstration going on but -- but
```

```
 1        sometimes it's just unavoidable.

 2            And I'm now on the other side, you know,

 3        working from the office.  There are times when

 4        something else might -- might trump the need to

 5        keep that constant education -- or the constant

 6        flow of instruction, which is regrettable.  In a

 7        perfect universe, there would be zero interruption

 8        during instruction.

 9   Q    All right.  The disrespect that -- well, no.  You

10        already answered that one.  I'm just kind of

11        jumping around.  So be patient with me for a

12        minute.

13            The disrespect that you received from your

14        subordinates, could this have had an effect --

15        could this have affected the way you handled things

16        when some of the same individuals harassed me?

17   A    Can you -- can you repeat the question -- or go

18        ahead.  I'm sorry.

19            MS. FISCHER:  I was just going to say

20        objection.  Confusing and -- yeah.  Could you

21        repeat the question?

22   Q    The disrespect that you received from your

23        subordinates, my colleagues, could this have had an

24        effect on the way you handled my situations that I

25        spoke with you about, my har- -- the harassment
```

```
 1        that they had given me?
 2            MS. FISCHER:  So I'm going to object.  Lack of
 3        foundation because I don't think we established
 4        that the individuals who disrespected
 5        Mr. Villarreal were the same that were involved in
 6        your allegations, but you can answer if you know,
 7        Mr. Villarreal.
 8    Q   And I'm speaking on just the work atmosphere point
 9        without even mentioning individuals.
10    A   And I'll tell you, some of the examples that I was
11        thinking of predated my time at Vilseck High
12        School.  I wasn't even necessarily thinking of some
13        of the same people but -- I mean, I don't think
14        there's -- there's hardly an action that doesn't
15        influence how you interact with people in the
16        future.  Like, I like to try and learn and grow
17        from interactions, but I would like to think it
18        would be only in a positive way that, you know, oh,
19        people deserve respect, like to be treated with
20        respect.  So I -- I don't know if I've answered
21        your question, Ms. Smithson.
22    Q   Do you think that everyone handles the same
23        situation differently -- people may handle the same
24        situation differently?
25    A   I think most people handle things quite
```

```
 1      differently.  So I don't assume that most people
 2      have -- like, I feel like I'm a fairly patient
 3      person.  I think there are people much more
 4      patient.  I don't know if patience is the right
 5      word.  Tolerant of some things.  I've known people
 6      -- for example, if -- if -- if someone you're
 7      working with is raising their voice, as I was
 8      saying before, to me, I might not feel threatened
 9      by that, and I would rather just hear them out, but
10      I've seen other people who've walked out of rooms
11      or walked out of conversations in that situation.
12      I think that there's a whole spectrum of how people
13      handle stressful situations.  And, again, I think
14      I'm on the more tolerant side, but I don't expect
15      everyone else to handle it like I do, if that makes
16      sense.
17   Q  So did you feel that I had already complained
18      enough when I filed the first EEOC in --
19   A  I like to live in a perfect universe.  Like, I feel
20      like you've had enough before you filed your first
21      EEO.  I don't think anyone deserves to be treated
22      with disrespect.  I wish you never felt
23      disrespected in a work environment.
24   Q  You told me this before, but for the record, you --
25      you could see what I was explaining to you; is that
```

```
 1     correct?

 2         MS. FISCHER:  Objection; vague.

 3   Q  You could see the disrespect and the harassment and

 4     the -- that I was experiencing, couldn't you?

 5   A  Can you repeat the question one more time?

 6   Q  Could you see -- could you see -- could you observe

 7     and see what I was complaining about?  Did you see

 8     that I was being harassed and disrespected?

 9         MS. FISCHER:  So I'm going to object because

10     it calls for a legal conclusion, and I'm going to

11     object because it's vague and ambiguous, but you

12     can answer.

13   Q  And it's not a legal conclusion if you actually

14     observed it.

15   A  I guess the answer that I was formulating in my

16     head -- and I still don't know if I completely

17     thought -- to me, if someone has a complaint, it's

18     legitimate.  Like, I am going to try and address

19     it.  Like, if someone says they feel harassed,

20     like, I want to try and do -- whether it meets the

21     threshold, like, it's -- it's empathy.  It's --

22     it's not saying -- it's not necessarily saying that

23     anybody else did anything wrong or maybe they did,

24     but it is just saying, like, okay, this was

25     troublesome or problematic for someone, and I -- I
```

```
 1       guess that's what I would say as my response.
 2   Q   Were you exhausted by the complaints or overwhelmed
 3       by all of the complaints that I had?
 4   A   I considered the complaints a part of my job -- a
 5       very important part of my job.
 6   Q   Did you feel that I should be able to tolerate the
 7       disrespect if you could tolerate the disrespect?
 8   A   That's what I think I was saying before,
 9       Ms. Smithson.  No, I don't necessarily think
10       anybody else -- in fact, sometimes I think that's
11       part of my position, but no, I don't feel like
12       anybody else should have to, no.
13   Q   Thinking back, what could you have done differently
14       to remedy the hostile work environment that I was
15       experiencing?
16           MS. FISCHER:  Objection.  Assumes facts not in
17       evidence.  You can answer.
18   A   I guess I would need the question repeated again.
19   Q   Thinking back, what could you have done differently
20       to remedy the hostile work environment that I was
21       experiencing?
22           MS. FISCHER:  And, again, I'm going to object
23       because it assumes facts not in evidence and also
24       for lack of foundation, but you can answer.
25           MS. SMITHSON:  I'm going to -- I'll repeat it
```

```
 1        again, and Ms. Fischer, I'm just repeating because
 2        he asked me to.
 3             MS. FISCHER:  Right.  And I'm going to -- I
 4        have to repeat my objections for the record, so I
 5        will do that also.
 6   Q    Okay.  Mr. Villarreal, do you understand the
 7        question?
 8   A    I honestly would have to think back to the
 9        different situations.  I mean, you, yourself, said
10        that there were quite a number of complaints.  I
11        would have to think about each one and really give
12        some pensible -- pensive thought on what could be
13        done differently.  I don't really -- at the moment,
14        I can't think of something -- not that I think
15        everything was handled perfectly, but, you know, I
16        can't think of something right now that -- or a
17        different solution.  So I just -- I don't really
18        have a cohesive answer to your question.
19   Q    I'm going to switch gears just a little bit.  When
20        DoDEA put out the applications for the virtual
21        school, how many teachers at Vilseck High School
22        applied for a detailed teaching position at the
23        virtual school due to COVID-19?
24   A    I honestly don't remember, Ms. Smithson.  I don't.
25        It wasn't -- it was a small percentage.  It wasn't
```

```
 1        an overwhelming percentage from the school, but I
 2        don't remember how many.  I don't.
 3   Q    More than three obviously because -- at least three
 4        because two -- three of us were in the virtual
 5        school.  Do you think there were like a few more
 6        than three?
 7   A    Again, honestly, I don't remember, Ms. Smithson.  I
 8        really don't.
 9   Q    Who is Michelle Wolff?
10   A    She was the administrative officer when I was
11        working there at Vilseck High School for the last,
12        I want to say, three years because my first year
13        there it was Arnell Valenzuela, and then after that
14        was Mr. Collie, and I was there five years.  I
15        think she was there -- I think we worked
16        approximately three school years together.
17   Q    And what was her position, her job?
18   A    The administrative officer, it's got a pretty broad
19        range of responsibilities.  She was shared between
20        two schools, between Vilseck Elementary and Vilseck
21        High School, but I'd say primarily her
22        responsibility lies within the facilities or
23        drills, safety, security, those -- that general --
24   Q    So would she need to be contacted before a system
25        as large as the hydroponic system that I wanted
```

```
 1        moved to another class, she would need to be --
 2        from one class to another, would she need to be
 3        contacted before a system like that of that size
 4        would be moved?
 5     A  She's -- she's absolutely the person that I would
 6        go to because, again, I'm not the facilities
 7        person.  The person that usually -- not person.
 8        The agency that would usually do that installation
 9        would be our subcontracted maintenance group, which
10        would be SKE, but me, I would -- I would consult
11        with the AO and say, hey, we would like to have
12        this moved.  Can you get with SKE and see if this
13        is a possibility?  So that's -- that's kind of how
14        it would flow.
15     Q  So I couldn't just pick up the system and move
16        it -- move it myself?
17     A  I don't know.  The -- we did have a recommendation
18        for -- for that because we did look into that, that
19        the hydroponic system, which gets filled with
20        water, and when it was looked into, it was told
21        that that -- for safety -- and this would be in her
22        lane totally, because it could fall over, it should
23        be anchored to a wall.  So that's not something
24        that I would -- maybe the way it was when it was
25        empty, you could pick it up and move it.  You know,
```

```
 1        I don't know.  I haven't tried.  I don't -- I don't
 2        -- I don't know how heavy.  But -- but we were told
 3        like that should be anchored to a wall.  Does that
 4        answer your question?
 5   Q  Yes, sir.
 6   A  Okay.
 7   Q  Do you agree that my classroom, if you remember,
 8        A212, my former class, was unsafe for the system to
 9        be set up?
10   A  I remember being told that where you had requested
11        that it be put -- and I don't -- I don't have
12        schematics what's behind the wall or whatever, but
13        I remember being told that it could not be anchored
14        to the wall that you wanted it at or where you
15        wanted it put.
16   Q  So do you think that I requested for it to be
17        placed there?
18   A  I believe -- I believed you did, yeah.
19   Q  Okay.  So I'm going to -- let's go to exhibit --
20        gee whiz.  For some reason, I don't think it
21        attached.  And that's fine.  For some reason, I
22        don't think that it attached.
23            So -- is it your belief that I requested for
24        it to be put in A212?
25   A  Ms. Smithson, it's been a couple years since I've
```

```
 1      been in the building -- or more than a year since
 2      I've been in the building.  I don't remember the
 3      classroom numbers at all.  Was that the classroom
 4      that you used for the years that I was there?
 5   Q  Yes, sir, I was in A212.
 6   A  I -- it was my understanding, I thought you were
 7      requesting, or at least my memory is that you had
 8      it requested to be put in your classroom.
 9   Q  Okay.  What about my classroom made it unsafe to
10      place the system?
11   A  And, again, this is the best of my memory.  It was
12      -- I believe I was being told that it couldn't be
13      anchored to a wall.  I believe that was the
14      problem.  I don't remember the specific details.  I
15      do remember us being told by our subcontractors
16      that it could not be safely installed in the
17      classroom.
18   Q  Who -- and who was responsible for making sure that
19      the classroom is safe?
20   A  Like the -- the administrative officer certainly
21      helps with that.  Ultimately, as the principal of
22      the high school, I have the ultimate responsibility
23      of that for everyone but -- but as far as, again,
24      facilities that -- that AO is the person that I
25      would go to, and they have people in our agency
```

```
 1       also that work with safety and security that --
 2       that help with inspections.
 3    Q  Would you say that the classroom teacher is also
 4       responsible for safety in the class?
 5    A  Absolutely.
 6    Q  What could happen if after the hydroponic system
 7       was set up in A212, in my classroom, if it was set
 8       up and an accidental or electrical shocking of a
 9       student or student tripped over the system, who
10       would be responsible for that?
11    A  Ultimately -- again, ultimately, I would feel
12       responsible myself as the principal of the school,
13       but honestly, it's not about -- my mindset is not
14       about, you know, who is going to be responsible.
15       It's like let's keep everybody safe.
16    Q  True.  Would the classroom teacher be responsible
17       for that as well, though?
18    A  Again, you know, I -- you know, I would -- I'm more
19       concerned with preventing accidents than like
20       looking who would be to blame if there was a
21       catastrophe.
22    Q  I definitely agree.  But for the purpose of the
23       questioning, I'm just asking who would be
24       responsible, and I understand for sure what you're
25       saying about --
```

```
 1   A   I would absolutely have to consult legal on that.
 2       I don't know if teachers could be held liable.
 3       Probably so.  I don't know.  I know I would feel
 4       morally liable and probably legally liable if -- if
 5       a student was hurt.  I just -- I feel like all of
 6       us have this obligation to keep -- keep students
 7       and, to me, teachers safe, too.
 8   Q   Why was the hydroponic system not able to be used
 9       in the place that it was originally set up?
10   A   I believe the place that it was originally set up
11       became Ms. Wolff's office.  That it was -- when --
12       that -- that was, I believe, part of a grant -- if
13       I remember -- and this is getting foggier every
14       year that we're gone.  Like, I believe that was
15       part of one of those grants, and I believe it was
16       for Ms. Holt, and it was originally going to be put
17       in the room that became Ms. Holt -- Ms. --
18       Ms. Wolff's office, which was vacant at the time,
19       and we, I think, grew in faculty.  I don't remember
20       the whole situation, but then we moved it across
21       the hall, which then -- because I think the bus
22       office was up there at the time on that floor.
23       There was -- and then eventually -- is it Mflc?
24       It's ASACS counselor, Ms. Franklin, it was -- it
25       was stored in her room.  It was put over there but
```

1    never connected.  Apart from where it was

2    originally set up, it never got reconnected, to the

3    best of my knowledge.

4  Q  Why was Ms. Holt's former classroom not made

5    available for me to place the hydroponic system?

6  A  It never was in her classroom, to the best of my

7    knowledge.  What -- like, I -- I believe, again,

8    the plan was for it to go where Ms. -- Ms. Wolff's

9    office was.

10  Q  Again, I -- so the question was, why was Ms. Holt's

11    former classroom, her classroom before, her old

12    classroom, not made available?  It was empty.  So

13    -- and I was trying to get the system placed into

14    that old classroom, but I was told that it could

15    not go in there.  So why was that classroom that

16    was not being used not made available for me to

17    place the hydroponic system?

18  A  I don't know why it was -- you were told that it

19    couldn't go in there.  It could be the same reason

20    it couldn't go on your wall.  Like, I don't know if

21    -- if they were told structurally like it can't go

22    on any of the walls.  This is all conjecture.  So I

23    don't -- but, you know, I -- I don't know why you

24    were told that it couldn't go in that room.  But --

25    yeah.  I -- I don't know.  It's conjecture.

1   Q   Did Ms. Wolff consult with you about moving the
2       hydroponic system to Ms. Holt's old room?
3   A   Ms. Smithson, I just don't recall.  I really don't.
4   Q   Did Ms. Holt ever attempt to -- I'm assuming she
5       spoke with you before she was reassigned.  Did
6       Ms. Holt ever attempt to find a way that she could
7       possibly remain at Vilseck High School?
8   A   To the best of my knowledge -- I just -- I don't
9       remember, but best of my knowledge, no, but I -- I
10      can't say I remember every conversation with
11      Ms. Holt ever, but to the best of my knowledge, no.
12  Q   Are you aware that Ms. Wolff interrupted my class
13      for -- to discuss the hydroponic system?
14  A   Ms. Smithson, that may have been one of the
15      complaints that you made.  I don't recall
16      specifically.  I believe she interrupted you.  I
17      don't remember if it was to have a conversation
18      about the hydroponic system.  I don't -- I don't
19      remember that specific -- the complaint.
20  Q   Do -- did I complain to you about Ms. Wolff coming
21      behind my desk and placing her hip against my
22      shoulder?
23  A   I do remember that specifically, about her coming
24      behind your desk, yes.
25  Q   And placing her hip against my shoulder while she

```
 1        was talking to --
 2    A   I honestly didn't -- didn't remember that detail,
 3        but I do remember you talking to me about her going
 4        behind your desk 100 percent.
 5    Q   Would it -- was it appropriate for Ms. Wolff to
 6        walk into my personal space?
 7    A   It would be inappropriate 100 percent for her to do
 8        it twice if she's been told not to.  Like, there
 9        are some people that it might not be problematic
10        that would say come look at my computer screen or
11        whatever.  So, you know, would -- would that fall
12        into the range of -- where someone walked behind
13        someone's desk that I should be contacting LMER?
14        No.  But if -- if conversations have later been
15        had, then it would become inappropriate.
16    Q   Is it inappropriate for Ms. Wolff to stand with her
17        hip against my shoulder in any situation other than
18        me saying stand here with your hip against my
19        shoulder?
20    A   Inappropriate is such a term -- I don't know.  I
21        would be uncomfortable if someone was doing that to
22        me.  People come from different backgrounds all
23        across the world.  Like, some -- some people might
24        not have the same boundaries.  Again, I don't know
25        that there was any ill meaning on her part.  I --
```

1    you know, it's -- it is something certainly --

2    like, if -- if she had done that, maybe she didn't

3    notice.  I don't need to -- I don't want to excuse

4    any behavior that's -- that's not appropriate, but

5    if -- I don't know that she did it in any way

6    thinking she would make you uncomfortable.  I would

7    hope quite the opposite.  But I can agree -- like,

8    I would be uncomfortable if someone was making

9    physical contact with me.  I think I would say

10   something to a person if they -- if they were like

11   making contact with me.  I would -- yeah.  I don't

12   know.  Did that answer your question?

13 Q Was it appropriate for Ms. Wolff to pat me on my

14   shoulder after I asked her to leave because I was

15   instructing my class?

16 A Again -- and I'm kind of thinking of words -- like,

17   appropriate is a very -- it can be a term that --

18   that -- if you're saying something is

19   inappropriate, like, that can be actionable in my

20   line of work.  Patting on the shoulder is something

21   that I see routinely, you know, and I can't say

22   that every pat on the shoulder is inappropriate.

23   You know, I -- so -- but I don't necessarily -- I

24   don't want to diminish.  Like, if you did not

25   appreciate that contact, that it shouldn't have

```
 1        happened.
 2   Q  In the years that we've known one another, have I
 3        ever -- have you known me to be like a hugger or --
 4        you know, do you see me hugging people all the time
 5        or have I hugged you or, you know, been touchy
 6        feely?
 7   A  No, ma'am.  And I -- in that much, I can empathize.
 8        I am also -- I have I feel like a pretty big
 9        personal space bubble.
10   Q  Do you think that is important for people to
11        respect that, especially in a professional
12        environment?
13   A  I absolutely think it is important for people to
14        respect that.
15   Q  We're going to switch gears again.  In August 2019,
16        you asked me to mentor a long-term substitute named
17        Payson Snowden.  Do you remember?
18   A  I remember Ms. Snowden.
19   Q  Did you have confidence that once you asked me to
20        assist Ms. Snowden that I would share everything
21        that I had access to with her?
22   A  Can you repeat the question?
23   Q  Did you have confidence -- do you remember asking
24        me to mentor or to assist Ms. Snowden as a new
25        teacher?
```

```
 1   A   I guess to completely answer the question honestly,
 2       I don't remember that -- that exact conversation.
 3       I don't remember saying on August whatever date,
 4       Tamica, will you please help -- you know, I don't
 5       remember that conversation.  I believe that
 6       happened.  I -- I am sure at that time where we
 7       were short teachers, we have a long-term sub, you
 8       know, filling in for biology, I think I was seeking
 9       help from everybody that could possibly help, if
10       that makes sense, but the individual conversation,
11       no, I don't recall it.
12   Q   Okay.  So did you have confidence that I would help
13       Ms. Snowden and give her access to everything that
14       I had access to?
15   A   I did have confidence in you and the whole science
16       department that you would all help Ms. Snowden,
17       absolutely.
18   Q   How long after that did Ms. -- well, how long after
19       that did Ms. Snowden ask for another mentor other
20       than me?
21   A   I don't know that Ms. Smithson -- or Snowden asked
22       for another mentor.  I don't recall those
23       conversations.  I don't.
24   Q   So you don't recall Ms. Snowden asking you to find
25       someone else to help her with the biology
```

1      curriculum?

2    A  I don't remember that.  I believe, Ms. Smithson,

3      the first person that I went to before you -- I

4      think the first person that I go to is the -- the

5      ISS, who would have been Ms. Schiele, you know, and

6      -- and then, of course, locally, and I

7      think Ms. Holt had been gone at that point.  I

8      don't recall.  I'm sure I asked yourself,

9      Ms. Corrigan, anybody else teaching biology, but I

10     don't remember her coming to me or talking about

11     switching, and I -- I certainly never assigned only

12     one person as a mentor.  It was just all hands on

13     deck, let's help out the substitute.

14   Q  So you don't remember Ms. Snowden coming to you and

15     asking for another mentor?

16   A  I don't.  I don't -- I don't recall that

17     conversation.

18   Q  Did you know that Ms. Holt was mentoring

19     Ms. Snowden?

20   A  Again -- and I think I just said this.  I couldn't

21     even remember at this moment in time if Ms. Snowden

22     -- or if Ms. Holt was still on staff or not that

23     year.  I am sure I just talked to everybody in the

24     department about making sure that she got off to a

25     strong start because we were short a teacher.

1   Q   So you -- I'm so sorry.

2   A   No.  I just -- I don't remember.  Honestly, I just

3       don't remember who, you know, specifically.

4   Q   But you would remember if you called Ms. Holt and

5       asked her to assist; right?  You don't think that

6       you called Ms. Holt or do you think that --

7           MS. FISCHER:  Objection.  Mischaracterizes the

8       testimony, but you can answer.

9           MS. SMITHSON:  Okay.  I'll rephrase that.

10  Q   Did you call Ms. Holt and ask her to help

11      Ms. Snowden?

12  A   I'm telling you, I don't even remember if she was

13      still working at the school.  I don't remember

14      having a conversation with her at all.  I don't,

15      no.

16  Q   So I will tell you that Ms. Holt was at -- in

17      Ramstein at the time.  So she was not at the

18      school, that's right.  You can't recall.

19  A   That's what I said.  I don't -- I don't -- I didn't

20      think she was still in our building.  Did I call

21      Ramstein High School to have her help?  I think I

22      would remember that.  No, I did not do that.

23  Q   Thank you.  Do you think it's possible that

24      Mr. Rodman called Ramstein High School?

25  A   I do not think that's impossible.  I don't think

| 1 | | that's inappropriate.  Like, if I knew a teacher -- |
|---|---|---|
| 2 | | because now I'm in a school -- a much smaller |
| 3 | | school.  Like, if I -- I would contact a school at |
| 4 | | Naples or Ankara or another school.  Like, I -- you |
| 5 | | know, if you -- if you know somebody that can -- |
| 6 | | can teach parallel, like absolutely I think that |
| 7 | | can happen.  I don't think there's -- there's |
| 8 | | anything wrong with that situation. |
| 9 | Q | But you definitely did not call? |
| 10 | A | I will just say I do not recall contacting Ms. Holt |
| 11 | | at all. |
| 12 | Q | In Ramstein? |
| 13 | A | At Ramstein.  Zero memory of that conversation at |
| 14 | | all.  I do not believe it happened. |
| 15 | Q | Did you know that -- so -- so -- so I have to ask. |
| 16 | | So did you -- so do you realize -- or did you |
| 17 | | realize that Ms. Holt ended up mentoring |
| 18 | | Ms. Snowden from Ramstein and Ms. Snowden |
| 19 | | discontinued her meetings with me? |
| 20 | A | If I ever knew that, I certainly don't remember it |
| 21 | | now.  I don't think I ever was aware that Ms. Holt |
| 22 | | was working with Ms. Snowden.  I just -- I don't |
| 23 | | recall, Ms. Smithson.  I don't recall. |
| 24 | Q | You were aware that I had not received materials |
| 25 | | for the curriculum that year, correct, the new |

```
1        biology curriculum?

2   A    I vaguely remember the biology materials coming

3        much later than the other materials that -- that

4        school year.

5   Q    Do you know if other schools experienced the same?

6   A    I believe -- and, again, this is -- this is memory

7        from -- I don't remember what year this is, but,

8        you know, this is three to four years ago.

9   Q    2019.

10  A    Yeah.  Three years ago.  I believe the same

11       situation was Europe wide or Germany wide.  I

12       believe that the biology materials hadn't arrived,

13       but I -- I don't know that with certainty.  I don't

14       recall.

15  Q    What individual was responsible for setting science

16       teachers up with the proper information for

17       students to be logged into their accounts?

18  A    Did -- I believe that information came through the

19       science ISS.  I'm not 100 percent sure on that.  I

20       believe it was Ms. Schiele.

21  Q    Can you repeat that?  Ms.?

22  A    Ms. Schiele.  I believe that is the person that's

23       responsible.  I'm not 100 percent certain on my

24       memory on that.

25  Q    Where is Ms. Schiele located?
```

```
 1    A   I believe her office is in the Kaiserslautern
 2        Ramstein area, the district office.
 3    Q   How close is Kaiserslautern and Ramstein?
 4    A   I couldn't give you a kilometer response.  I know
 5        that Google maps would tell you three to four
 6        hours.  I've driven it and it takes seven.  You
 7        know, it's -- it's -- you know, it's -- just
 8        depending on traffic.
 9    Q   I'm sorry.  I think you misunderstood my question.
10        I said how far -- if I said it this way, how far is
11        Kaiserslautern from Ramstein?
12    A   Oh, Kaiserslautern from Ramstein.  I believe
13        they're close.  Yeah, that's probably -- I probably
14        misunderstood the question.  I think -- that's all
15        considered commuting distance.  Like, I think they
16        are -- they are in the same area.
17    Q   And -- and they're in the same district as well;
18        correct?
19    A   Well, now Germany is one district.  Like, it's all
20        the same district.
21    Q   When we were divided, though, Kaiserslautern and
22        Ramstein?
23    A   They were the same district, and we were Bavaria.
24    Q   Exactly.  Thank you.  So Ms. Schiele and Ms. Holt
25        are close -- very close in location to one another.
```

```
 1      They're basically in the same complex.
 2   A  Close is a relative term, but relatively close,
 3      yes, compared -- compared to Vilseck, they are --
 4      they are much closer together than Vilseck and
 5      Ramstein or Vilseck and Kaiserslautern, yes,
 6      proximity.
 7   Q  Was Ms. Holt, who is in Ramstein four hours away
 8      was able to provide Ms. Snowden with materials that
 9      I did not have?  Why did -- why were those
10      materials not shared with me as well?
11          MS. FISCHER:  Objection.  Lack of foundation.
12   Q  How many teachers at Vilseck High School were
13      teaching biology at the time?
14   A  I do not recall.  I would guess about three.  It
15      wasn't ten.  It wasn't one.  My guess would be
16      three, but I don't -- I don't recall specifically.
17   Q  Okay.  I'm going to move on because I don't think
18      that you have the information that -- so even if
19      you did not have the information -- for the record,
20      I'm still going to ask you these questions just so
21      that we have it on record.
22          Did you know that while Ms. Snowden was
23      working with Ms. Holt, who was stationed in
24      Ramstein, that I continued to gather information to
25      share with Ms. Snowden because I didn't realize she
```

1  was working with Ms. Holt?  Did you realize that?

2 A I am not aware of any of that.

3 Q Was Ms. Snowden also working with Ms. Pam Conners

4  in the math department at the time?

5 A I would honestly have to say I do not recall.

6  Probably.  Most of our teachers taught more than

7  one subject.  Maybe she was doing biology, algebra.

8  I just -- I can't recall again three years ago the

9  schedule what a sub was teaching.  I do not recall.

10 Q Okay.  For the record is this the same

11  Ms. Conners -- Pam Conners that I filed charges

12  against in 2018?

13 A If it was working with her, it's the Pam Conners

14  who was the math department chair.

15 Q And is it the same Pam Conners that I filed charges

16  against in 2018?

17 A That would be the same person, yes.

18 Q Is it the same Pam Conners that slammed my hand

19  between two metal doors in 2018?

20   MS. FISCHER:  Objection.  Lack of foundation.

21 Q Mr. Villarreal, you were present that day when the

22  incident happened.  Is it the same Pam Conners that

23  slammed my hand between two metal doors in 2018

24  that you're thinking of?

25   MS. FISCHER:  Objection.  Lack of foundation.

1  Q  Mr. Villarreal, that doesn't mean that you can't

2     answer the question.  Are you still here,

3     Mr. Villarreal?

4  A  I am still here.

5  Q  I'm sorry.  Can you please answer the question?  Is

6     Pam Conners the person who I filed charges against

7     in 2018 for slamming my hand between two metal

8     doors?

9  A  Pam Conners is the person you filed the charges

10     against, yes.

11  Q  Is Pam Conners the same person that I believed

12     deliberately bumped into me after a fire drill in

13     2018?

14        MS. FISCHER:  Objection.  Lack of foundation.

15  Q  Again, Mr. Villarreal, that doesn't mean that you

16     can't answer the question.

17  A  Is that the person who you believed bumped into

18     you?

19  Q  Uh-huh.

20  A  I believe that's the same person.

21  Q  Is that the person who I believe deliberately

22     bumped into me?

23  A  Who you said you believed deliberately.

24  Q  Yes or no.  I'm sorry.

25  A  Yes, ma'am.

```
 1   Q   Are Ms. Conners and Ms. Holt friends outside of
 2       work?
 3            MS. FISCHER:  Objection.  Calls for
 4       speculation.
 5   Q   Mr. Villarreal, have you ever seen Ms. Conners and
 6       Ms. Holt together outside of work having dinner at
 7       a restaurant, shopping?
 8   A   To the best of my memory, I don't remember seeing
 9       them together ever.  I do not recall.
10   Q   Ms. Snowden was a new science teacher.  How old was
11       Ms. Snowden about?  Do you remember about what her
12       age was?
13   A   I honestly do not recall.  If I had to guess, I
14       would say 30'ish, less -- probably less, but I --
15       you know, I -- I don't know.
16   Q   Has Ms. Snowden placed an application with DoDEA
17       for a science position or any type of position as a
18       teacher that you know of?
19   A   To my knowledge, I -- I don't know.
20   Q   Okay.
21   A   I have not seen her name on a referral list for my
22       school.
23   Q   That was going to be my next question.  Did she --
24       did Ms. Snowden use your name as a reference?
25   A   That, I don't recall, like, if she used me as a
```

 1         reference.  She --

 2    Q  What is Ms. Snowden's race?

 3    A  Caucasian.

 4    Q  Ms. Snowden expressed very high regards for

 5         Ms. Holt in writing.  Is it possible that Ms. Holt

 6         and Ms. Conners could have greatly influenced her?

 7              MS. FISCHER:  Objection.  Calls for

 8         speculation, and it -- objection.  Hypothetical

 9         question.

10    Q  Mr. Villarreal, are you aware of the DoDEA guidance

11         on harassment in the workplace?

12    A  I am aware we have guidance on harassment in the

13         workplace, yes, ma'am.

14    Q  Uh-huh.  And this is my last question.  Can you

15         tell me a little bit about what you remember on

16         DoDEA guidance?  What is DoDEA's guidance on

17         harassment in the work environment?

18    A  I honestly don't like quoting anything without

19         pulling up the reg myself.  I just don't like

20         misquoting anything.  So I would prefer to have the

21         document in front of me before I cite anything

22         especially with something that says like DoDEA

23         letterhead on it.  Like, I don't want to start

24         citing something from memory that I don't have

25         memorized.

1    Q   I understand.

2            MS. SMITHSON:  Thank you very much,

3    Mr. Villarreal.  This concludes my deposition for

4    you today.

5            THE WITNESS:  Thank you, Ms. Smithson.

6            THE REPORTER:  This concludes the deposition

7    of Marc Villarreal.

8            Will counsel please state if they would like a

9    copy of the transcript, any stipulations, or other

10   matters to be included in the record?

11           MS. SMITHSON:  Yes, ma'am, I would like a

12   copy.

13           MS. FISCHER:  I would like a copy of the

14   transcript as well.

15           (The deposition concluded at 10:28.)

16

17

18

19

20

21

22

23

24

25

```
 1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF INDIANA
 2                 INDIANAPOLIS DIVISION

 3
    TAMICA J. SMITHSON,              )
 4                                   )
                 Plaintiff,          )
 5                                   )
            -v-                      )        Case No.
 6                                   )   1:21-CV-02193-JRS-MPB
    LLOYD AUSTIN III,                )
 7  Secretary, Department of         )
    Defense,                         )
 8                                   )
                 Defendant.
 9

10
                    Job No. 174902
11

12
            The deposition of MARC VILLARREAL, taken in
13  the above-captioned matter, on August 26, 2022, and at
    the time and place set out on the title page hereof.
14          It was requested that the deposition be
    transcribed by the reporter and that same be reduced
15  to typewritten form.
            It was agreed that the reading and signature
16  by the deponent to the deposition were waived on
    behalf of the parties Plaintiff and Defendant by their
17  respective counsel, the witness being present and
    consenting thereto, and/or pursuant to the Fed. R.
18  Civ. P. 30(e), the deposition to be read with the same
    force and effect as if signed by said deponent.
19

20

21

22

23           STEWART RICHARDSON & ASSOCIATES
             Registered Professional Reporters
24            One Indiana Square, Suite 2425
                Indianapolis, IN  46204
25                  (800) 869-0873
```

```
 1  STATE OF INDIANA         )
                             )
 2  COUNTY OF VANDERBURGH    )

 3

 4          I, Elizabeth Taylor Culiver, RPR, a Notary

 5  Public in and for said county and state, do hereby

 6  certify that the deponent herein was by me first duly

 7  sworn to tell the truth, the whole truth, and nothing

 8  but the truth in the aforementioned matter;

 9          That the foregoing deposition was taken on

10  behalf of the Plaintiff; that said deposition was

11  taken at the time and place heretofore mentioned

12  between 9:10 a.m. and 10:28 a.m.;

13          That said deposition was taken down in

14  stenograph notes and afterwards reduced to typewriting

15  under my direction; and that the typewritten

16  transcript is a true record of the testimony given by

17  said deponent;

18          Absent a request by the parties or by

19  agreement, the reading and signing by the deponent to

20  the deposition were waived on behalf of all the

21  parties by their respective counsel, the witness being

22  present and consenting thereto, and/or pursuant to the

23  Fed. R. Civ. P. 30(e); and the deposition is to be

24  read with the same force and effect as if signed by

25  said deponent.
```

1          I do further certify that I am a disinterested

2    person in this cause of action; that I am not a

3    relative of the attorneys for any of the parties.

4          IN WITNESS WHEREOF, I have hereunto set my

5    hand and affixed my notarial seal this 12th day of

6    September, 2022.

7

8

9

10

11

12

13    My Commission Expires:

14    August 14, 2023

15

16    Job No. 174902

17

18

19

20

21

22

23

24

25

*Elizabeth Taylor Culiver*

Elizabeth Taylor Culiver
NOTARY PUBLIC SEAL
STATE OF INDIANA
Commission No. NP0670402
My Commission Expires Aug. 14, 2023

## 1

**100** 25:12 42:4,7 49:19,23

**10:28** 56:15

**11** 7:18

**14** 27:20

**18** 16:18

**1998** 9:24

## 2

**2018** 52:12,16,19,23 53:7,13

**2019** 19:18,20 44:15 49:9

**2022** 4:9

**24** 9:24

**26th** 4:9

## 3

**30'ish** 54:14

## 4

**405** 4:8

## 5

**50** 17:1

## 9

**915** 4:7

**9:10** 4:10

## A

**a.m.** 4:10

**A212** 36:8,24 37:5 38:7

**absolutely** 18:14 26:23 27:15 35:5 38:5 39:1 44:13 45:17 48:6

**access** 12:24 13:2,6 44:21 45:13, 14

**accidental** 38:8

**accidents** 38:19

**accounts** 49:17

**accurately** 7:4 23:18,25

**action** 29:14

**actionable** 43:19

**actions** 16:4

**activities** 25:2

**add** 18:25

**additional** 24:16

**address** 31:18

**addressed** 26:13

**addressing** 25:14,15 26:2

**ADHD** 17:7,13 18:18,22,24 26:10

**administered** 5:20

**administration** 27:21

**administrative** 7:24 34:10,18 37:20

**administrator** 7:18

**administrators** 18:15 19:1

**affect** 6:18

**affected** 28:15

**affirmed** 5:2

**age** 54:12

**agency** 9:10,21 16:5 35:8 37:25

**agree** 18:15 36:7 38:22 43:7

**agreements** 9:9,10

**ahead** 28:18

**algebra** 52:7

**allegations** 29:6

**ambiguous** 31:11

**American** 14:8

**anchored** 35:23 36:3,13 37:13

**anger** 20:24 23:15

**angry** 20:22 21:3,10,12

**Ankara** 48:4

**annotated** 19:10

**annual** 24:25

**answering** 6:2 7:20 19:17

**anxiety** 17:6,13 18:18,24 26:10

**AO** 35:11 37:24

**apologize** 18:11

**application** 54:16

**applications** 33:20

**applied** 33:22

**approximately** 34:16

**area** 11:9 50:2,16

**Arnell** 34:13

**arrived** 49:12

**ASACS** 39:24

**assigned** 10:11 12:6,11 46:11

**assignment** 10:15

**assist** 44:20,24 47:5

**assistant** 11:3 16:16

**associate** 4:7

**Associates** 4:7

**assume** 30:1

**assumes** 32:16,23

**assuming** 41:4

**atmosphere** 15:17 29:8

**attached** 9:2 36:21,22

**attempt** 41:4,6

**attend** 16:10,13,20

**August** 4:9 9:24 44:15 45:3

**Austin** 4:16,19 5:14

**autism** 17:7,13,23 18:3,6,21,23, 24

**aware** 41:12 48:21,24 52:2 55:10, 12

## B

**back** 12:2 13:11 32:13,19 33:8

**backgrounds** 42:22

**bad** 6:25

**band** 14:19,22

**basically** 51:1

**basis** 20:19

**Bavaria** 50:23

**begin** 14:14

**beginning** 27:4,5

**behavior** 16:8 23:2 43:4

**belief** 36:23

**believed** 36:18 53:11,17,23

**Beth** 4:6

**big** 44:8

**binding** 19:15

**biology** 45:8,25 46:9 49:1,2,12 51:13 52:7

**bit** 33:19 55:15

**blame** 38:20

**blank** 12:5

**boundaries** 22:6 24:21 25:22 42:24

**boy** 23:8

**break** 6:12,14

**broad** 34:18

**bubble** 44:9

**building** 10:22 12:24 13:2,7,10 25:1,19 37:1,2 47:20

**bumped** 53:12,17,22

**burden** 18:12

**bus** 39:21

———————————

**C**

———————————

**call** 27:3 47:10,20 48:9

**called** 16:5 27:6 47:4,6,24

**calls** 31:10 54:3 55:7

**case** 5:17 7:11,17,25 8:1,5,6,8, 11,12,13,22 16:7

**catastrophe** 38:21

**Caucasian** 14:13 55:3

**CEDR** 25:3

**Center** 25:2

**Central** 4:10

**certainty** 25:12 49:13

**chair** 52:14

**challenging** 13:17

**changed** 11:15 16:8

**charged** 8:17

**charges** 52:11,15 53:6,9

**children** 14:5,6 15:1

**circumstances** 17:10,15

**cite** 55:21

**citing** 55:24

**class** 27:1,4 35:1,2 36:8 38:4 41:12 43:15

**classes** 19:21

**classroom** 15:17,21 25:17 36:7 37:3,8,9,17,19 38:3,7,16 40:4,6, 11,12,14,15

**close** 50:3,13,25 51:2

**closer** 51:4

**coached** 13:4

**cohesive** 33:18

**colleagues** 24:22 28:23

**Collie** 34:14

**common** 27:18

**communicate** 18:17 19:2,8

**communication** 23:11

**community** 18:4

**commuting** 50:15

**compared** 51:3

**complain** 41:20

**complained** 26:7 30:17

**complaining** 31:7

**complaint** 7:23 9:16 21:8 27:18 31:17 41:19

**complaints** 32:2,3,4 33:10 41:15

**complete** 25:21

**completely** 6:13 23:13 31:16 45:1

**complex** 51:1

**computer** 11:12,18 42:10

**concentration** 26:10

**concerned** 38:19

**concluded** 56:15

**concludes** 56:3,6

**conclusion** 31:10,13

**conditions** 18:18 19:3,9

**conduct** 22:6

**confidence** 44:19,23 45:12,15

**Conflict** 25:3

**Confusing** 28:20

**Congratulations** 10:14

**conjecture** 40:22,25

**connected** 8:2 40:1

**Conners** 52:3,11,13,15,18,22 53:6,9,11 54:1,5 55:6

**considered** 32:4 50:15

**constant** 28:5

**consult** 35:10 39:1 41:1

**contact** 11:10 17:10,14 43:9,11, 25 48:3

**contacted** 34:24 35:3

**contacting** 42:13 48:10

**continue** 11:20 13:11

**continued** 12:21 51:24

**control** 21:12

**conver-** 27:11

**conversation** 19:19 20:7 22:12 26:18 27:22 41:10,17 45:2,5,10 46:17 47:14 48:13

**conversations** 13:18,20 19:20 26:19 27:7 30:11 42:14 45:23

**convicted** 8:18

**copy** 56:9,12,13

**correct** 12:22,25 13:1 18:13 19:3 31:1 48:25 50:18

**correctly** 7:21

**Corrigan** 46:9

Index: counsel..evidence

**counsel**  4:1,13,18 9:3,4 16:7 18:7 56:8

**counselor**  39:24

**counselors**  11:4

**counterproductive**  23:14

**couple**  27:3 36:25

**court**  4:3 5:19,21,25 6:4,7 7:21 8:14

**COVID-19**  33:23

**crime**  8:17,18

**cross**  22:10

**Culiver**  4:6

**culture**  25:20

**current**  14:15

**curriculum**  46:1 48:25 49:1

**curse**  21:4

D

**date**  4:9 7:10,12 25:5 27:14 45:3

**day**  6:25 22:4 52:21

**deal**  23:8

**deathly**  17:18

**December**  19:18,20

**deck**  46:13

**deeply**  13:15

**defendant**  4:19

**definition**  19:11

**deliberately**  53:12,21,23

**demonstration**  27:25

**department**  45:16 46:24 52:4,14

**depending**  50:8

**deponent**  4:12

**deposed**  7:7,13 8:9

**deposition**  4:11 5:19 6:11,25 7:14,16,19,22,23 8:22 9:5,11,14 56:3,6,15

**deserve**  29:19

**deserves**  30:21

**desk**  19:21 41:21,24 42:4,13

**detail**  42:2

**detailed**  10:23 12:3 16:19,24 33:22

**details**  37:14

**determine**  5:15

**difference**  10:20

**differently**  29:23,24 30:1 32:13, 19 33:13

**diminish**  43:24

**dinner**  54:6

**directly**  23:11

**discontinued**  48:19

**discuss**  9:3,5 41:13

**discussed**  16:6 26:16

**discussing**  18:21

**discussion**  26:11

**disrespect**  28:9,13,22 30:22 31:3 32:7

**disrespected**  29:4 30:23 31:8

**disrespectful**  19:24 20:14 21:15,17,21,23 22:9,13,25 23:20 24:1,6

**distance**  50:15

**distribution**  11:21

**district**  50:2,17,19,20,23

**divided**  50:21

**document**  6:4 19:15 55:21

**documents**  8:21,23,25 9:1

**Dodea**  9:20,23 11:2,5 14:15 33:20 54:16 55:10,16,22

**Dodea's**  55:16

**doors**  52:19,23 53:8

**dozen**  24:17

**dramatically**  11:16

**drawing**  12:5

**drill**  53:12

**drills**  34:23

**driven**  50:6

**drugs**  6:17,19,21,22,23

**due**  26:10 33:23

**duly**  5:2

E

**Earlier**  18:20,22

**easier**  6:3

**education**  16:11,17 28:5

**educational**  19:12

**educator**  13:16

**EEO**  7:17 8:1,12,13 9:16 30:21

**EEOC**  7:23 30:18

**effect**  26:9 28:14,24

**electrical**  38:8

**Elementary**  34:20

**elements**  15:16

**email**  11:20

**emails**  11:23

**emergencies**  27:1

**empathize**  44:7

**empathy**  31:21

**employee**  16:6 22:7,11

**employer**  9:19,20

**empty**  35:25 40:12

**ended**  48:17

**enjoyed**  13:18

**entire**  24:11

**environment**  15:20 23:3 25:16, 22 26:4 30:23 32:14,20 44:12 55:17

**established**  25:23 29:3

**estimation**  17:3

**ethnicity**  14:9

**Europe**  49:11

**Evansville**  4:8

**eventually**  39:23

**evidence**  32:17,23

**exact** 45:2

**EXAMINATION** 5:5

**examined** 5:4

**examples** 29:10

**excuse** 43:3

**exhausted** 32:2

**exhibit** 36:19

**exhibits** 8:24

**expect** 15:8,12,15 30:14

**expectation** 15:20

**experienced** 49:5

**experiencing** 31:4 32:15,21

**expert** 18:4

**expertise** 19:7

**explain** 10:16

**explaining** 30:25

**express** 20:24

**expressed** 55:4

**F**

**facilities** 34:22 35:6 37:24

**facility** 11:12

**fact** 32:10

**facts** 32:16,23

**faculty** 23:16,22 24:11,15,19,20 25:3,7,16 26:3,16 27:8 39:19

**fairly** 30:2

**fall** 35:22 42:11

**federal** 5:13,14

**feedback** 27:9

**feel** 23:10 30:2,8,17,19 31:19 32:6,11 38:11 39:3,5 44:8

**feely** 44:6

**felt** 12:9 13:18 22:8 30:22

**filed** 9:16 30:18,20 52:11,15 53:6, 9

**filled** 35:19

**filling** 45:8

**find** 13:12 15:15 41:6 45:24

**fine** 26:4 36:21

**fire** 53:12

**Fischer** 4:5,18 9:6 18:19 28:19 29:2 31:2,9 32:16,22 33:1,3 47:7 51:11 52:20,25 53:14 54:3 55:7 56:13

**floor** 39:22

**flow** 28:6 35:14

**foggier** 39:13

**follow** 19:13,14,16

**formal** 7:14

**formulating** 31:15

**foundation** 29:3 32:24 51:11 52:20,25 53:14

**Franklin** 39:24

**frequent** 24:9

**friends** 54:1

**front** 26:20 27:2 55:21

**frustrating** 27:21,24

**functioning** 14:25

**future** 29:16

**G**

**gather** 51:24

**gave** 16:7 26:19

**gears** 33:19 44:15

**gee** 36:20

**general** 34:23

**Germany** 49:11 50:19

**give** 5:22 33:11 45:13 50:4

**good** 10:14 26:11

**Google** 50:5

**government** 22:7

**grant** 39:12

**grants** 39:15

**grateful** 23:9

**great** 10:16

**greatly** 16:21 55:6

**grew** 39:19

**group** 26:12 35:9

**grow** 29:16

**guess** 7:11 8:2 31:15 32:1,18 45:1 51:14,15 54:13

**guest** 24:25

**guidance** 55:10,12,16

**H**

**half** 7:11

**hall** 39:21

**hand** 52:18,23 53:7

**handle** 16:3 29:23,25 30:13,15

**handled** 16:18 28:15,24 33:15

**handles** 29:22

**handling** 21:8

**hands** 46:12

**happen** 24:8 25:25 27:1,2,5 38:6 48:7

**happened** 20:18 24:10 27:17 44:1 45:6 48:14 52:22

**happy** 11:11

**har-** 28:25

**harassed** 28:16 31:8,19

**harassing** 23:20 24:2

**harassment** 24:4,5 28:25 31:3 55:11,12,17

**head** 12:17,20 20:25 23:8 31:16

**healing** 21:5

**hear** 30:9

**heavy** 36:2

**held** 4:11 39:2

**helpful** 21:2

**helps** 20:23 21:5 37:21

**hey** 35:11

**high** 10:1,9 11:13,16 14:17 16:16 19:23 23:17,23 29:11 33:21 34:11,21 37:22 41:7 47:21,24

51:12 55:4

**highlighted** 25:2

**hip** 41:21,25 42:17,18

**Hispanic** 14:8

**Hohenfels** 16:19

**holds** 5:20

**Holt** 39:16,17 41:4,6,11 46:7,18, 22 47:4,6,10,16 48:10,17,21 50:24 51:7,23 52:1 54:1,6 55:5

**Holt's** 40:4,10 41:2

**honestly** 23:4 33:8,24 34:7 38:13 42:2 45:1 47:2 52:5 54:13 55:18

**hope** 10:14 11:10 43:7

**horrible** 22:3

**hostile** 32:14,20

**hours** 22:20 50:6 51:7

**hugged** 44:5

**hugger** 44:3

**hugging** 44:4

**hurt** 39:5

**hydroponic** 34:25 35:19 38:6 39:8 40:5,17 41:2,13,18

**Hypothetical** 55:8

---

**I**

**idea** 24:9 26:11

**identify** 4:13

**IEP** 16:10,20 17:5,20,21 18:10,13 19:10,11

**IEPS** 17:6,16

**Ill** 4:16 5:14

**ill** 42:25

**imagine** 17:4

**important** 32:5 44:10,13

**impossible** 26:24 47:25

**inappropriate** 42:7,15,16,20 43:19,22 48:1

**incident** 52:22

**included** 56:10

---

**including** 25:17

**incredible** 15:6

**Indiana** 4:8

**individual** 16:11 45:10 49:15

**individualized** 19:12

**individuals** 11:25 12:8 22:21 28:16 29:4,9

**influence** 23:2 29:15

**influenced** 55:6

**information** 5:16 49:16,18 51:18,19,24

**inspections** 38:2

**installation** 35:8

**installed** 37:16

**instance** 20:17

**instructing** 43:15

**instruction** 26:8 28:6,8

**instructions** 18:5

**interact** 29:15

**interactions** 13:13,21 29:17

**interrupt** 6:1,2

**interrupted** 26:9 41:12,16

**interruption** 28:7

**interruptions** 26:14,15,22,24

**involved** 29:5

**involves** 14:24

**ISS** 18:5 46:5 49:19

**issue** 10:25 11:1 15:22 26:13,16

**issues** 11:4

**Italy** 4:2

**item** 15:4

---

**J**

**job** 14:16 21:6 32:4,5 34:17

**judge** 22:3

**jumping** 28:11

---

**K**

**Kaiserslautern** 50:1,3,11,12,21 51:5

**kid** 26:25

**kilometer** 50:4

**kind** 22:19 23:4 28:10 35:13 43:16

**knew** 48:1,20

**know** 6:12 7:4 9:4 10:22 12:2,9 13:5,6,7 15:5,23 16:22,24,25 17:1,2,9,18,20,21,22,24 19:13,15, 16 20:14,22,25 21:1,3,4 22:4,6 23:4,9 24:16 25:17,24 26:18 28:2 29:6,18,20 30:4 31:16 33:15 35:17,25 36:1,2 38:14,18 39:2,3 40:18,20,23,25 42:11,20,24 43:1, 5,12,21,23 44:4,5 45:4,8,21 46:5, 18 47:3 48:5,15 49:5,8,13 50:4,7 51:22 54:15,18,19

**knowledge** 11:22 40:3,7 41:8,9, 11 54:19

---

**L**

**labor** 16:5 22:11

**lack** 29:2 32:24 51:11 52:20,25 53:14

**lane** 35:22

**laptop** 12:22

**large** 34:25

**lawsuit** 5:14

**learn** 29:16

**leave** 43:14

**legal** 19:14 31:10,13 39:1

**legally** 39:4

**legitimate** 31:18

**letter** 22:24

**letterhead** 55:23

**level** 7:16 18:16 19:1,5,6 24:5 26:14,15

**liable** 39:2,4

**lies** 34:22

**life** 5:12 12:11

**light** 16:22

**list** 11:21 15:2 54:21

**listen** 21:3

**live** 30:19

**living** 11:8

**Lloyd** 4:16,19 5:14

**LMER** 42:13

**locally** 46:6

**located** 4:2 49:25

**location** 50:25

**logged** 49:17

**logistics** 15:1

**long** 6:11 9:23,25 14:1 18:12 45:18

**long-term** 44:16 45:7

**looked** 35:20

**lunch** 27:6

---

**M**

**M-A-R-C** 5:9

**made** 9:9 37:9 40:4,12,16 41:15

**Main** 4:8

**maintenance** 35:9

**make** 6:8 43:6

**makes** 6:3,25 7:19 30:15 45:10

**making** 37:18 43:8,11 46:24

**management** 16:6 22:11 25:18

**maps** 50:5

**Marc** 4:12 5:1,9 56:7

**married** 13:24,25 14:1,2,4

**materials** 48:24 49:2,3,12 51:8, 10

**math** 12:13 52:4,14

**matters** 56:10

**meaning** 42:25

**medication** 6:20,22

**medications** 6:17,19

**meet** 24:11

**meeting** 17:1 24:20,22 25:4,7,16 26:3

**meetings** 10:5 16:11,13,20 24:12,14,15 26:17 27:8,13 48:19

**meets** 31:20

**Mel** 18:4

**member** 23:16,22

**memorized** 55:25

**memory** 37:7,11 48:13 49:6,24 54:8 55:24

**mentioned** 10:10 18:22,23 19:18 25:23

**mentioning** 29:9

**mentor** 44:16,24 45:19,22 46:12, 15

**mentoring** 46:18 48:17

**met** 9:3,6

**metal** 52:19,23 53:7

**Mflc** 39:23

**Michelle** 34:9

**middle** 14:17 26:25 27:22,24

**mind** 21:2 25:15

**mindset** 38:13

**mine** 8:5

**minimize** 26:21

**minimum** 16:25 24:13

**minute** 28:12

**minutes** 27:3

**Mischaracterizes** 47:7

**misquoting** 55:20

**misstates** 18:20

**misunderstood** 50:9,14

**moment** 18:11 33:13 46:21

**month** 24:12

**morally** 39:4

**move** 35:15,16,25 51:17

**moved** 14:2 35:1,4,12 39:20

**moving** 41:1

**multiple** 26:17

---

**N**

**named** 44:16

**names** 12:18

**Naples** 48:4

**nature** 8:4,8,11

**necessarily** 21:7 29:12 31:22 32:9 43:23

**needed** 11:7,9,12 13:6,8

**Negative** 5:12 9:8

**nods** 6:8

**nonsexual** 15:23

**notice** 43:3

**number** 26:6 33:10

**numbers** 37:3

---

**O**

**oath** 5:19 17:18

**object** 29:2 31:9,11 32:22

**objecting** 18:19

**objection** 28:20 31:2 32:16 47:7 51:11 52:20,25 53:14 54:3 55:7,8

**objections** 33:4

**obligation** 5:22 39:6

**observe** 31:6

**observed** 31:14

**occasion** 27:16

**office** 26:20 27:2 28:3 39:11,18, 22 40:9 50:1,2

**officer** 34:10,18 37:20

**open** 23:10

**opposing** 9:3

**opposite** 43:7

**order** 18:23

**originally**  39:9,10,16 40:2

**overwhelmed**  32:2

**overwhelming**  34:1

---

**P**

**Pam**  52:3,11,13,15,18,22 53:6,9, 11

**parallel**  48:6

**parent**  11:1

**parents**  26:25

**part**  7:11 12:1 16:5 21:6 26:18 32:4,5,11 39:12,15 42:25

**parties**  8:10

**pat**  43:13,22

**patience**  30:4

**patient**  28:11 30:2,4

**Patting**  43:20

**pay**  14:19,22

**Payson**  44:17

**pecuniary**  15:4

**pensible**  33:12

**pensive**  33:12

**people**  22:8 24:6 29:13,15,19,23, 25 30:1,3,5,10,12 37:25 42:9,22, 23 44:4,10,13

**percent**  25:12 42:4,7 49:19,23

**percentage**  33:25 34:1

**perfect**  28:7 30:19

**perfectly**  33:15

**performance**  15:16

**person**  22:3 30:3 35:5,7 37:24 43:10 46:3,4,12 49:22 52:17 53:6, 9,11,17,20,21

**personal**  15:10,13,14 21:24 24:21 25:9 26:7 42:6 44:9

**personally**  26:12

**persons**  4:14

**perspective**  13:22

**phase**  7:24

**philosophy**  21:24 25:19

**physical**  17:10,14 43:9

**pick**  35:15,25

**place**  37:10 39:9,10 40:5,17

**placing**  41:21,25

**plaintiff**  4:16 5:13

**plan**  6:11 16:11 19:12,13,14,17 40:8

**pleasant**  13:21

**point**  7:2,3 29:8 46:7

**pos-**  14:24

**position**  10:7 32:11 33:22 34:17 54:17

**positions**  12:10

**positive**  14:25 25:20 29:18

**possibility**  35:13

**possibly**  41:7 45:9

**predated**  29:11

**prefer**  55:20

**prepare**  8:22

**present**  4:14,19 23:17,23 52:21

**presented**  6:14

**pretty**  34:18 44:8

**preventing**  38:19

**previous**  18:20

**primarily**  34:21

**principal**  10:9,25 11:3,6 14:17, 23 16:10,17 23:18,24 37:21 38:12

**pro**  4:15 5:13

**problem**  23:9 37:14

**problematic**  31:25 42:9

**problems**  23:7

**proceeding**  8:15,16

**process**  21:5

**professional**  13:15,19 44:11

**profound**  13:16

**program**  25:3

**proper**  49:16

**provide**  11:18 12:21 51:8

**provoking**  13:20 19:19

**proximity**  51:6

**pulling**  55:19

**purpose**  23:6 38:22

**put**  33:20 36:11,15,24 37:8 39:16, 25

---

**Q**

**question**  6:14 8:7 17:17 19:17 22:14,23 23:21 26:1 28:17,21 29:21 31:5 32:18 33:7,18 36:4 40:10 43:12 44:22 45:1 50:9,14 53:2,5,16 54:23 55:9,14

**questioning**  38:23

**questions**  5:6,15 6:2,3 12:7 13:17,20 51:20

**quoting**  55:18

---

**R**

**r's**  5:10

**r-r-e-a-l**  5:10

**race**  14:7,12 55:2

**Rachana**  4:18

**raising**  30:7

**Ramstein**  47:17,21,24 48:12,13, 18 50:2,3,11,12,22 51:5,7,24

**range**  34:19 42:12

**realize**  48:16,17 51:25 52:1

**reason**  6:24 36:20,21 40:19

**reassigned**  41:5

**recall**  7:23 17:16 18:9 19:25 20:7 25:5 27:9,11,12 41:3,15 45:11,22, 24 46:8,16 47:18 48:10,23 49:14 51:14,16 52:5,8,9 54:9,13,25

**received**  16:4 20:11 28:13,22 48:24

**recite**  17:21

**recommendation**  35:17

**recommendations**  17:12,16,22 18:2

**reconnected** 40:2

**record** 4:14 5:7 30:24 33:4 51:19, 21 52:10 56:10

**reference** 54:24 55:1

**referral** 54:21

**reg** 55:19

**regrettable** 28:6

**regulated** 11:12

**related** 10:25

**relations** 16:6 22:11

**relationship** 11:15

**relative** 51:2

**remain** 41:7

**remedy** 32:14,20

**remember** 7:12 11:25 12:10,12, 16,19 17:19 22:19 25:6,8 33:24 34:2,7 36:7,10,13 37:2,14,15 39:13,19 41:9,10,17,19,23 42:2,3 44:17,18,23 45:2,3,5 46:2,10,14, 21 47:2,3,4,12,13,22 48:20 49:2,7 54:8,11 55:15

**remotely** 4:3

**repeat** 23:4,21 28:17,21 31:5 32:25 33:4 44:22 49:21

**repeated** 32:18

**repeating** 33:1

**rephrase** 47:9

**report** 20:11

**reported** 16:1

**reporter** 4:1,3,6 5:19,25 6:4,7 56:6

**reprimand** 22:18,21,25

**requested** 36:10,16,23 37:8

**requesting** 37:7

**require** 15:18

**required** 19:14

**resolution** 16:9 25:3

**resource** 13:8

**respect** 13:15,16 24:22,24,25 25:1 29:19,20 44:11,14

**respectful** 15:17,20 25:21

**respecting** 15:9,13 24:20 25:9

**response** 32:1 50:4

**responsibilities** 14:23 15:3 34:19

**responsibility** 10:17,21 15:4,6 34:22 37:22

**responsible** 37:18 38:4,10,12, 14,16,24 49:15,23

**restaurant** 54:7

**review** 8:21,24

**reword** 15:10

**Richardson** 4:7

**Rodman** 47:24

**room** 39:17,25 40:24 41:2

**rooms** 30:10

**roster** 12:18

**routine** 20:19

**routinely** 43:21

**rules** 5:18

**run** 26:23

**running** 15:6

**S**

**safe** 37:19 38:15 39:7

**safely** 37:16

**safety** 34:23 35:21 38:1,4

**salary** 14:20

**schedule** 52:9

**scheduled** 24:12,15

**schematics** 36:12

**Schiele** 46:5 49:20,22,25 50:24

**school** 10:1,2,4,9,10,12,13,18, 19,21,23,24 11:2,3,5,6,14,16,17 12:1,3,6,12 14:18,25 15:5,7 16:16 18:13 19:23 23:17,23 26:23 27:18 29:12 33:21,23 34:1,5,11,16,21 37:22 38:12 41:7 47:13,18,21,24 48:2,3,4 49:4 51:12 54:22

**schools** 34:20 49:5

**science** 27:23 45:15 49:15,19 54:10,17

**screen** 42:10

**security** 34:23 38:1

**seeking** 45:8

**sense** 7:20 30:16 45:10

**services** 17:5

**set** 25:22 36:9 38:7 39:9,10 40:2

**setting** 49:15

**share** 19:21 44:20 51:25

**shared** 20:2 34:19 51:10

**shocking** 38:8

**shopping** 54:7

**short** 12:9 45:7 46:25

**shoulder** 41:22,25 42:17,19 43:14,20,22

**Sicily** 4:2

**side** 9:4 28:2 30:14

**signed** 9:9

**Sigonella** 14:17

**sir** 20:16 22:15 36:5 37:5

**situ-** 18:8

**situation** 15:25 16:9 29:23,24 30:11 39:20 42:17 48:8 49:11

**situations** 21:9 28:24 30:13 33:9

**size** 35:3

**SKE** 35:10,12

**slammed** 52:18,23

**slamming** 53:7

**small** 33:25

**smaller** 48:2

**Smithson** 4:4,15 5:6 13:14 18:22 20:1 24:9 25:10 29:21 32:9,25 33:24 34:7 36:25 41:3,14 45:21 46:2 47:9 48:23 56:2,5,11

**Snowden** 44:17,18,20,24 45:13, 16,19,21,24 46:14,19,21 47:11 48:18,22 51:8,22,25 52:3 54:10, 11,16,24 55:4

**Snowden's** 55:2

**solution** 33:17

**solve** 23:7

**someone's** 42:13

**source** 27:17

**space** 15:10,14 24:21 25:9 26:7 42:6 44:9

**speak** 9:13 15:8,12

**speakers** 25:1

**speaking** 25:6,8 29:8

**special** 16:17

**specialist** 18:6

**specific** 26:19 37:14 41:19

**specifically** 25:6 41:16,23 47:3 51:16

**spectrum** 30:12

**speculate** 17:25

**speculation** 54:4 55:8

**speeding** 8:19

**spell** 5:8

**spoke** 22:22 28:25 41:5

**spoken** 24:19,24

**staff** 11:23 23:22 26:20 27:2 46:22

**stand** 42:16,18

**Standard** 4:10

**start** 46:25 55:23

**state** 5:8 56:8

**statement** 5:22

**statements** 5:23 6:8

**stationed** 51:23

**step** 14:21 18:4

**Stewart** 4:7

**stipulate** 4:1

**stipulations** 56:9

**stored** 39:25

**Street** 4:8

**stressful** 30:13

**strong** 46:25

**structurally** 40:21

**student** 15:23,24 16:1 17:9,13,23 18:17 19:2,9 38:9 39:5

**students** 15:8,12 16:11 17:4,6 26:8 39:6 49:17

**subcontracted** 35:9

**subcontractors** 37:15

**subject** 52:7

**subordinates** 19:22 20:6 23:2, 19 24:1 28:14,23

**substitute** 44:16 46:13

**suggestions** 18:8

**Suite** 4:8

**summer** 14:3

**supervision** 14:25 15:1

**supervisor** 20:12,13 21:1,7

**supply** 15:2

**surprised** 20:4

**switch** 33:19 44:15

**switching** 46:11

**sworn** 4:2 5:2

**sympathetic** 27:19

**system** 18:6,12 34:24,25 35:3, 15,19 36:8 37:10 38:6,9 39:8 40:5,13,17 41:2,13,18

---

**T**

**takes** 50:6

**taking** 6:17,20

**talk** 12:17

**talked** 46:23

**talking** 23:11 42:1,3 46:10

**Tamica** 4:15 45:4

**taught** 52:6

**teach** 48:6

**teacher** 10:21,22 11:2 12:14 15:18,22 16:4,7,8,17 20:22 27:20, 23 38:3,16 44:25 46:25 48:1 54:10,18

**teachers** 15:1,8,12,15 18:15,25 19:23 20:14 27:9,19 33:21 39:2,7 45:7 49:16 51:12 52:6

**teaching** 25:18 33:22 46:9 51:13 52:9

**team** 25:1

**telling** 47:12

**ten** 14:21 16:22 51:15

**term** 42:20 43:17 51:2

**testified** 5:4 8:14 24:2

**testify** 7:3 23:19,25

**testifying** 5:21

**testimony** 6:18 18:20 47:8

**textbook** 13:8

**things** 13:3 20:5 25:17 27:1 28:15 29:25 30:5

**thinking** 20:25 23:7 29:11,12 32:13,19 43:6,16 52:24

**thought** 13:20 19:19 31:17 33:12 37:6

**thoughtful** 13:19

**threatened** 30:8

**threshold** 31:21

**tickets** 8:19

**time** 4:9,10 7:15 12:1 23:17,23 29:11 31:5 39:18,22 44:4 45:6 46:21 47:17 51:13 52:4

**times** 7:13 24:8,17 26:6,17 28:3

**title** 14:16

**today** 6:18 8:24 9:2 56:4

**Today's** 4:9

**told** 22:4 30:24 35:20 36:2,10,13 37:12,15 40:14,18,21,24 42:8

**tolerant** 30:5,14

**tolerate** 32:6,7

**top** 12:17,20

**totally** 35:22

**touch** 17:23

**touched** 15:23

**touchy** 44:5

Index: traffic..Zoom

**traffic**  50:8

**train**  27:2

**training**  26:19

**trainings**  24:25

**transcribe**  5:25 6:7

**transcript**  56:9,14

**treat**  21:25

**treated**  22:1 29:19 30:21

**treatment**  20:11

**tripped**  38:9

**troublesome**  31:25

**True**  38:16

**trump**  28:4

**truth**  5:3

**truthful**  5:22,23

**truthfully**  7:4 23:18,24

**type**  54:17

**types**  13:3

---

U

**Uh-huh**  12:15 53:19 55:14

**uh-huhs**  6:7

**ultimate**  37:22

**ultimately**  37:21 38:11

**unable**  7:3

**unavoidable**  28:1

**unbecoming**  22:7

**uncomfortable**  15:24 42:21
43:6,8

**understand**  5:23 6:5,9,15 7:5
8:7 17:17 33:6 38:24 56:1

**understanding**  18:16 19:2,8
37:6

**unending**  15:2

**unhealthy**  23:13

**union**  26:19

**universe**  28:7 30:19

**unsafe**  36:8 37:9

**upset**  21:10,11,12,17,21

---

V

**V-I-L-L-A**  5:10

**vacant**  39:18

**vague**  31:2,11

**vaguely**  49:2

**Valenzuela**  12:13,21 13:4 34:13

**varied**  16:20

**variety**  17:4

**vent**  20:23 23:6

**verbal**  6:8 9:9

**verbatim**  18:1

**Villarreal**  4:12 5:1,7 19:4 29:5,7
33:6 52:21 53:1,3,15 54:5 55:10
56:3,7

**Vilseck**  10:1,8,9 11:9,16 13:13
14:2 16:15 19:23 23:17,23 29:11
33:21 34:11,20 41:7 51:3,4,5,12

**violated**  26:8

**virtual**  10:4,10,12,13,18,19,23,24
11:2,5,6,17 12:1,3,6,12 33:20,23
34:4

**voice**  30:7

**voicing**  23:14

---

W

**walk**  42:6

**walked**  30:10,11 42:12

**wall**  35:23 36:3,12,14 37:13
40:20

**walls**  40:22

**wanted**  34:25 36:14,15

**water**  35:20

**week**  16:23 17:1

**weight**  5:20

**whiz**  36:20

**who've**  30:10

**wide**  49:11

**witnessed**  23:19,25 24:3,6

**Wolff**  34:9 41:1,12,20 42:5,16
43:13

**Wolff's**  39:11,18 40:8

**word**  18:9,10 30:5

**words**  17:19,21 21:4 43:16

**work**  9:21,25 23:3 25:16 26:3
29:8 30:23 32:14,20 38:1 43:20
54:2,6 55:17

**worked**  9:23 10:1,4 13:13 34:15

**working**  10:3 11:5 14:15 25:21
28:3 30:7 34:11 47:13 48:22
51:23 52:1,3,13

**workplace**  9:17 15:9 55:11,13

**world**  42:23

**wow**  16:15

**writing**  55:5

**wrong**  22:5 31:23 48:8

---

Y

**year**  7:11 10:11,13 14:2,14 16:14,
19,22,23,24 17:2 24:17 27:15
34:12 37:1 39:14 46:23 48:25
49:4,7

**years**  7:18 8:20 9:24 10:2,3,6
14:3 16:15,18,21 27:20 34:12,14,
16 36:25 37:4 44:2 49:8,10 52:8

---

Z

**Zoom**  4:11

SMITHSON
EXHIBIT
MH-1
11/20/2022

# In the Matter Of:

*TAMICA J. SMITHSON*

*-v-*

*LLOYD J. AUSTIN III*

_____

## Melissa Jane Hayes

*August 26, 2022*

_____



**StewartRichardson**

DEPOSITION SERVICES

800.869.0873 | www.StewartRichardson.com

*Reporting Driven by Excellence — Since 1975*

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

```
 1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF INDIANA
 2                      INDIANAPOLIS DIVISION

 3
       TAMICA J. SMITHSON,              )
 4                                      )
                      Plaintiff,        )
 5                                      )
               -v-                      )          Case No.
 6                                      )   1:21-CV-02193-JRS-MPB
       LLOYD J. AUSTIN III,             )
 7     SECRETARY, DEPARTMENT OF         )
       DEFENSE,                         )
 8                                      )
                      Defendants.       )
 9

10

11          The videotaped deposition upon oral

12     examination of MELISSA JANE HAYES, a witness produced

13     and sworn via videoconference before me, Elizabeth

14     Taylor Culiver, RPR, a Notary Public in and for the

15     County of Vanderburgh, State of Indiana, taken on

16     behalf of the Plaintiff with all participants

17     appearing via videoconference on August 26, 2022, at

18     7:07 a.m., pursuant to the Federal Rules of Civil

19     Procedure.

20

21

22

23              STEWART RICHARDSON & ASSOCIATES
24              Registered Professional Reporters
                       (800) 869-0873
25
```

```
 1                        APPEARANCES

 2
        (All Participants Appearing Via Videoconference)
 3

 4   FOR THE PLAINTIFF:

 5            Tamica J. Smithson, Esq.
             CMR 411 Box 3668
 6           AOP, AE  09112
             tamica.smithson@yahoo.com
 7

 8   FOR THE DEFENDANTS:

 9            Rachana N. Fischer, Esq.
             OFFICE OF THE UNITED STATES ATTORNEY
10           10 West Market Street
             Suite 2100
11           Indianapolis, IN  46204
             rachana.fischer@usdoj.gov
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          INDEX OF EXAMINATION

                                                           PAGE
2
   EXAMINATION
3
   QUESTIONS BY MS. SMITHSON                                5
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        THE REPORTER:  Do all counsel stipulate that

 2   the witness located in Okinawa, Japan, can be sworn

 3   in remotely by the court reporter?

 4        MS. SMITHSON:  Yes.

 5        MS. FISCHER:  Yes.

 6        THE REPORTER:  My name is Beth Culiver, an

 7   associate of Stewart Richardson & Associates, 915

 8   Main Street, Suite 405, Evansville, Indiana.

 9   Today's date is August 26th, 2022.  The time is

10   7:07 a.m. Central Standard Time.

11        This deposition is being held via Zoom.  The

12   deponent is Melissa Hayes.

13        Will counsel please identify themselves and

14   any persons present with you for the record?

15        MS. SMITHSON:  Tamica Smithson.  No one is

16   present with me.

17        MS. FISCHER:  Rachana Fischer on behalf of the

18   defendant, Lloyd Austin, and no one is present with

19   me.

20

21

22

23

24

25
```

```
 1                    MELISSA HAYES,

 2   having been first duly sworn or affirmed to tell the

 3   truth, the whole truth, and nothing but the truth, was

 4   examined and testified as follows:

 5   EXAMINATION

 6   QUESTIONS BY MS. SMITHSON

 7   Q  Ms. Hayes, could you please state your name and

 8      spell your name for the record?

 9   A  My name is Melissa Hayes, M-e-l-i-s-s-a, H-a-y-e-s.

10   Q  Have you ever been known by a different name?

11   A  My maiden name, Melissa Akin.  A-k-i-n is the

12      spelling of my maiden name.  My middle name is

13      Jane, J-a-n-e.

14   Q  I'm a pro se plaintiff in a federal lawsuit against

15      Lloyd Austin, III, and I'll be asking you a few

16      questions to determine if there's information that

17      you may know about my case or that you may have

18      about my case.

19          I'll go over a few rules for deposition.  The

20      oath that the court reporter administered to you

21      holds the same weight as if you were testifying in

22      court.  You have the same obligation to give

23      truthful statements.  Do you understand?

24   A  Yes, I do.

25   Q  The court reporter will transcribe everything that
```

```
 1     we say.  I'll try not to interrupt you as you're
 2     answering questions.  I ask that you not interrupt
 3     me while I ask questions.  This makes it easier for
 4     the court reporter to document what we're saying.
 5     Do you understand?
 6   A Yes, I do.
 7   Q The court reporter cannot transcribe uh-huhs or
 8     nods.  So please make verbal statements.  Do you
 9     understand?
10   A Yes, I do.
11   Q I don't plan to take long for your deposition, but
12     if you need to take a break, just let me know.  I
13     only ask that you completely answer the last
14     question that I presented before we break.  Do you
15     understand?
16   A Yes, I do.
17   Q Are you currently taking any drugs or medications
18     that would affect your testimony today?  If so,
19     what medications or drugs?
20   A No, I am not.
21   Q Is there any reason that you think of that makes
22     this a bad day for a deposition?
23   A No, I do not.
24   Q If there's any point that you're unable to testify
25     accurately and truthfully, please let me know.  Do
```

```
 1        you understand?

 2   A  Yes, I do.

 3   Q  Have you ever been deposed before?

 4   A  No, I have not.

 5   Q  Have you ever testified in court or any other

 6        proceeding?

 7   A  No, I have not.

 8   Q  Have you ever been charged with or convicted of a

 9        crime?

10   A  No, I have not.

11   Q  (Audio breaks up.)

12            THE REPORTER:  I'm sorry, Ms. Smithson.

13        You're breaking up.

14   Q  Ms. Hayes, can you hear me?

15   A  Yes.

16   Q  Did you review any documents concerning this case

17        to prepare for the deposition?

18   A  Yes, I did.

19   Q  What documents?

20   A  I received a document from Ms. Fisher.  It was a

21        document signed with statements from a previous

22        allegation -- previous allegation.

23   Q  Have you met with counsel for the other side to

24        discuss this deposition?

25   A  No, I have not.
```

```
 1   Q   Have you signed any agreements or made any verbal
 2       agreements with anyone or the agency about this
 3       deposition?
 4   A   No, I have not.
 5   Q   (Audio breaks up.)
 6           THE REPORTER:  I'm sorry.  We didn't catch
 7       that question.
 8   Q   Did you speak with anyone else about this
 9       deposition?
10   A   Other than Ms. Fisher, no.
11   Q   (Audio breaks up.)
12           THE REPORTER:  I'm sorry.  You're breaking up
13       again.
14           MS. SMITHSON:  I shouldn't be.  I'm connected
15       with phone, and I'm connected through -- well,
16       through wifi first and my phone as a backup.  Hold
17       on.  Let me do this.  Can you hear me now?
18           THE REPORTER:  Yes.
19           THE WITNESS:  Yes.
20   Q   Have you ever filed an EEO complaint in the
21       workplace?
22   A   No, I have not.
23   Q   Who is your employer?
24   A   Department of Defense Education Activity.
25   Q   So you work for the same agency that I work for?
```

1    A  Yes, I do.

2    Q  How long have you worked for the agency?

3    A  22 years.

4    Q  Since what year?  1990?

5    A  2000.

6    Q  Oh, 2000.

7    A  2000.

8    Q  How long have you -- well, I can go back to that

9       one right there because we don't work together

10      anymore.  Hold on.  What is your job title?

11   A  I'm superintendent for DoDEA Pacific South located

12      in Okinawa, Japan.

13   Q  What are your responsibilities?

14   A  My responsibilities are the oversight of 13 schools

15      here on the island of Japan.  I supervise a

16      community superintendent and 13 principals of

17      schools and I assess staff, and I'm responsible for

18      ensuring that the instructional practices are sound

19      and that we provide professional learning for our

20      teachers and make sure that our students have an

21      excellent experience in their educational process

22      at school.

23   Q  And you said that you currently work in Okinawa,

24      Japan; correct?

25   A  Yes, I do.

1   Q  And how long have you been there?

2   A  March 8th, 2022.

3   Q  Were you ever a principal?

4   A  Yes, I was.

5   Q  For how long?

6   A  From 2005 to 2016.  So 11 years.

7   Q  And what are the responsibilities of a principal?

8   A  A principal's responsibilities are to ensure that

9      the school is operational both instructionally and

10      facility-wise.  The principal is responsible for

11      supervision and evaluation of the staff, the

12      certified staff as well as the employees that work

13      with the clerical side -- the GS side of our house.

14      A principal is responsible for ensuring the safety

15      of the students and the employees.  A principal is

16      responsible for ensuring that students, teachers,

17      and adults have a safe environment in which to work

18      and that they ensure that students have the best

19      educational opportunities available.

20   Q  Were you ever an assistant principal?

21   A  I was not.

22   Q  Okay.  Do you know what the responsibilities are of

23      the assistant principal?

24   A  Yes, I do.

25   Q  Can you please tell me?

1   A   Responsibilities of an assistant principal are to

2       support the principal of the school, to carry out

3       the duties as assigned for supervision, for

4       instructional practice, professional learning, for

5       -- also ensuring the safety of the students in

6       tandem with the principal of the school.  I think

7       without reviewing the whole job description,

8       basically an assistant principal is the assistant

9       to the principal and has the same responsibilities

10      as a principal.

11  Q   Okay.  So if the principal is away for, let's say,

12      one week, does the assistant principal assume all

13      of the responsibilities of that principal?

14  A   Typically, yes.

15  Q   Faculty -- so faculty and staff within the school

16      would then report to the assistant principal while

17      the principal is out?

18  A   Yes.

19  Q   Okay.  And then the assistant principal would

20      report to the superintendent; is that correct?

21  A   The principal -- the principal reports to the

22      direct supervisor of the principal.

23  Q   Okay.  So -- so the principal reports to the

24      superintendent; correct?

25  A   There may be a case where the principal's direct

```
 1        supervisor is a community superintendent.
 2    Q   Okay.  And so in that case, the principal would
 3        report to the community superintendent?
 4    A   (Witness nods head affirmatively.)
 5    Q   Okay.  All right.  And so -- and what years were
 6        you located in Vilseck Graf Community?
 7    A   From August 2016 to the end of July 2020.
 8    Q   Okay.  And what was your position at that time?
 9    A   I was the community superintendent for DoDEA Europe
10        East located in the Grafenwoehr field office.
11    Q   Okay.  So you've been with DoDEA since 2004.  So
12        when were the community superintendent positions
13        created?
14    A   There -- the community superintendent position
15        itself actually took the place of an assistant
16        super- -- what used to be termed as the assistant
17        superintendent.  When DoDEA went through the
18        restructuring, the RSA, for student achievement --
19        restructuring for student achievement, that was
20        beginning 2016, that is when DoDEA reorganized the
21        districts in Europe, and Europe East became the
22        district in Germany, which took in all of the
23        schools in Germany with the exception of
24        Spangdahlem.
25             At that time in 2016, the -- they set up the
```

```
 1      field offices in different locations throughout
 2      Europe in support of the district office, in which
 3      case in DoDEA Europe East, the district office was
 4      located in Kaiserslautern, Germany, and DoDEA
 5      established two field offices for Germany, one
 6      located in Stuttgart and one located in the
 7      Grafenwoehr Vilseck area.
 8   Q  Okay.  So what is the main difference between a
 9      community superintendent and the district
10      superintendent?
11   A  A community superintendent acts in the role of an
12      assistant superintendent.
13   Q  Okay.  How long did you and I work in the same
14      area --
15   A  I --
16   Q  -- or together?
17   A  Sorry.  I believe we were in the same building,
18      since my office was located at Vilseck High School,
19      for four years.
20   Q  Okay.  For four years.  And that was my next
21      question.  What building was your office located in
22      while you were here?  So you were actually in our
23      school -- in the high school?
24   A  My office was located at Vilseck High School.
25   Q  Okay.  And so you were in the same building as
```

```
 1      Mr. Villarreal, of course.

 2   A  Yes, I was.

 3   Q  How far was your office from Mr. Villarreal's

 4      office or about how long would it take for you to

 5      walk from his office to your office?

 6   A  I would say approximately two or three minutes.

 7   Q  Did Mr. Villarreal visit your office on a daily

 8      basis or a weekly basis?  How often?

 9   A  It was not on a regular basis.  There was no set

10      time for him to visit my office, no set -- in

11      the -- no set times on the calendar is what I'm

12      trying to say, but it was not on a regular basis.

13      So sometimes I might see him in a week.  Sometimes

14      it could be two or three times that week, but there

15      was never any set time or appointment made to -- to

16      visit with -- with Mr. Villarreal.

17   Q  What types of issues would -- could Mr. Villarreal

18      visit your office for if he needed to?

19   A  There were times when he visited my office to seek

20      support from our ISS team in our -- in support of

21      our continuous improvements district goals in

22      support of our CSI efforts, in support of a Cognia

23      visit, which we went through for accreditation in

24      2018, I believe it was.  There were times when he

25      would come into -- to give me a heads up if
```

1    anything he needed to share might come to my

2    attention.  He came in many times just to say how's

3    it going, how's school, you know, do you need any

4    support from us since your office is our building.

5  Q Could he come to speak with you about security

6    issues within the school or faculty problems or

7    things like that?

8  A Typically, no.  He -- he could certainly do that.

9    That's my role -- that was my role as a community

10    superintendent.  So I can't say no.  It was just

11    like any of our other schools that were located

12    outside of Vilseck High School because I did have

13    eight of them in that area.  He could come in and

14    talk to me about faculty issues.  He could come in

15    and talk to me about safety issues.

16  Q Thank you.  Is it safe to say that Mr. Villarreal

17    had more access to you than other principals in the

18    community complex because he was in the same

19    building?

20  A I'd have to say no.

21  Q Okay.  How many principals reported to you within

22    the complex?

23  A There were eight principals in the -- in the field

24    office area for Graf and Vilseck.

25  Q And it was just as easy for them to contact you as

```
 1      it was for Mr. Villarreal?

 2  A   Yes.

 3  Q   Have you ever been contacted by other principals

 4      about issues within their schools?

 5  A   Yes.

 6  Q   What types of issues did they contact you about?

 7  A   They would contact me about issues that involved --

 8      if there was a pending investigation because of a

 9      call that was made to family advocacy, they would

10      certainly inform me of a call made, whether it

11      involved a parent, a student, a teacher.  They

12      would involve me in instances such as a threat to

13      the school, a bomb threat.  They would call me when

14      they had an issue with facilities that needed to

15      come to my attention.  I believe at one time the

16      heat at Grafenwoehr Netzaburg Middle School went

17      out, both of the boilers, so I was contacted about

18      that.

19  Q   Okay.  Has anyone ever contacted you or any of the

20      principals ever contact you about disputes between

21      teachers?

22  A   Yes.

23  Q   How many times, about?

24  A   Not many.  I would say maybe five, maybe.

25  Q   Five from other principals?
```

```
 1    A   I'd say yes.

 2    Q   Were these issues resolved quickly normally?

 3    A   In most cases, yes.

 4    Q   What was your professional relationship -- well,

 5        you've kind of already said that, but I'll ask

 6        anyways.  What was your professional -- for the

 7        record, what was your professional relationship to

 8        Mr. Villarreal when you were the community

 9        superintendent at the Graf Vilseck area?

10    A   I was Mr. Villarreal's direct supervisor.

11    Q   And what was your professional relationship with

12        Mr. Rodman while you were the community

13        superintendent?

14    A   I didn't -- I was -- well, I was not his

15        supervisor.

16    Q   Mr. Shawn Rodman.  I'm sorry.  I didn't -- I didn't

17        know if you -- you do know who I'm talking about.

18    A   I do understand Mr. Rodman.  Yes, I'm familiar with

19        Mr. Rodman.  I was not his supervisor.

20    Q   Okay.  Would -- would Mr. Villarreal be responsible

21        for reporting issues of harassment or assaults

22        between teachers to you?

23    A   Yes, he would -- he would be responsible for that,

24        yes.

25    Q   Would you expect to know about harassments or
```

```
 1        assaults between teachers?

 2    A   No, I would not expect to know.

 3    Q   But he would be responsible for reporting those if

 4        they were to occur?

 5    A   I wouldn't say he's responsible for because that

 6        leads to expectation, but he could report those to

 7        me.

 8    Q   Okay.  Did Mr. Villarreal ever report harassments

 9        and assaults to you that I complained about to him?

10    A   No, he did not.

11    Q   Okay.  If I told you that within a single year I

12        reported at least ten incidents which are a

13        combination of harassments to include interruptions

14        of the learning environment, violations of personal

15        space, inappropriate touching, and simple

16        assaults -- simple assaults to Mr. Villarreal, I

17        reported these things to him during the time that

18        you were the community superintendent, what would

19        you have to say about this?

20            MS. FISCHER:  Objection.  That question is

21        ambiguous, what would she have to say about this,

22        but you can answer.

23    A   I'm -- that's hard to -- that's hard to say.  I can

24        only -- I can only suppose that if I were aware

25        that that many incidences had been addressed, then
```

```
 1        my question would be, how did you handle that
 2        situation.
 3    Q   So that would be your question to Mr. Villarreal?
 4    A   Yes, it would.
 5    Q   So I did, I reported at least ten incidents, which
 6        were a combination of harassments to include
 7        interruptions of the learning environment,
 8        violations of personal space, inappropriate
 9        touching, and simple assaults to Mr. Villarreal
10        during the time that you were the community
11        superintendent.  So you did not know that?
12    A   No.
13    Q   As superintend- -- a community superintendent,
14        would you say that a combination of these incidents
15        happening over a long period of time could create
16        an unsafe work environment?
17            MS. FISCHER:  Objection.  That calls for her
18        to speculate.  You can answer.
19    A   It would be hard to tell without knowing all the
20        facts and being able to actually have that
21        conversation.
22    Q   Could simple assaults create an unsafe work
23        environment?
24            MS. FISCHER:  Objection.  Calls for her to
25        speculate.
```

```
 1   Q   A simple assault such as pushing someone, could
 2       that cause an unsafe work environment?
 3   A   Yes.
 4   Q   Inappropriate touching such as hugging, forcefully
 5       hugging someone, could that cause an unsafe work
 6       environment?
 7           MS. FISCHER:  Objection.  It calls for
 8       speculation.
 9   Q   Inappropriate hugging, unwanted hugging, could that
10       call for an unsafe work environment?
11   A   Yes.
12   Q   As a community superintendent, can you see the
13       potential for at least those incidents to escalate
14       into a more serious and perhaps criminal matter?
15           MS. FISCHER:  Objection.  Calls for
16       speculation.
17   Q   I'm asking if unwanted hugging or pushing someone
18       could lead to a more serious or unsafe criminal
19       matter?
20           MS. FISCHER:  Ms. Smithson, you're just asking
21       a bunch of hypotheticals.  I'd ask that you just
22       ask Ms. Hayes about facts that she knows about.
23   Q   If someone were to -- since someone was pushed --
24           MS. FISCHER:  Ms. Smithson, again, you're just
25       asking hypotheticals.  Say someone did X, Y, Z.
```

```
 1        Please ask Ms. Hayes about facts.
 2    Q  Okay.  Someone was pushed -- I was pushed.  I'll
 3        say that.  I was pushed, bumped into by a
 4        colleague.  I believe that it was deliberate.
 5        Could something like that possibly lead to an
 6        unsafe -- or, I'm sorry, a more serious or criminal
 7        behavior?
 8            MS. FISCHER:  Again, you're asking Ms. Hayes
 9        to speculate.  Objection.
10    Q  One of my colleagues forcefully hugged me,
11        Ms. Schiele, and it was unwanted.  Could that lead
12        to something more serious and perhaps criminal?
13            MS. FISCHER:  Objection.  You're asking her to
14        speculate.
15            MS. SMITHSON:  But you're not asking -- you're
16        not telling Ms. Hayes not to answer me, of course.
17            MS. FISCHER:  Yes.  Ms. Hayes can answer.
18    A  I have no way of knowing that.  I have no way of
19        being able to tell what might -- what that might
20        lead to.
21    Q  Okay.  So I will tell you that during that time, I
22        was bumped into and I think it was deliberate
23        because the same person assaulted me later, and
24        that was Ms. Pam Conners, and I was hugged and did
25        not ask for the hug and that was -- and the hug was
```

```
 1      not wanted and that was Ms. Joy Schiele.  So who

 2      should Mr. Villarreal have reported my complaints

 3      to after -- after I reported them to him?

 4   A  Mr. Villarreal would be responsible for

 5      investigating or looking into your complaints.

 6      That would be his responsibility as a principal.

 7   Q  And if the incidents continued to happen, which

 8      they did, who should Mr. Villarreal have consulted?

 9   A  Mr. Villarreal could consult CEDR or our mediation

10      process.  Mr. Villarreal could consult with an

11      LMER, labor management relations and/or general

12      counsel.

13   Q  What would be -- could he have consulted with you?

14   A  Yes, he could have.

15   Q  Could that have been considered like a first step,

16      like, to take care of -- you know, try to solve the

17      problem, like something that -- I'm trying to think

18      of a way to word it.  The least aggressive way to

19      -- you know, to speak with the superintendent about

20      the issue.  Would that have been the least

21      aggressive way for him to go about trying to remedy

22      the situation?

23   A  Not in my opinion, no.

24   Q  No?  Okay.  Would it be appropriate for Mr.

25      Villarreal to address the entire faculty during our
```

```
 1        faculty meetings to make a general statement about
 2        not violating the space of colleagues or not
 3        interrupting instruction of students when a
 4        colleague has requested this over and over?  Would
 5        that be appropriate?
 6    A   I would say as a reminder to the staff of what we
 7        have been trained in as a -- as teachers and
 8        principals, yes, I think it would be appropriate to
 9        remind the staff to be respectful of each other.
10    Q   So you don't remember being informed of any of
11        these incidents that I've described to you?
12    A   No, I do not.
13    Q   And as the community superintendent at the time, do
14        you have an issue with that?
15    A   I wouldn't say it's uncommon if a principal had
16        done what he needed to do to investigate and handle
17        the situation.
18    Q   Okay.  So would your opinion change -- well, I'm
19        sorry.  I'll take that back here because -- are you
20        familiar with DoDEA's guidance on workplace
21        harassment?
22    A   Yes, I am.
23    Q   What is it?
24    A   The DoDEA stance on harassment in the workplace is
25        it's not tolerated.
```

```
 1   Q   Does DoDEA give steps for principals or anyone to
 2       take if workplace harassment in any form is taking
 3       place?
 4   A   Principals have training yearly on how to handle
 5       situations in their buildings, how to handle it
 6       when someone comes forward with a complaint and are
 7       given possible steps to take.  I know that
 8       principals do take those seriously and follow the
 9       steps -- they have been instructed on the steps to
10       follow in order to investigate and to resolve the
11       situation.
12   Q   Would you consider a situation resolved if the same
13       individual that's been complaining about
14       harassment, after the complaint, the harassments
15       continued and increased?
16           MS. FISCHER:  Again, objection.  Calls for her
17       to respond to a hypothetical, but you can answer.
18   A   I don't -- I don't know how to answer that.
19   Q   After I complained to Mr. Villarreal about the
20       harassments in various forms that I had been
21       subjected to you, those harassments increased.  Do
22       you think that -- that he was successful in
23       remedying the situation after I complained about
24       them if the incidents increased?
25           MS. FISCHER:  Objection.  Lack of foundation.
```

```
 1      You haven't established that she had knowledge of
 2      any of these incidents.
 3          MS. SMITHSON:  I'm not saying that she had
 4      knowledge of the incidents.  I'm asking her if she
 5      thinks that the situation had been handled -- or
 6      she used the term -- I have to remember what she
 7      used -- if the situation had been taken care of,
 8      I'll say that, because whatever word she used,
 9      that's what it equates to.
10   Q  So if the situation had been taken care of -- if I
11      complained but the incidents continued to occur and
12      increased in occurrence, Ms. Hayes, do you think
13      that the situation was handled if the incidents
14      continued?
15          MS. FISCHER:  So I'm going to object, again,
16      for lack of foundation because you haven't
17      established that she knew about the incidents, and
18      so she doesn't have a foundation to say one way or
19      the other whether they were resolved, but you can
20      answer.
21   A  I can only answer hypothetically.  If -- if
22      something continued, then, in my opinion, it would
23      not have been resolved.
24   Q  In your professional opinion, again, if you were
25      aware that Mr. Villarreal knew that I was diagnosed
```

```
 1       with adult ADHD, anxiety, and other neurological
 2       conditions that were affected when my colleagues
 3       interrupted my instruction to my students, would
 4       that concern you?
 5            MS. FISCHER:  Objection.  Hypothetical
 6       question.
 7  Q  Mr. Villarreal knew that I was diagnosed with adult
 8       ADHD, anxiety, and other conditions that were
 9       affecting -- that were affected when my colleagues
10       interrupted my classes because I had a reasonable
11       accommodation for those conditions but the
12       interruptions continued, does that concern you?
13            MS. FISCHER:  Objection.  Lack of foundation.
14  A  I don't know how to answer that.
15            MS. SMITHSON:  So there's not lack of
16       foundation because I've already shown that my
17       classes continued to be interrupted by my
18       colleagues.
19            MS. FISCHER:  Ms. Smithson, this witness has
20       no knowledge of that, and you can't ask her
21       questions about things that are outside of her
22       factual knowledge.
23  Q  So as a professional, as an assistant
24       superintendent -- no, not assistant superintendent
25       -- community superintendent -- I'll save that one.
```

```
 1          MS. FISCHER:  Ms. Smithson, she's not an
 2     expert witness here.  She's here to testify about
 3     her factual knowledge.
 4          MS. SMITHSON:   Okay.
 5  Q  So you were never given an opportunity to advise
 6     Mr. Villarreal on any of the complaints that I made
 7     to him while you were the community superintendent
 8     at Vilseck Grafenwoehr, were you?
 9  A  No.
10  Q  And why were you never given any opportunity?
11  A  I don't know.
12  Q  Were you ever -- were you ever told about anything
13     at all?
14  A  No, not to my knowledge.
15  Q  I have asked that.  If given the opportunity, what
16     would have been your professional guidance to
17     Mr. Villarreal on how to handle things after, let's
18     say, four or five complaints from one single
19     teacher?
20          MS. FISCHER:  Objection.  Hypothetical.  You
21     can answer.
22  A  My advice to a principal would be to seek the
23     advice of general counsel, to seek the advice of
24     the labor management relations representative, and
25     to possibly reach out to CEDR for mediation to
```

```
 1        bring some teamwork into the building, a mediator

 2        that would be able to help resolve an issue and to

 3        be able to talk through with the parties involved

 4        in terms of what was happening and how they might

 5        resolve it together.  It could be that

 6        Mr. Villarreal would investigate a situation, find

 7        out whether or not it had been substantiated and

 8        make the decision whether or not there was action

 9        that needed to be taken.

10   Q    How would you rate DoDEA's leadership?

11   A    I have -- I don't know what you mean by rate.

12   Q    Like, for example, you just gave some things that a

13        principal could do under a certain circumstance.

14        How many principals do you think would be able to

15        -- you know, who would know that those options were

16        available to them, for example?

17   A    All of our principals would know.

18   Q    Are most principals equipped to handle a variety of

19        issues because you've -- you've supervised several

20        principals.  So are most -- and you still do,

21        actually.  Are most principals equipped to handle

22        the variety of issues that could occur within a

23        school aside from normal day-to-day issues?

24   A    Yes, they are.

25   Q    Were you aware that in the federal employee
```

```
 1      viewpoint survey management officials rated DoDEA
 2      poorly in effective leadership and senior
 3      leadership?
 4  A  I don't recall seeing those results.
 5  Q  Do you think that this may have been a factor in
 6      the way Mr. Villarreal mishandled my concerns about
 7      a hostile work environment?
 8          MS. FISCHER:  Objection.  Lack of foundation.
 9      Calls for speculation.
10  Q  Ms. Hayes, you -- again, what years were you at
11      Vilseck -- in Vilseck?  I'm sorry.
12  A  2016 to 2020.
13  Q  My last question, actually.  Were -- it seems like
14      I can kind of remember you being there, but were
15      you present at the catapult training on April 13th,
16      2018?
17  A  I don't recall.
18          MS. SMITHSON:  And my deposition for Ms. Hayes
19      is over.  Thank you very much, Ms. Hayes.
20          THE WITNESS:  Thank you.
21          THE REPORTER:  This concludes the deposition
22      of Melissa Hayes.
23          Will counsel please state if they would like a
24      copy of the transcript, any stipulations, or other
25      matters to be included in the record?
```

1          MS. FISCHER:  I would like a copy of the

2     transcript.

3          MS. SMITHSON:  I would like a copy of the

4     transcript as well.

5          (The deposition concluded at 7:51 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
 2                      INDIANAPOLIS DIVISION

 3
     TAMICA J. SMITHSON,              )
 4                                    )
                    Plaintiff,        )
 5                                    )
              -v-                     )          Case No.
 6                                    )    1:21-CV-02193-JRS-MPB
     LLOYD J. AUSTIN III,             )
 7   SECRETARY, DEPARTMENT OF         )
     DEFENSE,                         )
 8                                    )
                    Defendant.        )
 9

10                       Job No. 174902

11

12
              The deposition of MELISSA JANE HAYES, taken
13   in the above-captioned matter, on August 26, 2022, and
     at the time and place set out on the title page
14   hereof.
              It was requested that the deposition be
15   transcribed by the reporter and that same be reduced
     to typewritten form.
16            It was agreed that the reading and signature
     by the deponent to the deposition were waived on
17   behalf of the parties Plaintiff and Defendant by their
     respective counsel, the witness being present and
18   consenting thereto, and/or pursuant to the Fed. R.
     Civ. P. 30(e), the deposition to be read with the same
19   force and effect as if signed by said deponent.

20

21

22

23             STEWART RICHARDSON & ASSOCIATES
              Registered Professional Reporters
24            One Indiana Square, Suite 2425
                 Indianapolis, IN  46204
25                    (800) 869-0873
```

```
 1   STATE OF INDIANA          )
                               )
 2   COUNTY OF VANDERBURGH     )

 3

 4          I, Elizabeth Taylor Culiver, RPR, a Notary

 5   Public in and for said county and state, do hereby

 6   certify that the deponent herein was by me first duly

 7   sworn to tell the truth, the whole truth, and nothing

 8   but the truth in the aforementioned matter;

 9          That the foregoing deposition was taken on

10   behalf of the Plaintiff; that said deposition was

11   taken at the time and place heretofore mentioned

12   between 7:07 a.m. and 7:51 a.m.;

13          That said deposition was taken down in

14   stenograph notes and afterwards reduced to typewriting

15   under my direction; and that the typewritten

16   transcript is a true record of the testimony given by

17   said deponent;

18          Absent a request by the parties or by

19   agreement, the reading and signing by the deponent to

20   the deposition were waived on behalf of all the

21   parties by their respective counsel, the witness being

22   present and consenting thereto, and/or pursuant to the

23   Fed. R. Civ. P. 30(e); and the deposition is to be

24   read with the same force and effect as if signed by

25   said deponent.
```

1              I do further certify that I am a disinterested

2     person in this cause of action; that I am not a

3     relative of the attorneys for any of the parties.

4              IN WITNESS WHEREOF, I have hereunto set my

5     hand and affixed my notarial seal this 12th day of

6     September, 2022.

7

8

9

10

11

12

13     My Commission Expires:

14     August 14, 2023

15

16     Job No. 174902

17

18

19

20

21

22

23

24

25

*Elizabeth Taylor Culiver*

Elizabeth Taylor Culiver
NOTARY PUBLIC SEAL
STATE OF INDIANA
Commission No. NP0670402
My Commission Expires Aug. 14, 2023

**1**

**11** 10:6
**13** 9:14,16
**13th** 29:15
**1990** 9:4

**2**

**2000** 9:5,6,7
**2004** 12:11
**2005** 10:6
**2016** 10:6 12:7,20,25 29:12
**2018** 14:24 29:16
**2020** 12:7 29:12
**2022** 4:9 10:2
**22** 9:3
**26th** 4:9

**4**

**405** 4:8

**7**

**7:07** 4:10
**7:51** 30:5

**8**

**8th** 10:2

**9**

**915** 4:7

**A**

**A-K-I-N** 5:11
**a.m.** 4:10 30:5
**access** 15:17
**accommodation** 26:11

**accreditation** 14:23
**accurately** 6:25
**achievement** 12:18,19
**action** 28:8
**Activity** 8:24
**acts** 13:11
**address** 22:25
**addressed** 18:25
**ADHD** 26:1,8
**administered** 5:20
**adult** 26:1,7
**adults** 10:17
**advice** 27:22,23
**advise** 27:5
**advocacy** 16:9
**affect** 6:18
**affected** 26:2,9
**affecting** 26:9
**affirmatively** 12:4
**affirmed** 5:2
**agency** 8:2,25 9:2
**aggressive** 22:18,21
**agreements** 8:1,2
**Akin** 5:11
**allegation** 7:22
**ambiguous** 18:21
**and/or** 22:11
**answering** 6:2
**anxiety** 26:1,8
**anymore** 9:10
**appointment** 14:15
**approximately** 14:6
**April** 29:15
**area** 13:7,14 15:13,24 17:9
**assault** 20:1
**assaulted** 21:23
**assaults** 17:21 18:1,9,16 19:9,22

**assess** 9:17
**assigned** 11:3
**assistant** 10:20,23 11:1,8,12,16, 19 12:15,16 13:12 26:23,24
**associate** 4:7
**Associates** 4:7
**assume** 11:12
**attention** 15:2 16:15
**audio** 7:11 8:5,11
**August** 4:9 12:7
**Austin** 4:18 5:15
**aware** 18:24 25:25 28:25

**B**

**back** 9:8 23:19
**backup** 8:16
**bad** 6:22
**basically** 11:8
**basis** 14:8,9,12
**beginning** 12:20
**behalf** 4:17
**behavior** 21:7
**Beth** 4:6
**boilers** 16:17
**bomb** 16:13
**break** 6:12,14
**breaking** 7:13 8:12
**breaks** 7:11 8:5,11
**bring** 28:1
**building** 13:17,21,25 15:4,19 28:1
**buildings** 24:5
**bumped** 21:3,22
**bunch** 20:21

**C**

**calendar** 14:11

**call** 16:9,10,13 20:10

**calls** 19:17,24 20:7,15 24:16 29:9

**care** 22:16 25:7,10

**carry** 11:2

**case** 5:17,18 7:16 11:25 12:2 13:3

**cases** 17:3

**catapult** 29:15

**catch** 8:6

**CEDR** 22:9 27:25

**Central** 4:10

**certified** 10:12

**change** 23:18

**charged** 7:8

**circumstance** 28:13

**classes** 26:10,17

**clerical** 10:13

**Cognia** 14:22

**colleague** 21:4 23:4

**colleagues** 21:10 23:2 26:2,9,18

**combination** 18:13 19:6,14

**community** 9:16 12:1,3,6,9,12, 14 13:9,11 15:9,18 17:8,12 18:18 19:10,13 20:12 23:13 26:25 27:7

**complained** 18:9 24:19,23 25:11

**complaining** 24:13

**complaint** 8:20 24:6,14

**complaints** 22:2,5 27:6,18

**completely** 6:13

**complex** 15:18,22

**concern** 26:4,12

**concerns** 29:6

**concluded** 30:5

**concludes** 29:21

**conditions** 26:2,8,11

**connected** 8:14,15

**Conners** 21:24

**considered** 22:15

**consult** 22:9,10

**consulted** 22:8,13

**contact** 15:25 16:6,7,20

**contacted** 16:3,17,19

**continued** 22:7 24:15 25:11,14, 22 26:12,17

**continuous** 14:21

**conversation** 19:21

**convicted** 7:8

**copy** 29:24 30:1,3

**correct** 9:24 11:20,24

**counsel** 4:1,13 7:23 22:12 27:23 29:23

**court** 4:3 5:20,22,25 6:4,7 7:5

**create** 19:15,22

**created** 12:13

**crime** 7:9

**criminal** 20:14,18 21:6,12

**CSI** 14:22

**Culiver** 4:6

**D**

**daily** 14:7

**date** 4:9

**day** 6:22

**day-to-day** 28:23

**decision** 28:8

**defendant** 4:18

**Defense** 8:24

**deliberate** 21:4,22

**Department** 8:24

**deponent** 4:12

**deposed** 7:3

**deposition** 4:11 5:19 6:11,22 7:17,24 8:3,9 29:18,21 30:5

**description** 11:7

**determine** 5:16

**diagnosed** 25:25 26:7

**difference** 13:8

**direct** 11:22,25 17:10

**discuss** 7:24

**disputes** 16:20

**district** 12:22 13:2,3,9 14:21

**districts** 12:21

**document** 6:4 7:20,21

**documents** 7:16,19

**Dodea** 9:11 12:9,11,17,20 13:3,4 23:24 24:1 29:1

**Dodea's** 23:20 28:10

**drugs** 6:17,19

**duly** 5:2

**duties** 11:3

**E**

**easier** 6:3

**East** 12:10,21 13:3

**easy** 15:25

**Education** 8:24

**educational** 9:21 10:19

**EEO** 8:20

**effective** 29:2

**efforts** 14:22

**employee** 28:25

**employees** 10:12,15

**employer** 8:23

**end** 12:7

**ensure** 10:8,18

**ensuring** 9:18 10:14,16 11:5

**entire** 22:25

**environment** 10:17 18:14 19:7, 16,23 20:2,6,10 29:7

**equates** 25:9

**equipped** 28:18,21

**escalate** 20:13

**established** 13:5 25:1,17

Index: Europe..involve

**Europe** 12:9,21 13:2,3

**evaluation** 10:11

**Evansville** 4:8

**EXAMINATION** 5:5

**examined** 5:4

**excellent** 9:21

**exception** 12:23

**expect** 17:25 18:2

**expectation** 18:6

**experience** 9:21

**expert** 27:2

――――――――――――――

**F**

**facilities** 16:14

**facility-wise** 10:10

**factor** 29:5

**facts** 19:20 20:22 21:1

**factual** 26:22 27:3

**faculty** 11:15 15:6,14 22:25 23:1

**familiar** 17:18 23:20

**family** 16:9

**federal** 5:14 28:25

**field** 12:10 13:1,5 15:23

**filed** 8:20

**find** 28:6

**Fischer** 4:5,17 18:20 19:17,24
20:7,15,20,24 21:8,13,17 24:16,
25 25:15 26:5,13,19 27:1,20 29:8
30:1

**Fisher** 7:20 8:10

**follow** 24:8,10

**forcefully** 20:4 21:10

**form** 24:2

**forms** 24:20

**forward** 24:6

**foundation** 24:25 25:16,18
26:13,16 29:8

――――――――――――――

**G**

**gave** 28:12

**general** 22:11 23:1 27:23

**Germany** 12:22,23 13:4,5

**give** 5:22 14:25 24:1

**goals** 14:21

**Graf** 12:6 15:24 17:9

**Grafenwoehr** 12:10 13:7 16:16
27:8

**GS** 10:13

**guidance** 23:20 27:16

――――――――――――――

**H**

**H-A-Y-E-S** 5:9

**handle** 19:1 23:16 24:4,5 27:17
28:18,21

**handled** 25:5,13

**happen** 22:7

**happening** 19:15 28:4

**harassment** 17:21 23:21,24
24:2,14

**harassments** 17:25 18:8,13
19:6 24:14,20,21

**hard** 18:23 19:19

**Hayes** 4:12 5:1,7,9 7:14 20:22
21:1,8,16,17 25:12 29:10,18,19,
22

**head** 12:4

**heads** 14:25

**hear** 7:14 8:17

**heat** 16:16

**held** 4:11

**high** 13:18,23,24 15:12

**Hold** 8:16 9:10

**holds** 5:21

**hostile** 29:7

**house** 10:13

――――――――――――――

**how's** 15:2,3

**hug** 21:25

**hugged** 21:10,24

**hugging** 20:4,5,9,17

**hypothetical** 24:17 26:5 27:20

**hypothetically** 25:21

**hypotheticals** 20:21,25

――――――――――――――

**I**

**identify** 4:13

**III** 5:15

**improvements** 14:21

**inappropriate** 18:15 19:8 20:4,9

**incidences** 18:25

**incidents** 18:12 19:5,14 20:13
22:7 23:11 24:24 25:2,4,11,13,17

**include** 18:13 19:6

**included** 29:25

**increased** 24:15,21,24 25:12

**Indiana** 4:8

**individual** 24:13

**inform** 16:10

**information** 5:16

**informed** 23:10

**instances** 16:12

**instructed** 24:9

**instruction** 23:3 26:3

**instructional** 9:18 11:4

**instructionally** 10:9

**interrupt** 6:1,2

**interrupted** 26:3,10,17

**interrupting** 23:3

**interruptions** 18:13 19:7 26:12

**investigate** 23:16 24:10 28:6

**investigating** 22:5

**investigation** 16:8

**involve** 16:12

**involved**  16:7,11 28:3

**island**  9:15

**ISS**  14:20

**issue**  16:14 22:20 23:14 28:2

**issues**  14:17 15:6,14,15 16:4,6,7 17:2,21 28:19,22,23

---

**J**

**J-A-N-E**  5:13

**Jane**  5:13

**Japan**  4:2 9:12,15,24

**job**  9:10 11:7

**Joy**  22:1

**July**  12:7

---

**K**

**Kaiserslautern**  13:4

**kind**  17:5 29:14

**knew**  25:17,25 26:7

**know**  5:17 6:12,25 10:22 15:3 17:17,25 18:2 19:11 22:16,19 24:7,18 26:14 27:11 28:11,15,17

**knowing**  19:19 21:18

**knowledge**  25:1,4 26:20,22 27:3,14

---

**L**

**labor**  22:11 27:24

**lack**  24:25 25:16 26:13,15 29:8

**lawsuit**  5:14

**lead**  20:18 21:5,11,20

**leadership**  28:10 29:2,3

**leads**  18:6

**learning**  9:19 11:4 18:14 19:7

**Lloyd**  4:18 5:15

**LMER**  22:11

**located**  4:2 9:11 12:6,10 13:4,6, 18,21,24 15:11

**locations**  13:1

**long**  6:11 9:2,8 10:1,5 13:13 14:4 19:15

---

**M**

**M-E-L-I-S-S-A**  5:9

**made**  8:1 14:15 16:9,10 27:6

**maiden**  5:11,12

**main**  4:8 13:8

**make**  6:8 9:20 23:1 28:8

**makes**  6:3,21

**management**  22:11 27:24 29:1

**March**  10:2

**matter**  20:14,19

**matters**  29:25

**mediation**  22:9 27:25

**mediator**  28:1

**medications**  6:17,19

**meetings**  23:1

**Melissa**  4:12 5:1,9,11 29:22

**met**  7:23

**middle**  5:12 16:16

**minutes**  14:6

**mishandled**  29:6

---

**N**

**needed**  14:18 15:1 16:14 23:16 28:9

**Netzaburg**  16:16

**neurological**  26:1

**nods**  6:8 12:4

**normal**  28:23

---

**O**

**oath**  5:20

**object**  25:15

**objection**  18:20 19:17,24 20:7, 15 21:9,13 24:16,25 26:5,13

27:20 29:8

**obligation**  5:22

**occur**  18:4 25:11 28:22

**occurrence**  25:12

**office**  12:10 13:2,3,18,21,24 14:3,4,5,7,10,18,19 15:4,24

**offices**  13:1,5

**officials**  29:1

**Okinawa**  4:2 9:12,23

**operational**  10:9

**opinion**  22:23 23:18 25:22,24

**opportunities**  10:19

**opportunity**  27:5,10,15

**options**  28:15

**order**  24:10

**oversight**  9:14

---

**P**

**Pacific**  9:11

**Pam**  21:24

**parent**  16:11

**parties**  28:3

**pending**  16:8

**period**  19:15

**person**  21:23

**personal**  18:14 19:8

**persons**  4:14

**phone**  8:15,16

**place**  12:15 24:3

**plaintiff**  5:14

**plan**  6:11

**point**  6:24

**poorly**  29:2

**position**  12:8,14

**positions**  12:12

**possibly**  21:5 27:25

**potential**  20:13

**practice** 11:4

**practices** 9:18

**prepare** 7:17

**present** 4:14,16,18 29:15

**presented** 6:14

**previous** 7:21,22

**principal** 10:3,7,10,14,15,20,23 11:1,2,6,8,9,10,11,12,13,16,17, 19,21,22,23 12:2 22:6 23:15 27:22 28:13

**principal's** 10:8 11:25

**principals** 9:16 15:17,21,23 16:3,20,25 23:8 24:1,4,8 28:14, 17,18,20,21

**pro** 5:14

**problem** 22:17

**problems** 15:6

**proceeding** 7:6

**process** 9:21 22:10

**professional** 9:19 11:4 17:4,6,7, 11 25:24 26:23 27:16

**provide** 9:19

**pushed** 20:23 21:2,3

**pushing** 20:1,17

---

**Q**

**question** 6:14 8:7 13:21 18:20 19:1,3 26:6 29:13

**questions** 5:6,16 6:2,3 26:21

**quickly** 17:2

---

**R**

**Rachana** 4:17

**rate** 28:10,11

**rated** 29:1

**reach** 27:25

**reason** 6:21

**reasonable** 26:10

**recall** 29:4,17

**received** 7:20

**record** 4:14 5:8 17:7 29:25

**regular** 14:9,12

**relations** 22:11 27:24

**relationship** 17:4,7,11

**remedy** 22:21

**remedying** 24:23

**remember** 23:10 25:6 29:14

**remind** 23:9

**reminder** 23:6

**remotely** 4:3

**reorganized** 12:20

**report** 11:16,20 12:3 18:6,8

**reported** 15:21 18:12,17 19:5 22:2,3

**reporter** 4:1,3,6 5:20,25 6:4,7 7:12 8:6,12,18 29:21

**reporting** 17:21 18:3

**reports** 11:21,23

**representative** 27:24

**requested** 23:4

**resolve** 24:10 28:2,5

**resolved** 17:2 24:12 25:19,23

**respectful** 23:9

**respond** 24:17

**responsibilities** 9:13,14 10:7,8, 22 11:1,9,13

**responsibility** 22:6

**responsible** 9:17 10:10,14,16 17:20,23 18:3,5 22:4

**restructuring** 12:18,19

**results** 29:4

**review** 7:16

**reviewing** 11:7

**Richardson** 4:7

**Rodman** 17:12,16,18,19

**role** 13:11 15:9

**RSA** 12:18

---

**rules** 5:19

---

**S**

**safe** 10:17 15:16

**safety** 10:14 11:5 15:15

**save** 26:25

**Schiele** 21:11 22:1

**school** 9:22 10:9 11:2,6,15 13:18,23,24 15:3,6,12 16:13,16 28:23

**schools** 9:14,17 12:23 15:11 16:4

**security** 15:5

**seek** 14:19 27:22,23

**senior** 29:2

**set** 12:25 14:9,10,11,15

**share** 15:1

**Shawn** 17:16

**shown** 26:16

**side** 7:23 10:13

**signed** 7:21 8:1

**simple** 18:15,16 19:9,22 20:1

**single** 18:11 27:18

**situation** 19:2 22:22 23:17 24:11,12,23 25:5,7,10,13 28:6

**situations** 24:5

**Smithson** 4:4,15 5:6 7:12 8:14 20:20,24 21:15 25:3 26:15,19 27:1,4 29:18 30:3

**solve** 22:16

**sound** 9:18

**South** 9:11

**space** 18:15 19:8 23:2

**Spangdahlem** 12:24

**speak** 8:8 15:5 22:19

**speculate** 19:18,25 21:9,14

**speculation** 20:8,16 29:9

**spell** 5:8

**spelling** 5:12

**staff**  9:17 10:11,12 11:15 23:6,9

**stance**  23:24

**Standard**  4:10

**state**  5:7 29:23

**statement**  23:1

**statements**  5:23 6:8 7:21

**step**  22:15

**steps**  24:1,7,9

**Stewart**  4:7

**stipulate**  4:1

**stipulations**  29:24

**Street**  4:8

**student**  12:18,19 16:11

**students**  9:20 10:15,16,18 11:5 23:3 26:3

**Stuttgart**  13:6

**subjected**  24:21

**substantiated**  28:7

**successful**  24:22

**Suite**  4:8

**super-**  12:16

**superintend-**  19:13

**superintendent**  9:11,16 11:20, 24 12:1,3,9,12,14,17 13:9,10,11, 12 15:10 17:9,13 18:18 19:11,13 20:12 22:19 23:13 26:24,25 27:7

**supervise**  9:15

**supervised**  28:19

**supervision**  10:11 11:3

**supervisor**  11:22 12:1 17:10,15, 19

**support**  11:2 13:2 14:20,22 15:4

**suppose**  18:24

**survey**  29:1

**sworn**  4:2 5:2

---

**T**

**taking**  6:17 24:2

**talk**  15:14,15 28:3

**talking**  17:17

**Tamica**  4:15

**tandem**  11:6

**teacher**  16:11 27:19

**teachers**  9:20 10:16 16:21 17:22 18:1 23:7

**team**  14:20

**teamwork**  28:1

**telling**  21:16

**ten**  18:12 19:5

**term**  25:6

**termed**  12:16

**terms**  28:4

**testified**  5:4 7:5

**testify**  6:24 27:2

**testifying**  5:21

**testimony**  6:18

**things**  15:7 18:17 26:21 27:17 28:12

**thinks**  25:5

**threat**  16:12,13

**time**  4:9,10 12:8,25 14:10,15 16:15 18:17 19:10,15 21:21 23:13

**times**  14:11,14,19,24 15:2 16:23

**title**  9:10

**today**  6:18

**Today's**  4:9

**told**  18:11 27:12

**tolerated**  23:25

**touching**  18:15 19:9 20:4

**trained**  23:7

**training**  24:4 29:15

**transcribe**  5:25 6:7

**transcript**  29:24 30:2,4

**truth**  5:3

**truthful**  5:23

**truthfully**  6:25

**types**  14:17 16:6

**Typically**  11:14 15:8

---

**U**

**uh-huhs**  6:7

**unable**  6:24

**uncommon**  23:15

**understand**  5:23 6:5,9,15 7:1 17:18

**unsafe**  19:16,22 20:2,5,10,18 21:6

**unwanted**  20:9,17 21:11

---

**V**

**variety**  28:18,22

**verbal**  6:8 8:1

**viewpoint**  29:1

**Villarreal**  14:1,7,16,17 15:16 16:1 17:8,20 18:8,16 19:3,9 22:2, 4,8,9,10,25 24:19 25:25 26:7 27:6,17 28:6 29:6

**Villarreal's**  14:3 17:10

**Vilseck**  12:6 13:7,18,24 15:12,24 17:9 27:8 29:11

**violating**  23:2

**violations**  18:14 19:8

**visit**  14:7,10,16,18,23

**visited**  14:19

---

**W**

**walk**  14:5

**wanted**  22:1

**week**  11:12 14:13,14

**weekly**  14:8

**weight**  5:21

**wifi**  8:16

**word**  22:18 25:8

**work**  8:25 9:9,23 10:12,17 13:13 19:16,22 20:2,5,10 29:7

Index: worked..Zoom

**worked**  9:2

**workplace**  8:21 23:20,24 24:2

---

### Y

**year**  9:4 18:11

**yearly**  24:4

**years**  9:3 10:6 12:5 13:19,20 29:10

---

### Z

**Zoom**  4:11

SMITHSON
EXHIBIT
MW-1
11/20/2022

# In the Matter Of:

*TAMICA J. SMITHSON*

*-v-*

*LLOYD AUSTIN III*

---

## Michele Wolff

*September 02, 2022*

---



800.869.0873 | www.StewartRichardson.com

Reporting Driven by Excellence — Since 1975

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF INDIANA
 2                         INDIANAPOLIS DIVISION


 3
      TAMICA J. SMITHSON,                )
 4                                       )
                    Plaintiff,           )
 5                                       )
              -v-                        )           Case No.
 6                                       )    1:21-CV-02193-JRS-MPB
      LLOYD AUSTIN III,                  )
 7    Secretary, Department of           )
      Defense,                           )
 8                                       )
                    Defendant.           )
 9


10


11              The videotaped deposition upon oral

12    examination of MICHELE WOLFF, a witness produced and

13    sworn via videoconference before me, Elizabeth Taylor

14    Culiver, RPR, a Notary Public in and for the County of

15    Vanderburgh, State of Indiana, taken on behalf of the

16    Plaintiff with all participants appearing via

17    videoconference on September 2, 2022, at 9:08 a.m.,

18    pursuant to the Federal Rules of Civil Procedure.

19


20


21


22


23                    STEWART RICHARDSON & ASSOCIATES
                      Registered Professional Reporters
24                            (800) 869-0873

25
```

```
 1                        APPEARANCES

 2
        (All Participants Appearing Via Videoconference)
 3

 4   FOR THE PLAINTIFF:

 5           Tamica J. Smithson, Esq.
             CMR 411 Box 3668
 6           AOP, AE  09112
             tamica.smithson@yahoo.com
 7

 8   FOR THE DEFENDANT:

 9           Rachana N. Fischer, Esq.
             OFFICE OF THE UNITED STATES ATTORNEY
10           10 West Market Street
             Suite 2100
11           Indianapolis, IN  46204
             rachana.fischer@usdoj.gov
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF EXAMINATION

                                               PAGE
 2
     EXAMINATION
 3
     QUESTIONS BY MS. SMITHSON                   5
 4

 5
                     INDEX OF EXHIBITS
 6

 7      NUM.              DESCRIPTION          PAGE

 8   Exhibit W2    Email to Michelle Jones from   31
                  Tamika Smithson dated September
 9                23, 2021

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        THE REPORTER:  Do all counsel stipulate that
 2   the witness located in Vilseck, Germany, can be
 3   sworn in remotely by the court reporter?
 4        MS. FISCHER:  Yes.
 5        MS. SMITHSON:  Yes.
 6        THE REPORTER:  My name is Beth Taylor Culiver,
 7   an associate of Stewart Richardson & Associates, in
 8   Evansville, Indiana.  Today's date is September
 9   2nd, 2022.  The time is 9:08 a.m. Central Standard
10   Time.
11        This deposition is being held via Zoom.  The
12   deponent is Michele Wolff.
13        Will counsel please identify themselves and
14   any persons present with you for the record?
15   Ms. Smithson, you're on mute.
16        MS. SMITHSON:  Sorry.  Tamica J. Smithson,
17   pro se plaintiff against Lloyd Austin, III.  No one
18   is present with me.
19        MS. FISCHER:  Rachana Fischer on behalf of
20   defendant Lloyd Austin, and no one is present with
21   me.
22
23
24
25
```

|    |                                                          |
|----|----------------------------------------------------------|
| 1  |                    MICHELE WOLFF,                        |
| 2  | having been first duly sworn or affirmed to tell the    |
| 3  | truth, the whole truth, and nothing but the truth, was  |
| 4  | examined and testified as follows:                      |
| 5  | EXAMINATION                                              |
| 6  | QUESTIONS BY MS. SMITHSON                                |
| 7  | Q  Ms. Wolff, could you please state and spell your     |
| 8  |    name for the record?                                 |
| 9  | A  Sure.  Michele Wolff, M-i-c-h-e-l-e.  Last name is   |
| 10 |    Wolff, W-o-l-f-f.                                     |
| 11 | Q  Have you ever been known by a different name?        |
| 12 | A  My last name before I got married was Wernik,        |
| 13 |    W-e-r-n-i-k.                                          |
| 14 | Q  I'm a pro se plaintiff in a federal lawsuit against  |
| 15 |    Lloyd Austin, III, and I'll be asking you a few      |
| 16 |    questions to determine if there's any information    |
| 17 |    that you may have about my case.                     |
| 18 | A  Okay.                                                |
| 19 | Q  I'll go over some rules for the deposition.  The     |
| 20 |    oath that the court reporter administered to you     |
| 21 |    holds the same weight as if you were testifying in   |
| 22 |    court.  You have the same obligation to give         |
| 23 |    truthful statements.  Do you understand?             |
| 24 | A  Yes.  Absolutely.                                    |
| 25 | Q  The court reporter will transcribe everything that   |

```
 1       we say.  I'll try not to interrupt you as you're
 2       answering questions.  I ask that you not interrupt
 3       me while I ask questions.  This makes it easier for
 4       the court reporter to document what we are saying.
 5       Do you understand?
 6   A   Yes.
 7   Q   The court reporter cannot transcribe uh-huhs and
 8       nods.  So please make verbal statements.  Do you
 9       understand?
10   A   Yes.
11   Q   I don't plan to take long for your deposition, but
12       if you need to take a break, just let me know.  I
13       only ask that you completely answer the last
14       question that I presented before we break.  Do you
15       understand?
16   A   I do.  Can I ask one favor?  My daughter is on her
17       way back somewhere, and she doesn't know I'm in a
18       meeting, so can I just please send her a text and
19       tell her what I'm -- that I can't be reached right
20       now?  So hang on.  I'm sorry.  I've got two at home
21       by themselves.  I'm really sorry.  One -- I haven't
22       seen the one yet so -- she was at camp.  I have to
23       tell -- I have to tell her that -- hang on.  Sorry.
24       -- oh, Jesus, Penny.  Give me a second to answer
25       you.  Hopefully, that's enough.  Okay.  Sorry.  Go
```

```
 1        ahead.
 2    Q   If you need to break to answer or, you know,
 3        communicate with your --
 4    A   I will.  I just sent her a text, so she should be
 5        okay right now, but if she does call back again,
 6        then it is a 91 -- I said unless it's a 911, you
 7        need to wait.
 8    Q   Just let -- just let us know, and it will be fine.
 9        Thank you.
10    A   Thanks.
11    Q   Are you currently taking any medications or drugs
12        that would affect your testimony today?  If so --
13    A   No.
14    Q   -- what medications or drugs?
15    A   No.  None.
16    Q   Is there any reason that you can think of that
17        makes this a bad day for a deposition?
18    A   No.
19    Q   If there is ever a point that you are unable to
20        testify accurately and truthfully, please let me
21        know.  Do you understand?
22    A   Yes.
23    Q   Have you ever been deposed before?  If so, when?
24    A   No.
25    Q   Have you ever testified in court or any other
```

```
 1      proceeding?  If so, when?

 2   A  I testified on a parking ticket once but that was

 3      probably about 35 years ago.  That was it.

 4   Q  Have you ever been charged or convicted of a crime?

 5   A  No.

 6   Q  Charged with or convicted of a crime.

 7   A  No.  Neither.

 8   Q  Are you married?

 9   A  Yes.

10   Q  How long have you been married?

11   A  I don't think that matters, I'll be honest.

12   Q  How long have you been married?

13   A  32 years, I think.  32.

14   Q  Do you have children?

15          THE WITNESS:  Rachana, are these questions for

16      -- is this normal?

17          MS. FISCHER:  This is normal background so --

18          THE WITNESS:  Okay.  I'm just asking.  I'm

19      just asking.

20   A  Yes, I have two kids.  I have one husband, two

21      kids.

22   Q  How old are your children?

23   A  11 and 14.

24   Q  Okay.  What is your age?

25   A  55.
```

```
 1   Q  What is your race?

 2   A  One more time?  Repeat.

 3   Q  Your race?  Your race?

 4   A  Oh.  I think white, I guess.  Yeah.

 5   Q  Are you unsure what your race is?  You said I think

 6      --

 7   A  Well, I think it's like White Nonhispanic I think

 8      is the category.  White Nonhispanic is the

 9      category, I guess.  I'm not sure.

10   Q  Did you review any documents concerning this -- you

11      know, let's go back to what is your race.  When

12      you're asked what is your race on --

13   A  Well, let's say this.  White.  That's what I wrote

14      down.

15   Q  Thank you.  Did you review any documents concerning

16      this case to prepare for your deposition?

17   A  Only what I was provided that I gave in a statement

18      before and what I was emailed from the attorney.

19   Q  And what documents were those?

20   A  My emails, questionnaire, pictures of the

21      classroom, and a paper that said the case.  Like,

22      it was just the official document for the case.

23   Q  Have you met with counsel for the other side to

24      discuss this deposition?  If so, who specifically

25      did you meet with?
```

1    A   Only with Ms. Fisher.

2    Q   Have you signed any agreements or made any verbal

3        agreements with anyone or the agency about this

4        deposition?

5    A   No.

6    Q   Did you speak with anyone else about this

7        deposition?  If so, who?

8    A   Only my supervisors that I was a witness in a case.

9    Q   Can you repeat that?  Only your -- I'm sorry.

10   A   Only my -- I have two principals that I work for,

11       so I had to tell them what I was doing today and

12       that I was going to be about one hour, and I was a

13       witness in a case.  That's all I told them.

14   Q   Have you ever filed an EEO complaint in the

15       workplace?

16   A   No.

17   Q   Who is your employer?

18   A   DoDEA.

19   Q   So the same --

20   A   Department of the Defense.

21   Q   Same agency that I work for?

22   A   Yes, ma'am.

23   Q   Who is your first level supervisor -- first line

24       supervisor?

25   A   Dr. Jones and Mr. Scott Finley.

1  Q  And how long has Dr. Jones been your first line
2     supervisor?
3  A  About one year now.
4  Q  And who was your first line supervisor before that?
5  A  Mr. Villarreal.
6  Q  And how long was he your --
7  A  And Mr. Finley.  And Mr. Finley.  Mr. Finley has
8     been here the whole time.
9  Q  And how long was Mr. Villarreal your first line
10    supervisor?
11 A  About three years.
12 Q  Okay.  And who is your second line supervisor?
13 A  The vice principals.  I only have one now.  That
14    would be -- now would be Gary Cummings, and prior
15    to that, it was Shawn Rodman.
16 Q  What year did you begin working for DoDEA?
17 A  Well, this time, 2018.
18 Q  And before that?
19 A  I worked for DoDEA for about ten years from around
20    -- no, not DoDEA.  I worked for DoDEA for about two
21    years in 2008, 2010 up in Hohenfels.  Around about.
22    That's a guess.  I'd have to look.
23 Q  And so your total years with DoDEA?
24 A  One, two, three, four, five, six.
25 Q  What is your job title?

```
 1    A   Administrative officer.

 2    Q   What is your pay band?

 3    A   GS-11.  I have to look at that, if that's okay with

 4        you, because I don't know the exact -- it's GS-11

 5        and then the series of 0341.

 6    Q   What is your current salary?

 7    A   I think around $68,000.

 8    Q   What are your responsibilities?

 9    A   I cover for both schools, the high school and the

10        elementary schools.  Facilities, keys, course

11        protection, safety, purchasing, occasionally

12        filling in in the office.  That's the main parts

13        but facilities could mean work orders, broken

14        things, moving furniture, things like that.

15    Q   Okay.  Can you think of any other responsibilities?

16    A   No.

17    Q   How long have you and I worked together?

18    A   I think you've been virtual for, what, two years

19        now?  And so of the four years, I think we were in

20        the building together maybe half that time.  So

21        about two years -- two to four, if you -- I don't

22        know if you count the whole thing with the time you

23        were in the building and out of the building or --

24    Q   So --

25    A   So I guess about three years -- four years total, I
```

```
 1        guess.
 2   Q    Okay.  Because you've been at Vilseck since what
 3        year?
 4   A    2018.
 5   Q    Okay.  How often do you have a chance to work with
 6        me or interact with me?
 7   A    Only if you need something so -- teachers will
 8        email me or call me if their power is out, if a
 9        light is broken, if they need -- just if they need
10        anything, really.
11   Q    Okay.  I'm going to switch gears.
12   A    Not very often.  It's random.  People might ask me
13        -- I might not hear from somebody for a half a
14        year.  So...
15   Q    I'm going to switch gears here for a minute.
16   A    Sure.
17   Q    Do you know my -- do you know who my daughter is?
18   A    No, I really don't.
19   Q    Do you recall me -- no.  When I entered in
20        July 2019 the Vilseck food court, you were sitting
21        with your daughter and you informed me that you had
22        just spoken with my daughter the week before.  Do
23        you recall?
24   A    Say that one more time.
25   Q    When I entered the food court in Vilseck, you were
```

| | | |
|---|---|---|
| 1 | | sitting with your daughter, Penny. |
| 2 | A | Okay. |
| 3 | Q | And you saw me, and you said that you had just |
| 4 | | spoken with my daughter about a week or so before |
| 5 | | that, and I told you that my daughter told me |
| 6 | | already.  Do you recall that? |
| 7 | A | I don't remember seeing you in the food court, but |
| 8 | | I remember saying hi to a bunch of kids before that |
| 9 | | so -- I don't really remember that.  I'm going to |
| 10 | | be honest.  That was a while ago. |
| 11 | Q | So I'm not talking about when you approached my |
| 12 | | daughter.  I'm talking about when you and your |
| 13 | | daughter were sitting in the food court. |
| 14 | A | No, I don't remember.  I really don't. |
| 15 | Q | Okay.  Who was my daughter with when you approached |
| 16 | | her at the Doner stand? |
| 17 | A | I didn't approach her.  She was in line just like |
| 18 | | my daughter and I, and my daughter and your |
| 19 | | daughter attended the same school at one time, so |
| 20 | | when she turned around and said hi, I said hi back, |
| 21 | | and she was just with a bunch of other kids.  I |
| 22 | | didn't know any of them so -- my daughter did, |
| 23 | | though. |
| 24 | Q | What questions did you ask my daughter when you |
| 25 | | were standing there next to her? |

```
 1   A   Nothing, really.  I just said hi to her, and then

 2       when I left, she said something to me, maybe have a

 3       great day, and then maybe I said something like,

 4       yeah, tell your mom hi or something like that.

 5       Really, it was a while ago.  So...

 6   Q   Did you ask --

 7   A   (Indecipherable.)

 8           THE REPORTER:  I'm sorry.  I didn't catch that

 9       last part.  You said, Really, it was a while ago.

10   A   I said it was a while ago so it's really hard to

11       remember exactly what I said unless I can look at

12       the paper, what I wrote down.  I really don't

13       remember.  It was a long time.

14   Q   About how many of her friends were present there

15       with her?

16   A   Oh, God.  I have no idea.  No idea.

17   Q   Did you ask --

18   A   No idea.

19   Q   Did you ask my daughter what business I was taking

20       care of over the summer, what I was doing over the

21       summer?

22   A   No.

23   Q   Were you and I ever friends?

24   A   We're work colleagues, but we don't hang out, so

25       probably I would say no.  We don't socialize.
```

```
 1        So...
 2   Q  How did our discussions begin about me using the
 3        hydroponic system?
 4   A  Well, that I've got to look up.  I have an email
 5        here around mid December 2019 where it was
 6        discussed about moving it into your room, and it
 7        says from you -- there must have been an email
 8        before that where I said when you're available, and
 9        this is -- it doesn't have all the emails, so I
10        must have asked when you were available.  You told
11        me 11:15 to 12:30 on 18 December.  I already told
12        you that I was already gone, which meant I was at
13        the elementary school, and I asked you about the
14        next day.  You said 1500 hours today or 5th period
15        tomorrow, which I already said I was gone for the
16        day.  And then I said, let me know if I should stop
17        by and consult with you.  You said, it doesn't look
18        like I have a free wall for the system to be
19        drilled into.  The power strips are in the way and
20        may cause a safety issue.  That's what I'm
21        thinking, but I'm not sure.  And then I said, yes,
22        it will be drilled into your wall.  I'm in my
23        office until 11:00 today, and I would like -- and
24        would like to look before Friday so we can do this
25        over break.  Then you said there may be one area
```

1      where it would fit, but I'm not sure.  And you said

2      it needs to be drilled into the wall; correct?  And

3      then there was -- hang on.  Da, da, da, da.  That's

4      pretty much it.

5   Q  So I expressed to you that room A212, my classroom

6      was unsafe for the hydroponic system.

7   A  Yeah.  It says right here, it doesn't look like I

8      have a free wall for the system to be drilled into.

9      The power strips are in the way and may cause a

10     safety issue.  That's what I'm thinking, but I'm

11     not sure.

12  Q  Did I request to have the system placed in A218,

13     Ms. Susan Holt's old classroom?

14  A  Ms. Susan Holt's old classroom?  No.  It wouldn't

15     even fit in there because one wall is sinks, one

16     wall was Smart board, one wall was windows, and the

17     other wall was a dry erase board.  So, no, you

18     didn't ask me that.

19  Q  So you wouldn't have an email that's showing me

20     asking you about room 218?

21  A  No.  All I have is this.  That's all I have.

22  Q  Was Susan Holt's old classroom being used?

23  A  Yes, it is a classroom right now.

24  Q  Was it being used at that time?

25  A  Was it being used?  I can't remember what year

| | | |
|---|---|---|
| 1 | | Ms. Holt left.  I don't know what year Ms. Holt |
| 2 | | left.  I don't remember what year she left. |
| 3 | Q | So the -- what I'm asking is, when I requested to |
| 4 | | use the hypotonic system -- hydroponic system, |
| 5 | | sorry, the hydroponic system, was Ms. Holt -- was |
| 6 | | her classroom being used at that time? |
| 7 | A | I don't remember if she was still there or not. |
| 8 | | That's what I'm -- that's what I'm -- I don't |
| 9 | | remember when she left.  Do you remember when she |
| 10 | | left?  Because I don't. |
| 11 | Q | Were you friends with Ms. Holt while she worked and |
| 12 | | lived here in Vilseck? |
| 13 | A | No.  Just like you.  Work colleagues.  We never |
| 14 | | socialized. |
| 15 | Q | So your families never went out to dinner, lunch, |
| 16 | | festivals together, anything? |
| 17 | A | No.  If we did, it was -- let me say it like this. |
| 18 | | There's union picnics.  There are functions for the |
| 19 | | school, things where a lot of people are present |
| 20 | | but not specifically just them and us, no. |
| 21 | Q | Did you feel the hydroponic system belonged to |
| 22 | | Ms. Holt? |
| 23 | A | It belonged to the environmental club. |
| 24 | Q | Did you feel that I shouldn't use the system? |
| 25 | A | No.  Anybody could use it. |

```
 1    Q   Why did you attempt to have the system placed into
 2        my classroom even though my classroom was unsafe?
 3    A   You asked me --
 4            MS. FISCHER:  Objection.  Mischaracterizes --
 5        hold on a second, Ms. Wolff.  Objection.
 6        Mischaracterizes the testimony.  I don't think
 7        she's testified to that.
 8    Q   Did you attempt to call KS -- the -- I can't
 9        remember if it's KSC.  What is -- what is the name
10        of the contractor that you would call to move the
11        system?
12    A   Oh, SKE.  That's our maintenance folks.
13    Q   So did you send me an email saying that you needed
14        to contact SKE to move the system over the holiday
15        into my classroom?
16    A   I said to you -- after you said it may be a safety
17        issue, I said I wanted to talk about it before
18        Friday so we can do this over break with SKE.  And
19        then you said to me, there may be one area where
20        the system would fit.  I answered you back, and we
21        didn't have any more discussion about it after that
22        so -- but it's not really something I can put in --
23        it's not really something I can put a work order in
24        for anyway because since it was built and paid for
25        by the club, it doesn't really -- it's not really
```

```
 1        -- how do I say this?  It's not like a light
 2        fixture in the school and SKE has to fix it.  I'm
 3        really not allowed to have SKE move that because it
 4        was something put into the school as something
 5        interesting to have, if I can say it like that.
 6    Q   But --
 7    A   But it could have been -- that's okay.  Go ahead.
 8    Q   No, please.  Finish.
 9    A   No.  I was just saying that we never know if it was
10        going to happen anyway so -- because we didn't get
11        that far.  So it's really --
12    Q   But you did send an email saying that you wanted me
13        to make a decision so that you could call SKE to
14        ask them to put it in over the holiday?
15    A   I wanted us to meet up one more time to talk about
16        it, but it never happened.
17    Q   In the email, did you state that you wanted to
18        contact SKE?
19    A   What I said was, yes, it will be drilled into your
20        wall.  I am in my office until 11:00 today and
21        would like to look before Friday so we can do this
22        over break with SKE.
23    Q   And you agree that my room -- my classroom was
24        unsafe.  It could not be moved in there.
25    A   It won't fit with you and all your kids.  That's
```

```
 1        what we talked about.  That's why I said I wanted
 2        to talk about it one more time because if we were
 3        going to do it, it would -- needed to be done over
 4        break.
 5   Q    Do you understand that I never wanted to put it in
 6        my classroom in the first place?
 7   A    No, because you wanted it in your classroom.
 8        That's what you told me.
 9   Q    Where -- where do you have -- or do you have
10        documentation that I said I wanted it in my
11        classroom?
12   A    I came to your room and measured at your request.
13        That's why I took pictures of your classroom so I
14        could show you.
15   Q    My original request was to use the hydroponic
16        system in the room that it was in.  However, that
17        room was being used by someone else.  I think it
18        was the counselor.  Is that correct?
19   A    Yes.  Uh-huh.  Yes.
20   Q    My next request was to have the hydroponic system
21        moved to Ms. Susan Holt's old classroom; is that
22        correct?
23   A    I never heard that request.  I only knew about it
24        -- you wanting it in your room.
25   Q    Is it true that I only considered placing it in my
```

```
 1        room when the other two options were not made
 2        available to me?
 3   A    I wouldn't know that.
 4   Q    Is it true that I said that my classroom was unsafe
 5        for the hydroponic system?
 6   A    You said it doesn't look like I have a free wall.
 7        That's what I'm thinking, but I'm not sure.  That
 8        was it.  But then I -- but then I came down and saw
 9        you, so we met up in your room after that.
10   Q    So in the email where I said it appears that I
11        don't have a free wall, that doesn't sound like my
12        initial request was to have it in my room, does it?
13   A    I only know of a request to put it in your room.
14        That's all I know.
15   Q    Was the hydroponic system ever moved?
16   A    It was removed from the school because we needed to
17        use it as an office later, like half a year ago.
18   Q    Where was it placed?
19   A    Where was it placed?  We took it to DRMO so that if
20        somebody wanted it, they could take it, because it
21        started to smell like mold.
22   Q    Can you explain what DRMO is for the record?
23   A    DRMO is where things are taken and another unit or
24        another school or an organization can come and see
25        what they have, and then you can either purchase it
```

```
 1        or have it transferred to your organization.
 2   Q    And if it's not taken from DRMO, what happens to
 3        the -- the property?
 4   A    It just -- it just stays there.  So -- but if
 5        someone takes it, then it -- then it's gone.  I
 6        wouldn't -- I wouldn't know who took it if somebody
 7        took it.  That's the other thing.
 8   Q    You viewed a sign on my desk stating not to walk
 9        behind my desk; is that correct?
10   A    I never saw that.
11   Q    I've informed you not to walk behind my desk unless
12        invited; is that correct?
13   A    No.
14   Q    I've requested that you not interrupt my class
15        while I am instructing my students; is that
16        correct?
17   A    No.
18   Q    Has administration ever discussed with you that you
19        should not walk into my personal area?
20   A    The day after we met, yes.
21   Q    Has administration ever informed you that I should
22        -- that you should not interrupt my class while I'm
23        instructing my students?
24   A    Yeah, but I asked you when I came to the door if I
25        could come in, and you said yes.
```

1  Q  In late -- you asked me when you came to the door

2     -- can you please explain what you mean when you

3     say that?

4  A  I knocked on the door like I do to every teacher.

5     I opened the door, and I said, is now a good time,

6     and you said yes.

7  Q  While I was instructing my students, while I was

8     speaking with them?

9  A  No.  You were sitting at your desk and they were

10    working on their own.  If you were teaching

11    teaching, I wouldn't have knocked on the door.

12 Q  I was instructing my students.  I was teaching

13    teaching.

14        MS. FISCHER:  Objection.  Ms. Smithson, you're

15    not here to testify.  You're here to ask questions.

16        MS. SMITHSON:  That's true.  That's true.

17 Q  In late September 2019 you entered my classroom

18    during the instruction of at least 20 students of

19    my biology class.  After I informed you that this

20    was not a good time to speak, why did you enter my

21    classroom still while instructing my students?

22 A  You didn't say that until after we talked about the

23    hydroponic system.  I would have never entered your

24    class if you said now is not a good time.  You said

25    now is a good time.  I walked over to your desk,

```
 1        and then when I said, I just don't think it's going
 2        to fit, then you said now is not a good time.
 3   Q    You received an email when I -- before that where I
 4        told you what a good time was, 5th period or after
 5        school; is that correct?
 6   A    You told me -- hang on.  I told you I was already
 7        gone that day to my other school that I work at.
 8        You said 1500 today or 5th period tomorrow will be
 9        good for me.  And that's when I came by because I
10        was already at the other school, so I came by the
11        next morning, I'm sure of it.
12   Q    So you entered my class during 7th period.  Do you
13        recall?  Do you remember that?
14   A    I don't remember.  Honest, to God, I don't remember
15        the exact time, but it was in the morning because I
16        was at the high school.
17   Q    So do you agree that you did not come to my class
18        at the time that I specified in the email?
19   A    No.
20   Q    You don't agree?
21   A    No.
22   Q    Did you come to my classroom during the time that I
23        specified in the email?
24   A    I didn't come at 1500 because that was the day
25        before, and I was already gone for the day to my
```

1  other school.

2      MS. FISCHER:  Just for clarity of the record,

3  what time are you claiming you specified?

4      MS. SMITHSON:  5th period or after school.

5      MS. FISCHER:  So I'm going to object because

6  you're mischaracterizing the document.  In the

7  document, you told her to come by between

8  1115 hours and 1230 hours.  I apologize.  My

9  military time reading is terrible, but the document

10  says you requested that she come between 11:15 and

11  12:30.

12      MS. SMITHSON:  Right.  That was that day, and

13  that's what she's saying.  So she was not there

14  that day.  So I told her 5th period.

15      MS. FISCHER:  Do you have the document in

16  front of you because I think it might be helpful if

17  we marked it.  I don't think you're reading the

18  document correctly.

19      THE WITNESS:  Me or --

20      MS. FISCHER:  No.  I'm talking to

21  Ms. Smithson.

22      MS. SMITHSON:  No.  She brought -- hold on.

23  Is that a document -- that's not one that I sent

24  you today; right?  She has that document.

25      MS. FISCHER:  No.

```
 1              MS. SMITHSON:  No.  But that's okay.  We can
 2        move on.  The document is in the record, so we
 3        can -- we can move on.  So the information in the
 4        document is in the record already and we can
 5        compare it to this deposition later.
 6    Q   Did you know that several students informed me that
 7        these types -- the type of interruptions that --
 8        you know, from when you entered my class did not
 9        take place in their other classes?
10    A   Say that one more time.
11    Q   When you entered my class -- and, of course, you're
12        not -- you weren't the first person nor the last to
13        interrupt my instruction, but my students informed
14        me that these types of interruptions don't normally
15        take place in their other classes.  Are you aware
16        of that?
17    A   I wouldn't know that.
18    Q   Was there another adult present when you entered my
19        classroom?
20    A   I don't know if there was an aide in there.  I
21        couldn't say.  I'm sure there was students in
22        there, but I don't -- no, I have no idea.
23    Q   There was another adult in there.  You don't
24        remember who that adult was?
25              MS. FISCHER:  Again, Ms. Smithson, she just
```

 1       testified she didn't -- doesn't know, so you can't

 2       testify then about what happened.

 3            MS. SMITHSON:  You're right again.  Thank you.

 4   Q  How many students were from the classroom at the

 5       time -- about how many students?

 6   A  If I had to guess, 12 to 15, maybe.  Maybe 18.  I'm

 7       not sure.  It was four years ago.

 8   Q  Is it possible that one of those students could

 9       have recorded you walking behind my desk and

10       standing with your hip against my shoulder on that

11       day?

12   A  I don't know.

13            MS. FISCHER:  Objection.  Calls for

14       speculation.  You can answer.

15   Q  Did you walk -- go ahead.

16   A  I don't know who's next.

17   Q  No.  You can answer she said?

18            MS. FISCHER:  Yeah, you can answer.

19            THE WITNESS:  I can answer or I can't?

20            MS. FISCHER:  You can answer if you know.

21   A  I don't know something like that.

22   Q  Did you walk behind my desk while I was instructing

23       my students?

24   A  I did because I couldn't hear you.

25   Q  And did you place your hip against my shoulder as

```
 1        you were standing next to me while I was sitting at
 2        my desk?
 3   A    No.
 4   Q    When I told you that I was busy with my students
 5        and that we could speak about the system later, did
 6        you pat me on my shoulder and say, okay, we'll talk
 7        later?
 8   A    I told you I didn't think the hydroponic system
 9        would fit, and you said I can't do this right now,
10        and I said okay, and I left.
11   Q    Did you pat me on my shoulder before you left?
12   A    No, no.
13   Q    Are you aware that during the investigation
14        Mr. Villarreal reported that you informed him that
15        you momentarily -- I quote, momentarily placed your
16        hand on my shoulder?
17   A    I don't remember that.
18   Q    Is it possible that you told Mr. Villarreal at that
19        time that you momentarily placed your hand on my
20        shoulder?
21   A    I don't remember.
22   Q    But now you're saying you did not place your hand
23        on my shoulder.
24   A    No.  You said you didn't have time to talk to me
25        anymore, basically, and I left.
```

1  Q  And before you left, did you place your hand on my

2     shoulder --

3  A  I already answered.

4  Q  -- pat me on my shoulder?

5  A  No.  I said no.

6  Q  Do we have a personal relationship?

7  A  No.

8  Q  Why would you stand so close in my personal space?

9        MS. FISCHER:  Objection.  It mischaracterizes

10     her testimony.  She never testified that she

11     standed -- that she stood extremely close to you in

12     your personal space.  You can answer.

13 A  I just came around your desk because I couldn't

14    hear you when we were talking.

15 Q  When you came around my desk, wasn't I talking to

16    my students?

17 A  No.  You were typing on your computer, but I don't

18    know what you were doing.

19 Q  Were you attempting to get a negative reaction from

20    me by doing this?

21 A  Say that again.

22 Q  Were you attempting to get a negative reaction from

23    me by entering my classroom while I was engaged

24    with a full class of students?

25 A  No.

```
 1   Q   Were you attempting to make me become aggressive

 2       toward you so that I could be fired?

 3   A   No.

 4   Q   After my complaint, had any supervisor counseled

 5       you about violating my personal space?

 6           MS. FISCHER:  I'm going to object.

 7   A   I already -- I already answered that.

 8           MS. FISCHER:  One second, Ms. Wolff.  Ms.

 9       Wolff, one second.  I'm going to object because

10       it's ambiguous as to complaint.  Do you mean your

11       legal complaint you filed in court or the complaint

12       you made to Mr. Villarreal?

13           MS. SMITHSON:  The complaint I made to

14       Mr. Villarreal.

15           MS. FISCHER:  You can answer, Ms. Wolff.

16   A   I already answered that.  You asked me that

17       already, and I told you that he told me the next

18       day.

19           (Exhibit W2 marked.)

20   Q   Can you open Exhibit W2, please?

21   A   What is that?  Is that this?

22   Q   It's W2.  It would have been sent to you in an

23       email.

24           MS. FISCHER:  I sent you the exhibits by email

25       this morning.
```

```
 1              THE WITNESS:  Oh, hang on.
 2              MS. FISCHER:  It's a forwarded email from
 3         Ms. Smithson.
 4              THE WITNESS:  Hang on.  I've got to minimize
 5         you guys for a second.  Is it called exhibits?
 6              MS. SMITHSON:  Yes.
 7              MS. FISCHER:  Yes.
 8              THE WITNESS:  Did you say W1 or W2?
 9              MS. SMITHSON:  W2.
10              THE WITNESS:  Okay.  I don't have any way to
11         print anymore because we got rid of printers in our
12         office, so I'm going to have to -- oh, crap -- open
13         it and look.
14    Q  And that's fine.  Can you do it from your computer?
15    A  Yep.  It says -- is it the one that starts with
16         good evening, Dr. Jones?
17    Q  Yes.  So do you recognize this document?
18    A  Hang on.  I've seen it once -- wait a minute.  Hang
19         on.  Thank you for your email.  I wanted to reply
20         when I received your email this morning, but I felt
21         the need --
22              THE REPORTER:  I'm sorry.  If you're going to
23         read, could you slow down, please?
24              THE WITNESS:  No.  I'm reading -- I'm just
25         reading the document to myself.  You don't need to
```

```
1        record.  I'm reading a page that was emailed to me.

2    A   I have scanned over this briefly, yes.

3    Q   What is it?

4    A   I believe it is some email traffic about your

5        computer and about keys and coming in the building,

6        I guess.

7    Q   On what day did I send you an email about gaining

8        access to the workplace?

9    A   Hang on one second.  Let me go back.  Let me look.

10       16 September was the first email.  17 September was

11       the -- I think 16 September, if I'm reading it

12       correctly.

13   Q   On what day did you reply?

14   A   Hang on one second, please.  Let me get the Zoom

15       back here.  I don't know how to get the Zoom back.

16       There you are.

17           I didn't reply because everything was up in

18       the air about several teachers at both of my

19       schools that we weren't sure if people were virtual

20       or going to be in person and which classrooms were

21       being shuffled around, so I let Dr. Jones handle it

22       because we really didn't know what everybody was

23       doing at the time.

24   Q   So you just didn't reply at all to at least inform

25       me that things were up in the air?
```

```
 1    A   No, because that would be for your supervisor to
 2        do.  I don't have any -- any control over virtual
 3        school.  I only -- they would tell me who's going
 4        to be in a certain classroom or things like that
 5        and then that would prompt whoever is going to pass
 6        out the keys to pass them out.  So that was up to
 7        Dr. Jones to do.
 8    Q   So if you go to the email on September 16th.
 9    A   Hang on.  I've got to minimize you guys.  Hang on.
10        Okay.  Go ahead.
11    Q   So who is this email addressed to?
12    A   Myself and Mr. Rodman and Dr. Jones.
13    Q   Who is it directly addressed to?
14    A   To myself.
15    Q   Who should be the responding party in an email?
16    A   Your supervisor.
17    Q   In any email, who is the responding party?
18    A   It depends on the topic.  This topic requires your
19        supervisor to respond.
20    Q   Who is the email addressed to?
21    A   Michele Wolff.
22    Q   And you've already stated what your
23        responsibilities are.  Did this request fall in
24        line with your responsibilities?
25    A   To pick up keys or to assign keys?
```

1  Q  To assign keys.

2  A  I don't assign keys unless the principal says to me

3     who is going to be teaching a particular class or

4     physically be in the building to teach classes.

5  Q  So when this email was addressed to you, would it

6     have been professional, courteous to reply to it so

7     that I would know how to move forward?

8  A  It -- it didn't require a response because things

9     were up in the air, and I'm not your supervisor.

10  Q  Who was cc'd on -- on this?

11  A  You asked me that.  Mr. Rodman and Ms. Jones.

12  Q  And what does cc stand for?

13  A  I guess a courtesy copy.

14  Q  Does that require the person to respond?

15  A  Ms. Smithson, I told you that it was for your

16     supervisor to tell me who was going to be teaching

17     in any particular room and if anybody was going to

18     be virtual and if they actually needed keys to the

19     building or not.  It's the same situation at the

20     elementary school.

21  Q  So when was your first time responding -- replying

22     to this email?

23  A  I didn't because I'm not your supervisor.

24  Q  So I sent you an email on September 16th; is that

25     correct?

```
1    A   Yep.

2    Q   At 2:35 a.m.

3    A   Yes.  I'm not awake --

4    Q   I sent you an email on --

5    A   I'm not awake at 2:35 a.m.  So...

6    Q   That's okay.  That's okay.  But when you woke up --

7        when you woke up, it was there; correct?

8    A   Yep.

9    Q   I sent you another email on September 17th, which

10       was a Friday, at 5:01 p.m.; is that correct?

11   A   Yep.

12   Q   I sent you another email on Tuesday, September 22nd

13       at 8:35 a.m.; is that correct?

14   A   Yep.

15   Q   I sent you -- actually -- so that was exactly --

16       I'm sorry.  Let me see.

17   A   Five days.

18   Q   Yes.  And then at that time, Dr. Jones replied --

19   A   Yep.

20   Q   -- is that correct?

21   A   Yes.

22   Q   And then I sent Dr. Jones an email explaining my

23       experience at Vilseck High School.  You received

24       that as well.

25   A   Okay.
```

```
1    Q  No, you did not.  That's just attached here.  So
2       you did not -- so this is your first time getting
3       that.  And so the first time that you actually
4       responded to me, do you remember when that was?
5    A  Well, the first two days that you asked me about
6       the keys and I told Dr. Jones, then the next two
7       days after that would have been Saturday and
8       Sunday, so since I don't work Saturday and Sunday,
9       then there was an email after that 18, 19, 20, 21,
10      four days later from you on the 21st of September,
11      and then you're following up on the email, and then
12      Dr. Jones responded to you two days later.
13   Q  So if I -- your first time responding to me was
14      exactly one week.  It was that next Thursday, the
15      23rd.
16   A  I don't see that -- I think Dr. Jones responded to
17      you.  I don't think I responded at all.
18   Q  You did.  It's in another email.  I probably should
19      have put that in the exhibit.
20   A  Okay.  I don't -- I don't --
21   Q  Do you remember?
22   A  No, because I don't see it.
23   Q  It was a week later.  It was a week later.
24   A  Okay.
25   Q  So let's go back to a statement that you made.  So
```

```
 1        -- so essentially --
 2   A    Hang on.  I'm trying to get the Zoom back.  There
 3        we go.  Got it.
 4   Q    So by not replying for a week, you denied me
 5        access.  Do you agree?
 6   A    No.
 7             MS. FISCHER:  Objection.  Mischaracterizes the
 8        facts and her testimony, but you can answer.
 9   A    No, I didn't deny you access.  You know where the
10        school is.  You can come to the main office, and
11        the secretary issues keys at that time.  We shared
12        the responsibility at that time, but I am the
13        ultimate overall key person, but the principal says
14        who I should give keys to.  Okay?  So if it's up in
15        the air at the elementary school and at the high
16        school, then that's when we wait for a decision to
17        be made if somebody is going to be virtual or if
18        they're going to be in person and how the
19        classrooms are going to be shuffled.
20   Q    Why was it up in the air?  What do you mean up in
21        the air?
22   A    Sometimes we say, okay, it looks like 75 students
23        signed up for this class and we only have two
24        teachers to do it.  We need to stand up a third
25        classroom.  That's just an example.  So something
```

```
 1        like that.
 2   Q    How many teachers did you have at the elementary
 3        school who were in the -- teaching in the virtual
 4        school?
 5   A    We had two at that time -- three.  Three.  Two to
 6        three because one -- two to three because one did
 7        it one year and one didn't do it the next year.
 8   Q    And how many teachers did you have at the high
 9        school teaching at this time in the virtual school?
10   A    I believe it was you and one other teacher, I
11        believe.  I believe it was two total.
12   Q    So I'm just talking about starting -- beginning
13        school year 2021.
14   A    Uh-huh.  Yeah.  I'm pretty sure two to three at the
15        elementary and I think a total of two at the high
16        school here.
17   Q    You mentioned Dr. Jones.  No, no.  I'm going to go
18        to this.  When Dr. -- yes, I will.  When Dr. Jones
19        arrived, did she have to speak with you and several
20        members of the faculty to include admin,
21        Mr. Rodman, to concerning the obligation to support
22        teachers in the virtual school?
23   A    I don't understand the question.
24   Q    Did Dr. Jones have to explain to you and Mr. Rodman
25        and a couple of other faculty members that you were
```

```
 1        obligated to support teachers assigned to the

 2        virtual school still?

 3   A    I don't remember a specific conversation about

 4        that, but anybody that works at the school will

 5        support them how we're needed.

 6   Q    Did you refuse to respond to my email because I was

 7        working in the virtual school?

 8   A    No.

 9   Q    Did you refuse me access even outside of school

10        hours, which I've always had, because I was working

11        in the virtual school?

12   A    No.

13             MS. FISCHER:  Objection.  Mischaracterizes

14        testimony that you were refused access, but you can

15        answer.

16   A    No.

17   Q    But you didn't respond when I emailed you for

18        access?

19   A    No, because your supervisor was going to respond.

20   Q    Did you speak with my supervisor?

21   A    I spoke with Dr. Jones.  I spoke with Dr. Jones,

22        and I said, you need to let me know which

23        classrooms are going to be used and if Ms. Smithson

24        would have a place in the school to work or how is

25        that going to work or if we're using the classroom.
```

```
 1   Q   Did anyone ever tell you to hold off on giving me

 2       access or giving me keys to the building?

 3   A   No.  They just needed to decide who was going to be

 4       where and that was really the main thing and if you

 5       were going to be virtual or be in person.  Never.

 6   Q   During the time that you didn't respond, did anyone

 7       tell you to hold off on responding?

 8   A   No.  I just said let me know what you want me to do

 9       like always on any topic.

10   Q   Did you -- do you have documentation that you did

11       that?

12   A   I -- no.  I walk down to the office all the time.

13       I'm in the office most of the morning.

14   Q   So you have no documentation that you even

15       discussed this email with anyone else between the

16       time that you --

17   A   Discussed the email?  I didn't discuss the email.

18       I just said, hey, I need the final list of how the

19       rooms are going to be set up and -- so that if I

20       need to move furniture or if a room is going to

21       stay empty, those things like that, the setup of

22       the school.

23   Q   Was there an overall problem with colleagues and

24       administration about supporting me while I worked

25       at the virtual school?
```

```
 1   A  No, not that -- no.  Absolutely not.  Everybody

 2      supports everybody here.  We even asked if you

 3      needed supplies.

 4   Q  Do you know why I am assigned to the virtual

 5      school?

 6   A  I just assume it's a choice that people make.  I

 7      have no idea why anybody does it.

 8   Q  I may have asked this already.  I can't remember.

 9      Did Dr. Jones have to speak with several members of

10      the faculty including admin -- did I already ask

11      you that?

12   A  You asked me --

13          MS. FISCHER:  Yes.  And I'm going to object as

14      asked and answered.

15   Q  How many students -- oh, no.  This one was asked

16      already as well.  Yeah.  I asked that one as well.

17          MS. SMITHSON:  My deposition for Ms. Wolff is

18      done.  Thank you very much, Ms. Wolff.

19          THE WITNESS:  No problem.

20          THE REPORTER:  This concludes the deposition

21      of Michele Wolff.

22          Will counsel please state if they would like a

23      copy of the transcript, any stipulations, or other

24      matters to be included in the record?

25          MS. SMITHSON:  Yes, I'd like a copy, please.
```

1    MS. FISCHER:  I would like a copy as well.

2    (The deposition concluded at 10:04 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF INDIANA
 2                     INDIANAPOLIS DIVISION

 3
     TAMICA J. SMITHSON,            )
 4                                  )
                      Plaintiff,    )
 5                                  )
             -v-                    )         Case No.
 6                                  )     1:21-CV-02193-JRS-MPB
     LLOYD AUSTIN III,              )
 7   Secretary, Department of       )
     Defense,                       )
 8                                  )
                      Defendant.    )
 9

10
                       Job No. 175089
11

12
             The deposition of MICHELE WOLFF, taken in the
13   above-captioned matter, on September 2, 2022, and at
     the time and place set out on the title page hereof.
14           It was requested that the deposition be
     transcribed by the reporter and that same be reduced
15   to typewritten form.
             It was agreed that the reading and signature
16   by the deponent to the deposition were waived on
     behalf of the parties Plaintiff and Defendant by their
17   respective counsel, the witness being present and
     consenting thereto, and/or pursuant to the Fed. R.
18   Civ. P. 30(e), the deposition to be read with the same
     force and effect as if signed by said deponent.
19

20

21

22
                 STEWART RICHARDSON & ASSOCIATES
23             Registered Professional Reporters
               One Indiana Square, Suite 2425
24                 Indianapolis, IN  46204
                       (800) 869-0873
25
```

```
 1    STATE OF INDIANA          )
                                )
 2    COUNTY OF VANDERBURGH     )

 3

 4          I, Elizabeth Taylor Culiver, RPR, a Notary

 5    Public in and for said county and state, do hereby

 6    certify that the deponent herein was by me first duly

 7    sworn to tell the truth, the whole truth, and nothing

 8    but the truth in the aforementioned matter;

 9          That the foregoing deposition was taken on

10    behalf of the Plaintiff; that said deposition was

11    taken at the time and place heretofore mentioned

12    between 9:08 a.m. and 10:05 a.m.;

13          That said deposition was taken down in

14    stenograph notes and afterwards reduced to typewriting

15    under my direction; and that the typewritten

16    transcript is a true record of the testimony given by

17    said deponent;

18          Absent a request by the parties or by

19    agreement, the reading and signing by the deponent to

20    the deposition were waived on behalf of all the

21    parties by their respective counsel, the witness being

22    present and consenting thereto, and/or pursuant to the

23    Fed. R. Civ. P. 30(e); and the deposition is to be

24    read with the same force and effect as if signed by

25    said deponent.
```

1              I do further certify that I am a disinterested

2    person in this cause of action; that I am not a

3    relative of the attorneys for any of the parties.

4              IN WITNESS WHEREOF, I have hereunto set my

5    hand and affixed my notarial seal this 12th day of

6    September, 2022.

7

8

9

10

11

12

13    My Commission Expires:

14    August 14, 2023

15

16    Job No. 175089

17

18

19

20

21

22

23

24

25

*Elizabeth Taylor Culiver*

Elizabeth Taylor Culiver
NOTARY PUBLIC SEAL
STATE OF INDIANA
Commission No. NP0670402
My Commission Expires Aug. 14, 2023

Index: $68,000..attempting

## Exhibits

**Michele Wolff Ex W2**  3:8
 31:19,20

---

## $

**$68,000**  12:7

---

## 0

**0341**  12:5

---

## 1

**10:04**  43:2

**11**  8:23

**1115**  26:8

**11:00**  16:23 20:20

**11:15**  16:11 26:10

**12**  28:6

**1230**  26:8

**12:30**  16:11 26:11

**14**  8:23

**15**  28:6

**1500**  16:14 25:8,24

**16**  33:10,11

**16th**  34:8 35:24

**17**  33:10

**17th**  36:9

**18**  16:11 28:6 37:9

**19**  37:9

---

## 2

**20**  24:18 37:9

**2008**  11:21

**2010**  11:21

**2018**  11:17 13:4

**2019**  13:20 16:5 24:17

**2021**  39:13

**2022**  4:9

**21**  37:9

**218**  17:20

**21st**  37:10

**22nd**  36:12

**23rd**  37:15

**2:35**  36:2,5

**2nd**  4:9

---

## 3

**32**  8:13

**35**  8:3

---

## 5

**55**  8:25

**5:01**  36:10

**5th**  16:14 25:4,8 26:4,14

---

## 7

**75**  38:22

**7th**  25:12

---

## 8

**8:35**  36:13

---

## 9

**91**  7:6

**911**  7:6

**9:08**  4:9

---

## A

**a.m.**  4:9 36:2,5,13 43:2

**A212**  17:5

**A218**  17:12

**Absolutely**  5:24 42:1

**access**  33:8 38:5,9 40:9,14,18
 41:2

**accurately**  7:20

**addressed**  34:11,13,20 35:5

**admin**  39:20 42:10

**administered**  5:20

**administration**  23:18,21 41:24

**Administrative**  12:1

**adult**  27:18,23,24

**affect**  7:12

**affirmed**  5:2

**age**  8:24

**agency**  10:3,21

**aggressive**  31:1

**agree**  20:23 25:17,20 38:5

**agreements**  10:2,3

**ahead**  7:1 20:7 28:15 34:10

**aide**  27:20

**air**  33:18,25 35:9 38:15,20,21

**allowed**  20:3

**ambiguous**  31:10

**answering**  6:2

**anymore**  29:25 32:11

**apologize**  26:8

**appears**  22:10

**approach**  14:17

**approached**  14:11,15

**area**  16:25 19:19 23:19

**arrived**  39:19

**assign**  34:25 35:1,2

**assigned**  40:1 42:4

**associate**  4:7

**Associates**  4:7

**assume**  42:6

**attached**  37:1

**attempt**  19:1,8

**attempting**  30:19,22 31:1

Index: attended..deponent

**attended** 14:19

**attorney** 9:18

**Austin** 4:17,20 5:15

**awake** 36:3,5

**aware** 27:15 29:13

---
**B**
---

**back** 6:17 7:5 9:11 14:20 19:20 33:9,15 37:25 38:2

**background** 8:17

**bad** 7:17

**band** 12:2

**basically** 29:25

**begin** 11:16 16:2

**beginning** 39:12

**behalf** 4:19

**belonged** 18:21,23

**Beth** 4:6

**biology** 24:19

**board** 17:16,17

**break** 6:12,14 7:2 16:25 19:18 20:22 21:4

**briefly** 33:2

**broken** 12:13 13:9

**brought** 26:22

**building** 12:20,23 33:5 35:4,19 41:2

**built** 19:24

**bunch** 14:8,21

**business** 15:19

**busy** 29:4

---
**C**
---

**call** 7:5 13:8 19:8,10 20:13

**called** 32:5

**Calls** 28:13

**camp** 6:22

**care** 15:20

**case** 5:17 9:16,21,22 10:8,13

**catch** 15:8

**category** 9:8,9

**cc'd** 35:10

**Central** 4:9

**chance** 13:5

**charged** 8:4,6

**children** 8:14,22

**choice** 42:6

**claiming** 26:3

**clarity** 26:2

**class** 23:14,22 24:19,24 25:12,17 27:8,11 30:24 35:3 38:23

**classes** 27:9,15 35:4

**classroom** 9:21 17:5,13,14,22, 23 18:6 19:2,15 20:23 21:6,7,11, 13,21 22:4 24:17,21 25:22 27:19 28:4 30:23 34:4 38:25 40:25

**classrooms** 33:20 38:19 40:23

**close** 30:8,11

**club** 18:23 19:25

**colleagues** 15:24 18:13 41:23

**communicate** 7:3

**compare** 27:5

**complaint** 10:14 31:4,10,11,13

**completely** 6:13

**computer** 30:17 32:14 33:5

**concluded** 43:2

**concludes** 42:20

**considered** 21:25

**consult** 16:17

**contact** 19:14 20:18

**contractor** 19:10

**control** 34:2

**conversation** 40:3

**convicted** 8:4,6

**copy** 35:13 42:23,25 43:1

**correct** 17:2 21:18,22 23:9,12,16 25:5 35:25 36:7,10,13,20

**correctly** 26:18 33:12

**counsel** 4:1,13 9:23 42:22

**counseled** 31:4

**counselor** 21:18

**count** 12:22

**couple** 39:25

**court** 4:3 5:20,22,25 6:4,7 7:25 13:20,25 14:7,13 31:11

**courteous** 35:6

**courtesy** 35:13

**cover** 12:9

**crap** 32:12

**crime** 8:4,6

**Culiver** 4:6

**Cummings** 11:14

**current** 12:6

---
**D**
---

**da** 17:3

**date** 4:8

**daughter** 6:16 13:17,21,22 14:1, 4,5,12,13,15,18,19,22,24 15:19

**day** 7:17 15:3 16:14,16 23:20 25:7,24,25 26:12,14 28:11 31:18 33:7,13

**days** 36:17 37:5,7,10,12

**December** 16:5,11

**decide** 41:3

**decision** 20:13 38:16

**defendant** 4:20

**Defense** 10:20

**denied** 38:4

**deny** 38:9

**Department** 10:20

**depends** 34:18

**deponent** 4:12

Index: deposed..guys

**deposed** 7:23

**deposition** 4:11 5:19 6:11 7:17 9:16,24 10:4,7 27:5 42:17,20 43:2

**desk** 23:8,9,11 24:9,25 28:9,22 29:2 30:13,15

**determine** 5:16

**dinner** 18:15

**directly** 34:13

**discuss** 9:24 41:17

**discussed** 16:6 23:18 41:15,17

**discussion** 19:21

**discussions** 16:2

**document** 6:4 9:22 26:6,7,9,15, 18,23,24 27:2,4 32:17,25

**documentation** 21:10 41:10,14

**documents** 9:10,15,19

**Dodea** 10:18 11:16,19,20,23

**Doner** 14:16

**door** 23:24 24:1,4,5,11

**drilled** 16:19,22 17:2,8 20:19

**DRMO** 22:19,22,23 23:2

**drugs** 7:11,14

**dry** 17:17

**duly** 5:2

---

E

**easier** 6:3

**EEO** 10:14

**elementary** 12:10 16:13 35:20 38:15 39:2,15

**email** 13:8 16:4,7 17:19 19:13 20:12,17 22:10 25:3,18,23 31:23, 24 32:2,19,20 33:4,7,10 34:8,11, 15,17,20 35:5,22,24 36:4,9,12,22 37:9,11,18 40:6 41:15,17

**emailed** 9:18 33:1 40:17

**emails** 9:20 16:9

**employer** 10:17

**empty** 41:21

**engaged** 30:23

**enter** 24:20

**entered** 13:19,25 24:17,23 25:12 27:8,11,18

**entering** 30:23

**environmental** 18:23

**erase** 17:17

**essentially** 38:1

**Evansville** 4:8

**evening** 32:16

**exact** 12:4 25:15

**EXAMINATION** 5:5

**examined** 5:4

**exhibit** 31:19,20 37:19

**exhibits** 31:24 32:5

**experience** 36:23

**explain** 22:22 24:2 39:24

**explaining** 36:22

**expressed** 17:5

**extremely** 30:11

---

F

**facilities** 12:10,13

**facts** 38:8

**faculty** 39:20,25 42:10

**fall** 34:23

**families** 18:15

**favor** 6:16

**federal** 5:14

**feel** 18:21,24

**felt** 32:20

**festivals** 18:16

**filed** 10:14 31:11

**filling** 12:12

**final** 41:18

**fine** 7:8 32:14

**Finish** 20:8

**Finley** 10:25 11:7

**fired** 31:2

**Fischer** 4:4,19 8:17 19:4 24:14 26:2,5,15,20,25 27:25 28:13,18, 20 30:9 31:6,8,15,24 32:2,7 38:7 40:13 42:13 43:1

**Fisher** 10:1

**fit** 17:1,15 19:20 20:25 25:2 29:9

**fix** 20:2

**fixture** 20:2

**folks** 19:12

**food** 13:20,25 14:7,13

**forward** 35:7

**forwarded** 32:2

**free** 16:18 17:8 22:6,11

**Friday** 16:24 19:18 20:21 36:10

**friends** 15:14,23 18:11

**front** 26:16

**full** 30:24

**functions** 18:18

**furniture** 12:14 41:20

---

G

**gaining** 33:7

**Gary** 11:14

**gave** 9:17

**gears** 13:11,15

**Germany** 4:2

**give** 5:22 6:24 38:14

**giving** 41:1,2

**God** 15:16 25:14

**good** 24:5,20,24,25 25:2,4,9 32:16

**great** 15:3

**GS-11** 12:3,4

**guess** 9:4,9 11:22 12:25 13:1 28:6 33:6 35:13

**guys** 32:5 34:9

## H

**half**  12:20 13:13 22:17

**hand**  29:16,19,22 30:1

**handle**  33:21

**hang**  6:20,23 15:24 17:3 25:6 32:1,4,18 33:9,14 34:9 38:2

**happen**  20:10

**happened**  20:16 28:2

**hard**  15:10

**hear**  13:13 28:24 30:14

**heard**  21:23

**held**  4:11

**helpful**  26:16

**hey**  41:18

**high**  12:9 25:16 36:23 38:15 39:8, 15

**hip**  28:10,25

**Hohenfels**  11:21

**hold**  19:5 26:22 41:1,7

**holds**  5:21

**holiday**  19:14 20:14

**Holt**  18:1,5,11,22

**Holt's**  17:13,14,22 21:21

**home**  6:20

**honest**  8:11 14:10 25:14

**hour**  10:12

**hours**  16:14 26:8 40:10

**husband**  8:20

**hydroponic**  16:3 17:6 18:4,5,21 21:15,20 22:5,15 24:23 29:8

**hypotonic**  18:4

## I

**idea**  15:16,18 27:22 42:7

**identify**  4:13

**Ill**  4:17 5:15

**include**  39:20

**included**  42:24

**including**  42:10

**Indecipherable**  15:7

**Indiana**  4:8

**inform**  33:24

**information**  5:16 27:3

**informed**  13:21 23:11,21 24:19 27:6,13 29:14

**initial**  22:12

**instructing**  23:15,23 24:7,12,21 28:22

**instruction**  24:18 27:13

**interact**  13:6

**interesting**  20:5

**interrupt**  6:1,2 23:14,22 27:13

**interruptions**  27:7,14

**investigation**  29:13

**invited**  23:12

**issue**  16:20 17:10 19:17

**issues**  38:11

## J

**Jesus**  6:24

**job**  11:25

**Jones**  10:25 11:1 32:16 33:21 34:7,12 35:11 36:18,22 37:6,12, 16 39:17,18,24 40:21 42:9

**July**  13:20

## K

**key**  38:13

**keys**  12:10 33:5 34:6,25 35:1,2, 18 37:6 38:11,14 41:2

**kids**  8:20,21 14:8,21 20:25

**knew**  21:23

**knocked**  24:4,11

**know**  6:12,17 7:2,8,21 9:11 12:4, 22 13:17 14:22 16:16 18:1 20:9

22:3,13,14 23:6 27:6,8,17,20 28:1,12,16,20,21 30:18 33:15,22 35:7 38:9 40:22 41:8 42:4

**KS**  19:8

**KSC**  19:9

## L

**late**  24:1,17

**lawsuit**  5:14

**left**  15:2 18:1,2,9,10 29:10,11,25 30:1

**legal**  31:11

**level**  10:23

**light**  13:9 20:1

**list**  41:18

**lived**  18:12

**Lloyd**  4:17,20 5:15

**located**  4:2

**long**  6:11 8:10,12 11:1,6,9 12:17 15:13

**lot**  18:19

**lunch**  18:15

## M

**M-I-C-H-E-L-E**  5:9

**made**  10:2 22:1 31:12,13 37:25 38:17

**main**  12:12 38:10 41:4

**maintenance**  19:12

**make**  6:8 20:13 31:1 42:6

**makes**  6:3 7:17

**marked**  26:17 31:19

**married**  5:12 8:8,10,12

**matters**  8:11 42:24

**meant**  16:12

**measured**  21:12

**medications**  7:11,14

**meet**  9:25 20:15

**meeting**  6:18

**members**  39:20,25 42:9

**mentioned**  39:17

**met**  9:23 22:9 23:20

**Michele**  4:12 5:1,9 34:21 42:21

**mid**  16:5

**military**  26:9

**minimize**  32:4 34:9

**minute**  13:15 32:18

**mischaracterizes**  19:4,6 30:9 38:7 40:13

**mischaracterizing**  26:6

**mold**  22:21

**mom**  15:4

**momentarily**  29:15,19

**morning**  25:11,15 31:25 32:20 41:13

**move**  19:10,14 20:3 27:2,3 35:7 41:20

**moved**  20:24 21:21 22:15

**moving**  12:14 16:6

**mute**  4:15

**N**

**needed**  19:13 21:3 22:16 35:18 40:5 41:3 42:3

**negative**  30:19,22

**nods**  6:8

**Nonhispanic**  9:7,8

**normal**  8:16,17

**O**

**oath**  5:20

**object**  26:5 31:6,9 42:13

**Objection**  19:4,5 24:14 28:13 30:9 38:7 40:13

**obligated**  40:1

**obligation**  5:22 39:21

**occasionally**  12:11

**office**  12:12 16:23 20:20 22:17 32:12 38:10 41:12,13

**officer**  12:1

**official**  9:22

**open**  31:20 32:12

**opened**  24:5

**options**  22:1

**order**  19:23

**orders**  12:13

**organization**  22:24 23:1

**original**  21:15

**P**

**p.m.**  36:10

**paid**  19:24

**paper**  9:21 15:12

**parking**  8:2

**part**  15:9

**parts**  12:12

**party**  34:15,17

**pass**  34:5,6

**pat**  29:6,11 30:4

**pay**  12:2

**Penny**  6:24 14:1

**people**  13:12 18:19 33:19 42:6

**period**  16:14 25:4,8,12 26:4,14

**person**  27:12 33:20 35:14 38:13, 18 41:5

**personal**  23:19 30:6,8,12 31:5

**persons**  4:14

**physically**  35:4

**pick**  34:25

**picnics**  18:18

**pictures**  9:20 21:13

**place**  21:6 27:9,15 28:25 29:22 30:1 40:24

**placing**  21:25

**plaintiff**  4:17 5:14

**plan**  6:11

**point**  7:19

**power**  13:8 16:19 17:9

**prepare**  9:16

**present**  4:14,18,20 15:14 18:19 27:18

**presented**  6:14

**pretty**  17:4 39:14

**principal**  35:2 38:13

**principals**  10:10 11:13

**print**  32:11

**printers**  32:11

**prior**  11:14

**pro**  4:17 5:14

**problem**  41:23 42:19

**proceeding**  8:1

**professional**  35:6

**prompt**  34:5

**property**  23:3

**protection**  12:11

**provided**  9:17

**purchase**  22:25

**purchasing**  12:11

**put**  19:22,23 20:4,14 21:5 22:13 37:19

**Q**

**question**  6:14 39:23

**questionnaire**  9:20

**questions**  5:6,16 6:2,3 8:15 14:24 24:15

**quote**  29:15

**R**

**race**  9:1,3,5,11,12

**Rachana**  4:19 8:15

**random** 13:12

**reached** 6:19

**reaction** 30:19,22

**read** 32:23

**reading** 26:9,17 32:24,25 33:1,11

**reason** 7:16

**recall** 13:19,23 14:6 25:13

**received** 25:3 32:20 36:23

**recognize** 32:17

**record** 4:14 5:8 22:22 26:2 27:2,4 33:1 42:24

**recorded** 28:9

**refuse** 40:6,9

**refused** 40:14

**relationship** 30:6

**remember** 14:7,8,9,14 15:11,13 17:25 18:2,7,9 19:9 25:13,14 27:24 29:17,21 37:4,21 40:3 42:8

**remotely** 4:3

**removed** 22:16

**repeat** 9:2 10:9

**replied** 36:18

**reply** 32:19 33:13,17,24 35:6

**replying** 35:21 38:4

**reported** 29:14

**reporter** 4:1,3,6 5:20,25 6:4,7 15:8 32:22 42:20

**request** 17:12 21:12,15,20,23 22:12,13 34:23

**requested** 18:3 23:14 26:10

**require** 35:8,14

**requires** 34:18

**respond** 34:19 35:14 40:6,17,19 41:6

**responded** 37:4,12,16,17

**responding** 34:15,17 35:21 37:13 41:7

**response** 35:8

**responsibilities** 12:8,15 34:23, 24

**responsibility** 38:12

**review** 9:10,15

**Richardson** 4:7

**rid** 32:11

**Rodman** 11:15 34:12 35:11 39:21,24

**room** 16:6 17:5,20 20:23 21:12, 16,17,24 22:1,9,12,13 35:17 41:20

**rooms** 41:19

**rules** 5:19

---

## S

**safety** 12:11 16:20 17:10 19:16

**salary** 12:6

**Saturday** 37:7,8

**scanned** 33:2

**school** 12:9 14:19 16:13 18:19 20:2,4 22:16,24 25:5,7,10,16 26:1,4 34:3 35:20 36:23 38:10,15, 16 39:3,4,9,13,16,22 40:2,4,7,9, 11,24 41:22,25 42:5

**schools** 12:9,10 33:19

**Scott** 10:25

**secretary** 38:11

**send** 6:18 19:13 20:12 33:7

**September** 4:8 24:17 33:10,11 34:8 35:24 36:9,12 37:10

**series** 12:5

**set** 41:19

**setup** 41:21

**shared** 38:11

**Shawn** 11:15

**shoulder** 28:10,25 29:6,11,16, 20,23 30:2,4

**show** 21:14

**showing** 17:19

**shuffled** 33:21 38:19

**side** 9:23

**sign** 23:8

**signed** 10:2 38:23

**sinks** 17:15

**sitting** 13:20 14:1,13 24:9 29:1

**situation** 35:19

**SKE** 19:12,14,18 20:2,3,13,18,22

**slow** 32:23

**Smart** 17:16

**smell** 22:21

**Smithson** 4:5,15,16 5:6 24:14,16 26:4,12,21,22 27:1,25 28:3 31:13 32:3,6,9 35:15 40:23 42:17,25

**socialize** 15:25

**socialized** 18:14

**sound** 22:11

**space** 30:8,12 31:5

**speak** 10:6 24:20 29:5 39:19 40:20 42:9

**speaking** 24:8

**specific** 40:3

**specifically** 9:24 18:20

**speculation** 28:14

**spell** 5:7

**spoke** 40:21

**spoken** 13:22 14:4

**stand** 14:16 30:8 35:12 38:24

**Standard** 4:9

**standed** 30:11

**standing** 14:25 28:10 29:1

**started** 22:21

**starting** 39:12

**starts** 32:15

**state** 5:7 20:17 42:22

**stated** 34:22

**statement** 9:17 37:25

**statements** 5:23 6:8

**stating** 23:8

**stay** 41:21

**stays** 23:4

**Stewart** 4:7

**stipulate** 4:1

**stipulations** 42:23

**stood** 30:11

**stop** 16:16

**strips** 16:19 17:9

**students** 23:15,23 24:7,12,18,21 27:6,13,21 28:4,5,8,23 29:4 30:16,24 38:22 42:15

**summer** 15:20,21

**Sunday** 37:8

**supervisor** 10:23,24 11:2,4,10, 12 31:4 34:1,16,19 35:9,16,23 40:19,20

**supervisors** 10:8

**supplies** 42:3

**support** 39:21 40:1,5

**supporting** 41:24

**supports** 42:2

**Susan** 17:13,14,22 21:21

**switch** 13:11,15

**sworn** 4:3 5:2

**system** 16:3,18 17:6,8,12 18:4,5, 21,24 19:1,11,14,20 21:16,20 22:5,15 24:23 29:5,8

---

**T**

---

**takes** 23:5

**taking** 7:11 15:19

**talk** 19:17 20:15 21:2 29:6,24

**talked** 21:1 24:22

**talking** 14:11,12 26:20 30:14,15 39:12

**Tamica** 4:16

**Taylor** 4:6

**teach** 35:4

**teacher** 24:4 39:10

**teachers** 13:7 33:18 38:24 39:2, 8,22 40:1

**teaching** 24:10,11,12,13 35:3,16 39:3,9

**ten** 11:19

**terrible** 26:9

**testified** 5:4 7:25 8:2 19:7 28:1 30:10

**testify** 7:20 24:15 28:2

**testifying** 5:21

**testimony** 7:12 19:6 30:10 38:8 40:14

**text** 6:18 7:4

**thing** 12:22 23:7 41:4

**things** 12:14 18:19 22:23 33:25 34:4 35:8 41:21

**thinking** 16:21 17:10 22:7

**Thursday** 37:14

**ticket** 8:2

**time** 4:9,10 9:2 11:8,17 12:20,22 13:24 14:19 15:13 17:24 18:6 20:15 21:2 24:5,20,24,25 25:2,4, 15,18,22 26:3,9 27:10 28:5 29:19, 24 33:23 35:21 36:18 37:2,3,13 38:11,12 39:5,9 41:6,12,16

**title** 11:25

**today** 7:12 10:11 16:14,23 20:20 25:8 26:24

**Today's** 4:8

**told** 10:13 14:5 16:10,11 21:8 25:4,6 26:7,14 29:4,8,18 31:17 35:15 37:6

**tomorrow** 16:15 25:8

**topic** 34:18 41:9

**total** 11:23 12:25 39:11,15

**traffic** 33:4

**transcribe** 5:25 6:7

**transcript** 42:23

**transferred** 23:1

**true** 21:25 22:4 24:16

**truth** 5:3

**truthful** 5:23

**truthfully** 7:20

**Tuesday** 36:12

**turned** 14:20

**type** 27:7

**types** 27:7,14

**typing** 30:17

---

**U**

---

**Uh-huh** 21:19 39:14

**uh-huhs** 6:7

**ultimate** 38:13

**unable** 7:19

**understand** 5:23 6:5,9,15 7:21 21:5 39:23

**union** 18:18

**unit** 22:23

**unsafe** 17:6 19:2 20:24 22:4

**unsure** 9:5

---

**V**

---

**verbal** 6:8 10:2

**vice** 11:13

**viewed** 23:8

**Villarreal** 11:5,9 29:14,18 31:12, 14

**Vilseck** 4:2 13:2,20,25 18:12 36:23

**violating** 31:5

**virtual** 12:18 33:19 34:2 35:18 38:17 39:3,9,22 40:2,7,11 41:5,25 42:4

---

**W**

---

**W-E-R-N-I-K** 5:13

**W-O-L-F-F** 5:10

**W1** 32:8

**W2** 31:19,20,22 32:8,9

**wait** 7:7 32:18 38:16

**walk** 23:8,11,19 28:15,22 41:12

**walked**  24:25

**walking**  28:9

**wall**  16:18,22 17:2,8,15,16,17 20:20 22:6,11

**wanted**  19:17 20:12,15,17 21:1, 5,7,10 22:20 32:19

**wanting**  21:24

**week**  13:22 14:4 37:14,23 38:4

**weight**  5:21

**Wernik**  5:12

**white**  9:4,7,8,13

**windows**  17:16

**woke**  36:6,7

**Wolff**  4:12 5:1,7,9,10 19:5 31:8,9, 15 34:21 42:17,18,21

**work**  10:10,21 12:13 13:5 15:24 18:13 19:23 25:7 37:8 40:24,25

**worked**  11:19,20 12:17 18:11 41:24

**working**  11:16 24:10 40:7,10

**workplace**  10:15 33:8

**works**  40:4

**wrote**  9:13 15:12

—————————————————

Y

—————————————————

**year**  11:3,16 13:3,14 17:25 18:1,2 22:17 39:7,13

**years**  8:3,13 11:11,19,21,23 12:18,19,21,25 28:7

—————————————————

Z

—————————————————

**Zoom**  4:11 33:14,15 38:2

**SMITHSON
EXHIBIT
MJ-1
11/20/2022**

# In the Matter Of:

*TAMICA J. SMITHSON*

*-v-*

*LLOYD AUSTIN III*

---

# Michelle Leigh Jones

*August 26, 2022*

---



800.869.0873 | www.StewartRichardson.com

Reporting Driven by Excellence — Since 1975

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF INDIANA
 2                       INDIANAPOLIS DIVISION

 3
      TAMICA J. SMITHSON,              )
 4                                     )
                      Plaintiff,       )
 5                                     )
               -v-                     )           Case No.
 6                                     )    1:21-CV-02193-JRS-MPB
      LLOYD AUSTIN III,                )
 7    Secretary, Department of         )
      Defense,                         )
 8                                     )
                      Defendant.       )
 9

10

11            The videotaped deposition upon oral

12    examination of MICHELLE LEIGH JONES, a witness

13    produced and sworn via videoconference before me,

14    Elizabeth Taylor Culiver, RPR, a Notary Public in and

15    for the County of Vanderburgh, State of Indiana, taken

16    on behalf of the Plaintiff with all participants

17    appearing via videoconference on August 26, 2022, at

18    8:07 a.m., pursuant to the Federal Rules of Civil

19    Procedure.

20

21

22

23                 STEWART RICHARDSON & ASSOCIATES
                    Registered Professional Reporters
24                         (800) 869-0873

25
```

```
 1                        APPEARANCES

 2
        (All Participants Appearing Via Videoconference)
 3

 4   FOR THE PLAINTIFF:

 5           Tamika Smithson, Esq.
             CMR 411 Box 3668
 6           AOP, AE  09112
             tamica.smithson@yahoo.com
 7

 8   FOR THE DEFENDANT:

 9           Rachana N. Fischer, Esq.
             OFFICE OF THE UNITED STATES ATTORNEY
10           10 West Market Street
             Suite 2100
11           Indianapolis, IN  46204
             rachana.fischer@usdoj.gov
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    INDEX  OF  EXAMINATION

                                                        PAGE
2

        EXAMINATION
3
        QUESTIONS  BY  MS.  SMITHSON                    5
4       QUESTIONS  BY  MS.  FISCHER                    34

5

                       INDEX  OF  EXHIBITS
6

7         NUM.                 DESCRIPTION          PAGE

8    Exhibit  J1      Email  to  Michelle  Jones  from     18
                     Tamika  Smithson  dated  September
9                    23,  2021

10   Exhibit  J2      Email  to  Shawn  Rodman  from       29
                     Tamika  Smithson  dated  January
11                   14,  2022

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        THE REPORTER:  Do all counsel stipulate that

 2   the witness located in Vilseck can be sworn in

 3   remotely by the court reporter?

 4        MS. FISCHER:  Yes.

 5        THE WITNESS:  I'm sorry, Ms. Smithson.  I

 6   think you cut out.

 7        MS. SMITHSON:  Yes, I did, as soon -- right

 8   after Dr. Jones got on, actually.  Not that it was

 9   Dr. Jones' fault.  Yeah.  So I'm back.  Can you

10   hear me?  Am I clear?

11        THE REPORTER:  Yes.  I just read in the

12   stipulation about swearing in remotely.  Is that

13   okay with you?

14        MS. SMITHSON:  Yes, ma'am.

15        THE REPORTER:  My name is Beth Culiver, an

16   associate of Stewart Richardson & Associates, 915

17   Main Street, Suite 405, Evansville, Indiana.

18   Today's date is August 26th, 2022.  The time is

19   8:07 a.m. Central Standard Time.

20        This deposition is being held via Zoom.  The

21   deponent is Michelle Jones.

22        Will counsel please identify themselves and

23   any persons present with you for the record?

24        MS. SMITHSON:  Tamica Smithson, pro se

25   plaintiff against Lloyd Austin, III.  I'm alone.
```

```
 1           MS. FISCHER:  Rachana Fischer on behalf of
 2      defendant, Lloyd Austin, and I am -- I don't have
 3      anyone present with me.
 4                MICHELLE LEIGH JONES,
 5  having been first duly sworn or affirmed to tell the
 6  truth, the whole truth, and nothing but the truth, was
 7  examined and testified as follows:
 8  EXAMINATION
 9  QUESTIONS BY MS. SMITHSON
10  Q  Dr. Jones, could you please state and spell your
11     name for the record?
12  A  Yes, ma'am.  Michelle Jones, M-i-c-h-e-l-l-e,
13     J-o-n-e-s.
14  Q  And have you been known by a different name ever?
15  A  Michelle Leigh Jones.  Leigh is my middle name,
16     L-e-i-g-h.
17  Q  I'm a pro se plaintiff in a federal lawsuit against
18     Lloyd Austin, III, and I'll be asking you a few
19     questions to determine if there's information that
20     you may have about my case.  I'll go over some of
21     the rules for the deposition.  The oath that the
22     court reporter administered -- that the court
23     reporter administered to you holds the same weight
24     as if you were testifying in court.  You have the
25     same obligation to give truthful statements.  Do
```

1   you understand?

2   A  Yes, ma'am.

3   Q  The court reporter will transcribe everything that

4      we say.  I'll try not to interrupt you as you're

5      answering questions.  I ask that you not interrupt

6      me while I ask questions.  This makes it better for

7      the court -- or easier for the court reporter to

8      document what we are saying.  Do you understand?

9   A  Yes, ma'am.

10  Q  The court reporter cannot transcribe uh-huhs and

11     nods.  So please make verbal statements.  Do you

12     understand?

13  A  Yes, ma'am.

14  Q  I don't plan to take long for your deposition, but

15     if you need to take a break, just let me know.  I

16     only ask that you completely answer the last

17     question that I presented before we break.  Do you

18     understand?

19  A  Yes, ma'am.

20  Q  Are you currently taking any medications or drugs

21     that would affect your testimony today?  If so,

22     what medications or drugs?

23  A  Taking no medications.

24  Q  Is there any reason that you can think of that

25     makes this a bad day for a deposition?

```
 1   A  No, ma'am.
 2   Q  If there's ever a point that you're unable to
 3      testify accurately and truthfully, please let me
 4      know.  Do you understand?
 5   A  Yes, ma'am.
 6   Q  Have you ever been deposed before?
 7   A  Yes.
 8   Q  When was that?
 9   A  In Okinawa, Japan.
10   Q  And what was the nature of the case?
11   A  It was a case that was filed -- an employee that
12      filed a case when I was an administrator at one of
13      the schools in Okinawa, Japan.
14   Q  Have you ever testified in any other depositions?
15   A  Yes, ma'am, in my previous position as chief of
16      staff.
17   Q  Okay.  And what was the nature of that?
18   A  It was -- you know, it was according to the
19      situation with educators who had possibly been
20      terminated and, of course, you know, had to provide
21      information and answer questions regarding whatever
22      their case may have been.
23   Q  Any other depositions?
24   A  No, ma'am.
25   Q  Have you ever testified in court or any other
```

```
 1      proceeding?

 2   A  No, ma'am.

 3   Q  Okay.  Have you ever been charged or convicted of a

 4      crime?

 5   A  No, ma'am.

 6   Q  Did you review any documents concerning this case

 7      to prepare for the deposition?

 8   A  Yes, ma'am, some emails.

 9   Q  Okay.  Any other documents?

10   A  No, ma'am.

11   Q  Okay.  And who were the emails from?

12   A  The emails were exhibits that were provided

13      directly I believe from you to Ms. Fischer and then

14      they were directly provided to me.

15   Q  And no other documents?

16   A  No, ma'am.

17   Q  Have you ever met with counsel for the other side,

18      agency counsel, to discuss the deposition -- this

19      deposition?

20   A  Yes, ma'am.  Just to share with me the expectations

21      of today.

22   Q  Who specifically did you meet with?

23   A  Ms. Fischer.

24   Q  Have you -- and have you -- did you meet with

25      anyone else?
```

```
 1   A   No, ma'am.

 2   Q   Have you signed any agreements or made any verbal

 3       agreements with anyone or the agency about this

 4       deposition?

 5   A   No, ma'am.

 6   Q   Did you speak with anyone else about this

 7       deposition?

 8   A   No, ma'am.

 9   Q   Have you ever filed an EEO complaint in the

10       workplace?

11   A   No, ma'am.

12   Q   Who is your employer?

13   A   The Department of Defense Education Activity.

14   Q   So you work for the same agency that I work for.

15   A   Yes, ma'am.

16   Q   How long have you worked for DoDEA?

17   A   Since 1998.

18   Q   Okay.  And how long have you and I worked together?

19   A   Excuse me.  Just a moment.  Just a moment.  Just a

20       moment.

21   Q   Yes, ma'am.

22           (The deposition was briefly interrupted.)

23   A   My apologies.  Someone walked in.

24   Q   That's quite all right.  I understand.

25   A   Ms. Smithson, do you mind asking the question
```

```
 1      again?

 2   Q  So I asked first how long have you and I worked

 3      together?

 4   A  I would say since September of 2021 when I first

 5      arrived to Vilseck High School.  I prior had been

 6      in Okinawa, Japan.

 7   Q  And I should have asked you this before.  How long

 8      have you worked for the agency?

 9   A  Since 1998.  I can use the calculator and calculate

10      my --

11   Q  That's okay.  How often do you have a chance to

12      work or interact with me?

13   A  To be honest, not very often because -- we interact

14      through email or when I see you here at this school

15      or when I see you at sports events for your

16      daughter.

17   Q  And how would you describe our interactions?

18   A  Professional, very cordial, kind.

19   Q  Okay.  Am I a toucher or a hugger or anything like

20      that?

21   A  No, ma'am.  I'm not either.

22   Q  But our interactions are pleasant for the most

23      part?

24   A  Oh, yes, ma'am.

25   Q  Are you married?
```

```
 1    A   Yes, ma'am.

 2    Q   Do you have children?

 3    A   Yes, ma'am.  I have three.

 4    Q   And how old are they?

 5    A   I have one that's 31.  I have one that's 23, and I

 6        have one that's 18.

 7    Q   And what is your race?

 8    A   White.

 9    Q   Okay.  What year did you begin working -- oh, we --

10        I already asked that question.  Let me continue.

11        What is your job title?

12    A   Principal at Vilseck High School.

13    Q   Okay.  What is your pay band?  I won't ask your

14        salary but your pay band.

15    A   TPKE because -- plus the ten years that you're

16        supposed to have, yes.

17    Q   Okay.  What are your responsibilities?  I'm sorry.

18        Yes.  What are your responsibilities?

19    A   Okay.  My responsibilities, of course, are to

20        ensure the safety and well-being of currently 417

21        students to include the safety and well-being of

22        around 50 educators and GS employees within the

23        Vilseck community area and ensure that we have a

24        culture of learning within our school community.

25    Q   Are there any other responsibilities that you can
```

```
 1        think of right now at this time?
 2   A    No, ma'am.
 3   Q    Okay.  I think that you mentioned the date, but
 4        just for the record, if you could state again, when
 5        did you arrive to Germany?
 6   A    I want to say it was September the 6th or 7th of
 7        2021.
 8   Q    And what date did you arrive to Vilseck High
 9        School?
10   A    I came in on Labor Day, I think that was
11        September the 6th of 2021, and I arrived in Munich
12        airport and literally went to the lodging, and then
13        I came to Vilseck High School the very next day.
14   Q    So --
15   A    It was a Tuesday.
16   Q    It was a Tuesday?
17   A    Yes, ma'am.
18   Q    So around September 9th -- 8th, 9th?
19   A    I want to say it was the 7th or 8th.
20   Q    Okay.
21   A    Yes, ma'am.
22   Q    I'm sorry?
23   A    Oh, I was going to say I could go back and look for
24        sure.
25   Q    That's okay.  That's close enough.  Thank you.  And
```

```
 1        where -- where were you assigned before Vilseck?

 2    A   Okinawa, Japan.

 3    Q   So when you arrived and started working at Vilseck

 4        High School, this was about how many days after the

 5        start of work for teachers?

 6    A   Teachers, from what I -- close to -- close to a

 7        month.  I know that teachers began in

 8        August because -- actually, the week that teachers

 9        returned and the first week of school that would

10        have been for students returning around August the

11        20 something -- I apologize I don't know the exact

12        date, but I actually opened the new '21 -- 21st

13        Century School in Okinawa, Japan, which was Bob

14        Hope Elementary School, and then I concluded that

15        and then I came to Vilseck High School.  So I was

16        working already in Okinawa, Japan, and, of course,

17        Vilseck High School educators and students had

18        already begun school.

19    Q   So do you think teachers were there for --

20    A   I would say two to three weeks.

21    Q   Okay.

22    A   Yeah.

23    Q   Who assumed your responsibilities until you

24        arrived?

25    A   Mr. Rodman, the assistant principal.
```

1   Q   Okay.  And what is Mr. Rodman's full name?

2   A   Shawn Rodman.  I do not know his middle name.

3   Q   That's good enough.  Thank you.  Would teachers

4       have reported any issues to Mr. Rodman during the

5       time that you were in transition?

6   A   I'm not aware of any issues that were reported.

7   Q   My question is, should teachers -- like, if

8       teachers had issues --

9   A   Oh, yes, ma'am.  Yes, ma'am.  Yes, yes.  If they

10      had a concern or question, they should have gone to

11      him so that it could be resolved.

12  Q   Okay.  Would -- and I will ask you about some

13      specific people now.  Would Ms. Moellendick have

14      reported to Mr. Rodman until you arrived?

15  A   Yes, ma'am.

16  Q   Would Mr. Johnson have reported to Mr. Rodman until

17      you arrived?

18  A   Yes.

19  Q   Mr. Jake Johnson.

20  A   Mr. Jake Johnson is a contractor; therefore, he

21      would report to his -- through his chain of

22      command, which would be Ms. Suzanne -- Susan -- I

23      can't think of her last name right now, but that

24      would be who his direct report would be.

25  Q   And I'd like to go back because I would like to say

```
 1        Ms. Cora Moellendick because we actually have a
 2        Mr. Moellendick as well.
 3   A  Yes, ma'am, she would have.  Yes.
 4   Q  And would Ms. Michelle Wolff have reported to
 5        Mr. Rodman until you arrived?
 6   A  Yes, ma'am.
 7   Q  Okay.  I asked you before about your interactions
 8        with me.  I'd like to ask just a couple of other
 9        questions about those --
10   A  Sure, sure.
11   Q  -- interactions.  How have your interactions --
12        well, no.  Do you know my -- my daughter?
13   A  Yes, ma'am, I know Scotland.
14   Q  You know Scotland.  And how have your interactions
15        with my daughter been since you've arrived?
16   A  Very positive.  She, of course, comes into our
17        school.  She came into our school last year, and
18        she would work on her DVS classes, but also she's a
19        student athlete.  So she would always stop by if I
20        was in here to say hello.  If I was not in the
21        office, when I would see here in the hallway, she
22        would always say hello.  And I would have the
23        opportunity to, of course, support the student
24        athletes by attending their events.
25   Q  Thank you.
```

```
 1   A   Uh-huh.
 2   Q   And you've also met and had the opportunity to have
 3       interactions with my husband.
 4   A   Yes.
 5   Q   You may not remember his name but -- do you
 6       remember his name by any chance?
 7   A   I say Mr. Smithson.  I do not know his first name,
 8       to be honest with you.
 9   Q   Mr. Smithson is fine.  His name is Eric -- William
10       Eric.  But how have your interactions been with
11       him?
12   A   They have been very positive as well.
13   Q   Thank you.  What would you do if -- now, this --
14       you may have to think about this.  What would you
15       do if your subordinates were disrespectful to you?
16           MS. FISCHER:  Objection.  It calls for a
17       hypothetical, but you can answer.
18           THE WITNESS:  Go ahead and answer,
19       Ms. Fischer?
20           MS. FISCHER:  Yes, you can answer.
21   A   Okay.  If my subordinates were to be disrespectful
22       to me, of course, taking the appropriate action to
23       have a coaching conversation with them to explain
24       to them why that it was -- the conversation was
25       disrespectful, and then, of course, we would look
```

```
 1        at ways to work together for improvement, but then
 2        if it continued, that would be considered, of
 3        course, a concern with educator to administrator
 4        relationships but also improper conduct, so I would
 5        have to work with my LMER partners to seek what
 6        actions or appropriate responses we would need to
 7        take next.
 8   Q    Okay.  Have any educators or any of your
 9        subordinates ever been disrespectful to you?
10   A    Yes, ma'am.
11   Q    And those were the actions that you took?
12   A    Yes, ma'am.
13   Q    Have you had to -- ever had to reprimand a
14        subordinate who continued to be disrespectful?
15   A    Yes, ma'am.  I have had to issue letters of
16        reprimand.
17   Q    Actually, at this point -- give me one minute.  I
18        have another question for you.
19   A    Yes, ma'am.
20   Q    Have you ever had an issue where teachers were in
21        conflict with one another?
22   A    Yes, ma'am.
23   Q    Had you ever had an issue where teachers were in
24        physical conflict with one another?
25   A    Not physical conflict with one another, no.
```

1  Q  But conflict with one another?

2  A  Yes, ma'am.

3  Q  And how did you handle that?

4  A  Always I try to bring those individuals in, look to

5     see if we can work through some sort of conflict

6     resolution.  If not, then I take the next step, of

7     course, working with the appropriate LMER partners

8     and follow that process by conducting the

9     appropriate pre-action investigation and then move

10    forward with the steps that need to be taken to

11    render whether it be a letter of expect- --

12    professional expectations, whether it be a letter

13    of caution, whether it be a letter of reprimand or

14    moving up the chain of consequences.

15 Q  Thank you.

16       (Exhibit J1.)

17 Q  If we can look at Exhibit 1 -- I mean, J1.

18 A  Yes, ma'am.

19 Q  Do you recognize this document?

20 A  Yes, ma'am.

21 Q  And can you briefly state basically what it is?

22 A  It is an email from you shared with me, and you

23    shared that there had been some concerns when you

24    were in the -- when you were actually physically in

25    the Vilseck High School building because you were

```
 1        now in the DVS program piece, that you had been

 2        excluded from having your IT -- necessary IT

 3        equipment to include -- it looks like you were

 4        removed from the faculty email distribution list,

 5        again, your computer, and the administrative

 6        officer had not provided you with what you needed.

 7   Q    Before receiving this email, were you aware that I

 8        had been refused a key fob for entry into the

 9        school?

10   A    No, ma'am.

11   Q    What -- was Mr. Rodman aware that I had not been

12        given a key fob?

13             MS. FISCHER:  Objection.  Lack of foundation.

14             MS. SMITHSON:  Mr. Rodman was assuming her

15        responsi- -- assuming Dr. Jones' responsibilities.

16             MS. FISCHER:  But you haven't established why

17        she would know what Mr. Rodman was aware of.

18   Q    What was the reason given for not providing a key

19        fob to me?

20   A    Mr. Rodman did not provide me with any type of

21        response as to why that a key fob was not provided

22        to you.  I do know that, you know, as soon as I

23        found out about it, I responded to you with we're

24        happy to set up a time for you to, you know, pick

25        up your items that you needed.
```

1    Q   Before receiving this email, were you aware that my

2        computer had been reassigned to a substitute?

3    A   No, ma'am.

4    Q   And what was the reason given for my computer being

5        reassigned to a substitute?

6    A   That the IT team, being Mrs. Moellendick and

7        Mr. Johnson, were not aware that you needed the IT

8        equipment.  I do remember explaining to them that

9        even though you were a part of the DVS team, that

10       we, as the school, that you are on my manpower and

11       report to as the physical building, that we do

12       provide you with those resources that you need.

13   Q   Are you aware that I had that computer the year

14       before?

15   A   No, ma'am.

16   Q   It was my computer the year before and for probably

17       seven years before that.

18           Before my email, were you aware that I had

19       been removed from the faculty email distribution

20       list?

21   A   No, ma'am.

22   Q   What was the reason given for me being removed from

23       the distribution list, the email list?

24   A   It was shared with me that they were not aware that

25       you would still receive information from the actual

```
 1        physical school that you were assigned to, so those
 2        that were not in the physical building, their
 3        emails had been, you know, removed from that
 4        distribution list.
 5    Q   Are you aware that I was, again, with the virtual
 6        school the year before?
 7    A   No, ma'am, I did not know -- I was not aware -- I
 8        did not know you at that time, so I did not know
 9        until I, of course, received email messages and met
10        you that you had been part of the DoDEA virtual
11        school.
12    Q   Do you know of the other two individuals from the
13        school that were also with the virtual school the
14        year before?  Are you aware who they are?
15    A   No, ma'am.
16    Q   Even today you're not aware of who they are?
17    A   No, ma'am.
18    Q   Okay.
19    A   No.
20    Q   So I was with the virtual school the year before,
21        as you're aware of, and I continued to receive
22        emails that entire year.  Can you -- and so did my
23        two coworkers.  Can you describe the global
24        atmosphere when you arrived in September 2021 at a
25        time when I had been excluded from the emails?
```

```
 1              MS. FISCHER:  I'm going to object as vague and
 2         ambiguous as to what the global atmosphere is, but
 3         you can answer if you're able.
 4    Q    I'll be more specific as well.  Can you -- can you
 5         describe like the global atmosphere as far as the
 6         pandemic and COVID-19 protocol?
 7    A    Yes, ma'am.  When I arrived at Vilseck High School,
 8         of course, there were still mitigation measures in
 9         place.  Everyone had to wear the mask.  It was --
10         the physical distancing was in place.  We were
11         following the DoDEA guidelines for COVID, the
12         operational procedures and protocols, to ensure, of
13         course, that we were conducting a safe environment
14         for our students to learn in.  And, again, of
15         course, you know, our base also working with them
16         dictates some of the measures that we have to put
17         in place.  But it was an environment -- again, mask
18         wearing, so you couldn't, you know, see everyone's
19         face.  You could see their eyes.  And we had those
20         mitigation measures in place when I arrived here.
21    Q    So COVID-19 protocols were being dis- -- were
22         COVID-19 protocols being distributed through email
23         during the start of the school year?
24    A    I am not aware of any that were distributed.  I
25         have to say I do not know what was distributed
```

prior to me arriving. I do know that when I arrived, I did provide everyone -- I set up a Teams channel where individuals would have access -- if you were in the, you know, distribution list, would have access to that and dropped in, and also my Friday messages, I added the DoDEA COVID-19 protocols and operational guidelines.

Q And that would have been on the 6th or 7th?

A No, ma'am. I send out Friday messages. So on Friday, my messages would go out, and I would add those kind of nuts and bolts, as we say, pieces of information.

Q Okay. Do you remember community guidelines or any kind of COVID information about German policies being sent to teachers?

A Yes, ma'am. The German policies were provided by the school liaison officer to the administrative officer, and I remember seeing some sent out via email.

Q Okay. And were some of the emails sent before you arrived?

A I would say -- I would hope that yes would be the answer; however, I cannot confirm.

Q Aside from COVID-19 policies rather than Germany -- German policies, local community policies, what

```
 1        other information is usually sent out at the

 2        beginning of the year for teachers?

 3   A    There should -- okay.  I'm going to speak to what

 4        should have been, but I can't -- I mean, there

 5        should have been an orientation letter sent out to

 6        educators to share with them the schedule of events

 7        for the week that they returned because for the

 8        past few years, we have had college and career

 9        readiness standards training.

10             Also, there -- you know, it should have been

11        the schedule of when that you have the opportunity

12        to work in your classroom and when the

13        administrator would be having conversation with you

14        to share the expectations.  I was not here at that

15        particular time frame.  I was still located in

16        Okinawa, Japan.  I can say I did not receive any of

17        those messages, but I can't speak for what the

18        faculty would have received.

19   Q    So, in general, for the school, how important --

20        for the faculty and staff, rather, would it --

21        would you say is the information that is normally

22        distributed by email at the start of the school

23        year?  How important is it?

24   A    It's very important.  Effective communication, not

25        just at the beginning but throughout the school
```

```
 1     year, is key essential.
 2  Q  I know you said that you didn't know exactly what
 3     COVID guidelines were sent --
 4  A  Yes, ma'am.
 5  Q  -- before you arrived, but what are some things
 6     that could happen if a person didn't follow COVID
 7     guidelines in Germany, let's say, or on the
 8     military base?
 9  A  Okay.  I'm going to speak to where I came from
10     because in my previous position, I was the Pacific
11     south chief of staff, and I worked on a daily basis
12     with our military medical partners and our schools
13     and, of course, the district -- because I was at
14     the district -- the region, and our headquarters.
15     And we were regularly putting out those COVID
16     guidelines because, for example, in Okinawa, Japan,
17     if an individual did not follow the guidance
18     entering into the country or if they had somehow
19     come in contact with COVID and tested positive for
20     COVID, there was what they call restriction of
21     movement.  And with restriction of movement, where
22     I came from, you had to stay in your home for the
23     14-day period, and the actual military medical
24     partners would reach out to those who had tested
25     positive, and they would check on them, and then
```

```
 1   they would follow up and be released on that tenth

 2   day.  Also, when you entered in, you had to be

 3   tested.  You weren't allowed to leave your home

 4   domicile until you received the results.

 5        So there were a lot of protocols and

 6   mitigation measures put into place that were to be

 7   followed.  And for those individuals who did not

 8   follow, of course, you know, there could be

 9   consequences for not following that guidance.

10        So it's very important to make sure that we

11   communicated that because the guidance was

12   changing.  Sometimes it would change, you know,

13   within 30 minutes.  So that is very important to

14   share that information, and especially when you're

15   in a foreign country because also, you know, if

16   you're in a foreign country, they also have

17   policies that you have to follow.

18        THE REPORTER:  Ms. Smithson, I think we lost

19   Ms. Fischer.  I think we lost Ms. Fischer.  Do you

20   want to go off the record until she comes back on?

21        MS. SMITHSON:  No.  I'd like to stay on the

22   record for sure.

23        THE REPORTER:  Okay.

24        MS. SMITHSON:  And so we need to wait for her?

25        THE REPORTER:  Yes, to see if she comes back
```

 1   on.

 2        THE WITNESS:  It says at the bottom that

 3   there's only three of us here.  She must have

 4   dropped.

 5        MS. SMITHSON:  Yes, she did.

 6        THE WITNESS:  I know that there's a storm

 7   here.

 8        MS. SMITHSON:  I hear it starting.

 9        THE WITNESS:  Yes, ma'am.

10        MS. SMITHSON:  But I think it's nice in your

11   area, right, Ms. Culiver?  Is it Culiver?

12        THE REPORTER:  Yes, Culiver.

13        MS. SMITHSON:  Beth?

14        THE REPORTER:  Yeah.  Do you want to go off

15   the record so we're not putting this all on the

16   record or do you want to stay on?

17        MS. SMITHSON:  Well, if we're off the record,

18   it doesn't go in the deposition, does it?

19        THE REPORTER:  Our -- if we're on the record,

20   just our conversation will be on the record talking

21   about the weather.

22        MS. SMITHSON:  Please don't put the weather

23   on.  I'm so sorry.  I misunderstood.  This is my

24   first time giving a deposition.  So yes, we can go

25   off the record.  Yes, ma'am.

```
 1              (Discussion held off the record.)

 2              (Record read.)

 3   Q  Dr. Jones, are you satisfied with that answer?

 4   A  Yes, ma'am.

 5   Q  Would you like to add to that answer?

 6   A  No, ma'am, not at this time.

 7   Q  Thank you.  I know that you can't account for the

 8      time that you were in Okinawa, but once you -- once

 9      you arrived to Germany, how would you describe --

10      you don't have to do it in as great detail.  You

11      did a great job.  Thank you very much.  How would

12      you describe the protocols here in Germany and

13      atmosphere as far as COVID-19?

14   A  The atmosphere in Germany, again, was very similar

15      to what it was in Okinawa, similar practices where

16      you cannot travel.  You were only to travel within

17      certain areas.  They had the red areas, yellow

18      areas, and green areas.  Also, again, wherever you

19      went, you had to follow the mask guidance of

20      wearing the mask and, of course, testing measures

21      were in place, and, again, the physical distancing

22      was in place here in Germany.  And I do remember

23      that it was important to test through our military

24      medical partners.  However, you could go off base

25      and test, but the off base testing facilities and
```

```
 1        community, there was a bit of a different protocol

 2        than what it was for the on base medical community.

 3        Therefore, it's important for us as guests in

 4        another country to receive all that information so

 5        we would know what guidance to follow but also make

 6        sure that we understand -- because we do live off

 7        the military installation, that we have the

 8        guidance from our post nation partner being in

 9        those small community areas, understanding their

10        expectations as well.

11   Q    So if any emails were sent concerning those, that

12        would be very important --

13   A    Yes, ma'am.

14   Q    -- to teachers correct?

15   A    Yes, ma'am.

16             (Exhibit J2 marked.)

17   Q    Can we look at Exhibit J2?  Now, there are two

18        exhibits because I didn't completely put it -- all

19        of the exhibit on the first one.  So we're looking

20        at the second one that has two pages.

21   A    Okay.  Yes, ma'am.

22   Q    Do you recognize this document?

23   A    Yes.

24   Q    Can you explain what it is?

25   A    Yes, ma'am.  This document I received from you,
```

1      Ms. Smithson, stating that one of the days -- well,

2      it was Tuesday, that you came in for your weekly

3      COVID-19 test, that in the foyer area there had

4      been a cordial discussion.  However, while waiting

5      on the nurse, the assistant principal, Mr. Rodman,

6      touched you and you wanted to share, of course, how

7      you felt about that, and I took that for action

8      when it was sent to me.

9  Q  How did you feel about me sending an email like

10     that to you?

11 A  I felt it was very appropriate because anytime a

12     teacher has a concern, I feel that -- or anyone

13     that enters into the building, I feel that it's

14     very appropriate to send to the principal and share

15     that concern.

16 Q  Did you consult with Mr. Rodman after receiving my

17     email?

18 A  First, I consulted with LMER and with legal because

19     of the concern of Mr. Rodman touching you and it

20     was an unwelcome touch.

21 Q  What did legal have to say?

22        MS. FISCHER:  Objection.  And I'm going to

23     instruct you not to answer any advice you got from

24     lawyers based on attorney-client privilege.

25 Q  So after you had a discussion with legal, you did

```
 1       consult with Mr. Rodman?

 2   A  Yes, ma'am, as in I had to have a conversation with

 3       Mr. Rodman as in a pre-action investigation to find

 4       out what occurred as I was not present when this

 5       incident happened.

 6   Q  What was his reasoning for violating my personal

 7       space?

 8   A  He did not realize that he had violated your

 9       personal space.  He thought he was being friendly.

10   Q  On what day did Mr. Rodman give notice that he

11       would be moving due to a promotion?

12   A  I'm thinking for just a moment.  It was -- it

13       actually wound up being his birthday, and I did not

14       know that until the message came in.  I want to --

15       I want to say it was April time frame -- early

16       April to mid April time frame when that offer came

17       in.

18   Q  I think I remember an email.  Does April 4th or 5th

19       sound familiar to you?

20   A  I know it was after spring break, and spring break

21       was the last week in March, and it ran into early

22       April, but I thought it was after that first week

23       in April.

24   Q  Okay.  So it was after spring break?

25   A  Yes, ma'am.  Uh-huh.  Yeah.
```

1    Q   Okay.  Thank you.  So after April 1st?

2    A   Yes, ma'am.

3    Q   Thank you.  Because April 1st, I think, was a

4        Friday, and then we had that weekend and we went

5        back.

6    A   Yes.  We had CCR training here in Europe East on

7        Monday.

8    Q   And I think that was the day he actually got notice

9        that Monday, maybe Tuesday.

10   A   I know it wasn't that Monday.

11   Q   Okay.

12   A   Yeah.

13   Q   When Mr. Rodman gave his reasoning, was it

14       acceptable to you?

15   A   No, ma'am, because I do not -- I feel as though

16       that we should all be professional and, you know,

17       we should not touch and put someone in an

18       uncomfortable situation.

19   Q   Now, sometimes you might see two people, and they

20       mutually want to give each other a hug at work.

21       How do you feel about that?

22   A   If they are in mutual agreement, that is different,

23       but if they're not in mutual agreement, it's not

24       professional, and it's not wanted.

25   Q   So I shouldn't run up and grab someone and hug them

```
 1        and then ask for their permission afterwards?

 2    A   Exactly.

 3            MS. FISCHER:  Objection.  Hypothetical

 4        question, but you can answer.

 5            THE WITNESS:  I said I agreed with

 6        Ms. Smithson.

 7    Q   Did Mr. Rodman appear to be happy with his

 8        promotion?

 9    A   He -- yes.  Yes, ma'am.

10    Q   Did he appear to be happy with his relocation?

11    A   Yes, ma'am.

12    Q   And I will end by asking, do you know DoDEA's

13        guidance on harassment in the workplace?

14    A   Yes, ma'am.

15    Q   And can you explain it to me just a little bit?

16    A   Yes, ma'am.  Anytime that an employee feels as

17        though there is -- whether it be hostile harassment

18        being verbally or unwanted touch or sexual

19        harassment, when that is brought to the

20        administrator, the administrator is to act upon

21        that, to investigate and find out what truly

22        happened, and then, of course, take the appropriate

23        course of action because we want everyone in the

24        workplace to feel safe and to feel comfortable when

25        they come to work, but it is our responsibility to
```

1  act upon those concerns that are brought to you.

2  Q  When a person doesn't feel safe -- a teacher

3     doesn't feel safe, what implications could that

4     have?

5  A  Well --

6         MS. FISCHER:  Objection.  Hypothetical, but

7     you can answer.

8  A  Okay.  Of course, they would not feel comfortable

9     coming to work and ultimately would affect the

10    success of the students because we want to promote

11    a culture of learning in the education system in

12    our school.

13        MS. SMITHSON:  Thank you very much, Dr. Jones.

14    That ends my deposition for you today.  Thank you

15    for taking the time.

16        MS. FISCHER:  I have a couple questions just

17    for the record.

18  EXAMINATION

19  QUESTIONS BY MS. FISCHER

20  Q  You mentioned that Ms. Smithson was assigned to the

21     DVS.  What is the DVS?

22  A  DoDEA virtual school.

23  Q  So what was her relationship to Vilseck High School

24     when she was assigned to the virtual school?

25  A  When she was assigned to the virtual school -- now,

 1   when the DoDEA virtual school positions were put

 2   into place '20 -- for '20 to '21 because COVID had

 3   occurred in '19-'20 and we closed the schools and

 4   remote learning and we instituted the DoDEA virtual

 5   school for those who wanted to attend and, of

 6   course, were medically sensitive, teachers were --

 7   were able to apply, and then they -- at head- -- at

 8   the headquarters level, not at the school level or

 9   district level, they selected those educators for

10   placement in DoDEA virtual school.  And I know for

11   sure for years '20-'21 and then '21-'22, if the

12   educators were selected to continue in the DoDEA

13   virtual school, that we were to continue to keep

14   them on our email distribution list.  We were to

15   provide them with all information that we were to

16   provide to all of our educators that were in the

17   physical building.

18        And I will share that I had -- when I first

19   came to Vilseck High School, I had to share that

20   with the assistant principal, with the office

21   staff, and, of course, with the educators that

22   those who were in DoDEA virtual school still

23   received information just like they did.  It seemed

24   as though that the administration was not aware --

25   or the assistant principal, let me put it that way,

 1   was not aware of that.

 2        MS. FISCHER:  I don't have anything further.

 3   Thank you.

 4        THE WITNESS:  Am I done?

 5        MS. FISCHER:  Yes.

 6        THE REPORTER:  This concludes the deposition

 7   of Michelle Jones.

 8        Will counsel please state if they would like a

 9   copy of the transcript, any stipulations, or other

10   matters to be included in the record?

11        MS. SMITHSON:  Yes.

12        MS. FISCHER:  I would like a copy of the

13   transcript.

14        (The deposition concluded at 9:02 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF INDIANA
 2                        INDIANAPOLIS DIVISION

 3
     TAMICA J. SMITHSON,             )
 4                                   )
                    Plaintiff,       )
 5                                   )
             -v-                     )          Case No.
 6                                   )   1:21-CV-02193-JRS-MPB
     LLOYD AUSTIN III,               )
 7   Secretary, Department of        )
     Defense,                        )
 8                                   )
                    Defendant.       )
 9

10
                       Job No. 174902
11

12
             The deposition of MICHELLE LEIGH JONES, taken
13   in the above-captioned matter, on August 26, 2022, and
     at the time and place set out on the title page
14   hereof.
             It was requested that the deposition be
15   transcribed by the reporter and that same be reduced
     to typewritten form.
16           It was agreed that the reading and signature
     by the deponent to the deposition were waived on
17   behalf of the parties Plaintiff and Defendant by their
     respective counsel, the witness being present and
18   consenting thereto, and/or pursuant to the Fed. R.
     Civ. P. 30(e), the deposition to be read with the same
19   force and effect as if signed by said deponent.

20

21

22
                  STEWART RICHARDSON & ASSOCIATES
23                Registered Professional Reporters
                  One Indiana Square, Suite 2425
24                  Indianapolis, IN  46204
                        (800) 869-0873
25
```

```
 1   STATE OF INDIANA          )
                               )
 2   COUNTY OF VANDERBURGH     )

 3

 4          I, Elizabeth Taylor Culiver, RPR, a Notary

 5   Public in and for said county and state, do hereby

 6   certify that the deponent herein was by me first duly

 7   sworn to tell the truth, the whole truth, and nothing

 8   but the truth in the aforementioned matter;

 9          That the foregoing deposition was taken on

10   behalf of the Plaintiff; that said deposition was

11   taken at the time and place heretofore mentioned

12   between 8:07 a.m. and 9:02 a.m.;

13          That said deposition was taken down in

14   stenograph notes and afterwards reduced to typewriting

15   under my direction; and that the typewritten

16   transcript is a true record of the testimony given by

17   said deponent;

18          Absent a request by the parties or by

19   agreement, the reading and signing by the deponent to

20   the deposition were waived on behalf of all the

21   parties by their respective counsel, the witness being

22   present and consenting thereto, and/or pursuant to the

23   Fed. R. Civ. P. 30(e); and the deposition is to be

24   read with the same force and effect as if signed by

25   said deponent.
```

1          I do further certify that I am a disinterested

2     person in this cause of action; that I am not a

3     relative of the attorneys for any of the parties.

4          IN WITNESS WHEREOF, I have hereunto set my

5     hand and affixed my notarial seal this 12th day of

6     September, 2022.

7

8

9     *Elizabeth Taylor Culiver*

10    Elizabeth Taylor Culiver
      NOTARY PUBLIC SEAL
      STATE OF INDIANA
11    Commission No. NP0670402
      My Commission Expires Aug. 14, 2023

12

13    My Commission Expires:

14    August 14, 2023

15

16    Job No. 174902

17

18

19

20

21

22

23

24

25

Index: 1..Austin

## Exhibits

**Michelle Jones Ex J1** 3:8
  18:16

**Michelle Jones Ex J2** 3:10
  29:16,17

---

### 1

**1** 18:17

**14-day** 25:23

**18** 11:6

**19-'20** 35:3

**1998** 9:17 10:9

**1st** 32:1,3

---

### 2

**20** 13:11 35:2

**20-'21** 35:11

**2021** 10:4 12:7,11 21:24

**2022** 4:18

**21** 13:12 35:2

**21-'22** 35:11

**21st** 13:12

**23** 11:5

**26th** 4:18

---

### 3

**30** 26:13

**31** 11:5

---

### 4

**405** 4:17

**417** 11:20

**4th** 31:18

---

### 5

**50** 11:22

---

**5th** 31:18

---

### 6

**6th** 12:6,11 23:8

---

### 7

**7th** 12:6,19 23:8

---

### 8

**8:07** 4:19

**8th** 12:18,19

---

### 9

**915** 4:16

**9:02** 36:14

**9th** 12:18

---

### A

**a.m.** 4:19 36:14

**acceptable** 32:14

**access** 23:3,5

**account** 28:7

**accurately** 7:3

**act** 33:20 34:1

**action** 16:22 30:7 33:23

**actions** 17:6,11

**Activity** 9:13

**actual** 20:25 25:23

**add** 23:10 28:5

**added** 23:6

**administered** 5:22,23

**administration** 35:24

**administrative** 19:5 23:17

**administrator** 7:12 17:3 24:13
  33:20

**advice** 30:23

---

**affect** 6:21 34:9

**affirmed** 5:5

**agency** 8:18 9:3,14 10:8

**agreed** 33:5

**agreement** 32:22,23

**agreements** 9:2,3

**ahead** 16:18

**airport** 12:12

**allowed** 26:3

**ambiguous** 22:2

**answering** 6:5

**anytime** 30:11 33:16

**apologies** 9:23

**apologize** 13:11

**apply** 35:7

**April** 31:15,16,18,22,23 32:1,3

**area** 11:23 27:11 30:3

**areas** 28:17,18 29:9

**arrive** 12:5,8

**arrived** 10:5 12:11 13:3,24 14:14,
  17 15:5,15 21:24 22:7,20 23:2,21
  25:5 28:9

**arriving** 23:1

**assigned** 13:1 21:1 34:20,24,25

**assistant** 13:25 30:5 35:20,25

**associate** 4:16

**Associates** 4:16

**assumed** 13:23

**assuming** 19:14,15

**athlete** 15:19

**athletes** 15:24

**atmosphere** 21:24 22:2,5 28:13,
  14

**attend** 35:5

**attending** 15:24

**attorney-client** 30:24

**August** 4:18 13:8,10

**Austin** 4:25 5:2,18

**aware** 14:6 19:7,11,17 20:1,7,13, 18,24 21:5,7,14,16,21 22:24 35:24 36:1

**B**

**back** 4:9 12:23 14:25 26:20,25 32:5

**bad** 6:25

**band** 11:13,14

**base** 22:15 25:8 28:24,25 29:2

**based** 30:24

**basically** 18:21

**basis** 25:11

**began** 13:7

**begin** 11:9

**beginning** 24:2,25

**begun** 13:18

**behalf** 5:1

**Beth** 4:15 27:13

**birthday** 31:13

**bit** 29:1 33:15

**Bob** 13:13

**bolts** 23:11

**bottom** 27:2

**break** 6:15,17 31:20,24

**briefly** 9:22 18:21

**bring** 18:4

**brought** 33:19 34:1

**building** 18:25 20:11 21:2 30:13 35:17

**C**

**calculate** 10:9

**calculator** 10:9

**call** 25:20

**calls** 16:16

**career** 24:8

**case** 5:20 7:10,11,12,22 8:6

**caution** 18:13

**CCR** 32:6

**Central** 4:19

**Century** 13:13

**chain** 14:21 18:14

**chance** 10:11 16:6

**change** 26:12

**changing** 26:12

**channel** 23:3

**charged** 8:3

**check** 25:25

**chief** 7:15 25:11

**children** 11:2

**classes** 15:18

**classroom** 24:12

**clear** 4:10

**close** 12:25 13:6

**closed** 35:3

**coaching** 16:23

**college** 24:8

**comfortable** 33:24 34:8

**command** 14:22

**communicated** 26:11

**communication** 24:24

**community** 11:23,24 23:13,25 29:1,2,9

**complaint** 9:9

**completely** 6:16 29:18

**computer** 19:5 20:2,4,13,16

**concern** 14:10 17:3 30:12,15,19

**concerns** 18:23 34:1

**concluded** 13:14 36:14

**concludes** 36:6

**conduct** 17:4

**conducting** 18:8 22:13

**confirm** 23:23

**conflict** 17:21,24,25 18:1,5

**consequences** 18:14 26:9

**considered** 17:2

**consult** 30:16 31:1

**consulted** 30:18

**contact** 25:19

**continue** 11:10 35:12,13

**continued** 17:2,14 21:21

**contractor** 14:20

**conversation** 16:23,24 24:13 27:20 31:2

**convicted** 8:3

**copy** 36:9,12

**Cora** 15:1

**cordial** 10:18 30:4

**correct** 29:14

**counsel** 4:1,22 8:17,18 36:8

**country** 25:18 26:15,16 29:4

**couple** 15:8 34:16

**court** 4:3 5:22,24 6:3,7,10 7:25

**COVID** 22:11 23:14 25:3,6,15,19, 20 35:2

**COVID-19** 22:6,21,22 23:6,24 28:13 30:3

**coworkers** 21:23

**crime** 8:4

**Culiver** 4:15 27:11,12

**culture** 11:24 34:11

**cut** 4:6

**D**

**daily** 25:11

**date** 4:18 12:3,8 13:12

**daughter** 10:16 15:12,15

**day** 6:25 12:10,13 26:2 31:10 32:8

**days** 13:4 30:1

**defendant** 5:2

**Defense** 9:13

**Department**  9:13

**deponent**  4:21

**deposed**  7:6

**deposition**  4:20 5:21 6:14,25 8:7,18,19 9:4,7,22 27:18,24 34:14 36:6,14

**depositions**  7:14,23

**describe**  10:17 21:23 22:5 28:9, 12

**detail**  28:10

**determine**  5:19

**dictates**  22:16

**direct**  14:24

**directly**  8:13,14

**dis-**  22:21

**discuss**  8:18

**discussion**  28:1 30:4,25

**disrespectful**  16:15,21,25 17:9, 14

**distancing**  22:10 28:21

**distributed**  22:22,24,25 24:22

**distribution**  19:4 20:19,23 21:4 23:4 35:14

**district**  25:13,14 35:9

**document**  6:8 18:19 29:22,25

**documents**  8:6,9,15

**Dodea**  9:16 21:10 22:11 23:6 34:22 35:1,4,10,12,22

**Dodea's**  33:12

**domicile**  26:4

**dropped**  23:5 27:4

**drugs**  6:20,22

**due**  31:11

**duly**  5:5

**DVS**  15:18 19:1 20:9 34:21

E

**early**  31:15,21

**easier**  6:7

**East**  32:6

**education**  9:13 34:11

**educator**  17:3

**educators**  7:19 11:22 13:17 17:8 24:6 35:9,12,16,21

**EEO**  9:9

**Effective**  24:24

**Elementary**  13:14

**email**  10:14 18:22 19:4,7 20:1,18, 19,23 21:9 22:22 23:19 24:22 30:9,17 31:18 35:14

**emails**  8:8,11,12 21:3,22,25 23:20 29:11

**employee**  7:11 33:16

**employees**  11:22

**employer**  9:12

**end**  33:12

**ends**  34:14

**ensure**  11:20,23 22:12

**entered**  26:2

**entering**  25:18

**enters**  30:13

**entire**  21:22

**entry**  19:8

**environment**  22:13,17

**equipment**  19:3 20:8

**Eric**  16:9,10

**essential**  25:1

**established**  19:16

**Europe**  32:6

**Evansville**  4:17

**events**  10:15 15:24 24:6

**everyone's**  22:18

**exact**  13:11

**EXAMINATION**  5:8 34:18

**examined**  5:7

**excluded**  19:2 21:25

**Excuse**  9:19

**exhibit**  18:16,17 29:16,17,19

**exhibits**  8:12 29:18

**expect-**  18:11

**expectations**  8:20 18:12 24:14 29:10

**explain**  16:23 29:24 33:15

**explaining**  20:8

**eyes**  22:19

F

**face**  22:19

**facilities**  28:25

**faculty**  19:4 20:19 24:18,20

**familiar**  31:19

**fault**  4:9

**federal**  5:17

**feel**  30:9,12,13 32:15,21 33:24 34:2,3,8

**feels**  33:16

**felt**  30:7,11

**filed**  7:11,12 9:9

**find**  31:3 33:21

**fine**  16:9

**Fischer**  4:4 5:1 8:13,23 16:16,19, 20 19:13,16 22:1 26:19 30:22 33:3 34:6,16,19 36:2,5,12

**fob**  19:8,12,19,21

**follow**  18:8 25:6,17 26:1,8,17 28:19 29:5

**foreign**  26:15,16

**forward**  18:10

**found**  19:23

**foundation**  19:13

**foyer**  30:3

**frame**  24:15 31:15,16

**Friday**  23:6,9,10 32:4

**friendly**  31:9

**full**  14:1

**G**

**gave**  32:13

**general**  24:19

**German**  23:14,16,25

**Germany**  12:5 23:24 25:7 28:9, 12,14,22

**give**  5:25 17:17 31:10 32:20

**giving**  27:24

**global**  21:23 22:2,5

**good**  14:3

**grab**  32:25

**great**  28:10,11

**green**  28:18

**GS**  11:22

**guests**  29:3

**guidance**  25:17 26:9,11 28:19 29:5,8 33:13

**guidelines**  22:11 23:7,13 25:3,7, 16

**H**

**hallway**  15:21

**handle**  18:3

**happen**  25:6

**happened**  31:5 33:22

**happy**  19:24 33:7,10

**harassment**  33:13,17,19

**head-**  35:7

**headquarters**  25:14 35:8

**hear**  4:10 27:8

**held**  4:20 28:1

**High**  10:5 11:12 12:8,13 13:4,15, 17 18:25 22:7 34:23 35:19

**holds**  5:23

**home**  25:22 26:3

**honest**  10:13 16:8

**hope**  13:14 23:22

**hostile**  33:17

**hug**  32:20,25

**hugger**  10:19

**husband**  16:3

**hypothetical**  16:17 33:3 34:6

**I**

**identify**  4:22

**Ill**  4:25 5:18

**implications**  34:3

**important**  24:19,23,24 26:10,13 28:23 29:3,12

**improper**  17:4

**improvement**  17:1

**incident**  31:5

**include**  11:21 19:3

**included**  36:10

**Indiana**  4:17

**individual**  25:17

**individuals**  18:4 21:12 23:3 26:7

**information**  5:19 7:21 20:25 23:12,14 24:1,21 26:14 29:4 35:15,23

**installation**  29:7

**instituted**  35:4

**instruct**  30:23

**interact**  10:12,13

**interactions**  10:17,22 15:7,11, 14 16:3,10

**interrupt**  6:4,5

**interrupted**  9:22

**investigate**  33:21

**investigation**  18:9 31:3

**issue**  17:15,20,23

**issues**  14:4,6,8

**items**  19:25

**J**

**J-O-N-E-S**  5:13

**J1**  18:16,17

**J2**  29:16,17

**Jake**  14:19,20

**Japan**  7:9,13 10:6 13:2,13,16 24:16 25:16

**job**  11:11 28:11

**Johnson**  14:16,19,20 20:7

**Jones**  4:8,21 5:4,10,12,15 28:3 34:13 36:7

**Jones'**  4:9 19:15

**K**

**key**  19:8,12,18,21 25:1

**kind**  10:18 23:11,14

**know**  6:15 7:4,18,20 13:7,11 14:2 15:12,13,14 16:7 19:17,22,24 21:3,7,8,12 22:15,18,25 23:1,4 24:10 25:2 26:8,12,15 27:6 28:7 29:5 31:14,20 32:10,16 33:12 35:10

**L**

**L-E-I-G-H**  5:16

**Labor**  12:10

**Lack**  19:13

**lawsuit**  5:17

**lawyers**  30:24

**learn**  22:14

**learning**  11:24 34:11 35:4

**leave**  26:3

**legal**  30:18,21,25

**Leigh**  5:4,15

**letter**  18:11,12,13 24:5

**letters**  17:15

**level**  35:8,9

**liaison**  23:17

Index: list..position

**list** 19:4 20:20,23 21:4 23:4 35:14

**literally** 12:12

**live** 29:6

**Lloyd** 4:25 5:2,18

**LMER** 17:5 18:7 30:18

**local** 23:25

**located** 4:2 24:15

**lodging** 12:12

**long** 6:14 9:16,18 10:2,7

**lost** 26:18,19

**lot** 26:5

---

**M**

**M-I-C-H-E-L-L-E** 5:12

**made** 9:2

**Main** 4:17

**make** 6:11 26:10 29:5

**makes** 6:6,25

**manpower** 20:10

**March** 31:21

**marked** 29:16

**married** 10:25

**mask** 22:9,17 28:19,20

**matters** 36:10

**measures** 22:8,16,20 26:6 28:20

**medical** 25:12,23 28:24 29:2

**medically** 35:6

**medications** 6:20,22,23

**meet** 8:22,24

**mentioned** 12:3 34:20

**message** 31:14

**messages** 21:9 23:6,9,10 24:17

**met** 8:17 16:2 21:9

**Michelle** 4:21 5:4,12,15 15:4 36:7

**mid** 31:16

**middle** 5:15 14:2

**military** 25:8,12,23 28:23 29:7

**mind** 9:25

**minute** 17:17

**minutes** 26:13

**misunderstood** 27:23

**mitigation** 22:8,20 26:6

**Moellendick** 14:13 15:1,2 20:6

**moment** 9:19,20 31:12

**Monday** 32:7,9,10

**month** 13:7

**move** 18:9

**movement** 25:21

**moving** 18:14 31:11

**Munich** 12:11

**mutual** 32:22,23

**mutually** 32:20

---

**N**

**nation** 29:8

**nature** 7:10,17

**needed** 19:6,25 20:7

**nice** 27:10

**nods** 6:11

**notice** 31:10 32:8

**nurse** 30:5

**nuts** 23:11

---

**O**

**oath** 5:21

**object** 22:1

**Objection** 16:16 19:13 30:22 33:3 34:6

**obligation** 5:25

**occurred** 31:4 35:3

**offer** 31:16

**office** 15:21 35:20

**officer** 19:6 23:17,18

**Okinawa** 7:9,13 10:6 13:2,13,16 24:16 25:16 28:8,15

**opened** 13:12

**operational** 22:12 23:7

**opportunity** 15:23 16:2 24:11

**orientation** 24:5

---

**P**

**Pacific** 25:10

**pages** 29:20

**pandemic** 22:6

**part** 10:23 20:9 21:10

**partner** 29:8

**partners** 17:5 18:7 25:12,24 28:24

**past** 24:8

**pay** 11:13,14

**people** 14:13 32:19

**period** 25:23

**permission** 33:1

**person** 25:6 34:2

**personal** 31:6,9

**persons** 4:23

**physical** 17:24,25 20:11 21:1,2 22:10 28:21 35:17

**physically** 18:24

**pick** 19:24

**piece** 19:1

**pieces** 23:11

**place** 22:9,10,17,20 26:6 28:21, 22 35:2

**placement** 35:10

**plaintiff** 4:25 5:17

**plan** 6:14

**pleasant** 10:22

**point** 7:2 17:17

**policies** 23:14,16,24,25 26:17

**position** 7:15 25:10

Index: positions..selected

**positions**  35:1

**positive**  15:16 16:12 25:19,25

**possibly**  7:19

**post**  29:8

**practices**  28:15

**pre-action**  18:9 31:3

**prepare**  8:7

**present**  4:23 5:3 31:4

**presented**  6:17

**previous**  7:15 25:10

**principal**  11:12 13:25 30:5,14 35:20,25

**prior**  10:5 23:1

**privilege**  30:24

**pro**  4:24 5:17

**procedures**  22:12

**proceeding**  8:1

**process**  18:8

**professional**  10:18 18:12 32:16, 24

**program**  19:1

**promote**  34:10

**promotion**  31:11 33:8

**protocol**  22:6 29:1

**protocols**  22:12,21,22 23:7 26:5 28:12

**provide**  7:20 19:20 20:12 23:2 35:15,16

**provided**  8:12,14 19:6,21 23:16

**providing**  19:18

**put**  22:16 26:6 27:22 29:18 32:17 35:1,25

**putting**  25:15 27:15

**Q**

**question**  6:17 9:25 11:10 14:7, 10 17:18 33:4

**questions**  5:9,19 6:5,6 7:21 15:9 34:16,19

**R**

**race**  11:7

**Rachana**  5:1

**ran**  31:21

**reach**  25:24

**read**  4:11 28:2

**readiness**  24:9

**realize**  31:8

**reason**  6:24 19:18 20:4,22

**reasoning**  31:6 32:13

**reassigned**  20:2,5

**receive**  20:25 21:21 24:16 29:4

**received**  21:9 24:18 26:4 29:25 35:23

**receiving**  19:7 20:1 30:16

**recognize**  18:19 29:22

**record**  4:23 5:11 12:4 26:20,22 27:15,16,17,19,20,25 28:1,2 34:17 36:10

**red**  28:17

**refused**  19:8

**region**  25:14

**regularly**  25:15

**relationship**  34:23

**relationships**  17:4

**released**  26:1

**relocation**  33:10

**remember**  16:5,6 20:8 23:13,18 28:22 31:18

**remote**  35:4

**remotely**  4:3,12

**removed**  19:4 20:19,22 21:3

**render**  18:11

**report**  14:21,24 20:11

**reported**  14:4,6,14,16 15:4

**reporter**  4:1,3,11,15 5:22,23 6:3, 7,10 26:18,23,25 27:12,14,19 36:6

**reprimand**  17:13,16 18:13

**resolution**  18:6

**resolved**  14:11

**resources**  20:12

**responded**  19:23

**response**  19:21

**responses**  17:6

**responsi-**  19:15

**responsibilities**  11:17,18,19,25 13:23 19:15

**responsibility**  33:25

**restriction**  25:20,21

**results**  26:4

**returned**  13:9 24:7

**returning**  13:10

**review**  8:6

**Richardson**  4:16

**Rodman**  13:25 14:2,4,14,16 15:5 19:11,14,17,20 30:5,16,19 31:1,3, 10 32:13 33:7

**Rodman's**  14:1

**rules**  5:21

**run**  32:25

**S**

**safe**  22:13 33:24 34:2,3

**safety**  11:20,21

**salary**  11:14

**satisfied**  28:3

**schedule**  24:6,11

**school**  10:5,14 11:12,24 12:9,13 13:4,9,13,14,15,17,18 15:17 18:25 19:9 20:10 21:1,6,11,13,20 22:7,23 23:17 24:19,22,25 34:12, 22,23,24,25 35:1,5,8,10,13,19,22

**schools**  7:13 25:12 35:3

**Scotland**  15:13,14

**seek**  17:5

**selected**  35:9,12

**send** 23:9 30:14

**sending** 30:9

**sensitive** 35:6

**September** 10:4 12:6,11,18 21:24

**set** 19:24 23:2

**sexual** 33:18

**share** 8:20 24:6,14 26:14 30:6,14 35:18,19

**shared** 18:22,23 20:24

**Shawn** 14:2

**side** 8:17

**signed** 9:2

**similar** 28:14,15

**situation** 7:19 32:18

**small** 29:9

**Smithson** 4:5,7,14,24 5:9 9:25 16:7,9 19:14 26:18,21,24 27:5,8, 10,13,17,22 30:1 33:6 34:13,20 36:11

**sort** 18:5

**sound** 31:19

**south** 25:11

**space** 31:7,9

**speak** 9:6 24:3,17 25:9

**specific** 14:13 22:4

**specifically** 8:22

**spell** 5:10

**sports** 10:15

**spring** 31:20,24

**staff** 7:16 24:20 25:11 35:21

**Standard** 4:19

**standards** 24:9

**start** 13:5 22:23 24:22

**started** 13:3

**starting** 27:8

**state** 5:10 12:4 18:21 36:8

**statements** 5:25 6:11

**stating** 30:1

**stay** 25:22 26:21 27:16

**step** 18:6

**steps** 18:10

**Stewart** 4:16

**stipulate** 4:1

**stipulation** 4:12

**stipulations** 36:9

**stop** 15:19

**storm** 27:6

**Street** 4:17

**student** 15:19,23

**students** 11:21 13:10,17 22:14 34:10

**subordinate** 17:14

**subordinates** 16:15,21 17:9

**substitute** 20:2,5

**success** 34:10

**Suite** 4:17

**support** 15:23

**supposed** 11:16

**Susan** 14:22

**Suzanne** 14:22

**swearing** 4:12

**sworn** 4:2 5:5

**system** 34:11

**T**

**taking** 6:20,23 16:22 34:15

**talking** 27:20

**Tamica** 4:24

**teacher** 30:12 34:2

**teachers** 13:5,6,7,8,19 14:3,7,8 17:20,23 23:15 24:2 29:14 35:6

**team** 20:6,9

**Teams** 23:2

**ten** 11:15

**tenth** 26:1

**terminated** 7:20

**test** 28:23,25 30:3

**tested** 25:19,24 26:3

**testified** 5:7 7:14,25

**testify** 7:3

**testifying** 5:24

**testimony** 6:21

**testing** 28:20,25

**things** 25:5

**thinking** 31:12

**thought** 31:9,22

**time** 4:18,19 12:1 14:5 19:24 21:8,25 24:15 27:24 28:6,8 31:15, 16 34:15

**title** 11:11

**today** 6:21 8:21 21:16 34:14

**Today's** 4:18

**touch** 30:20 32:17 33:18

**touched** 30:6

**toucher** 10:19

**touching** 30:19

**TPKE** 11:15

**training** 24:9 32:6

**transcribe** 6:3,10

**transcript** 36:9,13

**transition** 14:5

**travel** 28:16

**truth** 5:6

**truthful** 5:25

**truthfully** 7:3

**Tuesday** 12:15,16 30:2 32:9

**type** 19:20

**U**

**Uh-huh** 16:1 31:25

**uh-huhs** 6:10

Index: ultimately..Zoom

**ultimately**  34:9

**unable**  7:2

**uncomfortable**  32:18

**understand**  6:1,8,12,18 7:4 9:24 29:6

**understanding**  29:9

**unwanted**  33:18

**unwelcome**  30:20

---

**V**

**vague**  22:1

**verbal**  6:11 9:2

**verbally**  33:18

**Vilseck**  4:2 10:5 11:12,23 12:8, 13 13:1,3,15,17 18:25 22:7 34:23 35:19

**violated**  31:8

**violating**  31:6

**virtual**  21:5,10,13,20 34:22,24,25 35:1,4,10,13,22

---

**W**

**wait**  26:24

**waiting**  30:4

**walked**  9:23

**wanted**  30:6 32:24 35:5

**ways**  17:1

**wear**  22:9

**wearing**  22:18 28:20

**weather**  27:21,22

**week**  13:8,9 24:7 31:21,22

**weekend**  32:4

**weekly**  30:2

**weeks**  13:20

**weight**  5:23

**well-being**  11:20,21

**White**  11:8

**William**  16:9

**Wolff**  15:4

**work**  9:14 10:12 13:5 15:18 17:1, 5 18:5 24:12 32:20 33:25 34:9

**worked**  9:16,18 10:2,8 25:11

**working**  11:9 13:3,16 18:7 22:15

**workplace**  9:10 33:13,24

**wound**  31:13

---

**Y**

**year**  11:9 15:17 20:13,16 21:6,14, 20,22 22:23 24:2,23 25:1

**years**  11:15 20:17 24:8 35:11

**yellow**  28:17

---

**Z**

**Zoom**  4:20

SMITHSON
EXHIBIT
SR-2

```
 1        UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                          AT WASHINGTON DC
 2    _____

 3   TAMICA SMITHSON                    )
                                        )
 4            Complainant               )   EEOC NO.:
                                        )   570-2019-00926X
 5   Vs.                                )
                                        )   AGENCY NO.:
 6   US DEPT. OF DEFENSE                )   EU-FY18-054
                                        )
 7            Agency                    )
                                        )
 8                                      )
     _____

 9

10          Telephonic Deposition Upon Oral Examination

11                              of

12                        SHAWN RODMAN

13   _____

14

15                          1:00 p.m.
                          April 27, 2020
16                        Vilseck, Germany

17

18

19

20

21

22

23
     Zoya O. Spencer, Court Reporter
24   CCR # 2418

25
```

*Spencer & Associates  (206)382-9695  Court Reporters*

```
 1                        APPEARANCES

 2

 3    FOR THE COMPLAINANT:

 4            BRADLEY R. MARSHALL
              Designated Representative
 5            Chartmans, Inc.
              1240 Winnowing Way, Suite 102
 6            Mt. Pleasant, South Carolina 29466
              Telephone: 843 303-9532
 7            Email: Brad@Charmans.com

 8

 9    FOR THE AGENCY:

10            MAXWELL G. SELZ
              Deputy General Counsel
11            DoD Dependents Schools - Europe/Pacific
              Phone: DSN 545-1592/CIV: +49
              (0)611-1435451592/ Cell +49-(0)162-2704730
12            Maxwell.Selz@eu.dodea.edu

13

14    ALSO PRESENT:

15            TAMICA SMITHSON

16

17                      I N D E X

18

19    EXAMINATION                                     PAGE

20
      BY MR. MARSHALL                                    3
21

22

23                 NO EXHIBITS MARKED

24

25
```

```
 1                        SHAWN RODMAN,
                   witness herein, having been
 2                     duly sworn, was deposed
                       and said as follows:
 3

 4                        EXAMINATION

 5     BY MR. MARSHALL:

 6        Q.   Again, sir, thank you for joining us.  My name

 7     is Brad Marshall, I represent Tamica Smithson in a case

 8     that's before the Equal Opportunity Employment

 9     Commission?

10          Have you ever had your deposition taken before,

11     sir?

12        A.   No.

13        Q.   I'm going to give you some basic instructions to

14     keep in mind for the deposition.  My job is to ask

15     questions that you understand.  If at any point in time,

16     Mr. Rodman I ask a question that you don't understand,

17     don't hesitate to let me know, sir.  If you go ahead and

18     answer it, I'm going to assume that you understood the

19     question.  If at any point in time Mr. Selz needs to

20     interpose an objection, please allow him to do so before

21     trying to answer the question.

22          And the last thing I would like to say is it's

23     important for you and I not to speak at the same time.

24     So because we're doing this by telephone, that can

25     sometimes be a bit cumbersome.  I will try to give you
```

SHAWN RODMAN (April 27, 2020)                                    4

```
 1    plenty of space to answer the question.  And if you,

 2    sir, would give me space to ask the question, even

 3    though you anticipate what I'm going to ask you, just go

 4    ahead and let me ask it for the record so that the

 5    record is clear.

 6           Those are the basic instructions.  Do you have

 7    any questions with any of those instructions, sir?

 8        A.   No, I don't.

 9        Q.   Great.  We'll get started then.  Mr. Rodman,

10    would you please give us some background information,

11    sir, your years with DoDEA, where you were located, and

12    your educational background, sir?

13        A.   Okay.  I started with DoDEA in 1998 in

14    Hohenfels, Germany.  I worked there as a special

15    education teacher until 2015.  In August of 2015, I came

16    to Vilseck High School as the assistant principal.  I've

17    been here since that time.  This year, however, I've

18    had, I guess you would call it dual duty.  I was named

19    the interim principal at Hohenfels Middle High School in

20    November of 2019 and have been working at both schools

21    since then until now.  My background, I have a master's

22    degree in special education and a degree in psychology.

23        Q.   Okay.  All right, sir.  Now, what have you done

24    to prepare for your deposition this morning, sir, what

25    have you read?
```

SHAWN RODMAN (April 27, 2020)                                    5

```
 1      A.   I was sent a document last week, I'm not sure

 2    what the title is, just a record of the testimony here.

 3    I basically went back and read my parts of that

 4    document, the parts that I put in there, and that's all.

 5      Q.   You were provided the report of investigation

 6    last week?

 7      A.   I think, yes, someone sent it to me.  I didn't

 8    open it until -- I didn't open it and read it until this

 9    morning.  It says T. Smithson ROI PDF, and I was sent

10    it.

11      Q.   You didn't read it until this morning, sir?

12      A.   Correct.

13      Q.   Okay.  What else have you done to prepare for

14    your deposition this morning?

15      A.   I spoke with Mr. Selz about this.  Basically he

16    gave me the time frames of things, but I spoke with him

17    on the phone.

18      Q.   I don't need you to tell me anything that

19    Mr. Selz told you.  Anything other than the

20    conversations with Mr. Selz.  Have you spoken with

21    anyone else, sir --

22      A.   No, sir.

23      Q.   -- in connection with this case?

24      A.   No, sir.

25      Q.   You haven't spoken with Mr. Villareal in the
```

1    last several days?

2        A.  I've spoken with him.  He's in the next office.

3    But I haven't spoken with him about this case, no.

4        Q.  He didn't tell you anything about his testimony

5    at all?

6        A.  No.

7        Q.  Have you spoken with any other witness in the

8    case, sir?

9        A.  No.  I take that back.  Ms. Connors called me

10   last week by mistake.  Apparently she was involved in

11   this going on, it cut out on her, she called my number

12   thinking that was the number.  She told me she was

13   involved in the deposition and she called the wrong

14   number, but that was it, so I guess that would qualify.

15   But she didn't tell me anything about the case, she just

16   called me with the wrong number.

17       Q.  When did she do that, sir?

18       A.  I don't remember the day.  I think it was last

19   week as well.  I was actually just leaving my office in

20   Hohenfels when she called and said she got cut out of

21   the phone call, and my number was the number she didn't

22   recognize, it was the work phone, and she dialed it and

23   said, "Oh, it's not you I need to talk to.  I was

24   involved in the deposition, I got cut out, sorry."  And

25   then she hung up.

SHAWN RODMAN (April 27, 2020)                                    7

```
1        Q.   Who else did you speak to, sir?

2        A.   Nobody.

3        Q.   Okay.  Have you read anything, other than the

4   report of investigation, concerning this case?

5        A.   No.

6        Q.   All right, sir.  Mr. Rodman, have you ever been

7   the subject of an EEO complaint, sir?

8        A.   No.

9        Q.   Have you ever testified in an EEO complaint,

10  sir?

11       A.   No.

12       Q.   Hello?

13       A.   Hello?  I said no, sorry.

14       Q.   Oh, I didn't hear you.  You haven't been a

15  witness in any kind of an EEO case; is that correct,

16  sir?

17       A.   Correct, I have not.

18       Q.   Okay.  Have you received training, sir, on

19  discrimination since you've been serving as assistant

20  principal?

21       A.   Generally, they touch on trainings that are

22  annual administrative conferences about EEO, sometimes

23  it could be any one of the protected classes.  I don't

24  remember specifically examples involving race, but, in

25  general, we've had some type of EEO training every year
```

SHAWN RODMAN (April 27, 2020)

```
 1    that I've been an assistant principal.
 2         Q.   So my question was related to discrimination.
 3         A.   No, no -- well, yes, then, discrimination we
 4    have.
 5         Q.   Okay.  Since you've been at the school there,
 6    how many African-Americans have been employed as
 7    teachers?
 8         A.   Let me think.  As teachers, I believe four.  Did
 9    you hear me?
10         Q.   Yes, sir.  Did you not hear me?  The next
11    question I asked was:  Could you tell me their names?
12         A.   I didn't hear that, sorry.
13              Tamica Smithson, Prince Young --
14         Q.   I'm sorry, what was the first one, sir?
15         A.   Ms. Tamica Smithson.
16         Q.   Uh-huh.
17         A.   Prince Young, Byron Jones.  And I'm spacing on
18    the last one, she just left us last year, she hasn't
19    been here this year.  I can tell you what she taught,
20    culinary arts.  I'm sorry, I'm not good with names.
21         Q.   You don't recall the name, sir?
22         A.   It will come to me.  I'm sorry.
23         Q.   We'll go on and then we may come back to that.
24    Okay?
25         A.   Okay.
```

SHAWN RODMAN (April 27, 2020)                                    9

```
 1        Q.   Now, Mr. Rodman, I understand your wife is
 2    employed at the school?
 3        A.   She is a substitute, yes.
 4        Q.   How long has she served in that capacity?
 5        A.   Well, I guesses at our school she's not on our
 6    school's books, she's on the elementary school's books.
 7    She started working here at a time when we did not have
 8    substitutes available, we didn't have anybody, so that
 9    would have been in 2016 that she started -- I believe
10    started working.
11        Q.   She began working for DoDEA in 2016, sir?
12        A.   No, she worked as a substitute in Hohenfels as
13    well.  She had to reapply, which took a long time to get
14    her things through.  So she didn't live up here the
15    first year I was here in 2015.  My son was graduating at
16    Hohenfels so my family stayed down there and I drove,
17    it's about an hour's drive.  So she came up here, but
18    they wouldn't transfer her directly from Hohenfels to
19    Vilseck.  And she was actually picked up by the Vilseck
20    Elementary School, which she subbed sometimes, I
21    believe.  But then when we didn't have any subs for
22    positions here because we were short, they allowed her
23    to work over here.  And she's worked more over here
24    probably than she worked over there.  I don't remember
25    the year exactly that she was brought into -- that she
```

SHAWN RODMAN (April 27, 2020)                                    10

1    became a substitute with DoDEA.

2        Q.   As I understand your testimony, sir, it sounds

3    like you're looking through some papers; is that

4    correct?

5        A.   No.

6            MR. MARSHALL:  Okay.  Someone is turning papers.

7        If they could just mute their phone, that would be

8        very appreciated.

9        A.   There's a paper next to the phone but I'm not

10   doing anything about it.  There a stack of papers, I'm

11   not doing anything with them.

12       Q.   Sir, if you could not utilize any papers --

13       A.   Okay.

14       Q.   -- or review any papers until I direct you to do

15   so, that would be very helpful, sir.

16       A.   Okay.

17       Q.   During your time at Vilseck -- when did your

18   wife first begin teaching at Vilseck, sir?

19       A.   That would have been in the 2016-17 school year,

20   sometime in there.  But there was a delay because

21   everyone was delayed to come.  But I don't remember

22   specific when she started working here.  She applied

23   here during '16-17 school year, but it was delayed.  She

24   applied as is substitute teacher.  But it took everyone

25   a long time during that time, so I don't remember when

SHAWN RODMAN (April 27, 2020)

```
1    she actually came onboard as a sub.

2         Q.   Were you instrumental in assisting her in her

3    employment as a substitute teacher, sir?

4         A.   No, I didn't handle any of that as far as she

5    was concerned.  Our secretary basically picked subs that

6    were needed.

7         Q.   What is her name?

8         A.   At the time, the secretary's name was Dewanna

9    Dean.

10        Q.   Is she still with the agency?

11        A.   No.

12        Q.   Is Dewanna Dean, she's the secretary of the

13   front office there?

14        A.   I don't have an immediate secretary.  She's in

15   the front office -- she was.  It is now Ms. White.

16        Q.   I see.  And when did Ms. -- when did Ms. -- is

17   it Dewanna, did you say?

18        A.   Yes.

19        Q.   When did she leave?

20        A.   I don't know.  I think it was during that first

21   year, she left.

22        Q.   When was that, sir?

23        A.   Probably 2016-2017 school year.

24        Q.   Uh-huh.  Did you discuss with Mr. Villareal that

25   your wife was interested in substituting?
```

SHAWN RODMAN (April 27, 2020)

12

```
 1      A.   Yes, he knew, but as far as --
 2      Q.   Did you discuss your wife's interest in
 3   substituting with Mr. Villareal?
 4      A.   Yeah, I suppose I did.  I mean, he knew that she
 5   wanted to, yes.
 6      Q.   How did he know that, sir?
 7      A.   Because she applied.
 8      Q.   Well, of course she applied, but --
 9      A.   I mean --
10      Q.   -- how --
11      A.   I don't understand the question really, then.
12      Q.   Well, I think you indicated that you did discuss
13   with Mr. Villareal your wife's interest in substituting,
14   right?
15      A.   Yes.
16      Q.   Okay.  So that's how he knew, right?
17      A.   Yes.  I mean --
18      Q.   Yes, sir.
19      A.   I'm still -- yeah, but I didn't go to him and
20   say, yeah, my wife is applying for a job.
21      Q.   What did you say to him?
22      A.   Mostly that we need subs, we don't have anyone
23   available, she's applied for a job, we need to call
24   other places.  So we were basically, at that point,
25   there were no substitutes available, we were getting
```

SHAWN RODMAN (April 27, 2020)

13

```
1    everyone we could.  I was substituting classes, he was
2    substituting classes.  So I probably said to him, hey,
3    when my wife gets on, maybe she can come here but she's
4    applying at the elementary school.
5        Q.  Okay.  During the time that you began working at
6    Vilseck, did any of the African-American teachers
7    complain that they were being subjected to any form of
8    hostility or harassment, sir?
9        A.  No.  Oh, Brittini Barnes was the other teacher,
10   by the way.  I just remembered that name.
11       Q.  Thank you, sir.  During your tenure -- as I
12   understand it, you came to Vilseck in 2015; is that
13   correct?
14       A.  Correct.
15       Q.  And was Ms. Smithson there at that time?
16       A.  Yes.
17       Q.  Were you made aware that Ms. Smithson had a
18   reasonable accommodation?
19       A.  Officially, no.  I was made aware that she had a
20   different schedule that she could come in.  When
21   Mr. Nicholson was the principal, he allowed her to come
22   in later in the mornings.
23       Q.  Who made you aware of that, sir?
24       A.  I don't recall if it was Mr. Nicholson or
25   Ms. Phipps, the secretary.
```

*Spencer & Associates  (206)382-9695  Court Reporters*

SHAWN RODMAN (April 27, 2020)

1    Q.  So am I correct in understanding that you were

2    not aware that her coming in late was a reasonable

3    accommodation?

4    A.  Well, it was an accommodation, but I didn't

5    know -- at the time, it was just something that

6    Mr. Nicholson, I believe it was him or Ms. Phipps told

7    me that's just the way it was.  I did not know there was

8    a plan in place officially.  I never saw any paperwork

9    about that.  So I knew she could come in --

10   Q.  What's -- I'm sorry.  Go right ahead, sir.  I

11   thought you had finished.  Go right ahead.

12   A.  Because they said she could come in later.  I

13   really became aware of it mostly in the springtime

14   because I didn't -- there wasn't a time that I noticed

15   it.  I became aware in the springtime when we were

16   making the schedule, because they made the schedule and

17   one of the rules they put in, so to speak, for the

18   scheduling parameters in the computer to make the master

19   schedule was that she did not have classes first period

20   or fifth period.  So that's when I became aware that it

21   was something -- you know, that people were working

22   around, essentially.  But as far as seeing any paperwork

23   for reasonable accommodation, no one told me, you know,

24   this is an official accommodation plan.

25   Q.  You arrived at Vilseck in what, August of 2015;

SHAWN RODMAN (April 27, 2020)

```
 1    is that correct?

 2        A.   All right.

 3        Q.   Is it your testimony you did not become aware

 4    that there was a reasonable accommodation until the

 5    spring of 2016?

 6        A.   That there was something officially in place,

 7    yes.

 8        Q.   Was it after spring of 2016, sir?

 9        A.   Yes.

10        Q.   Was that the spring of 2016, Mr. -- thank you.

11             And so from the time you arrived in August until

12    the spring of 2016, what did you believe were the

13    reasons Ms. Smithson was coming in late?

14        A.   Quite frankly, I didn't know that she was coming

15    in late.

16        Q.   I asked you that question and you said she was

17    coming in late and you said you understood that there

18    was some kind of an accommodation is what I understood

19    from your testimony.

20        A.   I was saying for quite a while I didn't know or

21    understand that she was coming in late, I didn't know

22    how often it was.  I guess for part of that time, I

23    didn't know she was coming in late until -- I don't know

24    if there was an incident, probably a change in schedule,

25    and we forgot to cover her classes.  That's typically
```

SHAWN RODMAN (April 27, 2020)

1  what happened and I would go and cover the class in the

2  morning.  But I would not have noticed nor did I notice

3  probably the first half of the school year that she was

4  late.

5      Q.  Well, but then what did you mean earlier when

6  you said that you were told by Mr. Villareal or the

7  secretary that Ms. Smithson would be coming in late?

8      A.  Because one of those things had to have

9  happened.  Did they pull me aside and say --

10     Q.  Do you know that it happened or are you guessing

11 that it happened?  I'm trying to understand your

12 testimony, sir.

13     A.  Okay, officially, I don't remember a time when I

14 went and --

15     Q.  Not officially.  Not officially.  Don't qualify

16 the answer.  Just tell me, did -- you previously

17 testified that either Mr. Villareal or the secretary

18 told you that she'd be coming in late.  Is that true or

19 not?

20     A.  Mr. Villareal was not -- this is before him.

21     Q.  Okay.  Well, the principal at the time was

22 Mr. Nicholson, correct?

23     A.  Correct.

24     Q.  Okay.  Did Mr. -- is it Nicholson or Nichols?

25     A.  Nicholson.

SHAWN RODMAN (April 27, 2020)                                    17

```
1       Q.   Did Mr. Nicholson or the secretary tell you when
2    you arrived in 2015 that Ms. Smithson would be coming in
3    late?
4       A.   No.
5       Q.   Okay.  Then how would you have known she was
6    coming in late?
7       A.   Because she came in late and I had to cover a
8    class.
9       Q.   So you were covering a class, she was coming in
10   late, and you had no knowledge that she was coming in
11   late based on a reasonable accommodation; is that your
12   testimony, sir?
13      A.   That's what I'm saying, yes.
14      Q.   How is it possible, sir, that you as the
15   assistant principal would be directed to cover her class
16   for better than a half a year and you not know why?
17      A.   I wasn't covering it for half a year.  It was
18   one day.  That's what I'm saying --
19      Q.   For how long -- okay, I'm confused.
20      A.   She missed a class, there was no class
21   scheduled.
22      Q.   I'm confused, sir.  I thought you said -- you
23   started your testimony that she was coming in late in
24   2015 for about -- and you were unaware of her having a
25   reasonable accommodation.  There was an accommodation
```

SHAWN RODMAN (April 27, 2020)                                    18

```
 1      for her to come in late.

 2          A.   Yes.

 3          Q.   What did you mean by that testimony, sir?

 4          A.   Well, what I mean is she did not have a

 5      scheduled class.  So if she was coming in late, I would

 6      not know it because there was no substitute needed for

 7      the class.  So if she came in -- let's say she came in

 8      at 9:00, her classes typically would not start until

 9      9:10, 9:30, depending if it was an A day, B day or seven

10      period day.  So I did not know that was the case because

11      no substitute was ever needed.

12               I was aware that there was a testing --

13          Q.   I'm sorry --

14          A.   -- schedule.  And we had to cover her class.

15          Q.   You had to cover her class.  When did you cover

16      her class?

17          A.   There were a number of times when I covered her

18      class.  I don't remember the exact dates.

19          Q.   Is this the 8:00 a.m. class or this was the 9:00

20      a.m. class?

21          A.   This would be an 8:00 a.m. class but not on our

22      typical schedule.  Our typical schedule, she was not

23      scheduled for a class.  If we changed because of

24      testing, like we do at the semesters, then that adjusts

25      is that schedule.  If there was not a substitute for her
```

SHAWN RODMAN (April 27, 2020)

1    class and she was not coming in typically, if we didn't

2    have coverage, someone would have to go cover her class,

3    oftentimes that was me.

4        Q.   Okay, help me understand under what

5    circumstances in 2015 and 2016 you or someone else had

6    to cover her 8:00 a.m. class.

7        A.   If we changed the schedule for any reason, for

8    example our testing schedule with the semester, we run

9    the test, the test schedule is different.  So

10   Ms. Smithson didn't have a class period, she had

11   preparation period first period and fifth period, which

12   basically she didn't have students to teach at 8:00.

13   Sometimes during the testing schedule it will adjust so

14   the first period might be second period, if that makes

15   sense.  The second period, instead of meeting at 9:30,

16   would meet at 8:20, which is when we start school.  So

17   on those occasions, if we didn't get a sub, someone

18   would have to go cover her first morning class until she

19   arrived because she arrived late.

20       Q.   How many times would you estimate, sir, in 2015

21   and 2016, did you or someone else have to cover for

22   Ms. Smithson's class or 8:00 a.m. class?

23       A.   An estimate?

24       Q.   Yes.

25       A.   Less than ten.

SHAWN RODMAN (April 27, 2020)                                    20

```
 1        Q.   Okay.  And who were the people covering her
 2    class during this time period?
 3        A.   It could have been anyone who does not have a
 4    scheduled class period.  We could have --
 5        Q.   Who do you recall it being, sir?
 6        A.   What?
 7        Q.   Who do you recall it being?  Who do you recall
 8    covered her class at this time?
 9        A.   Most assuredly, one was me.  Other than that, I
10    can't say for sure, because people covered everywhere.
11        Q.   And it's your testimony that you did not know
12    for all of 2015 and up through the time that the
13    class -- the master schedule was being prepared, you did
14    not know that Ms. Smithson had a reasonable
15    accommodation to come in an hour late?
16        A.   Mr. Nicholson didn't tell me that.
17        Q.   Is that your testimony?
18        A.   Most of that year, I did not know.
19        Q.   When did you first learn that, that she had a
20    reasonable accommodation?
21        A.   I don't recall.
22        Q.   Give me your best estimate.  You said around the
23    master schedule.  When is the master schedule normally
24    prepared, sir?
25        A.   Usually around -- we start around February,
```

*Spencer & Associates  (206)382-9695  Court Reporters*

SHAWN RODMAN (April 27, 2020)

```
1    March time frame.

2         Q.  Okay.  So is it your testimony you learned

3    around the preparation of the master schedule?

4         A.  Yes.

5         Q.  All right.  Now, when you learned it, how did

6    you learn it?  Was it Mr. Nicholson that told you, or

7    the secretary?

8         A.  I don't recall.

9         Q.  You previously testified you thought it was

10   either Mr. Nicholson or the secretary that told you; is

11   that correct?

12        A.  Yes.

13        Q.  All right.  Now, as an assistant principal, was

14   this your first assignment as assistant principal, sir?

15        A.  Yes.

16        Q.  Okay.  And wouldn't you have liked to have known

17   that one of your teachers was on a reasonable

18   accommodation, particularly if it required you to cover

19   for her classes from time to time?

20        A.  I would liked to have known that.

21        Q.  You should have known that, don't you think so,

22   consistent with policy?

23        A.  I'm not sure exactly what the policy would say,

24   but I would have liked to have known that.

25        Q.  In fact, during that time frame, that is 2015 to
```

SHAWN RODMAN (April 27, 2020)

22

1    2016, there were times when kids were outside of the

2    classroom and there was no coverage at all; isn't that

3    true?

4        A.   For an entire class period?

5        Q.   I didn't qualify it in any way, sir.  I'm

6    asking, were there times in 2015 and 2016 where students

7    were outside of the classroom because there was no

8    teacher?

9        A.   I don't know specifically for her class, no, I

10   don't know that.

11       Q.   Did you ever receive reports, at any time from

12   the time you arrived until the present, where you

13   learned that students were outside the classroom and

14   there was no one there to cover for Ms. Smithson's

15   classroom, sir?

16       A.   I don't know about Ms. Smithson's class

17   specifically, I don't recall specifically, but that has

18   happened on occasion throughout our building if

19   something happens where a teacher is delayed.

20       Q.   I'm only specifically concerned about

21   Ms. Smithson, sir.

22       A.   And I'm just telling you that I don't know

23   directly for Ms. Smithson.  I'm giving you the bigger

24   picture that it happened in other places.  I don't

25   recall for her specifically.  I would say probably yes,

SHAWN RODMAN (April 27, 2020)

23

```
 1    because it happens often.

 2        Q.   Didn't Mr. Krebsbach communicate to you that he

 3    had observed students outside of Ms. Smithson's

 4    classroom who were not being supervised?

 5        A.   He may have.  I don't recall specifically.

 6        Q.   And isn't it true, sir, that you have had

 7    conversations with Mr. Villareal about the reasonable

 8    accommodation that Ms. Smithson has?

 9        A.   Only when this came up two years ago or whenever

10    it was, last year.

11        Q.   Please describe the nature of the conversation

12    you had with Mr. Villareal, sir.

13        A.   It really wasn't -- I walked in and was in on a

14    phone call from Ms. Tronge, I believe, and she was

15    talking about the accommodation and that Mr. Nicholson

16    should not have put something like that in place.  As

17    far as me talking specifically about Ms. Smithson with

18    Mr. Villareal, we did not.  I was in on that phone call.

19    But as far as making another plan or how those other

20    things went, I have not been involved in those

21    discussions.

22        Q.   When did the conversation you're describing

23    occurred with Ms. Tronge, when did that occur?

24        A.   I believe it was last school year, and I don't

25    know exactly when.
```

SHAWN RODMAN (April 27, 2020)

24

```
1        Q.   What did Mr. Villareal say -- were you
2    present -- did the three of you have communication
3    during that phone call, sir?
4        A.   No, I mostly just listened.  Ms. Tronge spoke.
5        Q.   What specifically did Ms. Tronge say?
6        A.   What I remember specifically is that she said
7    that that kind of accommodation should not have been put
8    in place, that basically she could have an alternate
9    arrival time, and that's basically all I really I
10   remember from that phone call.
11       Q.   And what did Mr. Villareal say?
12       A.   I don't recall.
13       Q.   You're aware, though, that Mr. Villareal made
14   changed to the accommodation following that telephone
15   conversation, correct?
16       A.   Yes.
17       Q.   And you and he had discussions about why the
18   change should be made?
19       A.   We didn't have discussions about it, no.
20       Q.   How do you know the changes were made after that
21   conversation, Mr. Rodman?
22       A.   I'm trying to think how.  Basically
23   Mr. Villareal instructed our secretary and myself that
24   she needed to call in if she was going to be late and
25   use sick time if it was going to happen.  So he
```

SHAWN RODMAN (April 27, 2020)

25

```
 1    instructed our secretary, and that's how I -- there

 2    wasn't really a discussion, he just told us that's

 3    what's being to happen.

 4        Q.  Who was the secretary that was directed along

 5    with yourself by Mr. Villareal?

 6        A.  Syretta White, I believe.

 7        Q.  And what specifically did Mr. Villareal say?

 8        A.  I don't know specifically.  The substance was

 9    she needed to use sick leave to come in -- or to be

10    late, and she needed to call.

11        Q.  And this change was directed by Mr. Villareal in

12    an email or was it verbal?

13        A.  It was verbal.  We were in either my office or

14    Ms. White's office.

15        Q.  And when he stated that that change would occur,

16    what did he say was the reason for that change?

17        A.  I don't think that he did.

18        Q.  But you understood, because of what Ms. Tronge

19    had said, that this was the reason for the change,

20    correct?

21        A.  Yeah, I probably understood that, yeah.

22        Q.  Now, the change in this leave policy that's been

23    applied, has there been -- has that policy, that change,

24    has that been officially adopted in written format for

25    all of the educators there?
```

SHAWN RODMAN (April 27, 2020)                          26

```
 1      A.  I believe so, yes.  I've --

 2      Q.  Is there a written policy -- I'm sorry, go

 3   ahead, I thought you were finished.

 4      A.  I've not seen it in writing, but yes, she was --

 5      Q.  That was my question.

 6      A.  No, I haven't seen anything in writing.

 7      Q.  Previous to this application or this change as

 8   it relates to Ms. Smithson, has that policy been in

 9   effect?

10      A.  I don't understand your question.

11      Q.  Right.  The leave that's now being applied, the

12   policy that we've been discussing that you indicated

13   came after Ms. Tronge made her comments to Mr. Villareal

14   in a phone conversation, has that policy been in effect

15   prior to Ms. Tronge making the statement she did to

16   Mr. Villareal?

17      A.  As far as people coming in late and using leave

18   time?

19      Q.  Yes.

20      A.  I would say if someone calls in because they're

21   stuck in snow or sick kids, something along those lines,

22   I would say no, it really depends on how long that time

23   was going to be.

24      Q.  Right.  But let's be clear, the policy went into

25   effect as it applies to Ms. Smithson after the telephone
```

1    call with Ms. Tronge --

2        A.   Uh-huh.

3        Q.   -- was that Ms. Smithson would have to -- was

4    required to take a half a day for any one hour that she

5    was late, correct?

6        A.   Specifics times, if she was coming in, she

7    needed to call in and use sick days, yes.

8        Q.   Right.  She would have to use half a day,

9    correct?

10       A.   Sure, yes.

11       Q.   All right.  Now my question is, isn't it true

12   that other teachers have called in being an hour late or

13   stuck in traffic perhaps because of inclement weather,

14   but they have not been required to take a half a day of

15   leave; isn't that true?

16       A.   Since that time, I would say no.  If it's going

17   to be a few minutes, then probably not.  But if it's

18   longer than an hour, then they would ask for leave time.

19       Q.   Is there anything in writing to that effect,

20   sir?

21       A.   Not that I'm aware of, no.

22       Q.   And do you have -- has there been any kind of an

23   assessment or document, documentation of any kind

24   showing that every time a teacher is either an hour or

25   more late they're required to take a half a day's leave?

SHAWN RODMAN (April 27, 2020)

28

1      A.  I don't believe so, no.

2      Q.  All right.  And can you think of anyone, sir,

3   other than Ms. Smithson, who has been required to take a

4   half a day leave because they were an hour late?

5      A.  Myself.

6      Q.  Other than yourself, sir.

7      A.  Yes, there have been a number of people on our

8   staff that have had appointments or what have you and

9   they used sick time or some other time in the morning if

10  they had to go -- you know, we would give administrative

11  leave if somebody had an 8:00 appointment for an

12  appointment, but we require leave slips when they're not

13  going to be here.

14     Q.  That's not my question.  That's not my question,

15  sir.

16     A.  Okay.

17     Q.  I'm specifically interested in knowing if you

18  can identify any teacher who has either been late

19  unexpectedly or if it was planned where they would be

20  late for an hour and they're required to take a half a

21  day leave.

22     A.  I mean, there's probably a number.  I don't

23  know -- I can't say exactly.

24     Q.  That's what I'm asking you, if you can name

25  anyone who has had that policy applied to them.

SHAWN RODMAN (April 27, 2020)                                    29

```
 1        A.   Cora Moellendick.

 2        Q.   Excuse me?

 3        A.   Cora Moellendick, I believe.

 4        Q.   Could you spell that person's first and last

 5   name, please?

 6        A.   C-O-R-A, M-O-E-L-L-E-N-D-I-C-K.

 7        Q.   Is Cora the first name?

 8        A.   Yes.

 9        Q.   Okay.  And under what circumstances was Ms. Cora

10   required to take a half a day leave?

11        A.   I believe she had a sick child.

12        Q.   Okay.  Was she out for more than an hour, sir?

13        A.   I would think so.  I really don't recall.  I

14   just remember --

15        Q.   I'm specifically --

16        A.   What?

17        Q.   I'm sorry, sir.  Go ahead and finish your

18   sentence.  I thought you had finished.  Go ahead, sir.

19        A.   I'm just recalling a time when she called and

20   she had she was going to be late.  I said, okay, when

21   you get here, fill out a leave slip.  I don't know if it

22   was 45 minutes, an hour or two hours, I don't know.

23        Q.   Was it for a half a day, that's my question,

24   when you told her to come in and fill out a leave slip,

25   did you --
```

SHAWN RODMAN (April 27, 2020)                          30

```
 1        A.  For half day, yes.

 2        Q.  Did you look to see if it was for half a day,

 3   sir?

 4        A.  No.

 5        Q.  Okay, my question sir, is a very specific

 6   question, and if you don't know, you can simply say you

 7   don't know.  If you do know, I definitely want you to

 8   tell me.  And let me try to make sure you understand the

 9   question.  I'm asking for every -- can you tell me any

10   teacher who has been late for more than -- for

11   less than -- for an hour or less where they have been

12   required to take a half a day of leave?

13        A.  To be absolutely sure, no.

14        Q.  All right.  But you do know that Ms. Smithson,

15   if she is required to take an hour or less of leave, she

16   is required to take a half a day of leave, correct?

17        A.  If she calls in, yes.

18            MR. MARSHALL:  Just a moment, please.

19            (Discussion off the record.)

20            MR. MARSHALL:  All right, Mr. Rodman.  We're

21        going to take a ten minute break and we'll be back on

22        the line in just about ten minutes, sir.

23            THE WITNESS:  Okay.

24            MR. MARSHALL:  Thank you.

25            (A brief recess was taken.)
```

*Spencer & Associates  (206)382-9695  Court Reporters*

SHAWN RODMAN (April 27, 2020)

31

1     Q.   Mr. Rodman, when did you first become aware that

2  Ms. Smithson had filed an EEO complaint or was otherwise

3  involved in EEO activity?

4     A.   Date-wise, I don't recall.  It was probably, I'm

5  trying to think, when I got my first questionnaire.

6     Q.   Was that March 26 -- I'm looking at a

7  memorandum, and you might want to turn there, sir, page

8  116 of the ROI.

9     A.   Okay.  116?

10     Q.   Yes, sir.

11     A.   Okay.

12     Q.   Are you there?

13     A.   Yes, I am.

14     Q.   All right.  Does this look -- does this document

15  look familiar to you, sir?  I think your signature is at

16  the bottom there.

17     A.   Yes.  My signature is actually not on -- oh,

18  yes, it is.  There it is.  Okay.  Yes.

19     Q.   Do you see it there?

20     A.   Yes.

21     Q.   All right.  And you would agree that you

22  received this document on or about this date; is that

23  correct, March 26 of 2018?

24     A.   Yes.

25     Q.   All right.  Now, Mr. Rodman, I want to go back

1    in time.  Did you receive notice of any other EEO

2    activity as it relates to Ms. Smithson prior to

3    receiving this notification?

4        A.  I don't believe so, no.

5        Q.  Mr. Villareal never said before this, sir, that

6    there had been a complaint filed by Ms. Smithson or that

7    she was planning on filing a complaint?

8        A.  No.

9        Q.  Did you and Mr. Villareal have discussions after

10   you received this notification about the EEO activity of

11   Ms. Smithson?

12       A.  No.

13       Q.  Did you have discussions with anyone concerning

14   this complaint, sir?

15       A.  I don't believe so, no.

16       Q.  Just a moment, please.

17          Can you please go down to page 144?  And tell me

18   when you're there.

19       A.  Okay.

20       Q.  Question No. 4 says, "When did you become aware

21   of her raising prior EEO activity?"

22          And you say, "Yes, I am aware of her -- I was

23   not aware of reprisal issues prior to an email she sent

24   to Mr. Villareal on March 20th in which she claimed

25   mistreatment by other members of our staff."

SHAWN RODMAN (April 27, 2020)

33

```
 1       A.   Uh-huh.

 2       Q.   Do you see that answer there?

 3       A.   I do.

 4       Q.   What was contained in the March 20th, 2018 email

 5   that you're referring to?

 6       A.   I don't recall.

 7       Q.   Could you go down to question No. 6, please?

 8       A.   Yes.

 9       Q.   You indicate here that she did report to you an

10   assault; is that correct?

11       A.   Yes.

12       Q.   What did she say about that assault?

13       A.   Well, first, she said that her hand was shut in

14   the door.  And I asked, you know, about an accident, she

15   stated it was an assault, which I was surprised by that.

16   So I'm trying to remember the conversation we had.  She

17   said something along the lines, and now I don't know if

18   it was that night or something else, I said something

19   about it being an accident or there was intent or

20   something that no one knew she was out there.  And she

21   said something along the lines of, it happens, or

22   something like that, or intimated there were things but

23   she wouldn't expand on any of that.

24       Q.   Did you see her condition, condition of her hand

25   after the incident, sir?
```

SHAWN RODMAN (April 27, 2020)

34

```
 1      A.  Yes.  Actually, I didn't have a phone.  She took
 2   a picture of it.  I never saw the picture.  I did notice
 3   that she had two scratches on two of her fingernails but
 4   I didn't see any bruising.  She moved her hands freely.
 5   So that was the night that it happened and then I
 6   referred her to the nurse the next day.  I don't
 7   remember the next day if I looked at her hands or not.
 8   But that night -- and so she had gotten ice from the --
 9   they were selling things, she got ice from people that
10   were selling something, had ice on her hand as well.
11   But I didn't see -- there was no bleeding.  All I
12   remember is there was just a couple of scratches on her
13   finger nails but they weren't obviously bleeding or
14   crushed or obviously disfigurement other than the
15   scratches on her fingernails.
16      Q.  Did you see the photograph that was taken of her
17   hand, sir?
18      A.  No, I did not.
19      Q.  Where were you when she made contact with you
20   and showed you her hand?
21      A.  She made contact with me in our MPR where the
22   play was and then I took her up front just so we could
23   be away from people.  We were just outside my office,
24   there's a little kitchen area just outside my office,
25   and she showed me her hand.
```

*Spencer & Associates  (206)382-9695  Court Reporters*

SHAWN RODMAN (April 27, 2020)

35

```
1        Q.  Did you contact the lady who was involved in

2    this incident, sir?

3        A.  She told me Ms. Connors did this.  Yes, I did

4    contact Ms. Connors.

5        Q.  When did you do that?

6        A.  The next day or a couple days after that.  Maybe

7    it was the next day.  I don't remember the dates.

8        Q.  Why didn't you contact her immediately, sir?

9        A.  I don't believe she was there.  It was when

10   she --

11       Q.  When did you --

12       A.  I didn't see her in the room.  My immediate

13   attention then was to bring Ms. Smithson up to look at

14   her hand.

15       Q.  She told you it was an assault, right?

16       A.  Yes.

17       Q.  Why didn't you go and speak with Ms. Connors

18   immediately, sir?

19       A.  I was more worried about Ms. Smithson's hand.

20       Q.  Well, the nurse was there to assist her, she was

21   getting ice, correct?

22       A.  I don't remember seeing the nurse there either.

23   All I remember is talking to Ms. Smithson.

24       Q.  She was getting ice on that -- it didn't occur

25   to you that someone had just assaulted a teacher and you
```

SHAWN RODMAN (April 27, 2020)                                36

```
 1    should make contact with the person who did it?

 2        A.   No, my first thought was of Ms. Smithson's hand.

 3        Q.   Well, how long did it take for you and

 4    Ms. Smithson to have a conversation about her hand, sir?

 5        A.   I don't recall.

 6        Q.   Why did it take you more than two days to

 7    contact Ms. Connors, sir?

 8        A.   I don't know if it did.  It wasn't more than two

 9    days.

10        Q.   Do you have any documentation that would

11    indicate when you contacted her, sir?

12        A.   I don't.  I gave that all to Mr. Villareal.

13        Q.   Right.  And from my review of the materials, it

14    doesn't indicate that you spoke with her, that is

15    Ms. Connors, on the day of the incident or the following

16    day.  Do you have something that would contradict that,

17    sir?

18        A.   I don't.

19        Q.   When did you first make contact with

20    Mr. Villareal?

21        A.   I think I told him that night.

22        Q.   Did you make any kind of a notation or anything

23    that night, sir?

24        A.   No.  Other than speaking to him and looking at

25    her hand, no.
```

SHAWN RODMAN (April 27, 2020)

37

1    Q.   Now, am I correct in understanding that at the

2    time this incident occurred you were aware that

3    Ms. Smithson had filed an EEO complaint?

4    A.   I don't think so.

5    Q.   Now, how long have you known Ms. Connors?

6    A.   I've known who she was since we were in -- I

7    used to sponsor a group that she sponsored in this

8    school when I was at Hohenfels, so I knew who she was.

9    But really beyond when I met the staff when I came here,

10   that was -- that's probably it as far as knowing her,

11   knowing her.  I mean, I knew who she was from the other

12   group that we sponsored.

13   Q.   Can you be more specific, sir?

14   A.   Yes, she was involved in future educators at

15   Vilseck, I was involved in future educators in

16   Hohenfels.  Our two schools would share a bus to Garmish

17   for the conference.  So I knew her because we rode the

18   bus, but we sponsored different teams -- different

19   groups of kids from different schools.

20   Q.   How many years have you known her, sir?

21   A.   I don't remember when that first conference was

22   or if she was there.  Maybe two years before I came to

23   Vilseck, so 2013.  No, that was before that, I'm sorry,

24   because I'm just thinking when my daughter was involved.

25   So I had seen Ms. Connors -- my daughter graduated in

SHAWN RODMAN (April 27, 2020)                    38

```
 1    2012, that would be the last time I saw her before I
 2    came up to Vilseck in 2015.
 3        Q.   Did Ms. Connors teach your daughter?
 4        A.   No, my daughter was at Hohenfels.  Ms. Connors
 5    was in Vilseck.
 6        Q.   I see.  So did you have a good, friendly
 7    relationship with her, sir?
 8        A.   Yes.
 9        Q.   Did that influence how you conducted yourself on
10    the night that this occurred, sir?
11        A.   No.
12        Q.   Is Ms. Connors married?
13        A.   I don't believe so, no.
14        Q.   Did your wife also share a friendly relationship
15    with Ms. Connors?
16        A.   More recently, yes.  I wouldn't say -- I
17    wouldn't say they really knew each other at the time
18    this event happened, but recently they probably know
19    each other better.
20        Q.   Would you agree that they're friends?
21        A.   I would say probably more associates than
22    friends.  We don't do anything socially.  My wife
23    doesn't do anything socially with Ms. Connors.  I would
24    say more professional relationship than friends.
25        Q.   Friendly professional relationship; would that
```

SHAWN RODMAN (April 27, 2020)

1    be an accurate statement, sir?

2        A.   Yes.

3        Q.   Now, you were informed, were you not, sir, that

4    Ms. Smithson had reported to you that she had been the

5    subject of hostility in the workplace when this assault

6    had occurred; isn't that true?

7        A.   Can you say that again?

8        Q.   Prior to this assault occurring, Ms. Smithson

9    had reported that she had been subjected to hostility in

10   the workplace, correct?

11       A.   I don't believe prior to this, no.  I think it

12   was in conjunction with this when she said something to

13   the effect it's not the first time or -- but she didn't

14   elaborate.

15       Q.   Okay.  So you understood when she reported this

16   to you that this had not been the first time that she

17   had been subjected to physical contact by either

18   Ms. Connors or others; is that a fair statement, sir?

19       A.   I didn't take it as being physical, no.

20       Q.   What did you take it as, sir?

21       A.   She said -- she said -- I can't remember the

22   exact words, but I did not take it as physical.  I

23   thought she meant as people not being nice to her or

24   that they treated her differently.  I don't know, but I

25   did not take it as she had been assaulted in the past,

1      no.

2          Q.   When she reported that to you, did you take any

3      steps to investigate what she was saying?

4          A.   Other than saying, "What do you mean by that?"

5      And she just shook her.

6          Q.   I want to be sure you understand --

7               (Speakers overlapping.)

8          A.   (Inaudible.)

9          Q.   Do you have anything to corroborate what she

10     told you, sir?

11         A.   No.

12         Q.   Do you have any evidence?  Was there anyone

13     present when this conversation occurred, sir?

14         A.   I don't believe so.  I think it was when we were

15     walking either right after she told me that she felt it

16     was assault and I was kind of shocked by that, I don't

17     remember asking, I think she just came -- maybe she read

18     my thing.  I don't remember the conversation.  I was,

19     like I said before, mostly shocked that someone was

20     accusing someone of hurting themselves, and I was more

21     concerned about her injury than anything else at the

22     moment.

23         Q.   Did you report what Ms. Smithson had reported to

24     you about how she had been treated in the past to

25     Mr. Villareal, sir?

SHAWN RODMAN (April 27, 2020)                                41

1      A.   No, she didn't really report anything about what

2   had happened in the past.  She didn't get into any

3   details or anything like that.

4      Q.   Mr. -- I'm sorry.

5      A.   I may have --

6      Q.   I'm sorry, sir, just a moment, please.

7           Mr. Rodman, it's important for you just to

8   answer my question, sir.  Mr. Selz may have some

9   questions for you at the end of my questioning, but

10  please just answer my question.

11     A.   Okay.

12     Q.   You indicated that Ms. Smithson reported to you

13  that this was not the first time that she had had -- had

14  been mistreated.  And my question is, simply, did you

15  report that to Mr. Villareal?

16     A.   I don't recall.

17     Q.   Now, you had an obligation to report that to

18  your supervisor, didn't you?

19     A.   I don't think so.  I don't recall if it came up

20  in the conversations.  I think that I --

21          MR. MARSHALL:  Objection, move to strike as

22  nonresponsive.

23     Q.   Sir, do you have an obligation as the assistant

24  principal to report such information to your supervisor?

25  That's the question.

SHAWN RODMAN (April 27, 2020)

```
 1        A.   Yes.

 2        Q.   You have an obligation to do that consistent

 3   with policy, correct?

 4        A.   I don't know exactly what the policy says, but I

 5   believe that would be true.

 6        Q.   And the question is did you do that, did report

 7   it to Mr. Villareal, yes or no?

 8        A.   I'm trying to recall the conversation that we

 9   had about this, and if I said, in her words, this wasn't

10   the first time.  And honestly, I don't recall -- we had

11   discussions about this thing right after it happened,

12   but I don't recall if I said that to him or not.

13        Q.   Did you document what Ms. Smithson reported to

14   you, sir, yes or no?

15        A.   I don't recall.

16        Q.   Now, in your statement here at 144, it says you

17   received statements from five people, one parent and

18   four staff members, none of them reported to seeing the

19   incident.  Some remembered Ms. Connors shutting the door

20   but did not know that Ms. Smithson was hurt in the

21   process or that she was anywhere near the door.

22             Now, isn't it true that Ms. Connors stated that

23   Ms. Smithson was not near the door when she shut it?

24        A.   I think it was probably more accurate she didn't

25   see her.  Where --
```

SHAWN RODMAN (April 27, 2020)

1    Q.   That's what she said in her statement, correct?

2    A.   Who said that, I'm sorry?

3    Q.   Ms. Connors.

4    A.   I think she said she did not see her, which is

5    entirely possible, being where the door was and where

6    Ms. Smithson was.

7    Q.   Okay.  And so you believed what Ms. Connors was

8    telling you, correct?

9    A.   I did.

10   Q.   And you did not believe Ms. Smithson, correct?

11   A.   No, I believed Ms. Smithson.  I believe that it

12   happened.

13   Q.   Well, you didn't believe that it was assault,

14   that it was intentional, did you?

15   A.   Well, I believed that the door was shut on her

16   hand, that there was evidence of that.  To say that --

17   Q.   Listen to my question, sir.

18   A.   Okay.

19   Q.   My question didn't -- my question was:  You did

20   not believe that Ms. Connors had intentionally shut the

21   door on Ms. Smithson's hand; isn't that true?

22   A.   Intentionally, no, she did not.

23   Q.   Yeah.  And you don't know what was in her mind

24   when she did it, do you?

25   A.   No I don't.

SHAWN RODMAN (April 27, 2020)

44

1     Q.   So why would you make the statement "it wasn't

2   intentional" if you didn't know?

3     A.   Because I know where Ms. Smithson was standing,

4   and compared to the door you couldn't see her.

5     Q.   Excuse me, sir -- sir?

6     A.   Yes.

7     Q.   Were you there the night it happened?

8     A.   Yes.  Ms. Smithson --

9     Q.   Excuse me.  Were you at the door when the

10   incident occurred?

11    A.   No.

12    Q.   Did you know where Ms. Smithson was standing in

13   relationship to the door?

14    A.   Yes.

15    Q.   Were you there to see where she was standing?

16    A.   No.

17    Q.   No, you don't have any specific -- you have to

18   rely on other people to know anything about this

19   incident, correct?

20    A.   No, Ms. Smithson asked me if she could go out

21   and use the phone, she told me where she would be.

22    Q.   Excuse me, sir, I'm asking a very specific

23   question.  You didn't see the incident so you have to

24   rely on others to report what happened; isn't that true?

25    A.   Yes.

SHAWN RODMAN (April 27, 2020)

45

1    Q.   Okay.  So -- but you've made a decision, without

2    conducting an investigation, that Ms. Connors did not

3    intentionally do this.  What I'm trying to understand is

4    why would you weigh in on whether it was intentional or

5    not, or where she was standing or not, and you didn't

6    know and you have to rely on others to tell you?

7    A.   That's what I'm trying to tell you.  She asked

8    me if she could go out and use the phone.  I said she

9    could probably get better reception in the front of the

10   school.  She said, no, I'd rather just step out book.  I

11   said, okay, if that door shuts, then it's going to lock.

12   Just prior -- while she was still out there, I knew she

13   was using the phone.  Before the door was shut, I went

14   over and put my ear to the door and made sure it was

15   still open, it was open about maybe a half an inch, and

16   I could hear Ms. Smithson so I knew that she was still

17   out there and I knew the door was still shut.  But it

18   wasn't open enough for her to see her.  If she opened it

19   in the meantime, maybe it happened.

20   Q.   Right.

21   A.   But I was directly involved in why she was out

22   there and making sure she could get back in, so based on

23   that, it made sense.

24   Q.   In fact, you were not aware that Ms. Smithson

25   and Ms. -- (inaudible) -- you weren't aware of that,

SHAWN RODMAN (April 27, 2020)                    46

```
 1    were you?
 2        A.  It blanked out.  I didn't hear the question, I'm
 3    sorry.
 4        Q.  You weren't aware that Ms. Smithson and
 5    Ms. Connors had a conversation just before
 6    Ms. Smithson's hand was slammed in the door --
 7        A.  No.
 8        Q.  -- right?
 9        A.  No.
10        Q.  Right.  You don't know what Ms. Connors said to
11    Ms. Smithson, do you?
12        A.  No.
13        Q.  And that's because you never asked Ms. Smithson
14    for her recitation of what occurred, right?  You never
15    asked her to give you a statement, did you?
16        A.  Ms. Connors?  I believe she wrote one.
17        Q.  Ms. Smithson, sir.  Sir, I'm asking you a very
18    specific question.  Did you ask Ms. Smithson to provide
19    you with a written statement --
20        A.  No, I didn't.
21        Q.  -- that night or the following day?  Right.  I'm
22    just wondering why you didn't do that.
23        A.  I don't know.
24        Q.  Isn't it because you believed Ms. Connors
25    because you had a friendly relationship with her and you
```

SHAWN RODMAN (April 27, 2020)

47

```
 1     did not -- and you wanted to serve as her defender?

 2        A.   No.

 3        Q.   You were supposed to be an objective third party

 4     to assure that Ms. Smithson was protected against

 5     harassment and hostility; isn't that true, sir?

 6        A.   Yes.

 7        Q.   And isn't it further true, sir, that as the

 8     principal or assistant principal, you had an obligation

 9     to impartially investigate what happened?

10        A.   Yes.

11        Q.   Isn't it true that Ms. Smithson told you that

12     she had been -- her shoulder was forcefully nudged by

13     Ms. Connors on January 25th of 2018?

14        A.   She never told me that.

15        Q.   She never told you that?

16        A.   I don't recall her telling me that.

17        Q.   Are you sure?

18        A.   I'm pretty sure.

19        Q.   Did Ms. Smithson ever report to you that her

20     physical space had been violated by faculty staff

21     members?

22        A.   Not to me, no.

23        Q.   She never reported that to you either; is that

24     your testimony, sir?

25        A.   Yes, I don't believe so.
```

SHAWN RODMAN (April 27, 2020)

48

```
 1          Q.   Looking, sir, at the evidence in the record,

 2     sir, did you ask Ms. Smithson to provide a statement to

 3     you of the things that she had -- the various incidents

 4     that she had suffered which you say she referenced to

 5     you on the night the assault occurred?

 6          A.   At the time when she said it, I said, "What do

 7     you mean?"  And she just shook her head and said, "I'm

 8     not going to talk about that."  And I said okay.

 9          Q.   That's your recollection of what happened, sir.

10     That is not what she recalls.  So I'm asking you, did

11     you ask her to provide a statement of the incidents that

12     she was experiencing?

13          A.   No.

14          Q.   I want to be sure I understand your testimony,

15     sir.  I had shown you a statement earlier that you had

16     signed acknowledging receipt of the notification of EEO

17     case that Ms. Smithson had filed.

18          A.   Uh-huh.

19          Q.   Is it your testimony that this is the first time

20     you knew that Ms. Smithson had experienced or was

21     participating in some form of EEO activity, sir?

22          A.   Yes.

23          Q.   Did you ever receive a phone call from Robin

24     Jamison advising you that Ms. Smithson had contacted her

25     office?
```

SHAWN RODMAN (April 27, 2020)                    49

1      A.   I don't recall.

2      Q.   You know who Robin Jamison is though?

3      A.   No, just from the letter that you just showed

4    me.  But I don't remember her name, no.

5      Q.   Okay.  But when you did receive the

6    notification, contained in the notice there is a

7    reference to the fact that Ms. Jamison on March 8, 2018,

8    had filed an informal complaint of discrimination; do

9    you recall that, sir?

10      A.   In the document -- can you tell me where that

11    document is again?  I went to the other one, I don't

12    know.

13      Q.   Sure.  It's page (inaudible) --

14      A.   I'm sorry, you went out again, I didn't hear

15    you.

16      Q.   Page 116.

17      A.   Okay.

18      Q.   Do you see there where it indicates that she had

19    filed an informal complaint on March 8th, sir?

20      A.   So from March 24th through March 8th, she's been

21    subject to harassment, that line?

22      Q.   Yes, sir.

23      A.   I see that line, if that's the one you're

24    referring to.  Okay, I see the top line, yes.

25      Q.   What I'm trying to understand is, when you

SHAWN RODMAN (April 27, 2020)

50

1    received this notice, did this encourage you at all to

2    talk with Ms. Smithson to understand what she had been

3    going through, sir?

4        A.   It did not.  I took this as we were being

5    investigated so I -- and I've never been around --

6        Q.   You took it that you were being investigated or

7    we were being -- when you say "we were being

8    investigated," what do you mean?

9        A.   Well, I'm named in it.  I just took it as we as

10   a school are being investigated, so that's how I took

11   it.  I have never seen anything like this before.  This

12   is my first time.

13       Q.   So you viewed this as "we" being you,

14   Mr. Villareal and the teachers?

15       A.   Or school, yes.

16       Q.   And so, in effect, then you felt that you and

17   Mr. Villareal and the teachers were being subjected to

18   an investigation because of Ms. Smithson's complaint; is

19   that correct?

20       A.   Yes.

21       Q.   And this caused you to feel that you needed to

22   do whatever you could to protect the school, right?

23       A.   Actually, no.  I questioned myself, not for

24   protection, but what are we doing that she feels this

25   way.  She had not spoken to me about it, so I was

SHAWN RODMAN (April 27, 2020)

1    concerned that we had someone who felt this way.  I

2    wasn't talking about or thinking about protecting

3    anybody or protecting us.

4        Q.   Well, I'm a little confused by your testimony.

5    I thought you just said that you had been told by

6    Ms. Smithson that she had been assaulted or subjected to

7    some other form of mistreatment before, so you weren't

8    completely surprised by this, right?

9        A.   No.

10       Q.   And --

11       A.   I guess, but --

12       Q.   Sir --

13       A.   If I could change that answer, I would say yes,

14   I'm surprised it came to a level as this.  So yes, I

15   would be surprised that it would come to this yes.

16       Q.   Well, okay, that's a different point.  You were

17   surprised that it would become an informal complaint but

18   you weren't surprised about the allegations because you

19   had heard them before; is that a correct statement, sir?

20       A.   Can you say that again?  I'm sorry.

21       Q.   Yes.  You were surprised that it had come to an

22   informal complaint but you weren't surprised about the

23   allegations because you had heard about them before,

24   right?

25       A.   Only the statement that she made that it

1    happened before.  But as far as allegations, no, she

2    didn't make allegations.

3        Q.   Well, by this time, you had heard, had you not,

4    sir, that she was complaining that a coworker had

5    assaulted her.  She had told you also that she needed

6    help, because she came to you to report it, right?

7        A.   Yes, that night she came to me to report it,

8    yes.

9        Q.   And, in effect, you did nothing?

10       A.   No, I interviewed the people of the names she

11   gave me.

12       Q.   Did you ever get back to Ms. Smithson on the

13   information you received?

14       A.   I don't recall.

15       Q.   And you knew that Ms. Connors had refused to

16   provide a statement to the police when they sought to

17   get a statement from her, correct?

18       A.   I didn't know that she refused to talk to the

19   MPs.

20       Q.   Did the military police seek to speak with

21   Ms. Connors, sir?

22       A.   I don't know.  I know they came in, but I --

23   they do their investigation, I don't know if they did.

24       Q.   Hang on, sir.

25       A.   Okay.

SHAWN RODMAN (April 27, 2020)

53

1      Q.   Did you ever serve as the first line supervisor

2   for Ms. Smithson, sir?

3      A.   The very first year I was here.

4      Q.   And you did not serve as her supervisor

5   thereafter; is that correct?

6      A.   I don't believe so, no.  I think it was just the

7   first year.

8      Q.   In your declaration, page 131, and it's question

9   4, your answer, "I was not aware of reprisal issues

10   prior to an email she sent to Mr. Villareal on March

11   20th in which she claimed mistreatment by other members

12   of our staff."

13      A.   Uh-huh.

14      Q.   Why do you use that language, "she claimed"?

15      A.   That's what she was doing.  I could have used a

16   number of verbs.  I don't know why I used "claimed."

17      Q.   Did you not believe the things that she was

18   telling you, sir?

19      A.   I didn't know.

20      Q.   And you didn't investigate, correct?

21      A.   No, other than the assault issue.

22      Q.   Did Ms. Smithson ever convey to you that she

23   felt that there were people who were seeking to spy on

24   her and report information back to you and Mr. Villareal

25   about her lesson plans and/or teaching methods?

SHAWN RODMAN (April 27, 2020)                                    54

```
 1        A.   No.

 2        Q.   Now, your wife has been assigned to work in

 3   Ms. Smithson's class, correct?

 4        A.   Yes.  That's a long time ago, yes, I believe she

 5   was.

 6        Q.   When is the last time that that happened, sir,

 7   if you know?

 8        A.   I don't know.

 9        Q.   Now, and forgive me for asking but I have to

10   ask, is there any prohibition against a husband and wife

11   working in the same school in which the husband or wife

12   is in a supervisory position, sir?

13        A.   I believe there is, which is why I didn't

14   supervise her.

15        Q.   What's the prohibition, sir?  What is the policy

16   on that issue?

17        A.   I don't know what the policy says.

18        Q.   Well, you would agree, would you not, sir, that

19   as the assistant principal at the school, you are

20   generally in a supervisory role irrespective of whether

21   or not you're assigned to be the administrator of a

22   particular teacher; would you agree with that?

23        A.   To some extent, yes.

24        Q.   All right.  Now, did you take any steps at all,

25   Mr. Rodman, to inform teachers at the school that you
```

SHAWN RODMAN (April 27, 2020)                                    55

```
 1    would recuse yourself from any involvement in

 2    allegations, EEO or otherwise, as it relates to your

 3    wife?

 4        A.   So did I approach our entire staff and say if

 5    anything happens I will recuse myself, or --

 6        Q.   Well, you are aware that Ms. Smithson was making

 7    allegations about the conduct of your wife, correct?

 8        A.   No, I wasn't, until I had to fill out the form

 9    that was sent to me.

10        Q.   That's what I mean.  At the time you had to fill

11    out the form, you were aware that your wife was the

12    subject of allegations; isn't that true, sir?

13        A.   Yes.

14        Q.   Did you convey to Ms. Smithson or to anyone else

15    that you were recusing yourself based upon your role as

16    assistant principal and being supervisor over the

17    teachers?

18        A.   I don't understand, recusing myself from what?

19        Q.   From serving -- from influencing the teachers or

20    for any involvement in the investigation of the claims

21    at issue.

22        A.   No, I did not do that.

23        Q.   And, sir, I just have to ask the question.  Do

24    you believe that your failure to do that may have

25    impacted the investigation as it relates to the conduct
```

SHAWN RODMAN (April 27, 2020)

1    of your wife?

2        A.   No.

3        Q.   How do you know, sir?

4        A.   You asked if I thought it had an impact.  I

5    don't think it does, so I don't -- I say no.

6        Q.   Other than just your thought that it doesn't,

7    you didn't do any kind of an assessment or seek to find

8    out how Ms. Smithson was feeling or how other teachers

9    were feeling who may have witnessed what was going on?

10       A.   I don't know what happened, if she went back

11   into Ms. Smithson's class after that.  I didn't have any

12   impact upon where she went.  That would have been

13   controlled by whoever is managing the subs or if she was

14   in a SPED aide supervised by the CSC chair who would

15   make their schedules.  I do know that my wife -- we

16   don't discuss teacher performance or anything like that

17   between us.  So in that regard, I would say no.

18       Q.   Sir, I don't want to intrude into the marital

19   relationship, but this is the concern I have.  Your wife

20   was assigned to be in Ms. Smithson's room on multiple

21   occasions, and at the time she was in that room on

22   multiple occasions, you were aware there was an EEO

23   complaint concerning her conduct; isn't that true?

24       A.   I was aware -- I was aware of the complaint from

25   Ms. Smithson.  I was not aware how frequently she was in

SHAWN RODMAN (April 27, 2020)                                                       57

```
 1    her room.
 2        Q.  But why -- I'm sorry, I thought you had
 3    finished.  Go ahead.
 4        A.  No, go ahead.
 5        Q.  Why didn't you take steps, when you became
 6    aware -- (inaudible)-- to have your wife reassigned,
 7    sir?
 8        A.  I didn't hear most of that question.  It kind of
 9    garbled out, I'm sorry.
10        Q.  I'm sorry.  Why didn't you, once you learned
11    these claims were made, these allegations, why didn't
12    you take steps, sir, to have your wife reassigned?
13        A.  Well, my wife particularly, but all the other --
14    I mean, there were other people, I believe one of the
15    SPED teachers was named as well.  But we need to serve
16    those kids, so I didn't take steps for any of them, but
17    I didn't think it would impact any investigation.  And
18    as far as spying, she wasn't, she wasn't reporting to me
19    at all.
20        Q.  And did Mr. Villareal consult with you about
21    whether it would be appropriate to remove your wife from
22    the classroom, sir?
23        A.  The what?
24        Q.  Did you have any discussions with Mr. Villareal
25    about reassigning your wife from the classroom?
```

SHAWN RODMAN (April 27, 2020)

58

1      A.   I don't believe we did, no.

2      Q.   Were you aware that Mr. Krebsbach, who was then

3   a probationary employee, had been given Ms. Smithson's

4   chemistry class, sir?

5      A.   Yes.

6      Q.   Did you make this decision, sir, in consultation

7   with Mr. Villareal?

8      A.   No.

9      Q.   You made this decision on your own, did you not,

10   sir?

11      A.   No, I didn't make the decision.  The scheduling

12   is done by our counselors and Mr. Villareal.  I was in

13   on some of those meetings; but as far as the final

14   master schedule, they did that.

15      Q.   Well, I'm trying to understand why you would

16   take -- this was done -- I mean, you and Mr. Villareal

17   and the counselor consult when you're preparing the

18   master schedule, right?

19      A.   Yes.  That year was more them than me, but yes.

20      Q.   Well, sir, with all due respect, Ms. Smithson

21   had been teaching chemistry for some time, hadn't she?

22      A.   I don't know how long she's been teaching it.

23      Q.   Well, you knew she had been teaching it for as

24   long as you had been at the school, right?

25      A.   Yes.

SHAWN RODMAN (April 27, 2020)                                    59

```
1      Q.   (Inaudible) -- taken from them; isn't that true,

2    sir?

3      A.   Once again, I didn't hear your question.  It

4    keeps going blank.

5      Q.   I'm sorry, I don't know what's going on.  If I

6    have to, I may have to change to a different phone, but

7    let's try.

8           Was there -- were there other teachers at the

9    school who were teaching chemistry other than

10   Ms. Smithson and Mr. Krebsbach?

11     A.   At the time, I don't know.  We had a number of

12   science teachers.  I don't recall back what exactly they

13   all were teaching.  I do know why the change was made

14   but I don't recall what the other people were teaching.

15     Q.   Now, you say in your statement, "When I saw on

16   the schedule that Ms. Smithson was only teaching

17   biology, I thought it was good for her as she only had

18   to prepare for one class."

19     A.   Yes.

20     Q.   Well, did you think that she was incapable of

21   preparing for the chemistry class?

22     A.   No.

23     Q.   Well, I don't understand why you make that

24   statement, sir.

25     A.   Because often teachers ask to have as few class
```

SHAWN RODMAN (April 27, 2020)

60

```
 1    preparations as possible.  For example, someone might
 2    come to us and say, if you could have someone teach
 3    geometry and give me all five algebra classes, that
 4    would be great.  Basically the teacher has one
 5    preparation and they have those classes, they just teach
 6    one.  So oftentimes -- Ms. Smithson didn't come and ask
 7    for that, but oftentimes people will come and say when
 8    they're doing a schedule that they only want one; if
 9    they can get down to as few preps as possible, the
10    better.  That's why I made that statement.
11        Q.  Did Mr. Krebsbach ask to teach the chemistry
12    class?
13        A.  Not to me, no.
14        Q.  Did he ask that of Mr. Villareal or anyone else
15    that you're aware of?
16        A.  I don't know.
17        Q.  Did you ever speak with Mr. Krebsbach about it?
18        A.  No.
19        Q.  I'm still trying to understand, you say he was
20    not qualified to teach biology.  How do you know that
21    that?
22        A.  One of the counselors said that.
23        Q.  Who?
24        A.  But -- I believe it was possibly Ms. Laveck
25    (phonetic) or maybe Mr. Villareal said it, that he did
```

SHAWN RODMAN (April 27, 2020)

```
 1    not have biology on his certificate to teach it.  So I

 2    took that as --

 3        Q.   Did you confirm that, sir?

 4        A.   Excuse me?

 5        Q.   Did you ever confirm that?

 6        A.   No.

 7        Q.   Did you ever speak with him about it?

 8        A.   No.

 9        Q.   Has he taught biology since he's been at the

10    school?

11        A.   I don't know.  I don't believe so.

12        Q.   Are there other teachers capable of teaching

13    biology other than Ms. Smithson?

14        A.   Yes.

15        Q.   And as I understand it, Mr. Krebsbach teaches

16    math as well; is that correct?

17        A.   He's qualified to teach that, I don't know that

18    he does anymore.  I don't have a schedule in front of

19    me.

20        Q.   What does he teach now, sir?

21        A.   I know he teaches physics and an AP physics, and

22    he might teach a chemistry class.

23        Q.   You would agree that Ms. Smithson is an

24    excellent teacher, correct?

25        A.   I didn't hear the question.
```

SHAWN RODMAN (April 27, 2020)

62

1    Q.   You would agree that Ms. Smithson is an

2    excellent teacher, correct?

3    A.   Yes, she's a good teacher.

4         MR. MARSHALL:  All right, I would like to take a

5    break at this time.  I have 9:02 and we're going to

6    take a 15 minute break.  All right, sir?

7         THE WITNESS:  Okay.

8         (A brief recess was taken.)

9    Q.   Mr. Rodman, now, at some point in time between

10   when you arrived at the school and when Mr. Villareal

11   came aboard, to the present, what is your understanding

12   of Ms. Smithson's medical diagnosis?

13   A.   I only have information about what she told me,

14   which I believe is side effects of the medications that

15   she takes.

16   Q.   What are those side effects, sir?

17   A.   She has some light sensitivity and is dizzy in

18   the mornings.  Those are the ones she's told me about.

19   Q.   What did you understand were the causes of these

20   symptoms?

21   A.   She told me -- I don't know the name of it, but

22   she told me that it's a -- I think it's pressure in the

23   fluid inside her spinal column, if I remember correctly,

24   something along those lines.

25   Q.   Did you ever review any medical reports relating

SHAWN RODMAN (April 27, 2020)

63

1    to her condition?

2        A.   No.

3        Q.   Did you ever learn what the medical diagnoses

4    were for her condition?

5        A.   I didn't hear the first part of that question,

6    sorry.

7        Q.   Did you ever learn the medical diagnoses for her

8    condition?

9        A.   No.

10       Q.   Now, did Ms. Smithson ever report to you that

11   she was the subject of individuals coming into her room,

12   invading her personal space, touching her, coming behind

13   her desk, that kind of thing, sir?

14       A.   No.  I don't recall that, no.

15       Q.   Did she ever say to you that she did not want to

16   be touched?

17       A.   I don't recall her saying that to me, no.

18       Q.   Did you ever touch Ms. Smithson?

19       A.   I don't think so, no.

20       Q.   Did you ever go behind her desk?

21       A.   Not when she was behind her desk.

22       Q.   Under what circumstances did you go behind her

23   desk, sir?

24       A.   I was substituting in her class.

25       Q.   Did you ever go behind her desk while she was

SHAWN RODMAN (April 27, 2020)

1     present in the classroom, sir?

2         A.   I don't recall that I did that, no.

3         Q.   And just to be clear, you never learned that was

4     a form of harassment where people were going behind her

5     desk, violating her personal space and touching her?

6     That was something you were ever aware of; is that

7     correct?

8         A.   Correct, not until the reports came out.

9         Q.   What reports, sir?

10        A.   I had a questionnaire that came to me last week,

11    I believe it was in those questionnaires.

12        Q.   Okay.  But you did not learn that prior to last

13    week; is that correct?

14        A.   No.  I don't believe so, no.

15        Q.   Did you ever learn that Ms. Smithson had

16    requested that this kind of thing not continue?

17        A.   I don't recall her making a request like that to

18    me, no.

19        Q.   I previously asked you a question that related

20    to your wife's relationship she has with a group of

21    teachers who have been the very teachers who

22    Ms. Smithson has experienced harassment from.  And my

23    question to you, sir, is:  Do you know if your wife

24    maintains a social relationship with any of the teachers

25    at the school there, sir?

SHAWN RODMAN (April 27, 2020)

65

1     A.  Like going out socially?

2     Q.  Well, no.  I mean, just, now that we have this

3  social distancing, I'm not sure that that's the best way

4  to -- but what I'm trying to understand is, did you --

5  over the course of the last four years, three or four

6  years, has she maintained friendships with any of the

7  teachers at the school?

8     A.  There were probably a couple that she was

9  friends with before we moved here that she's friends

10  with now.

11     Q.  And what are their names, sir?

12     A.  Leigh Ann Taylor is one, she's one of our

13  counselors.  I'm trying to think if there's -- Cassie

14  Stuart is another one.  She invited Cassie and her

15  family to come to our house when her husband was

16  deployed.  She's a history teacher.

17     Q.  What was her first and last name?

18     A.  Cassie Stuart.  It's S-T-U-A-R-T for spelling;

19  Cassie.  But as far as anyone doing anything socially,

20  Janet Hyten.  But we've known them for a long time

21  through swim team, so it's not because of here, it's

22  because of before.

23     Q.  Any friendships that have developed since your

24  wife began teaching as a substitute, sir?

25     A.  Just Cassie Stuart.  She's younger.  She's the

SHAWN RODMAN (April 27, 2020)

66

```
 1    only one from now in terms of doing anything socially.

 2        Q.   Right.  We've looked at your wife's face page.

 3        A.   Okay.

 4        Q.   And it shows friends that she has among the

 5    teachers and staff there at the school.

 6        A.   Okay.

 7        Q.   Were you aware of that face page, sir?

 8        A.   I'm aware of the page.  I don't go on it.

 9        Q.   Okay.  Are you aware of who she's befriended?

10        A.   No, not necessarily.

11        Q.   And you understand how the face page friends,

12    how that works, correct?

13        A.   Yes, I am.

14        Q.   Could you tell me what your understanding is?

15        A.   Just you get, you know, friend requests or

16    messages from people.  She often shares when someone we

17    both know makes a post or says something about their

18    kids or something, yeah, I understand how that works.

19        Q.   And it shows a number of postings that have been

20    accessed by these friends about various personal,

21    private information.

22        A.   Okay.

23        Q.   Now, one of the concerns about this case is that

24    your wife among -- (inaudible) -- chose to create a

25    hostile work environment for my client.
```

SHAWN RODMAN (April 27, 2020)

```
 1        A.   It went blank again.  I'm sorry, I didn't hear
 2    what you were saying.
 3        Q.   I'm so sorry.  The question I was about to pose
 4    was:  As a result of this core group of people that your
 5    wife has befriended, my client has experienced hostility
 6    in the workplace, okay.
 7        A.   Okay.
 8        Q.   And what I'm concerned about, Mr. Rodman, is
 9    you've recently reassigned your wife back to
10    Ms. Smithson's classroom, and I'm just wondering why you
11    did that, sir.
12        A.   I don't have anything to do with assignments
13    here in the school right now.
14        Q.   Who would be responsible for that, sir?
15        A.   I'm sorry, I didn't hear it again.
16        Q.   Who would be responsible for that?
17        A.   I understand they're talking about -- she told
18    me they asked my wife to come back as a special ed aide,
19    so that person would be Ms. Hyten.  I'm not aware of any
20    specifics of what classes she's in or not, I don't know.
21    But I'm just aware she's coming back.  I'm not in charge
22    of any of those things now.  I'm more involved in
23    Hohenfels right now.
24             I'm not hearing anything.
25        Q.   I didn't say anything.  I'm just reviewing
```

*Spencer & Associates  (206)382-9695  Court Reporters*

SHAWN RODMAN (April 27, 2020)

1    something here.

2        A.   Sorry.

3        Q.   Now, are you saying that Mr. Villareal made that

4    decision, or Ms. Hyten?

5        A.   Ms. Hyten -- well, there's a couple of decisions

6    that take place.  One would be the decision to have her

7    come on as a sub.  The second would be which classes.

8    It's my understanding that the SPED aide, I think her

9    name is Rebecca Washington, is PCs'ing, her last day was

10   last week, and my wife got a note from the secretary

11   that she would be taking Ms. Washington's caseload.  I

12   don't know what that caseload is or which teachers she

13   would be helping at this point.

14           MR. MARSHALL:  Okay, let me just take a moment

15       and review my notes, Mr. Rodman, and speak to my

16       client for a moment.  Just hold on for a moment,

17       please.

18           THE WITNESS:  Okay.

19           (A brief recess was taken.)

20       Q.   Mr. Rodman, has there ever come a time, sir,

21   where you have had to speak with your wife concerning

22   her involvement in matters at the school that may create

23   a problem?

24       A.   I don't really understand your question.  What

25   kind of problem?

SHAWN RODMAN (April 27, 2020)

69

```
 1        Q.   Well, let me ask it this way.  Who supervises
 2   your wife when she works there?
 3        A.   Mr. Villareal.
 4        Q.   All right.  Has Mr. Villareal ever had to
 5   caution your wife about her conduct in any way?
 6        A.   I don't know.
 7        Q.   All right.  And has there ever been any
 8   complaints made to you that you became aware of that
 9   your wife was involved in creating a hostile work
10   environment?
11        A.   No.
12        Q.   And you indicated that Mr. Villareal served as
13   her supervisor.  How do you know that?
14        A.   Well, just any -- because she was here, anything
15   that came up with her, he said that he would handle, and
16   I agreed with that.  In fact, we --
17        Q.   When did he say that, sir?
18        A.   I don't recall.  When she started here.
19        Q.   Okay.  Why did he say that?
20        A.   Probably just because it would be -- you would
21   have to ask him why he said it.  I assume so I wouldn't
22   be directly involved in her supervision.
23        Q.   You supervise some of the teachers at the
24   school, correct?
25        A.   Yes.
```

SHAWN RODMAN (April 27, 2020)                                70

```
 1        Q.  And do you know if your wife has made statements
 2    to those teachers that because of her being married to
 3    you that that somehow gave them cart blanche to conduct
 4    themselves in ways that may be inappropriate, sir?
 5        A.  I don't believe so, no.
 6            MR. MARSHALL:  Okay, sir.  I don't have any
 7    other questions for you.  I appreciate you making
 8    yourself available.  Mr. Selz may have some questions
 9    for you.
10            MR. SELZ:  I do not.  Thank you.
11            THE WITNESS:  I have a question.
12            MR. MARSHALL:  Okay, Mr. Rodman, yes, sir.
13            THE WITNESS:  I have a question.  And I don't
14    know if it's advice or not.  I wasn't aware that --
15    if it's true or not that my wife would be covering
16    Ms. Smithson's class.  Now that I'm aware, would it
17    be appropriate for me to let Mr. Villareal know that
18    so that she's not in that classroom?
19            MR. SELZ:  Mr. Rodman, we'll talk about that off
20    the record.
21            MR. MARSHALL:  I was just going to say that
22    that's a question that should be directed to
23    Mr. Selz.
24            MR. SELZ:  (Inaudible.)
25            MR. MARSHALL:  Thank you again, Mr. Rodman, and
```

SHAWN RODMAN (April 27, 2020)                    71

1        have a good day, sir.

2                THE WITNESS:  You too.  Thank you.

3                (Deposition concluded at 3:40 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3      STATE OF WASHINGTON )
                           ) ss.
4      COUNTY OF KING      )

5

       I, the undersigned Washington State Certified Court
6      Reporter, hereby certify that the foregoing deposition
       upon oral examination of the witness named herein was
7      taken before me on April 27, 2020, and transcribed under
       my direction;
8              That the witness before examination was first
       duly sworn by me pursuant to RCW 5.28.10 to testify
9      truthfully; that the transcript of the deposition is a
       full, true and correct transcript to the best of my
10     ability; that I am neither attorney for nor a relative
       or employee of any of the parties to the action or any
11     attorney or counsel employed by the parties hereto nor
       financially interested in its outcome.
12             IN WITNESS WHEREOF, I have hereunto affixed my
       electronic signature this 12th day of May 2020.  The
13     document has been digitally signed in accordance with
       Washington Court Rules GR 30(D)(2)(B).

14

15

16

17     _____
       /s/ Zoya O. Spencer
       Washington State Certified Court Reporter
18     WA CCR No. 2418
       License effective until: 11/22/2020

19

20

21

22

23

24

25

**'**

**'16-17** [1] - 10:23

**/**

**/s** [1] - 72:17

**0**

**0)611-1435451592** [1] - 2:11

**1**

**102** [1] - 2:5
**11/22/2020** [1] - 72:18
**116** [3] - 31:8, 31:9, 49:16
**1240** [1] - 2:5
**12th** [1] - 72:12
**131** [1] - 53:8
**144** [2] - 32:17, 42:16
**15** [1] - 62:6
**1998** [1] - 4:13
**1:00** [1] - 1:14

**2**

**2012** [1] - 38:1
**2013** [1] - 37:23
**2015** [13] - 4:15, 9:15, 13:12, 14:25, 17:2, 17:24, 19:5, 19:20, 20:12, 21:25, 22:6, 38:2
**2016** [10] - 9:9, 9:11, 15:5, 15:8, 15:10, 15:12, 19:5, 19:21, 22:1, 22:6
**2016-17** [1] - 10:19
**2016-2017** [1] - 11:23
**2018** [4] - 31:23, 33:4, 47:13, 49:7
**2019** [1] - 4:20
**2020** [3] - 1:15, 72:7, 72:12
**20th** [3] - 32:24, 33:4, 53:11
**2418** [2] - 1:24, 72:18
**24th** [1] - 49:20
**25th** [1] - 47:13
**26** [2] - 31:6, 31:23
**27** [2] - 1:15, 72:7
**29466** [1] - 2:6

**3**

**3** [1] - 2:20
**30(D)(2)(B)** [1] - 72:13

**303-9532** [1] - 2:6
**3:40** [1] - 71:3

**4**

**4** [2] - 32:20, 53:9
**45** [1] - 29:22
**49** [1] - 2:11
**49-(0)162-2704730** [1] - 2:11

**5**

**5.28.10** [1] - 72:8
**545-1592/CIV** [1] - 2:11
**570-2019-00926X** [1] - 1:4

**6**

**6** [1] - 33:7

**8**

**8** [1] - 49:7
**843** [1] - 2:6
**8:00** [6] - 18:19, 18:21, 19:6, 19:12, 19:22, 28:11
**8:20** [1] - 19:16
**8th** [2] - 49:19, 49:20

**9**

**9:00** [2] - 18:8, 18:19
**9:02** [1] - 62:5
**9:10** [1] - 49:18
**9:30** [2] - 18:9, 19:15

**A**

**a.m** [5] - 18:19, 18:20, 18:21, 19:6, 19:22
**ability** [1] - 72:10
**aboard** [1] - 62:11
**absolutely** [1] - 30:13
**accessed** [1] - 66:20
**accident** [2] - 33:14, 33:19
**accommodation** [17] - 13:18, 14:3, 14:4, 14:23, 14:24, 15:4, 15:18, 17:11, 17:25, 20:15, 20:20, 21:18, 23:8, 23:15, 24:7, 24:14
**accordance** [1] - 72:13
**accurate** [2] - 39:1,

42:24
**accusing** [1] - 40:20
**acknowledging** [1] - 48:16
**action** [1] - 72:10
**activity** [5] - 31:3, 32:2, 32:10, 32:21, 48:21
**adjust** [1] - 19:13
**adjusts** [1] - 18:24
**administrative** [2] - 7:22, 28:10
**administrator** [1] - 54:21
**adopted** [1] - 25:24
**advice** [1] - 70:14
**advising** [1] - 48:24
**affixed** [1] - 72:12
**African** [2] - 8:6, 13:6
**African-American** [1] - 13:6
**African-Americans** [1] - 8:6
**Agency** [1] - 1:7
**agency** [1] - 11:10
**AGENCY** [2] - 1:5, 2:8
**ago** [2] - 23:9, 54:4
**agree** [6] - 31:21, 38:20, 54:18, 54:22, 61:23, 62:1
**agreed** [1] - 69:16
**ahead** [9] - 3:17, 4:4, 14:10, 14:11, 26:3, 29:17, 29:18, 57:3, 57:4
**aide** [3] - 56:14, 67:18, 68:8
**algebra** [1] - 60:3
**allegations** [8] - 51:18, 51:23, 52:1, 52:2, 55:2, 55:7, 55:12, 57:11
**allow** [1] - 3:20
**allowed** [2] - 9:22, 13:21
**ALSO** [1] - 2:13
**alternate** [1] - 24:8
**American** [1] - 13:6
**Americans** [1] - 8:6
**Ann** [1] - 65:12
**annual** [1] - 7:22
**answer** [9] - 3:18, 3:21, 4:1, 16:16, 33:2, 41:8, 41:10, 51:13, 53:9
**anticipate** [1] - 4:3
**AP** [1] - 61:21
**APPEARANCES** [1] - 2:1
**application** [1] - 26:7

**applied** [8] - 10:22, 10:24, 12:7, 12:8, 12:23, 25:23, 26:11, 28:25
**applies** [1] - 26:25
**applying** [2] - 12:20, 13:4
**appointment** [2] - 28:11, 28:12
**appointments** [1] - 28:8
**appreciate** [1] - 70:7
**appreciated** [1] - 10:8
**approach** [1] - 55:4
**appropriate** [2] - 57:21, 70:17
**April** [2] - 1:15, 72:7
**area** [1] - 34:24
**arrival** [1] - 24:9
**arrived** [7] - 14:25, 15:11, 17:2, 19:19, 22:12, 62:10
**arts** [1] - 8:20
**aside** [1] - 16:9
**assault** [10] - 33:10, 33:12, 33:15, 35:15, 39:5, 39:8, 40:16, 43:13, 48:5, 53:21
**assaulted** [4] - 35:25, 39:25, 51:6, 52:5
**assessment** [2] - 27:23, 56:7
**assigned** [3] - 54:2, 54:21, 56:20
**assignment** [1] - 21:14
**assignments** [1] - 67:12
**assist** [1] - 35:20
**assistant** [10] - 4:16, 7:19, 8:1, 17:15, 21:13, 21:14, 41:23, 47:8, 54:19, 55:16
**assisting** [1] - 11:2
**associates** [1] - 38:21
**assume** [2] - 3:18, 69:21
**assure** [1] - 47:4
**assuredly** [1] - 20:9
**AT** [1] - 1:1
**attention** [1] - 35:13
**attorney** [2] - 72:10, 72:11
**August** [3] - 4:15, 14:25, 15:11
**available** [4] - 9:8, 12:23, 12:25, 70:8
**aware** [38] - 13:17, 13:19, 13:23, 14:2, 14:13, 14:15, 14:20,

15:3, 18:12, 24:13, 27:21, 31:1, 32:20, 32:22, 32:23, 37:2, 45:24, 45:25, 46:4, 53:9, 55:6, 55:11, 56:22, 56:24, 56:25, 57:6, 58:2, 60:15, 64:6, 66:7, 66:8, 66:9, 67:19, 67:21, 69:8, 70:14, 70:16

**B**

**background** [3] - 4:10, 4:12, 4:21
**Barnes** [1] - 13:9
**based** [3] - 17:11, 45:22, 55:15
**basic** [2] - 3:13, 4:6
**became** [6] - 10:1, 14:13, 14:15, 14:20, 57:5, 69:8
**become** [4] - 15:3, 31:1, 32:20, 51:17
**befriended** [2] - 66:9, 67:5
**began** [3] - 9:11, 13:5, 65:24
**begin** [1] - 10:18
**behind** [6] - 63:12, 63:20, 63:21, 63:22, 63:25, 64:4
**best** [3] - 20:22, 65:3, 72:9
**better** [4] - 17:16, 38:19, 45:9, 60:10
**between** [2] - 56:17, 62:9
**beyond** [1] - 37:9
**bigger** [1] - 22:23
**biology** [5] - 59:17, 60:20, 61:1, 61:9, 61:13
**bit** [1] - 3:25
**blanche** [1] - 70:3
**blank** [2] - 59:4, 67:1
**blanked** [1] - 46:2
**bleeding** [2] - 34:11, 34:13
**book** [1] - 45:10
**books** [1] - 9:6
**bottom** [1] - 31:16
**Brad** [1] - 3:7
**brad@Charmans. com** [1] - 2:7
**BRADLEY** [1] - 2:4
**break** [3] - 30:21, 62:5, 62:6
**brief** [3] - 30:25, 62:8, 68:19

**bring** [1] - 35:13
**Brittini** [1] - 13:9
**brought** [1] - 9:25
**bruising** [1] - 34:4
**building** [1] - 22:18
**bus** [2] - 37:16, 37:18
**BY** [2] - 2:20, 3:5
**Byron** [1] - 8:17

## C

**capable** [1] - 61:12
**capacity** [1] - 9:4
**Carolina** [1] - 2:6
**cart** [1] - 70:3
**case** [10] - 3:7, 5:23, 6:3, 6:8, 6:15, 7:4, 7:15, 18:10, 48:17, 66:23
**caseload** [2] - 68:11, 68:12
**Cassie** [5] - 65:13, 65:14, 65:18, 65:19, 65:25
**caused** [1] - 50:21
**causes** [1] - 62:19
**caution** [1] - 69:5
**CCR** [2] - 1:24, 72:18
**Cell** [1] - 2:11
**certificate** [1] - 61:1
**Certified** [2] - 72:5, 72:17
**certify** [1] - 72:6
**chair** [1] - 56:14
**change** [12] - 15:24, 24:18, 25:11, 25:15, 25:16, 25:19, 25:22, 25:23, 26:7, 51:13, 59:6, 59:13
**changed** [3] - 18:23, 19:7, 24:14
**changes** [1] - 24:20
**charge** [1] - 67:21
**Chartmans** [1] - 2:5
**chemistry** [6] - 58:4, 58:21, 59:9, 59:21, 60:11, 61:22
**child** [1] - 29:11
**chose** [1] - 66:24
**circumstances** [3] - 19:5, 29:9, 63:22
**claimed** [4] - 32:24, 53:11, 53:14, 53:16
**claims** [2] - 55:20, 57:11
**class** [40] - 16:1, 17:8, 17:9, 17:15, 17:20, 18:5, 18:7, 18:14, 18:15, 18:16, 18:18, 18:19, 18:20, 18:21,

18:23, 19:1, 19:2, 19:6, 19:10, 19:18, 19:22, 20:2, 20:4, 20:8, 20:13, 22:4, 22:9, 22:16, 54:3, 56:11, 58:4, 59:18, 59:21, 59:25, 60:12, 61:22, 63:24, 70:16
**classes** [11] - 7:23, 13:1, 13:2, 14:19, 15:25, 18:8, 21:19, 60:3, 60:5, 67:20, 68:7
**classroom** [10] - 22:2, 22:7, 22:13, 22:15, 23:4, 57:22, 57:25, 64:1, 67:10, 70:18
**clear** [3] - 4:5, 26:24, 64:3
**client** [3] - 66:25, 67:5, 68:16
**column** [1] - 62:23
**coming** [9] - 14:2, 15:13, 15:14, 15:17, 15:21, 15:23, 16:7, 16:18, 17:2, 17:6, 17:9, 17:10, 17:23, 18:5, 19:1, 26:17, 27:6, 63:11, 63:12, 67:21
**comments** [1] - 26:13
**COMMISSION** [1] - 1:1
**Commission** [1] - 3:9
**communicate** [1] - 23:2
**communication** [1] - 24:2
**compared** [1] - 44:4
**complain** [1] - 13:7
**complainant** [1] - 1:4
**COMPLAINANT** [1] - 2:3
**complaining** [1] - 52:4
**complaint** [14] - 7:7, 7:9, 31:2, 32:6, 32:7, 32:14, 37:3, 49:8, 49:19, 50:18, 51:17, 51:22, 56:23, 56:24
**complaints** [1] - 69:8
**completely** [1] - 51:8
**computer** [1] - 14:18
**concern** [1] - 56:19
**concerned** [5] - 11:5, 22:20, 40:21, 51:1, 67:8
**concerning** [4] - 7:4, 32:13, 56:23, 68:21
**concerns** [1] - 66:23
**concluded** [1] - 71:3

**condition** [5] - 33:24, 63:1, 63:4, 63:8
**conduct** [5] - 55:7, 55:25, 56:23, 69:5, 70:3
**conducted** [1] - 38:9
**conducting** [1] - 45:2
**conference** [2] - 37:17, 37:21
**conferences** [1] - 7:22
**confirm** [2] - 61:3, 61:5
**confused** [3] - 17:19, 17:22, 51:4
**conjunction** [1] - 39:12
**connection** [1] - 5:23
**connors** [1] - 47:13
**Connors** [26] - 6:9, 35:3, 35:4, 35:17, 36:7, 36:15, 37:5, 37:25, 38:3, 38:4, 38:12, 38:15, 38:23, 39:18, 42:19, 42:22, 43:3, 43:7, 43:20, 45:2, 46:5, 46:10, 46:16, 46:24, 52:15, 52:21
**consistent** [2] - 21:22, 42:2
**consult** [2] - 57:20, 58:17
**consultation** [1] - 58:6
**contact** [9] - 34:19, 34:21, 35:1, 35:4, 35:8, 36:1, 36:7, 36:19, 39:17
**contacted** [2] - 36:11, 48:24
**contained** [2] - 33:4, 49:6
**continue** [1] - 64:16
**contradict** [1] - 36:16
**controlled** [1] - 56:13
**conversation** [11] - 23:11, 23:22, 24:15, 24:21, 26:14, 33:16, 36:4, 40:13, 40:18, 42:8, 46:5
**conversations** [3] - 5:20, 23:7, 41:20
**convey** [2] - 53:22, 55:14
**Cora** [4] - 29:1, 29:3, 29:7, 29:9
**CORA** [1] - 29:6
**core** [1] - 67:4
**correct** [42] - 5:12, 7:15, 7:17, 10:4, 13:13, 13:14, 14:1,

15:1, 16:22, 16:23, 21:11, 24:15, 25:20, 27:5, 27:9, 30:16, 31:23, 33:10, 35:21, 37:1, 39:10, 42:3, 43:1, 43:8, 43:10, 44:19, 50:19, 51:19, 52:17, 53:5, 53:20, 54:3, 55:7, 61:16, 61:24, 62:2, 64:7, 64:8, 64:13, 66:12, 69:24, 72:9
**correctly** [1] - 62:23
**corroborate** [1] - 40:9
**counsel** [1] - 72:11
**Counsel** [1] - 2:10
**counselor** [1] - 58:17
**counselors** [3] - 58:12, 60:22, 65:13
**COUNTY** [1] - 72:4
**couple** [4] - 34:12, 35:6, 65:8, 68:5
**course** [2] - 12:8, 65:5
**Court** [4] - 1:23, 72:5, 72:13, 72:17
**cover** [13] - 15:25, 16:1, 17:7, 17:15, 18:14, 18:15, 19:2, 19:6, 19:18, 19:21, 21:18, 22:14
**coverage** [2] - 19:2, 22:2
**covered** [3] - 18:17, 20:8, 20:10
**covering** [4] - 17:9, 17:17, 20:1, 70:15
**coworker** [1] - 52:4
**create** [2] - 66:24, 68:22
**creating** [1] - 69:9
**crushed** [1] - 34:14
**CSC** [1] - 56:14
**culinary** [1] - 8:20
**cumbersome** [1] - 3:25
**cut** [3] - 6:11, 6:20, 6:24

## D

**date** [2] - 31:4, 31:22
**date-wise** [1] - 31:4
**dates** [2] - 18:18, 35:7
**daughter** [4] - 37:24, 37:25, 38:3, 38:4
**day's** [1] - 27:25
**days** [5] - 6:1, 27:7, 35:6, 36:6, 36:9
**DC** [1] - 1:1
**Dean** [2] - 11:9, 11:12

**decision** [6] - 45:1, 58:6, 58:9, 58:11, 68:4, 68:6
**decisions** [1] - 68:5
**declaration** [1] - 53:8
**defender** [1] - 47:1
**DEFENSE** [1] - 1:6
**definitely** [1] - 30:7
**degree** [2] - 4:22
**delay** [1] - 10:20
**delayed** [3] - 10:21, 10:23, 22:19
**Dependents** [1] - 2:10
**deployed** [1] - 65:16
**deposed** [1] - 3:2
**Deposition** [2] - 1:10, 71:3
**deposition** [8] - 3:10, 3:14, 4:24, 5:14, 6:13, 6:24, 72:6, 72:9
**DEPT** [1] - 1:6
**Deputy** [1] - 2:10
**describe** [1] - 23:11
**describing** [1] - 23:22
**Designated** [1] - 2:4
**desk** [6] - 63:13, 63:20, 63:21, 63:23, 63:25, 64:5
**details** [1] - 41:3
**developed** [1] - 65:23
**Dewanna** [3] - 11:8, 11:12, 11:17
**diagnoses** [2] - 63:3, 63:7
**diagnosis** [1] - 62:12
**dialed** [1] - 6:22
**different** [7] - 13:20, 19:9, 37:18, 37:19, 51:16, 59:6
**differently** [1] - 39:24
**digitally** [1] - 72:13
**direct** [1] - 10:14
**directed** [4] - 17:15, 25:4, 25:11, 70:22
**direction** [1] - 72:7
**directly** [4] - 9:18, 22:23, 45:21, 69:22
**discrimination** [4] - 7:19, 8:2, 8:3, 49:8
**discuss** [4] - 11:24, 12:2, 12:12, 56:16
**discussing** [1] - 26:12
**Discussion** [1] - 30:19
**discussion** [1] - 25:2
**discussions** [7] - 23:21, 24:17, 24:19, 32:9, 32:13, 42:11, 57:24
**disfigurement** [1] -

34:14
**distancing** [1] - 65:3
**dizzy** [1] - 62:17
**document** [9] - 5:1, 5:4, 27:23, 31:14, 31:22, 42:13, 49:10, 49:11, 72:13
**documentation** [2] - 27:23, 36:10
**DoD** [1] - 2:10
**DoDEA** [4] - 4:11, 4:13, 9:11, 10:1
**done** [4] - 4:23, 5:13, 58:12, 58:16
**door** [15] - 33:14, 42:19, 42:21, 42:23, 43:5, 43:15, 43:21, 44:4, 44:9, 44:13, 45:11, 45:13, 45:14, 45:17, 46:6
**down** [4] - 9:16, 32:17, 33:7, 60:9
**drive** [1] - 9:17
**drove** [1] - 9:16
**DSN** [1] - 2:11
**dual** [1] - 4:18
**due** [1] - 58:20
**duly** [2] - 3:2, 72:8
**during** [10] - 10:17, 10:23, 10:25, 11:20, 13:5, 13:11, 19:13, 20:2, 21:25, 24:3
**duty** [1] - 4:18

## E

**ear** [1] - 45:14
**ed** [1] - 67:18
**education** [2] - 4:15, 4:22
**educational** [1] - 4:12
**educators** [3] - 25:25, 37:14, 37:15
**EEO** [15] - 7:7, 7:9, 7:15, 7:22, 7:25, 31:2, 31:3, 32:1, 32:10, 32:21, 37:3, 48:16, 48:21, 55:2, 56:22
**EEOC** [1] - 1:4
**effect** [7] - 26:9, 26:14, 26:25, 27:19, 39:13, 50:16, 52:9
**effective** [1] - 72:18
**effects** [2] - 62:14, 62:16
**either** [9] - 16:17, 21:10, 25:13, 27:24, 28:18, 35:22, 39:17, 40:15, 47:23

**elaborate** [1] - 39:14
**electronic** [1] - 72:12
**elementary** [2] - 9:6, 13:4
**Elementary** [1] - 9:20
**email** [4] - 25:12, 32:23, 33:4, 53:10
**Email** [1] - 2:7
**employed** [3] - 8:6, 9:2, 72:11
**employee** [2] - 58:3, 72:10
**employment** [1] - 11:3
**EMPLOYMENT** [1] - 1:1
**Employment** [1] - 3:8
**encourage** [1] - 50:1
**end** [1] - 41:9
**entire** [2] - 22:4, 55:4
**entirely** [1] - 43:5
**environment** [2] - 66:25, 69:10
**Equal** [1] - 3:8
**EQUAL** [1] - 1:1
**essentially** [1] - 14:22
**estimate** [3] - 19:20, 19:23, 20:22
**EU-FY18-054** [1] - 1:6
**Europe/Pacific** [1] - 2:10
**event** [1] - 38:18
**everywhere** [1] - 20:10
**evidence** [3] - 40:12, 43:16, 48:1
**exact** [2] - 18:18, 39:22
**exactly** [6] - 9:25, 21:23, 23:25, 28:23, 42:4, 59:12
**EXAMINATION** [2] - 2:19, 3:4
**Examination** [1] - 1:10
**examination** [2] - 72:6, 72:8
**example** [2] - 19:8, 60:1
**examples** [1] - 7:24
**excellent** [2] - 61:24, 62:2
**excuse** [5] - 29:2, 44:5, 44:9, 44:22, 61:4
**EXHIBITS** [1] - 2:23
**expand** [1] - 33:23
**experienced** [3] - 48:20, 64:22, 67:5
**experiencing** [1] - 48:12
**extent** [1] - 54:23

## F

**face** [3] - 66:2, 66:7, 66:11
**fact** [4] - 21:25, 45:24, 49:7, 69:16
**faculty** [1] - 47:20
**failure** [1] - 55:24
**fair** [1] - 39:18
**familiar** [1] - 31:15
**family** [2] - 9:16, 65:15
**far** [11] - 11:4, 12:1, 14:22, 23:17, 23:19, 26:17, 37:10, 52:1, 57:18, 58:13, 65:19
**February** [1] - 20:25
**felt** [4] - 40:15, 50:16, 51:1, 53:23
**few** [3] - 27:17, 59:25, 60:9
**fifth** [1] - 14:20, 19:11
**filed** [6] - 31:2, 32:6, 37:3, 48:17, 49:8, 49:19
**filing** [1] - 32:7
**fill** [4] - 29:21, 29:24, 55:8, 55:10
**final** [1] - 58:13
**financially** [1] - 72:11
**finger** [1] - 34:13
**fingernails** [2] - 34:3, 34:15
**finish** [1] - 29:17
**finished** [4] - 14:11, 26:3, 29:18, 57:3
**first** [31] - 8:14, 9:15, 10:18, 11:20, 14:19, 16:3, 19:11, 19:14, 19:18, 20:19, 21:14, 29:4, 29:7, 31:1, 31:5, 33:13, 36:2, 36:19, 37:21, 39:13, 39:16, 41:13, 42:10, 48:19, 50:12, 53:1, 53:3, 53:7, 63:5, 65:17, 72:8
**five** [2] - 42:17, 60:3
**fluid** [1] - 62:23
**following** [3] - 24:14, 36:15, 46:21
**follows** [1] - 3:2
**FOR** [2] - 2:3, 2:8
**forcefully** [1] - 47:12
**foregoing** [1] - 72:6
**forgive** [1] - 54:9
**forgot** [1] - 15:25
**form** [6] - 13:7, 48:21, 51:7, 55:8, 55:11, 64:4
**format** [1] - 25:24

**four** [4] - 8:8, 42:18, 65:5
**frame** [2] - 21:1, 21:25
**frames** [1] - 5:16
**frankly** [1] - 15:14
**freely** [1] - 34:4
**frequently** [1] - 56:25
**friend** [1] - 66:15
**friendly** [4] - 38:6, 38:14, 38:25, 46:25
**friends** [8] - 38:20, 38:22, 38:24, 65:9, 66:4, 66:11, 66:20
**friendships** [2] - 65:6, 65:23
**front** [5] - 11:13, 11:15, 34:22, 45:9, 61:18
**full** [1] - 72:9
**future** [2] - 37:14, 37:15

## G

**garbled** [1] - 57:9
**Garmish** [1] - 37:16
**general** [1] - 7:25
**General** [1] - 2:10
**generally** [2] - 7:21, 54:20
**geometry** [1] - 60:3
**Germany** [2] - 1:15, 4:14
**given** [1] - 58:3
**GR** [1] - 72:13
**graduated** [1] - 37:25
**graduating** [1] - 9:15
**great** [2] - 4:9, 60:4
**group** [4] - 37:7, 37:12, 64:20, 67:4
**groups** [1] - 37:19
**guess** [4] - 4:18, 6:14, 15:22, 51:11
**guesses** [1] - 9:5
**guessing** [1] - 16:10

## H

**half** [16] - 16:3, 17:16, 17:17, 27:4, 27:8, 27:14, 27:25, 28:4, 28:20, 29:10, 29:23, 30:1, 30:2, 30:12, 30:16, 45:15
**hand** [14] - 33:13, 33:24, 34:10, 34:17, 34:20, 34:25, 35:14, 35:19, 36:2, 36:4, 36:25, 43:16, 43:21, 46:6

**handle** [2] - 11:4, 69:15
**hands** [2] - 34:4, 34:7
**hang** [1] - 52:24
**harassment** [5] - 13:8, 47:5, 49:21, 64:4, 64:22
**head** [1] - 48:7
**hear** [13] - 7:14, 8:9, 8:10, 8:12, 45:16, 46:2, 49:14, 57:8, 59:3, 61:25, 63:5, 67:1, 67:15
**heard** [3] - 51:19, 51:23, 52:3
**hearing** [1] - 67:24
**hello** [2] - 7:12, 7:13
**help** [2] - 19:4, 52:6
**helpful** [1] - 10:15
**helping** [1] - 68:13
**hereby** [1] - 72:6
**herein** [2] - 3:1, 72:6
**hereto** [1] - 72:11
**hereunto** [1] - 72:12
**hesitate** [1] - 3:17
**High** [2] - 4:16, 4:19
**history** [1] - 65:16
**Hohenfels** [10] - 4:14, 4:19, 6:20, 9:12, 9:16, 9:18, 37:8, 37:16, 38:4, 67:23
**hold** [1] - 68:16
**honestly** [1] - 42:10
**hostile** [2] - 66:25, 69:9
**hostility** [5] - 13:8, 39:5, 39:9, 47:5, 67:5
**hour** [11] - 20:15, 27:4, 27:12, 27:18, 27:24, 28:4, 28:20, 29:12, 29:22, 30:11, 30:15
**hour's** [1] - 9:17
**hours** [1] - 29:22
**house** [1] - 65:15
**hung** [1] - 6:25
**hurt** [1] - 42:20
**hurting** [1] - 40:20
**husband** [3] - 54:10, 54:11, 65:15
**Hyten** [4] - 65:20, 67:19, 68:4, 68:5

## I

**ice** [5] - 34:8, 34:9, 34:10, 35:21, 35:24
**identify** [1] - 28:18
**immediate** [2] - 11:14, 35:12

**immediately** [2] - 35:8, 35:18
**impact** [3] - 56:4, 56:12, 57:17
**impacted** [1] - 55:25
**impartially** [1] - 47:9
**important** [2] - 3:23, 41:7
**IN** [1] - 72:12
**inappropriate** [1] - 70:4
**Inaudible** [2] - 40:8, 70:24
**inaudible** [5] - 45:25, 49:13, 57:6, 59:1, 66:24
**Inc** [1] - 2:5
**incapable** [1] - 59:20
**inch** [1] - 45:15
**incident** [9] - 15:24, 33:25, 35:2, 36:15, 37:2, 42:19, 44:10, 44:19, 44:23
**incidents** [2] - 48:3, 48:11
**inclement** [1] - 27:13
**indicate** [3] - 33:9, 36:11, 36:14
**indicated** [4] - 12:12, 26:12, 41:12, 69:12
**indicates** [1] - 49:18
**individuals** [1] - 63:11
**influence** [1] - 38:9
**influencing** [1] - 55:19
**inform** [1] - 54:25
**informal** [4] - 49:8, 49:19, 51:17, 51:22
**information** [4] - 4:10, 41:24, 52:13, 53:24, 62:13, 66:21
**informed** [1] - 39:3
**injury** [1] - 40:21
**inside** [1] - 62:23
**instead** [1] - 19:15
**instructed** [2] - 24:23, 25:1
**instructions** [3] - 3:13, 4:6, 4:7
**instrumental** [1] - 11:2
**intent** [1] - 33:19
**intentional** [3] - 43:14, 44:2, 45:4
**intentionally** [3] - 43:20, 43:22, 45:3
**interest** [2] - 12:2, 12:13
**interested** [3] - 11:25, 28:17, 72:11
**interim** [1] - 4:19

**interpose** [1] - 3:20
**interviewed** [1] - 52:10
**intimated** [1] - 33:22
**intrude** [1] - 56:18
**invading** [1] - 63:12
**investigate** [3] - 40:3, 47:9, 53:20
**investigated** [4] - 50:5, 50:6, 50:8, 50:10
**investigation** [8] - 5:5, 7:4, 45:52, 50:18, 52:23, 55:20, 55:25, 57:17
**invited** [1] - 65:14
**involved** [13] - 6:10, 6:13, 6:24, 23:20, 31:3, 35:1, 37:14, 37:15, 37:24, 45:21, 67:22, 69:9, 69:22
**involvement** [3] - 55:1, 55:20, 68:22
**involving** [1] - 7:24
**irrespective** [1] - 54:20
**issue** [3] - 53:21, 54:16, 55:21
**issues** [2] - 32:23, 53:9

## J

**Jamison** [3] - 48:24, 49:2, 49:7
**Janet** [1] - 65:20
**January** [1] - 47:13
**job** [3] - 3:14, 12:20, 12:23
**joining** [1] - 3:6
**Jones** [1] - 8:17

## K

**keep** [1] - 3:14
**keeps** [1] - 59:4
**kids** [5] - 22:1, 26:21, 37:19, 57:16, 66:18
**kind** [12] - 7:15, 15:18, 24:7, 27:22, 27:23, 36:22, 40:16, 56:7, 57:8, 63:13, 64:16, 68:25
**KING** [1] - 72:4
**kitchen** [1] - 34:24
**knowing** [3] - 28:17, 37:10, 37:11
**knowledge** [1] - 17:10
**known** [9] - 17:5, 21:16, 21:20, 21:21,

21:24, 37:5, 37:6, 37:20, 65:20
**Krebsbach** [6] - 23:2, 58:2, 59:10, 60:11, 60:17, 61:15

## L

**lady** [1] - 35:1
**language** [1] - 53:14
**last** [19] - 3:22, 5:1, 5:6, 6:1, 6:10, 6:18, 8:18, 23:10, 23:24, 29:4, 38:1, 54:6, 64:10, 64:12, 65:5, 65:17, 68:9, 68:10
**late** [30] - 14:2, 15:13, 15:15, 15:17, 15:21, 15:23, 16:4, 16:7, 16:18, 17:3, 17:6, 17:7, 17:10, 17:11, 17:23, 18:1, 18:5, 19:19, 20:15, 24:24, 25:10, 26:17, 27:5, 27:12, 27:25, 28:4, 28:18, 28:20, 29:20, 30:10
**Laveck** [1] - 60:24
**learn** [6] - 20:19, 21:6, 63:3, 63:7, 64:12, 64:15
**learned** [5] - 21:2, 21:5, 22:13, 57:10, 64:3
**leave** [18] - 11:19, 25:9, 25:22, 26:11, 26:17, 27:15, 27:18, 27:25, 28:4, 28:11, 28:12, 28:21, 29:10, 29:21, 29:24, 30:12, 30:15, 30:16
**leaving** [1] - 6:19
**left** [2] - 8:18, 11:21
**Leigh** [1] - 65:12
**less** [4] - 19:25, 30:11, 30:15
**lesson** [1] - 53:25
**letter** [1] - 49:3
**level** [1] - 51:14
**License** [1] - 72:18
**light** [1] - 62:17
**line** [5] - 30:22, 49:21, 49:23, 49:24, 53:1
**lines** [4] - 26:21, 33:17, 33:21, 62:24
**listen** [1] - 43:17
**listened** [1] - 24:4
**live** [1] - 9:14
**located** [1] - 4:11
**lock** [1] - 45:11

**look** [4] - 30:2, 31:14, 31:15, 35:13
**looked** [2] - 34:7, 66:2
**looking** [4] - 10:3, 31:6, 36:24, 48:1

## M

**M-O-E-L-L-E-N-D-I-C -K** [1] - 29:6
**maintained** [1] - 65:6
**maintains** [1] - 64:24
**managing** [1] - 56:13
**March** [10] - 21:1, 31:6, 31:23, 32:24, 33:4, 49:7, 49:19, 49:20, 53:10
**marital** [1] - 56:18
**MARKED** [1] - 2:23
**married** [2] - 38:12, 70:2
**Marshall** [1] - 3:7
**MARSHALL** [4] - 2:20, 3:5, 10:6, 30:18, 30:20, 30:24, 41:21, 62:4, 68:14, 70:6, 70:12, 70:21, 70:25
**master** [7] - 14:18, 20:13, 20:23, 21:3, 58:14, 58:18
**master's** [1] - 4:21
**materials** [1] - 36:13
**math** [1] - 61:16
**matters** [1] - 68:22
**MAXWELL** [1] - 2:9
**Maxwell.Selz@eu. dodea.edu** [1] - 2:12
**mean** [15] - 12:4, 12:9, 12:17, 16:5, 18:3, 18:4, 28:22, 37:11, 40:4, 48:7, 50:8, 55:10, 57:14, 58:16, 65:2
**meant** [1] - 39:23
**meantime** [1] - 45:19
**medical** [4] - 62:12, 62:25, 63:3, 63:7
**medications** [1] - 62:14
**meet** [1] - 19:16
**meeting** [1] - 19:15
**meetings** [1] - 58:13
**members** [4] - 32:25, 42:18, 47:21, 53:11
**memorandum** [1] - 31:7
**messages** [1] - 66:16
**met** [1] - 37:9
**methods** [1] - 53:25

**Middle** [1] - 4:19
**might** [4] - 19:14, 31:7, 60:1, 61:22
**military** [1] - 52:20
**mind** [2] - 3:14, 43:23
**minute** [2] - 30:21, 62:6
**minutes** [3] - 27:17, 29:22, 30:22
**missed** [1] - 17:20
**mistake** [1] - 19:12
**mistreated** [1] - 41:14
**mistreatment** [3] - 32:25, 51:7, 53:11
**Moellendick** [2] - 29:1, 29:3
**moment** [7] - 30:18, 32:16, 40:22, 41:6, 68:14, 68:16
**morning** [7] - 4:24, 5:9, 5:11, 5:14, 16:2, 19:18, 28:9
**mornings** [2] - 13:22, 62:18
**most** [3] - 20:9, 20:18, 57:8
**mostly** [4] - 12:22, 14:13, 24:4, 40:19
**move** [1] - 41:21
**moved** [2] - 34:4, 65:9
**MPR** [1] - 34:21
**MPs** [1] - 52:19
**MR** [16] - 2:20, 3:5, 10:6, 30:18, 30:20, 30:24, 41:21, 62:4, 68:14, 70:6, 70:10, 70:12, 70:19, 70:21, 70:24, 70:25
**Mt** [1] - 2:6
**multiple** [2] - 56:20, 56:22
**mute** [1] - 10:7

## N

**nails** [1] - 34:13
**name** [12] - 3:6, 8:21, 11:7, 11:8, 13:10, 28:24, 29:5, 29:7, 49:4, 62:21, 65:17, 68:9
**named** [4] - 4:18, 50:9, 57:15, 72:6
**names** [4] - 8:11, 8:20, 52:10, 65:11
**nature** [1] - 23:11
**near** [2] - 42:21, 42:23
**necessarily** [1] - 66:10
**need** [5] - 5:18, 6:23, 12:22, 12:23, 57:15

**needed** [9] - 11:6, 18:6, 18:11, 24:24, 25:9, 25:10, 27:7, 50:21, 52:5
**needs** [1] - 3:19
**never** [11] - 14:8, 32:5, 34:2, 46:13, 46:14, 47:14, 47:15, 47:23, 50:5, 50:11, 64:3
**next** [7] - 6:2, 8:10, 10:9, 34:6, 34:7, 35:6, 35:7
**nice** [1] - 39:23
**Nichols** [1] - 16:24
**Nicholson** [11] - 13:21, 13:24, 14:6, 16:22, 16:24, 16:25, 17:1, 20:16, 21:6, 21:10, 23:15
**night** [10] - 33:18, 34:5, 34:8, 36:21, 36:23, 38:10, 44:7, 46:21, 48:5, 52:7
**NO** [3] - 1:4, 1:5, 2:23
**nobody** [1] - 7:2
**none** [1] - 42:18
**nonresponsive** [1] - 41:22
**normally** [1] - 20:23
**notation** [1] - 36:22
**note** [1] - 68:10
**notes** [1] - 68:15
**nothing** [1] - 52:9
**notice** [5] - 16:2, 32:1, 34:2, 49:6, 50:1
**noticed** [2] - 14:14, 16:2
**notification** [4] - 32:3, 32:10, 48:16, 49:6
**November** [1] - 4:20
**nudged** [1] - 47:12
**number** [12] - 6:11, 6:12, 6:14, 6:16, 6:21, 18:17, 28:7, 28:22, 53:16, 59:11, 66:19
**nurse** [3] - 34:6, 35:20, 35:22

## O

**objection** [2] - 3:20, 41:21
**objective** [1] - 47:3
**obligation** [4] - 41:17, 41:23, 42:2, 47:8
**observed** [1] - 23:3
**obviously** [2] - 34:13, 34:14
**occasion** [1] - 22:18

**occasions** [3] - 19:17, 56:21, 56:22
**occur** [3] - 23:23, 25:15, 35:24
**occurred** [8] - 23:23, 37:2, 38:10, 39:6, 40:13, 44:10, 46:14, 48:5
**occurring** [1] - 39:8
**OF** [3] - 1:6, 72:3, 72:4
**office** [9] - 6:2, 6:19, 11:13, 11:15, 25:13, 25:14, 34:23, 34:24, 48:25
**official** [1] - 14:24
**officially** [7] - 13:19, 14:8, 15:6, 16:13, 16:15, 25:24
**often** [4] - 15:22, 23:1, 59:25, 66:16
**oftentimes** [3] - 19:3, 60:6, 60:7
**onboard** [1] - 11:1
**once** [2] - 57:10, 59:3
**one** [28] - 7:23, 8:14, 8:18, 14:17, 14:23, 16:8, 17:18, 20:9, 21:17, 22:14, 27:4, 33:20, 42:17, 46:16, 49:11, 49:23, 57:14, 59:18, 60:4, 60:6, 60:8, 60:22, 65:12, 65:14, 66:1, 66:23, 68:6
**ones** [2] - 62:18
**open** [5] - 5:8, 45:15, 45:18
**opened** [1] - 45:18
**Opportunity** [1] - 3:8
**OPPORTUNITY** [1] - 1:1
**oral** [1] - 72:6
**Oral** [1] - 1:10
**otherwise** [2] - 31:2, 55:2
**outcome** [1] - 72:11
**outside** [6] - 22:1, 22:7, 22:13, 23:3, 34:23, 34:24
**overlapping** [1] - 40:7
**own** [1] - 58:9

## P

**p.m** [2] - 1:14, 71:3
**page** [9] - 31:7, 32:17, 49:13, 49:16, 53:8, 66:2, 66:7, 66:8, 66:11
**PAGE** [1] - 2:19

**paper** [1] - 10:9
**papers** [5] - 10:3, 10:6, 10:10, 10:12, 10:14
**paperwork** [2] - 14:8, 14:22
**parameters** [1] - 14:18
**parent** [1] - 42:17
**part** [2] - 15:22, 63:5
**participating** [1] - 48:21
**particular** [1] - 54:22
**particularly** [2] - 21:18, 57:13
**parties** [2] - 72:10, 72:11
**parts** [2] - 5:3, 5:4
**party** [1] - 47:3
**past** [3] - 39:25, 40:24, 41:2
**PCs'ing** [1] - 68:9
**PDF** [1] - 5:9
**people** [18] - 14:21, 20:1, 20:10, 26:17, 28:7, 34:9, 34:23, 39:23, 42:17, 44:18, 52:10, 53:23, 57:14, 59:14, 60:7, 64:4, 66:16, 67:4
**performance** [1] - 56:16
**perhaps** [1] - 27:13
**period** [13] - 14:19, 14:20, 18:10, 19:10, 19:11, 19:14, 19:15, 20:2, 20:4, 22:4
**person** [2] - 36:1, 67:19
**person's** [1] - 29:4
**personal** [3] - 63:12, 64:5, 66:20
**Phipps** [2] - 13:25, 14:6
**Phone** [1] - 2:11
**phone** [16] - 5:17, 6:21, 6:22, 10:7, 10:9, 23:14, 23:18, 24:3, 24:10, 26:14, 34:1, 44:21, 45:8, 45:13, 48:23, 59:6
**phonetic** [1] - 60:25
**photograph** [1] - 34:16
**physical** [4] - 39:17, 39:19, 39:22, 47:20
**physics** [2] - 61:21
**picked** [2] - 9:19, 11:5
**picture** [3] - 22:24, 34:2
**place** [5] - 14:8, 15:6,

23:16, 24:8, 68:6
**places** [2] - 12:24, 22:24
**plan** [3] - 14:8, 14:24, 23:19
**planned** [1] - 28:19
**planning** [1] - 32:7
**plans** [1] - 53:25
**play** [1] - 34:22
**pleasant** [1] - 2:6
**plenty** [1] - 4:1
**point** [6] - 3:15, 3:19, 12:24, 51:16, 62:9, 68:13
**police** [2] - 52:16, 52:20
**policy** [14] - 21:22, 21:23, 25:22, 25:23, 26:2, 26:8, 26:12, 26:14, 26:24, 28:25, 42:3, 42:4, 54:15, 54:17
**pose** [1] - 67:3
**position** [1] - 54:12
**positions** [1] - 9:22
**possible** [4] - 17:14, 43:5, 60:1, 60:9
**possibly** [1] - 60:24
**post** [1] - 66:17
**postings** [1] - 66:19
**preparation** [3] - 19:11, 21:3, 60:5
**preparations** [1] - 60:1
**prepare** [3] - 4:24, 5:13, 59:18
**prepared** [2] - 20:13, 20:24
**preparing** [2] - 58:17, 59:21
**preps** [1] - 60:9
**PRESENT** [1] - 2:13
**present** [5] - 22:12, 24:2, 40:13, 62:11, 64:1
**pressure** [1] - 62:22
**pretty** [1] - 47:18
**previous** [1] - 26:7
**previously** [3] - 16:16, 21:9, 64:19
**Prince** [1] - 8:13
**prince** [1] - 8:17
**principal** [14] - 4:16, 4:19, 7:20, 8:1, 13:21, 16:21, 17:15, 21:13, 21:14, 41:24, 47:8, 54:19, 55:16
**private** [1] - 66:21
**probationary** [1] - 58:3

**problem** [2] - 68:23, 68:25
**process** [1] - 42:21
**professional** [2] - 38:24, 38:25
**prohibition** [2] - 54:10, 54:15
**protect** [1] - 50:22
**protected** [2] - 7:23, 47:4
**protecting** [2] - 51:2, 51:3
**protection** [1] - 50:24
**provide** [4] - 46:18, 48:2, 48:11, 52:16
**provided** [1] - 5:5
**psychology** [1] - 4:22
**pull** [1] - 16:9
**pursuant** [1] - 72:8
**put** [5] - 5:4, 14:17, 23:16, 24:7, 45:14

## Q

**qualified** [2] - 60:20, 61:17
**qualify** [3] - 6:14, 16:15, 22:5
**questioned** [1] - 50:23
**questioning** [1] - 41:9
**questionnaire** [2] - 31:5, 64:10
**questionnaires** [1] - 64:11
**questions** [5] - 3:15, 4:7, 41:9, 70:7, 70:8
**quite** [2] - 15:14, 15:20

## R

**race** [1] - 7:24
**raising** [1] - 32:21
**rather** [1] - 45:10
**RCW** [1] - 72:8
**read** [6] - 4:25, 5:3, 5:8, 5:11, 7:3, 40:17
**really** [11] - 12:11, 14:13, 23:13, 24:9, 25:2, 26:22, 29:13, 37:9, 38:17, 41:1, 68:24
**reapply** [1] - 9:13
**reason** [3] - 19:7, 25:16, 25:19
**reasonable** [10] - 13:18, 14:2, 14:23, 15:4, 17:11, 17:25, 20:14, 20:20, 21:17, 23:7

**reasons** [1] - 15:13
**reassigned** [3] - 57:6, 57:12, 67:9
**reassigning** [1] - 57:25
**Rebecca** [1] - 68:9
**recalling** [1] - 29:19
**receipt** [1] - 48:16
**receive** [4] - 22:11, 32:1, 48:23, 49:5
**received** [6] - 7:18, 31:22, 32:10, 42:17, 50:1, 52:13
**receiving** [1] - 32:3
**recently** [3] - 38:16, 38:18, 67:9
**reception** [1] - 45:9
**recess** [3] - 30:25, 62:8, 68:19
**recitation** [1] - 46:14
**recognize** [1] - 6:22
**recollection** [1] - 48:9
**record** [6] - 4:4, 4:5, 5:2, 30:19, 48:1, 70:20
**recuse** [2] - 55:1, 55:5
**recusing** [2] - 55:15, 55:18
**reference** [1] - 49:7
**referenced** [1] - 48:4
**referred** [1] - 34:6
**referring** [2] - 33:5, 49:24
**refused** [2] - 52:15, 52:18
**regard** [1] - 56:17
**related** [2] - 8:2, 64:19
**relates** [4] - 26:8, 32:2, 55:2, 55:25
**relating** [1] - 62:25
**relationship** [9] - 38:7, 38:14, 38:24, 38:25, 44:13, 46:25, 56:19, 64:20, 64:24
**relative** [1] - 72:10
**rely** [3] - 44:18, 44:24, 45:6
**remember** [22] - 6:18, 7:24, 9:24, 10:21, 10:25, 16:13, 18:18, 24:6, 24:10, 29:14, 33:16, 34:7, 34:12, 35:7, 35:22, 35:23, 37:21, 39:21, 40:17, 40:18, 49:4, 62:23
**remembered** [2] - 13:10, 42:19
**remove** [1] - 57:21
**report** [15] - 5:5, 7:4, 33:9, 40:23, 41:1,

41:15, 41:17, 41:24, 42:6, 44:24, 47:19, 52:6, 52:7, 53:24, 63:10
**reported** [9] - 39:4, 39:9, 39:15, 40:2, 40:23, 41:12, 42:13, 42:18, 47:23
**Reporter** [3] - 1:23, 72:6, 72:17
**reporting** [1] - 57:18
**reports** [4] - 22:11, 62:25, 64:8, 64:9
**represent** [1] - 3:7
**Representative** [1] - 2:4
**reprisal** [2] - 32:23, 53:9
**request** [1] - 64:17
**requested** [1] - 64:16
**requests** [1] - 66:15
**require** [1] - 28:12
**required** [10] - 21:18, 27:4, 27:14, 27:25, 28:3, 28:20, 29:10, 30:12, 30:15, 30:16
**respect** [1] - 58:20
**responsible** [2] - 67:14, 67:16
**result** [1] - 67:4
**review** [4] - 10:14, 36:13, 62:25, 68:15
**reviewing** [1] - 67:25
**Robin** [2] - 48:23, 49:2
**rode** [1] - 37:17
**RODMAN** [2] - 1:12, 3:1
**Rodman** [13] - 4:9, 7:6, 9:1, 30:20, 31:1, 31:25, 41:7, 54:25, 62:9, 67:8, 68:15, 68:20, 70:25
**rodman** [4] - 3:16, 24:21, 70:12, 70:19
**ROI** [2] - 5:9, 31:8
**role** [2] - 54:20, 55:15
**room** [5] - 35:12, 56:20, 56:21, 57:1, 63:11
**Rules** [1] - 72:13
**rules** [1] - 14:17
**run** [1] - 19:8

---

**S**

---

**saw** [4] - 14:8, 34:2, 38:1, 59:15
**schedule** [22] - 13:20, 14:16, 14:19, 15:24, 18:14, 18:22, 18:25,

19:7, 19:8, 19:9, 19:13, 20:13, 20:23, 21:3, 58:14, 58:18, 59:16, 60:8, 61:18
**scheduled** [4] - 17:21, 18:5, 18:23, 20:4
**schedules** [1] - 56:15
**scheduling** [2] - 14:18, 58:11
**school** [28] - 8:5, 9:2, 9:5, 10:19, 10:23, 11:23, 13:4, 16:3, 19:16, 23:24, 37:8, 45:10, 50:10, 50:15, 50:22, 54:11, 54:19, 54:25, 58:24, 59:9, 61:10, 62:10, 64:25, 65:7, 66:5, 67:13, 68:22, 69:24
**School** [3] - 4:16, 4:19, 9:20
**school's** [2] - 9:6
**Schools** [1] - 2:10
**schools** [3] - 4:20, 37:16, 37:19
**science** [1] - 59:12
**scratches** [3] - 34:3, 34:12, 34:15
**second** [2] - 19:14, 19:15, 68:7
**secretary** [13] - 11:5, 11:12, 11:14, 13:25, 16:7, 16:17, 17:1, 21:7, 21:10, 24:23, 25:1, 25:4, 68:10
**secretary's** [1] - 11:8
**see** [11] - 11:16, 30:2, 31:19, 33:2, 33:24, 34:4, 34:11, 34:16, 35:12, 38:6, 42:25, 43:4, 44:4, 44:15, 44:23, 45:18, 49:18, 49:23, 49:24
**seeing** [3] - 14:22, 35:22, 42:18
**seek** [2] - 52:20, 56:7
**seeking** [1] - 53:23
**selling** [2] - 34:9, 34:10
**SELZ** [4] - 2:9, 70:10, 70:19, 70:24
**Selz** [7] - 3:19, 5:15, 5:19, 5:20, 41:8, 70:8, 70:23
**semester** [1] - 19:8
**semesters** [1] - 18:24
**sense** [2] - 19:15, 45:23
**sensitivity** [1] - 62:17
**sent** [6] - 5:1, 5:7, 5:9,

32:23, 53:10, 55:9
**sentence** [1] - 29:18
**serve** [4] - 47:1, 53:1, 53:4, 57:15
**served** [2] - 9:4, 69:12
**serving** [2] - 7:19, 55:19
**seven** [1] - 18:9
**several** [1] - 6:1
**share** [2] - 37:16, 38:14
**shares** [1] - 66:16
**SHAWN** [2] - 1:12, 3:1
**shocked** [2] - 40:16, 40:19
**shook** [2] - 40:5, 48:7
**short** [1] - 9:22
**shoulder** [1] - 47:12
**showed** [3] - 34:20, 34:25, 49:3
**showing** [1] - 27:24
**shown** [1] - 48:15
**shows** [2] - 66:4, 66:19
**shut** [6] - 33:13, 42:23, 43:15, 43:20, 45:13, 45:17
**shuts** [1] - 45:11
**shutting** [1] - 42:19
**sick** [6] - 24:25, 25:9, 26:21, 27:7, 28:9, 29:11
**side** [2] - 62:14, 62:16
**signature** [3] - 31:15, 31:17, 72:12
**signed** [2] - 48:16, 72:13
**simply** [2] - 30:6, 41:14
**slammed** [1] - 46:6
**slip** [2] - 29:21, 29:24
**slips** [1] - 28:12
**Smithson** [76] - 3:7, 5:9, 8:13, 8:15, 13:15, 13:17, 15:13, 16:7, 17:2, 19:10, 20:14, 22:21, 22:23, 23:8, 23:17, 26:8, 26:25, 27:3, 28:3, 30:14, 31:2, 32:2, 32:6, 32:11, 35:13, 35:23, 36:4, 37:3, 39:4, 39:8, 40:23, 41:12, 42:13, 42:20, 42:23, 43:6, 43:10, 43:11, 44:3, 44:8, 44:12, 44:20, 45:16, 45:24, 46:4, 46:11, 46:13, 46:17, 46:18, 47:4, 47:11, 47:19,

48:2, 48:17, 48:20, 48:24, 50:2, 51:6, 52:12, 53:2, 53:22, 55:6, 55:14, 56:8, 56:25, 58:20, 59:10, 59:16, 60:6, 61:13, 61:23, 62:1, 63:10, 63:18, 64:15, 64:22
**SMITHSON** [2] - 1:3, 2:14
**Smithson's** [16] - 19:22, 22:14, 22:16, 23:3, 35:19, 36:2, 43:21, 46:6, 50:18, 54:3, 56:11, 56:20, 58:3, 62:12, 67:10, 70:16
**snow** [1] - 26:21
**social** [2] - 64:24, 65:3
**socially** [5] - 38:22, 38:23, 65:1, 65:19, 66:1
**someone** [5] - 5:7, 10:6, 19:2, 19:5, 19:17, 19:21, 26:20, 35:25, 40:19, 40:20, 51:1, 60:1, 60:2, 66:16
**sometime** [1] - 10:20
**sometimes** [4] - 3:25, 7:22, 9:20, 19:13
**son** [1] - 9:15
**sorry** [26] - 6:24, 7:13, 8:12, 8:14, 8:20, 8:22, 14:10, 18:13, 26:2, 29:17, 37:23, 41:4, 41:6, 43:2, 46:3, 49:14, 51:20, 57:2, 57:9, 57:10, 59:5, 63:6, 67:1, 67:3, 67:15, 68:2
**sought** [1] - 52:16
**sounds** [1] - 10:2
**South** [1] - 2:6
**space** [5] - 4:1, 4:2, 47:20, 63:12, 64:5
**spacing** [1] - 8:17
**Speakers** [1] - 40:7
**speaking** [1] - 36:24
**special** [3] - 4:14, 4:22, 67:18
**specific** [6] - 10:22, 30:5, 37:13, 44:17, 44:22, 46:18
**specifically** [14] - 7:24, 22:9, 22:17, 22:20, 22:25, 23:5, 23:17, 24:5, 24:6, 25:7, 25:8, 28:17, 29:15

**specifics** [2] - 27:6, 67:20
**SPED** [3] - 56:14, 57:15, 68:8
**spell** [1] - 29:4
**spelling** [1] - 65:18
**Spencer** [2] - 1:23, 72:17
**spinal** [1] - 62:23
**spoken** [6] - 5:20, 5:25, 6:2, 6:3, 6:7, 50:25
**sponsor** [1] - 37:7
**sponsored** [3] - 37:7, 37:12, 37:18
**spring** [4] - 15:5, 15:8, 15:10, 15:12
**springtime** [1] - 14:13, 14:15
**spy** [1] - 53:23
**spying** [1] - 57:18
**ss** [1] - 72:3
**stack** [1] - 10:10
**staff** [8] - 28:8, 32:25, 37:9, 42:18, 47:20, 53:12, 55:4, 66:5
**standing** [4] - 44:3, 44:12, 44:15, 45:5
**start** [3] - 18:8, 19:16, 20:25
**started** [8] - 4:9, 4:13, 9:7, 9:9, 9:10, 10:22, 17:23, 69:18
**STATE** [1] - 72:3
**State** [2] - 72:5, 72:17
**statement** [18] - 26:15, 39:1, 39:18, 42:16, 43:1, 44:1, 46:15, 46:19, 48:2, 48:11, 48:15, 51:19, 51:25, 52:16, 52:17, 59:15, 59:24, 60:10
**statements** [2] - 42:17, 70:1
**STATES** [1] - 1:1
**stayed** [1] - 9:16
**step** [1] - 45:10
**steps** [5] - 40:3, 54:24, 57:5, 57:12, 57:16
**still** [7] - 11:10, 12:19, 45:12, 45:15, 45:16, 45:17, 60:19
**strike** [1] - 41:21
**Stuart** [3] - 65:14, 65:18, 65:25
**STUART** [1] - 65:18
**stuck** [2] - 26:21, 27:13
**students** [4] - 19:12, 22:6, 22:13, 23:3

**sub** [3] - 11:1, 19:17, 68:7
**subbed** [1] - 9:20
**subject** [5] - 7:7, 39:5, 49:21, 55:12, 63:11
**subjected** [5] - 13:7, 39:9, 39:17, 50:17, 51:6
**subs** [4] - 9:21, 11:5, 12:22, 56:13
**substance** [1] - 25:8
**substitute** [9] - 9:3, 9:12, 10:1, 10:24, 11:3, 18:6, 18:11, 18:25, 65:24
**substitutes** [2] - 9:8, 12:25
**substituting** [6] - 11:25, 12:3, 12:13, 13:1, 13:2, 63:24
**suffered** [1] - 48:4
**Suite** [1] - 2:5
**supervise** [2] - 54:14, 69:23
**supervised** [2] - 23:4, 56:14
**supervises** [1] - 69:1
**supervision** [1] - 69:22
**supervisor** [6] - 41:18, 41:24, 53:1, 53:4, 55:16, 69:13
**supervisory** [2] - 54:12, 54:20
**suppose** [1] - 12:4
**supposed** [1] - 47:3
**surprised** [8] - 33:15, 51:8, 51:14, 51:15, 51:17, 51:18, 51:21, 51:22
**swim** [1] - 65:21
**sworn** [2] - 3:2, 72:8
**symptoms** [1] - 62:20
**Syretta** [1] - 25:6

### T

**Tamica** [3] - 3:7, 8:13, 8:15
**TAMICA** [2] - 1:3, 2:14
**taught** [2] - 8:19, 61:9
**Taylor** [1] - 65:12
**teach** [10] - 19:12, 38:3, 60:2, 60:5, 60:11, 60:20, 61:1, 61:17, 61:20, 61:22
**teacher** [17] - 4:15, 10:24, 11:3, 13:9, 22:8, 22:19, 27:24, 28:18, 30:10, 35:25,

54:22, 56:16, 60:4, 61:24, 62:2, 62:3, 65:16
**teachers** [24] - 8:7, 8:8, 13:6, 21:17, 27:12, 50:14, 50:17, 54:25, 55:17, 55:19, 56:8, 57:15, 59:8, 59:12, 59:25, 61:12, 64:21, 64:24, 65:7, 66:5, 68:12, 69:23, 70:2
**teaches** [2] - 61:15, 61:21
**teaching** [11] - 10:18, 53:25, 58:21, 58:22, 58:23, 59:9, 59:13, 59:14, 59:16, 61:12, 65:24
**team** [1] - 65:21
**teams** [1] - 37:18
**Telephone** [1] - 2:6
**telephone** [3] - 3:24, 24:14, 26:25
**Telephonic** [1] - 1:10
**ten** [3] - 19:25, 30:21, 30:22
**tenure** [1] - 13:11
**terms** [1] - 66:1
**test** [2] - 19:9
**testified** [3] - 7:9, 16:17, 21:9
**testify** [1] - 72:8
**testimony** [16] - 5:2, 6:4, 10:2, 15:3, 15:19, 16:12, 17:12, 17:23, 18:3, 20:11, 20:17, 21:2, 47:24, 48:14, 48:19, 51:4
**testing** [4] - 18:12, 18:24, 19:8, 19:13
**THE** [8] - 2:3, 2:8, 30:23, 62:7, 68:18, 70:11, 70:13, 71:2
**themselves** [2] - 40:20, 70:4
**thereafter** [1] - 53:5
**thinking** [3] - 6:12, 37:24, 51:2
**third** [1] - 47:3
**three** [2] - 24:2, 65:5
**throughout** [1] - 22:18
**title** [1] - 5:2
**took** [9] - 9:13, 10:24, 34:1, 34:22, 50:4, 50:6, 50:9, 50:10, 61:2
**top** [1] - 49:24
**touch** [2] - 7:21, 63:18
**touched** [1] - 63:16

**touching** [2] - 63:12, 64:5
**traffic** [1] - 27:13
**training** [2] - 7:18, 7:25
**trainings** [1] - 7:21
**transcribed** [1] - 72:7
**transcript** [2] - 72:9, 72:9
**transfer** [1] - 9:18
**treated** [2] - 39:24, 40:24
**Tronge** [8] - 23:14, 23:23, 24:4, 24:5, 25:18, 26:13, 26:15, 27:1
**true** [18] - 16:18, 22:3, 23:6, 27:11, 27:15, 39:6, 42:5, 42:22, 43:21, 44:24, 47:5, 47:7, 47:11, 55:12, 56:23, 59:1, 70:15, 72:9
**truthfully** [1] - 72:9
**try** [3] - 3:25, 30:8, 59:7
**trying** [13] - 3:21, 16:11, 24:22, 31:5, 33:16, 42:8, 45:3, 45:7, 49:25, 58:15, 60:19, 65:4, 65:13
**turn** [1] - 31:7
**turning** [1] - 10:6
**two** [8] - 23:9, 29:22, 34:3, 36:6, 36:8, 37:16, 37:22
**type** [1] - 7:25
**typical** [2] - 18:22
**typically** [3] - 15:25, 18:8, 19:1

### U

**unaware** [1] - 17:24
**under** [4] - 19:4, 29:9, 63:22, 72:7
**undersigned** [1] - 72:5
**understood** [6] - 3:18, 15:17, 15:18, 25:18, 25:21, 39:15
**unexpectedly** [1] - 28:19
**UNITED** [1] - 1:1
**up** [11] - 6:25, 9:14, 9:17, 9:19, 20:12, 23:9, 34:22, 35:13, 38:2, 41:19, 69:15
**US** [1] - 1:6
**utilize** [1] - 10:12

### V

**various** [2] - 48:3, 66:20
**verbal** [2] - 25:12, 25:13
**verbs** [1] - 53:16
**viewed** [1] - 50:13
**Villareal** [44] - 5:25, 11:24, 12:3, 12:13, 16:6, 16:17, 16:20, 23:7, 23:12, 23:18, 24:1, 24:11, 24:13, 24:23, 25:5, 25:7, 25:11, 26:13, 26:16, 32:5, 32:9, 32:24, 36:12, 36:20, 40:25, 41:15, 42:7, 50:14, 50:17, 53:10, 53:24, 57:20, 57:24, 58:7, 58:12, 58:16, 60:14, 60:25, 62:10, 68:3, 69:3, 69:4, 69:12, 70:17
**Vilseck** [13] - 1:15, 4:16, 9:19, 10:17, 10:18, 13:6, 13:12, 14:25, 37:15, 37:23, 38:2, 38:5
**violated** [1] - 47:20
**violating** [1] - 64:5
**Vs** [1] - 1:5

### W

**WA** [1] - 72:18
**walked** [1] - 23:13
**walking** [1] - 40:15
**Washington** [4] - 68:9, 72:5, 72:13, 72:17
**WASHINGTON** [2] - 1:1, 72:3
**Washington's** [1] - 68:11
**ways** [1] - 70:4
**weather** [1] - 27:13
**week** [3] - 5:1, 5:6, 6:10, 6:19, 64:10, 64:13, 68:10
**weigh** [1] - 45:4
**WHEREOF** [1] - 72:12
**White** [1] - 25:6
**white** [1] - 11:15
**White's** [1] - 25:14
**wife** [34] - 9:1, 10:18, 11:25, 12:20, 13:3, 38:14, 38:22, 54:2, 54:10, 54:11, 55:3, 55:7, 55:11, 56:1,

56:15, 56:19, 57:6,
57:12, 57:13, 57:21,
57:25, 64:23, 65:24,
66:24, 67:5, 67:9,
67:18, 68:10, 68:21,
69:2, 69:5, 69:9,
70:1, 70:15
**wife's** [4] - 12:2,
12:13, 64:20, 66:2
**Winnowing** [1] - 2:5
**wise** [1] - 31:4
**witness** [5] - 3:1, 6:7,
7:15, 72:6, 72:8
**WITNESS** [7] - 30:23,
62:7, 68:18, 70:11,
70:13, 71:2, 72:12
**witnessed** [1] - 56:9
**wondering** [2] - 46:22,
67:10
**words** [2] - 39:22,
42:9
**workplace** [3] - 39:5,
39:10, 67:6
**works** [3] - 66:12,
66:18, 69:2
**worried** [1] - 35:19
**writing** [3] - 26:4,
26:6, 27:19
**written** [3] - 25:24,
26:2, 46:19
**wrote** [1] - 46:16

## Y

**year** [19] - 4:17, 7:25,
8:18, 8:19, 9:15,
9:25, 10:19, 10:23,
11:21, 11:23, 16:3,
17:16, 17:17, 20:18,
23:10, 23:24, 53:3,
53:7, 58:19
**years** [6] - 4:11, 23:9,
37:20, 37:22, 65:5,
65:6
**Young** [2] - 8:13, 8:17
**younger** [1] - 65:25
**yourself** [6] - 25:5,
28:6, 38:9, 55:1,
55:15, 70:8

## Z

**Zoya** [2] - 1:23, 72:17

SMITHSON
EXHIBIT
SR-1
11/20/2022

# In the Matter Of:

*TAMICA J. SMITHSON*

*-v-*

*LLOYD AUSTIN III*

---

## Shawn Rodman

*August 26, 2022*

---



DEPOSITION SERVICES

800.869.0873 | www.StewartRichardson.com

Reporting Driven by Excellence — Since 1975

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

```
 1                UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF INDIANA
 2                  INDIANAPOLIS DIVISION

 3
     TAMICA J. SMITHSON,            )
 4                                  )
                    Plaintiff,      )
 5                                  )
          -v-                       )        Case No.
 6                                  )   1:21-CV-02193-JRS-MPB
     LLOYD AUSTIN III,              )
 7   Secretary, Department of       )
     Defense,                       )
 8                                  )
                    Defendant.      )
 9

10

11

12            The videotaped deposition upon oral

13   examination of SHAWN RODMAN, a witness produced and

14   sworn via videoconference before me, Elizabeth Taylor

15   Culiver, RPR, a Notary Public in and for the County of

16   Vanderburgh, State of Indiana, taken on behalf of the

17   Plaintiff with all participants appearing via

18   videoconference on August 26, 2022, at 10:41 a.m.,

19   pursuant to the Federal Rules of Civil Procedure.

20

21

22

23            STEWART RICHARDSON & ASSOCIATES
               Registered Professional Reporters
24                    (800) 869-0873

25
```

```
 1                        APPEARANCES

 2
        (All Participants Appearing Via Videoconference)
 3

 4   FOR THE PLAINTIFF:

 5            Tamica J. Smithson, Esq.
              CMR 411 Box 3668
 6            AOP, AE  09112
              tamica.smithson@yahoo.com
 7

 8   FOR THE DEFENDANT:

 9            Rachana N. Fischer, Esq.
              OFFICE OF THE UNITED STATES ATTORNEY
10            10 West Market Street
              Suite 2100
11            Indianapolis, IN  46204
              rachana.fischer@usdoj.gov
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      INDEX OF EXAMINATION
                                                        PAGE
 2
     EXAMINATION
 3
     QUESTIONS BY MS. SMITHSON                              5
 4

 5
                       INDEX OF EXHIBITS
 6

 7       NUM.              DESCRIPTION                   PAGE

 8   Exhibit R2    Email to Shawn Rodman from             29
                   Tamika Smithson dated January
 9                 14, 2022 and Email to Tamika
                   Smithson from Shawn Rodman dated
10                 January 18, 2022

11   Exhibit R3    Email to Michelle Jones from          32
                   Tamika Smith dated September 23,
12                 2021

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1       THE REPORTER:  Do all counsel stipulate that

 2  the witness located in Mons, Belgium, can be sworn

 3  in remotely by the court reporter?

 4       MS. SMITHSON:  Yes.

 5       THE REPORTER:  Ms. Fischer, I don't think I

 6  heard your answer.

 7       MS. FISCHER:  Yes.

 8       THE REPORTER:  Okay.  I just wanted to make

 9  sure I could hear your audio.

10       My name is Beth Culiver, an associate of

11  Stewart Richardson, 915 Main Street, Suite 405,

12  Evansville, Indiana.  Today's date is August 26th,

13  2022.  The time is 10:41 a.m. Central Standard

14  Time.

15       This deposition is being held via Zoom.  The

16  deponent is Shawn Rodman.

17       Will counsel please identify themselves or any

18  persons present with you for the record?

19       MS. SMITHSON:  Tamica Smithson, pro se

20  plaintiff against Lloyd Austin, III.  No one is

21  with me.

22       MS. FISCHER:  Rachana Fischer on behalf of

23  defendant, Lloyd Austin, and no one is present with

24  me.

25

```
 1                       SHAWN RODMAN,

 2   having been first duly sworn or affirmed to tell the

 3   truth, the whole truth, and nothing but the truth, was

 4   examined and testified as follows:

 5   EXAMINATION

 6   QUESTIONS BY MS. SMITHSON

 7   Q  Mr. Rodman, could you please state and spell your

 8      last name?  I'm sorry.  Could you please state and

 9      spell your name for the record?

10   A  First and last name?

11   Q  First and last name.

12   A  Okay.  Shawn Rodman, S-h-a-w-n, R-o-d-m-a-n.

13   Q  Have you ever been known by a different name?

14   A  No.

15   Q  I'm a pro se plaintiff in a federal lawsuit against

16      Lloyd Austin, III, and I'll be asking you a few

17      questions to determine if there's information that

18      you may have about my case.  I'll go over some

19      rules for the deposition.  The oath that the court

20      reporter administered to you holds the same weight

21      as if you were testifying in court.  You have the

22      same obligation to give truthful statements.  Do

23      you understand?

24   A  Yes, ma'am.

25   Q  The court reporter will transcribe everything that
```

```
 1        we say.  I'll try to -- I'll try not to interrupt
 2        you as you are answering questions.  I ask that you
 3        not interrupt me while I'm asking questions.  This
 4        makes it easier for the court reporter to document
 5        what we are saying.  Do you understand?
 6   A    Yes, ma'am.
 7   Q    The court reporter cannot transcribe uh-huhs or
 8        nods, so please make verbal statements.  Do you
 9        understand?
10   A    Yes, ma'am.
11   Q    I won't take long for your deposition, but if you
12        do need to take a break, please let me know.  I
13        only ask that you completely answer the last
14        question that I presented before we break.  Do you
15        understand?
16   A    Yes.
17   Q    Are you currently taking any medications or drugs
18        that would affect your testimony today?  If so,
19        what medications or drugs?
20   A    No, ma'am.
21   Q    Is there any reason that you can think of that
22        makes this a bad day for a deposition?
23   A    No.
24   Q    Is there any point -- if at -- if there is a point
25        -- excuse me.  If there is ever a point that you
```

```
 1       are unable to testify accurately and truthfully,
 2       please let me know.
 3    A  Okay.
 4    Q  Do you understand?
 5    A  Yes, I do.
 6    Q  Have you ever been deposed before?
 7    A  Yes.
 8    Q  When was that?
 9    A  I don't know the date, to be honest with you.
10       Probably a year or so ago.
11    Q  And what was the nature of the case?
12    A  It was your case.  That was the last thing -- the
13       claims you were making against the -- I guess the
14       government or the agency.
15    Q  Have you been deposed anytime other than that?
16    A  No, ma'am.
17    Q  Have you ever testified in court or any other
18       proceeding?
19    A  No, ma'am, other than my previous job with
20       corrections I had to testify and make statements
21       for parole boards.  That was a long time ago.
22    Q  Have you ever been charged or convicted with a
23       crime?
24    A  No.
25    Q  Of a crime?
```

```
 1   A   No.
 2   Q   Did you review any documents concerning this case
 3       to prepare for the deposition?
 4   A   I looked over what was sent to me.  Some of the
 5       emails and other -- I think the pre-deposition
 6       questions I got the last time, but I didn't -- I
 7       mean, I just looked them over.  That was it.
 8   Q   Okay.  Have you met with counsel for the other side
 9       to discuss this deposition?
10   A   I met with Rachana just the other day.  She just
11       basically gave me what was going to happen.  I
12       mean, gave me the time and place and that's about
13       it.
14           MS. FISCHER:  I'd ask that you not share
15       anything we discussed --
16           THE WITNESS:  Okay.
17           MS. FISCHER:  -- and assert attorney-client
18       privilege.
19           THE WITNESS:  Okay.
20   Q   Have you met with anyone else?
21   A   No.
22   Q   Have you signed any agreements or made any verbal
23       agreements with anyone or agency about this
24       deposition?
25   A   No.
```

1   Q   And did you speak with anyone else about this

2       deposition?

3   A   No.

4   Q   Okay.  Have you ever filed an EEO complaint in the

5       workplace?

6   A   No.

7   Q   Who is your employer?

8   A   DoDEA.

9   Q   So you work for the same agency that I work for?

10  A   Yes, ma'am.

11  Q   How long have you worked for DoDEA?

12  A   Since 1998.

13  Q   Okay.  And what is your current position?

14  A   I'm the principal at SHAPE American High School in

15      Belgium.

16  Q   And how long have you been there?

17  A   Three weeks.  Actually, I started the end of last

18      year in June, but I was gone most of the summer, so

19      really just since the beginning of the school year.

20  Q   And where did you work before that?

21  A   Vilseck High School.

22  Q   And that's where I work.  That's my home school.

23      So you worked with me?

24  A   Yes.

25  Q   How long did you work at Vilseck High School?

```
 1   A   From August of 2015 when I was hired to just last
 2       year.
 3   Q   Okay.  And how long did you work with me?
 4   A   I'm not -- I guess just -- I've got to think
 5       because I was out of the -- I'm trying to think
 6       when -- so 2015 until you went to virtual school
 7       around COVID, so 2020.  But I was gone for part --
 8       when COVID hit, I was the interim principal at
 9       Hohenfels High School but still officially
10       stationed at Vilseck.
11   Q   How often did we have a chance to interact with one
12       another?
13   A   I really couldn't say.  Probably at least maybe
14       once -- once a week in some way or another.
15       Sometimes it was just email, but I don't know if
16       there was an average.  I was always just doing what
17       I needed to do in school.  If that involved your
18       classroom, then I went, but I really don't know how
19       to answer that.
20   Q   How would you describe our interactions?  Were they
21       pleasant?
22   A   Yeah.
23   Q   Are you married?
24   A   Yes.
25   Q   Do you have children?
```

```
 1   A   Yes.

 2   Q   How old are they?

 3   A   28, 24, and 17.

 4   Q   What is your race?

 5   A   I'm Caucasian, white.

 6   Q   Did I ask you what year you began working for

 7       DoDEA?

 8   A   Yes.  1998.

 9   Q   On what date did you get notification that you

10       would be in this new position?

11   A   Early March.  I want to say March 11th or 12th,

12       somewhere in there.  That was the -- when I got my

13       first offer, and then it took a while to process

14       all that.

15   Q   Okay.  How did you feel about the promotion?

16   A   Honestly, mixed emotions.  I liked Vilseck, but it

17       was time to go.  It's always tough to move the

18       family and -- so mixed, but I'm happy to be here.

19   Q   And that was my next question.  How did you feel

20       about the relocation?

21   A   It's getting better.

22   Q   What are your current responsibilities as a

23       principal?

24   A   Oh, how long have you got?  It's immense.  All the

25       staffing, all the budget.  I don't have an
```

1    assistant right now.  I sub classes because we're

2    eight teachers short.  Discipline for students,

3    managing the schedule, managing substitutes,

4    managing the office staff.  It's -- there's a lot.

5    Employee relations, all of those kind of things.

6  Q  How large is the school there?  How many students?

7  A  We just adjusted because we had some going to the

8    international school, but we're right in the 380

9    range, maybe just above 380.

10 Q  So you don't have an assistant principal.  That was

11   going to be my next question.

12 A  No.

13 Q  Are they getting one for you?

14 A  I hope so.  That's the plan.

15 Q  And what will be the responsibilities of your

16   assistant principal if you get one?

17 A  I'd probably have to talk to them and see who is

18   hired.  It really depends on what their strengths

19   are, what their experiences are.  For example, if

20   they have experience with special education, I

21   might have them manage that department.  So I

22   really have to talk to them to see what they're

23   comfortable with and if they have experience being

24   an assistant principal.

25 Q  Do the responsibilities of the assistant principal

```
 1        change when the principal is out of the building
 2        like, let's say, for a few days or a week?
 3    A   Yes and no.  I think you have to put up -- you
 4        know, deal with things that come in for the
 5        principal, if they come in for the principal.  So
 6        it just depends on what's brought to your
 7        attention, you know.  So it really depends on the
 8        situation and what the principal is comfortable
 9        with you dealing with.
10    Q   If the principal is away, does the assistant
11        principal assume the responsibilities of the
12        principal?
13    A   Not -- well, not all the responsibilities because,
14        for example, there are some things an assistant
15        can't do.  I can't sign payroll, for example, as
16        assistant principal.  So there are things that I
17        can't do -- or I couldn't do as an assistant
18        principal that I have to do now as a principal.  So
19        I can't authorize anything to be bought so -- as an
20        assistant, so there's certain things that just
21        can't be done.
22    Q   Let's go back to Vilseck High School.  What was
23        some of your responsibilities as the assistant
24        principal there?
25    A   Mostly -- during the first time I was there, I was
```

```
 1        involved in establishing the extra duty contracts.

 2        I didn't mention some of these things as

 3        responsibilities before, but there's just a lot.

 4        Extra duty contracts.  I did special education,

 5        student discipline, lunchroom monitoring.  I

 6        substituted in classes on occasion when teachers

 7        weren't there.  I did walk-throughs for teachers,

 8        managed all the athletics and supervised coaches,

 9        authorized those trips, authorized the security

10        checks for all of those trips, dealt a lot with

11        what was going on with command involving athletics

12        and facility usage, youth sports, other things like

13        that.  So that was mostly -- you know, and then

14        whatever else the principal had asked me to do at

15        some time.  They might ask me to go to a meeting,

16        you know, a command meeting or something like that,

17        but those were my major roles when I was there.

18             When Ms. Jones came, she wanted to go to the

19        special education meetings, so she did most of

20        those when she came.  I did the 504 plans and

21        things like that.

22   Q    Who is your current direct supervisor, first level

23        supervisor?

24   A    Teresa Moon.

25             THE REPORTER:  Could you say the last name
```

```
 1      again?
 2           THE WITNESS:  Moon.
 3           THE REPORTER:  Thank you.
 4  Q  Who was your -- Oh, I'm sorry.
 5           THE REPORTER:  No.  I just said thank you.
 6  Q  Who was your first -- who was your direct first
 7      level supervisor when you were the assistant
 8      principal at Vilseck High School?
 9  A  Last year, it was Dr. Jones.  Previous -- prior to
10      that, it was Mr. Villarreal.
11  Q  Okay.  And who was your second level supervisor
12      while you were the AP at Vilseck High School?
13  A  Melissa Hayes for the -- for the first time, and
14      then Hollie Becker, Dr. Becker was my second level
15      supervisor the last two years I believe that she
16      was there.
17  Q  Now, Ms. Hayes, she was in our building when she
18      was there.
19  A  Correct.
20  Q  In Vilseck High School, in the building.
21  A  And so was Dr. Becker, yes.
22  Q  She was here as well.  Okay.  I did not know
23      Dr. Becker.  So -- so she was also in the building.
24      In the same room as -- or office as Ms. Hayes?
25  A  They moved around.  Same area of the building.  The
```

```
 1        ISS staff and the community superintendent were in

 2        the same area of the building.

 3   Q    So the ISS was also in the building?

 4   A    Some of them.  For our area that were there, the

 5        math ISS, the literacy ISS, and the elementary or K

 6        through five math ISS were in there, and as well as

 7        the person responsible for assessment, she was

 8        upstairs, but in the same -- the chair OTC kind of

 9        section of the building.  There are vacant

10        classrooms there.  So...

11   Q    About how many faculty and staff were employed at

12        Vilseck High School?

13   A    I don't know.  I mean, I know the range is roughly

14        40, but it was -- we've gone up and down.  Roughly

15        between 40 and 50 with -- with all the secretaries

16        and teachers, SPED staff.  Probably a little more

17        than 50 if you include all the SPED staff and that

18        as well.

19   Q    If you can go back to the beginning of last year,

20        did that number increase or decrease -- or within

21        the last couple of years that you were at Vilseck

22        High School, did that number increase or decrease?

23   A    I want to say it stayed the same through COVID;

24        however, some teachers, yourself included, were on

25        our staff but were teaching not in our building.
```

```
 1        So we had, I believe -- do I want to say three
 2        people out of our building for some of that time a
 3        couple years ago, and then we had ISSs filling in
 4        those -- some of those positions, but they didn't
 5        let us over hire people for those positions so --
 6        so it was probably roughly the same.
 7   Q    So you -- you remember three people.  So you said I
 8        was one, of course.  I went to the virtual school.
 9        Can you remember the other two?
10   A    I believe Michael Valenzuela and Mr. Gore, I
11        believe, was also out.
12   Q    Do you know if any other teachers applied for the
13        position --
14   A    I don't.
15   Q    -- for the virtual school?  You don't know?
16   A    No.  They didn't go -- they didn't go through me,
17        no.
18   Q    They didn't go through you.
19   A    No.
20   Q    Okay.
21   A    I don't know who asked for that.  They -- that was
22        separate from what -- we didn't have any say in any
23        of those things -- or I didn't anyway.  I didn't
24        have any knowledge of that.
25   Q    Would Mr. Villarreal have seen who applied from the
```

```
 1      school?

 2   A  I don't know.

 3   Q  Okay.  I want to go back a few years to the

 4      beginning of the year 2019.  Do you remember

 5      Ms. Payson Snowden?

 6   A  Yes.

 7   Q  Do you remember Ms. Snowden coming to you and

 8      asking to be reassigned to another mentor?  I was

 9      mentoring Ms. Snowden.  Do you remember her coming

10      to you and asking to be reassigned?

11   A  I don't remember that, no.

12   Q  Do you remember contacting Ms. Susan Holt in

13      Ramstein and asking her to mentor Ms. Snowden at

14      all in biology?

15   A  No, I don't.  I may have because she was the

16      teacher, and I may have asked her for lesson plans.

17      Mentor is not a word I would use, but I may have

18      asked her because we were -- we were trying to get

19      -- I believe Payson filled in in the science

20      classrooms and did that.  So I may have asked

21      Ms. Holt for lesson plans, but I probably also

22      asked the ISSs for lesson plans or someone at

23      Hohenfels for lesson plans.  We were just trying to

24      get what we could get for her.

25   Q  Would you have called Ms. Holt in Ramstein to ask
```

```
 1      for that?
 2    A  I really don't recall.  That was kind of a scramble
 3      when we were trying to find what we were going to
 4      do with our regular teachers out of the building
 5      and try to find people that were qualified enough
 6      to do that.  I mean, I don't think -- it was just a
 7      challenge to make sure, especially in math and
 8      science classes, that we had capable people doing
 9      those courses, but I don't -- I don't know if I
10      called her or wrote her.  I don't recall.
11    Q  Okay.  Do you remember Payson Snowden working with
12      Ms. Conners, Ms. Pam Conners?
13    A  For?
14    Q  Math.
15    A  She may have.  I was not involved in any of those
16      conversations.
17    Q  Did you have much contact at all with Ms. Payson?
18    A  Not really.  We had to rely on people in the
19      department to support them.  During that time --
20      this was last year.  I'm trying to figure the
21      years.
22    Q  This was 2019.
23    A  Right.  I'm just trying to remember what was
24      happening.  Like, last year I was subbing in class.
25      There were a lot of classes I was subbing in.  So
```

```
 1        Mr. Villarreal may have been involved in those
 2        things because I was in classes.  I did a lot of
 3        that because we were short.  Last year I was
 4        teaching AP English for eight weeks.  So I don't --
 5        I don't recall those specific conversations with
 6        her or if she got help.  I mean, we asked all of
 7        our staff to pitch in and help the substitutes that
 8        were in the building that were -- that were
 9        working.
10   Q    Okay.
11   A    And I will say a lot of that happened during
12        collaboration time.  So if they were in -- in those
13        meetings with collaboration, then -- like, if
14        Payson was in the math collaboration, she probably
15        got help directly from them, but I don't -- I
16        wasn't involved in any of those things.
17   Q    Okay.  During what years did you serve as my direct
18        supervisor?
19   A    I don't know.  We switched back and forth.  I often
20        didn't have the science department.  Mr. Villarreal
21        did it by science -- or did it by departments.  So
22        usually I had the math department.  I had the
23        history department.  But I -- I don't know if I
24        directly had you.  So I'm not sure.
25   Q    So you --
```

```
 1   A   It's possible.  I don't know.  I just don't
 2       remember when -- what years, if I had -- if I had
 3       that at all, and you were not in our building the
 4       last couple years.  So I -- I knew I had last year
 5       but I -- I don't know.
 6   Q   So you can't recall at all having me evaluate --
 7   A   I probably did it one year, like the DP maps and
 8       things like that.  I remember people that, you
 9       know, could stand out one way or the other if there
10       were issues or something, but I think for the most
11       part, I did not have -- I did not have you.  Mr. V
12       usually had you.
13   Q   Would you describe our relationship, yours and
14       mine, as personal on any level?
15   A   No.  Probably more professional; although, there
16       were things -- I remember the first time I met you
17       when I first got to Vilseck.  Your daughter lost a
18       coloring book at a football game and you asked me
19       to open up the gate to go back in and get the -- so
20       that's -- that's personal, but I happened to have
21       the keys to go back and get your daughter's
22       coloring book.  We didn't find it, but, you know,
23       that's -- I do remember meeting you like that.  Or
24       the first kind of interaction outside of school.
25       So it was in the fall and you just said she lost
```

1    her coloring book, and I -- I let you back in to go

2    get it.  So -- I mean, that's not professional, but

3    I guess it kind of is.  I mean, personal, I should

4    say.  It's kind of personal, kind of professional

5    because I had the keys, but that's it.

6  Q  What happened on the day that I visited the high

7    school for a mandatory COVID test in January 2022?

8  A  I saw you approaching the building.  I went and

9    opened the door.  Shelby Rincon (phonetic), our

10   secretary, was there as well to greet you.  I

11   didn't -- I didn't know why you were coming.  I

12   just happened to be in the hallway.  And you came

13   in, and it was right after we had had some issues

14   with a bus breaking down, and I wanted to let you

15   know how much your husband had helped us in the gym

16   and keeping those things -- you know, just keeping

17   the kids -- he was about to get hotels and blankets

18   and all that, but it was just -- he went way above

19   and beyond for us, and I wanted to thank you there.

20   I wanted to welcome you to our building because I

21   hadn't seen you.  And, you know, you coming in.  So

22   we had a conversation.  I asked you how you were

23   doing.  I complimented you on your shirt.  I

24   pointed at your sleeve, and I thought it was a good

25   conversation.

1  Q  Did you reach over during the compliment and touch
2     my garment at my lower arm, wrist?
3  A  You claim that.  I honestly don't -- I don't recall
4     making contact.  I pointed at it.  I believe it was
5     like an animal print of some kind.  I thought it
6     was nice, and I pointed at the fabric on your
7     sleeve, and then that's how things were and walked
8     off.  I thought it was a positive conversation.  In
9     fact, Ms. Recon afterwards said, well, that was
10    nice.  I don't know why she said it, but she said,
11    well, that was nice.
12 Q  What was my response at that time?
13 A  You said things are okay, and I walked away.  I
14    thought it was a pleasant conversation.  I didn't
15    -- I didn't feel that I had offended you in any
16    way.  I thought you didn't react really in any way.
17    Just said I'll -- you know, I'll talk to you later
18    and walked away, and you said okay.
19 Q  So before this incident back in 2018, you had
20    witnessed me upset about my personal space being
21    violated in another -- in another case by someone
22    else.  Could you explain what you witnessed?
23 A  I didn't witness -- I don't believe I witnessed --
24    if it's what you're talking about at the play?
25 Q  Uh-huh.  Yes.

1    A   I didn't witness the incident at all.  I didn't

2        witness it at all.  You came to me and told me that

3        you were assaulted.  I -- on your hand.  So -- I

4        mean, I was kind of shocked because I didn't know

5        that anything had happened.  You told me that

6        Ms. Conners had shut a door on your fingers.  I

7        knew you were going out there because you asked me

8        if you could go out and use the phone, make a phone

9        call outside.  I said, well -- I suggested to go to

10       the front because the lighting was better, and if

11       the door shuts, you know, no one is going to know

12       that's out there, but I didn't witness you being

13       out there.  I knew that you went out there.

14   Q   I didn't want to interrupt you.  I'm so sorry.

15       Maybe it was the way I phrased the question.  You

16       witnessed me being upset about the incident.

17   A   Yes.

18   Q   I guess my question was -- maybe I worded it -- let

19       me think of another way to word it.  So after

20       observing my response to -- so I'm having -- yeah.

21       I think -- by the way you answered the question, I

22       think I didn't ask it in the best way.  So I

23       apologize for that, yeah.

24            So when you compare the two -- so I don't want

25       you to describe what happened, but at the other

```
 1        incident, when you compare the two, you witnessed
 2        me upset.  Both our incidents where I feel like I
 3        was -- my personal space was violated, and I was --
 4        and/or touched unwantedly in an unwanted fashion.
 5        So you observed both reactions is what I'm trying
 6        to get at.  What -- can you see -- can you -- was
 7        there a major difference between my reaction, my
 8        response, emotional response in the first incident
 9        from my emotional response in the incident with
10        you.
11    A   Well, I didn't observe a response in the incident
12        the second time when we had the conversation in the
13        -- I didn't observe a response that I noticed at
14        all.
15             In 2018 when that happened, you were upset.  I
16        was worried.  In fact, I went to get you ice.  I
17        was worried your hand was hurt because I didn't
18        know what happened.  You said -- I mean, it's a
19        very different thing.  You had -- you said your
20        hand was slammed in the door.  I asked you to take
21        a picture of it.  You seemed very upset about that.
22             So I would say the reaction recently this past
23        year when I met you in the hallway, I didn't notice
24        a reaction at all.  But the reaction with the other
25        thing, you were -- you were upset.  You, you know,
```

```
 1     showed me -- I didn't -- I wanted to make sure your
 2     hand was okay.  You took pictures.  There was --
 3     all I remember was a couple nicks on your nail, and
 4     I got you an ice pack.  So it was a very
 5     different -- I mean, I was reacting not necessarily
 6     -- one, I was shocked that you would -- that you
 7     said someone assaulted you, which I was shocked
 8     that that would happen at one of our events.  But I
 9     was more concerned -- the reaction I got was not
10     about someone violating your space, but I thought
11     you were hurt.  So I -- the reaction that I noticed
12     was more I think about your hand being in pain,
13     which is why I asked you to take pictures of it and
14     got you some ice, if I were to compare the two
15     reactions.
16  Q  In the reaction -- I mean, in the incident with
17     you, did I -- did I ask you to touch me?
18  A  No.
19  Q  In the time that you've known me, have you known me
20     as being an individual who is a hug -- you know, a
21     person that likes to hug or touchy touchy type
22     person?
23  A  I don't -- no, not -- certainly not with me.  I
24     mean, I never -- you know, I've never given you a
25     hug.  I've never -- never.  So no.  No.
```

1  Q  And so why -- what made you feel like that was

2     appropriate in a work environment?

3  A  Well, I need to clarify --

4         MS. FISCHER:  Objection.  Mischaracterizes the

5     witness' testimony.  I think his testimony was he

6     doesn't recall touching you, but you can answer.

7  A  That's what I was going to say.  I don't -- it was

8     not my intent to do that.  I was pointing at the

9     fabric on your sleeve as I was kind of walking past

10    you and going back to my office.  I don't -- I

11    don't recall making contact with you.

12 Q  And who was present at that time?

13 A  Ms. Shelby, the secretary, Rincon, as far as -- I

14    think she was there.

15 Q  And what is her position at the school?

16 A  She's a secretary.

17 Q  What was her response to your compliment?

18 A  I told you she -- after you had gone, you said that

19    was nice -- she said that was a nice conversation.

20    Like I said, I don't know why she said that.  She

21    said that was a nice conversation.

22 Q  Do you normally compliment the attire of your

23    subordinates in such a personal manner?

24 A  I have.  If someone, you know, looks nice or is

25    wearing something that stands out, yeah, I would

```
 1        say you look nice or I like your shirt or -- yeah,
 2        I -- or -- you know, I have, yeah.
 3   Q    Prior to January 2022, to that incident, have I
 4        ever complained about you violating my personal
 5        space?
 6   A    I don't think so.
 7   Q    Do you recall me complaining about this in a prior
 8        EEO complaint?
 9   A    I remember someone violating your personal space.
10        The claim about someone coming behind your desk.  I
11        don't know if it was specifically targeted at me.
12        I've been behind your desk in your classroom to
13        substitute for your class.  I honestly don't recall
14        if it was meant to me because I don't -- I don't
15        recall a situation that I would have done that.
16   Q    So you were never -- oh, I'm sorry.  Go ahead.
17   A    I don't know.  Like I said, I saw the documents.  I
18        didn't review what was there, but I don't -- I
19        don't recall that claim being made against me
20        personally.
21   Q    So you were never questioned in a previous
22        complaint about my -- about violating my personal
23        space in the past, even if it was just walking
24        behind my desk and lingering over my personal
25        items, like my purse?  No one -- you've never been
```

```
1      questioned?

2  A   No.  My understanding, that was about somebody

3      else.  I don't remember that being about me.  I

4      believe Ms. -- maybe Ms. Wolff, but I don't recall

5      those complaints being about me, and I don't recall

6      any situation where I would have done that to you.

7      I'm sorry, but I really don't.  I don't recall

8      that.

9  Q   At the start of 2020-2021 -- oh, actually -- well,

10     let me look and see.  Let's go to an exhibit, and I

11     need to see which one, though.  Actually, let's go

12     to Exhibit R2.

13         (Exhibit R2 marked.)

14 Q   Do you recognize that document?

15 A   I don't see anything.

16 Q   R2?

17 A   Is it up on the screen or am I supposed to get it?

18         MS. FISCHER:  You should retrieve it from your

19     email.  It was emailed to you earlier today.

20 A   Okay.  My email is down.  So give me a minute.

21     Sorry.  I didn't want to be interrupted by it.

22     Sorry.  Let me find it.  Okay.  I have it.

23 Q   You have it up?

24 A   Yes.

25 Q   And do you recognize this document?
```

1    A   Yeah.  It's an email you sent to me, I believe.

2    Q   What is it?

3    A   It's an email that you sent to me.

4    Q   Yes.  What is it pertaining to?

5    A   That -- that incident -- okay.  When you came in to

6        get your COVID test.

7    Q   Right.  And if you look at the second page, what is

8        that?

9    A   That's my response.

10   Q   And what was your response?

11   A   I apologized for causing you any discomfort when

12       you came in last week, that it was not my intent,

13       and it won't happen again.

14   Q   So what were you -- what were you apologizing for?

15   A   Causing you discomfort.  Hello?

16   Q   No.  I'm here.

17   A   I'm sorry.  My screen went blank.  Sorry.

18   Q   Okay.  So you were apologizing for causing me

19       discomfort in my -- first, in my email, I was very

20       specific about what made me uncomfortable.  And so,

21       yes, you emailed me saying that you apologized for

22       causing me discomfort.  Why did you -- I notice

23       that you -- you separated the email.  So when I

24       looked at this email -- normally when you respond

25       -- when you reply, you just reply to the original

```
 1        email.  You didn't do that.  You -- so my email was
 2        titled Tuesday visit for COVID-19 test, and then
 3        your email is Tuesday visit.  Why not just reply to
 4        the email and say what you said and apologize?
 5   A    I don't have -- I don't have any reason for that.
 6        I just wrote you back.
 7   Q    So you -- you took the time to create another email
 8        that said Tuesday visit and you apologized for
 9        making me uncomfortable, but why not just reply to
10        the original email?
11   A    I don't have any reason for that.  I just -- I was
12        pretty upset by it, to be honest with you, because
13        I didn't think anything happened because of that
14        thing.  You know, it came in -- I saw it later on a
15        Friday evening, and I was upset by that.  I let
16        Dr. Jones know that I -- I got it, and I left.  So
17        I -- I didn't have it.  I think -- I don't know
18        when the reply was.  It was pretty later on in the
19        week, or earlier the next week, Tuesday.  So I just
20        -- I just created an email to apologize to you.
21   Q    Were you -- did you create a different email to
22        somehow disconnect the two events?
23   A    No, no.
24   Q    I was going to say your apology from what I
25        actually had concerns about, you didn't create that
```

```
 1        separate e-mail to disconnect those two events?
 2   A    No.
 3             (Exhibit R3 marked.)
 4   Q    Let's go to the next exhibit which -- 3.  Do you
 5        recognize --
 6   A    Hang on a second.
 7   Q    I'm sorry.  I can give you some time.
 8   A    Okay.
 9   Q    Do you recognize this email?
10   A    I'm on it, but I -- yeah, I -- yeah.
11   Q    And what does that email concern?
12   A    That you felt mistreated about being removed from
13        the faculty email list, that your computer was
14        assigned to a teacher -- or a teacher's aide and
15        denied equal access to the school.
16   Q    So at the start of 2021-22 -- school year 2021-22,
17        I -- did I e-mail the list -- this list of
18        complaints to you and Dr. Jones?
19   A    Uh-huh.
20   Q    During this time -- who was the supervisor in
21        charge during the time that Dr. Jones was in
22        transition before she arrived at Vilseck High
23        School?
24   A    We both were, really.  She -- we had meetings
25        pretty much every morning -- her evening in Japan
```

1    and my morning.

2  Q  Who made decisions about the day-to-day operations

3     at the school?

4  A  We both did.

5  Q  And who did teachers consult when they had -- or

6     not just teachers, faculty or staff, who did they

7     consult when they had questions or problems?

8  A  Kind of, once again, both of us.  If it was

9     something directly in the school, a teacher would

10    usually come talk to me.  So once again, we -- we

11    both did, but it depends on what it was for.

12    Dr. Jones wanted to be in charge from the very

13    beginning, whether she was in the country or not.

14    That was -- that was made very clear to me.

15 Q  So did you -- do you know of teachers who emailed

16    Dr. Jones before she actually came -- I mean,

17    personally about -- about -- about things in the

18    school before she actually arrived at the school?

19    Sorry.

20 A  There were some because I was cc'd on those.  I

21    don't remember specifically what they were about,

22    but if someone just emailed her and there were

23    people she wanted to hear directly from, then, you

24    know, they wouldn't consult me.

25 Q  So you --

```
 1   A   So I really don't know.  I don't know how many or
 2       who did.  If they did, it was outside of my
 3       knowledge, but there were some people that I know
 4       did.
 5   Q   So you --
 6   A   I certainly did so -- yeah.  Sorry.
 7   Q   So you received emails that she was cc'd on.  Is
 8       that what you're saying?
 9   A   Sometimes, yes.  Like -- like, this one.  I mean,
10       it's directed to her, but it was -- like, you cc'd
11       me, but I don't remember specifically about how
12       many or how often that happened.  There were
13       certain questions that she wanted people to write
14       to her about.  I don't know how often that
15       happened.
16   Q   So when I sent this email, Dr. Jones was in place
17       here at Vilseck High School, and so I'm asking
18       about before she actually came --
19   A   Okay.
20   Q   -- to Vilseck High School.  Did she -- like, if you
21       use my email as an example, did you see emails
22       where someone wrote her directly and cc'd you
23       maybe?
24   A   Not very often, no.
25   Q   So for the most part, faculty and staff consulted
```

```
 1        with you until Dr. Jones came to the building?
 2    A   Once again, I don't -- I don't know how often
 3        people wrote her.  I know people talked to me or
 4        wrote me, but to say for the most part, I don't
 5        know how many people wrote her.  For the day-to-day
 6        operations of things, the minor things that went
 7        on, they probably just talked to me.  I don't know
 8        about big things.  I don't know about -- for
 9        example, she was having direct communication with
10        our entire office staff that I didn't know about
11        basically giving them directions on how she wanted
12        things set up in Teams and all those things, but
13        she didn't cc me on any of those.  So I don't know
14        how much correspondence went back.  I know I had
15        duties in the school, and I was doing my best to do
16        alone, but I don't know how often other people
17        consulted with her.
18    Q   Who gave the directive to break the lock and assign
19        my laptop to a substitute teacher at that time?
20        This was before Dr. Jones arrived.
21    A   I don't know.  It may have been -- it may have been
22        me.  It may have been -- they're just using --
23        like, Cora Moellendick was getting computers for
24        the staff we had.
25            This was a very new experience for us because
```

```
 1    we didn't -- we had never had teachers that
 2    belonged to us that weren't in the building.  We
 3    also had a number of computers out that students
 4    had that we didn't, and we just -- we had a
 5    shortage of -- and we're trying to, you know, get
 6    those resources to the people that needed them.
 7         If it wasn't being used, I may have said, you
 8    know, go and take it, but I mean, no one really has
 9    -- I mean, yes, it was on your desk.  I don't know
10    if it -- you know, to say it was your personal
11    computer or laptop, I don't know if that's fair.  I
12    don't -- I don't have -- this all belongs to the
13    government.
14         So we were trying to find the resources we
15    had, and I know Ms. Moellendick and Jake and
16    Ms. Wolff were scrambling to find resources for
17    teachers and kids in the building.  So it may have
18    been me that said that one, but, you know, I said
19    go find -- you know, find the ones we can use and
20    fix the ones we can and let's get them to the
21    people that need them.
22  Q  Were you aware that this was my assigned laptop for
23    at least seven years but probably longer?
24  A  No.  I don't know how people have -- how long
25    they've had their computers.  Like I said, they
```

| | | |
|---|---|---|
| 1 | | switch -- it may have been assigned to you, but I |
| 2 | | don't -- I don't keep track of what's assigned to |
| 3 | | what.  I went through, you know, three computers |
| 4 | | last year because they kept breaking, but they just |
| 5 | | assign them and reboot them and distribute them. |
| 6 | | So I wouldn't -- I wouldn't ever expect someone to |
| 7 | | have the same laptop for that long. |
| 8 | Q | Who was the substitute that was given the laptop? |
| 9 | A | That specific laptop? |
| 10 | Q | Uh-huh. |
| 11 | A | I don't know. |
| 12 | Q | Are you aware that I had used the laptop, of |
| 13 | | course, while -- while I was working at the virtual |
| 14 | | school the year before? |
| 15 | A | No.  Like I said, I don't know who was using what |
| 16 | | specific laptop. |
| 17 | Q | Did someone ask you if they could take the laptop |
| 18 | | that was assigned to me and use it for someone |
| 19 | | else? |
| 20 | A | I don't know. |
| 21 | Q | But you gave the okay to -- |
| 22 | A | I said I may have done that.  There were many |
| 23 | | resources that I said, well, get some -- like I |
| 24 | | said, I may have said to someone, well, how many |
| 25 | | kids are in this class?  Do you need all of the |

1       laptops that are in that COW.  COW being the place

2       where the laptop is kept.  If there's spare

3       laptops, let's get them to people because we didn't

4       -- we didn't get all of our resources back.  Some

5       of them came back broken.  Some of them, because

6       they were out, didn't have updates.  So we were

7       trying at the very beginning to get computers to

8       kids and teachers, and we were trying to find

9       everything we had that could work.

10          If there was one sitting in your room that was

11      not being used, I may not have said directly -- I

12      know I didn't say directly take Ms. Smithson's or

13      the one from Ms. Smithson's room, but if it wasn't

14      being used, I would have said, well, find the ones

15      that aren't being used and distribute them.  But it

16      wasn't directed, you know, at any one person's

17      laptop because they don't belong to us.

18   Q  During the same time before Dr. Jones arrived at

19      the school, who made the decision that I would not

20      be given back my key fob for access to the

21      building?

22   A  I don't know.  I may have once again said that.

23      Once again, we didn't know who -- I mean, I was

24      asked probably by Shelby who was supposed to have

25      these keys.  I didn't know what your role was at

```
 1          school, nor Mr. Valenzuela or the other people.  I
 2          probably did not because I wouldn't think why would
 3          I have a problem with that unless it had to be -- I
 4          know the keys that were out had to be re- -- like
 5          re-imaged, if you will, or reset.  So if that were
 6          the reason to come in, but to take it away, I don't
 7          -- I wouldn't have any reason to do that.
 8      Q   Are you aware that I had access to the building
 9          with my key fob while I was working in the virtual
10          school the year before?
11      A   So you're talking '21-'22 or 20 -- what year are
12          you talking?  '19-'20?  '21 --
13      Q   '20 to '21.
14      A   Excuse me.
15      Q   '20 to '21.
16      A   Yeah, eventually, yeah.
17      Q   And are you --
18      A   Are you talking about the key being taken away at
19          the beginning of 2021-22?
20      Q   Yes.
21      A   Okay.  No, I wasn't aware of that.  I knew you had
22          access before, yeah.  We were directed to give you
23          space because you still belonged to us, you were on
24          our -- at that point.  So since you were on our
25          document, our staffing document that year, then,
```

1    yeah.

2  Q  So I'll go back and ask.  So during 20-21 -- school

3     year 20-21 -- so -- I need to say the years all the

4     way out because of the way the numbers are.  So for

5     school year 2020-2021, I had the -- my key fob --

6     were you aware of that -- while I worked at the

7     virtual school?

8  A  I think so, yeah.  I honestly didn't put a lot of

9     thought into that.  So probably, but I'm thinking

10    back, I don't know why it would even be an issue

11    with me.

12 Q  For the school year 2020-2021, Michael Valenzuela,

13    he also had access to his key fob.

14 A  Okay.

15 Q  Are you aware of that?

16 A  Probably.

17 Q  And for the school year 2020-2021, Miles Gore also

18    had his key fob for access to the building.  Are

19    you aware of that?

20 A  I think so, yes.

21 Q  So the next year in year -- school year 2021-2022,

22    when I was the only teacher assigned to the virtual

23    school, I was refused my key fob.  And so now I'm

24    asking you, are you aware of that?

25       MS. FISCHER:  Objection.  Lack of foundation.

```
 1        It might be helpful, Ms. Smithson, if you explained

 2        when you were refused your key fob or who refused

 3        your key fob.

 4    Q   So at the beginning of the school year 2021-2022, I

 5        sent an email -- oh, goodness.  Maybe I should have

 6        just gone to the exhibit.  Hold on.  Okay.  So for

 7        some reason, I didn't include that exhibit on

 8        yours, but you were in that email as well.  I sent

 9        an email, you were cc'd, to Ms. Wolff asking for

10        access to the building.

11    A   Okay.

12    Q   And Ms. Wolff denied me access.  She would not give

13        me the key fob.  Do you know why I was not allowed

14        access to the building when I was allowed access

15        the year before when me and two other colleagues

16        were assigned to the virtual school?

17            MS. FISCHER:  I'm going to object for lack of

18        foundation, but you can answer.

19    A   I don't know why.

20    Q   Do you remember being included in that email where

21        I requested --

22    A   I don't remember -- I don't remember specifically,

23        no.

24    Q   Yeah.  I included it in Dr. Jones' exhibit.  I

25        didn't include it in yours.  That's okay.
```

1          MS. FISCHER:  Could you hold on for a second?

2    I want to make sure I have the document.

3          MS. SMITHSON:  Uh-huh.  Sure.

4          MS. FISCHER:  So I'm not seeing it attached to

5    Dr. Jones' email.  So what is the document that

6    you're describing somewhere someone denied you a

7    key?

8          MS. SMITHSON:  It's -- it's the one -- oh,

9    maybe it is included.  I'm so sorry.  It is

10   included in Mr. Rodman's email.  It's --

11   Mr. Rodman's email, it is R3, and it's the second

12   page.

13         MS. FISCHER:  Then I'm just going to object

14   for mischaracterizing the document because the

15   document states that you were granted the key, but

16   you can ask your question.

17         MS. SMITHSON:  The document states that I was

18   granted the key?

19 Q So Mr. Rodman, if you -- do you have the document?

20 A I do.

21 Q Okay.  Great.  And I think I see what Ms. Fischer

22   is referring to.  So if you go all the way down at

23   the bottom of the document and I -- where I first

24   sent an email to Ms. Wolff asking for the keys and

25   everyone is on there and that was on the 16th of

```
 1          September, and there must have been another email,
 2          and I would have to go and look and find that
 3          because -- or maybe not.  So -- no, no, there
 4          wasn't.  I'm sorry.
 5               So in the second email, it was the next day.
 6          So I hadn't gotten a response.  That's what it was.
 7          So I emailed Ms. Wolff on Thursday, the 16th, and
 8          then I emailed Ms. Wolff on Friday, the 17th, and
 9          then still no response.  So, again, you can see
10          that all of these emails are connected.  Okay?  And
11          then I emailed Ms. Wolff again on the 21st, and I
12          still did not get a response.  And so I evidently
13          thought I needed to -- oh, Dr. Jones.  Excuse me.
14          Dr. Jones ended up emailing me instead of
15          Ms. Wolff, but before Dr. Jones had arrived,
16          Ms. Wolff, who is in charge of the keys -- no, no.
17          So Mr. Rodman, who is in charge of the key
18          distribution?
19     A    Ms. Wolff is in charge.  She has the box.  She's in
20          charge of distribution collection and
21          accountability.
22     Q    So normally teachers go to who to get their keys?
23     A    Either Ms. Wolff or if she's not in the building
24          because she's covering two schools, they would go
25          to the secretary.  Typically, they go to the
```

```
 1        secretary, but Ms. Wolff is the one that has the
 2        accountability, I believe, officially for those --
 3        for those keys.
 4   Q    And the 16th is the first day that I sent a message
 5        to Ms. Wolff.  Do you see on there that Ms. Wolff
 6        responded to me?
 7   A    No.
 8   Q    No.  When is the first response that you could see
 9        that I got at all from anyone?
10   A    Ms. Jones.
11   Q    And what day was that?
12   A    The 23rd.
13   Q    The 23rd.  And how long is that that passed?
14   A    A week.
15   Q    Is that reasonable?
16   A    I don't know what the issue was.
17   Q    For -- to get my keys for access to the building so
18        that I could work.
19   A    I don't know what the issue was to not give them to
20        you.
21   Q    Oh, excuse me.  Okay.  So one week and I never
22        received a response from the person who is supposed
23        to distribute the keys.  Do you see what the
24        problem is?
25   A    You wanted your keys and Ms. Wolff wasn't
```

```
 1        responding to you.
 2    Q   Thank you.  Are you aware that I had access to the
 3        building -- oh, I think I asked you that already.
 4        I had access to the building while I was in the
 5        virtual school.  Are you aware that I had access to
 6        the building when I was in the virtual school?
 7    A   Yes, yes, I had said before.
 8    Q   All right.  So those teachers -- you named the
 9        teachers who were also in the virtual school with
10        me.  What is Michael Valenzuela's sex?
11    A   I believe he identifies as male.
12    Q   What is Michael Valenzuela's race?
13    A   Hispanic.
14    Q   That's his ethnicity.  Do you know his race?
15    A   Okay.
16    Q   Sorry.
17    A   No.
18    Q   Okay.  What is Miles Gore's sex?
19    A   I believe he identifies as male.
20    Q   And what is Miles Gore's race?
21    A   Caucasian, white.
22    Q   All right.  Who gave the directive to have me
23        removed from the faculty staff email distribution
24        list?
25    A   I don't know.  There was -- can I -- there was a
```

 1   lot of questions at that time, because we're in new

 2   territory, about who you belonged to.  Do you --

 3   did you -- were you supposed to be on our list

 4   getting our information or were you in virtual

 5   school because we didn't know at that time, but I

 6   don't know who gave the directive to take you off.

 7   I don't have the rights to do that.  So I don't

 8   know who gave the directive.

 9 Q At that time, were -- were you aware that my name

10   had been removed from the list, though?

11 A I don't recall if I knew at that time.  I remember

12   the discussion, not about you specifically, about

13   with the district about, okay, what -- where do the

14   people who are no longer in our building but in our

15   area, where do they fall in terms of supervision,

16   in terms of the email distributions and, you know,

17   who are they getting information from.

18       So I know there was discussion about that at

19   the district level, and more importantly, at the

20   district level, how do we re-cover your classes

21   when you weren't there.  That was mostly what I was

22   concerned with, is making our schedule work without

23   having another science teacher, another teacher in

24   the building.

25 Q Are you aware that the year before, Mr. Valenzuela,

1       Mr. Miles, and myself were all getting emails from
2       Vilseck High School?
3   A   Yes, but during that time, you were on our staffing
4       document.  You were connected with the virtual
5       school but you were still -- they made it very
6       clear you're still part of Vilseck High School.
7       The following year, that was not so clear.
8   Q   Was there someone that you could have consulted
9       with to find out for sure what my status was?
10  A   I consulted with Dr. Jones because she was -- she
11      was the person with access to those staffing
12      documents.  I didn't have access to those and what
13      we were supposed to do with that.
14          I remember Cora and, I think, Ms. Wolff
15      discussing that or they told me they had discussed
16      it with Dr. Jones, but I don't remember
17      specifically what was said in those -- in those
18      discussions.
19  Q   So Dr. Jones was not at the school at that time?
20  A   Correct.
21  Q   So you would have made most of the decisions for
22      the school; correct?
23  A   As I said before, I don't -- I don't know how to
24      really equate that.  I made the decisions that were
25      brought to me, but I don't know who was consulting

1    with her.  There were many things that I had to

2    consult with her, and quite frankly, it was a very,

3    very busy time.  I had never opened a school by

4    myself before.  We were trying to get resources

5    back that we did not have because kids were not

6    here.  There were a lot of big things on the plate

7    at the time, which is why it's all kind of blurry

8    to me.

9         If someone were to ask me a year from now

10   every decision I made, I would probably have the

11   same answer because there's just a lot going on,

12   and I'm doing it all by myself.

13        With her situation there, Ms. Jones being

14   gone, I don't know how to equate what she had her

15   direct influence on or what direct decisions she

16   made and those she referred to me.  I know she

17   called me every single morning to give a rundown of

18   things, and I don't recall whether or not that

19   situation was discussed with her.

20  Q  You said with Ms. -- Dr. Jones being gone, but you

21     mean with Dr. Jones not having arrived yet;

22     correct?

23  A  Yeah.  She wasn't there.

24  Q  Okay.  What types of emails are sent to teachers at

25     the beginning of the school year?

 1  A  A lot of -- I guess they term them nuts and bolts,
 2     things that are happening inside the building,
 3     relating to kids showing up, to what they're
 4     supposed to be doing in the classrooms, those kinds
 5     of things, for the most part.  Any -- or we forward
 6     any information that comes down from the district,
 7     you know, first day expectations, those kind of
 8     things.
 9  Q  Are community emails sent out as well?
10  A  Often, yes.
11  Q  Were emails sent about local COVID-19 updates and
12     protocols?
13  A  During that time, most of those were coming from
14     the district.
15  Q  But they -- those who were on the email
16     distribution list got them because they were
17     addressed to Vilseck High School faculty and staff;
18     correct?
19  A  I think so, yeah.
20  Q  So I would not have gotten those emails; correct?
21  A  I would think you would get them from the virtual
22     school.
23  Q  The virtual -- well -- okay.  So I wouldn't have
24     gotten emails that you all got at Vilseck from our
25     district here in Europe where I'm actually located;

```
 1      right?
 2   A  Well, they sent them to all staff, and you're
 3      working Europe, then you would get them.
 4   Q  Okay.  What about -- oh, I'm sorry.  Go ahead.
 5   A  Nothing.
 6   Q  What about emails that were sent about the German
 7      COVID-19 updates and protocols?  Those are not sent
 8      by -- would not be sent by the virtual school
 9      because they're based in the United States.
10   A  Okay.
11   Q  So you guys -- you received those at the school,
12      the teachers who were on the distribution list
13      received those emails; correct?
14   A  Probably.
15   Q  But I wouldn't receive them because I was removed
16      from the distribution list.
17   A  Correct, but at that point, you were working for
18      virtual school.  I mean, you had a different chain
19      of -- I think you had a different chain of command
20      and supervisor.  So those people are all still in
21      Germany.  I don't know -- I mean, as far as local
22      information, I guess you're not getting it, but if
23      you were off our list, did you get things -- I
24      don't know if you got things from the virtual
25      school or not and that was the question is who did
```

1    you belong to.

2  Q  Is it fair to say that I missed some important

3     correspondence during the time that my name was

4     wrongfully removed from the distribution list?

5  A  I don't know all the information that you received

6     or from who you would receive it from.  If you were

7     off of ours, I don't know how much information came

8     directly from us about that, and a lot of it came

9     from the Garrison to, you know, different people.

10 Q  Even in speaking with you today, you sound a little

11    agitated.  Were you upset -- was there -- you said

12    that there was a lot going on at the beginning of

13    the year 2021-2022; correct?

14 A  Yeah, yeah.

15       MS. FISCHER:  Objection.  That

16    mischaracterizes the witness' demeanor, but you can

17    answer.

18 A  I'm not agitated.  I'm thinking really hard about

19    what you're asking me because I want to give you an

20    accurate answer.  I'm not agitated.

21 Q  All right.  Were you upset that -- you also

22    mentioned that you had to figure out what to do

23    with my classes.  Were you upset that I was still

24    assigned to the virtual school?

25 A  No.  I was --

1   Q  I'm sorry.  Were you --

2   A  I was -- actually, no, I was not upset that you

3      were assigned because it was my understanding --

4      and I -- it was my understanding that that's what

5      you wanted to do.

6   Q  Do you know why?

7   A  No, I don't know why, but it was my understanding

8      that you were successful in those -- in that

9      situation.  I think -- I don't know -- I think you

10     requested to stay there, so I was happy that --

11     that that was working for you.

12  Q  From your understanding, why did I apply for the

13     virtual school?

14  A  I don't know.  I don't know what was -- I mean, I

15     just know that you -- you -- you had a reason to go

16     there and you wanted to stay there.  I believe we

17     had a conversation maybe in the parking lot, and I

18     asked how things were going, and you said it's

19     great.  That was the previous year.  So I'm just

20     thinking that that's where you wanted to be so --

21     it was -- it was hard to cover those classes, but

22     it wasn't -- I never had anything personal against

23     you for, you know, wanting to go there.  I did

24     not -- I don't know the reasons or what that was --

25     why you went there, but you told -- I think you

1    told me -- it seemed like you were happy being

2    there.

3  Q  Mr. Rodman, do you know DoDEA's policy on workplace

4    harassment?

5  A  Not verbatim, but I know we shouldn't do that.

6  Q  Can you briefly explain to me, like, what their

7    policy is?

8  A  I think -- you know, conversely I think that people

9    need to be -- feel safe in their environment -- in

10   the work environment.  That goes for kids.  That

11   goes for staff.  They shouldn't be bullied.  They

12   shouldn't be harassed for any reason.  They should

13   feel like they're safe at work.

14  Q  And do you know specifically what DoDEA states in

15   their policy?

16  A  Like I said, I can't say verbatim, but I think I

17   summed it up.

18       MS. SMITHSON:  Okay.  Thank you very much for

19   your time.  This concludes my deposition of you.

20       THE WITNESS:  Okay.  Thank you.

21       THE REPORTER:  This concludes the deposition

22   of Shawn Rodman.

23       Will counsel please state if they would like a

24   copy of the transcript, any stipulations, or other

25   matters to be included in the record?

1    MS. SMITHSON:  Yes, I would like a copy.

2    MS. FISCHER:  Yes, I would.

3    (The deposition concluded at 11:54 a.m.)

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF INDIANA
 2                  INDIANAPOLIS DIVISION

 3
     TAMICA J. SMITHSON,              )
 4                                    )
                    Plaintiff,        )
 5                                    )
          -v-                         )        Case No.
 6                                    )   1:21-CV-02193-JRS-MPB
     LLOYD AUSTIN III,                )
 7   Secretary, Department of         )
     Defense,                         )
 8                                    )
                    Defendant.
 9

10
                    Job No. 174902
11

12
          The deposition of SHAWN RODMAN, taken in the
13   above-captioned matter, on August 26, 2022, and at the
     time and place set out on the title page hereof.
14        It was requested that the deposition be
     transcribed by the reporter and that same be reduced
15   to typewritten form.
          It was agreed that the reading and signature
16   by the deponent to the deposition were waived on
     behalf of the parties Plaintiff and Defendant by their
17   respective counsel, the witness being present and
     consenting thereto, and/or pursuant to the Fed. R.
18   Civ. P. 30(e), the deposition to be read with the same
     force and effect as if signed by said deponent.
19

20

21

22
               STEWART RICHARDSON & ASSOCIATES
23             Registered Professional Reporters
               One Indiana Square, Suite 2425
24                Indianapolis, IN  46204
                     (800) 869-0873
25
```

```
 1    STATE OF INDIANA         )
                               )
 2    COUNTY OF VANDERBURGH    )

 3

 4          I, Elizabeth Taylor Culiver, RPR, a Notary

 5    Public in and for said county and state, do hereby

 6    certify that the deponent herein was by me first duly

 7    sworn to tell the truth, the whole truth, and nothing

 8    but the truth in the aforementioned matter;

 9          That the foregoing deposition was taken on

10    behalf of the Plaintiff; that said deposition was

11    taken at the time and place heretofore mentioned

12    between 10:41 a.m. and 11:54 a.m.;

13          That said deposition was taken down in

14    stenograph notes and afterwards reduced to typewriting

15    under my direction; and that the typewritten

16    transcript is a true record of the testimony given by

17    said deponent;

18          Absent a request by the parties or by

19    agreement, the reading and signing by the deponent to

20    the deposition were waived on behalf of all the

21    parties by their respective counsel, the witness being

22    present and consenting thereto, and/or pursuant to the

23    Fed. R. Civ. P. 30(e); and the deposition is to be

24    read with the same force and effect as if signed by

25    said deponent.
```

1    I do further certify that I am a disinterested

2 person in this cause of action; that I am not a

3 relative of the attorneys for any of the parties.

4    IN WITNESS WHEREOF, I have hereunto set my

5 hand and affixed my notarial seal this 12th day of

6 September, 2022.

7

8

9

10    *Elizabeth Taylor Culiver*

11    Elizabeth Taylor Culiver
      NOTARY PUBLIC SEAL
      STATE OF INDIANA
      Commission No. NP0670402
12    My Commission Expires Aug. 14, 2023

13

14 My Commission Expires:
   August 14, 2023

15

16 Job No. 174902

17

18

19

20

21

22

23

24

25

### Exhibits

**Shawn Rodman Ex R2**  3:8 29:12,13

**Shawn Rodman Ex R3**  3:11 32:3

### 1

**10:41**  4:13
**11:54**  54:3
**11th**  11:11
**12th**  11:11
**16th**  42:25 43:7 44:4
**17**  11:3
**17th**  43:8
**19-'20**  39:12
**1998**  9:12 11:8

### 2

**20**  39:11,13,15
**20-21**  40:2,3
**2015**  10:1,6
**2018**  23:19 25:15
**2019**  18:4 19:22
**2020**  10:7
**2020-2021**  29:9 40:5,12,17
**2021-2022**  40:21 41:4 51:13
**2021-22**  32:16 39:19
**2022**  4:13 22:7 28:3
**21**  39:12,13,15
**21-'22**  39:11
**21st**  43:11
**23rd**  44:12,13
**24**  11:3
**26th**  4:12
**28**  11:3

### 3

**3**  32:4
**380**  12:8,9

### 4

**40**  16:14,15
**405**  4:11

### 5

**50**  16:15,17
**504**  14:20

### 9

**915**  4:11

### A

**a.m.**  4:13 54:3
**access**  32:15 38:20 39:8,22 40:13,18 41:10,12,14 44:17 45:2, 4,5 47:11,12
**accountability**  43:21 44:2
**accurate**  51:20
**accurately**  7:1
**addressed**  49:17
**adjusted**  12:7
**administered**  5:20
**affect**  6:18
**affirmed**  5:2
**agency**  7:14 8:23 9:9
**agitated**  51:11,18,20
**agreements**  8:22,23
**ahead**  28:16 50:4
**aide**  32:14
**allowed**  41:13,14
**American**  9:14
**and/or**  25:4

**animal**  23:5
**answering**  6:2
**anytime**  7:15
**AP**  15:12 20:4
**apologize**  24:23 31:4,20
**apologized**  30:11,21 31:8
**apologizing**  30:14,18
**apology**  31:24
**applied**  17:12,25
**apply**  52:12
**approaching**  22:8
**area**  15:25 16:2,4 46:15
**arm**  23:2
**arrived**  32:22 33:18 35:20 38:18 43:15 48:21
**assaulted**  24:3 26:7
**assert**  8:17
**assessment**  16:7
**assign**  35:18 37:5
**assigned**  32:14 36:22 37:1,2,18 40:22 41:16 51:24 52:3
**assistant**  12:1,10,16,24,25 13:10,14,16,17,20,23 15:7
**associate**  4:10
**assume**  13:11
**athletics**  14:8,11
**attached**  42:4
**attention**  13:7
**attire**  27:22
**attorney-client**  8:17
**audio**  4:9
**August**  4:12 10:1
**Austin**  4:20,23 5:16
**authorize**  13:19
**authorized**  14:9
**average**  10:16
**aware**  36:22 37:12 39:8,21 40:6, 15,19,24 45:2,5 46:9,25

## B

**back** 13:22 16:19 18:3 20:19 21:19,21 22:1 23:19 27:10 31:6 35:14 38:4,5,20 40:2,10 48:5

**bad** 6:22

**based** 50:9

**basically** 8:11 35:11

**Becker** 15:14,21,23

**began** 11:6

**beginning** 9:19 16:19 18:4 33:13 38:7 39:19 41:4 48:25 51:12

**behalf** 4:22

**Belgium** 4:2 9:15

**belong** 38:17 51:1

**belonged** 36:2 39:23 46:2

**belongs** 36:12

**Beth** 4:10

**big** 35:8 48:6

**biology** 18:14

**blank** 30:17

**blankets** 22:17

**blurry** 48:7

**boards** 7:21

**bolts** 49:1

**book** 21:18,22 22:1

**bottom** 42:23

**bought** 13:19

**box** 43:19

**break** 6:12,14 35:18

**breaking** 22:14 37:4

**briefly** 53:6

**broken** 38:5

**brought** 13:6 47:25

**budget** 11:25

**building** 13:1 15:17,20,23,25 16:2,3,9,25 17:2 19:4 20:8 21:3 22:8,20 35:1 36:2,17 38:21 39:8 40:18 41:10,14 43:23 44:17 45:3,

4,6 46:14,24 49:2

**bullied** 53:11

**bus** 22:14

**busy** 48:3

## C

**call** 24:9

**called** 18:25 19:10 48:17

**capable** 19:8

**case** 5:18 7:11,12 8:2 23:21

**Caucasian** 11:5 45:21

**causing** 30:11,15,18,22

**cc'd** 33:20 34:7,10,22 41:9

**Central** 4:13

**chain** 50:18,19

**chair** 16:8

**challenge** 19:7

**chance** 10:11

**change** 13:1

**charge** 32:21 33:12 43:16,17,19, 20

**charged** 7:22

**checks** 14:10

**children** 10:25

**claim** 23:3 28:10,19

**claims** 7:13

**clarify** 27:3

**class** 19:24 28:13 37:25

**classes** 12:1 14:6 19:8,25 20:2 46:20 51:23 52:21

**classroom** 10:18 28:12

**classrooms** 16:10 18:20 49:4

**clear** 33:14 47:6,7

**coaches** 14:8

**collaboration** 20:12,13,14

**colleagues** 41:15

**collection** 43:20

**coloring** 21:18,22 22:1

**comfortable** 12:23 13:8

**command** 14:11,16 50:19

**communication** 35:9

**community** 16:1 49:9

**compare** 24:24 25:1 26:14

**complained** 28:4

**complaining** 28:7

**complaint** 9:4 28:8,22

**complaints** 29:5 32:18

**completely** 6:13

**compliment** 23:1 27:17,22

**complimented** 22:23

**computer** 32:13 36:11

**computers** 35:23 36:3,25 37:3 38:7

**concern** 32:11

**concerned** 26:9 46:22

**concerns** 31:25

**concluded** 54:3

**concludes** 53:19,21

**connected** 43:10 47:4

**Conners** 19:12 24:6

**consult** 33:5,7,24 48:2

**consulted** 34:25 35:17 47:8,10

**consulting** 47:25

**contact** 19:17 23:4 27:11

**contacting** 18:12

**contracts** 14:1,4

**conversation** 22:22,25 23:8,14 25:12 27:19,21 52:17

**conversations** 19:16 20:5

**conversely** 53:8

**convicted** 7:22

**copy** 53:24 54:1

**Cora** 35:23 47:14

**correct** 15:19 47:20,22 48:22 49:18,20 50:13,17 51:13

Index: corrections..evaluate

**corrections** 7:20

**correspondence** 35:14 51:3

**counsel** 4:1,17 8:8 53:23

**country** 33:13

**couple** 16:21 17:3 21:4 26:3

**courses** 19:9

**court** 4:3 5:19,21,25 6:4,7 7:17

**cover** 52:21

**covering** 43:24

**COVID** 10:7,8 16:23 22:7 30:6

**COVID-19** 31:2 49:11 50:7

**COW** 38:1

**create** 31:7,21,25

**created** 31:20

**crime** 7:23,25

**Culiver** 4:10

**current** 9:13 11:22 14:22

— **D** —

**date** 4:12 7:9 11:9

**daughter** 21:17

**daughter's** 21:21

**day** 6:22 8:10 22:6 43:5 44:4,11 49:7

**day-to-day** 33:2 35:5

**days** 13:2

**deal** 13:4

**dealing** 13:9

**dealt** 14:10

**decision** 38:19 48:10

**decisions** 33:2 47:21,24 48:15

**decrease** 16:20,22

**defendant** 4:23

**demeanor** 51:16

**denied** 32:15 41:12 42:6

**department** 12:21 19:19 20:20, 22,23

**departments** 20:21

**depends** 12:18 13:6,7 33:11

**deponent** 4:16

**deposed** 7:6,15

**deposition** 4:15 5:19 6:11,22 8:3,9,24 9:2 53:19,21 54:3

**describe** 10:20 21:13 24:25

**describing** 42:6

**desk** 28:10,12,24 36:9

**determine** 5:17

**difference** 25:7

**direct** 14:22 15:6 20:17 35:9 48:15

**directed** 34:10 38:16 39:22

**directions** 35:11

**directive** 35:18 45:22 46:6,8

**directly** 20:15,24 33:9,23 34:22 38:11,12 51:8

**discipline** 12:2 14:5

**discomfort** 30:11,15,19,22

**disconnect** 31:22 32:1

**discuss** 8:9

**discussed** 8:15 47:15 48:19

**discussing** 47:15

**discussion** 46:12,18

**discussions** 47:18

**distribute** 37:5 38:15 44:23

**distribution** 43:18,20 45:23 49:16 50:12,16 51:4

**distributions** 46:16

**district** 46:13,19,20 49:6,14,25

**document** 6:4 29:14,25 39:25 42:2,5,14,15,17,19,23 47:4

**documents** 8:2 28:17 47:12

**Dodea** 9:8,11 11:7 53:14

**Dodea's** 53:3

**door** 22:9 24:6,11 25:20

**DP** 21:7

**drugs** 6:17,19

**duly** 5:2

**duties** 35:15

**duty** 14:1,4

— **E** —

**e-mail** 32:1,17

**earlier** 29:19 31:19

**Early** 11:11

**easier** 6:4

**education** 12:20 14:4,19

**EEO** 9:4 28:8

**elementary** 16:5

**email** 10:15 29:19,20 30:1,3,19, 23,24 31:1,3,4,7,10,20,21 32:9, 11,13 34:16,21 41:5,8,9,20 42:5, 10,11,24 43:1,5 45:23 46:16 49:15

**emailed** 29:19 30:21 33:15,22 43:7,8,11

**emailing** 43:14

**emails** 8:5 34:7,21 43:10 47:1 48:24 49:9,11,20,24 50:6,13

**emotional** 25:8,9

**emotions** 11:16

**employed** 16:11

**Employee** 12:5

**employer** 9:7

**end** 9:17

**ended** 43:14

**English** 20:4

**entire** 35:10

**environment** 27:2 53:9,10

**equal** 32:15

**equate** 47:24 48:14

**establishing** 14:1

**ethnicity** 45:14

**Europe** 49:25 50:3

**evaluate** 21:6

**Evansville** 4:12

**evening** 31:15 32:25

**events** 26:8 31:22 32:1

**eventually** 39:16

**evidently** 43:12

**EXAMINATION** 5:5

**examined** 5:4

**excuse** 6:25 39:14 43:13 44:21

**exhibit** 29:10,12,13 32:3,4 41:6, 7,24

**expect** 37:6

**expectations** 49:7

**experience** 12:20,23 35:25

**experiences** 12:19

**explain** 23:22 53:6

**explained** 41:1

**extra** 14:1,4

---

**F**

**fabric** 23:6 27:9

**facility** 14:12

**fact** 23:9 25:16

**faculty** 16:11 32:13 33:6 34:25 45:23 49:17

**fair** 36:11 51:2

**fall** 21:25 46:15

**family** 11:18

**fashion** 25:4

**federal** 5:15

**feel** 11:15,19 23:15 25:2 27:1 53:9,13

**felt** 32:12

**figure** 19:20 51:22

**filed** 9:4

**filled** 18:19

**filling** 17:3

**find** 19:3,5 21:22 29:22 36:14,16, 19 38:8,14 43:2 47:9

---

**fingers** 24:6

**Fischer** 4:5,7,22 8:14,17 27:4 29:18 40:25 41:17 42:1,4,13,21 51:15 54:2

**fix** 36:20

**fob** 38:20 39:9 40:5,13,18,23 41:2,3,13

**football** 21:18

**forward** 49:5

**foundation** 40:25 41:18

**frankly** 48:2

**Friday** 31:15 43:8

**front** 24:10

---

**G**

**game** 21:18

**garment** 23:2

**Garrison** 51:9

**gate** 21:19

**gave** 8:11,12 35:18 37:21 45:22 46:6,8

**German** 50:6

**Germany** 50:21

**get all** 38:4

**give** 5:22 29:20 32:7 39:22 41:12 44:19 48:17 51:19

**giving** 35:11

**good** 22:24

**goodness** 41:5

**Gore** 17:10 40:17

**Gore's** 45:18,20

**government** 7:14 36:13

**granted** 42:15,18

**great** 42:21 52:19

**greet** 22:10

**guess** 7:13 10:4 22:3 24:18 49:1 50:22

**guys** 50:11

**gym** 22:15

---

**H**

**hallway** 22:12 25:23

**hand** 24:3 25:17,20 26:2,12

**Hang** 32:6

**happen** 8:11 26:8 30:13

**happened** 20:11 21:20 22:6,12 24:5,25 25:15,18 31:13 34:12,15

**happening** 19:24 49:2

**happy** 11:18 52:10 53:1

**harassed** 53:12

**harassment** 53:4

**hard** 51:18 52:21

**Hayes** 15:13,17,24

**hear** 4:9 33:23

**heard** 4:6

**held** 4:15

**helped** 22:15

**helpful** 41:1

**high** 9:14,21,25 10:9 13:22 15:8, 12,20 16:12,22 22:6 32:22 34:17, 20 47:2,6 49:17

**hire** 17:5

**hired** 10:1 12:18

**Hispanic** 45:13

**history** 20:23

**hit** 10:8

**Hohenfels** 10:9 18:23

**hold** 41:6 42:1

**holds** 5:20

**Hollie** 15:14

**Holt** 18:12,21,25

**home** 9:22

**honest** 7:9 31:12

**honestly** 11:16 23:3 28:13 40:8

**hope** 12:14

**hotels** 22:17

**hug** 26:20,21,25

Index: hurt..make

**hurt** 25:17 26:11

**husband** 22:15

**I**

**ice** 25:16 26:4,14

**identifies** 45:11,19

**identify** 4:17

**Ill** 4:20 5:16

**immense** 11:24

**important** 51:2

**importantly** 46:19

**incident** 23:19 24:1,16 25:1,8,9, 11 26:16 28:3 30:5

**incidents** 25:2

**include** 16:17 41:7,25

**included** 16:24 41:20,24 42:9,10 53:25

**increase** 16:20,22

**Indiana** 4:12

**individual** 26:20

**influence** 48:15

**information** 5:17 46:4,17 49:6 50:22 51:5,7

**inside** 49:2

**intent** 27:8 30:12

**interact** 10:11

**interaction** 21:24

**interactions** 10:20

**interim** 10:8

**international** 12:8

**interrupt** 6:1,3 24:14

**interrupted** 29:21

**involved** 10:17 14:1 19:15 20:1, 16

**involving** 14:11

**ISS** 16:1,3,5,6

**ISSS** 17:3 18:22

**issue** 40:10 44:16,19

**issues** 21:10 22:13

**items** 28:25

**J**

**Jake** 36:15

**January** 22:7 28:3

**Japan** 32:25

**job** 7:19

**Jones** 14:18 15:9 31:16 32:18,21 33:12,16 34:16 35:1,20 38:18 43:13,14,15 44:10 47:10,16,19 48:13,20,21

**Jones'** 41:24 42:5

**June** 9:18

**K**

**keeping** 22:16

**key** 38:20 39:9,18 40:5,13,18,23 41:2,3,13 42:7,15,18 43:17

**keys** 21:21 22:5 38:25 39:4 42:24 43:16,22 44:3,17,23,25

**kids** 22:17 36:17 37:25 38:8 48:5 49:3 53:10

**kind** 12:5 16:8 19:2 21:24 22:3,4 23:5 24:4 27:9 33:8 48:7 49:7

**kinds** 49:4

**knew** 21:4 24:7,13 39:21 46:11

**know** 6:12 7:2,9 10:15,18 13:4,7 14:13,16 15:22 16:13 17:12,15,21 18:2 19:9 20:19,23 21:1,5,9,22 22:11,15,16,21 23:10,17 24:4,11 25:18,25 26:20,24 27:20,24 28:2, 11,17 31:14,16,17 33:15,24 34:1, 3,14 35:2,3,5,7,8,10,13,14,16,21 36:5,8,9,10,11,15,18,19,24 37:3, 11,15,20 38:12,16,22,23,25 39:4 40:10 41:13,19 44:16,19 45:14,25 46:5,6,8,16,18 47:23,25 48:14,16 49:7 50:21,24 51:5,7,9 52:6,7,9, 14,15,23,24 53:3,5,8,14

**knowledge** 17:24 34:3

**L**

**lack** 40:25 41:17

**laptop** 35:19 36:11,22 37:7,8,9, 12,16,17 38:2,17

**laptops** 38:1,3

**large** 12:6

**lawsuit** 5:15

**left** 31:16

**lesson** 18:16,21,22,23

**level** 14:22 15:7,11,14 21:14 46:19,20

**lighting** 24:10

**likes** 26:21

**lingering** 28:24

**list** 32:13,17 45:24 46:3,10 49:16 50:12,16,23 51:4

**literacy** 16:5

**Lloyd** 4:20,23 5:16

**local** 49:11 50:21

**located** 4:2 49:25

**lock** 35:18

**long** 6:11 7:21 9:11,16,25 10:3 11:24 36:24 37:7 44:13

**longer** 36:23 46:14

**looked** 8:4,7 30:24

**lost** 21:17,25

**lot** 12:4 14:3,10 19:25 20:2,11 40:8 46:1 48:6,11 49:1 51:8,12 52:17

**lower** 23:2

**lunchroom** 14:5

**M**

**made** 8:22 27:1 28:19 30:20 33:2, 14 38:19 47:5,21,24 48:10,16

**Main** 4:11

**major** 14:17 25:7

**make** 4:8 6:8 7:20 19:7 24:8 26:1

Index: makes..place

42:2

**makes**  6:4,22

**making**  7:13 23:4 27:11 31:9
46:22

**male**  45:11,19

**manage**  12:21

**managed**  14:8

**managing**  12:3,4

**mandatory**  22:7

**manner**  27:23

**maps**  21:7

**March**  11:11

**marked**  29:13 32:3

**married**  10:23

**math**  16:5,6 19:7,14 20:14,22

**matters**  53:25

**meant**  28:14

**medications**  6:17,19

**meeting**  14:15,16 21:23

**meetings**  14:19 20:13 32:24

**Melissa**  15:13

**mention**  14:2

**mentioned**  51:22

**mentor**  18:8,13,17

**mentoring**  18:9

**message**  44:4

**met**  8:8,10,20 21:16 25:23

**Michael**  17:10 40:12 45:10,12

**Miles**  40:17 45:18,20 47:1

**mine**  21:14

**minor**  35:6

**minute**  29:20

**mischaracterizes**  27:4 51:16

**mischaracterizing**  42:14

**missed**  51:2

**mistreated**  32:12

**mixed**  11:16,18

**Moellendick**  35:23 36:15

**monitoring**  14:5

**Mons**  4:2

**Moon**  14:24 15:2

**morning**  32:25 33:1 48:17

**move**  11:17

**moved**  15:25

**N**

**nail**  26:3

**named**  45:8

**nature**  7:11

**necessarily**  26:5

**needed**  10:17 36:6 43:13

**nice**  23:6,10,11 27:19,21,24 28:1

**nicks**  26:3

**nods**  6:8

**notice**  25:23 30:22

**noticed**  25:13 26:11

**notification**  11:9

**number**  16:20,22 36:3

**numbers**  40:4

**nuts**  49:1

**O**

**oath**  5:19

**object**  41:17 42:13

**Objection**  27:4 40:25 51:15

**obligation**  5:22

**observe**  25:11,13

**observed**  25:5

**observing**  24:20

**occasion**  14:6

**offended**  23:15

**offer**  11:13

**office**  12:4 15:24 27:10 35:10

**officially**  10:9 44:2

**open**  21:19

**opened**  22:9 48:3

**operations**  33:2 35:6

**original**  30:25 31:10

**OTC**  16:8

**P**

**pack**  26:4

**pain**  26:12

**Pam**  19:12

**parking**  52:17

**parole**  7:21

**part**  10:7 21:11 34:25 35:4 47:6
49:5

**passed**  44:13

**past**  25:22 27:9 28:23

**payroll**  13:15

**Payson**  18:5,19 19:11,17 20:14

**people**  17:2,5,7 19:5,8,18 21:8
33:23 34:3,13 35:3,5,16 36:6,21,
24 38:3 39:1 46:14 50:20 51:9
53:8

**person**  16:7 26:21,22 44:22
47:11

**person's**  38:16

**personal**  21:14,20 22:3,4 23:20
25:3 27:23 28:4,9,22,24 36:10
52:22

**personally**  28:20 33:17

**persons**  4:18

**pertaining**  30:4

**phone**  24:8

**phonetic**  22:9

**phrased**  24:15

**picture**  25:21

**pictures**  26:2,13

**pitch**  20:7

**place**  8:12 34:16 38:1

Index: plaintiff..Rincon

**plaintiff**  4:20 5:15

**plan**  12:14

**plans**  14:20 18:16,21,22,23

**plate**  48:6

**play**  23:24

**pleasant**  10:21 23:14

**point**  6:24,25 39:24 50:17

**pointed**  22:24 23:4,6

**pointing**  27:8

**policy**  53:3,7,15

**position**  9:13 11:10 17:13 27:15

**positions**  17:4,5

**positive**  23:8

**pre-deposition**  8:5

**prepare**  8:3

**present**  4:18,23 27:12

**presented**  6:14

**pretty**  31:12,18 32:25

**previous**  7:19 15:9 28:21 52:19

**principal**  9:14 10:8 11:23 12:10, 16,24,25 13:1,5,8,10,11,12,16,18, 24 14:14 15:8

**print**  23:5

**prior**  15:9 28:3,7

**privilege**  8:18

**pro**  4:19 5:15

**problem**  39:3 44:24

**problems**  33:7

**proceeding**  7:18

**process**  11:13

**professional**  21:15 22:2,4

**promotion**  11:15

**protocols**  49:12 50:7

**purse**  28:25

**put**  13:3 40:8

**Q**

**qualified**  19:5

**question**  6:14 11:19 12:11 24:15,18,21 42:16 50:25

**questioned**  28:21 29:1

**questions**  5:6,17 6:2,3 8:6 33:7 34:13 46:1

**R**

**R-O-D-M-A-N**  5:12

**R2**  29:12,13,16

**R3**  32:3 42:11

**race**  11:4 45:12,14,20

**Rachana**  4:22 8:10

**Ramstein**  18:13,25

**range**  12:9 16:13

**re-**  39:4

**re-cover**  46:20

**re-imaged**  39:5

**reach**  23:1

**react**  23:16

**reacting**  26:5

**reaction**  25:7,22,24 26:9,11,16

**reactions**  25:5 26:15

**reason**  6:21 31:5,11 39:6,7 41:7 52:15 53:12

**reasonable**  44:15

**reasons**  52:24

**reassigned**  18:8,10

**reboot**  37:5

**recall**  19:2,10 20:5 21:6 23:3 27:6,11 28:7,13,15,19 29:4,5,7 46:11 48:18

**receive**  50:15 51:6

**received**  34:7 44:22 50:11,13 51:5

**recently**  25:22

**recognize**  29:14,25 32:5,9

**Recon**  23:9

**record**  4:18 5:9 53:25

**referred**  48:16

**referring**  42:22

**refused**  40:23 41:2

**regular**  19:4

**relating**  49:3

**relations**  12:5

**relationship**  21:13

**relocation**  11:20

**rely**  19:18

**remember**  17:7,9 18:4,7,9,11,12 19:11,23 21:2,8,16,23 26:3 28:9 29:3 33:21 34:11 41:20,22 46:11 47:14,16

**remotely**  4:3

**removed**  32:12 45:23 46:10 50:15 51:4

**reply**  30:25 31:3,9,18

**reporter**  4:1,3,5,8 5:20,25 6:4,7 14:25 15:3,5 53:21

**requested**  41:21 52:10

**reset**  39:5

**resources**  36:6,14,16 37:23 38:4 48:4

**respond**  30:24

**responded**  44:6

**responding**  45:1

**response**  23:12 24:20 25:8,9,11, 13 27:17 30:9,10 43:6,9,12 44:8, 22

**responsibilities**  11:22 12:15,25 13:11,13,23 14:3

**responsible**  16:7

**retrieve**  29:18

**review**  8:2 28:18

**Richardson**  4:11

**rights**  46:7

**Rincon**  22:9 27:13

**Rodman**  4:16 5:1,7,12 42:19 43:17 53:3,22

**Rodman's**  42:10,11

**role**  38:25

**roles**  14:17

**room**  15:24 38:10,13

**roughly**  16:13,14 17:6

**rules**  5:19

**rundown**  48:17

### S

**S-H-A-W-N**  5:12

**safe**  53:9,13

**schedule**  12:3 46:22

**school**  9:14,19,21,22,25 10:6,9, 17 12:6,8 13:22 15:8,12,20 16:12, 22 17:8,15 18:1 21:24 22:7 27:15 32:15,16,23 33:3,9,18 34:17,20 35:15 37:14 38:19 39:1,10 40:2,5, 7,12,17,21,23 41:4,16 45:5,6,9 46:5 47:2,5,6,19,22 48:3,25 49:17,22 50:8,11,18,25 51:24 52:13

**schools**  43:24

**science**  18:19 19:8 20:20,21 46:23

**scramble**  19:2

**scrambling**  36:16

**screen**  29:17 30:17

**secretaries**  16:15

**secretary**  22:10 27:13,16 43:25 44:1

**section**  16:9

**security**  14:9

**separate**  17:22 32:1

**separated**  30:23

**September**  43:1

**serve**  20:17

**set**  35:12

**sex**  45:10,18

**SHAPE**  9:14

**share**  8:14

**Shawn**  4:16 5:1,12 53:22

**Shelby**  22:9 27:13 38:24

**shirt**  22:23 28:1

**shocked**  24:4 26:6,7

**short**  12:2 20:3

**shortage**  36:5

**showed**  26:1

**showing**  49:3

**shut**  24:6

**shuts**  24:11

**side**  8:8

**sign**  13:15

**signed**  8:22

**single**  48:17

**sitting**  38:10

**situation**  13:8 28:15 29:6 48:13, 19 52:9

**slammed**  25:20

**sleeve**  22:24 23:7 27:9

**Smithson**  4:4,19 5:6 41:1 42:3,8, 17 53:18 54:1

**Smithson's**  38:12,13

**Snowden**  18:5,7,9,13 19:11

**sound**  51:10

**space**  23:20 25:3 26:10 28:5,9,23 39:23

**spare**  38:2

**speak**  9:1

**speaking**  51:10

**special**  12:20 14:4,19

**specific**  20:5 30:20 37:9,16

**specifically**  28:11 33:21 34:11 41:22 46:12 47:17 53:14

**SPED**  16:16,17

**spell**  5:7,9

**sports**  14:12

**staff**  12:4 16:1,11,16,17,25 20:7 33:6 34:25 35:10,24 45:23 49:17 50:2 53:11

**staffing**  11:25 39:25 47:3,11

**stand**  21:9

**Standard**  4:13

**stands**  27:25

**start**  29:9 32:16

**started**  9:17

**state**  5:7,8 53:23

**statements**  5:22 6:8 7:20

**states**  42:15,17 50:9 53:14

**stationed**  10:10

**status**  47:9

**stay**  52:10,16

**stayed**  16:23

**Stewart**  4:11

**stipulate**  4:1

**stipulations**  53:24

**Street**  4:11

**strengths**  12:18

**student**  14:5

**students**  12:2,6 36:3

**subbing**  19:24,25

**subordinates**  27:23

**substitute**  28:13 35:19 37:8

**substituted**  14:6

**substitutes**  12:3 20:7

**successful**  52:8

**suggested**  24:9

**Suite**  4:11

**summed**  53:17

**summer**  9:18

**superintendent**  16:1

**supervised**  14:8

**supervision**  46:15

**supervisor**  14:22,23 15:7,11,15 20:18 32:20 50:20

Index: support..weight

**support** 19:19

**supposed** 29:17 38:24 44:22 46:3 47:13 49:4

**Susan** 18:12

**switch** 37:1

**switched** 20:19

**sworn** 4:2 5:2

---

**T**

**taking** 6:17

**talk** 12:17,22 23:17 33:10

**talked** 35:3,7

**talking** 23:24 39:11,12,18

**Tamica** 4:19

**targeted** 28:11

**teacher** 18:16 32:14 33:9 35:19 40:22 46:23

**teacher's** 32:14

**teachers** 12:2 14:6,7 16:16,24 17:12 19:4 33:5,6,15 36:1,17 38:8 43:22 45:8,9 48:24 50:12

**teaching** 16:25 20:4

**Teams** 35:12

**Teresa** 14:24

**term** 49:1

**terms** 46:15,16

**territory** 46:2

**test** 22:7 30:6 31:2

**testified** 5:4 7:17

**testify** 7:1,20

**testifying** 5:21

**testimony** 6:18 27:5

**thing** 7:12 25:19,25 31:14

**things** 12:5 13:4,14,16,20 14:2, 12,21 17:23 20:2,16 21:8,16 22:16 23:7,13 33:17 35:6,8,12 48:1,6,18 49:2,5,8 50:23,24 52:18

**thinking** 40:9 51:18 52:20

**thought** 22:24 23:5,8,14,16 26:10 40:9 43:13

**Thursday** 43:7

**time** 4:13,14 7:21 8:6,12 11:17 13:25 14:15 15:13 17:2 19:19 20:12 21:16 23:12 25:12 26:19 27:12 31:7 32:7,20,21 35:19 38:18 46:1,5,9,11 47:3,19 48:3,7 49:13 51:3 53:19

**titled** 31:2

**today** 6:18 29:19 51:10

**Today's** 4:12

**told** 24:2,5 27:18 47:15 52:25 53:1

**touch** 23:1 26:17

**touched** 25:4

**touching** 27:6

**touchy** 26:21

**tough** 11:17

**track** 37:2

**transcribe** 5:25 6:7

**transcript** 53:24

**transition** 32:22

**trips** 14:9,10

**truth** 5:3

**truthful** 5:22

**truthfully** 7:1

**Tuesday** 31:2,3,8,19

**type** 26:21

**types** 48:24

**Typically** 43:25

---

**U**

**Uh-huh** 23:25 32:19 37:10 42:3

**uh-huhs** 6:7

**unable** 7:1

**uncomfortable** 30:20 31:9

**understand** 5:23 6:5,9,15 7:4

**understanding** 29:2 52:3,4,7,12

**United** 50:9

**unwanted** 25:4

**unwantedly** 25:4

**updates** 38:6 49:11 50:7

**upset** 23:20 24:16 25:2,15,21,25 31:12,15 51:11,21,23 52:2

**upstairs** 16:8

**usage** 14:12

---

**V**

**vacant** 16:9

**Valenzuela** 17:10 39:1 40:12 46:25

**Valenzuela's** 45:10,12

**verbal** 6:8 8:22

**verbatim** 53:5,16

**Villarreal** 15:10 17:25 20:1,20

**Vilseck** 9:21,25 10:10 11:16 13:22 15:8,12,20 16:12,21 21:17 32:22 34:17,20 47:2,6 49:17,24

**violated** 23:21 25:3

**violating** 26:10 28:4,9,22

**virtual** 10:6 17:8,15 37:13 39:9 40:7,22 41:16 45:5,6,9 46:4 47:4 49:21,23 50:8,18,24 51:24 52:13

**visit** 31:2,3,8

**visited** 22:6

---

**W**

**walk-throughs** 14:7

**walked** 23:7,13,18

**walking** 27:9 28:23

**wanted** 4:8 14:18 22:14,19,20 26:1 33:12,23 34:13 35:11 44:25 52:5,16,20

**wanting** 52:23

**wearing** 27:25

**week** 10:14 13:2 30:12 31:19 44:14,21

**weeks** 9:17 20:4

**weight** 5:20

Index: white..Zoom

**white** 11:5 45:21

**witness'** 27:5 51:16

**witnessed** 23:20,22,23 24:16 25:1

**Wolff** 29:4 36:16 41:9,12 42:24 43:7,8,11,15,16,19,23 44:1,5,25 47:14

**word** 18:17 24:19

**worded** 24:18

**work** 9:9,20,22,25 10:3 27:2 38:9 44:18 46:22 53:10,13

**worked** 9:11,23 40:6

**working** 11:6 19:11 20:9 37:13 39:9 50:3,17 52:11

**workplace** 9:5 53:3

**worried** 25:16,17

**wrist** 23:2

**write** 34:13

**wrongfully** 51:4

**wrote** 19:10 31:6 34:22 35:3,4,5

—————————————
              **Y**
—————————————

**year** 7:10 9:18,19 10:2 11:6 15:9 16:19 18:4 19:20,24 20:3 21:4,7 25:23 32:16 37:4,14 39:10,11,25 40:3,5,12,17,21 41:4,15 46:25 47:7 48:9,25 51:13 52:19

**years** 15:15 16:21 17:3 18:3 19:21 20:17 21:2,4 36:23 40:3

**youth** 14:12

—————————————
              **Z**
—————————————

**Zoom** 4:15

```
1        UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                        AT WASHINGTON DC
2     _____

3    TAMICA SMITHSON                    )
                                        )
4              Complainant             )    EEOC NO.:
                                        )    570-2019-00926X
5    Vs.                                )
                                        )    AGENCY NO.:
6    US DEPT. OF DEFENSE               )    EU-FY18-054
                                        )
7              Agency                   )
                                        )
8                                       )
      _____
9     _____

10        Telephonic Deposition Upon Oral Examination

11                            of

12                     MARC VILLAREAL

13              VOLUME I (Pages 1 - 96)

14    _____
      _____
15

16                     1:00 p.m.
                      April 24, 2020
17                   Vilseck, Germany

18

19

20

21

22

23

24    Zoya O. Spencer, Court Reporter
      CCR # 2418
25
```

```
 1                       APPEARANCES

 2


 3    FOR THE COMPLAINANT:

 4            BRADLEY R. MARSHALL
              Designated Representative
 5            Chartmans, Inc.
              1240 Winnowing Way, Suite 102
 6            Mt. Pleasant, South Carolina 29466
              Telephone: 843 303-9532
 7            Email: Brad@Charmans.com

 8

 9    FOR THE AGENCY:

              MAXWELL G. SELZ
10            Deputy General Counsel
              DoD Dependents Schools - Europe/Pacific
11            Phone: DSN 545-1592/CIV: +49
              (0)611-1435451592/ Cell +49-(0)162-2704730
12            Maxwell.Selz@eu.dodea.edu

13

14    ALSO PRESENT:

              TAMICA SMITHSON
15

16

17                       I N D E X

18

19    EXAMINATION                                  PAGE

20
      BY MR. MARSHALL                                3
21

22

23                 NO EXHIBITS MARKED

24

25
```

```
 1                      MARC VILLAREAL,
                   witness herein, having been
 2                   duly sworn, was deposed
                        and said as follows:
 3

 4                        EXAMINATION

 5    BY MR. MARSHALL:

 6       Q.  All right, sir.  My name is Brad Marshall, I

 7    represent Ms. Tamica Smithson in a case that's now

 8    before the Equal Employment Opportunity Commission, and

 9    I appreciate you making yourself available for your

10    deposition.  My understanding is that we have some time

11    today and we will have some time on Tuesday to complete

12    your deposition.  Apparently you're not available

13    Monday.  Is that correct, sir?

14       A.  I am available on Monday.  I believe it is

15    Mr. Rodman who wasn't available Tuesday so we switched

16    time slots.  But, yes, I believe what you said is

17    accurate that we will meet today, and if we need to

18    continue we can continue on to Tuesday.

19       Q.  Okay, super duper.  Alrighty.

20           Have you had your deposition taken before, sir?

21       A.  This is my very first time.

22       Q.  Okay.  So I'm going to give you some basic

23    instructions to keep in mind.  Mr. Selz may have already

24    gone over some of this with you, but just for the

25    record, my job here is to ask you questions that you
```

MARC VILLAREAL - Vol. I (April 24, 2020)                    4

```
 1    understand.  If at any point in time you don't
 2    understand a question, just let me know and I'll restate
 3    the question.
 4         It's also important for me to wait until you've
 5    completed your answer before I ask a follow-up question.
 6    But because of this being a telephone deposition,
 7    sometimes that becomes difficult, so I will try to give
 8    you plenty of space to answer the question.  At the same
 9    time, it's important for you, even though you may
10    anticipate my question before I've actually completed
11    it, just allow me to finish the question so the record's
12    clear before you begin to answer.
13         If you need a break for any reason, it's no
14    problem at all, just let me know.  We will be taking
15    breaks probably once every 50 or 60 minutes.  But that's
16    pretty much the instructions that I have for you.
17         Do you have a computer in front of you, sir?
18    A.   I have a computer in front of me.
19    Q.   Okay.  Have you been provided a copy of the
20    report of investigation?
21    A.   I have been provided a copy of the report of
22    investigation.
23    Q.   All right.  Have you reviewed the report, sir?
24    A.   I have particularly reviewed my statement.
25    Q.   All right, sir.  Have you reviewed the
```

1    statements of anyone else?

2       A.   Sir, I've really, because it's large document, I

3    can't say that my eyes haven't hit other statements, but

4    I just reviewed my statement.

5       Q.   Okay.  So you have looked at other statements

6    but you didn't review them carefully; is that what

7    you're saying?

8       A.   Right, yes.

9       Q.   Okay.  What other statements have you reviewed,

10   sir, or looked at?

11      A.   I cannot recall -- I can't tell you anything

12   about any other statement.  I just used my name in my

13   search to look for them.  I'm telling you the truth,

14   whole truth, and nothing but the truth.  I can't say my

15   eyes haven't seen them looking for another, but I've

16   just reviewed my statement.  I can't remember anything

17   from any other statement at the moment.

18      Q.   Okay, sir.  Other than the reviews that you have

19   indicated here today, have you reviewed any other

20   documents, sir, in preparation for your deposition?

21      A.   I would say reviewing emails that I've sent to

22   Ms. Smithson on her reasonable accommodation, the

23   reasonable accommodation updates and the like.

24      Q.   And what format were those reviewed in?  In

25   other words, were those emails that you had been

MARC VILLAREAL - Vol. I (April 24, 2020)

```
 1    provided here in the last week or so?
 2         A.   Negative.  Just using my own Outlook, just
 3    searching emails that I have.
 4         Q.   Okay.  Have you spoken with anyone, sir,
 5    regarding this case, other than Mr. Selz?
 6         A.   I was just going to say, other than Mr. Selz,
 7    no, sir.
 8         Q.   Okay, sir.  You haven't spoken with anyone who's
 9    testified in this case, have you?
10         A.   Negative.  No, sir.
11         Q.   Okay, very good.  All right.  And would you do
12    me a favor?  While I'm asking questions this morning,
13    unless I indicate to you to review something, please
14    don't review anything on your computer or within the
15    report or any emails unless I ask you to do so; is that
16    okay, sir?
17         A.   That sounds one hundred percent fair.
18         Q.   Okay, excellent.  Thank you very, very much.
19              All right, Mr. Villareal, please provided some
20    background information, education and work experience
21    with the federal government, please.
22         A.   Can you just repeat the question one more time?
23         Q.   Sure.  Your work experience and your -- with the
24    federal government and your educational background.
25         A.   Okay.  I guess I'll start from my own
```

MARC VILLAREAL - Vol. I (April 24, 2020)                    7

```
 1    chronological sense of my own educational background.  I
 2    graduated high school in Madison, Wisconsin, in 1991 and
 3    I went to the University of Wisconsin Madison, pursued a
 4    bachelor of science.  Started off engineering, ended up
 5    switching when I found out -- I made the decision I
 6    wanted to go into engineering -- sorry, education, found
 7    a teaching program, a master's program where you could
 8    get a certificate for teaching called Teach for
 9    Diversity.  So I went straight through to get a master's
10    in education, I think that was 1997 when that was all
11    said and done.  I taught here in the United States and
12    then I began my career with the federal government.  I
13    took a position in 1998 as a teacher in Okinawa, Japan,
14    in the military base.  I taught there for a couple
15    years.  Back then, we had an active transfer round.  I
16    used the transfer round and moved to Sigonella, Sicily,
17    at a Navy base there.  From Sicily, I took a transfer to
18    Bitburg, Germany, taught there for six years.  Got a
19    transfer back to Sigonella, to Sicily, and that's when I
20    applied for my first position in administration and I
21    took an assistant principal's job in Schweinfurt,
22    Germany.  I was there until essentially Schweinfurt
23    closed.  Just before it closed, they sent me to my next
24    duty station which was my second assistant principal
25    position in Roda, Spain.  And from Roda, Spain, I
```

1    accepted a position for the principal position that I'm

2    now filling, which is principal of Vilseck High School.

3    This is my first position as a principal.

4         Q.   Am I correct that you served as an assistant

5    principal before; is that correct?

6         A.   Correct, in two duty situations both, in

7    Schweinfurt, Germany, and Roda, Spain, Roda Middle High

8    School.

9         Q.   Now, during the time that you served as

10   assistant principal and principal, have you had -- have

11   you been the subject of an EEO complaint other than with

12   Ms. Smithson, sir?

13        A.   Okay, have I been the subject.  I have been the

14   subject of one other case that is not with Ms. Smithson.

15        Q.   Okay.  What school was that, sir, at?

16        A.   Vilseck High School.

17        Q.   Okay.  And who was the person that filed the

18   complaint, sir?

19        A.   His name is Michael Priser.

20        Q.   What was the nature of the complaint that was

21   filed?

22        A.   A discrimination suit, it is EEO.  He wanted to

23   be able to be excessed because -- and this was just last

24   year, there was -- if you were declared excessed, you

25   would be entitled to the -- what is it -- the VSIP, a

MARC VILLAREAL - VOL. I (April 24, 2020)                    9

```
 1    cash award.  But he was my school psychologist.  And

 2    just following the guidance on the directives that I was

 3    given, I can't excess a position that I need at my

 4    school.  And I can't -- I only have one school

 5    psychologist, so if I excess that position, that means

 6    I'm saying I don't need a school psychologist.  Does

 7    that make sense?  But he's a certified math teacher and

 8    wanted to be declared excessed, and, you know, I was not

 9    able to do that and that was the source of the claim.

10    Does that answer your question, sir?

11        Q.   Yes.  What's the pending status of that claim?

12        A.   I received questions, I want to say last spring.

13    I really do not recall.  But I've heard nothing since

14    then.

15        Q.   Okay.  No other EEO complaints, sir?

16        A.   Negative.

17        Q.   All right.  Have you been the subject of any

18    union grievances concerning your conduct towards an

19    employee, sir?

20        A.   Never.

21        Q.   Okay.  Have you ever personally filed an EEO

22    complaint yourself?

23        A.   Never.

24        Q.   Okay.  Now, Mr. Villareal, how long have you

25    worked with Mr. Shawn Rodman?
```

1     A.   We've been working together since I took this

2     position August 1st, 2016.

3     Q.   He's been your assistant principal during that

4     time -- since that time, sir?

5     A.   Correct.

6     Q.   All right.  Have you worked with him prior to

7     your becoming principal?

8     A.   I never worked with him prior to that.

9     Q.   Okay.  All right.  Mr. Villareal, have you

10    received training as a principal for protected -- EEO

11    protected activity or EEO claims, have you received any

12    training in that since you've been principal, sir?

13    A.   Absolutely.

14    Q.   Can you tell me what training you've received in

15    that regard?

16    A.   We were offered training by the EEO office.  I

17    can remember Robin Jamison my first year when she

18    conducted it, and the second year.  But it is always

19    we've had basically a week of training every year that

20    I've been a principal.  The last couple years, it's been

21    in August, but not every year it's been at the very,

22    very beginning of the year.  But every time when they

23    pull us for trainings for a year -- for the year, there

24    are different sections that you can choose from and

25    there are some mandatory sections, and every year I've

MARC VILLAREAL - VOL. I (April 24, 2020)

1    gone through training for EEO.

2       Q.   Have you had training concerning disability

3    discrimination or reasonable accommodations, sir?

4       A.   Yes, in the same format, again, when they pull

5    all principals together and host trainings, I have

6    received training.

7       Q.   All right, sir.  And this was as a principal; is

8    that correct, sir?

9       A.   That is correct.

10      Q.   During your time as a principal, did you learn

11   that Ms. Smithson had or has a physical or mental

12   disability?

13      A.   Did I learn as a principal that she has a

14   physical or a medical disability, was that the question?

15      Q.   Physical or mental disability, yes, sir.

16      A.   I have been notified, yes.  In fact, I've seen

17   the medical documentation supporting her reasonable

18   accommodation.

19      Q.   So you became aware that she had a physical and

20   a mental disability, or one or the other?

21      A.   I believe it is both.

22      Q.   Do you want to add something, sir?

23      A.   No, no.

24      Q.   Okay.  When did you first learn that

25   Ms. Smithson had both a physical and mental disability?

 1       A.   I cannot specifically recall.  It was certainly

 2   in my first year as principal, but it wasn't something I

 3   found out my first day in my first year as principal,

 4   but I cannot specifically remember when I first found

 5   out.

 6       Q.   What major life activity did Ms. Smithson

 7   suffer?

 8       A.   Can you repeat the question?

 9       Q.   Yes, sir.  You've indicated that Ms. Smithson

10   suffered with both a physical and mental disability, and

11   my question is:  What major life activity did she have

12   difficulty performing?

13       A.   I know she suffers from nausea, vertigo, I

14   believe, ADHD.  I still don't know if I'm answering your

15   question, and I'm trying to, sir, the best I can.  Can

16   you ask me the question one more time?  What major life

17   activity can she not --

18       Q.   Yes, sir.  Well, yes.  Let me try to get at it

19   this way.  What was her diagnosis, as far as you know?

20       A.   Well, I know she suffers from debilitating

21   migraines -- I know migraines and possibly medication, I

22   know -- and she's mentioned ADHD to me.  Am I answering

23   your question?

24       Q.   Yes, I think you are, sir.  Is there any other

25   information regarding her diagnosis that you were made

MARC VILLAREAL - Vol. I (April 24, 2020)                    13

```
 1    aware of?

 2        A.   Well, I'm aware that it's chronic.  I remember

 3    being mentioned that it was chronic and more or less

 4    degenerative, that it will get worse, not better.  Does

 5    that make sense?

 6        Q.   Now, insofar as her diagnoses are concerned,

 7    what did she have difficulty doing in terms of her

 8    normal work as a teacher?

 9        A.   Her normal work as a teacher or her normal --

10    her job?  Because there are a lot of tasks that might

11    not be related to teaching that are still part of the

12    job description.  I'm not sure I understand the

13    question.

14        Q.   Yes, I think that's a fair distinction.  Just if

15    you could answer it the best you know how, sir, in terms

16    of her duties as a teacher, what did she have difficulty

17    doing as a result of her medical condition?

18        A.   I guess I want to make it clear, I don't want

19    to -- I have a great deal of sympathy for Ms. Smithson,

20    because she has shared a number -- I mean, some things

21    can be as simple as just being in a room with all the

22    lights on can be -- I think put her in pain or

23    discomfort, and I've tried to accommodate in every

24    situation where we've been there.  If she's in her own

25    classroom, she has much more control over something like
```

MARC VILLAREAL - Vol. I (April 24, 2020)                14

 1    that.  But in general meetings, faculty gatherings, that

 2    can be a problem.

 3            I do believe mobility can be an issue.  I don't

 4    know if that's because of the vertigo, but she's

 5    mentioned to me before as a teacher that she feels more

 6    comfortable sitting most of the time.

 7            But there are -- I know the medication that she

 8    takes, she has mentioned affects her in the morning and

 9    it has affected her ability to -- I would say just to

10    generally function while she's in a range of time

11    between when she's taken that medication; I believe

12    that's the way she's explained it to me.  And that could

13    be anything.  Like sometimes it can be as simple as she

14    just needs some time, like she's been here at the

15    building and just needed time to go up the stairs.  Or

16    sometimes she's had to call in and just said that she's

17    not able to come in at this time and basically perform

18    any of the functions.

19        Q.  Now, in terms of her diagnosis, do you know

20    which of the diagnoses impacted her mentally and which

21    impacted her physically?

22        A.  Sir, I'm just going to say no.  I'm not a

23    medical professional.  And I feel it's my job to work

24    with reasonable accommodations to work with her for the

25    position so that she can function in her job, but I

MARC VILLAREAL - Vol. I (April 24, 2020)                    15

1    can't tell you which diagnosis is affecting which --

2    causing which symptom, et cetera.

3        Q.   Alrighty.  Did you at any point in time ever

4    seek clarification from an independent medical provider

5    concerning what Ms. Smithson was conveying to you or

6    what her medical providers were conveying to you?

7        A.   Negative.  No.  Have I ever gone to another

8    medical provider, is that your question?

9        Q.   My question --

10           MR. MARSHALL:  Zoya, would you repeat the

11       question for the witness, please.

12           (The record was read back by the reporter.)

13       A.   No, never.  Negative.

14       Q.   During the time that you served as principal,

15   were there any questions in your mind about

16   Ms. Smithson's ability to perform her duties as teacher?

17       A.   If she calls me and says that she can't come in,

18   sure, I'm concerned.  I'm concerned, period, for her

19   health, for her well being.  I'm not sure I completely

20   understand the question.  You know, if you're asking me

21   if I ever questioned her capability to teach.  When

22   she's here and she's well, she's a fully successful

23   teacher.  She's a very good teacher.

24       Q.   Did you at any point in time provide performance

25   evaluations for Ms. Smithson?

MARC VILLAREAL - Vol. I (April 24, 2020)                16

```
 1        A.   Yes, sir.
 2        Q.   Did you at any time in those performance
 3   evaluations indicate that she was deficient in her work
 4   as a teacher?
 5        A.   Negative.
 6        Q.   Did you ever convey to her that you thought her
 7   disability may pose a problem for her in performing her
 8   duties?
 9        A.   Can you repeat the question one more time?
10        Q.   Sure?
11             MR. MARSHALL:  Zoya, would you read the question
12        back for the witness, please.
13             (The record was read back by the reporter.)
14        A.   That her disability may pose a problem for her
15   performing her duties, I believe my answer is no, sir.
16   I guess I'm still a little confused by the question.  If
17   she calls me and is unable to come to work, then she
18   can't perform the duty.  But when she's --
19        Q.   Did you at any point -- go ahead, sir.
20        A.   Yeah, because -- and, you know, she now notifies
21   me, and I don't go into details, you know, I don't ask
22   her, you know, are you not feeling well, do you have a
23   sick child, do you -- but I believe it's fair to assume
24   very often it's connected with her disability that she
25   has called in and exercise d her reasonable
```

MARC VILLAREAL - Vol. I (April 24, 2020)

1    accommodation.  But I have never done the reverse thing,

2    you know, I see you here at school, Ms. Smithson, but I

3    believe your disability is getting in the way of you

4    being able to perform your duties.  I've never had that

5    conversation with her.

6         Q.   Is Ms. Smithson, in your estimation, qualified

7    to perform the duties of a teacher?

8         A.   She is qualified to teach biology, chemistry and

9    general science, yes, and maybe more.

10        Q.   What are the essential functions of

11   Ms. Smithson's job as a teacher?

12        A.   That honestly is like a full page document or

13   more if you go into the job description.  Obviously,

14   teaching is a part of the position and it is the main,

15   the principal part of the position.  And Ms. Smithson

16   does that very well.  But there are many other parts of

17   that -- of being a teacher that can be considered

18   critical.  Taking attendance is part of the job.  It has

19   nothing to do with teaching but is part of the job

20   description.  You know, being responsible for students,

21   being responsible -- or just classroom management,

22   conduct, communication with parents, communication with

23   administration, communication with the students, those

24   are all parts of the job description.  Collaborating

25   with peers, attending trainings.  Yeah, again, I think

MARC VILLAREAL - Vol. I (April 24, 2020)                    18

1     I'm repeating saying collaboration.  There are many,

2     meaning facets.  I cannot recall everything that's in

3     the job description but I could certainly find that and

4     share that with you.

5         Q.  No, that's fine.  I just wanted your

6     understanding, sir.  Thank you.

7             Were you made aware at the time that you became

8     principal that Ms. Smithson had been granted a

9     reasonable accommodation by your predecessors?

10        A.  Negative.  No, sir.

11        Q.  Okay.  Did you ever become aware that your

12    predecessors had granted Ms. Smithson a reasonable

13    accommodation?

14        A.  Yes.

15        Q.  And when did you become aware of that, sir?

16        A.  I specifically do not recall.  Again, I know it

17    was within my first year, I know it was not my first day

18    there.  I mean probably within the first month of me

19    working at the school.  I just don't -- I don't recall

20    when I became aware of it, I just don't specifically

21    recall.

22        Q.  How did you become aware of the prior?

23        A.  If I could answer that, I could probably answer

24    the previous question.  Honestly, I specifically don't

25    recall.  I remember seeing it in her file but I don't

*Spencer & Associates  (206)382-9695  Court Reporters*

MARC VILLAREAL - Vol. I (April 24, 2020)

```
 1   know if it was from a conversation from her, I don't
 2   remember if it was Mr. Rodman drawing it to my
 3   attention.  I don't specifically recall, I really don't.
 4      Q.  How long had Mr. Rodman been at the school
 5   before you arrived, sir?
 6      A.  He was at the school one school year before me,
 7   so he would have started in August of 2015.
 8      Q.  Do you know school principal Duane Werner?
 9      A.  I met Duane Werner a few times, we were in the
10   same district, I was in Schweinfurt when he was
11   principal of Vilseck High School.  And when I was in
12   Roda, Spain, he ended up taking the principalship in
13   Naples.  So I know we attended trainings together.
14      Q.  Did you ever have discussions with Mr. Werner
15   regarding Ms. Smithson?
16      A.  Never.  Never.
17      Q.  Do you know Robert Nicholson?
18      A.  I know Robert Nicholson.
19      Q.  How do you know him, sir?
20      A.  Again, when I was the assistant principal in
21   Schweinfurt in 2011, I believe he accepted a promotion
22   as an assistant principal at Schweinfurt Elementary
23   School.  And I believe after one year of us working
24   together there, he accepted the principalship here in
25   Vilseck.  I don't remember how long he was there.  But I
```

 1     knew him in Schweinfurt, and again we were a relatively

 2     small district in Bavaria here before Germany went to

 3     one big district.  So we had district training,

 4     basically monthly I would see Mr. Nicholson.

 5         Q.  Did you ever have any conversations with

 6     Mr. Nicholson about Ms. Smithson?

 7         A.  Negative.  He retired before I came here.  And

 8     when I was working at Schweinfurt, I don't believe I

 9     knew anybody on the Vilseck staff apart from the

10     administration, so we would just meet at district

11     meetings.

12         Q.  After you became principal, was Ms. Smithson's

13     disability and accommodations the first employee in

14     which you served as principal?  In other words, was this

15     the first teacher that was requesting or was given

16     reasonable accommodations?

17         A.  She was, if not the first, one of the first

18     cases that I was dealing with as a principal, yes.

19         Q.  Were there any other teachers -- I'm sorry, go

20     ahead, sir.

21         A.  This is my first school.  So as principal,

22     whoever was on reasonable accommodation, they were my

23     first cases.

24         Q.  How many other teachers had a reasonable

25     accommodation at the school when you became principal?

MARC VILLAREAL - Vol. I (April 24, 2020)

```
1        A.  Sir, I don't specifically recall, I really
2    don't.
3        Q.  Just your best estimate, sir.
4        A.  I would say less than five.
5        Q.  Okay.  Can you provide the names of those
6    teachers, please?
7        A.  I honestly, I can't, no.  I don't recall.  It
8    would have been a handful.
9        Q.  You don't recall any of the teachers that have a
10   reasonable accommodation?
11       A.  You're saying back in 2016, just again --
12       Q.  Through the present, sir.
13       A.  Through the present.  I'm trying to do the
14   truth, the whole truth, nothing but the truth.  I'm
15   trying not to blur it between school years because the
16   years blur a little bit.  I know I've worked with
17   reasonable accommodations for teachers that had back
18   issues, like Mr. Ed Fierman got a chair and a standing
19   desk.  Mr. --
20       Q.  Can you spell his last name please?
21       A.  Sure, it's F-I-E-R-M-A-N.  Ms. Natasha Lance,
22   also similar medical issues, chair, standing desk sort
23   of issue.
24       Q.  Anyone else, sir?
25       A.  Mr. Telesfor Martinez.
```

MARC VILLAREAL - Vol. I (April 24, 2020)

```
 1        Q.   What was his reasonable accommodation?
 2        A.   I believe, again, back issues, standing desk.  I
 3   don't think he had a chair.  I believe that's the extent
 4   of it.
 5        Q.   Who else, sir?
 6        A.   Right now, sir, that's all that I can draw from
 7   memory.
 8        Q.   Can you give me the first names of each of these
 9   individuals, please?
10        A.   Sure, sure.  Edward Fierman, Natasha Lance.
11        Q.   Is it L-A-N-C-E?
12        A.   Correct.  And Telesfor Martinez.  Telesfor is
13   his first name.
14        Q.   Yes, sir.  Do you know who Mr. Krebsbach is,
15   sir?
16        A.   I do.
17        Q.   Was Mr. Krebsbach provided a reasonable
18   accommodation during your tenure as principal?
19        A.   I do not specifically recall.  I would have to
20   check.  I do not recall at this moment.
21        Q.   Now, he testified that he was provided a
22   reasonable accommodation.  Is each of these teachers,
23   Fierman, Lance, Martinez and Krebsbach, they're all
24   teachers, correct?
25        A.   Correct, correct.
```

MARC VILLAREAL - Vol. I (April 24, 2020)

1      Q.   And they all -- you either serve as their first

2    line or their second line supervisor; is that correct?

3      A.   Correct.

4      Q.   And you would be the person who either approved

5    or disapproved of their requests for reasonable

6    accommodation?

7      A.   Correct.  Unless they predated me.  You know,

8    some -- but I think each of those would have been while

9    I was principal here.

10     Q.   All right, sir.  Did you take away or change

11    their reasonable accommodations at all since you've been

12    the principal at the school there?

13     A.   I don't know if any of them have had updates to

14    their reasonable accommodations at the moment, I don't

15    specifically recall.

16     Q.   Well, the question is:  Do you have any

17    knowledge that their accommodations have either been

18    removed or if they've been adjusted, as you sit here

19    today do you have any such knowledge?

20     A.   Negative.

21     Q.   When a person requests a reasonable

22    accommodation and is approved for the reasonable

23    accommodation, is there a requirement that they have the

24    accommodation updated each year?

25     A.   To the best of my knowledge, no.

MARC VILLAREAL - Vol. I (April 24, 2020)                    24

```
 1      Q.   When you arrived -- and I understand you may not

 2   be able to give me a specific day, but did you at any

 3   point in time review the written accommodations that had

 4   been provided to Ms. Smithson by Mr. Werner and

 5   Mr. Nicholson, sir?

 6      A.   Did I ever review them, is that your question?

 7      Q.   Yes, sir.

 8      A.   Yes.  Yes, sir, I did.

 9      Q.   All right.  When did you do that, approximately?

10   And I understand you can't give me a specific date.

11      A.   Again, I would say for sure in the first year of

12   my principalship, sometime in 2016.  I would say even as

13   specific as I could get it would be sometime in the year

14   2016, for sure in that school year.  But I would think

15   it was somewhere in the first month as being principal

16   here, not in the first day, I just can't specifically

17   recall when.

18      Q.   Now, had you provided or reviewed and/or decided

19   reasonable accommodations when you served as assistant

20   principal?

21      A.   I remember specifically working on one situation

22   with an employee, a supply tech that I worked with when

23   I was in Roda, Spain, I worked through the process with

24   that person.  There may have been more, honestly.

25      Q.   Okay.  What do you mean when you say worked
```

MARC VILLAREAL - Vol. I (April 24, 2020)

```
1    through the process?
2        A.   He needed an accommodation and it was a new
3    accommodation, not an existing one, so my principal at
4    that time had asked me to work with whoever our contact
5    was from the med district in 2014 or whatever years it
6    was that can you please work with the person with
7    reasonable accommodations.  And his first name is Ed, I
8    can't remember his last name right now, but just worked
9    through the process to work the paperwork for the
10   reasonable accommodations.
11       Q.   Would you please describe for me, when you
12   arrived in 2016 to Vilseck up through the present --
13   well, strike that.
14            If you would describe what the process was for
15   granting or approving a reasonable accommodation insofar
16   as the policies are concerned when you arrived at
17   Vilseck in 2016, sir.
18       A.   Can you please repeat that question?
19       Q.   Sure.  I'm asking if you would please describe
20   the policies of the agency as it relates to the process
21   for approving or disapproving of a reasonable
22   accommodation when you arrived in 2016.
23       A.   Are you saying to describe the process or --
24       Q.   Yes, sir.
25       A.   Okay.  Okay.  In general, it has been, you know,
```

```
 1    if an employee has an issue where they need an

 2    accommodation at work, we work with the reasonable

 3    accommodation specialist, whoever that is, and they

 4    really make sure that we are staying within policy

 5    because sometimes there is -- an employee may ask for an

 6    accommodation and there may be an alternative that's

 7    offered that still meets it, it may not be what the

 8    employee was asking for, so it's not necessarily an

 9    employee asks for something and is granted something,

10    you know, and it may be something better than they had

11    thought possible, it's just there's a process where we

12    look at, you know, what the disability is, we work with

13    the experts, and at the end of the day the reasonable

14    accommodation is presented by the principal and is

15    signed by the principal and shared with the employee.

16    Does that answer your question?

17        Q.   Just understand, sir, I'm not allowed to answer

18    questions unless it's something logistical or

19    procedural.  So I'm not trying to be rude or anything by

20    not responding.

21        A.   Okay.

22        Q.   So let me move to another question.

23             You're familiar with the interactive process, are

24    you not, sir?

25        A.   I am familiar with the interactive process,
```

MARC VILLAREAL - Vol. I (April 24, 2020)                    27

 1    correct.

 2        Q.   Okay.  So as I understand it, the process

 3    entails, one, a request for reasonable accommodation

 4    which is placed on a form the agency provides employees,

 5    correct?

 6        A.   Can you repeat the question?  I'm sorry, I'm not

 7    trying to be difficult, but --

 8        Q.   I'm just trying to be sure, can you physically

 9    hear me okay, sir?

10        A.   Yes, I do.

11        Q.   Okay.  My understanding is the process begins

12    with an -- when an employee desires a reasonable

13    accommodation, they are required to complete -- and I'm

14    going back to 2016, they're required a complete a form

15    where they articulate on the form what their disability

16    is and what accommodation they're seeking; is that

17    correct?

18        A.   And supply medical documentation, yes.

19        Q.   I was going to get to that but I just want to

20    take it one step at a time.  There's a form and they

21    need to complete that form, correct?

22        A.   Correct, correct.

23        Q.   All right.  And the form requires them to

24    request what -- to provide the nature of their

25    disability and the request in terms of the

MARC VILLAREAL - Vol. I (April 24, 2020)                    28

1     accommodation, that would also be required, correct?

2        A.   Correct.

3        Q.   As well as providing medical documentation to

4     support the request; is that correct?

5        A.   Correct.

6        Q.   All right.  And then the principal or the agency

7     officials then review that material and they meet with

8     the employee for an interactive process, correct?

9        A.   Correct.

10       Q.   All right.  And after reviewing it and

11    discussing it with the employee, they are required to

12    complete the form by indicating whether they've approved

13    it or disapproved the request; is that correct?

14       A.   I'm sorry, can you ask the question one more

15    time?  I'm sorry.

16       Q.   Okay.  Stay with me now, Mr. Villareal;

17    otherwise, we'll be here all day.  You've got to listen

18    carefully to my question.

19            After they have the interactive process, they

20    then are required to either approve or disapprove of the

21    request and complete a form -- complete the form that

22    indicates that; is that a correct statement, sir?

23       A.   Who is approving that, the administrator, the

24    agency?

25       Q.   Yes, sir, yes, sir.

MARC VILLAREAL - Vol. I (April 24, 2020)

```
 1        A.   That sounds accurate.

 2        Q.   Okay.  And so now --

 3        A.   I'm getting lost with the pronouns, I'm sorry.

 4        Q.   So once the document is completed and there's an

 5   approval, that approval or disapproval is provided to

 6   the employee, correct?

 7        A.   The approval or disapproval is provided to the

 8   employee, yes, yes, that's correct.

 9        Q.   Okay.  And what happens to that document, that

10   completed document, what does the administrator do --

11   what's done with that document, sir?

12        A.   Well, after it is shared with the employee?

13        Q.   Yes, sir.

14        A.   I've kept a record of it apart from their

15   personnel file, I've just kept a record of the

16   reasonable accommodation.

17        Q.   In the case of Ms. Smithson, where were those

18   records kept?

19        A.   I think I know the conversation that you're

20   going with.  When I first came here, her reasonable

21   accommodations were in the personnel file which were --

22   they're files that's kept in a secured filing cabinet

23   behind a locked door in the secretary's office which is

24   behind a locked door in the main office.  And that is no

25   longer the case, but that is where I first found the
```

MARC VILLAREAL - Vol. I (April 24, 2020)                    30

1      reasonable accommodation.

2          Q.   Okay.  Now, is that location appropriate under

3      the policies of the agency, sir?

4          A.   Honestly, when it was brought to my attention, I

5      just figured I would err on the side of caution.

6      Whether it's appropriate or not, I keep it apart from

7      there.

8          Q.   Why is that, sir?

9          A.   It was brought to my attention by Ms. Smithson

10     that it was in there and so I have just -- I have kept

11     it apart since then.  But, again, I just figured it was

12     appropriate to err on the side of caution.  There's no

13     one else that has access to it where it was other than

14     the secretary that has the keys to it.  But to be safe,

15     because it does have sensitive medical documentation in

16     there, I've kept it apart.

17         Q.   Who is the secretary that had the keys to that

18     information, sir?

19         A.   The secretary now is Syretta White.  The

20     secretary before her was Dewanna Dean.  I believe the

21     secretary before that was Christina Phipps.  I don't

22     know if there was anyone else in between there.

23         Q.   Did Ms. Smithson bring this to your attention,

24     sir?

25         A.   Yes, sir.

MARC VILLAREAL - Vol. I (April 24, 2020)

```
 1        Q.   When did she do that?

 2        A.   I do not specifically recall.

 3        Q.   Can you give me an estimate, your best estimate,

 4   sir?

 5        A.   It was not that first school year I was here, it

 6   was not within the school year in '16-17.  My guess

 7   would have been school year '17-18.

 8        Q.   What specifically did Ms. Smithson say to you

 9   when she brought it to your attention?

10        A.   Again, I don't specifically remember the words,

11   I really don't.  And I believe it was an email just

12   bringing to my attention that it was there and she

13   thought that it didn't belong in that file.

14        Q.   Did she indicate that she thought her private

15   confidential medical information had been breached?

16        A.   She may have used those words.  I have -- okay,

17   she may have used those words.

18        Q.   Did you have a face-to-face conversation with

19   her about it?

20        A.   If we did, I really do not specifically recall.

21   I will not say impossible, but I do not specifically

22   recall face-to-face about that, that file.

23        Q.   Did she -- did you investigate who had put that

24   information in the location that you found it?

25        A.   Negative.  It was there when I had arrived so it
```

```
 1    wasn't the current secretary that had put it there, it
 2    was the secretary that was prior to me, and really only
 3    there just the first few weeks that I was principal here
 4    was Christina Phipps, but it could have been in there by
 5    the secretaries prior.  But to answer your question, no,
 6    I did not investigate.
 7        Q.   And, Mr. Villareal, I understand that you moved
 8    it.  Where did you move it to?
 9        A.   I have that specific medical file in a locked
10    desk drawer in my office.
11        Q.   And you would agree, would you not, sir, that
12    the information that was in this other location would
13    have been accessible to the secretary?
14        A.   It would have been accessible to the secretary.
15        Q.   And also to other administrators; is that
16    correct, sir?
17        A.   It would have been accessible to other
18    administrators.
19        Q.   And my understanding is it would have been
20    accessible to other instructors, other teachers as well,
21    depending on what duties they had?
22        A.   I don't believe that is correct.  If the
23    secretary was asked by a teacher for another teacher's
24    file, that would not be approved.  I cannot think of one
25    reason why another teacher would need to see another
```

1    teacher's file.

2        Q.   Would that also apply to the chairpersons of

3    each department?

4        A.   They would have no reason to go into those

5    files.

6        Q.   You would agree that other staff that works in

7    the office there would have had access to those

8    materials, correct?

9        A.   No, I would not agree to that.  There's one key.

10   And I remember when I got here, there was just one key.

11   In fact, we got a new filing cabinet because there was

12   only one working key which almost broke, and we would

13   have had the files locked and had to get a locksmith to

14   open it up.  So we have a new -- in our office, we have

15   a new filing cabinet there that has separate copies, but

16   that type of medical information is not in there any

17   longer.

18       Q.   Did you remove other medical information of

19   other teachers and/or employees since that time now,

20   sir?

21       A.   Yes, sir.  Yes, sir.

22       Q.   When was that -- when did you remove that

23   information, sir?

24       A.   Again, the same time that was brought to my

25   attention, I would estimate school year '17-18.  I

MARC VILLAREAL - Vol. I (April 24, 2020)                    34

```
 1    couldn't begin to tell you what month or when.

 2         Q.   You indicated that you did not conduct an

 3    investigation.  Why not, sir?

 4         A.   Because it had clearly been placed there prior

 5    to my arrival.  The people that were working in the

 6    office no longer worked in our school, no longer worked

 7    for DoDEA.  I don't even know how -- and there's -- it

 8    just would have been very difficult to conduct an

 9    investigation.  I thought the best thing to do at that

10    point was to take it out, and moving forward, I also had

11    no evidence that the security had been breached, that

12    anybody else had seen it, it just was in the wrong place

13    or at least there was a potential risk having it in that

14    place and it was more secure in a locked file desk in my

15    office.

16         Q.   How come you did not speak to Mr. Rodman about

17    the teachers' medical information?

18         A.   I would have to check with him.  I may have

19    asked him about that.  I honestly don't specifically

20    recall if I asked him about that breach.  I may have.

21    But I wouldn't call speaking to Mr. Rodman an

22    investigation.

23         Q.   Just so I'm correct, as you sit here today, you

24    don't have any recollection of having spoken with

25    Mr. Rodman about the circumstances involving the
```

MARC VILLAREAL - Vol. I (April 24, 2020)                    35

```
 1    location of Ms. Smithson's private confidential medical

 2    information, sir?

 3        A.  I guess I'm stating it the way I do because I

 4    may have talked to him about the location of it, you

 5    know, just specifically for his own edification about

 6    what files should be kept where, and that I may have --

 7    you know, that there may have been something that may be

 8    kept somewhere else.  I tend to believe I had that

 9    conversation with him.  I just can't specifically recall

10    a conversation from years ago, I don't specifically

11    recall.

12        Q.  Did I understand you to testify that there were

13    other medical files located in that same area that you

14    had to remove as well?

15        A.  Other reasonable accommodations.  Does that make

16    sense?

17        Q.  Who were the employees whose files that had

18    reasonable accommodations that you moved, sir?

19        A.  I don't specifically recall.  I don't

20    specifically recall.

21        Q.  Do you recall that you actually did have to

22    remove the files of employees who had reasonable

23    accommodations other than Ms. Smithson, sir?

24        A.  Yes, I recall moving other files, looking

25    through -- yes, sir.
```

MARC VILLAREAL - VOL. I (April 24, 2020)

1      Q.   Did -- can you tell me the names of those

2   employees, sir, or the number of employees whose files

3   had to be removed?

4      A.   No.  Honestly, I can't remember names, I can't

5   remember numbers.  Again, when we're looking at these

6   names, it's a small number and we've had employees who

7   have since left.  I don't --

8      Q.   Wouldn't it be in your file there in your desk,

9   sir?

10      A.   Again, we have employees that would have

11   specifically -- that have left that are no longer with

12   us.  No, I don't specifically --

13      Q.   But this is my question.  As it relates to

14   whoever the employees are, are you saying there

15   presently are employees that have reasonable

16   accommodations and whose files are in your desk?

17      A.   Oh, do I have other reasonable accommodations

18   that are here now, yes.

19      Q.   Yes, that's what I'm asking.  What are the names

20   of those employees, sir?

21      A.   Again, and the reason I'm just using caution is

22   I don't want to be guilty of omission.  I'm not trying

23   to hide anything, but --

24      Q.   Just so you know, sir, this is a federally

25   protected, private proceeding.  So any information you

```
1    provide to me is going to remain confidential.  But for
2    purposes of analysis, we are entitled to that
3    information, sir.
4        A.   Right.  So I have records of medical information
5    of reasonable accommodation, I know for Edward Fierman,
6    Natasha Lance, Telesfor Martinez.  And, again, there may
7    be others.  But I would have to check on Michael
8    Krebsbach, but I have no reason to believe I don't on
9    him too.  You mentioned his name.
10       Q.   Well, speaking of Mr. Krebsbach, he indicated
11   that he did not complete a reasonable accommodation form
12   but he was given a reasonable accommodation kind of in
13   an informal way.  Is that consistent with policy?
14       A.   I don't know what reasonable accommodation --
15   that's why I said -- I didn't list his name to begin
16   with.  You said that he was claiming to have one or
17   claiming that he had reasonable accommodation.
18       Q.   Yes, sir.
19       A.   I don't specifically recall granting an informal
20   one to Mr. Krebsbach.
21       Q.   Is there an informal process by which a
22   reasonable accommodation can be granted that you know
23   of?
24       A.   Not that I'm aware of, sir, no.
25       Q.   Now, as I understand your testimony,
```

 1    Ms. Smithson was the person who brought to your

 2    attention that her private confidential medical

 3    information was being housed in a location that

 4    compromised her confidentiality; is that correct, sir?

 5        A.   She brought to my attention the location of it,

 6    that is correct.

 7        Q.   And I understand you don't recall when she did

 8    that, but do you know how she learned that that was

 9    happening?

10        A.   No, sir.  And if she told me back then, I don't

11    specifically recall.

12        Q.   All right, sir.  Now, just if you would

13    estimate, how long, sir, had you been at the school when

14    you learned from Ms. Smithson that her private medical

15    information was being compromised?

16        A.   I don't know that her medical information was

17    compromised.

18        Q.   Well, I thought you indicated that the secretary

19    would have had access to that information, and others as

20    well.

21        A.   That file, I can tell you specifically in the

22    personnel file where it was, it was the very last pages

23    on the very back of it.  So I don't know that anybody

24    saw it that didn't need to.  The secretaries go in there

25    and they add new trainings, they add SF-50s.  And they

MARC VILLAREAL - Vol. I (April 24, 2020)                    39

1    don't do it anymore.  That is when we used to do it with

2    hardcopy and paper.  But I don't know that the secretary

3    went in and looked through the back files of her

4    personnel files here and saw medical documentation.  I

5    don't know that it was compromised.

6        Q.  But, sir, you would agree that the secretary

7    would not be a person that should have access to that

8    information, correct?

9        A.  I agree that it was better stored elsewhere,

10   that's why I moved it.

11       Q.  And the secretary would not be in a position to

12   know that information, that confidential medical

13   information, correct?

14       A.  Correct.

15       Q.  All right.  And, again, you took action to

16   remove it.

17            My original question was:  When in terms of

18   when you became aware of it -- I thought you said you

19   don't know the actual date you learned of it, right?

20       A.  Yes, I do not know the date I learned of it, I

21   do not.

22       Q.  You would agree, would you not, sir, that DoDEA

23   has a very strict policy that such information should be

24   protected at all times; you would agree with that, would

25   you not, sir?

MARC VILLAREAL - Vol. I (April 24, 2020)

```
 1      A.  Sir -- and, again, I'm just trying to as
 2   factually answer your question as possible -- I do not
 3   have rote memorization of DoDEA policy.  I do not know
 4   the DoDEA policy because you asked if DoDEA policy
 5   strictly forbids this.  I thought it was a good decision
 6   anyhow to move it, but I don't know if DoDEA policy
 7   forbids it.  I thought it was a good idea to move it.
 8      Q.  You're familiar PII, though, correct?
 9      A.  Correct.
10      Q.  You understand the policies --
11      A.  The secretaries, they have to --
12      Q.  Hold on one second, please.
13      A.  Yes, sir.
14      Q.  Just one second, please.
15      A.  Yes.
16      Q.  Mr. Villareal, I just need know, are you
17   familiar with the PII policy of DoDEA?
18      A.  Yes, sir.  We go through annual training.  Yes,
19   sir.
20      Q.  Okay.  So you understand and you agree that
21   these policies are supposed to be adhered to, correct?
22      A.  Correct.
23          MR. MARSHALL:  All right.  At this time we're
24   going to go ahead and take our break.  I have about
25   8:17.  Let's go ahead and come back at 8:30, okay.
```

1        Let's take a 15 minute break.  8:30, 8:32.  Is that

2        okay with you Mr. Selz?

3             MR. SELZ:  Yes.

4             (A brief recess was taken.)

5        Q.   Mr. Villareal, as I understand your testimony,

6    you indicated that when you looked into the file, that

7    the medical records were at the bottom of the file; is

8    that correct, sir?

9        A.   I believe they were on the back page at the back

10   because they have these folding -- I don't know how to

11   describe it -- hole punched and you find these things at

12   the back, I do believe that's where they were.

13       Q.   All right.  And do you have the file with you

14   right now, sir?

15       A.   I have changed desks since then.  I do believe I

16   have her original reasonable accommodation.  I know I

17   changed it to electronic so I could access it more

18   quickly that way.  But, yes, I believe I have her file.

19       Q.   Can you look and see where the medical records

20   are in the file at this time, sir?

21       A.   No, I don't have -- her personnel file is still

22   there, I just removed the medical documents from there.

23       Q.   I see, okay.  Now, how many times did Ms. Tamica

24   Smithson convey to you, either through email, mail or

25   some other means, that her medical information was being

MARC VILLAREAL - Vol. I (April 24, 2020)                42

```
 1    breached?

 2        A.  I do not recall --

 3        Q.  I'm sorry, that's my -- okay, just a moment,

 4    please.

 5            (Brief pause in proceedings.)

 6        A.  Sir, I do not recall.

 7        Q.  I apologize, my dog was barking so I had to get

 8    him.  My apologies.

 9            You said you just don't recall, Mr. Villareal,

10    how many times she mentioned it to you?

11        A.  No, no, I do not.

12        Q.  All right.  Mr. Villareal, would you agree, sir,

13    that breaching a person's confidential medical records

14    could create problems for that person if teachers are

15    aware of her condition and begin to taunt her for it?

16        A.  Do I agree that breaching her file could -- can

17    you repeat the whole question?

18        Q.  Yes.  I'm just interest in knowing -- you

19    understand why PII is such an important policy for the

20    agency and for its employees to protect; do you agree,

21    sir?

22        A.  I agree, sir.

23        Q.  And you would agree that the medical --

24    confidential medical information about her disability,

25    in this case Ms. Smithson's disability, if that
```

MARC VILLAREAL - Vol. I (April 24, 2020)                    43

1    information was disseminated to teachers, that that

2    could have adverse effect on Ms. Smithson; would you

3    agree with that?

4       A.   You're asking me if it was breached and it was

5    disseminated, could it have an adverse effect.  There's

6    really only one answer.  Yes, it could.

7       Q.   Okay.  Thank you, sir.  Now, the reason I asked

8    that question, sir, is because I previously asked you

9    did you investigate what had happened with respect to

10   this breach, and you indicated you had not.

11      A.   You asked me, sir, if I investigated who put

12   that in the file.  Am I incorrect?  I believe that was

13   your question, who put that in the file.  That was my

14   understanding.

15      Q.   No, that was not my question.

16           My question was:  Did you investigate -- when

17   Ms. Smithson communicated to you that someone had

18   breached her medical files, did you investigate that,

19   sir?

20      A.   Well, I followed up with Ms. Smithson.

21      Q.   Right.  But did you go and talk to the secretary

22   and talk with -- find out from Mr. Rodman and others who

23   may have had access to that information, sir?

24      A.   I --

25      Q.   I thought you said you had not, but I might be

MARC VILLAREAL - Vol. I (April 24, 2020)

1    wrong.

2         A.   No, I said I had not.  And I guess I'm just kind

3    of belaboring the definition of investigation, because,

4    again, I don't recall whether I talked about it with

5    Mr. Rodman or not.  I do believe I spoke with him just

6    about the procedure of what should be stored there, I

7    believe I had that conversation, but I don't recall.

8    But, you know --

9         Q.   Would Mr. Rodman's -- I'm sorry.  Go ahead, sir.

10        A.   I didn't feel like the best way to resolve the

11   situation would be to investigate, or, you know -- and

12   questions of the staff, have you seen those files that

13   maybe you shouldn't have.  I was just trying to bring

14   closure to the situation.  I was addressing the

15   situation, I just wouldn't use the word "investigate"

16   with the actions that I took.  I took action.

17        Q.   Sir, Ms. Smithson contacted you on multiple

18   occasions regarding her concerns about her confidential

19   medical information being breached, right?

20        A.   I don't know if it was multiple.  I told you

21   that I don't recall how many times that she wrote me.

22        Q.   But, I mean, she spoke with you about it as

23   well, right?  I mean, you and she had conversations

24   about this?

25        A.   I told you, again, I don't recall face-to-face.

MARC VILLAREAL - Vol. I (April 24, 2020)

```
 1    I thought -- I thought it was email.  I don't recall --
 2        Q.  We do have the emails, but I'm asking about
 3    conversations that you and she had about it, sir.
 4        A.  I don't recall.  Honestly, sir, I don't
 5    specifically recall.
 6        Q.  Now, you do recall Ms. Smithson telling you that
 7    she was being -- she was being subjected to hostility in
 8    the workplace, correct?
 9        A.  I have that in emails from her, yes, yes.
10        Q.  And she also informed you that she was the
11    subject of being spied upon and people reporting back on
12    her lessons and class performance to Mr. Rodman and to
13    yourself, correct?
14        A.  Can you rephrase -- or not rephrase, can you
15    restate that question?
16        Q.  Yes.  You recall that Ms. Smithson told you that
17    she was the subject of people spying on her and
18    reporting back on her lesson plans and class performance
19    to yourself and to Mr. Rodman?
20        A.  The only response I can give is she alleged that
21    those occurrences happened.  She --
22        Q.  Yes, sir.  How many times -- how many times did
23    she say to you that she was being spied on, sir?
24        A.  I don't specifically recall, sir, I really
25    don't.
```

1       Q.   That's okay.  I just want your best estimate.

2    How many times would you estimate she reported this to

3    you, sir?

4       A.   Maybe I have a better memory for email than

5    conversation.  I specifically remember seeing it in an

6    email, I don't remember her saying those words to me.

7    Maybe she did.

8       Q.   Did you ever, after you received the emails, did

9    you ever meet with her to discuss what she was conveying

10   to you in an email, sir?

11      A.   I know I responded to the email where I

12   articulated to her that, you know, those people have not

13   been sent by me or anyone.  The only -- I believe I used

14   words along the lines that the only persons that have

15   gone into her classroom to evaluate her are Mr. Rodman

16   or me.  I know I articulated in an email that what the

17   allegations were were just not true.  I don't want to

18   put judgment.  It's fair for her to have those beliefs,

19   you know.  I don't want to discredit that at all.  But I

20   just wanted to state that I put in an email that,

21   Ms. Smith, it's just not the case.

22      Q.   Didn't Ms. Smithson convey to you, sir, that in

23   addition to her confidential medical records being

24   breached, that people were making reference to her

25   disability?

```
 1        A.   Sir, the only honest answer I can give is maybe.
 2    I don't remember her specifically talking about
 3    people -- I do recall her saying, you know, that she
 4    felt like she was in a hostile work environment.  I
 5    don't recall if she said to me, I believe I'm in a
 6    hostile work environment, people are discriminating
 7    against me because of my disability.  I don't recall
 8    that conversation.
 9        Q.   Well, help me understand.  Do you recall any of
10    the conversations you've had where you and she actually
11    spoke face to face?
12        A.   Yes, sir, I recall the conversations.
13        Q.   What conversation do you recall where you spoke
14    face to face?
15        A.   What conversations do I recall speaking face to
16    face?
17        Q.   Uh-huh.
18        A.   We recently, when I saw her pausing going up the
19    stairs, you know, I remember checking on her, making
20    sure that she's well.  She looked like she was taking
21    her time going up the stairs maybe a little -- maybe
22    that she wasn't feeling her best, I remember having
23    conversations about that.  I've had specific
24    conversations with her about duties, grades, parents.
25    She's articulated to me before that she has felt that
```

MARC VILLAREAL - Vol. I (April 24, 2020)

1    she's been treated unfairly.  But I don't specifically

2    remember her saying, "because of my disability," I

3    don't.

4        Q.  Well, what did you understand her to mean when

5    she said that she was being treated unfairly, sir?

6        A.  Well, if she felt she was being treated

7    unfairly, it's just my job to correct it, it doesn't

8    matter the what root cause.  I want whatever behavior --

9    whatever transgression or whatever allegation, I just

10   want the behavior to stop.

11       Q.  But Mr. Villareal, I'm asking a different

12   question.  When you heard her tell you that she was

13   being treatment unfairly, what did you understand the

14   reason to be for her being treated this way, sir, if you

15   know?

16       A.  I can't say I specifically know.  You know, a

17   person -- I just -- I don't specifically know.

18       Q.  You never had her in your office and asked that

19   question, sir?

20       A.  I never had her in my office, to the best of my

21   knowledge, and asked her why, why do you feel like

22   you're in a hostile environment.  To the best of my

23   knowledge, I don't believe I ever asked that question,

24   sir.

25       Q.  Did you ever ask her what was being done or said

MARC VILLAREAL - Vol. I (April 24, 2020)

1    to her that made her feel like she was in a hostile work

2    environment?

3        A.  Yes, sir, I do believe I've asked that question

4    and I believe we've even had conversations, but she's

5    done a great job of following up with emails saying, you

6    know what, these are some of the things that I

7    consider -- I believe her using the words like

8    "microaggression," different things that she took

9    offense to to behaviors from her colleagues.

10       Q.  Right.  She's made clear to you, sir, that the

11   nature of what she has experienced is related to her

12   disability, correct?

13       A.  I don't have the understanding that it was

14   because of her disability that someone walked in and

15   interrupted her classroom, I never made that connection,

16   nor did I think it was an appropriate part of the

17   conversation.  If she feels there's too many

18   interruptions in the class, I think it's my job to stop

19   the interruptions in the class --

20       Q.  I apologize.  I thought you had finished your

21   answer, sir.

22           Now, this is the concern I have, Mr. Villareal.

23   If a person has a medical disability and has been given

24   reasonable accommodations, you understand that that's

25   protected under the Rehabilitation Act, correct?

MARC VILLAREAL - Vol. I (April 24, 2020)                    50

```
 1        A.   Yes.

 2        Q.   And the policies of the agency; you understand

 3   that, sir?

 4        A.   Yes, sir.

 5        Q.   And you understand that an employ -- a teacher

 6   like Ms. Smithson is entitled to have those

 7   accommodations and not be the subject of jokes and

 8   tauntings and harassment; you agree with that as well,

 9   right?

10        A.   I agree with that, sir.  I believe everybody is

11   entitled to that, or deserves that.

12        Q.   And you agree that Ms. Smithson conveyed to you

13   on multiple occasions that she was being, in addition to

14   being spied on, she was suffering from telephone calls,

15   interruptions, unprofessional distractions, in an

16   attempt to create a hostile work environment, and a lot

17   of this was coming from your secretary, sir, who had

18   access to her medical records?  You understand that,

19   right, Mr. Villareal?

20        A.   Sir, there's just some things inaccurate with

21   that timeline.  Again, I believe this is about two, two

22   and a half years ago when these files that are in my

23   desk drawer that are in my hand right now, were taken

24   out of her file that was in the secretary's office.

25   That secretary has been gone for well over a year.  So
```

MARC VILLAREAL - Vol. I (April 24, 2020)

1    it is not -- it's not even plausible that my secretary I

2    have now is a part of the disruptions that Ms. Smithson

3    was reporting disruptions this school year.

4        Q.   No, but I'm speaking of September of 2017, the

5    records that were in that file that the secretary had

6    access to --

7        A.   Okay.

8        Q.   -- that was the case in September of 2017; isn't

9    that true, sir?

10       A.   It could be true.  I can't confirm, but it could

11   be true.

12       Q.   And a lot of the teachers who she complained

13   about, Ms. Smithson that is, were present in 2017 up

14   through the present; isn't that true, sir?  And I could

15   give you the names if you would like.

16       A.   Why don't you give me the names if it would

17   help.

18       Q.   Sure.  Layna Castle.  Nancy Kelley-Burne, Fred

19   Conrad, Michael Krebsbach, Ms. Rodman -- Judy Rodman.

20   These people have been there.  Pam Connors.  These

21   people have all been there for some time, now, haven't

22   they, since '17?

23       A.   Most of those people are.  Ms. Castle was a

24   substitute, that was PCS'd over a year ago.  She was

25   not, but --

MARC VILLAREAL - VOL. I (April 24, 2020)                52

```
1        Q.  But she was there in '17, right?

2        A.  She was there in '17 to the best of my

3    knowledge, yes, yes.

4        Q.  And the secretary that was there during that

5    time, sir, was who?

6        A.  I believe, and I'm just raising things with

7    caution because I don't want to be wrong, but I believe

8    it was Dewanna Dean at that time.

9        Q.  Uh-huh.  Now, when Ms. Smithson was complaining

10   about this problem of interruptions, distractions and

11   the like, these were coming from this same secretary,

12   isn't that true, back in September of 2017?

13       A.  In 2017, for much of that year, we had one

14   person working in the office.  So any interruption would

15   have to come from her, whether it was calling a student

16   because they had to be called from class or they were

17   tardy.  I'm not sure I understand the question.

18       Q.  Did you ever ask the secretary if she had gone

19   into the file and looked at Ms. Smithson's confidential

20   medical records, sir?

21       A.  I never asked Ms. Dean if she went into that

22   confidential file, no.

23            MR. MARSHALL:  How long have you been off the

24       phone?  Hello?

25       A.  Hi, sir.  I'm not sure I understand your
```

MARC VILLAREAL - ~~VOL~~. I (April 24, 2020)                    53

```
1    question.
2           MR. MARSHALL:  I'm sorry, just a moment.  Hold
3       on, please.  Something just happened.  Hold on,
4       please.
5           Hello, Ms. Smithson -- just a second, please.  I
6       think I lost my client.  Hold on.
7           (A brief recess was taken.)
8           MR. MARSHALL:  Okay, my apologies, let's resume.
9           Ms. Spencer, would you please give me the last
10   question and answer, please.
11          (The record was read back by the reporter.)
12      Q.  How come you didn't do that, Mr. Villareal?
13      A.  Sir, I'm really not sure on the timeline when I
14   pulled the file out.  The file would not have been put
15   in there, it was there before Ms. Dean became secretary.
16   I am not certain if she was secretary when I took it out
17   or not.  I would really have to look at the timeline,
18   and that would really help me answer that question
19   there.  Because she may not have been my secretary then.
20      Q.  Did you check with any of the secretaries, sir,
21   since this became an issue, did you at any time talk
22   with any of the secretaries about whether they had gone
23   in and reviewed those medical records, sir?
24      A.   I told you I did not ask Ms. Phipps, who was
25   secretary only for a matter of weeks, it might have only
```

```
 1    been one week when I first came here.  She had already

 2    left.  She had apparently already left.

 3         Q.   Mr. Villareal, listen to my question.

 4              Did you speak with any of the secretaries that

 5    were assigned to your office from the time you arrived

 6    until the present about whether they have reviewed

 7    medical records of Ms. Smithson?

 8         A.   No.

 9         Q.   Now, Mr. Villareal, you understand, sir,

10    according to the agency's policies, that once you become

11    aware of a complaint of hostility in the workplace, as

12    principal you have an obligation to investigate that;

13    are you aware of that, sir?

14         A.   I'm aware, sir.

15         Q.   Okay.  And this is what I'm concerned about, is

16    you knew that Ms. Smithson had a good work record,

17    right, when you came aboard and during your tenure

18    there?

19         A.   Yes.

20         Q.   And you knew that she had never been disciplined

21    for anything, right?

22         A.   To the best of my knowledge, yes.

23         Q.   And you knew she had an excellent performance

24    record, correct?

25         A.   It was at that time pass/fail, but she had been
```

MARC VILLAREAL - Vol. I (April 24, 2020)          55

```
 1    fully successful, you know, all her years, to the best
 2    of my knowledge.
 3         Q.   All right.  And she was reporting to you that
 4    she was being subjected to hostility in the workplace.
 5    I'm just trying to understand, sir, you knew what the
 6    policies required.  I'm just trying to understand, did
 7    you consult with anyone within the headquarters or
 8    within the superintendent's office on what you should do
 9    to handle this issue?
10         A.   I do not recall --
11         Q.   You knew that they were -- I'm sorry, go right
12    ahead, sir.
13         A.   I do recall taking action, I do recall taking
14    the files out.  I do -- but -- I do recall taking
15    action.  I don't recall if I contacted the community
16    superintendent, the superintendent, anybody, I just
17    simply don't recall.
18         Q.   So the only action as I understand it you took
19    was to take the medical records out of where they were
20    being housed and you took them to your office and locked
21    them up in your desk, correct?
22         A.   Right.  And, again, I do believe --
23         Q.   Did you take any other action, sir?
24         A.   I do believe I spoke with Mr. Rodman
25    procedurally about where the files should be stored.  I
```

MARC VILLAREAL - VOL. I (April 24, 2020)                    56

1        communicated with Ms. Smithson.  I don't recall any

2        other action at this time, I don't recall.

3            Q.  Isn't it true, sir, that Ms. Smithson also

4        reported to you that she -- her personal space was being

5        violated by faculty and staff members; isn't that true?

6            A.  She has reported that to me, yes.

7            Q.  All right.  And didn't she also report that

8        after reporting it to you and telling staff and faculty

9        to respect her personal space, that she was being

10       subjected to an increased effort to not respect her

11       personal space, sir?

12           A.  I don't believe that's true, I don't believe an

13       increased.

14           Q.  Did you at any point in time, Mr. Villareal,

15       contact any staff or faculty members to inquire as to

16       what they were doing in the way of violating

17       Ms. Smithson's personal space?

18           A.   In every instance that was reported to me, I

19       spoke to the individual.  There were various reasons for

20       teachers -- I should just say employees that went into

21       her space.  And every one of those cases, I told them

22       not to do it again.

23           Q.  Who are the people that you contacted about this

24       issue, sir?

25           A.  I mean, you probably have the list of names

```
 1    better than I.  I specifically remember speaking to

 2    Michele Wolff about it.  I specifically remember

 3    speaking to Ester Franklin about it.  I'm trying to

 4    think of others.  There may have been substitute

 5    teachers.  I don't -- I don't recall all of the people

 6    that I spoke to about it, but I did speak to a number of

 7    employees about that.

 8        Q.   Okay.  Do you have any documentation, sir, that

 9    you have spoke to them?

10        A.   I believe I have some emails where I followed up

11    to them and just, you know, please don't do it again.  I

12    did not -- yes, I believe that's the extent of it.

13        Q.   Did you ever convey to Ms. Smithson that you had

14    spoke with these individuals?

15        A.   I believe so, sir.  I believe that I've written

16    to her saying please let me know if this continues.

17        Q.   Is it your testimony she did not convey to you

18    she was having additional problems with this, sir?

19        A.   Can you repeat the question?  It is muffled

20    right now.

21        Q.   Oh, I'm sorry.  Is it your testimony that

22    Ms. Smithson did not subsequently` communicate to you

23    that she was having -- she was continuing to have this

24    problem with people violating her space?

25        A.   That is not my testimony at all.  But the people
```

MARC VILLAREAL - VOL. I (April 24, 2020)                    58

1    who have been spoken to did not repeat the behavior.

2        Q.   How do you know that, sir?

3        A.   Well, I should say that Ms. Smithson did not

4    report to me that the same people repeated the behavior

5    after I communicated with them.

6        Q.   Mr. Villareal, how come you didn't just send out

7    a notification that all employees have a right to

8    personal space and please don't violate it?

9        A.   I guess one reason, Mr. Marshall, is that

10   everybody has different personal space thresholds.  I

11   don't know the right word that I'm looking for.  Some

12   teachers may appreciate that a counselor came to them

13   behind their desk and whispered to them and said I need

14   a person.  Ms. Smithson clearly, clearly does not.  And

15   I want that respected, she deserves that respect.  But

16   not everybody on the faculty may have the same desires

17   for space that she does.  And I don't want to impede

18   other people's communication with colleagues.  I do want

19   to protect Ms. Smithson's personal space -- yeah, her

20   personal space.

21       Q.   But Mr. Villareal, the record would indicate,

22   sir, that you actually conveyed to these people that

23   they have done nothing wrong when they violated her

24   personal space; isn't that true?

25       A.   I don't know if that was on any of the personal

MARC VILLAREAL - Vol. I (April 24, 2020)                    59

1    space issues.  But, again, if someone comes behind --

2        Q.   What was it in relationship to, sir?  When you

3    stated, "You've done nothing wrong," when Ms. Smithson

4    complained to you, why did you say that?

5        A.   And I think I said in a couple instances "I'm

6    not saying you did anything wrong," because in some

7    cases I think people were attempting to do something

8    that made sense to them which was maybe to be a little

9    bit discreet to ask for a student.  So that's not them

10   doing something wrong, they're not being disciplined for

11   it, but their behavior needs to stop.

12       Q.   But that's the point, isn't it?  When you say to

13   them, "You've done nothing wrong," and an employee who

14   has a documented confirmed medical disability who has

15   been provided reasonable accommodations, her medical

16   confidential records have been violated and she comes to

17   you and tells you that these employees are violating my

18   space and they're doing it intentionally, don't you have

19   a duty to say stop it and don't do it again?

20       A.   I do have a duty to do that and I did do that.

21       Q.   Sir, with all due respect to you, and I don't

22   mean to be argumentative in any way, but the records we

23   have indicate that you said to them, you've done nothing

24   wrong.

25       A.   If a teacher walks into another teacher's

```
 1    classroom, that might be absolutely accepted between
 2    different colleagues.  In fact, we encourage that kind
 3    of collaboration.  Ms. Smithson might not appreciate it.
 4    If Ms. Smithson doesn't appreciate it, then we want it
 5    to stop.  But not other people -- I'm saying if a
 6    teacher, after I told them, you know what, Ms. Smithson
 7    told me she doesn't want you going behind her desk,
 8    please stop going behind her desk.  Those conversations,
 9    I had with those individuals.  If that teacher or
10    otherwise employee went and repeated that behavior, that
11    would be wrong.  Then it would be a completely different
12    conversation between that employee and me.  The first
13    time, I can't say that it is wrong for someone to walk
14    behind a person's desk, even though me personally, I
15    wouldn't do it.  And I have had that conversation with
16    Tamica.  You know, I personally agree with her.  I like
17    a personal space bubble.  But people, that can be a
18    cultural thing, people have very different space
19    thresholds.
20         Q.   What do you mean, a cultural thing?
21         A.   My wife is from the south of Spain and I spend a
22    lot of time there.  People there when speaking and
23    acting, their space bubble is much smaller, they're much
24    closer together, and even just in conversation I find
25    myself as an American we tend to have bigger space
```

MARC VILLAREAL - VOL. I (April 24, 2020)                    61

```
 1    bubbles, and generally I want more space.  But I think
 2    the same could be true of somebody who came from a big
 3    city as somebody who came from the Midwest.  I think it
 4    varies from culture to culture, region to region, they
 5    have different amounts of space what they like from one
 6    another.  Ms. Smithson she has every right to say I
 7    don't want you coming behind my desk, and it shouldn't
 8    be repeated.
 9        Q.  Mr. Villareal, I'm interested in your
10    understanding.  Have you had mis-dealings with
11    African-American women?
12        A.  I have been working professionally with
13    African-American women as long as I've been in DoDEA.
14        Q.  Are you making some kind of a judgment call
15    culturally, sir, about Ms. Smithson's request to have
16    her personal space respected?
17        A.  Not whatsoever.  Not at all, sir, no.
18        Q.  Because you've made these distinctions about
19    cultures, and I want to understand if you were allowing
20    your personal view and perhaps the views of your wife's
21    culture, to impact your perception of Ms. Smithson's
22    concerns about her personal space being violated.
23        A.  No, I don't think you were listening to what I
24    was saying, because with all due respect, and I don't
25    mean that disrespectfully, I think that, and I felt like
```

1    I said this, maybe I didn't articulate myself clearly,

2    that individuals have different thresholds for personal

3    space.  And I think I said to you I agree with

4    Ms. Smithson.  I personally tend to have a bigger space

5    bubble.  Some people have walked right up to

6    Ms. Smithson and she hasn't appreciated that, and I

7    think she has every right to do that.  It has nothing to

8    do with her gender, culture, race, it just is her right

9    as a human being.

10        Q.   That's what I'm saying.  In this particular

11   case, sir, you were aware that Ms. Smithson had raised

12   some concerns to you about her private medical records

13   being violated and that she had disabilities which we

14   discussed earlier that are relatively -- well, I think

15   it's fair to say they're fairly complex and require

16   attention and respect of those reasonable

17   accommodations.

18            And my concern with you I guess is that she's

19   telling you these things and she's reporting on multiple

20   occasions, and I haven't actually seen anything that

21   would indicate you ever took action to terminate what

22   was happening.

23            And maybe I'm mistaken, sir, but the next

24   question I have here is:  You were aware that these

25   various employees, teachers and staff members were

MARC VILLAREAL - Vol. I (April 24, 2020)                    63

1     communicating amongst themselves about Ms. Smithson and

2     her issues with her personal space, her complaints about

3     being violated, correct?

4         A.   I have no idea what you just said is true and I

5     did discuss that with separate individuals and they have

6     told me before -- I won't say quite the opposite, but

7     they have told me specifically the reason they went in

8     her room, there was no indication of --

9         Q.   Who are you speaking of, sir?

10        A.   In a recent claim that she had, she talked about

11    Mr. Johnson, Ms. Judith Villanueva, I think

12    Ms. Franklin, she had I think three interruptions on the

13    same day, which is frustrating, but there's no evidence

14    in any way, shape or form that they worked together to

15    try and disrupt her classroom.

16        Q.   No, no.  I'm talking about in 2017 and '18, did

17    you take any steps to investigate what Ms. Smithson was

18    telling you about her space being violated, sir?

19        A.   Yes, every time that she has listed, I've

20    interviewed the individuals, I've directed them, and she

21    has not had repeat offenses from individuals.  If

22    there's a new employee that came to the school that did

23    it, again, that is not somebody who has had guidance not

24    to do that and has done it again, that would be wrong;

25    that's somebody who unknowingly went behind her desk.

```
 1    But there's not been repeat offenses of people who have

 2    gone behind her desk and been directed and then gone

 3    back, in every one of the instances I spoke with the

 4    employee, to the best of my knowledge.

 5       Q.   Okay.  Do you have the documentation to support

 6    that, sir, to corroborate that?  Because that has not

 7    been turned over to us at this time and I know Mr. Selz

 8    would like to get that material.

 9       A.   You know, in a lot of instances they were

10    conversations, but generally I followed them up with

11    emails, and I believe I have shared that with Mr. Selz

12    as well.

13            MR. MARSHALL:  Okay, Mr. Selz, have you provided

14       that to us, sir?

15            MR. SELZ:  Yes, all documentation provided to us

16       by Mr. Villareal has been forwarded to you in

17       discovery.

18       Q.   I have gone through that.  So everything that

19    you provided that you say would relate to this issue

20    about these people offending Tamica, her personal space,

21    you provided to Mr. Selz and Mr. Selz has provided it to

22    me; is that correct, sir?

23       A.   I guess to the best of my knowledge.  There's

24    been thousands and thousands of emails.  I can't be a

25    hundred percent certain that there's not one that I
```

1      didn't share with Mr. Selz that he didn't share -- if

2      there was an omission, it wasn't intentional.

3          Q.   I just need to know -- Mr. Selz and I have to

4      work with certain regulations and rules on production.

5      So he's indicated that he's produced everything you

6      produced to him?

7          A.   Okay, yes.

8          Q.   So very good.  To the extent that you have had

9      conversations with individuals, you don't have any

10     documentation of that, is that correct, verbal

11     communications?

12         A.   Some of the individuals I've spoken with

13     verbally and verbally only, to the best of my knowledge.

14         Q.   Ms. Villanueva -- I don't know if I'm

15     pronouncing that right.  Do you know who I'm speaking of

16     there, sir?

17         A.   Judith Villanueva.

18         Q.   I didn't pronounce it right.  How many times did

19     you speak to her about this problem?

20         A.   I believe one time.  There may have been two

21     separate occasions, but I believe one time.

22         Q.   Are you aware that she continued to do it, sir,

23     there was repeat offenses?

24         A.   I am not aware of it going on after the last

25     complaint I heard from Ms. Smithson.

 1       Q.   No, but are you aware that there was more than

 2   one complaint about her, sir?

 3       A.   I believe when Tamica communicated with me, she

 4   had said that this has happened multiple times.  But I

 5   don't -- yes, okay, does that answer your question?

 6       Q.   Yes.  You're aware that it happened after you

 7   spoke with her as well?

 8       A.   No, that I am not aware of.

 9       Q.   How about Ms. Schiele, you know who she is?

10       A.   I know who Ms. Schiele is.

11       Q.   And how many times did you speak to her, sir?

12       A.   Ms. Schiele, first of all, is not my employee to

13   direct.  She works for the district.

14       Q.   No, but when she comes on to your property, she

15   has a responsibility to follow the policies and

16   procedures of your -- of the agency.  And to protect

17   your employees, you have an obligation to make sure that

18   your employees are protected, right?

19       A.   Correct.  And I did speak with her.  And she did

20   repeat a behavior that I cannot support.  She put her

21   hand -- I believe it was a hand or a side hug or

22   something towards Tamica, which was not appropriate.  I

23   won't say inappropriate, it was unwanted, it was

24   unwanted.

25       Q.   She had complained about this before and you

MARC VILLAREAL - VOL. I (April 24, 2020)                    67

```
 1    told her not to do it and she did it again, right?

 2        A.   She repeated a behavior.  The first time was a

 3    different situation, different setting -- well, I guess

 4    similar setting.  What is the question?  I'm not sure

 5    I'm clear on the question.

 6        Q.   Did you not tell her to stop it and she repeated

 7    it again; isn't that true, sir?

 8        A.   I asked her to give Ms. Smithson her space.

 9    Years prior, it is true that she a second time violated

10    that space within Ms. Smithson's -- yeah, the

11    unwelcomed -- I don't know what to say, presence in her

12    space, she did repeat that behavior.

13        Q.   Did you -- did she -- did you have to speak to

14    her again after that, sir?

15        A.   I did speak to her again after that, sir.

16        Q.   What did she do the first time?

17        A.   The first time, I did not see it, but

18    Ms. Smithson later shared it with me.  She actually came

19    to me first, Ms. Schiele, that it had to do with her

20    wanting Ms. Smithson to be a part of a different group,

21    and I believe she moved her desk, I believe that was the

22    situation, and --

23        Q.   She physically tried to move the desk that

24    Ms. Schiele was sitting in -- that Ms. Smithson was

25    sitting in, correct?
```

MARC VILLAREAL - VOL. I (April 24, 2020)

68

```
 1        A.   I believe that is what happened, correct.

 2        Q.   And did you tell her that that was not

 3   appropriate for her to do?

 4        A.   I told her to leave Ms. Smithson where she was

 5   at, absolutely.

 6        Q.   And this was in front of about 20 other

 7   educators; isn't that true, sir?

 8        A.   I believe so.  I was not one of those educators,

 9   but I believe so.  Again, these are -- I was not -- I

10   believe I wasn't in the room.

11        Q.   Ms. Schiele said you were in the room.

12        A.   We were in different groups.  Maybe I was in the

13   room, but I did not witness the event, I did not see it.

14        Q.   Well, it was a very humiliating, very

15   offensive -- according to Ms. Smithson, she went to the

16   ladies room in tears and was humiliated.

17             Did you talk with Ms. Smithson about that

18   situation, sir, on the day that it happened?

19        A.   I do not recall.

20        Q.   Well, I mean, this is -- were you aware that

21   Ms. Smithson advised Ms. Schiele before she tried to

22   move her that she had a disability and that she could

23   not be exposed to the light that was at the front of the

24   room; were you aware of that, sir?

25        A.   I don't believe so.
```

1      Q.  But you knew that Ms. Smithson had this -- this
2   was one of her -- it was contained in the medical
3   documentation you had been provided, sir, right?
4      A.  You asked me if I knew that Ms. Smithson
5   communicated -- I was aware, yes.
6      Q.  You were aware, yes.  Why didn't you contact
7   Ms. Smithson after this event, sir, and take steps to
8   investigate what happened, sir?
9      A.  You asked me if I spoke with her afterwards and
10   I just said I don't recall.  I don't know if I spoke to
11   her or I didn't, I don't recall.  I know I followed up
12   with Ms. Schiele, because, again, my purpose is stopping
13   the behavior.
14      Q.  Do you have any written corroboration for any
15   contact you had with Ms. Schiele, sir?
16      A.  I don't believe so.  I don't believe so.  I know
17   I spoke with her.  Again, this is something from years
18   past.  I don't specifically recall.
19      Q.  Now, Mr. Villareal, what was the second event
20   involving Ms. Schiele?
21      A.  I believe -- again, it was a training where
22   Ms. Schiele was here working with science teachers, and
23   I don't remember if it was a hand or attempting to give
24   a hug, but she moved into Ms. Smithson's personal space
25   again.

1        Q.   And when Ms. Smithson contacted you about this,

2    could you describe what her demeanor was?

3        A.   Ms. Smithson's?

4        Q.   Yes.

5        A.   I would say her demeanor was professional.  She

6    may -- I believe probably upset.  But she was very clear

7    in articulating that this was something unwanted.  I

8    would say she was still calm, cool, collected.  She

9    didn't seem -- she didn't seem -- I don't know the right

10   way to describe it.  Ms. Smithson is always professional

11   and she just articulated that she didn't appreciate

12   that.

13       Q.   Now, this is not the only situation in which

14   Ms. Smithson has advised you that she has been

15   physically touched; isn't that true, sir?

16       A.   That is true.

17       Q.   Tell me, as you best recall it, how many times

18   has she communicated that she has been touched by other

19   employees in an inappropriate way, sir?

20       A.   Inappropriate is such a loaded term there.  I

21   would say unwanted touch, and right now when you're

22   asking me I recall one other time specifically, but

23   there may have been more.  I remember one other time

24   specifically.

25       Q.   What do you recall, sir?

MARC VILLAREAL - VOL. I (April 24, 2020)                71

1      A.   I believe she said that Ms. Wolff came behind

2   her desk and had put her hand on her shoulder as well.

3      Q.   Did you have any communication with Ms. Wolff

4   about this?

5      A.   I absolutely had communication with Ms. Wolff

6   about it.

7      Q.   Do you have any written corroboration for that,

8   sir?

9      A.   I would have to look specifically.  Again, I

10   don't recall if I followed that with an email.  I very

11   clearly spoke to her about it.

12      Q.   Now, these teachers that are involved in doing

13   all this, any all know other, right?  These are all

14   people that work together, correct?

15      A.   It's a small enough community that all -- I

16   would say just about everybody knows each other.

17      Q.   Because of the size of the community there, the

18   American community, the teachers, they all converse with

19   each other frequently, do they not, sir?

20      A.   I wouldn't even necessarily say yes to that.

21   You know, for -- I was a teacher for years before I

22   became an administrator, and I think to some degree

23   Ms. Smithson may be similar, where if you're a teacher

24   and you have your classrooms, there are some people that

25   go to their classrooms and don't really have a lot of

MARC VILLAREAL - Vol. I (April 24, 2020)                    72

```
 1    interactions with their colleagues, and there are others

 2    that are very social.

 3         Q.   Now, Ms. Smithson also informed you that

 4    Ms. Wolff had approached her child as well

 5    inappropriately; isn't that true, sir?

 6         A.   To the best of my knowledge, the first time I

 7    heard of that incident was on a complaint that I

 8    received from Nicolette Sims.  I don't believe

 9    Ms. Smithson approached me about that incident from her

10    child.

11         Q.   Now, you would agree, would you not, sir, that

12    this is rather disturbing that Ms. Wolff has been told

13    not to touch, to leave Ms. Smithson alone, stay out of

14    her physical space, and she continues to do it; would

15    you agree with that, sir?

16         A.   No, I would not agree with that.  I don't know

17    that she continues to do that.  They do have to work

18    together.  They do have to work with one another.  They

19    do have to communicate with one another.  She is, for

20    all intents and purposes, our facilities manager.  Their

21    paths will cross.  But Ms. Wolff should be respectful of

22    Ms. Smithson's personal space.

23         Q.   Well, that's the point.  If it's being done

24    intentionally to create a hostility for this woman who

25    has major disabilities and accommodations, you would --
```

1    as principal, you would understand the need to protect

2    her from this kind of thing, right?  Right?

3        A.  I'm just pondering the right words to answer

4    your question.  I believe it is part of my duties to

5    make sure that Ms. Smithson feels safe in her working

6    environment.

7        Q.  But, I mean, you have a duty to protect her

8    knowing that she has had disabilities that require

9    accommodations, you as the principal have the duty to

10   take steps to make sure that that's protected, don't

11   you, sir?

12       A.  Yes, sir.  I have no problem with that question.

13   Yes.

14       Q.  All right.  Well, Ms. Connors also assaulted

15   Ms. Smithson.  Did you take any steps to investigate

16   that?

17       A.  Again, you're making an assertion here that --

18   you're stating that Ms. Connors assaulted her, and I

19   don't have any evidence that Ms. Connors intentionally

20   harmed Ms. Smithson.  Ms. Connors closed the door when

21   Ms. Smithson's hand was allegedly in the door frame.

22   And I saw her hand afterwards and it was very

23   unfortunate, and I'm very sorry that she's hurt.  But

24   there's no evidence --

25       Q.  Waited just a second.  Wait just a second.  You

```
 1    said you saw her hand afterwards.  Would you describe

 2    what you saw?

 3        A.   Ms. Smithson had had her hand on ice after --

 4    because I believe the incident happened during the half

 5    time or some point during the play.  I don't know when

 6    it happened.  I didn't witness it.  I was at the play.

 7        Q.   Can you describe the hand that you saw, sir?

 8        A.   But afterwards, she showed it to me after it had

 9    been iced.  I saw some damage to a nail.  She may have

10    even taken a picture of it.  And it looked like it had

11    been injured, it had been closed in a door.

12        Q.   It was red?

13        A.   Sure, it was red.

14        Q.   It was bruised?

15        A.   I don't know if I saw bruising.  Again, you're

16    asking something I don't recall.  I don't recall how

17    quickly the bruising, but it looked like an injured

18    hand, yes.

19        Q.   Was it swollen, Mr. Villareal?

20        A.   I believe it was swollen, yes.

21        Q.   All right, now this is my question to you.

22        A.   Yes.

23        Q.   Did you ask Ms. Smithson how she knows it was

24    intentional, sir?

25        A.   Did I ask her the question you just asked me?
```

 1    The answer is no.

 2        Q.   Why didn't you ask her that question, sir?

 3        A.   One of the things she said to me after the play

 4    was, you know, she said she had been assaulted, and I

 5    think I even asked her at that moment, are you sure that

 6    she went and closed the door on your hand.  And

 7    Ms. Smithson remarked something along these lines, I

 8    don't want to get it wrong, but it's pretty close to a

 9    direct quote, you know, "I don't care if it was an

10    accident," or, "It doesn't matter if it was an accident,

11    it's still assault."  So her words were something along

12    those lines.  Do you understand what I'm saying?  I know

13    you're not allowed to answer questions.

14        Q.   Well, isn't it true, she sent you an email, sir,

15    and informed you that this was an assault?

16        A.   But you asked me a question of why I didn't ask

17    that specific question.

18        Q.   I'm asking a different question now.  Didn't she

19    convey to you in an email that this was assault?

20        A.   She told me she believed she was assaulted, yes.

21        Q.   Okay.  And this is my question Mr. Villareal, I

22    say this, sir, with all due respect to you, and I know

23    this was your first principalship that you were serving

24    as a principal.  But Ms. Smithson was there and

25    available for you to ask any questions.  How come you

 1     didn't ask her, Ms. Smithson, how do you know this was

 2     intentional?  Because this answer, to me, sir, is

 3     critically important because she has information on why

 4     it was intentional and this is why I'm asking you why

 5     didn't ask that question, sir.

 6         A.  I had Ms. Smithson who had told me that she was

 7     assaulted.  So I asked a number of people, including

 8     everybody that she asked me to ask that showed up in the

 9     video, and there is nobody that gave an indication of

10     intentionality.  And, again, these are people that

11     Ms. Smithson asked me to ask, including parents that are

12     not connected closely to the school.

13             I thought the most objective thing was to ask as

14     many people as we possibly could, and some people had

15     said they had seen nothing.  So there was just -- there

16     was no indication that there was intentionality behind

17     what happened.  It was a horrible accident.  I feel very

18     bad for what happened to her.

19         Q.  Yes, sir.  The thing that's concerning to me,

20     sir, and I'm just wanting to know, did you look at the

21     statement that Ms. Connors provided where she claims she

22     didn't even know that Ms. Smithson was there in the

23     doorway, and yet there's other witnesses who were

24     sitting at the table with her, said, yeah, there was

25     Ms. Smithson was right in the doorway there.  I mean,

MARC VILLAREAL - VOL. I (April 24, 2020)                    77

```
 1    the thing I guess I'm concerned about -- and that's not
 2    a question, so let me ask a question.
 3              Sir, did you interview personally yourself,
 4    Mr. Villareal, Ms. Connors, did you personally interview
 5    her?
 6         A.   I believe I did.  I can't remember if it was --
 7    because Mr. Rodman and I divided up the people on the
 8    list that Ms. Smithson had asked.  I believe it was me
 9    that spoke with Ms. Connors.
10         Q.   Were you alone when you did so?  Was it just you
11    and Ms. Connors present in the room, sir?
12         A.   I believe so, sir.
13         Q.   And did you take any notes of any kind,
14    Mr. Villareal?
15         A.   I believe I asked her to write what she said to
16    me in a statement.  I did not -- I don't believe --
17         Q.   That's not my question.
18         A.   I don't believe I wrote down notes.  I don't
19    recall.
20         Q.   You didn't take any notes at all, did you?
21         A.   I don't recall.  I often walk around with a
22    notebook in hand.  I don't think I did, but I don't
23    recall.  But I do recall asking her to send me --
24         Q.   Did you provide those notes to Mr. Selz, sir?
25         A.   I provided the statement that Ms. Connors wrote
```

MARC VILLAREAL - Vol. I (April 24, 2020)                    78

1    to me to Mr. Selz, yes.

2        Q.   That's not my question.  Did you provide any

3    notes to Mr. Selz that you took of that interview, sir?

4        A.   Negative.

5        Q.   All right.  Hold on, please.  I want to look at

6    my notes.

7            All right, sir, we're going to take a break here

8    in just a moment, but I'm a bit concerned.  From my

9    count on everything that I've reviewed thus far with

10   you, sir, it appears that there were multiple physical

11   incidents involving various people within your school.

12   How many teachers are at the school?

13       A.   It has fluctuate in my four years here.  We lost

14   six of them, but between 35 and 45.

15       Q.   And would you agree, sir, that it was generally

16   about somewhere between six and ten educators whose

17   names continued to pop up with these physical contacts?

18       A.   If I mistaken, I believe there's only three when

19   you say physical contact.

20       Q.   Either physical space where they're violating a

21   physical space or they're touching her.

22       A.   Right.  I believe there was only three, again,

23   to the best of my knowledge, physical contact.  But

24   there were more that walked into her physical space.

25       Q.   That's what I mean, the physical space and the

MARC VILLAREAL - Vol. I (April 24, 2020)                    79

```
1    physical touching, it's somewhere between six and ten;
2    is that a fair estimation, sir?
3         A.   That's a fair estimate.
4         Q.   All right.  And then Ms. Connor would also have
5    taken her shoulder and pushed it into Ms. Smithson.  And
6    she communicated that information to you as well; is
7    that not correct?
8         A.   She communicated that information to me.
9              (Discussion off the record.)
10        A.   I apologize for the interruption.
11        Q.   No worries.  Can you tell me, sir, did you have
12   a conversation with Ms. Connors about that, sir?
13        A.   Yes, I had a conversation with Ms. Connors about
14   that.
15        Q.   Do you have any written corroboration for that,
16   sir?
17        A.   Again, I may have written down notes, I don't
18   have it written down.  But I did write an email to
19   Ms. Connors about physical contact and physical space,
20   to give her space.
21        Q.   Well, did you at any point in time,
22   Mr. Villareal, did you consider the possibility that
23   these individuals, Schiele, Connors, the various other
24   employees, Wolff, et cetera, that these people either --
25   were actively involved in some kind of orchestrated
```

1    campaign of hostility?

2        A.   Even just you saying those words puts the

3    thought into your head.  Did I ever consider -- you

4    know, Ms. Smithson put words similar to me in an email

5    saying I believe these people are working together to

6    disrupt my class.  But I have no evidence to prove that

7    there's any conspiracy to disrupt her class or create a

8    hostile work environment for her.  I am not saying that

9    people have not violated her personal space in a way

10   that she has right to have personal space, but I have no

11   evidence to support the assertion that you just made.

12       Q.   Now, Mr. Villareal, you know as the principal,

13   according to the policy, sir, you were required to

14   conduct an investigation, and it sets forth in the

15   policy how that can be done.  Why didn't you conduct an

16   investigation consistent with policy, sir?

17       A.   Sir, I have conducted an investigation.

18       Q.   You have?  Where is that investigative report?

19       A.   Again, I have interviewed every individual that

20   has -- Ms. Smithson has alleged of conspiring, and found

21   no evidence to support what you're saying.

22       Q.   That's what I'm saying.  Where is the

23   investigative report, sir?  Do you have one?

24       A.   I have interviewed every individual.  I did not

25   write it in one accumulated report, but I have

MARC VILLAREAL - VOL. I (April 24, 2020)

1    investigated every individual.

2        Q.   Okay, but Mr. Villareal, you understand that

3    when someone does an investigation, there's a report

4    that's issued.  That way, we're not relying on your

5    memory, we're not relying on some bias that you might

6    have, we're not relying on any of these subjective

7    things.  And I'm not accusing you of anything, I'm just

8    saying these things can pop up, that's why a report is

9    important.  You understand that the agency requires that

10   you conduct an investigation and provide a report,

11   correct?

12       A.   Again, I have investigated every person, I have

13   interviewed every person that Ms. Smithson has alleged

14   hostility.

15       Q.   But you don't have any report on any so-called

16   investigation; is that fair to say, sir?

17       A.   I think it's fair to say I have not accumulated

18   them into one large report, no, that is fair to say.

19       Q.   No report of any kind, not one report, right?

20       A.   Not a one individual report.

21       Q.   Okay.  Not even multiple reports, right?

22       A.   An interview --

23       Q.   Mr. Villareal, no, sir, I'm asking --

24       A.   (Inaudible).

25       Q.   Sir, I don't want you to change the question.

 1     If you could just answer the question I'm asking.
 2     There's no investigative report or reports that you
 3     prepared; isn't that true, sir?
 4         A.   You know, again, I have investigated and I have
 5     written responses -- or written follow-up to them.  That
 6     is documentation you have an investigation.
 7         Q.   Did you provide any of that to Ms. Smithson,
 8     sir, any investigative report, sir?
 9         A.   I have reported findings and conclusions to her,
10     yes.
11         Q.   Did you provide any report, investigative report
12     to your supervisor, Dr. Dunham, correct?
13         A.   I have never been supervised by Dr. Dunham.  I
14     was supervised -- my supervisor the entirety of my
15     tenure here is Melissa Hayes, superintendent.
16         Q.   Ms. Melissa Hayes?
17         A.   Correct.
18         Q.   Did you provide an investigative report to
19     Ms. Hayes?
20         A.   Negative.
21         Q.   All right, sir, now you were, during the time --
22     (inaudible) -- Ms. Smithson, correct?
23             MR. SELZ:  Mr. Marshall, you broke up on my end.
24             MR. MARSHALL:  All right.  I'll restate the
25         question.

MARC VILLAREAL - Vol. I (April 24, 2020)

```
 1        Q.   During the time you were receiving these reports
 2   from Ms. Smithson about how she was being subjected to
 3   harassment and hostility, you were personally the
 4   subject of an EEO complaint by her; isn't that true,
 5   sir?
 6        A.   That is correct.
 7        Q.   And she advised you in an email that she would
 8   be pursuing that EEO complaint against you; isn't that
 9   true, sir?
10        A.   That is true.
11        Q.   Now, Mr. Villareal, I understand that, according
12   to your testimony, this particular EEO complaint that
13   Ms. Smithson has filed against you, I guess it's been
14   more than one, this was the first time you had been the
15   subject of an EEO complaint by a teacher, correct?
16        A.   That is correct.
17        Q.   And how did it make you feel, sir, that you were
18   being charged with discrimination?
19        A.   How did it make me feel?
20        Q.   Yes, sir.
21        A.   I guess, because I like to feel that I'm someone
22   that's very supportive, understanding, compassionate and
23   multicultural, diverse thinking, I kind of was wondering
24   just like how is this happening and I even questioned
25   myself like what is going on.  But at the same time, I
```

 1    very much respect the process.  And if somebody is

 2    feeling that, that feeling from the other person is a

 3    hundred percent valid always.  So I just -- I guess

 4    maybe it did cause me to reflect, you know, is there

 5    anything that I'm doing that would give the impression

 6    that I'm being discriminatory, because I really, really,

 7    really try not to, I try to do very much the opposite,

 8    to be as open and inclusive as possible.  That's the

 9    type of school and environment I want.

10        Q.   But, sir, is it possible as you reflect on this,

11    that when you were the subject of Ms. Smithson's EEO

12    complaint, that that caused you to defend the others who

13    were the subject of her complaints of hostility and

14    harassment?

15        A.   Absolutely not.

16        Q.   I mean, because I know that you say this was the

17    first complaint and you reflected on it, I mean, did you

18    reflect on it and come to the conclusion that, listen,

19    I've done nothing wrong?

20        A.   Sir, I don't ever think I have done nothing

21    wrong.  Every day when I go home, I think I could have

22    done better, I could have done more.  But I do go home

23    knowing that I did the best job that I could, I did the

24    best of my ability on that given day.  But there are

25    certainly lots of things that I feel that I can do

1    better, and I still aim to do better every single day.

2         But I certainly did not ever take personally

3    Ms. Smithson's claim and don't want to do anything that

4    in any way would illegitimize it, but it certainly

5    caused me to reflect why would Ms. Smithson feel that I

6    have made decisions based on her medical history, her

7    gender, her race, and just to reflect in words and

8    myself on my own decision-making what could give that

9    appearance.

10   Q.   Well, sir, this is the second -- actually, this

11   is the first -- the complaint says, "Since September

12   2017, Mr. Villareal has allowed staff from the main

13   office," and it goes on and on about the things that you

14   have done to not provide her assistance to stop the

15   hostile work environment.

16        And according to your testimony, you didn't do

17   an investigative report, you didn't send out any memo

18   telling people to respect each other and their physical

19   space, and to not touch them, to not assault them.

20   These are things that you could have done that you did

21   not do.  You never went back to Ms. Smithson to advise

22   her of what your plan was, sir.

23        So I guess what I'm wondering is, do you believe

24   that maybe -- maybe not intentional, but maybe you're

25   just -- you just did not feel that the claims made

MARC VILLAREAL - VOL. I (April 24, 2020)                86

1    against you by Ms. Smithson were credible and therefore

2    the claims she's making about others are not credible;

3    is that possible, sir?

4         A.  No.

5              MR. SELZ:  Objection to the question.  There's

6         so many sub parts and aspects and rabbit holes, I

7         would just note that I object to the form of the

8         question and ask that it be more specific.

9              MR. MARSHALL:  I think I've gotten the answer

10        already so I don't need to go there.

11             I want to move to a different subject, if I may.

12        We've been going for about -- yeah, we've been going

13        for some time, over an hour now.  Why don't we go

14        ahead and take another break.  Let's take another 15

15        minute break and --

16             MR. SELZ:  Mr. Marshall, may I address an

17        administrative matter before we do that?

18             MR. MARSHALL:  Absolutely.

19             MR. SELZ:  Do you recall yesterday we had an

20        exchange, very -- I thought, very reasonable and

21        cooperative, and I appreciate that.  I'm moving

22        forward with scheduling and I think we had used up

23        four and a half hours today and four and a half hours

24        of the next session.  I just wanted to point out that

25        we're into our fourth hour, it's 4:05.  If we take

MARC VILLAREAL - VOL. I (April 24, 2020)                    87

1        another 15 minute break, it begs the question moving

2        forward.  So do you have any thoughts on that?

3              MR. MARSHALL:  Yes, I think -- I thought what we

4        had agreed on was that we would go for three and a

5        half hours, for a total of seven hours, three and a

6        half hours today and three and a half hours on

7        Tuesday.  And this is, of course, not including the

8        breaks.  But I was hoping to take a 15 minute break,

9        come back for another 15 minutes or so, maybe 20, and

10       then recess for the day.  Is that okay with you?

11             MR. SELZ:  Yes, that's very reasonable.  No

12       problem.

13             MR. MARSHALL:  Okay.  Excellente.  Let's take a

14       15 minute break.  I have 10 after.  Let's just come

15       back at 10:20, and I'll call it a day and wish you

16       both a happy weekend.

17             (A brief recess was taken.)

18       Q.  Mr. Villareal, did you at any time provide any

19   of the teachers who were the subject of accusations by

20   Ms. Smithson with a copy of the agency policies on

21   discrimination, sir?

22       A.  They get annual -- biannual --

23       Q.  Objection, nonresponsive.  I need you to answer

24   my question.  Did you provide the policy to them, sir?

25       A.  I believe I'm answering your question.

*Spencer & Associates  (206)382-9695  Court Reporters*

MARC VILLAREAL - VOL. I (April 24, 2020)                    88

```
 1      Q.  No, it's a very specific question.  Did you
 2   provide the policy to them at the time you communicated
 3   with them about the issues?
 4      A.  At the time -- okay.  At the time I communicated
 5   the issues, no.
 6      Q.  Did you provide it to them at any other time in
 7   connection with what Ms. Smithson was telling you, sir?
 8      A.  Did I provide it at any other time, yes.
 9      Q.  Okay.  When did you provide it to them, sir?
10      A.  Again, we have biannual trainings where they
11   receive the policies and the information on
12   antidiscrimination.
13      Q.  I see.  So you provided the policy to them in
14   the course of their training that was provided annually;
15   is that your testimony, sir?
16      A.  That's my testimony, sir.
17      Q.  All right, Mr. Villareal, I'm looking at the
18   email communication that you sent to Ms. Connors on
19   March 30th, and I'm reading it, it says, "Ms. Connors,
20   we have a challenging situation where a faculty member,
21   Ms. Smithson, has reported two instances where there may
22   have been physical contact, one on March 1st during the
23   play and the other during a January 25th fire alarm
24   evacuation.  Please do all you can to avoid any physical
25   contact with Ms. Smithson in the future.  Please let me
```

MARC VILLAREAL - Vol. I (April 24, 2020)                    89

```
 1    know if you have any questions or concerns."

 2         Now, did anyone assist you in the preparation of

 3    this mail communication, Mr. Villareal?

 4      A.   To the best of my knowledge, to the best of my

 5    recollection, no.

 6      Q.   Okay.  Now, Mr. Villareal, why did you say, "we

 7    have a challenging situation where a faculty member,

 8    Ms. Smithson, has reported two instances," and it goes

 9    on from there.  What did you mean by, "we have a

10    challenging situation"?

11      A.   I guess the "challenging" in my mind, I want to

12    keep interactions between everybody positive, yet at the

13    same time I'm telling people to stay apart.  You know,

14    that's -- it's a challenge.  I want people to get along,

15    but then at the same time I'm trying to keep them apart.

16    So, you know, I don't want Ms. Connors to have ill

17    feelings towards Ms. Smithson, I don't want Ms. Smithson

18    to have ill feelings towards Ms. Connors.  It's a

19    challenging situation.  So --

20      Q.   But what part of it is challenging, sir?

21      A.   I think I just --

22      Q.   Because what you say here, what you say is the

23    accusation is challenging.  You say, "we have a

24    challenging situation where a faculty member,

25    Ms. Smithson, has reported two instances where there may
```

MARC VILLAREAL - Vol. I (April 24, 2020)                90

```
1    have been physical contact."  And so what is it about
2    her report is challenging?
3         A.  I didn't say her report is challenging.  I just
4    articulated what the sentiments I believe were going
5    through my head two some years ago.  And I'm not trying
6    to be snarky, I'm really not.  I don't have an English
7    degree, I don't claim to be the best communicator, and I
8    don't believe I consulted anybody in the writing of it.
9    But I just -- maybe I should have used a period in
10   there.  The situation is challenging, like trying to
11   navigate this where -- I would like to keep a very
12   positive work environment.  I would love it if
13   Ms. Connors and Ms. Smithson got along famously, like
14   that would be the perfect situation for me.  But right
15   now I have to say, you know, don't speak to this person,
16   stay away.  And that can put up a wall which to me is
17   really, really challenging, when I really want a faculty
18   that jells and gets along well together and
19   collaborates.  So that was why I used the word
20   "challenging."
21        Q.  Okay.  In here, the sentence reads that the
22   challenging situation was her, Ms. Smithson's reports of
23   two instances of physical contact.  You go on to say,
24   "one on March 1st during the play and the other on
25   January 25th."  But before that, you say, "reported two
```

1    instances where there may have been," implying that what

2    she had indicated to you is untrue, or may not be true.

3    Do you understand how your language may have undermined

4    Ms. Smithson's report to you?

5        A.  Well, I can tell you why I used that phrasing.

6    When I interviewed Ms. Connors about the nudging the

7    shoulder, she didn't say that she did it, she didn't say

8    she didn't, she said it may have happened, because this

9    happened during a fire drill.  She did not recall making

10   contact with Ms. Smithson at all.  And whether she made

11   that contact or not, I was saying stay away from

12   Ms. Smithson.  So rather than --

13       Q.  Why would you say stay -- I'm sorry, sir, I

14   thought you had finished.  Go ahead, sir.

15       A.  No, I'm finished.

16       Q.  Okay, I don't mean to cut you off.  I thought

17   you had finished but you went on, it sounded like you

18   wanted to say something else, so I wanted to give you

19   the freedom to do that, sir.

20       A.  I have lost the train of thought.  I don't even

21   remember where I was going.  So if you have any other

22   questions.

23       Q.  Okay.  It appears that you used similar language

24   in your communications with Ms. Peters, Mr. Conrad,

25   Mr. Krebsbach.  And, again, is it -- sir, is it possible

1    that in your mind, Mr. Villareal, you just really didn't

2    believe Ms. Smithson and what she was reporting to you?

3        A.  No, that is not possible whatsoever.  You know,

4    again, I saw her hand, I know that she was injured.  I

5    am a hundred percent certain that somebody bumped her

6    during a fire drill.  Was it Ms. Connors?  Probably.

7    But I can't say beyond a shadow of a doubt, I can't say

8    definitively.  You know, it's --

9        Q.  But, sir, isn't it the point that here is a

10   teacher, very credible teacher, well-performing teacher,

11   who reports to you that she is being subjected to

12   hostility in these forms that she's describing, and it

13   appears in your language within the questions -- within

14   the statements you've posed to teachers, that it's a

15   challenge that she's made the report and it may or may

16   not have happened.

17        Do you think that your language may have created

18   in the minds of those who were involved in this that you

19   did not believe Ms. Smithson and that they were

20   licensed, in effect, to continue doing what they were

21   doing?

22        A.  The purpose of the words that I chose was,

23   rather than make those employees defensive, was to get

24   them just to where I said, you know, whether you did

25   this or not, please stay away from Ms. Smithson.

1    Whether or not you intended to be disrespectful,

2    Mr. Conrad, to her in email, please go through me for

3    further communication.  You know, I wanted to focus on

4    changing the behavior so that it stopped.  And we did

5    not have more communication issues from Mr. Conrad with

6    Ms. Smithson.  We have not had more physical contact

7    between Ms. Connors and Ms. Smithson.  That is my goal,

8    that is my thinking behind the words that I put there.

9        Q.  You also say, though, in email communication to

10   teachers, and I'm quoting, "I do not think you did

11   anything wrong," end of quote.

12       A.  In some cases, that is true.  Again, if someone,

13   say, a counselor who wanted to take a kid out of class,

14   was trying to be discreet, walked behind her desk.  I

15   can't say that's a wrong behavior, a wrong intent, the

16   first time.  But if they did it because they don't know

17   Ms. Smithson, some other teachers may absolutely have no

18   problem with that.  So I can't say that their behavior

19   was wrong, but I can say please don't do that again.

20       Q.  I guess I'm concerned that in your communication

21   with Ms. Peters, Maureen Peters, relating to

22   communication she had about Ms. Smithson's lessons and

23   teaching content in her classroom, Ms. Smithson reports

24   it to you and asks that you tell her not to do it, okay,

25   and then you say, "I do not think you did anything

MARC VILLAREAL - VOL. I (April 24, 2020)

```
 1    wrong."

 2         I mean I'm trying to understand, sir, you're

 3    supposed to be the objective administrator who is

 4    supposed to terminate the hostility.  At this point in

 5    time, you are the subject of an EEO complaint, you had

 6    been the subject of a prior complaint and then a

 7    subsequent complaint had been filed by Ms. Smithson

 8    regarding your conduct, and you're making statements

 9    about "I don't think they've done anything wrong."  I

10    mean, I'm just having a hard time understanding, sir,

11    and I say that very respectfully to you.  Why do you --

12         MR. SELZ:  Objection as to form.  I appreciate

13      your opinion, Mr. Marshall, but shouldn't you be

14      asking a question?

15         MR. MARSHALL:  That was a question, sir.

16         MR. SELZ:  It was a statement.

17    Q.  Go ahead and answer, sir.

18    A.  Can you repeat the question, please?

19         MR. MARSHALL:  Yes.  Mr. Villareal, I'm just --

20      sir, and I say this very respectfully to you, but I'm

21      just trying to understand -- well, I don't think I'm

22      going to ask the question.  We've run out of time for

23      the day.

24         I'm going to suspend the deposition at this time.

25      Let's resume at 7:00 a.m. on Tuesday morning.  And I
```

```
1        do appreciate you making yourself available, sir.

2             We will start with Mr. Rodman at 7:00 a.m. is my

3     understanding, Mr. Selz, on Monday morning.

4             MR. SELZ:  Yes, that's correct.

5             MR. MARSHALL:  All right.  Super duper.  Now I

6     just want to say that we're going to make

7     Ms. Smithson available for you to take her

8     deposition, I understand you're going to start that

9     at 8:00 and go to 11:00 a.m., is that correct, sir,

10    on the 29th?

11            MR. SELZ:  Yes.

12            MR. MARSHALL:  All right.  Excellent.  We'll say

13    farewell to everybody today and wish everybody a

14    happy weekend.

15            Zoya, if you have any additional questions for

16    Mr. Villareal, this would be a good time for that.

17    And, otherwise, again, happy weekend to everyone.

18            (Deposition adjourned at 4:42 p.m.)

19

20

21

22

23

24

25
```

C E R T I F I C A T E

STATE OF WASHINGTON )
                    ) ss.
COUNTY OF KING      )


I, the undersigned Washington State Certified Court
Reporter, hereby certify that the foregoing deposition
upon oral examination of the witness named herein was
taken before me on April 24, 2020, and transcribed under
my direction;
        That the witness before examination was first
duly sworn by me pursuant to RCW 5.28.10 to testify
truthfully; that the transcript of the deposition is a
full, true and correct transcript to the best of my
ability; that I am neither attorney for nor a relative
or employee of any of the parties to the action or any
attorney or counsel employed by the parties hereto nor
financially interested in its outcome.
        IN WITNESS WHEREOF, I have hereunto affixed my
electronic signature this 12th day of May 2020.  The
document has been digitally signed in accordance with
Washington Court Rules GR 30(D)(2)(B).


_____
/s/ Zoya O. Spencer
    Washington State Certified Court Reporter
    WA CCR No. 2418
    License effective until: 11/22/2020

**'**

'16-17 [1] - 31:6
'17 [3] - 51:22, 52:1, 52:2
'17-18 [2] - 31:7, 33:25
'18 [1] - 63:16

**/**

/s [1] - 96:17

**0**

0)611-1435451592 [1] - 2:11

**1**

1 [1] - 1:13
10 [1] - 87:14
102 [1] - 2:5
10:20 [1] - 87:15
11/22/2020 [1] - 96:18
11:00 [1] - 95:9
1240 [1] - 2:5
12th [1] - 96:12
15 [6] - 41:1, 86:14, 87:1, 87:8, 87:9, 87:14
1991 [1] - 7:2
1997 [1] - 7:10
1998 [1] - 7:13
1:00 [1] - 1:16
1st [3] - 10:2, 88:22, 90:24

**2**

20 [2] - 68:6, 87:9
2011 [1] - 19:21
2014 [1] - 25:5
2015 [1] - 19:7
2016 [8] - 10:2, 21:11, 24:12, 24:14, 25:12, 25:17, 25:22, 27:14
2017 [7] - 51:4, 51:8, 51:13, 52:12, 52:13, 63:16, 85:12
2020 [3] - 1:16, 96:7, 96:12
24 [2] - 1:16, 96:7
2418 [2] - 1:24, 96:18
25th [2] - 88:23, 90:25
29466 [1] - 2:6
29th [1] - 95:10

**3**

3 [1] - 2:20

**30(D)(2)(B)** [1] - 96:13
303-9532 [1] - 2:6
30th [1] - 88:19
35 [1] - 78:14

**4**

45 [1] - 78:14
49 [1] - 2:11
49-(0)162-2704730 [1] - 2:11
4:05 [1] - 86:25
4:42 [1] - 95:18

**5**

5.28.10 [1] - 96:8
50 [1] - 4:15
545-1592/CIV [1] - 2:11
570-2019-00926X [1] - 1:4

**6**

60 [1] - 4:15

**7**

7:00 [2] - 94:25, 95:2

**8**

843 [1] - 2:6
8:00 [1] - 95:9
8:17 [1] - 40:25
8:30 [2] - 40:25, 41:1
8:32 [1] - 41:1

**9**

96 [1] - 1:13

**A**

a.m [3] - 94:25, 95:2, 95:9
ability [4] - 14:9, 15:16, 84:24, 96:10
able [5] - 8:23, 9:9, 14:17, 17:4, 24:2
aboard [1] - 54:17
absolutely [7] - 10:13, 60:1, 68:5, 71:5, 84:15, 86:18, 93:17
accepted [4] - 8:1, 19:21, 19:24, 60:1
access [8] - 30:13, 33:7, 38:19, 39:7, 41:17, 43:23, 50:18, 51:6

accessible [4] - 32:13, 32:14, 32:17, 32:20
accident [3] - 75:10, 76:17
accommodate [1] - 13:23
accommodation [37] - 5:22, 5:23, 11:18, 17:1, 18:9, 18:13, 20:22, 20:25, 21:10, 22:1, 22:18, 22:22, 23:6, 23:22, 23:23, 23:24, 25:2, 25:3, 25:15, 25:22, 26:2, 26:3, 26:6, 26:14, 27:3, 27:13, 27:16, 28:1, 29:16, 30:1, 37:5, 37:11, 37:12, 37:14, 37:17, 37:22, 41:16
accommodations [24] - 11:3, 14:24, 20:13, 20:16, 21:17, 23:11, 23:14, 23:17, 24:3, 24:19, 25:7, 25:10, 29:21, 35:15, 35:18, 35:23, 36:16, 36:17, 49:24, 50:7, 59:15, 62:17, 72:25, 73:9
accordance [1] - 96:13
according [5] - 54:10, 68:15, 80:13, 83:11, 85:16
accumulated [2] - 80:25, 81:17
accurate [2] - 3:17, 29:1
accusation [1] - 89:23
accusations [1] - 87:19
accusing [1] - 81:7
Act [1] - 49:25
acting [1] - 60:23
action [9] - 39:15, 44:16, 55:13, 55:15, 55:18, 55:23, 56:2, 62:21, 96:10
actions [1] - 44:16
active [1] - 7:15
actively [1] - 79:25
activity [4] - 10:11, 12:6, 12:11, 12:17
actual [1] - 39:19
add [3] - 11:22, 38:25
addition [4] - 46:23, 50:13
additional [2] - 57:18, 95:15
address [1] - 86:16

addressing [1] - 44:14
ADHD [2] - 12:14, 12:22
adhered [1] - 40:21
adjourned [1] - 95:18
adjusted [1] - 23:18
administration [3] - 7:20, 17:23, 20:10
administrative [1] - 86:17
administrator [4] - 28:23, 29:10, 71:22, 94:3
administrators [2] - 32:15, 32:18
adverse [2] - 43:2, 43:5
advise [1] - 85:21
advised [3] - 68:21, 70:14, 83:7
affected [1] - 14:9
affecting [1] - 15:1
affects [1] - 14:8
affixed [1] - 96:12
African [2] - 61:11, 61:13
African-American [2] - 61:11, 61:13
afterwards [4] - 69:9, 73:22, 74:1, 74:8
Agency [1] - 1:7
agency [10] - 25:20, 27:4, 28:6, 28:24, 30:3, 42:20, 50:2, 66:16, 81:9, 87:20
AGENCY [2] - 1:5, 2:8
agency's [1] - 54:10
ago [4] - 35:10, 50:22, 51:24, 90:5
agree [23] - 32:11, 33:6, 33:9, 39:6, 39:9, 39:22, 39:24, 40:20, 42:12, 42:16, 42:20, 42:22, 42:23, 43:3, 50:8, 50:10, 50:12, 60:16, 62:3, 72:11, 72:15, 72:16, 78:15
agreed [1] - 87:4
ahead [9] - 16:19, 20:20, 40:24, 40:25, 44:9, 55:12, 86:14, 91:14, 94:17
aim [1] - 85:1
alarm [1] - 88:23
allegation [1] - 48:9
allegations [1] - 46:17
alleged [3] - 45:20, 80:20, 81:13
allegedly [1] - 73:21

allow [1] - 4:11
allowed [3] - 26:17, 75:13, 85:12
allowing [1] - 61:19
almost [1] - 33:12
alone [2] - 72:13, 77:10
alrighty [2] - 3:19, 15:3
ALSO [1] - 2:13
alternative [1] - 26:6
American [4] - 60:25, 61:11, 61:13, 71:18
amounts [1] - 61:5
analysis [1] - 37:2
annual [2] - 40:18, 87:22
annually [1] - 88:14
answer [26] - 4:5, 4:8, 4:12, 9:10, 13:15, 16:15, 18:23, 26:16, 26:17, 32:5, 40:2, 43:6, 47:1, 49:21, 53:10, 53:18, 66:5, 73:3, 75:1, 75:13, 76:2, 82:1, 86:9, 87:23, 94:17
answering [3] - 12:14, 12:22, 87:25
anticipate [1] - 4:10
antidiscrimination [1] - 88:12
anyhow [1] - 40:6
apart [7] - 20:9, 29:14, 30:6, 30:11, 30:16, 89:13, 89:15
apologies [2] - 42:8, 53:8
apologize [3] - 42:7, 49:20, 79:10
appearance [1] - 85:9
APPEARANCES [1] - 2:1
applied [1] - 7:20
apply [1] - 33:2
appreciate [8] - 3:9, 58:12, 60:3, 60:4, 70:11, 86:21, 94:12, 95:1
appreciated [1] - 62:6
approached [2] - 72:4, 72:9
appropriate [6] - 30:2, 30:6, 30:12, 49:16, 66:22, 68:3
approval [3] - 29:5, 29:7
approve [1] - 28:20
approved [4] - 23:4, 23:22, 28:12, 32:24

**approving** [2] - 25:15, 25:21, 28:23
**April** [2] - 1:16, 96:7
**area** [1] - 35:13
**argumentative** [1] - 59:22
**arrival** [1] - 34:5
**arrived** [7] - 19:5, 24:1, 25:12, 25:16, 25:22, 31:25, 54:5
**articulate** [2] - 27:15, 62:1
**articulated** [5] - 46:12, 46:16, 47:25, 70:11, 90:4
**articulating** [1] - 70:7
**aspects** [1] - 86:6
**assault** [4] - 75:11, 75:15, 75:19, 85:19
**assaulted** [5] - 73:14, 73:18, 75:4, 75:20, 76:7
**assertion** [2] - 73:17, 80:11
**assigned** [1] - 54:5
**assist** [1] - 89:2
**assistance** [1] - 85:14
**assistant** [8] - 7:21, 7:24, 8:4, 8:10, 10:3, 19:20, 19:22, 24:19
**assume** [1] - 16:23
**AT** [1] - 1:1
**attempt** [1] - 50:16
**attempting** [2] - 59:7, 69:23
**attendance** [1] - 17:18
**attended** [1] - 19:13
**attending** [1] - 17:25
**attention** [10] - 19:3, 30:4, 30:9, 30:23, 31:9, 31:12, 33:25, 38:2, 38:5, 62:16
**attorney** [2] - 96:10, 96:11
**August** [3] - 10:2, 10:21, 19:7
**available** [7] - 3:9, 3:12, 3:14, 3:15, 75:25, 95:1, 95:7
**avoid** [1] - 88:24
**award** [1] - 9:1
**aware** [25] - 11:19, 13:1, 13:2, 18:7, 18:11, 18:15, 18:20, 18:22, 37:24, 39:18, 42:15, 54:11, 54:13, 54:14, 62:11, 62:24, 65:22, 65:24, 66:1, 66:6, 66:8, 68:20, 68:24, 69:5, 69:6

## B

**bachelor** [1] - 7:4
**background** [3] - 6:20, 6:24, 7:1
**bad** [1] - 76:18
**barking** [1] - 42:7
**base** [2] - 7:14, 7:17
**based** [1] - 85:6
**basic** [1] - 3:22
**Bavaria** [1] - 20:2
**became** [9] - 11:19, 18:7, 18:20, 20:12, 20:25, 39:18, 53:15, 53:21, 71:22
**become** [4] - 18:11, 18:15, 18:22, 54:10
**becomes** [1] - 4:7
**becoming** [1] - 10:7
**began** [1] - 7:12
**begin** [4] - 4:12, 34:1, 37:15, 42:15
**beginning** [1] - 10:22
**begins** [1] - 27:11
**begs** [1] - 87:1
**behavior** [13] - 48:8, 48:10, 58:1, 58:4, 59:11, 60:10, 66:20, 67:2, 67:12, 69:13, 93:4, 93:15, 93:18
**behaviors** [1] - 49:9
**behind** [14] - 29:23, 29:24, 58:13, 59:1, 60:7, 60:8, 60:14, 61:7, 63:25, 64:2, 71:1, 76:16, 93:8, 93:14
**belaboring** [1] - 44:3
**beliefs** [1] - 46:18
**belong** [1] - 31:13
**best** [26] - 12:15, 13:15, 21:3, 23:25, 31:3, 34:9, 44:10, 46:1, 47:22, 48:20, 48:22, 52:2, 54:22, 55:1, 64:4, 64:23, 65:13, 70:17, 72:6, 78:23, 84:23, 84:24, 89:4, 90:7, 96:9
**better** [8] - 13:4, 26:10, 39:9, 46:4, 57:1, 84:22, 85:1
**between** [10] - 14:11, 21:15, 30:22, 60:1, 60:12, 78:14, 78:16, 79:1, 89:12, 93:7
**beyond** [1] - 92:7
**biannual** [2] - 87:22, 88:10
**bias** [1] - 81:5

**big** [2] - 20:3, 61:2
**bigger** [2] - 60:25, 62:4
**biology** [1] - 17:8
**bit** [3] - 21:16, 59:9, 78:8
**Bitburg** [1] - 7:18
**blur** [2] - 21:15, 21:16
**bottom** [1] - 41:7
**Brad** [1] - 3:6
**brad@Charmans. com** [1] - 2:7
**BRADLEY** [1] - 2:4
**breach** [2] - 34:20, 43:10
**breached** [7] - 31:15, 34:11, 42:1, 43:4, 43:18, 44:19, 46:24
**breaching** [2] - 42:13, 42:16
**break** [8] - 4:13, 40:24, 41:1, 78:7, 86:14, 86:15, 87:1, 87:8, 87:14
**breaks** [2] - 4:15, 87:8
**brief** [3] - 41:4, 53:7, 87:17
**Brief** [1] - 42:5
**bring** [2] - 30:23, 44:13
**bringing** [1] - 31:12
**broke** [2] - 33:12, 82:23
**brought** [6] - 30:4, 30:9, 31:9, 33:24, 38:1, 38:5
**bruised** [1] - 74:14
**bruising** [2] - 74:15, 74:17
**bubble** [3] - 60:17, 60:23, 62:5
**bubbles** [1] - 61:1
**building** [1] - 14:15
**bumped** [1] - 92:5
**Burne** [1] - 51:18
**BY** [2] - 2:20, 3:5

## C

**cabinet** [3] - 29:22, 33:11, 33:15
**calm** [1] - 70:8
**campaign** [1] - 80:1
**cannot** [6] - 5:11, 12:1, 12:4, 18:2, 32:24, 66:20
**capability** [1] - 15:21
**care** [1] - 75:9
**career** [1] - 7:12
**carefully** [2] - 5:6,

28:18
**Carolina** [1] - 2:6
**case** [10] - 3:7, 6:5, 6:9, 8:14, 29:17, 29:25, 42:25, 46:21, 51:8, 62:11
**cases** [2] - 20:18, 20:23, 56:21, 59:7, 93:12
**cash** [1] - 9:1
**Castle** [1] - 51:18
**castle** [1] - 51:23
**caused** [2] - 84:12, 85:5
**causing** [1] - 15:2
**caution** [4] - 30:5, 30:12, 36:21, 52:7
**CCR** [2] - 1:24, 96:18
**Cell** [1] - 2:11
**certain** [4] - 53:16, 64:25, 65:4, 92:5
**certainly** [5] - 12:1, 18:3, 84:25, 85:2, 85:4
**certificate** [1] - 7:8
**Certified** [2] - 96:5, 96:17
**certified** [1] - 9:7
**certify** [1] - 96:6
**cetera** [2] - 15:2, 79:24
**chair** [3] - 21:18, 21:22, 22:3
**chairpersons** [1] - 33:2
**challenge** [2] - 89:14, 92:15
**challenging** [14] - 88:20, 89:7, 89:10, 89:11, 89:19, 89:20, 89:23, 89:24, 90:2, 90:3, 90:10, 90:17, 90:20, 90:22
**change** [2] - 23:10, 81:25
**changed** [2] - 41:15, 41:17
**changing** [1] - 93:4
**charged** [1] - 83:18
**Chartmans** [1] - 2:5
**check** [4] - 22:20, 34:18, 37:7, 53:20
**checking** [1] - 47:19
**chemistry** [1] - 17:8
**child** [3] - 16:23, 72:4, 72:10
**choose** [1] - 10:24
**chose** [1] - 92:22
**Christina** [2] - 30:21, 32:4
**chronic** [2] - 13:2,

13:3
**chronological** [1] - 7:1
**circumstances** [1] - 34:25
**city** [1] - 61:3
**claim** [5] - 9:9, 9:11, 63:10, 85:3, 90:7
**claiming** [2] - 37:16, 37:17
**claims** [4] - 10:11, 76:21, 85:25, 86:2
**clarification** [1] - 15:4
**class** [8] - 45:12, 45:18, 49:18, 49:19, 52:16, 80:6, 80:7, 93:13
**classroom** [7] - 13:25, 17:21, 46:15, 49:15, 60:1, 63:15, 93:23
**classrooms** [2] - 71:24, 71:25
**clear** [4] - 4:12, 13:18, 49:10, 67:5, 70:6
**clearly** [5] - 34:4, 58:14, 62:1, 71:11
**client** [1] - 53:6
**close** [1] - 75:8
**closed** [5] - 7:23, 73:20, 74:11, 75:6
**closely** [1] - 76:12
**closer** [1] - 60:24
**closure** [1] - 44:14
**collaborates** [1] - 90:19
**collaborating** [1] - 17:24
**collaboration** [2] - 18:1, 60:3
**colleagues** [4] - 49:9, 58:18, 60:2, 72:1
**collected** [1] - 70:8
**comfortable** [1] - 14:6
**coming** [3] - 50:17, 52:11, 61:7
**COMMISSION** [1] - 1:1
**Commission** [1] - 3:8
**communicate** [2] - 57:22, 72:19
**communicated** [10] - 43:17, 56:1, 58:5, 66:3, 69:5, 70:18, 79:6, 79:8, 88:2, 88:4
**communicating** [1] - 63:1
**communication** [13] - 17:22, 17:23, 58:18, 71:3, 71:5, 88:18,

89:3, 93:3, 93:5, 93:9, 93:20, 93:22
**communications** [2] - 65:11, 91:24
**communicator** [1] - 90:7
**community** [4] - 55:15, 71:15, 71:17, 71:18
**compassionate** [1] - 83:22
**complainant** [1] - 1:4
**COMPLAINANT** [1] - 2:3
**complained** [3] - 51:12, 59:4, 66:25
**complaining** [1] - 52:9
**complaint** [18] - 8:11, 8:18, 8:20, 9:22, 54:11, 65:25, 66:2, 72:7, 83:4, 83:8, 83:12, 83:15, 84:12, 84:17, 85:11, 94:5, 94:6, 94:7
**complaints** [3] - 9:15, 63:2, 84:13
**complete** [8] - 3:11, 27:13, 27:14, 27:21, 28:12, 28:21, 37:11
**completed** [4] - 4:5, 4:10, 29:4, 29:10
**completely** [2] - 15:19, 60:11
**complex** [1] - 62:15
**compromised** [4] - 38:4, 38:15, 38:17, 39:5
**computer** [3] - 4:17, 4:18, 6:14
**concern** [2] - 49:22, 62:18
**concerned** [8] - 13:6, 15:18, 25:16, 54:15, 77:1, 78:8, 93:20
**concerning** [4] - 9:18, 11:2, 15:5, 76:19
**concerns** [4] - 44:18, 61:22, 62:12, 89:1
**conclusion** [1] - 84:18
**conclusions** [1] - 82:9
**condition** [2] - 13:17, 42:15
**conduct** [8] - 9:18, 17:22, 34:2, 34:8, 80:14, 80:15, 81:10, 94:8
**conducted** [2] - 10:18, 80:17
**confidential** [12] - 31:15, 35:1, 37:1,

38:2, 39:12, 42:13, 42:24, 44:18, 46:23, 52:19, 52:22, 59:16
**confidentiality** [1] - 38:4
**confirm** [1] - 51:10
**confirmed** [1] - 59:14
**confused** [1] - 16:16
**connected** [2] - 16:24, 76:12
**connection** [2] - 49:15, 88:7
**Connor** [1] - 79:4
**Connors** [21] - 51:20, 73:14, 73:18, 73:19, 73:20, 77:4, 77:9, 77:11, 77:25, 79:12, 79:13, 79:19, 79:23, 88:18, 88:19, 89:16, 89:18, 90:13, 91:6, 92:6, 93:7
**connors** [1] - 76:21
**Conrad** [4] - 51:19, 91:24, 93:2, 93:5
**consider** [3] - 49:7, 79:22, 80:3
**considered** [1] - 17:17
**consistent** [2] - 37:13, 80:16
**conspiracy** [1] - 80:7
**conspiring** [1] - 80:20
**consult** [1] - 55:7
**consulted** [1] - 90:8
**contact** [14] - 25:4, 56:15, 69:6, 69:15, 78:19, 78:23, 79:19, 88:22, 88:25, 90:1, 90:23, 91:10, 91:11, 93:6
**contacted** [4] - 44:17, 55:15, 56:23, 70:1
**contacts** [1] - 78:17
**contained** [1] - 69:2
**content** [1] - 93:23
**continue** [3] - 3:18, 92:20
**continued** [2] - 65:22, 78:17
**continues** [3] - 57:16, 72:14, 72:17
**continuing** [1] - 57:23
**control** [1] - 13:25
**conversation** [16] - 17:5, 19:1, 29:19, 31:18, 35:9, 35:10, 44:7, 46:5, 47:8, 47:13, 49:17, 60:12, 60:15, 60:24, 79:12, 79:13
**conversations** [12] -

20:5, 44:23, 45:3, 47:10, 47:12, 47:15, 47:23, 47:24, 49:4, 60:8, 64:10, 65:9
**converse** [1] - 71:18
**convey** [6] - 16:6, 41:24, 46:22, 57:13, 57:17, 75:19
**conveyed** [2] - 50:12, 58:22
**conveying** [3] - 15:5, 15:6, 46:9
**cool** [1] - 70:8
**cooperative** [1] - 86:21
**copies** [1] - 33:15
**copy** [3] - 4:19, 4:21, 87:20
**correct** [69] - 3:13, 8:4, 8:5, 8:6, 10:5, 11:8, 11:9, 22:12, 22:24, 22:25, 23:2, 23:3, 23:7, 27:1, 27:5, 27:17, 27:21, 27:22, 28:1, 28:2, 28:4, 28:5, 28:8, 28:9, 28:13, 28:22, 29:6, 29:8, 32:16, 32:22, 33:8, 34:23, 38:4, 38:6, 39:8, 39:13, 39:14, 40:8, 40:9, 40:21, 40:22, 41:8, 45:8, 45:13, 48:7, 49:12, 49:25, 54:24, 55:21, 63:3, 64:22, 65:10, 66:19, 67:25, 68:1, 71:14, 79:7, 81:11, 82:12, 82:17, 82:22, 83:6, 83:15, 83:16, 95:4, 95:9, 96:9
**corroborate** [1] - 64:6
**corroboration** [3] - 69:14, 71:7, 79:15
**counsel** [1] - 96:11
**Counsel** [1] - 2:10
**counselor** [2] - 58:12, 93:13
**count** [1] - 78:9
**COUNTY** [1] - 96:4
**couple** [3] - 7:14, 10:20, 59:5
**course** [2] - 87:7, 88:14
**Court** [4] - 1:24, 96:5, 96:13, 96:17
**create** [4] - 42:14, 50:16, 72:24, 80:7
**created** [1] - 92:17
**credible** [3] - 86:1,

86:2, 92:10
**critical** [1] - 17:18
**critically** [1] - 76:3
**cross** [1] - 72:21
**cultural** [2] - 60:18, 60:20
**culturally** [1] - 61:15
**culture** [4] - 61:4, 61:21, 62:8
**cultures** [1] - 61:19
**current** [1] - 32:1
**cut** [1] - 91:16

## D

**damage** [1] - 74:9
**date** [3] - 24:10, 39:19, 39:20
**DC** [1] - 1:1
**deal** [1] - 13:19
**dealing** [1] - 20:18
**dealings** [1] - 61:10
**Dean** [4] - 30:20, 52:8, 52:21, 53:15
**debilitating** [1] - 12:20
**decided** [1] - 24:18
**decision** [3] - 7:5, 40:5, 85:8
**decision-making** [1] - 85:8
**decisions** [1] - 85:6
**declared** [2] - 8:24, 9:8
**defend** [1] - 84:12
**DEFENSE** [1] - 1:6
**defensive** [1] - 92:23
**deficient** [1] - 16:3
**definition** [1] - 44:3
**definitively** [1] - 92:8
**degenerative** [1] - 13:4
**degree** [2] - 71:22, 90:7
**demeanor** [2] - 70:2, 70:5
**department** [1] - 33:3
**Dependents** [1] - 2:10
**deposed** [1] - 3:2
**Deposition** [2] - 1:10, 95:18
**deposition** [9] - 3:10, 3:12, 3:20, 4:6, 5:20, 94:24, 95:8, 96:6, 96:9
**DEPT** [1] - 1:6
**Deputy** [1] - 2:10
**describe** [9] - 25:11, 25:14, 25:19, 25:23, 41:11, 70:2, 70:10, 74:1, 74:7

**describing** [1] - 92:12
**description** [5] - 13:12, 17:13, 17:20, 17:24, 18:3
**deserves** [1] - 50:11, 58:15
**Designated** [1] - 2:4
**desires** [2] - 27:12, 58:16
**desk** [20] - 21:19, 21:22, 22:2, 32:10, 34:14, 36:8, 36:16, 50:23, 55:21, 58:13, 60:7, 60:8, 60:14, 61:7, 63:25, 64:2, 67:21, 67:23, 71:2, 93:14
**desks** [1] - 41:15
**details** [1] - 16:21
**Dewanna** [2] - 30:20, 52:8
**diagnoses** [2] - 13:6, 14:20
**diagnosis** [4] - 12:19, 12:25, 14:19, 15:1
**different** [15] - 10:24, 48:11, 49:8, 58:10, 60:2, 60:11, 60:18, 61:5, 62:2, 67:3, 67:20, 68:12, 75:18, 86:11
**difficult** [3] - 4:7, 27:7, 34:8
**difficulty** [3] - 12:12, 13:7, 13:16
**digitally** [1] - 96:13
**direct** [2] - 66:13, 75:9
**directed** [2] - 63:20, 64:2
**direction** [1] - 96:7
**directives** [1] - 9:2
**disabilities** [3] - 62:13, 72:25, 73:8
**disability** [25] - 11:2, 11:12, 11:14, 11:15, 11:20, 11:25, 12:10, 16:7, 16:14, 16:24, 17:3, 20:13, 26:12, 27:15, 27:25, 42:24, 42:25, 46:25, 47:7, 48:2, 49:12, 49:14, 49:23, 59:14, 68:22
**disapproval** [2] - 29:5, 29:7
**disapprove** [1] - 28:20
**disapproved** [2] - 23:5, 28:13
**disapproving** [1] - 25:21
**disciplined** [2] -

54:20, 59:10
**discomfort** [1] - 13:23
**discovery** [1] - 64:17
**discredit** [1] - 46:19
**discreet** [2] - 59:9, 93:14
**discriminating** [1] - 47:6
**discrimination** [4] - 8:22, 11:3, 83:18, 87:21
**discriminatory** [1] - 84:6
**discuss** [2] - 46:9, 63:5
**discussed** [1] - 62:14
**discussing** [1] - 28:11
**Discussion** [1] - 79:9
**discussions** [1] - 19:14
**disrespectful** [1] - 93:1
**disrespectfully** [1] - 61:25
**disrupt** [3] - 63:15, 80:6, 80:7
**disruptions** [2] - 51:2, 51:3
**disseminated** [2] - 43:1, 43:5
**distinction** [1] - 13:14
**distinctions** [1] - 61:18
**distractions** [2] - 50:15, 52:10
**district** [7] - 19:10, 20:2, 20:3, 20:10, 25:5, 66:13
**disturbing** [1] - 72:12
**diverse** [1] - 83:23
**Diversity** [1] - 7:9
**divided** [1] - 77:7
**document** [7] - 5:2, 17:12, 29:4, 29:9, 29:10, 29:11, 96:13
**documentation** [11] - 11:17, 27:18, 28:3, 30:15, 39:4, 57:8, 64:5, 64:15, 65:10, 69:3, 82:6
**documented** [1] - 59:14
**documents** [2] - 5:20, 41:22
**DoD** [1] - 2:10
**DoDEA** [15] - 34:7, 39:22, 40:3, 40:4, 40:6, 40:17, 61:13
**dog** [1] - 42:7
**done** [19] - 7:11, 17:1,

29:11, 48:25, 49:5, 58:23, 59:3, 59:13, 59:23, 63:24, 72:23, 80:15, 84:19, 84:20, 84:22, 85:14, 85:20, 94:9
**door** [6] - 29:23, 29:24, 73:20, 73:21, 74:11, 75:6
**doorway** [2] - 76:23, 76:25
**doubt** [1] - 92:7
**down** [3] - 77:18, 79:17, 79:18
**Dr** [2] - 82:12, 82:13
**draw** [1] - 22:6
**drawer** [2] - 32:10, 50:23
**drawing** [1] - 19:2
**drill** [2] - 91:9, 92:6
**DSN** [1] - 2:11
**Duane** [2] - 19:8, 19:9
**due** [3] - 59:21, 61:24, 75:22
**duly** [2] - 3:2, 96:8
**Dunham** [2] - 82:12, 82:13
**duper** [2] - 3:19, 95:5
**during** [16] - 8:9, 10:3, 11:10, 15:14, 22:18, 52:4, 54:17, 74:4, 74:5, 82:21, 83:1, 88:22, 88:23, 90:24, 91:9, 92:6
**duties** [9] - 13:16, 15:16, 16:8, 16:15, 17:4, 17:7, 32:21, 47:24, 73:4
**duty** [7] - 7:24, 8:6, 16:18, 59:19, 59:20, 73:7, 73:9

### E

**Ed** [2] - 21:18, 25:7
**edification** [1] - 35:5
**education** [3] - 6:20, 7:6, 7:10
**educational** [2] - 6:24, 7:1
**educators** [3] - 68:7, 68:8, 78:16
**Edward** [2] - 22:10, 37:5
**EEO** [14] - 8:11, 8:22, 9:15, 9:21, 10:10, 10:11, 10:16, 11:1, 83:4, 83:8, 83:12, 83:15, 84:11, 94:5
**EEOC** [1] - 1:4

**effect** [3] - 43:2, 43:5, 92:20
**effective** [1] - 96:18
**effort** [1] - 56:10
**either** [7] - 23:1, 23:4, 23:17, 28:20, 41:24, 78:20, 79:24
**electronic** [2] - 41:17, 96:12
**Elementary** [1] - 19:22
**elsewhere** [1] - 39:9
**Email** [1] - 2:7
**email** [18] - 31:11, 41:24, 45:1, 46:4, 46:6, 46:10, 46:11, 46:16, 46:20, 71:10, 75:14, 75:19, 79:18, 80:4, 83:7, 88:18, 93:2, 93:9
**emails** [11] - 5:21, 5:25, 6:3, 6:15, 45:2, 45:9, 46:8, 49:5, 57:10, 64:11, 64:24
**employ** [1] - 50:5
**employed** [1] - 96:11
**employee** [21] - 9:19, 20:13, 24:22, 26:1, 26:5, 26:8, 26:9, 26:15, 27:12, 28:8, 28:11, 29:6, 29:8, 29:12, 59:13, 60:10, 60:12, 63:22, 64:4, 66:12, 96:10
**employees** [22] - 27:4, 33:19, 35:17, 35:22, 36:2, 36:6, 36:10, 36:14, 36:15, 36:20, 42:20, 56:20, 57:7, 58:7, 59:17, 62:25, 66:17, 66:18, 70:19, 79:24, 92:23
**EMPLOYMENT** [1] - 1:1
**Employment** [1] - 3:8
**encourage** [1] - 60:2
**end** [3] - 26:13, 82:23, 93:11
**ended** [2] - 7:4, 19:12
**engineering** [2] - 7:4, 7:6
**English** [1] - 90:6
**entails** [1] - 27:3
**entirety** [1] - 82:14
**entitled** [4] - 8:25, 37:2, 50:6, 50:11
**environment** [10] - 47:4, 47:6, 48:22, 49:2, 50:16, 73:6, 80:8, 84:9, 85:15, 90:12

**Equal** [1] - 3:8
**EQUAL** [1] - 1:1
**err** [2] - 30:5, 30:12
**essential** [1] - 17:10
**essentially** [1] - 7:22
**Ester** [1] - 57:3
**estimate** [8] - 21:3, 31:3, 33:25, 38:13, 46:1, 46:2, 79:3
**estimation** [2] - 17:6, 79:2
**et** [2] - 15:2, 79:24
**EU-FY18-054** [1] - 1:6
**Europe/Pacific** [1] - 2:10
**evacuation** [1] - 88:24
**evaluate** [1] - 46:15
**evaluations** [2] - 15:25, 16:3
**event** [3] - 68:13, 69:7, 69:19
**evidence** [7] - 34:11, 63:13, 73:19, 73:24, 80:6, 80:11, 80:21
**EXAMINATION** [2] - 2:19, 3:4
**examination** [2] - 96:6, 96:8
**Examination** [1] - 1:10
**excellent** [3] - 6:18, 54:23, 95:12
**excellente** [1] - 87:13
**excess** [2] - 9:3, 9:5
**excessed** [3] - 8:23, 8:24, 9:8
**exchange** [1] - 86:20
**exercise** [1] - 16:25
**EXHIBITS** [1] - 2:23
**existing** [1] - 25:3
**experience** [2] - 6:20, 6:23
**experienced** [1] - 49:11
**experts** [1] - 26:13
**explained** [1] - 14:12
**exposed** [1] - 68:23
**extent** [3] - 22:3, 57:12, 65:8
**eyes** [2] - 5:3, 5:15

### F

**F-I-E-R-M-A-N** [1] - 21:21
**face** [12] - 31:18, 31:22, 44:25, 47:11, 47:14, 47:15, 47:16
**face-to-face** [3] - 31:18, 31:22, 44:25
**facets** [1] - 18:2

**facilities** [1] - 72:20
**fact** [3] - 11:16, 33:11, 60:2
**factually** [1] - 40:2
**faculty** [9] - 14:1, 56:5, 56:8, 56:15, 58:16, 88:20, 89:7, 89:24, 90:17
**fair** [10] - 6:17, 13:14, 16:23, 46:18, 62:15, 79:2, 79:3, 81:16, 81:17, 81:18
**fairly** [1] - 62:15
**familiar** [4] - 26:23, 26:25, 40:8, 40:17
**famously** [1] - 90:13
**far** [2] - 12:19, 78:9
**farewell** [1] - 95:13
**favor** [1] - 6:12
**federal** [3] - 6:21, 6:24, 7:12
**federally** [1] - 36:24
**feelings** [2] - 89:17, 89:18
**felt** [4] - 47:4, 47:25, 48:6, 61:25
**few** [2] - 19:9, 32:3
**Fierman** [4] - 21:18, 22:10, 22:23, 37:5
**figured** [2] - 30:5, 30:11
**file** [27] - 18:25, 29:15, 29:21, 31:13, 31:22, 32:9, 32:24, 33:1, 34:14, 36:8, 38:21, 38:22, 41:6, 41:7, 41:13, 41:18, 41:20, 41:21, 42:16, 43:12, 43:13, 50:24, 51:5, 52:19, 52:22, 53:14
**filed** [5] - 8:17, 8:21, 9:21, 83:13, 94:7
**files** [17] - 29:22, 33:5, 33:13, 35:6, 35:13, 35:17, 35:22, 35:24, 36:2, 36:16, 39:3, 39:4, 43:18, 44:12, 50:22, 55:14, 55:25
**filing** [3] - 29:22, 33:11, 33:15
**filling** [1] - 8:2
**financially** [1] - 96:11
**findings** [1] - 82:9
**fine** [1] - 18:5
**finish** [1] - 4:11
**finished** [4] - 49:20, 91:14, 91:15, 91:17
**fire** [3] - 88:23, 91:9, 92:6
**first** [43] - 3:21, 7:20,

8:3, 10:17, 11:24, 12:2, 12:3, 12:4, 18:17, 18:18, 20:13, 20:15, 20:17, 20:21, 20:23, 22:8, 22:13, 23:1, 24:11, 24:15, 24:16, 25:7, 29:20, 29:25, 31:5, 32:3, 54:1, 60:12, 66:12, 67:2, 67:16, 67:17, 67:19, 72:6, 75:23, 83:14, 84:17, 85:11, 93:16, 96:8
**five** [1] - 21:4
**fluctuate** [1] - 78:13
**focus** [1] - 93:3
**folding** [1] - 41:10
**follow** [3] - 4:5, 66:15, 82:5
**follow-up** [2] - 4:5, 82:5
**followed** [5] - 43:20, 57:10, 64:10, 69:11, 71:10
**following** [2] - 9:2, 49:5
**follows** [1] - 3:2
**FOR** [2] - 2:3, 2:8
**forbids** [2] - 40:5, 40:7
**foregoing** [1] - 96:6
**form** [13] - 27:4, 27:14, 27:15, 27:20, 27:21, 27:23, 28:12, 28:21, 37:11, 63:14, 86:7, 94:12
**format** [2] - 5:24, 11:4
**forms** [1] - 92:12
**forth** [1] - 80:14
**forward** [3] - 34:10, 86:22, 87:2
**forwarded** [1] - 64:16
**four** [3] - 78:13, 86:23
**fourth** [1] - 86:25
**frame** [1] - 73:21
**Franklin** [2] - 57:3, 63:12
**Fred** [1] - 51:18
**freedom** [1] - 91:19
**frequently** [1] - 71:19
**front** [4] - 4:17, 4:18, 68:6, 68:23
**frustrating** [1] - 63:13
**full** [2] - 17:12, 96:9
**fully** [2] - 15:22, 55:1
**function** [2] - 14:10, 14:25
**functions** [2] - 14:18, 17:10
**future** [1] - 88:25

# G

**gatherings** [1] - 14:1
**gender** [2] - 62:8, 85:7
**General** [1] - 2:10
**general** [3] - 14:1, 17:9, 25:25
**generally** [4] - 14:10, 61:1, 64:10, 78:15
**Germany** [5] - 1:17, 7:18, 7:22, 8:7, 20:2
**given** [5] - 9:3, 20:15, 37:12, 49:23, 84:24
**goal** [1] - 93:7
**government** [3] - 6:21, 6:24, 7:12
**GR** [1] - 96:13
**grades** [1] - 47:24
**graduated** [1] - 7:2
**granted** [4] - 18:8, 18:12, 26:9, 37:22
**granting** [2] - 25:15, 37:19
**great** [2] - 13:19, 49:5
**grievances** [1] - 9:18
**group** [1] - 67:20
**groups** [1] - 68:12
**guess** [17] - 6:25, 13:18, 16:16, 31:6, 35:3, 44:2, 58:9, 62:18, 64:23, 67:3, 77:1, 83:13, 83:21, 84:3, 85:23, 89:11, 93:20
**guidance** [2] - 9:2, 63:23
**guilty** [1] - 36:22

# H

**half** [7] - 50:22, 74:4, 86:23, 87:5, 87:6
**hand** [14] - 50:23, 66:21, 69:23, 71:2, 73:21, 73:22, 74:1, 74:3, 74:7, 74:18, 75:6, 77:22, 92:4
**handful** [1] - 21:8
**handle** [1] - 55:9
**happy** [3] - 87:16, 95:14, 95:17
**harassment** [3] - 50:8, 83:3, 84:14
**hard** [1] - 94:10
**hardcopy** [1] - 39:2
**harmed** [1] - 73:20
**Hayes** [3] - 82:15, 82:16, 82:19
**head** [2] - 80:3, 90:5
**headquarters** [1] -

55:7
**health** [1] - 15:19
**hear** [1] - 27:9
**heard** [4] - 9:13, 48:12, 65:25, 72:7
**hello** [2] - 52:24, 53:5
**help** [3] - 47:9, 51:17, 53:18
**hereby** [1] - 96:6
**herein** [2] - 3:1, 96:6
**hereto** [1] - 96:11
**hereunto** [1] - 96:12
**hi** [1] - 52:25
**hide** [1] - 36:23
**High** [4] - 8:2, 8:7, 8:16, 19:11
**high** [1] - 7:2
**history** [1] - 85:6
**hit** [1] - 5:3
**hold** [5] - 40:12, 53:2, 53:3, 53:6, 78:5
**hole** [1] - 41:11
**holes** [1] - 86:6
**home** [2] - 84:21, 84:22
**honest** [1] - 47:1
**honestly** [8] - 17:12, 18:24, 21:7, 24:24, 30:4, 34:19, 36:4, 45:4
**hoping** [1] - 87:8
**horrible** [1] - 76:17
**host** [1] - 11:5
**hostile** [7] - 47:4, 47:6, 48:22, 49:1, 50:16, 80:8, 85:15
**hostility** [10] - 45:7, 54:11, 55:4, 72:24, 80:1, 81:14, 83:3, 84:13, 92:12, 94:4
**hour** [2] - 86:13, 86:25
**hours** [6] - 86:23, 87:5, 87:6
**housed** [2] - 38:3, 55:20
**hug** [2] - 66:21, 69:24
**human** [1] - 62:9
**humiliated** [1] - 68:16
**humiliating** [1] - 68:14
**hundred** [4] - 6:17, 64:25, 84:3, 92:5
**hurt** [1] - 73:23

# I

**ice** [1] - 74:3
**iced** [1] - 74:9
**idea** [2] - 40:7, 63:4
**ill** [2] - 89:16, 89:18
**illegitimize** [1] - 85:4

**impact** [1] - 61:21
**impacted** [2] - 14:20, 14:21
**impede** [1] - 58:17
**implying** [1] - 91:1
**important** [5] - 4:4, 4:9, 42:19, 76:3, 81:9
**impossible** [1] - 31:21
**impression** [1] - 84:5
**IN** [1] - 96:12
**inaccurate** [1] - 50:20
**inappropriate** [3] - 66:23, 70:19, 70:20
**inappropriately** [1] - 72:5
**inaudible** [1] - 82:22
**inaudible)** [1] - 81:24
**Inc** [1] - 2:5
**incident** [3] - 72:7, 72:9, 74:4
**incidents** [1] - 78:11
**including** [3] - 76:7, 76:11, 87:7
**inclusive** [1] - 84:8
**incorrect** [1] - 43:12
**increased** [2] - 56:10, 56:13
**independent** [1] - 15:4
**indicate** [6] - 6:13, 16:3, 31:14, 58:21, 59:23, 62:21
**indicated** [9] - 5:19, 12:9, 34:2, 37:10, 38:18, 41:6, 43:10, 65:5, 91:2
**indicates** [1] - 28:22
**indicating** [1] - 28:12
**indication** [3] - 63:8, 76:9, 76:16
**individual** [5] - 56:19, 80:19, 80:24, 81:1, 81:20
**individuals** [10] - 22:9, 57:14, 60:9, 62:2, 63:5, 63:20, 63:21, 65:9, 65:12, 79:23
**informal** [3] - 37:13, 37:19, 37:21
**information** [31] - 6:20, 12:25, 30:18, 31:15, 31:24, 32:12, 33:16, 33:18, 33:23, 34:17, 35:2, 36:25, 37:3, 37:4, 38:3, 38:15, 38:16, 38:19, 39:8, 39:12, 39:13, 39:23, 41:25, 42:24, 43:1, 43:23, 44:19, 76:3, 79:6, 79:8,

88:11
**informed** [3] - 45:10, 72:3, 75:15
**injured** [3] - 74:11, 74:17, 92:4
**inquire** [1] - 56:15
**insofar** [2] - 13:6, 25:15
**instance** [1] - 56:18
**instances** [8] - 59:5, 64:3, 64:9, 88:21, 89:8, 89:25, 90:23, 91:1
**instructions** [2] - 3:23, 4:16
**instructors** [1] - 32:20
**intended** [1] - 93:1
**intent** [1] - 93:15
**intentional** [5] - 65:2, 74:24, 76:2, 76:4, 85:24
**intentionality** [2] - 76:10, 76:16
**intentionally** [3] - 59:18, 72:24, 73:19
**intents** [1] - 72:20
**interactions** [2] - 72:1, 89:12
**interactive** [4] - 26:23, 26:25, 28:8, 28:19
**interest** [1] - 42:18
**interested** [2] - 61:9, 96:11
**interrupted** [1] - 49:15
**interruption** [2] - 52:14, 79:10
**interruptions** [5] - 49:18, 49:19, 50:15, 52:10, 63:12
**interview** [4] - 77:3, 77:4, 78:3, 81:22
**interviewed** [5] - 63:20, 80:19, 80:24, 81:13, 91:6
**investigate** [11] - 31:23, 32:6, 43:9, 43:16, 43:18, 44:11, 44:15, 54:12, 63:17, 69:8, 73:15
**investigated** [4] - 43:11, 81:1, 81:12, 82:4
**investigation** [13] - 4:20, 4:22, 34:3, 34:9, 34:22, 44:3, 80:14, 80:16, 80:17, 81:3, 81:10, 81:16, 82:6
**investigative** [7] - 80:18, 80:23, 82:2,

82:8, 82:11, 82:18, 85:17
**involved** [3] - 71:12, 79:25, 92:18
**involving** [3] - 34:25, 69:20, 78:11
**issue** [7] - 14:3, 21:23, 26:1, 53:21, 55:9, 56:24, 64:19
**issued** [1] - 81:4
**issues** [8] - 21:18, 21:22, 22:2, 59:1, 63:2, 88:3, 88:5, 93:5

**J**

**Jamison** [1] - 10:17
**January** [2] - 88:23, 90:25
**Japan** [1] - 7:13
**jells** [1] - 90:18
**job** [16] - 3:25, 7:21, 13:10, 13:12, 14:23, 14:25, 17:11, 17:13, 17:18, 17:19, 17:24, 18:3, 48:7, 49:5, 49:18, 84:23
**Johnson** [1] - 63:11
**jokes** [1] - 50:7
**judgment** [2] - 46:18, 61:14
**Judith** [2] - 63:11, 65:17
**Judy** [1] - 51:19

**K**

**keep** [5] - 3:23, 30:6, 89:12, 89:15, 90:11
**Kelley** [1] - 51:18
**Kelley-Burne** [1] - 51:18
**kept** [8] - 29:14, 29:15, 29:18, 29:22, 30:10, 30:16, 35:6, 35:8
**key** [3] - 33:9, 33:10, 33:12
**keys** [2] - 30:14, 30:17
**kid** [1] - 93:13
**kind** [9] - 37:12, 44:2, 60:2, 61:14, 73:2, 77:13, 79:25, 81:19, 83:23
**KING** [1] - 96:4
**knowing** [3] - 42:18, 73:8, 84:23
**knowledge** [14] - 23:17, 23:19, 23:25, 48:21, 48:23, 52:3,

54:22, 55:2, 64:4, 64:23, 65:13, 72:6, 78:23, 89:4
**knows** [2] - 71:16, 74:23
**Krebsbach** [8] - 22:14, 22:17, 22:23, 37:8, 37:10, 37:20, 51:19, 91:25

**L**

**ladies** [1] - 68:16
**Lance** [4] - 21:21, 22:10, 22:23, 37:6
**LANCE** [1] - 22:11
**language** [4] - 91:3, 91:23, 92:13, 92:17
**large** [2] - 5:2, 81:18
**last** [9] - 6:1, 8:23, 9:12, 10:20, 21:20, 25:8, 38:22, 53:9, 65:24
**Layna** [1] - 51:18
**learn** [3] - 11:10, 11:13, 11:24
**learned** [4] - 38:8, 38:14, 39:19, 39:20
**least** [1] - 34:13
**leave** [2] - 68:4, 72:13
**left** [4] - 36:7, 36:11, 54:2
**less** [2] - 13:3, 21:4
**lesson** [1] - 45:18
**lessons** [2] - 45:12, 93:22
**License** [1] - 96:18
**licensed** [1] - 92:20
**life** [3] - 12:6, 12:11, 12:16
**light** [1] - 68:23
**lights** [1] - 13:22
**line** [1] - 23:2
**lines** [3] - 46:14, 75:7, 75:12
**list** [3] - 37:15, 56:25, 77:8
**listed** [1] - 63:19
**listen** [3] - 28:17, 54:3, 84:18
**listening** [1] - 61:23
**loaded** [1] - 70:20
**located** [1] - 35:13
**location** [7] - 30:2, 31:24, 32:12, 35:1, 35:4, 38:3, 38:5
**locked** [6] - 29:23, 29:24, 32:9, 33:13, 34:14, 55:20
**locksmith** [1] - 33:13

**logistical** [1] - 26:18
**look** [7] - 5:13, 26:12, 41:19, 53:17, 71:9, 76:20, 78:5
**looked** [5] - 5:5, 5:10, 39:3, 41:6, 47:20, 52:19, 74:10, 74:17
**looking** [5] - 5:15, 35:24, 36:5, 58:11, 88:17
**lost** [4] - 29:3, 53:6, 78:13, 91:20
**love** [1] - 90:12

**M**

**Madison** [2] - 7:2, 7:3
**mail** [2] - 41:24, 89:3
**main** [3] - 17:14, 29:24, 85:12
**major** [4] - 12:6, 12:11, 12:16, 72:25
**management** [1] - 17:21
**manager** [1] - 72:20
**mandatory** [1] - 10:25
**MARC** [2] - 1:12, 3:1
**March** [3] - 88:19, 88:22, 90:24
**MARKED** [1] - 2:23
**MARSHALL** [19] - 2:4, 2:20, 3:5, 15:10, 16:11, 40:23, 52:23, 53:2, 53:8, 64:13, 82:24, 86:9, 86:18, 87:3, 87:13, 94:15, 94:19, 95:5, 95:12
**Marshall** [3] - 3:6, 58:9, 82:23, 86:16, 94:13
**Martinez** [4] - 21:25, 22:12, 22:23, 37:6
**master's** [2] - 7:7, 7:9
**material** [2] - 28:7, 64:8
**materials** [1] - 33:8
**math** [1] - 9:7
**matter** [4] - 48:8, 53:25, 75:10, 86:17
**Maureen** [1] - 93:21
**MAXWELL** [1] - 2:9
**Maxwell.Selz@eu. dodea.edu** [1] - 2:12
**mean** [20] - 13:20, 18:18, 24:25, 44:22, 44:23, 48:4, 56:25, 59:22, 60:20, 61:25, 68:20, 73:7, 76:25, 78:25, 84:16, 84:17, 89:9, 91:16, 94:2,

94:10
**meaning** [1] - 18:2
**means** [2] - 9:5, 41:25
**med** [1] - 25:5
**medical** [45] - 11:14, 11:17, 13:17, 14:23, 15:4, 15:6, 15:8, 21:22, 27:18, 28:3, 30:15, 31:15, 32:9, 33:16, 33:18, 34:17, 35:1, 35:13, 37:4, 38:2, 38:14, 38:16, 39:4, 39:12, 41:7, 41:19, 41:22, 41:25, 42:13, 42:23, 42:24, 43:18, 44:19, 46:23, 49:23, 50:18, 52:20, 53:23, 54:7, 55:19, 59:14, 59:15, 62:12, 69:2, 85:6
**medication** [3] - 12:21, 14:7, 14:11
**meet** [4] - 3:17, 20:10, 28:7, 46:9
**meetings** [2] - 14:1, 20:11
**meets** [1] - 26:7
**Melissa** [2] - 82:15, 82:16
**member** [3] - 88:20, 89:7, 89:24
**members** [3] - 56:5, 56:15, 62:25
**memo** [1] - 85:17
**memorization** [1] - 40:3
**memory** [3] - 22:7, 46:4, 81:5
**mental** [5] - 11:11, 11:15, 11:20, 11:25, 12:10
**mentally** [1] - 14:20
**mentioned** [6] - 12:22, 13:3, 14:5, 14:8, 37:9, 42:10
**met** [1] - 19:9
**Michael** [3] - 8:19, 37:7, 51:19
**Michele** [1] - 57:2
**microaggression** [1] - 49:8
**Middle** [1] - 8:7
**Midwest** [1] - 61:3
**might** [6] - 13:10, 43:25, 53:25, 60:1, 60:3, 81:5
**migraines** [2] - 12:21
**military** [1] - 7:14
**mind** [4] - 3:23, 15:15, 89:11, 92:1

**minds** [1] - 92:18
**minute** [5] - 41:1, 86:15, 87:1, 87:8, 87:14
**minutes** [2] - 4:15, 87:9
**mis** [1] - 61:10
**mis-dealings** [1] - 61:10
**mistaken** [2] - 62:23, 78:18
**mobility** [1] - 14:3
**moment** [7] - 5:17, 22:20, 23:14, 42:3, 53:2, 75:5, 78:8
**Monday** [3] - 3:13, 3:14, 95:3
**month** [3] - 18:18, 24:15, 34:1
**monthly** [1] - 20:4
**morning** [4] - 6:12, 14:8, 94:25, 95:3
**most** [3] - 14:6, 51:23, 76:13
**move** [7] - 26:22, 32:8, 40:6, 40:7, 67:23, 68:22, 86:11
**moved** [6] - 7:16, 32:7, 35:18, 39:10, 67:21, 69:24
**moving** [4] - 34:10, 35:24, 86:21, 87:1
**MR** [29] - 2:20, 3:5, 15:10, 16:11, 40:23, 41:3, 52:23, 53:2, 53:8, 64:13, 64:15, 82:23, 82:24, 86:5, 86:9, 86:16, 86:18, 86:19, 87:3, 87:11, 87:13, 94:12, 94:15, 94:16, 94:19, 95:4, 95:5, 95:11, 95:12
**Mt** [1] - 2:6
**muffled** [1] - 57:19
**multicultural** [1] - 83:23
**multiple** [7] - 44:17, 44:20, 50:13, 62:19, 66:4, 78:10, 81:21

**N**

**nail** [1] - 74:9
**name** [9] - 3:6, 5:12, 8:19, 21:20, 22:13, 25:7, 25:8, 37:9, 37:15
**named** [1] - 96:6
**names** [10] - 21:5, 22:8, 36:1, 36:4,

36:6, 36:19, 51:15, 51:16, 56:25, 78:17
**Nancy** [1] - 51:18
**Naples** [1] - 19:13
**Natasha** [3] - 21:21, 22:10, 37:6
**nature** [3] - 8:20, 27:24, 49:11
**nausea** [1] - 12:13
**navigate** [1] - 90:11
**Navy** [1] - 7:17
**necessarily** [2] - 26:8, 71:20
**need** [14] - 3:17, 4:13, 9:3, 9:6, 26:1, 27:21, 32:25, 38:24, 40:16, 58:13, 65:3, 73:1, 86:10, 87:23
**needed** [2] - 14:15, 25:2
**needs** [2] - 14:14, 59:11
**negative** [12] - 6:2, 6:10, 9:16, 15:7, 15:13, 16:5, 18:10, 20:7, 23:20, 31:25, 78:4, 82:20
**never** [15] - 9:20, 9:23, 10:8, 15:13, 17:1, 17:4, 19:16, 48:18, 48:20, 49:15, 52:21, 54:20, 82:13, 85:21
**new** [6] - 25:2, 33:11, 33:14, 33:15, 38:25, 63:22
**next** [3] - 7:23, 62:23, 86:24
**Nicholson** [5] - 19:17, 19:18, 20:4, 20:6, 24:5
**Nicolette** [1] - 72:8
**NO** [3] - 1:4, 1:5, 2:23
**nobody** [1] - 76:9
**nonresponsive** [1] - 87:23
**normal** [3] - 13:8, 13:9
**note** [1] - 86:7
**notebook** [1] - 77:22
**notes** [7] - 77:13, 77:18, 77:20, 77:24, 78:3, 78:6, 79:17
**nothing** [12] - 5:14, 9:13, 17:19, 21:14, 58:23, 59:3, 59:13, 59:23, 62:7, 76:15, 84:19, 84:20
**notification** [1] - 58:7
**notified** [1] - 11:16
**notifies** [1] - 16:20
**nudging** [1] - 91:6

**number** [5] - 13:20, 36:2, 36:6, 57:6, 76:7
**numbers** [1] - 36:5

### O

**object** [1] - 86:7
**objection** [3] - 86:5, 87:23, 94:12
**objective** [2] - 76:13, 94:3
**obligation** [2] - 54:12, 66:17
**obviously** [1] - 17:13
**occasions** [4] - 44:18, 50:13, 62:20, 65:21
**occurrences** [1] - 45:21
**OF** [3] - 1:6, 96:3, 96:4
**offending** [1] - 64:20
**offense** [1] - 49:9
**offenses** [2] - 63:21, 64:1, 65:23
**offensive** [1] - 68:15
**offered** [2] - 10:16, 26:7
**office** [1] - 10:16, 29:23, 29:24, 32:10, 33:7, 33:14, 34:6, 34:15, 48:18, 48:20, 50:24, 52:14, 54:5, 55:8, 55:20, 85:13
**officials** [1] - 28:7
**often** [2] - 16:24, 77:21
**Okinawa** [1] - 7:13
**omission** [2] - 36:22, 65:2
**once** [3] - 4:15, 29:4, 54:10
**one** [51] - 6:17, 6:22, 8:14, 9:4, 11:20, 12:16, 16:9, 19:6, 19:23, 20:3, 20:17, 24:21, 25:3, 27:3, 27:20, 28:14, 30:13, 32:24, 33:9, 33:10, 33:12, 37:16, 37:20, 40:12, 40:14, 43:6, 52:13, 54:1, 56:21, 58:9, 61:5, 64:3, 64:25, 65:20, 65:21, 66:2, 68:8, 69:2, 70:22, 70:23, 72:18, 72:19, 75:3, 80:23, 80:25, 81:18, 81:19, 81:20, 83:14, 88:22, 90:24
**open** [2] - 33:14, 84:8

**opinion** [1] - 94:13
**Opportunity** [1] - 3:8
**OPPORTUNITY** [1] - 1:1
**opposite** [2] - 63:6, 84:7
**Oral** [1] - 1:10
**oral** [1] - 96:6
**orchestrated** [1] - 79:25
**original** [2] - 39:17, 41:16
**otherwise** [3] - 28:17, 60:10, 95:17
**outcome** [1] - 96:11
**Outlook** [1] - 6:2
**own** [6] - 6:2, 6:25, 7:1, 13:24, 35:5, 85:8

### P

**p.m** [2] - 1:16, 95:18
**PAGE** [1] - 2:19
**page** [2] - 17:12, 41:9
**Pages** [1] - 1:13
**pages** [1] - 38:22
**pain** [1] - 13:22
**Pam** [1] - 51:20
**paper** [1] - 39:2
**paperwork** [1] - 25:9
**parents** [3] - 17:22, 47:24, 76:11
**part** [10] - 13:11, 17:14, 17:15, 17:18, 17:19, 49:16, 51:2, 67:20, 73:4, 89:20
**particular** [2] - 62:10, 83:12
**particularly** [1] - 4:24
**parties** [2] - 96:10, 96:11
**parts** [3] - 17:16, 17:24, 86:6
**pass/fail** [1] - 54:25
**past** [1] - 69:18
**paths** [1] - 72:21
**pause** [1] - 42:5
**pausing** [1] - 47:18
**PCS'd** [1] - 51:24
**peers** [1] - 17:25
**pending** [1] - 9:11
**people** [38] - 34:5, 45:11, 45:17, 46:12, 46:24, 47:3, 47:6, 51:20, 51:21, 51:23, 56:23, 57:5, 57:24, 57:25, 58:4, 58:22, 59:7, 60:5, 60:17, 60:18, 60:22, 62:5,

64:1, 64:20, 71:14, 71:24, 76:7, 76:10, 76:14, 77:7, 78:11, 79:24, 80:5, 80:9, 85:18, 89:13, 89:14
**people's** [1] - 58:18
**percent** [4] - 6:17, 64:25, 84:3, 92:5
**perception** [1] - 61:21
**perfect** [1] - 90:14
**perform** [5] - 14:17, 15:16, 16:18, 17:4, 17:7
**performance** [5] - 15:24, 16:2, 45:12, 45:18, 54:23
**performing** [4] - 12:12, 16:7, 16:15, 92:10
**perhaps** [1] - 61:20
**period** [2] - 15:18, 90:9
**person** [8] - 8:17, 23:4, 23:21, 24:24, 25:6, 38:1, 39:7, 42:14, 48:17, 49:23, 52:14, 58:14, 81:12, 81:13, 84:2, 90:15
**person's** [2] - 42:13, 60:14
**personal** [21] - 56:4, 56:9, 56:11, 56:17, 58:8, 58:10, 58:19, 58:20, 58:24, 58:25, 60:17, 61:16, 61:20, 61:22, 62:2, 63:2, 64:20, 69:24, 72:22, 80:9, 80:10
**personally** [8] - 9:21, 60:14, 60:16, 62:4, 77:3, 77:4, 83:3, 85:2
**personnel** [5] - 29:15, 29:21, 38:22, 39:4, 41:21
**persons** [1] - 46:14
**Peters** [3] - 91:24, 93:21
**Phipps** [3] - 30:21, 32:4, 53:24
**phone** [1] - 52:24
**Phone** [1] - 2:11
**phrasing** [1] - 91:5
**physical** [24] - 11:11, 11:14, 11:15, 11:19, 11:25, 12:10, 72:14, 78:10, 78:17, 78:19, 78:20, 78:21, 78:23, 78:24, 78:25, 79:1, 79:19, 85:18, 88:22,

88:24, 90:1, 90:23, 93:6
**physically** [4] - 14:21, 27:8, 67:23, 70:15
**picture** [1] - 74:10
**PII** [3] - 40:8, 40:17, 42:19
**place** [2] - 34:12, 34:14
**placed** [2] - 27:4, 34:4
**plan** [1] - 85:22
**plans** [1] - 45:18
**plausible** [1] - 51:1
**play** [5] - 74:5, 74:6, 75:3, 88:23, 90:24
**pleasant** [1] - 2:6
**plenty** [1] - 4:8
**point** [14] - 4:1, 15:3, 15:24, 16:19, 24:3, 34:10, 56:14, 59:12, 72:23, 74:5, 79:21, 86:24, 92:9, 94:4
**policies** [11] - 25:16, 55:20, 30:3, 40:10, 40:21, 50:2, 54:10, 55:6, 66:15, 87:20, 88:11
**policy** [15] - 26:4, 37:13, 39:23, 40:3, 40:4, 40:6, 40:17, 42:19, 80:13, 80:15, 80:16, 87:24, 88:2, 88:13
**pondering** [1] - 73:3
**pop** [2] - 78:17, 81:8
**pose** [2] - 16:7, 16:14
**posed** [1] - 92:14
**position** [13] - 7:13, 7:20, 7:25, 8:1, 8:3, 9:3, 9:5, 10:2, 14:25, 17:14, 17:15, 39:11
**positive** [2] - 89:12, 90:12
**possibility** [1] - 79:22
**possible** [7] - 26:11, 40:2, 84:8, 84:10, 86:3, 91:25, 92:3
**possibly** [2] - 12:21, 76:14
**potential** [1] - 34:13
**predated** [1] - 23:7
**predecessors** [2] - 18:9, 18:12
**preparation** [2] - 5:20, 89:2
**prepared** [1] - 82:3
**presence** [1] - 67:11
**present** [7] - 21:12, 21:13, 25:12, 51:13, 51:14, 54:6, 77:11

**PRESENT** [1] - 2:13
**presented** [1] - 26:14
**presently** [1] - 36:15
**pretty** [2] - 4:16, 75:8
**previous** [1] - 18:24
**previously** [1] - 43:8
**principal** [44] - 7:24, 8:1, 8:2, 8:3, 8:5, 8:10, 10:3, 10:7, 10:10, 10:12, 10:20, 11:7, 11:10, 11:13, 12:2, 12:3, 15:14, 17:15, 18:8, 19:8, 19:11, 19:20, 19:22, 20:12, 20:14, 20:18, 20:21, 20:25, 22:18, 23:9, 23:12, 24:15, 24:20, 25:3, 26:14, 26:15, 28:6, 32:3, 54:12, 73:1, 73:9, 75:24, 80:12
**principal's** [1] - 7:21
**principals** [1] - 11:5
**principalship** [4] - 19:12, 19:24, 24:12, 75:23
**Priser** [1] - 8:19
**private** [6] - 31:14, 35:1, 36:25, 38:2, 38:14, 62:12
**problem** [10] - 4:14, 14:2, 16:7, 16:14, 52:10, 57:24, 65:19, 73:12, 87:12, 93:18
**problems** [2] - 42:14, 57:18
**procedural** [1] - 26:19
**procedurally** [1] - 55:25
**procedure** [1] - 44:6
**procedures** [1] - 66:16
**proceeding** [1] - 36:25
**proceedings** [1] - 42:5
**process** [15] - 24:23, 25:1, 25:9, 25:14, 25:20, 25:23, 26:11, 26:23, 26:25, 27:2, 27:11, 28:8, 28:19, 37:21, 84:1
**produced** [2] - 65:5, 65:6
**production** [1] - 65:4
**professional** [3] - 14:23, 70:5, 70:10
**professionally** [1] - 61:12
**program** [2] - 7:7
**promotion** [1] - 19:21
**pronounce** [1] - 65:18
**pronouncing** [1] -

65:15
**pronouns** [1] - 29:3
**property** [1] - 66:14
**protect** [5] - 42:20, 58:19, 66:16, 73:1, 73:7
**protected** [7] - 10:10, 10:11, 36:25, 39:24, 49:25, 66:18, 73:10
**prove** [1] - 80:6
**provide** [17] - 15:24, 21:5, 27:24, 37:1, 77:24, 78:2, 81:10, 82:7, 82:11, 82:18, 85:14, 87:18, 87:24, 88:2, 88:6, 88:8, 88:9
**provided** [21] - 4:19, 4:21, 6:1, 6:19, 22:17, 22:21, 24:4, 24:18, 29:5, 29:7, 59:15, 64:13, 64:15, 64:19, 64:21, 69:3, 76:21, 77:25, 88:13, 88:14
**provider** [2] - 15:4, 15:8
**providers** [1] - 15:6
**provides** [1] - 27:4
**providing** [1] - 28:3
**psychologist** [3] - 9:1, 9:5, 9:6
**pull** [2] - 10:23, 11:4
**pulled** [1] - 53:14
**punched** [1] - 41:11
**purpose** [2] - 69:12, 92:22
**purposes** [2] - 37:2, 72:20
**pursuant** [1] - 96:8
**pursued** [1] - 7:3
**pursuing** [1] - 83:8
**pushed** [1] - 79:5
**put** [13] - 13:22, 31:23, 32:1, 43:11, 43:13, 46:18, 46:20, 53:14, 66:20, 71:2, 80:4, 90:16, 93:8
**puts** [1] - 80:2

**Q**

**qualified** [2] - 17:6, 17:8
**questioned** [2] - 15:21, 83:24
**questions** [12] - 3:25, 6:12, 9:12, 15:15, 26:18, 44:12, 75:13, 75:25, 89:1, 91:22,

92:13, 95:15
**quickly** [2] - 41:18, 74:17
**quite** [1] - 63:6
**quote** [2] - 75:9, 93:11
**quoting** [1] - 93:10

**R**

**rabbit** [1] - 86:6
**race** [2] - 62:8, 85:7
**raised** [1] - 62:11
**raising** [1] - 52:6
**range** [1] - 14:10
**rather** [3] - 72:12, 91:12, 92:23
**RCW** [1] - 96:8
**read** [4] - 15:12, 16:11, 16:13, 53:11
**reading** [1] - 88:19
**reads** [1] - 90:21
**really** [22] - 5:2, 9:13, 19:3, 21:1, 26:4, 31:11, 31:20, 32:2, 43:6, 45:24, 53:13, 53:17, 53:18, 71:25, 84:6, 84:7, 90:6, 90:17, 92:1
**reason** [9] - 4:13, 32:25, 33:4, 36:21, 37:8, 43:7, 48:14, 58:9, 63:7
**reasonable** [5] - 5:22, 5:23, 11:3, 11:17, 14:24, 16:25, 18:9, 18:12, 20:16, 20:22, 20:24, 21:10, 21:17, 22:1, 22:17, 22:22, 23:5, 23:11, 23:14, 23:21, 23:22, 24:19, 25:7, 25:10, 25:15, 25:21, 26:2, 26:13, 27:3, 27:12, 29:16, 29:20, 30:1, 35:15, 35:18, 35:22, 36:15, 36:17, 37:5, 37:11, 37:12, 37:14, 37:17, 37:22, 41:16, 49:24, 59:15, 62:16, 86:20, 87:11
**reasons** [1] - 56:19
**receive** [1] - 88:11
**received** [7] - 9:12, 10:10, 10:11, 10:14, 11:6, 46:8, 72:8
**receiving** [1] - 83:1
**recent** [1] - 63:10
**recently** [1] - 47:18
**recess** [4] - 41:4, 53:7, 87:10, 87:17

**recollection** [2] - 34:24, 89:5
**record** [10] - 3:25, 15:12, 16:13, 29:14, 29:15, 53:11, 54:16, 54:24, 58:21, 79:9
**record's** [1] - 4:11
**records** [15] - 29:18, 37:4, 41:7, 41:19, 42:13, 46:23, 50:18, 51:5, 52:20, 53:23, 54:7, 55:19, 59:16, 59:22, 62:12
**red** [2] - 74:12, 74:13
**reference** [1] - 46:24
**reflect** [5] - 84:4, 84:10, 84:18, 85:5, 85:7
**reflected** [1] - 84:17
**regard** [1] - 10:15
**regarding** [5] - 6:5, 12:25, 19:15, 44:18, 94:8
**region** [2] - 61:4
**regulations** [1] - 65:4
**Rehabilitation** [1] - 49:25
**relate** [1] - 64:19
**related** [2] - 13:11, 49:11
**relates** [2] - 25:20, 36:13
**relating** [1] - 93:21
**relationship** [1] - 59:2
**relative** [1] - 96:10
**relatively** [2] - 20:1, 62:14
**relying** [3] - 81:4, 81:5, 81:6
**remain** [1] - 37:1
**remarked** [1] - 75:7
**remember** [25] - 5:16, 10:17, 12:4, 13:2, 18:25, 19:2, 19:25, 24:21, 25:8, 31:10, 33:10, 36:4, 36:5, 46:5, 46:6, 47:2, 47:19, 47:22, 48:2, 57:1, 57:2, 69:23, 70:23, 77:6, 91:21
**remove** [5] - 33:18, 33:22, 35:14, 35:22, 39:16
**removed** [3] - 23:18, 36:3, 41:22
**repeat** [15] - 6:22, 12:8, 15:10, 16:9, 25:18, 27:6, 42:17, 57:19, 58:1, 63:21, 64:1, 65:23, 66:20,

67:12, 94:18
**repeated** [5] - 58:4, 60:10, 61:8, 67:2, 67:6
**repeating** [1] - 18:1
**rephrase** [2] - 45:14
**report** [27] - 4:20, 4:21, 4:23, 6:15, 56:7, 58:4, 80:18, 80:23, 80:25, 81:3, 81:8, 81:10, 81:15, 81:18, 81:19, 81:20, 82:2, 82:8, 82:11, 82:18, 85:17, 90:2, 90:3, 91:4, 92:15
**reported** [9] - 46:2, 56:4, 56:6, 56:18, 82:9, 88:21, 89:8, 89:25, 90:25
**reporter** [3] - 15:12, 16:13, 53:11
**Reporter** [3] - 1:24, 96:6, 96:17
**reporting** [7] - 45:11, 45:18, 51:3, 55:3, 56:8, 62:19, 92:2
**reports** [6] - 81:21, 82:2, 83:1, 90:22, 92:11, 93:23
**represent** [1] - 3:7
**Representative** [1] - 2:4
**request** [7] - 27:3, 27:24, 27:25, 28:4, 28:13, 28:21, 61:15
**requesting** [1] - 20:15
**requests** [2] - 23:5, 23:21
**require** [2] - 62:15, 73:8
**required** [7] - 27:13, 27:14, 28:1, 28:11, 28:20, 55:6, 80:13
**requirement** [1] - 23:23
**requires** [2] - 27:23, 81:9
**resolve** [1] - 44:10
**respect** [10] - 43:9, 56:9, 56:10, 58:15, 59:21, 61:24, 62:16, 75:22, 84:1, 85:18
**respected** [2] - 58:15, 61:16
**respectful** [1] - 72:21
**respectfully** [2] - 94:11, 94:20
**responded** [1] - 46:11
**responding** [1] - 26:20

**response** [1] - 45:20
**responses** [1] - 82:5
**responsibility** [1] - 66:15
**responsible** [2] - 17:20, 17:21
**restate** [3] - 4:2, 45:15, 82:24
**result** [1] - 13:17
**resume** [2] - 53:8, 94:25
**retired** [1] - 20:7
**reverse** [1] - 17:1
**review** [6] - 5:6, 6:13, 6:14, 24:3, 24:6, 28:7
**reviewed** [12] - 4:23, 4:24, 4:25, 5:4, 5:9, 5:16, 5:19, 5:24, 24:18, 53:23, 54:6, 78:9
**reviewing** [2] - 5:21, 28:10
**reviews** [1] - 5:18
**risk** [1] - 34:13
**Robert** [2] - 19:17, 19:18
**Robin** [1] - 10:17
**Roda** [6] - 7:25, 8:7, 19:12, 24:23
**Rodman** [17] - 3:15, 9:25, 19:2, 19:4, 34:16, 34:21, 34:25, 43:22, 44:5, 45:12, 45:19, 46:15, 51:19, 55:24, 77:7, 95:2
**Rodman's** [1] - 44:9
**room** [8] - 13:21, 63:8, 68:10, 68:11, 68:13, 68:16, 68:24, 77:11
**root** [1] - 48:8
**rote** [1] - 40:3
**round** [2] - 7:15, 7:16
**rude** [1] - 26:19
**Rules** [1] - 96:13
**rules** [1] - 65:4
**run** [1] - 94:22

**S**

**safe** [2] - 30:14, 73:5
**saw** [10] - 38:24, 39:4, 47:18, 73:22, 74:1, 74:2, 74:7, 74:9, 74:15, 92:4
**scheduling** [1] - 86:22
**Schiele** [12] - 66:9, 66:10, 66:12, 67:19, 67:24, 68:11, 68:21, 69:12, 69:15, 69:20,

69:22, 79:23
**school** [29] - 7:2, 8:15, 9:1, 9:4, 9:6, 17:2, 18:19, 19:4, 19:6, 19:8, 20:21, 20:25, 21:15, 23:12, 24:14, 31:5, 31:6, 31:7, 33:25, 34:6, 38:13, 51:3, 63:22, 76:12, 78:11, 78:12, 84:9
**School** [5] - 8:2, 8:8, 8:16, 19:11, 19:23
**Schools** [1] - 2:10
**Schweinfurt** [8] - 7:21, 7:22, 8:7, 19:10, 19:21, 19:22, 20:1, 20:8
**science** [3] - 7:4, 17:9, 69:22
**search** [1] - 5:13
**searching** [1] - 6:3
**second** [11] - 7:24, 10:18, 23:2, 40:12, 40:14, 53:5, 67:9, 69:19, 73:25, 85:10
**secretaries** [6] - 32:5, 38:24, 40:11, 53:20, 53:22, 54:4
**secretary** [26] - 30:14, 30:17, 30:19, 30:20, 30:21, 32:1, 32:2, 32:13, 32:14, 32:23, 38:18, 39:2, 39:6, 39:11, 43:21, 50:17, 50:25, 51:1, 51:5, 52:4, 52:11, 52:18, 53:15, 53:16, 53:19, 53:25
**secretary's** [2] - 29:23, 50:24
**sections** [2] - 10:24, 10:25
**secure** [1] - 34:14
**secured** [1] - 29:22
**security** [1] - 34:11
**see** [8] - 17:2, 20:4, 32:25, 41:19, 41:23, 67:17, 68:13, 88:13
**seeing** [2] - 18:25, 46:5
**seek** [1] - 15:4
**seeking** [1] - 27:16
**seem** [2] - 70:9
**SELZ** [12] - 2:9, 41:3, 64:15, 82:23, 86:5, 86:16, 86:19, 87:11, 94:12, 94:16, 95:4, 95:11
**Selz** [15] - 3:23, 6:5, 6:6, 41:2, 64:7,

64:11, 64:13, 64:21, 65:1, 65:3, 77:24, 78:1, 78:3, 95:3
**send** [3] - 58:6, 77:23, 85:17
**sense** [5] - 7:1, 9:7, 13:5, 35:16, 59:8
**sensitive** [1] - 30:15
**sent** [5] - 5:21, 7:23, 46:13, 75:14, 88:18
**sentence** [1] - 90:21
**sentiments** [1] - 90:4
**separate** [3] - 33:15, 63:5, 65:21
**September** [4] - 51:4, 51:8, 52:12, 85:11
**serve** [1] - 23:1
**served** [5] - 8:4, 8:9, 15:14, 20:14, 24:19
**serving** [1] - 75:23
**session** [1] - 86:24
**sets** [1] - 80:14
**setting** [2] - 67:3, 67:4
**seven** [1] - 87:5
**SF-50s** [1] - 38:25
**shadow** [1] - 92:7
**shape** [1] - 63:14
**share** [3] - 18:4, 65:1
**shared** [5] - 13:20, 26:15, 29:12, 64:11, 67:18
**Shawn** [1] - 9:25
**shoulder** [3] - 71:2, 79:5, 91:7
**showed** [2] - 74:8, 76:8
**Sicily** [3] - 7:16, 7:17, 7:19
**sick** [1] - 16:23
**side** [3] - 30:5, 30:12, 66:21
**signature** [1] - 96:12
**signed** [2] - 26:15, 96:13
**Sigonella** [2] - 7:16, 7:19
**similar** [5] - 21:22, 67:4, 71:23, 80:4, 91:23
**simple** [2] - 13:21, 14:13
**simply** [1] - 55:17
**Sims** [1] - 72:8
**single** [1] - 85:1
**sit** [2] - 23:18, 34:23
**sitting** [4] - 14:6, 67:24, 67:25, 76:24
**situation** [17] - 13:24, 24:21, 44:11, 44:14, 44:15, 67:3, 67:22,

64:11, 64:13, 64:21, 65:1, 65:3, 77:24, 78:1, 78:3, 95:3
**68**:18, 70:13, 88:20, 89:7, 89:10, 89:19, 89:24, 90:10, 90:14, 90:22
**situations** [1] - 8:6
**six** [4] - 7:18, 78:14, 78:16, 79:1
**size** [1] - 71:17
**slots** [1] - 3:16
**small** [3] - 20:2, 36:6, 71:15
**smaller** [1] - 60:23
**Smith** [1] - 46:21
**Smithson** [121] - 3:7, 5:22, 8:12, 8:14, 11:11, 11:25, 12:6, 12:9, 13:19, 15:5, 15:25, 17:2, 17:6, 17:15, 18:8, 18:12, 19:15, 20:6, 24:4, 29:17, 30:9, 30:23, 31:8, 35:23, 38:1, 38:14, 41:24, 43:2, 43:17, 43:20, 44:17, 45:6, 45:16, 46:22, 50:6, 50:12, 51:2, 51:13, 52:9, 53:5, 54:7, 54:16, 56:1, 56:3, 57:13, 57:22, 58:3, 58:14, 59:3, 60:3, 60:4, 60:6, 61:6, 62:4, 62:6, 62:11, 63:1, 63:17, 65:25, 67:8, 67:18, 67:20, 67:24, 68:4, 68:15, 68:17, 68:21, 69:1, 69:4, 69:7, 70:1, 70:10, 70:14, 71:23, 72:3, 72:9, 72:13, 73:5, 73:15, 73:20, 74:3, 74:23, 75:7, 75:24, 76:1, 76:6, 76:11, 76:22, 76:25, 77:8, 79:5, 80:4, 80:20, 81:13, 82:7, 82:22, 83:2, 83:13, 85:5, 85:21, 86:1, 87:20, 88:7, 88:21, 88:25, 89:8, 89:17, 89:25, 90:13, 91:10, 91:12, 92:2, 92:19, 92:25, 93:6, 93:7, 93:17, 93:23, 94:7, 95:7
**SMITHSON** [2] - 1:3, 2:14
**Smithson's** [20] - 15:16, 17:11, 20:12, 35:1, 42:25, 52:19, 56:17, 58:19, 61:15,

61:21, 67:10, 69:24, 70:3, 72:22, 73:21, 84:11, 85:3, 90:22, 91:4, 93:22
**snarky** [1] - 90:6
**so-called** [1] - 81:15
**social** [1] - 72:2
**someone** [7] - 43:17, 49:14, 59:1, 60:13, 81:3, 83:21, 93:12
**sometime** [2] - 24:12, 24:13
**sometimes** [4] - 4:7, 14:13, 14:16, 26:5
**somewhere** [4] - 24:15, 35:8, 78:16, 79:1
**sorry** [13] - 7:6, 20:19, 27:6, 28:14, 28:15, 29:3, 42:3, 44:9, 53:2, 55:11, 57:21, 73:23, 91:13
**sort** [1] - 21:22
**sounded** [1] - 91:17
**sounds** [2] - 6:17, 29:1
**source** [1] - 9:9
**south** [1] - 60:21
**South** [1] - 2:6
**space** [43] - 4:8, 56:4, 56:9, 56:11, 56:17, 56:21, 57:24, 58:8, 58:10, 58:17, 58:19, 58:20, 58:24, 59:1, 59:18, 60:17, 60:18, 60:23, 60:25, 61:1, 61:5, 61:16, 61:22, 62:3, 62:4, 63:2, 63:18, 64:20, 67:8, 67:10, 67:12, 69:24, 72:14, 72:22, 78:20, 78:21, 78:24, 78:25, 79:19, 79:20, 80:9, 80:10, 85:19
**Spain** [6] - 7:25, 8:7, 19:12, 24:23, 60:21
**speaking** [9] - 34:21, 37:10, 47:15, 51:4, 57:1, 57:3, 60:22, 63:9, 65:15
**specialist** [1] - 26:3
**specific** [8] - 24:2, 24:10, 24:13, 32:9, 47:23, 75:17, 86:8, 88:1
**specifically** [41] - 12:1, 12:4, 18:16, 18:20, 18:24, 19:3, 21:1, 22:19, 23:15, 24:16, 24:21, 31:2,

31:8, 31:10, 31:20, 31:21, 34:19, 35:5, 35:9, 35:10, 35:19, 35:20, 36:11, 36:12, 37:19, 38:11, 38:21, 45:5, 45:24, 46:5, 47:2, 48:1, 48:16, 48:17, 57:1, 57:2, 63:7, 69:18, 70:22, 70:24, 71:9
**spell** [1] - 21:20
**Spencer** [3] - 1:24, 53:9, 96:17
**spend** [1] - 60:21
**spied** [3] - 45:11, 45:23, 50:14
**spoken** [5] - 6:4, 6:8, 34:24, 58:1, 65:12
**spring** [1] - 9:12
**spying** [1] - 45:17
**ss** [1] - 96:3
**staff** [8] - 20:9, 33:6, 44:12, 56:5, 56:8, 56:15, 62:25, 85:12
**stairs** [3] - 14:15, 47:19, 47:21
**standing** [3] - 21:18, 21:22, 22:2
**start** [3] - 6:25, 95:2, 95:8
**started** [2] - 7:4, 19:7
**state** [1] - 46:20
**STATE** [1] - 96:3
**State** [2] - 96:5, 96:17
**statement** [10] - 4:24, 5:4, 5:12, 5:16, 5:17, 28:22, 76:21, 77:16, 77:25, 94:16
**statements** [6] - 5:1, 5:3, 5:5, 5:9, 92:14, 94:8
**STATES** [1] - 1:1
**States** [1] - 7:11
**stating** [2] - 35:3, 73:18
**station** [1] - 7:24
**status** [1] - 9:11
**stay** [7] - 28:16, 72:13, 89:13, 90:16, 91:11, 91:13, 92:25
**staying** [1] - 26:4
**step** [1] - 27:20
**steps** [4] - 63:17, 69:7, 73:10, 73:15
**still** [8] - 12:14, 13:11, 16:16, 26:7, 41:21, 70:8, 75:11, 85:1
**stop** [8] - 48:10, 49:18, 59:11, 59:19, 60:5, 60:8, 67:6,

85:14
**stopped** [1] - 93:4
**stopping** [1] - 69:12
**stored** [3] - 39:9, 44:6, 55:25
**straight** [1] - 7:9
**strict** [1] - 39:23
**strictly** [1] - 40:5
**strike** [1] - 25:13
**student** [2] - 52:15, 59:9
**students** [2] - 17:20, 17:23
**sub** [1] - 86:6
**subject** [15] - 8:11, 8:13, 8:14, 9:17, 45:11, 45:17, 50:7, 83:4, 83:15, 84:11, 84:13, 86:11, 87:19, 94:5, 94:6
**subjected** [5] - 45:7, 55:4, 56:10, 83:2, 92:11
**subjective** [1] - 81:6
**subsequent** [1] - 94:7
**subsequently** [1] - 57:22
**substitute** [2] - 51:24, 57:4
**successful** [2] - 15:22, 55:1
**suffer** [1] - 12:7
**suffered** [1] - 12:10
**suffering** [1] - 50:14
**suffers** [2] - 12:13, 12:20
**suit** [1] - 8:22
**Suite** [1] - 2:5
**super** [2] - 3:19, 95:5
**superintendent** [3] - 55:16, 82:15
**superintendent's** [1] - 55:8
**supervised** [2] - 82:13, 82:14
**supervisor** [3] - 23:2, 82:12, 82:14
**supply** [2] - 24:22, 27:18
**support** [5] - 28:4, 64:5, 66:20, 80:11, 80:21
**supporting** [1] - 11:17
**supportive** [1] - 83:22
**supposed** [3] - 40:21, 94:3, 94:4
**suspend** [1] - 94:24
**switched** [1] - 3:15
**switching** [1] - 7:5
**swollen** [2] - 74:19,

74:20
**sworn** [2] - 3:2, 96:8
**sympathy** [1] - 13:19
**symptom** [1] - 15:2
**Syretta** [1] - 30:19

## T

**table** [1] - 76:24
**Tamica** [6] - 3:7, 41:23, 60:16, 64:20, 66:3, 66:22
**TAMICA** [2] - 1:3, 2:14
**tardy** [1] - 52:17
**tasks** [1] - 13:10
**taught** [3] - 7:11, 7:14, 7:18
**taunt** [1] - 42:15
**tauntings** [1] - 50:8
**teach** [2] - 15:21, 17:8
**Teach** [1] - 7:8
**teacher** [26] - 7:13, 9:7, 13:8, 13:9, 13:16, 14:5, 15:16, 15:23, 16:4, 17:7, 17:11, 17:17, 20:15, 32:23, 32:25, 50:5, 59:25, 60:6, 60:9, 71:21, 71:23, 83:15, 92:10
**teacher's** [3] - 32:23, 33:1, 59:25
**teachers** [24] - 20:19, 20:24, 21:6, 21:9, 21:17, 22:22, 22:24, 32:20, 33:19, 42:14, 43:1, 51:12, 56:20, 57:5, 58:12, 62:25, 69:22, 71:12, 71:18, 78:12, 87:19, 92:14, 93:10, 93:17
**teachers'** [1] - 34:17
**teaching** [6] - 7:7, 7:8, 13:11, 17:14, 17:19, 93:23
**tears** [1] - 68:16
**tech** [1] - 24:22
**Telephone** [1] - 2:6
**telephone** [2] - 4:6, 50:14
**Telephonic** [1] - 1:10
**Telesfor** [4] - 21:25, 22:12, 37:6
**ten** [2] - 78:16, 79:1
**tend** [3] - 35:8, 60:25, 62:4
**tenure** [3] - 22:18, 54:17, 82:15
**term** [1] - 70:20
**terminate** [2] - 62:21,

94:4
**terms** [5] - 13:7, 13:15, 14:19, 27:25, 39:17
**testified** [2] - 6:9, 22:21
**testify** [2] - 35:12, 96:8
**testimony** [9] - 37:25, 41:5, 57:17, 57:21, 57:25, 83:12, 85:16, 88:15, 88:16
**THE** [2] - 2:3, 2:8
**themselves** [1] - 63:1
**therefore** [1] - 86:1
**they've** [3] - 23:18, 28:12, 94:9
**thinking** [2] - 83:23, 93:8
**thoughts** [1] - 87:2
**thousands** [2] - 64:24
**three** [6] - 63:12, 78:18, 78:22, 87:4, 87:5, 87:6
**thresholds** [3] - 58:10, 60:19, 62:2
**timeline** [3] - 50:21, 53:13, 53:17
**today** [8] - 3:11, 3:17, 5:19, 23:19, 34:23, 86:23, 87:6, 95:13
**together** [10] - 10:1, 11:5, 19:13, 19:24, 60:24, 63:14, 71:14, 72:18, 80:5, 90:18
**took** [13] - 7:13, 7:17, 7:21, 10:1, 39:15, 44:16, 49:8, 53:16, 55:18, 55:20, 62:21, 78:3
**total** [1] - 87:5
**touch** [3] - 70:21, 72:13, 85:19
**touched** [2] - 70:15, 70:18
**touching** [2] - 78:21, 79:1
**towards** [4] - 9:18, 66:22, 89:17, 89:18
**train** [1] - 91:20
**training** [12] - 10:10, 10:12, 10:14, 10:16, 10:19, 11:1, 11:2, 11:6, 20:3, 40:18, 69:21, 88:14
**trainings** [6] - 10:23, 11:5, 17:25, 19:13, 38:25, 88:10
**transcribed** [1] - 96:7
**transcript** [2] - 96:9, 96:9

**transfer** [4] - 7:15, 7:16, 7:17, 7:19
**transgression** [1] - 48:9
**treated** [4] - 48:1, 48:5, 48:6, 48:14
**treatment** [1] - 48:13
**tried** [3] - 13:23, 67:23, 68:21
**true** [26] - 46:17, 51:9, 51:10, 51:11, 51:14, 52:12, 56:3, 56:5, 56:12, 58:24, 61:2, 63:4, 67:7, 67:9, 68:7, 70:15, 70:16, 72:5, 75:14, 82:3, 83:4, 83:9, 83:10, 91:2, 93:12, 96:9
**truth** [5] - 5:13, 5:14, 21:14
**truthfully** [1] - 96:9
**try** [5] - 4:7, 12:18, 63:15, 84:7
**trying** [18] - 12:15, 21:13, 21:15, 26:19, 27:7, 27:8, 36:22, 40:1, 44:13, 55:5, 55:6, 57:3, 89:15, 90:5, 90:10, 93:14, 94:2, 94:21
**Tuesday** [5] - 3:11, 3:15, 3:18, 87:7, 94:25
**turned** [1] - 64:7
**two** [10] - 8:6, 50:21, 65:20, 88:21, 89:8, 89:25, 90:5, 90:23, 90:25
**type** [2] - 33:16, 84:9

## U

**unable** [1] - 16:17
**under** [3] - 30:2, 49:25, 96:7
**undermined** [1] - 91:3
**undersigned** [1] - 96:5
**unfairly** [4] - 48:1, 48:5, 48:7, 48:13
**unfortunate** [1] - 73:23
**union** [1] - 9:18
**UNITED** [1] - 1:1
**United** [1] - 7:11
**University** [1] - 7:3
**unknowingly** [1] - 63:25
**unless** [4] - 6:13, 6:15, 23:7, 26:18

**unprofessional** [1] - 50:15
**untrue** [1] - 91:2
**unwanted** [4] - 66:23, 66:24, 70:7, 70:21
**unwelcomed** [1] - 67:11
**up** [24] - 4:5, 7:4, 14:15, 19:12, 25:12, 33:14, 43:20, 47:18, 47:21, 49:5, 51:13, 55:21, 57:10, 62:5, 64:10, 69:11, 76:8, 77:7, 78:17, 81:8, 82:5, 82:23, 86:22, 90:16
**updated** [1] - 23:24
**updates** [2] - 5:23, 23:13
**upset** [1] - 70:6
**US** [1] - 1:6

## V

**valid** [1] - 84:3
**varies** [1] - 61:4
**various** [4] - 56:19, 62:25, 78:11, 79:23
**verbal** [1] - 65:10
**verbally** [2] - 65:13
**vertigo** [2] - 12:13, 14:4
**video** [1] - 76:9
**view** [1] - 61:20
**views** [1] - 61:20
**Villanueva** [3] - 63:11, 65:14, 65:17
**VILLAREAL** [2] - 1:12, 3:1
**Villareal** [38] - 6:19, 9:24, 10:9, 28:16, 32:7, 40:16, 41:5, 42:9, 42:12, 48:11, 49:22, 50:19, 53:12, 54:3, 54:9, 56:14, 58:6, 58:21, 61:9, 64:16, 69:19, 74:19, 75:21, 77:4, 77:14, 79:22, 80:12, 81:2, 81:23, 83:11, 85:12, 87:18, 88:17, 89:3, 89:6, 92:1, 94:19, 95:16
**Vilseck** [8] - 1:17, 8:2, 8:16, 19:11, 19:25, 20:9, 25:12, 25:17
**violate** [1] - 58:8
**violated** [9] - 56:5, 58:23, 59:16, 61:22, 62:13, 63:3, 63:18,

67:9, 80:9
**violating** [4] - 56:16, 57:24, 59:17, 78:20
**VOLUME** [1] - 1:13
**Vs** [1] - 1:5
**VSIP** [1] - 8:25

## W

**WA** [1] - 96:18
**wait** [2] - 4:4, 73:25
**waited** [1] - 73:25
**walk** [2] - 60:13, 77:21
**walked** [4] - 49:14, 62:5, 78:24, 93:14
**walks** [1] - 59:25
**wall** [1] - 90:16
**WASHINGTON** [2] - 1:1, 96:3
**Washington** [3] - 96:5, 96:13, 96:17
**week** [3] - 6:1, 10:19, 54:1
**weekend** [3] - 87:16, 95:14, 95:17
**weeks** [2] - 32:3, 53:25
**well-performing** [1] - 92:10
**Werner** [4] - 19:8, 19:9, 19:14, 24:4
**whatsoever** [2] - 61:17, 92:3
**WHEREOF** [1] - 96:12
**whispered** [1] - 58:13
**White** [1] - 30:19
**whole** [3] - 5:14, 21:14, 42:17
**wife** [1] - 60:21
**wife's** [1] - 61:20
**Winnowing** [1] - 2:5
**Wisconsin** [2] - 7:2, 7:3
**wish** [2] - 87:15, 95:13
**witness** [7] - 3:1, 15:11, 16:12, 68:13, 74:6, 96:6, 96:8
**WITNESS** [1] - 96:12
**witnesses** [1] - 76:23
**Wolff** [8] - 57:2, 71:1, 71:3, 71:5, 72:4, 72:12, 72:21, 79:24
**woman** [1] - 72:24
**women** [2] - 61:11, 61:13
**wondering** [2] - 83:23, 85:23
**word** [3] - 44:15, 58:11, 90:19
**words** [15] - 5:25,

20:14, 31:10, 31:16, 31:17, 46:6, 46:14, 49:7, 73:3, 75:11, 80:2, 80:4, 85:7, 92:22, 93:8
**workplace** [3] - 45:8, 54:11, 55:4
**works** [2] - 33:6, 66:13
**worries** [1] - 79:11
**worse** [1] - 13:4
**write** [3] - 77:15, 79:18, 80:25
**writing** [1] - 90:8
**written** [9] - 24:3, 57:15, 69:14, 71:7, 79:15, 79:17, 79:18, 82:5
**wrote** [3] - 44:21, 77:18, 77:25

## Y

**year** [26] - 8:24, 10:17, 10:18, 10:19, 10:21, 10:22, 10:23, 10:25, 12:2, 12:3, 18:17, 19:6, 19:23, 23:24, 24:11, 24:13, 24:14, 31:5, 31:6, 31:7, 33:25, 50:25, 51:3, 51:24, 52:13
**years** [14] - 7:15, 7:18, 10:20, 21:15, 21:16, 25:5, 35:10, 50:22, 55:1, 67:9, 69:17, 71:21, 78:13, 90:5
**yesterday** [1] - 86:19
**yourself** [6] - 3:9, 9:22, 45:13, 45:19, 77:3, 95:1

## Z

**Zoya** [5] - 1:24, 15:10, 16:11, 95:15, 96:17